

JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

               Plaintiff,

         -against-

JPMORGAN CHASE & CO.; JPMORGAN
CHASE BANK, N.A.; J.P. MORGAN
MORTGAGE ACQUISITION
CORPORATION; J.P. MORGAN
SECURITIES LLC (f/k/a J.P. MORGAN
SECURITIES INC.); J.P. MORGAN
ACCEPTANCE CORPORATION I; EMC
MORTGAGE LLC (f/k/a EMC MORTGAGE
CORPORATION); BEAR STEARNS & CO.,
INC.; STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC.; BEAR STEARNS
ASSET BACKED SECURITIES I LLC;
WAMU ASSET ACCEPTANCE
CORPORATION; WAMU CAPITAL
CORPORATION; WASHINGTON
MUTUAL MORTGAGE SECURITIES
CORPORATION; LONG BEACH
SECURITIES CORPORATION;
CITIGROUP GLOBAL MARKETS, INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
GOLDMAN, SACHS & CO.; RBS
SECURITIES, INC.; DAVID M. DUZYK;
LOUIS SCHIOPPO, JR.; CHRISTINE E.
COLE; EDWIN F. MCMICHAEL; WILLIAM
A. KING; BRIAN BERNARD; MATTHEW
E. PERKINS; JOSEPH T. JURKOWSKI, JR.;
SAMUEL L. MOLINARO, JR.; THOMAS F.
MARANO; KIM LUTTHANS; KATHERINE
GARNIEWSKI; JEFFREY MAYER;
JEFFREY L. VERSCHLEISER; MICHAEL
B. NIERENBERG; RICHARD CAREAGA;
DAVID BECK; DIANE NOVAK; THOMAS

11 CIV 6188

___ CIV. ___ (___)

**COMPLAINT**

**JURY TRIAL DEMANDED**



GREEN; ROLLAND JURGENS; THOMAS
G. LEHMANN; STEPHEN FORTUNATO;
DONALD WILHELM; MICHAEL J. KULA;
CRAIG S. DAVIS; MARC K. MALONE;
MICHAEL L. PARKER; MEGAN M.
DAVIDSON; DAVID H. ZIELKE; THOMAS
W. CASEY; JOHN F. ROBINSON; KEITH
JOHNSON; SUZANNE KRAHLING;
LARRY BREITBARTH; MARANGAL I.
DOMINGO; TROY A. GOTSCHALL; ART
DEN HEYER; AND STEPHEN LOBO

Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................................................2

PARTIES ........................................................................................................................12

    *The Plaintiffs and the GSEs* .............................................................................12

    *The JPMorgan Entities* ....................................................................................13

    *The WaMu Entities* ..........................................................................................19

    *The Long Beach Entities* ..................................................................................23

    *The Other Underwriter Defendants* .................................................................27

    *The Non-Party Originators* ..............................................................................29

JURISDICTION AND VENUE ......................................................................................29

FACTUAL ALLEGATIONS ..........................................................................................30

I.    The Securitizations................................................................................................30

    A.    Residential Mortgage-Backed Securitizations In General......................30

    B.    The Securitizations At Issue In This Case ...........................................32

    C.    The Securitization Process..................................................................37

        1.    J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, and Long Beach Mortgage Transfer The Mortgage Loans To Special Purpose Trusts..................................................................37

        2.    The Trusts Issue Securities Backed by the Loans.....................40

II.    The Defendants' Participation in the Securitization Process...............................48

    A.    The Role of Each of the JPMorgan Defendants....................................48

        1.    J.P. Morgan Acquisition ...........................................................49

        2.    J.P. Morgan Acceptance ...........................................................49

        3.    J.P. Morgan Securities ..............................................................50

        4.    JPMorgan Chase and JPMorgan Bank......................................50

i

|   |   |   |   |
|---|---|---|---|
|   | 5. | The JPMorgan Individual Defendants | 51 |
| B. |   | The Role of Each of the Bear Stearns Entities | 53 |
|   | 1. | EMC | 54 |
|   | 2. | SAMI and BSABS | 55 |
|   | 3. | BSC and J.P. Morgan Securities as Successor to BSC | 56 |
|   | 4. | JPMorgan Chase as Successor to BSI | 56 |
|   | 5. | The Bear Stearns Individual Defendants | 57 |
| C. |   | The Role of Each of the WaMu Entities | 60 |
|   | 1. | JPMorgan Bank as Successor to WaMu Bank | 61 |
|   | 2. | WaMu Securities | 62 |
|   | 3. | WaMu Acceptance | 64 |
|   | 4. | WaMu Capital | 64 |
|   | 5. | The WaMu Individual Defendants | 65 |
| D. |   | The Role of Each of the Long Beach Entities | 68 |
|   | 1. | JPMorgan Bank as Successor to WaMu Bank and Long Beach Mortgage | 69 |
|   | 2. | Long Beach Securities | 71 |
|   | 3. | The Long Beach Individual Defendants | 71 |
| E. |   | The Other Underwriter Defendants | 74 |
| F. |   | Defendants' Failure To Conduct Proper Due Diligence | 75 |
|   | 1. | The JPMorgan Defendants | 77 |
|   | 2. | The Bear Stearns Entities | 80 |
|   | 3. | The WaMu Entities | 81 |
|   | 4. | The Long Beach Entities | 86 |
| G. |   | Liability of JPMorgan Chase and JPMorgan Bank as Successors in Interest | 90 |

1.      Liability of the JPMorgan Defendants as Successors in Interest to the Bear Stearns Entities ................................................................90

2.      Liability of the JPMorgan Defendants as Successors in Interest to the WaMu and Long Beach Entities ...........................................92

III.    The Registration Statements and the Prospectus  Supplements...........................................98

A.      Compliance With Underwriting Guidelines .........................................................98

1.      JPMorgan's Statements Regarding Compliance With Underwriting Guidelines ...................................................................98

2.      Bear Stearns's Statements Regarding Compliance With Underwriting Guidelines.................................................................101

3.      WaMu's Statements Regarding Compliance With Underwriting Guidelines .................................................................103

4.      Long Beach's Statements Regarding Compliance With Underwriting Guidelines.................................................................105

5.      Statements Regarding Representations Made by the Originator and Seller ....................................................................................108

B.      Statements Regarding Occupancy Status of Borrower .......................................109

C.      Statements Regarding Loan to Value Ratios ......................................................114

D.      Statements Regarding Credit Ratings ................................................................119

IV.     Falsity Of Statements in the Registration Statements and Prospectus  Supplements......122

A.      The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False...................................122

1.      Owner Occupancy Data Was Materially False .......................................122

2.      Loan-to-Value Data Was Materially False ..............................................128

B.      The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines ......................................................134

1.      Government Investigations and Private Actions Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines .......135

2.       The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ................................................................ 142

3.       The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ................................... 146

V.       Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach Knew Their Representations Were False ....................................................................... 150

A.       JPMorgan, Bear Stearns, WaMu, and Long Beach Had Actual Knowledge From Their Due Diligence That They Were Securitizing Defective Loans ........ 150

B.       JPMorgan Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors .................. 156

C.       Bear Stearns Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors .................. 160

D.       WaMu and Long Beach Knew Their Representations Were False And Were Willing to Capitalize On Their Unique Knowledge At The Expense of Investors ........................................................................................... 169

VI.      The GSEs Justifiably Relied on the Representations of JPMorgan, Bear Stearns, WaMu, and Long Beach .......................................................... 184

VII.     Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages ......................................................................... 186

FIRST CAUSE OF ACTION ......................................................................... 192

Violation of Section 11 of the Securities Act of 1933 .................................. 192

SECOND CAUSE OF ACTION ..................................................................... 200

Violation of Section 12(a)(2) of the Securities Act of 1933 ......................... 200

THIRD CAUSE OF ACTION ......................................................................... 205

Violation of Section 15 of the Securities Act of 1933 .................................. 205

FOURTH CAUSE OF ACTION ..................................................................... 218

Violation of Section 13.1-522(A)(ii) of the Virginia Code .......................... 218

FIFTH CAUSE OF ACTION .......................................................................... 223

Violation of Section 13.1-522(C) of the Virginia Code ............................... 223

SIXTH CAUSE OF ACTION ......................................................................................236

Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code.............................236

SEVENTH CAUSE OF ACTION ..............................................................................241

Violation of Section 31-5606.05(c) of the District of Columbia Code.....................................241

EIGHTH CAUSE OF ACTION ..................................................................................254

Common Law Negligent Misrepresentation ...........................................................254

NINTH CAUSE OF ACTION......................................................................................259

Common Law Fraud ................................................................................................259

TENTH CAUSE OF ACTION .....................................................................................263

Aiding and Abetting Fraud ......................................................................................263

ELEVENTH CAUSE OF ACTION .............................................................................267

Successor and Vicarious Liability ..........................................................................267

PRAYER FOR RELIEF ..............................................................................................268

JURY TRIAL DEMANDED .......................................................................................269

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against JPMorgan Chase & Co. ("JPMorgan Chase"); JPMorgan Chase Bank, N.A. ("JPMorgan Bank"); J.P. Morgan Mortgage Acquisition Corporation ("J.P. Morgan Acquisition"); J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.) ("J.P. Morgan Securities"); J.P. Morgan Acceptance Corporation I  ("J.P. Morgan Acceptance") (collectively, the "JPMorgan Defendants"); Bear Stearns & Co. Inc. ("BSC"); EMC Mortgage LLC (f/k/a EMC Mortgage Corporation) ("EMC"); Structured Asset Mortgage Investments II Inc. ("SAMI"); Bear Stearns Asset Backed Securities LLC  ("BSABS") (collectively, the "Bear Stearns Defendants"); WaMu Asset Acceptance Corporation ("WaMu Acceptance"); WaMu Capital Corporation ("WaMu Capital"); Washington Mutual Mortgage Securities Corporation ("WaMu Securities") (collectively, the "WaMu Defendants"); Long Beach Securities Corporation ("Long Beach Securities"); Citigroup Global Markets, Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman, Sachs & Co. ("Goldman Sachs"), and RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc. ("RBS Greenwich") (collectively, the "Other Underwriter Defendants"); David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, Edwin F. McMichael, William A. King, Brian Bernard, Matthew E. Perkins, Joseph T. Jurkowski, Jr., Samuel L. Molinaro, Jr., Thomas F. Marano, Kim Lutthans, Katherine Garniewski, Jeffrey Mayer, Jeffrey L. Verschleiser, Michael B. Nierenberg, Richard Careaga, David Beck, Diane Novak, Thomas Green, Rolland Jurgens, Thomas G. Lehmann, Stephen Fortunato, Donald Wilhelm, Michael J. Kula, Craig S. Davis, Marc K. Malone, Michael L. Parker, Megan M. Davidson, David H. Zielke, Thomas W. Casey, John F. Robinson, Keith

Johnson, Suzanne Krahling, Larry Breitbarth, Marangal I. Domingo, Troy A. Gotschall, Art Den Heyer, and Stephen Lobo (the "Individual Defendants") (together with the JPMorgan Defendants, the Bear Stearns Defendants, the WaMu Defendants, Long Beach Securities, and the Other Underwriter Defendants, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans.  These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes negligent misrepresentation, common law fraud, and aiding and abetting fraud.

2.      Between September 7, 2005 and September 19, 2007, Fannie Mae and Freddie Mac purchased over $33 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 103 securitizations sponsored by J.P. Morgan Acquisition, EMC, Washington Mutual Bank ("WaMu Bank"), WaMu Securities, and Long Beach Mortgage Company ("Long Beach Mortgage") and/or underwritten by J.P. Morgan

Securities, BSC, and WaMu Capital.[1]  The GSE Certificates purchased by Fannie Mae and

Freddie Mac, along with date and amount of purchases, are listed below in Tables 11 and 12.

The 103 securitizations at issue (collectively, the "Securitizations") are listed in Table 1:

**Table 1**

| Full Name | Abbreviation |
|---|---|
| Aegis Asset Backed Securities Trust Mortgage Pass-Through Certificates, Series 2005-5 | AABST 2005-5 |
| American Home Mortgage Investment Trust 2005-1, Mortgage-Backed Notes, Series 2005-1 | AHM 2005-1 |
| American Home Mortgage Investment Trust 2005-4, Mortgage-Backed Grantor Trust Certificates, Series 2005-4 | AHM 2005-4 |
| Argent Securities Trust 2006-M2, Asset-Backed Pass-Through Certificates, Series 2006-M2 | ARSI 2006-M2 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2005-10 | BALTA 2005-10 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-1 | BALTA 2006-1 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-2 | BALTA 2006-2 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-3 | BALTA 2006-3 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-4 | BALTA 2006-4 |
| Bear Stearns Asset Backed Securities I Trust 2005-HE12, Asset-Backed Certificates, Series 2005-HE12 | BSABS 2005-HE12 |
| Bear Stearns Asset Backed Securities I Trust 2006-AQ1, Asset-Backed Certificates, Series 2006-AQ1 | BSABS 2006-AQ1 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE2, Asset-Backed Certificates, Series 2006-HE2 | BSABS 2006-HE2 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE4, Asset-Backed Certificates, Series 2006-HE4 | BSABS 2006-HE4 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE5, Asset-Backed Certificates, Series 2006-HE5 | BSABS 2006-HE5 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE7, Asset-Backed Certificates, Series 2006-HE7 | BSABS 2006-HE7 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE8, Asset-Backed Certificates, Series 2006-HE8 | BSABS 2006-HE8 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE9, Asset-Backed Certificates, Series 2006-HE9 | BSABS 2006-HE9 |

[1]   For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

| Full Name | Abbreviation |
|---|---|
| Bear Stearns Asset Backed Securities I Trust 2006-HE10, Asset-Backed Certificates, Series 2006-HE10 | BSABS 2006-HE10 |
| Bear Stearns Asset Backed Securities I Trust 2007-FS1, Asset-Backed Certificates, Series 2007-FS1 | BSABS 2007-FS1 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE1, Asset-Backed Certificates, Series 2007-HE1 | BSABS 2007-HE1 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE2, Asset-Backed Certificates, Series 2007-HE2 | BSABS 2007-HE2 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE3, Asset-Backed Certificates, Series 2007-HE3 | BSABS 2007-HE3 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE4, Asset-Backed Certificates, Series 2007-HE4 | BSABS 2007-HE4 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE5, Asset-Backed Certificates, Series 2007-HE5 | BSABS 2007-HE5 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE6, Asset-Backed Certificates, Series 2007-HE6 | BSABS 2007-HE6 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE7, Asset-Backed Certificates, Series 2007-HE7 | BSABS 2007-HE7 |
| Bear Stearns Mortgage Funding Trust 2006-SL5, Mortgage-Backed Certificates, Series 2006-SL5 | BSMF 2006-SL5 |
| Bear Stearns Mortgage Funding Trust 2006-SL6, Mortgage-Backed Certificates, Series 2006-SL6 | BSMF 2006-SL6 |
| Bear Stearns Mortgage Funding Trust 2007-AR3, Mortgage Pass-Through Certificates, Series 2007-AR3 | BSMF 2007-AR3 |
| Bear Stearns Mortgage Funding Trust 2007-SL1, Mortgage-Backed Certificates, Series 2007-SL1 | BSMF 2007-SL1 |
| Bear Stearns Mortgage Funding Trust 2007-SL2,Mortgage-Backed Certificates, Series 2007-SL2 | BSMF 2007-SL2 |
| C-BASS 2006-CB2 Trust, C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB2 | CBASS 2006-CB2 |
| C-BASS 2006-CB7 Trust, C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB7 | CBASS 2006-CB7 |
| GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5 | GPMF 2005-AR5 |
| GreenPoint Mortgage Funding Trust 2006-AR3, Mortgage Pass-Through Certificates, Series 2006-AR3 | GPMF 2006-AR3 |
| J.P. Morgan Alternative Loan Trust 2005-A2, Mortgage Pass-Through Certificates, Series 2005-A2 | JPALT 2005-A2 |
| J.P. Morgan Alternative Loan Trust 2007-A2, Mortgage Pass-Through Certificates, Series 2007-A2 | JPALT 2007-A2 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-FRE1, Asset-Backed Pass-Through Certificates, Series 2005-FRE1 | JPMAC 2005-FRE1 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-OPT2, Asset-Backed Pass-Through Certificates, Series 2005-OPT2 | JPMAC 2005-OPT2 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-WMC1, Asset-Backed Pass-Through Certificates, Series 2005-WMC1 | JPMAC 2005-WMC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1, Asset-Backed Pass-Through Certificates, Series 2006-ACC1 | JPMAC 2006-ACC1 |

| Full Name | Abbreviation |
|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-CH1, Asset-Backed Pass-Through Certificates, Series 2006-CH1 | JPMAC 2006-CH1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2, Asset-Backed Pass-Through Certificates, Series 2006-CH2 | JPMAC 2006-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CW1, Asset-Backed Pass-Through Certificates, Series 2006-CW1 | JPMAC 2006-CW1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CW2, Asset-Backed Pass-Through Certificates, Series 2006-CW2 | JPMAC 2006-CW2 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-FRE1, Asset-Backed Pass-Through Certificates, Series 2006-FRE1 | JPMAC 2006-FRE1 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-FRE2, Asset-Backed Pass-Through Certificates, Series 2006-FRE2 | JPMAC 2006-FRE2 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1, Asset-Backed Pass-Through Certificates, Series 2006-HE1 | JPMAC 2006-HE1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2, Asset-Backed Pass Through Certificates, Series 2006-HE2 | JPMAC 2006-HE2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE3, Asset-Backed Pass Through Certificates, Series 2006-HE3 | JPMAC 2006-HE3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1, Asset-Backed Pass Through Certificates, Series 2006-NC1 | JPMAC 2006-NC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset-Backed Pass Through Certificates, Series 2006-NC2 | JPMAC 2006-NC2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1, Asset-Backed Pass Through Certificates, Series 2006-RM1 | JPMAC 2006-RM1 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-WMC1, Asset-Backed Pass-Through Certificates, Series 2006-WMC1 | JPMAC 2006-WMC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2, Asset-Backed Pass Through Certificates, Series 2006-WMC2 | JPMAC 2006-WMC2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3, Asset-Backed Pass Through Certificates, Series 2006-WMC3 | JPMAC 2006-WMC3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Asset-Backed Pass Through Certificates, Series 2006-WMC4 | JPMAC 2006-WMC4 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2, Asset-Backed Pass Through Certificates, Series 2007-CH2 | JPMAC 2007-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3, Asset-Backed Pass Through Certificates, Series 2007-CH3 | JPMAC 2007-CH3 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4, Asset-Backed Pass Through Certificates, Series 2007-CH4 | JPMAC 2007-CH4 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5, Asset-Backed Pass Through Certificates, Series 2007-CH5 | JPMAC 2007-CH5 |
| J.P. Morgan Mortgage Trust 2006-A3, Mortgage Pass-Through Certificates, Series 2006-A3 | JPMMT 2006-A3 |
| Long Beach Mortgage Loan Trust 2005-3, Asset-Backed Certificates, Series 2005-3 | LBMLT 2005-3 |
| Long Beach Mortgage Loan Trust 2006-1, Asset-Backed Certificates, Series 2006-1 | LBMLT 2006-1 |
| Long Beach Mortgage Loan Trust 2006-2, Asset-Backed Certificates, Series 2006-2 | LBMLT 2006-2 |

| Full Name | Abbreviation |
|---|---|
| Long Beach Mortgage Loan Trust 2006-3, Asset-Backed Certificates, Series 2006-3 | LBMLT 2006-3 |
| Long Beach Mortgage Loan Trust 2006-4, Asset-Backed Certificates, Series 2006-4 | LBMLT 2006-4 |
| Long Beach Mortgage Loan Trust 2006-5, Asset-Backed Certificates, Series 2006-5 | LBMLT 2006-5 |
| Long Beach Mortgage Loan Trust 2006-6, Asset-Backed Certificates, Series 2006-6 | LBMLT 2006-6 |
| Long Beach Mortgage Loan Trust 2006-7, Asset-Backed Certificates, Series 2006-7 | LBMLT 2006-7 |
| Long Beach Mortgage Loan Trust 2006-8, Asset-Backed Certificates, Series 2006-8 | LBMLT 2006-8 |
| Long Beach Mortgage Loan Trust 2006-9, Asset-Backed Certificates, Series 2006-9 | LBMLT 2006-9 |
| Long Beach Mortgage Loan Trust 2006-10, Asset-Backed Certificates, Series 2006-10 | LBMLT 2006-10 |
| Long Beach Mortgage Loan Trust 2006-11, Asset-Backed Certificates, Series 2006-11 | LBMLT 2006-11 |
| Long Beach Mortgage Loan Trust 2006-WL1, Asset-Backed Certificates, Series 2006-WL1 | LBMLT 2006-WL1 |
| Long Beach Mortgage Loan Trust 2006-WL2, Asset-Backed Certificates, Series 2006-WL2 | LBMLT 2006-WL2 |
| Long Beach Mortgage Loan Trust 2006-WL3, Asset-Backed Certificates, Series 2006-WL3 | LBMLT 2006-WL3 |
| Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 | LUM 2006-3 |
| Newcastle Mortgage Securities Trust 2007-1, Asset-Backed Notes, Series 2007-1 | NCMT 2007-1 |
| People's Choice Home Loan Securities Trust Series 2005-4, Mortgage-Backed Notes Series 2005-4 | PCHLT 2005-4 |
| SACO I Trust 2007-1, Mortgage-Backed Certificates, Series 2007-1 | SACO 2007-1 |
| SACO I Trust 2007-2, Mortgage-Backed Certificates, Series 2007-2 | SACO 2007-2 |
| Structured Asset Mortgage Investments II Trust 2006-AR4, Mortgage Pass-Through Certificates, Series 2006-AR4 | SAMI 2006-AR4 |
| WaMu Mortgage Pass-Through Certificates Series 2007-OA3 Trust, WaMu Mortgage Pass-Through Certificates, Series 2007-OA3 | WAMU 2007-OA3 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE1 Trust | WMABS 2006-HE1 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE3 Trust | WMABS 2006-HE3 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE4 Trust | WMABS 2006-HE4 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 Trust | WMABS 2006-HE5 |
| Washington Mutual Asset-Backed Certificates, WMABS Series 2007-HE1 Trust | WMABS 2007-HE1 |

| Full Name | Abbreviation |
|---|---|
| Washington Mutual Asset-Backed Certificates WMABS Series 2007-HE2 Trust | WMABS 2007-HE2 |
| Washington Mutual  Mortgage Pass-Through Certificates, WMALT Series 2005-9 Trust | WMALT 2005-9 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-10 Trust | WMALT 2005-10 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Trust | WMALT 2006-AR4 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust | WMALT 2006-AR5 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust | WMALT 2006-AR8 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006- AR9 Trust | WMALT 2006-AR9 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 Trust | WMALT 2007-OA1 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007- OA2 Trust | WMALT 2007-OA2 |
| Washington Mutual Mortgage Pass- Through Certificates, WMALT Series 2007-OA3 Trust | WMALT 2007-OA3 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE1 Trust | WMHE 2007-HE1 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust | WMHE 2007-HE2 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | WMHE 2007-HE3 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust | WMHE 2007-HE4 |

3.      The Certificates were offered for sale pursuant to one of 19 shelf registration

statements (the "Registration Statements") filed with the Securities and Exchange Commission

(the "SEC").  Defendants J.P. Morgan Acceptance, BSABS, SAMI, WaMu Securities, WaMu

Acceptance, and Long Beach Securities filed 13 Shelf Registration Statements that pertained to

97 of the Securitizations at issue in this action.  The Individual Defendants signed one or more of

those 13 Shelf Registration Statements, and the amendments thereto.  Aegis Asset Backed

Securities Corp., American Home Mortgage Securities LLC, Argent Securities Inc., Bond

Securitization, LLC, and People's Choice Home Loan Securities Corp. filed the six remaining

Shelf Registration Statements.  With respect to all but four of the Securitizations, J.P. Morgan

Securities, BSC, or WaMu Capital was the lead underwriter, and, with respect to all but seven of

the Securitizations, J.P. Morgan Securities, BSC, or WaMu Capital was the underwriter who sold the Certificates to the GSEs.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization.[2]  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the origination and underwriting practices used to make and approve the loans.  Such statements were material to a reasonable investor's decision to invest in mortgage-backed securities by purchasing the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and had materially poorer credit quality than was represented in the Registration Statements.

6.      The Registration Statements also contained statistical summaries of the collateral groups and entire portfolio of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors.  However, a loan level analysis of a sample of loans for each Securitization – a review that encompassed thousands of mortgages across all of the Securitizations – has revealed that these statistics were false and omitted material facts due to

---

[2]  The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

widespread falsification of occupancy status, property values, and other key characteristics of the mortgage loans.

7.      For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of the Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan level analysis reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans and the actual ability of the individual mortgage holders to satisfy their debts.

8.      Defendants J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich (which lead underwrote and then sold the GSE Certificates to the GSEs); and Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities (which acted as the depositors in 97 of the Securitizations); and the Individual Defendants (who signed the Registration Statements with respect to 97 of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

9.      Defendants J.P. Morgan Acquisition, JPMorgan Bank, and JPMorgan Chase are likewise responsible for the misstatements and omissions of material fact contained in the

Registration Statements by virtue of their direction and control over Defendants J.P. Morgan Acceptance and J.P. Morgan Securities.

10.     J.P. Morgan Acceptance was a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC and JPMorgan Chase.  J.P. Morgan Securities was likewise a wholly-owned subsidiary of JPMorgan Chase.

11.     J.P. Morgan Acquisition and JPMorgan Chase directly participated in and exercised dominion and control over the business operations of Defendant J.P. Morgan Acceptance.  JPMorgan Chase directly participated in and exercised dominion and control over the business operations of Defendant J.P. Morgan Securities.

12.     Defendants EMC, J.P. Morgan Securities, and JPMorgan Chase (as successor to non-party The Bear Stearns Companies, Inc. ("BSI")), are likewise responsible, either directly or as successors-in-interest, for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants SAMI, BSABS, and BSC.  J.P. Morgan Securities is the successor-in-interest to BSC and JPMorgan Chase is the successor-in-interest to BSI.

13.     SAMI and BSABS were wholly-owned subsidiaries of BSI, which was acquired by JPMorgan Chase, making SAMI and BSABS wholly-owned subsidiaries of JPMorgan Chase.  BSC was likewise a wholly-owned subsidiary of BSI, which was acquired by JPMorgan Chase, making BSC a wholly-owned subsidiary of JPMorgan Chase.  BSC also merged into J.P. Morgan Securities, a wholly-owned subsidiary of JPMorgan Chase.

14.     EMC and BSI directly participated in and exercised dominion and control over the business operations of Defendants SAMI and BSABS.  BSI directly participated in and exercised dominion and control over the business operations of Defendant BSC.  JPMorgan

10

Chase is the successor-in-interest to BSI as a result of the acquisition of BSI by JPMorgan

Chase, and J.P. Morgan Securities is the successor-in-interest to BSC as a result of a merger

between BSC and J.P. Morgan Securities.

15.      Non-party WaMu Bank and Defendant JPMorgan Bank are likewise responsible,

either directly or as successor-in-interest, for the misstatements and omissions of material fact

contained in the Registration Statements by virtue of their direction and control over Defendants

WaMu Securities, WaMu Acceptance, and WaMu Capital.  JPMorgan Bank is the successor-in-

interest to WaMu Bank.

16.      WaMu Securities and WaMu Acceptance were wholly-owned subsidiaries of

WaMu Bank, the assets, subsidiaries, and liabilities of which were acquired by JPMorgan Bank,

making WaMu Securities and WaMu Acceptance wholly-owned subsidiaries of JPMorgan Bank.

WaMu Capital was likewise a wholly-owned subsidiary of WaMu Bank, the assets, subsidiaries,

and liabilities of which were acquired by JPMorgan Bank, making WaMu Capital a wholly-

owned subsidiary of JPMorgan Bank.

17.      WaMu Bank directly participated in and exercised dominion and control over the

business operations of Defendants WaMu Securities and WaMu Acceptance.  WaMu Bank

directly participated in and exercised dominion and control over the business operations of

Defendant WaMu Capital.  JPMorgan Bank is the successor-in-interest to WaMu Bank as a

result of the acquisition of WaMu Bank's assets, subsidiaries, and liabilities by JPMorgan Bank.

18.      Non-parties WaMu Bank and Long Beach Mortgage and Defendant JPMorgan

Bank are likewise responsible, either directly or as successor-in-interest, for the misstatements

and omissions of material fact contained in the Registration Statements by virtue of their

11

direction and control over Defendant Long Beach Securities.  JPMorgan Bank is the successor-in-interest to WaMu Bank and Long Beach Mortgage.

19.     Long Beach Securities was a wholly-owned subsidiary of WaMu Bank, the assets, subsidiaries, and liabilities of which were acquired by JPMorgan Bank, making Long Beach Securities a wholly-owned subsidiary of JPMorgan Bank.

20.     WaMu Bank and Long Beach Mortgage directly participated in and exercised dominion and control over the business operations of Defendant Long Beach Securities. JPMorgan Bank is the successor-in-interest to WaMu Bank and Long Beach Mortgage as a result of the acquisition of WaMu Bank's assets, subsidiaries, and liabilities by JPMorgan Bank.

21.     Fannie Mae and Freddie Mac purchased over $33 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material fact concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

22.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for negligent misrepresentation, common law fraud, and aiding and abetting fraud.

## PARTIES

### The Plaintiffs and the GSEs

23.     The Federal Housing Finance Agency is a federal agency located at 1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing

12

and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008)

(codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan

Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and

Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA

has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the

authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12

U.S.C. § 4617(b)(2).

> 24.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by

Congress with a mission to provide liquidity, stability and affordability to the United States

housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in

residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW

in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### *The JPMorgan Entities*

> 25.     Defendant JPMorgan Chase is a Delaware financial holding company with its

principal place of business in New York, New York.  JPMorgan Chase is a global financial

services firm and one of the largest banking institutions in the United States.  JPMorgan Chase is

the sole owner of Defendants JPMorgan Bank and J.P. Morgan Securities and is the ultimate

owner of Defendants J.P. Morgan Acquisition and J.P. Morgan Acceptance.  JPMorgan Chase is

also the successor-in-interest to BSI.

> 26.     Defendant JPMorgan Bank is a national banking association, a wholly-owned

bank subsidiary of JPMorgan Chase, a Delaware corporation, and the sole owner of J.P. Morgan

Acquisition.  Its main office is located in Columbus, Ohio.  JPMorgan Bank is a commercial

bank that is chartered, and its business is subject to examination and regulation by, the Office of

the Comptroller of Currency ("OCC").  It is a member of the Federal Reserve System and its

deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").  JPMorgan Bank is also the successor-in-interest to Washington Mutual Bank.

27.     Defendant J.P. Morgan Securities is a Delaware corporation with its principal place of business at 277 Park Avenue, New York, New York 10017.  J.P. Morgan Securities was formerly known as J.P. Morgan Securities, Inc.  On or about September 1, 2010, JP Morgan Securities Inc. was converted into a limited liability company, namely, J.P. Morgan Securities, LLC.  J.P. Morgan Securities, a SEC-registered broker-dealer, engages in investment banking activities in the United States and is the primary nonbank subsidiary of JPMorgan Chase.  J.P. Morgan Securities was the lead underwriter for 30 of the Securitizations, and was intimately involved in the offerings.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 30 of the 103 Securitizations from J.P. Morgan Securities in its capacity as underwriter of the Securitizations.

28.     Defendant J.P. Morgan Acquisition is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Acquisition is a direct, wholly-owned subsidiary of JPMorgan Bank.  J.P. Morgan Acquisition was the sponsor of 27 of the Securitizations.

29.     Defendant J.P. Morgan Acceptance is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Acceptance is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC which, in turn, is a direct, wholly-owned subsidiary of JPMorgan Chase.  J.P. Morgan Acceptance was the depositor for 27 of the Securitizations.  J.P. Morgan Acceptance, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

30.     JPMorgan Chase, JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan

Securities, and J.P. Morgan Acceptance are collectively referred to herein as "JPMorgan."  An

organizational chart of JPMorgan is set forth below.  An organizational chart of the JPMorgan

Defendants is set forth below.



31.     Defendant David M. Duzyk served as President of J.P. Morgan Acceptance at the

time of the Securitizations and signed certain of the Shelf Registration Statements and the

amendments thereto and did so in New York.

32.     Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of

J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf

Registration Statements and the amendments thereto and did so in New York.

15

33.     Defendant Christine E. Cole served as a Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

34.     Defendant Edwin F. McMichael served as a Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

35.     Defendant William A. King served as President and Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

36.     Defendant Brian Bernard served as President of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

### *The Bear Stearns Entities*

37.     Non-party BSI was, at all relevant times, a holding company that provided investment banking, securities, and derivative trading services to its clients through its broker-dealer and banking subsidiaries.  BSI was the sole owner, at the time of the Securitizations, of BSC, EMC, SAMI, and BSABS.  On March 16, 2008, BSI entered into an Agreement and Plan of Merger (the "Merger") with JPMorgan Chase to merge with Bear Stearns Merger Corporation ("BSMC"), a wholly-owned subsidiary of JPMorgan Chase, making BSI a wholly-owned subsidiary of JPMorgan Chase.  Therefore, this action is brought against JPMorgan Chase as the successor to BSI.  BSI is not a defendant in this action.

38.     Defendant BSC was, at all relevant times, an SEC-registered broker-dealer with its principal place of business at 383 Madison Avenue, New York, New York 10179.  BSC was a wholly-owned subsidiary of BSI.  BSC directed the activities of its affiliates EMC, SAMI, and

16

BSABS.  BSC was the lead underwriter for 38 of the Securitizations, and was intimately

involved in the offerings.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 37 of

the 103 Securitizations from BSC in its capacity as underwriter of the Securitizations.  On or

about October 1, 2008, following the Merger effective May 30, 2008, BSC merged with a

subsidiary of JPMorgan Chase, Defendant J.P. Morgan Securities, and is now doing business as

J.P. Morgan Securities.  All allegations against BSC are thus made against its successor-in-

interest, J.P. Morgan Securities, as well.

39.     Defendant EMC is incorporated in the State of Delaware and was, at all relevant

times, a wholly-owned subsidiary of BSI.  EMC was formerly known as EMC Mortgage

Corporation.  On or about March 31, 2011, it was concerted to a limited liability company and

became known as EMC Mortgage LLC.  EMC was organized for the purpose of acquiring,

holding, servicing, and securitizing mortgage loans and mortgage securities.  EMC was the

sponsor of 32 of the Securitizations.  As a result of the Merger between BSI and JPMorgan

Chase, EMC became a wholly-owned subsidiary of JPMorgan Chase.

40.     Defendant SAMI was, at all relevant times, a Delaware corporation with its

principal place of business at 383 Madison Avenue, New York, New York 10179.  SAMI was a

wholly-owned subsidiary of BSI.  SAMI was the depositor for nine of the Securitizations.

SAMI, as depositor, was also responsible for preparing and filing reports required under the

Securities Exchange Act of 1934.  As a result of the Merger between BSI and JPMorgan Chase,

SAMI became a wholly-owned subsidiary of JPMorgan Chase.

41.     Defendant BSABS was, at all relevant times, a Delaware limited liability

company with its principal place of business at 383 Madison Avenue, New York, New York

10179.  BSABS was a wholly-owned subsidiary of BSI.  BSABS was the depositor for 26 of the

17

Securitizations.  BSABS, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.   As a result of the Merger between BSI and JPMorgan Chase, BSABS became a wholly-owned subsidiary of JPMorgan Chase.

42.    BSC, EMC, SAMI, BSABS, J.P. Morgan Securities (as successor-in-interest to BSC), and JPMorgan Chase (as successor-in-interest to BSI), are collectively referred to herein as "Bear Stearns."  An organizational chart of Bear Stearns is set forth below.



43.    Defendant Matthew E. Perkins served as President and Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

44.    Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

18

45.     Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

46.     Defendant Thomas F. Marano served as a Director of BSABS and as a Director of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

47.     Defendant Kim Lutthans served as an Independent Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

48.     Defendant Katherine Garniewski served as an Independent Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

49.     Defendant Jeffrey Mayer served as a Director of BSABS and as a Director of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

50.     Defendant Jeffrey L. Verschleiser served as President of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

51.     Defendant Michael B. Nierenberg served as Treasurer of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

### The WaMu Entities

52.     At all relevant times, WaMu Bank was a federal savings (or thrift) association that provided financial services to consumer and commercial clients.  WaMu Bank was the sole

19

owner, at the time of the Securitizations, of WaMu Capital, WaMu Acceptance, and WaMu Securities.  WaMu Bank was also the sponsor or co-sponsor of 12 of the Securitizations.  On September 25, 2008, JPMorgan Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPMorgan Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including WaMu Capital, WaMu Acceptance, and WaMu Securities.  Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank.  WaMu Bank is not a defendant in this action.

53.     Defendant WaMu Capital was, at all relevant times, an SEC-registered broker-dealer principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WaMu Capital was a wholly-owned subsidiary of WaMu Bank.  WaMu Capital was the lead underwriter for 31 of the Securitizations, and was intimately involved in the offerings.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 29 of the 103 Securitizations from WaMu Capital in its capacity as underwriter of the Securitizations.  WaMu Capital is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

54.     Defendant WaMu Acceptance was, at all relevant times, a wholly-owned subsidiary of WaMu Bank and was principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WaMu Acceptance was the depositor for 18 of the Securitizations.  WaMu Acceptance, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.  WaMu Acceptance is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

55.     Defendant WaMu Securities is a Delaware corporation and was, at all relevant times, a wholly-owned, special-purpose subsidiary of WaMu Bank with its principal offices located in Vernon Hills, Illinois.  WaMu Securities was the sponsor of 15 of the Securitizations.  WaMu Securities was also the depositor for two of the Securitizations.  WaMu Securities, as depositor, was responsible for preparing and filing reports required under the Securities Exchange Act of 1934.  WaMu Securities is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

56.     WaMu Capital, WaMu Acceptance, WaMu Securities, and JPMorgan Bank (as successor-in-interest to WaMu Bank) are collectively referred to herein as "WaMu."  An organizational chart of WaMu is set forth below.



57.     Defendant Richard Careaga served as First Vice President of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

58.     Defendant David Beck served as President and Director of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

59.     Defendant Diane Novak served as a Director of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

60.     Defendant Thomas Green served as Chief Financial Officer of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

61.     Defendant Rolland Jurgens served as Controller of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

62.     Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

63.     Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

64.     Defendant Donald Wilhelm served as Controller of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

65.     Defendant Michael J. Kula served as Senior Vice President, Chief Financial Officer, and Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

66.     Defendant Craig S. Davis served as Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

67.     Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

68.     Defendant Michael L. Parker served as President and Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

69.     Defendant Megan M. Davidson served as Senior Vice President and Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

70.     Defendant Marangal I. Domingo served as a Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

### The Long Beach Entities

71.     At all relevant times, WaMu Bank was a federal savings (or thrift) association that provided financial services to consumer and commercial clients.  WaMu Bank was the sole

23

owner, at the time of the Securitizations, of Long Beach Mortgage and Long Beach Securities. On September 25, 2008, JPMorgan Bank entered into the PAA with the FDIC, under which JPMorgan Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase all of WaMu Bank's assets, including Long Beach Mortgage and Long Beach Securities. Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank. WaMu Bank is not a defendant in this action.

72.     Long Beach Mortgage was one of the largest subprime originators in the country. Long Beach Mortgage was acquired by Washington Mutual, Inc. ("WMI") in 1999. At all relevant times, WMI was a savings and loan holding company incorporated in Washington State, subject to regulation by the Office of Thrift Supervision ("OTS"), and was the parent company of WaMu Bank. From December 2000 to March 2006, Long Beach Mortgage operated as a subsidiary of WMI. In March 2006, Long Beach Mortgage became a wholly-owned subsidiary of WaMu Bank. From March 2006 to July 2006, Long Beach Mortgage operated as a subsidiary of WaMu Bank and was WaMu Bank's primary subprime originator. In July 2006, Long Beach Mortgage was wholly integrated into its parent company and became a division of WaMu Bank, operating as its "Specialty Wholesale Lending" channel. Long Beach Mortgage was the sponsor for nine of the Securitizations. WaMu Bank shut down Long Beach Mortgage in 2007. The liabilities associated with Long Beach Mortgage's securitization activities were assumed by JPMorgan Bank, successor-in-interest to WaMu Bank and Long Beach Mortgage. Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank and Long Beach Mortgage. WMI, WaMu Bank, and Long Beach Mortgage are not defendants in this action.

73.     Defendant Long Beach Securities is a Delaware corporation and was, at all relevant times, a wholly-owned subsidiary of WaMu Bank with a principal place of business at

1100 Town & Country Road, Orange, California 92868.  Long Beach Securities was the

depositor for 15 of the Securitizations.  Long Beach Securities, as depositor, was also responsible

for preparing and filing reports required under the Securities Exchange Act of 1934.  Long Beach

Securities is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of

JPMorgan Bank, successor-in-interest to WaMu Bank.

     74.    Long Beach Securities and JPMorgan Bank (as successor to WaMu Bank and

Long Beach Mortgage) are collectively referred to herein as the "Long Beach."  An

organizational chart of Long Beach is set forth below.



75.     Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank at the time of the Securitizations and signed certain of the amendments to the Shelf Registration Statements.

76.     Defendant Thomas W. Casey served as a Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

77.     Defendant John F. Robinson served as a Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

78.     Defendant Keith Johnson served as President and Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

79.     Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

80.     Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

81.     Defendant Craig S. Davis served as President and Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

82.     Defendant Marangal I. Domingo served as Chief Executive Officer and Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

83.     Defendant Troy A. Gotschall served as Chief Operations Officer and Executive Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

84.     Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

85.     Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

86.     Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

87.     Defendant Rolland Jurgens served as Controller of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

88.     No recovery is sought in this action against any bankrupt entity or any entity in receivership.

### The Other Underwriter Defendants

89.     Defendant CitiGroup Global Markets, Inc., formerly known as Salomon Smith Barney or Smith Barney, is a New York corporation with its principal place of business at 388 Greenwich St. in New York, New York.  Citigroup is a registered broker-dealer with the SEC,

and is a wholly owned subsidiary of Citigroup, Inc.  Citigroup served as the selling underwriter for the LUM 2006-3 Securitization and was intimately involved in the offering and sale of the LUM 2006-3 Certificates to Fannie Mae.

90.     Defendant Credit Suisse Securities (USA) LLC is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.  Credit Suisse served as the selling underwriter for the LBMLT 2006-1 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-1 Certificates to Fannie Mae and Freddie Mac.

91.     Defendant Goldman, Sachs & Co. is incorporated in New York and has its principal executive offices at 200 West Street in New York, New York.  Goldman Sachs is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and is its principal U.S. broker-dealer.  Goldman Sachs served as the selling underwriter for the LBMLT 2006-WL1 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-WL1 Certificates to Fannie Mae and Freddie Mac.

92.     Defendant RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc. was founded in 1981 and acquired by RBS Group in 2000.  RBS Greenwich is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the largest underwriters of mortgage and other asset-backed securities in the United States.  RBS Greenwich served as the selling underwriter for the LBMLT 2006-2 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-WL1 Certificates to Freddie Mac.

*The Non-Party Originators*

93.     In addition, many of the loans underlying the Certificates were acquired by the sponsor for each Securitization from unaffiliated non-party mortgage originators.[3]  The unaffiliated originators principally responsible for the loans underlying the Certificates include WMC Mortgage Corp. ("WMC"); Fremont Investment & Loan ("Fremont"); Countrywide Home Loans, Inc. ("Countrywide"); and GreenPoint Mortgage Funding, Inc. ("GreenPoint"), among others.

94.     The Certificates were issued by a trust established by the depositor.  The issuing trusts for each Securitization are listed in paragraph 2.

## JURISDICTION AND VENUE

95.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

96.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C.  §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

97.     This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction

---

[3]    J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, and Long Beach Mortgage were the sponsors for 94 of the Securitizations.  The remaining nine Securitizations were sponsored by non-parties.  In particular, Aegis Mortgage Corporation; American Home Mortgage Acceptance, Inc.; Newcastle Investment Corporation; Luminent Mortgage Capital, Inc.; People's Choice Funding, Inc.; Credit-Based Asset Servicing and Securitization LLC; and Ameriquest Mortgage Company each sponsored one or more of those nine Securitizations.

under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claims of

negligent misrepresentation, fraud, and aiding and abetting fraud, pursuant to this Court's

supplemental jurisdiction under 28 U.S.C. § 1367(a).

98.    Venue is proper in this district pursuant to Section 22 of the Securities Act of

1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Several of the Defendants are principally

located in this district, several of the Individual Defendants reside in this district, and many of

the acts and transactions alleged herein, including the preparation and dissemination of the

Registration Statements occurred in substantial part within this District.  Defendants are also

subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I.    The Securitizations

### A.    Residential Mortgage-Backed Securitizations In General

99.    Asset-backed securitization distributes risk by pooling cash-producing financial

assets and issuing securities backed by those pools of assets.  In residential mortgage-backed

securitizations, the cash-producing financial assets are residential mortgage loans.

100.    The most common form of securitization of mortgage loans involves a sponsor or

seller – the entity that acquires or originates the mortgage loans and initiates the securitization –

and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of

mortgage loans.  The trust is established pursuant to a pooling and servicing agreement entered

into by, among others, the "depositor" for that securitization.  In many instances, the transfer of

assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to

an intermediate entity, often a limited purpose entity created by the sponsor . . .  and commonly

called a depositor, and then the depositor will transfer the assets to the [trust] for the particular

asset-backed transactions." Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

101.    Residential mortgage-backed securities are backed by the underlying mortgage loans. Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups of mortgage loans. For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group. Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans. Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

102.    Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC. These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates. Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

103.    A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee. The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance. The servicer is required to report key information about the loans to the trustee. The trustee (or trust

administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

### B.    The Securitizations At Issue In This Case

104.    This case involves the 103 Securitizations listed in paragraph 2 above.  JPMorgan served as the lead underwriter for 30 of the Securitizations; in 27 of the Securitizations, JPMorgan also served as sponsor and, in 27 of the Securitizations, JPMorgan was also the depositor and therefore the issuer and offeror of the Certificates.  Bear Stearns served as the lead underwriter for 38 of the Securitizations; in 32 of the Securitizations, Bear Stearns also served as sponsor and, in 35 of the Securitizations, Bear Stearns was also the depositor and therefore the issuer and offeror of the Certificates.  WaMu served as the lead underwriter for 31 of the Securitizations; in 35 of the Securitizations, WaMu or Long Beach also served as sponsor and, in 35 of the Securitizations, WaMu or Long Beach was also the depositor and therefore the issuer and offeror of the Certificates.  The GSE Certificates correlate to 127 tranches[4] of the 103 Securitizations.[5]  For each of the 103 Securitizations, Table 2 identifies the: (1) the sponsor; (2) the depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches purchased by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE Certificate for that Securitization (referred to as the "Supporting Loan Groups").

---

[4]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

[5]   For example, the GSEs purchased Certificates issued pursuant to both the A1A and A1B tranches of the JPMAC 2006-RM1 Securitization.

**Table 2**

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Aegis Mortgage Corp. | Aegis Asset Backed Securities Corp. | BSC | $500,000,000 | 10/28/2005 | Pool 2 |
| AHM 2005-1 | VIA | American Home Mortgage Acceptance, Inc. | American Home Mortgage Securities LLC | BSC | $337,000,000 | 4/25/2006 | Group VI |
| AHM 2005-4 | IVA | American Home Mortgage Acceptance, Inc. | BSABS | BSC | $556,435,000 | 10/7/2005 | Group IV |
| ARSI 2006-M2 | A1 | Ameriquest Mortgage Company | Argent Securities Inc. | J.P. Morgan Securities (co-lead with Citigroup) | $717,382,000 | 8/29/2006 | Group I |
| BALTA 2005-10 | II2A1 | EMC | SAMI | BSC | $407,783,000 | 12/30/2005 | Group II-2 |
| BALTA 2005-10 | II3A1 | EMC | SAMI | BSC | $569,686,000 | 12/30/2005 | Group II-3 |
| BALTA 2006-1 | III1A1 | EMC | BSABS | BSC | $300,000,000 | 1/31/2006 | Group II-1 |
| BALTA 2006-2 | II2A1 | EMC | SAMI | BSC | $431,361,000 | 3/31/2006 | Group II-2 |
| BALTA 2006-3 | III1A1 | EMC | SAMI | BSC | $276,267,000 | 4/28/2006 | Group II-1 |
| BALTA 2006-4 | I2A1 | EMC | SAMI | BSC | $807,809,000 | 6/30/2006 | Group I-2 |
| BALTA 2006-4 | III1A1 | EMC | SAMI | BSC | $132,532,000 | 6/30/2006 | Group III-1 |
| BSABS 2005-HE12 | IIA | EMC | BSABS | BSC | $302,737,000 | 12/30/2005 | Group II |
| BSABS 2006-AQ1 | I2A | EMC | BSABS | BSC | $192,142,000 | 11/30/2006 | Group I-2 |
| BSABS 2006-HE2 | IIA | EMC | BSABS | BSC | $241,697,000 | 2/28/2006 | Group II |
| BSABS 2006-HE4 | IIA | EMC | BSABS | BSC | $264,889,000 | 4/28/2006 | Group II |
| BSABS 2006-HE5 | IIA | EMC | BSABS | BSC | $162,020,000 | 5/30/2006 | Group II |
| BSABS 2006-HE7 | II2A | EMC | BSABS | BSC | $100,275,000 | 8/30/2006 | Group II-2 |
| BSABS 2006-HE8 | II2A | EMC | BSABS | BSC | $51,306,000 | 10/30/2006 | Group II-2 |
| BSABS 2006-HE9 | IIA | EMC | BSABS | BSC | $218,304,000 | 11/30/2006 | Group II |
| BSABS 2006-HE9 | IIIA | EMC | BSABS | BSC | $236,045,000 | 11/30/2006 | Group III |
| BSABS 2006-HE10 | II2A | EMC | BSABS | BSC | $201,892,000 | 12/29/2006 | Group II-2 |
| BSABS 2006-HE10 | II3A | EMC | BSABS | BSC | $132,221,000 | 12/29/2006 | Group II-3 |
| BSABS 2007-FS1 | IIA | EMC | BSABS | BSC | $70,635,000 | 2/28/2006 | Group II |
| BSABS 2007-HE1 | II2A | EMC | BSABS | BSC | $118,512,000 | 1/30/2007 | Group II-2 |
| BSABS 2007-HE1 | II3A | EMC | BSABS | BSC | $92,100,000 | 1/30/2007 | Group II-3 |
| BSABS 2007-HE2 | II2A | EMC | BSABS | BSC | $75,162,000 | 2/28/2007 | Group II-2 |
| BSABS 2007-HE2 | II3A | EMC | BSABS | BSC | $77,349,000 | 2/28/2007 | Group II-3 |
| BSABS 2007-HE3 | IIA | EMC | BSABS | BSC | $131,715,000 | 3/30/2007 | Group II |
| BSABS 2007-HE3 | IIIA | EMC | BSABS | BSC | $90,354,000 | 3/30/2007 | Group III |
| BSABS 2007-HE4 | IIA | EMC | BSABS | BSC | $210,625,000 | 4/30/2007 | Group II |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| BSABS 2007-HE5 | IIA | EMC | BSABS | BSC | $99,922,000 | 5/30/2007 | Group II |
| BSABS 2007-HE5 | IIIA | EMC | BSABS | BSC | $122,752,000 | 5/30/2007 | Group III |
| BSABS 2007-HE6 | IIA | EMC | BSABS | BSC | $291,210,000 | 8/30/2007 | Group II |
| BSABS 2007-HE7 | IIA1 | EMC | BSABS | BSC | $137,892,000 | 9/19/2007 | Group II |
| BSABS 2007-HE7 | IIIA1 | EMC | BSABS | BSC | $69,504,000 | 9/19/2007 | Group III |
| BSMF 2006-SL5 | IIA | EMC | BSABS | BSC | $23,706,000 | 11/30/2006 | Group II |
| BSMF 2006-SL6 | IIA | EMC | BSABS | BSC | $20,279,000 | 12/29/2006 | Group II |
| BSMF 2007-AR3 | II2A1 | EMC | SAMI | BSC | $241,679,000 | 3/30/2007 | Group II-2 |
| BSMF 2007-SL1 | IIA | EMC | BSABS | BSC | $24,050,000 | 1/30/2007 | Group II |
| BSMF 2007-SL2 | IIA | EMC | BSABS | BSC | $21,671,000 | 2/28/2007 | Group II |
| CBASS 2006-CB2 | AV | Credit-Based Asset Servicing and Securitization LLC | Bond Securitization, LLC | J.P. Morgan Securities | $347,712,000 | 2/28/2006 | Group 1 |
| CBASS 2006-CB7 | A1 | Credit-Based Asset Servicing and Securitization LLC | Bond Securitization, LLC | J.P. Morgan Securities | $385,237,000 | 10/5/2006 | Group I |
| GPMF 2005-AR5 | IIA1 | EMC | SAMI | BSC | $470,923,000 | 10/31/2005 | Group II |
| GPMF 2006-AR3 | IIA1 | EMC | SAMI | BSC | $492,223,000 | 4/28/2006 | Group II |
| GPMF 2006-AR3 | IIA2 | EMC | SAMI | BSC | $259,690,000 | 4/28/2006 | Group II |
| JPALT 2005-A2 | 2A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $68,406,000 | 12/29/2005 | Pool 2 |
| JPALT 2007-A2 | 11A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $369,061,000 | 5/31/2007 | Pool 1A |
| JPMAC 2005-FRE1 | AI | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $274,516,000 | 11/29/2005 | Group I |
| JPMAC 2005-OPT2 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $311,578,000 | 12/21/2005 | Group 1 |
| JPMAC 2005-WMC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $404,000,000 | 10/27/2005 | Group 1 |
| JPMAC 2006-ACC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $266,700,000 | 6/2/2006 | Group 1 |
| JPMAC 2006-CH1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $149,925,000 | 11/14/2006 | Group 1 |
| JPMAC 2006-CH2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $900,296,000 | 12/14/2006 | Group 2-A |
| JPMAC 2006-CW1 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $213,081,000 | 5/31/2006 | Group 1 |
| JPMAC 2006-CW2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $410,588,000 | 8/8/2006 | Group 2 |
| JPMAC 2006-FRE1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $279,696,000 | 1/27/2006 | Group 1 |
| JPMAC 2006-FRE2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $267,476,000 | 3/29/2006 | Group 1 |
| JPMAC 2006-HE1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $166,827,000 | 2/28/2006 | Group 1 |
| JPMAC 2006-HE2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $171,430,000 | 6/30/2006 | Group 1 |

34

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| JPMAC 2006-HE3 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $189,800,000 | 11/10/2006 | Group 1 |
| JPMAC 2006-NC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $345,251,000 | 4/27/2006 | Group 1 |
| JPMAC 2006-NC2 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $223,083,000 | 8/23/2006 | Group 1 |
| JPMAC 2006-RM1 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $230,853,000 | 9/27/2006 | Group 1 |
| JPMAC 2006-RM1 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $57,713,000 | 9/27/2006 | Group 1 |
| JPMAC 2006-WMC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $161,500,000 | 3/30/2006 | Group 1 |
| JPMAC 2006-WMC2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $324,255,000 | 6/28/2006 | Group 1 |
| JPMAC 2006-WMC3 | A1SS | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $175,270,000 | 9/14/2006 | Group 1 |
| JPMAC 2006-WMC3 | A1MZ | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $43,817,000 | 9/14/2006 | Group 1 |
| JPMAC 2006-WMC4 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $376,675,000 | 12/20/2006 | Group 1 |
| JPMAC 2006-WMC4 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $41,853,000 | 12/20/2006 | Group 1 |
| JPMAC 2007-CH2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $234,600,000 | 3/15/2007 | Group 2-A |
| JPMAC 2007-CH3 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $374,118,000 | 5/15/2007 | Group 1 |
| JPMAC 2007-CH3 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $41,569,000 | 5/15/2007 | Group 1 |
| JPMAC 2007-CH4 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $435,000,000 | 6/15/2007 | Group 1 |
| JPMAC 2007-CH5 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $304,336,000 | 7/12/2007 | Group 1 |
| JPMMT 2006-A3 | 1A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $174,568,800 | 7/12/2007 | Pool 1 |
| LBMLT 2005-3 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with Lehman Brothers Inc.) | $604,830,000 | 9/7/2005 | Group I |
| LBMLT 2006-1 | IA | Long Beach Mortgage | Long Beach Securities | Credit Suisse | $870,736,000 | 2/7/2006 | Group I |
| LBMLT 2006-2 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with RBS Greenwich) | $1,101,891,000 | 3/7/2006 | Group I |
| LBMLT 2006-3 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital | $513,901,000 | 4/6/2006 | Group I |
| LBMLT 2006-4 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with Lehman Brothers Inc.) | $787,668,000 | 5/9/2006 | Group I |
| LBMLT 2006-5 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital | $631,423,000 | 6/15/2006 | Group I |
| LBMLT 2006-6 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $415,891,000 | 7/26/2006 | Group I |
| LBMLT 2006-7 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $360,139,000 | 8/30/2006 | Group I |
| LBMLT 2006-8 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $366,091,000 | 9/21/2006 | Group I |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| LBMLT 2006-9 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $420,396,000 | 10/12/2006 | Group I |
| LBMLT 2006-10 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $288,380,000 | 11/9/2006 | Group I |
| LBMLT 2006-11 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $408,047,000 | 12/14/2006 | Group I |
| LBMLT 2006-WL1 | IA1 | Long Beach Mortgage | Long Beach Securities | Goldman Sachs | $284,678,000 | 2/8/2006 | Group I |
| LBMLT 2006-WL1 | IA2 | Long Beach Mortgage | Long Beach Securities | Goldman Sachs | $256,210,000 | 2/8/2006 | Group I |
| LBMLT 2006-WL2 | IA | Long Beach Mortgage | Long Beach Securities | Lehman Brothers Inc. | $462,263,000 | 10/12/2006 | Group I |
| LBMLT 2006-WL3 | IA | Long Beach Mortgage | Long Beach Securities | Lehman Brothers Inc. | $440,218,000 | 1/30/2006 | Group I |
| LUM 2006-3 | II2A1 | Luminent Mortgage Capital, Inc. | SAMI | BSC | $147,795,000 | 4/28/2006 | Group II-2 |
| NCMT 2007-1 | 1A1 | Newcastle Investment Corp. | BSABS | BSC | $370,224,000 | 7/12/2007 | Group 1 |
| PCHLT 2005-4 | 2A1 | People's Choice Funding, Inc. | People's Choice Home Loan Securities Corp. | BSC | $433,582,000 | 10/26/2005 | Group 2 |
| SACO 2007-1 | IIA | EMC | BSABS | BSC | $50,429,000 | 1/16/2007 | Group II |
| SACO 2007-2 | IIA | EMC | BSABS | BSC | $20,226,000 | 2/28/2007 | Group II |
| SAMI 2006-AR4 | IA1 | EMC | SAMI | BSC | $316,180,000 | 6/30/2006 | Group I |
| WAMU 2007-OA3 | 1A | WaMu Bank | WaMu Acceptance | WaMu Capital | $140,139,000 | 3/27/2007 | Group 1 |
| WMABS 2006-HE1 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $53,578,000 | 4/20/2006 | Group 1 |
| WMABS 2006-HE3 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $175,828,000 | 9/27/2006 | Group I |
| WMABS 2006-HE4 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $117,798,000 | 10/27/2006 | Group I |
| WMABS 2006-HE5 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $269,063,000 | 12/7/2006 | Group I |
| WMABS 2007-HE1 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $115,217,000 | 1/16/2007 | Group I |
| WMABS 2007-HE2 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $286,276,000 | 3/13/2007 | Group I |
| WMALT 2005-9 | 1CB | WaMu Securities | WaMu Securities | WaMu Capital | $69,400,400 | 10/31/2005 | Group 1 |
| WMALT 2005-10 | 1CB | WaMu Securities | WaMu Securities | WaMu Capital | $62,532,200 | 11/30/2005 | Group 1 |
| WMALT 2006-AR4 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $76,071,000 | 5/30/2006 | Group 1 |
| WMALT 2006-AR4 | 2A | WaMu Securities | WaMu Acceptance | WaMu Capital | $69,518,000 | 5/30/2006 | Group 2 |
| WMALT 2006-AR4 | 3A | WaMu Securities | WaMu Acceptance | WaMu Capital | $251,313,000 | 5/30/2006 | Group 3 |
| WMALT 2006-AR5 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $74,766,000 | 6/28/2006 | Group 1 |
| WMALT 2006-AR5 | 2A | WaMu Securities | WaMu Acceptance | WaMu Capital | $57,966,000 | 6/28/2006 | Group 2 |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| WMALT 2006-AR8 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $211,150,000 | 9/28/2006 | Group 1 |
| WMALT 2006-AR9 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $270,142,000 | 10/26/2006 | Group 1 |
| WMALT 2007-OA1 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $255,047,000 | 1/26/2007 | Group 1 |
| WMALT 2007-OA2 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $222,967,000 | 2/26/2007 | Group 1 |
| WMALT 2007-OA3 | 1A | WaMu Securities & WaMu Bank | WaMu Acceptance | WaMu Capital | $230,966,000 | 3/28/2007 | Group 1 |
| WMALT 2007-OA3 | 3A | WaMu Securities & WaMu Bank | WaMu Acceptance | WaMu Capital | $195,998,000 | 3/28/2007 | Group 3 |
| WMHE 2007-HE1 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $368,226,000 | 1/16/2007 | Group I |
| WMHE 2007-HE2 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $491,550,000 | 4/10/2007 | Group I |
| WMHE 2007-HE3 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $372,475,000 | 5/10/2007 | Group I |
| WMHE 2007-HE4 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $249,921,000 | 6/13/2007 | Group I |

## C.    The Securitization Process

### 1.    J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, and Long Beach Mortgage Transfer The Mortgage Loans To Special Purpose Trusts

105.    As the sponsor for 27 of the 103 Securitizations (the "JPMorgan Securitizations"), J.P. Morgan Acquisition purchased the mortgage loans underlying the Certificates for those 27 Securitizations after they were originated, either directly from the originators or through affiliates of the originators.

106.    As the sponsor for 32 of the 103 Securitizations (the "Bear Stearns Securitizations"), EMC purchased the mortgage loans underlying the Certificates for those 32 Securitizations after they were originated, either directly from the originators or through affiliates of the originators.

107.    As the sponsors or co-sponsors for 26 of the 103 Securitizations (the "WaMu Securitizations"), WaMu Bank and WaMu Securities purchased the mortgage loans underlying

the Certificates for those 26 Securitizations after they were originated, either directly from the originators or through affiliates of the originators.

108.    As the sponsor for nine of the 103 Securitizations (the "Long Beach Securitizations"), Long Beach Mortgage purchased the mortgage loans underlying the Certificates for those nine Securitizations after they were originated, either directly from the originators or through affiliates of the originators.

109.    Non-party sponsors Aegis Mortgage Corporation, American Home Mortgage Acceptance, Inc., Newcastle Investment Corporation, Luminent Mortgage Capital, Inc., People's Choice Funding, Inc., Credit-Based Asset Servicing and Securitization LLC, and Ameriquest Mortgage Company were each a sponsor of one or more of the remaining nine Securitizations. The sponsor for each Securitization is included above in Table 2.

110.    J.P. Morgan Acquisition then sold the mortgage loans for the 27 Securitizations that it sponsored to the depositor, J.P. Morgan Acceptance, which is a JPMorgan-affiliated entity. EMC then sold the mortgage loans for the 32 Securitizations that it sponsored to one of two depositors, SAMI and BSABS, both of which are Bear Stearns-affiliated entities.  WaMu Bank then sold the mortgage loans for the 12 Securitizations that it sponsored or co-sponsored to one of two depositors, WaMu Acceptance or Long Beach Securities, one of which is a WaMu-affiliated entity and one of which is a Long Beach-affiliated entity.  WaMu Securities then sold the mortgage loans for 13 of the 15 Securitizations that it sponsored or co-sponsored to WaMu Acceptance, which is a WaMu-affiliated entity.  WaMu Securities itself acted as the depositor for the remaining two Securitizations that it sponsored.  Long Beach Mortgage then sold the mortgage loans for the nine Securitizations that it sponsored to the depositor, Long Beach Securities, which is a Long Beach-affiliated entity.

38

111.    With respect to three of the remaining nine Securitizations, non-parties American Home Mortgage Acceptance, Inc. and Newcastle Investment Corp. sold the mortgage loans to Defendant BSABS for the AHM 2005-4 and NCMT 2007-1 Securitizations, respectively, and Luminent Mortgage Capital, Inc. sold the mortgage loans to Defendant SAMI for the LUM 2006-3 Securitization.  With respect to the remaining six Securitizations, non-party sponsors sold the mortgage loans to non-party depositors, as reflected above in Table 2; Defendant J.P. Morgan Securities was the lead or co-lead underwriter and selling underwriter for the ARSI 2006-M2, CBASS 2006-CB2, and CBASS 2006-CB7 Securitizations; Defendant BSC was the lead or co-lead underwriter and selling underwriter for the AABST 2005-5, AHM 2005-1, and PCHLT 2005-4 Securitizations.

112.    Both J.P. Morgan Acquisition (sponsor) and J.P. Morgan Acceptance (depositor) were controlled by their ultimate parent, JPMorgan Chase.  Both EMC (sponsor) and SAMI and BSABS (depositors) were controlled by their ultimate parent, BSI.  Both WaMu Securities (sponsor and depositor) and WaMu Acceptance (depositor) were controlled by their ultimate parent, WaMu Bank, who also was a sponsor.  Both Long Beach Mortgage (sponsor) and Long Beach Securities (depositor) were controlled by their ultimate parent, WaMu Bank, who also was a sponsor.  The sole purpose of the depositor, and the common law trusts created through this process, was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

113.    The transfer of the mortgage loans to the trust was generally effected by means of either a Pooling and Servicing Agreement or other agreement of substantially similar effect[6] (a

---

[6]  In AHM 2005-1 and AHM 2005-4, the trustee executed a Trust Agreement; in JPMAC 2006-CW1, the trustee executed a Pooling Agreement; and in PCHLT 2005-4, the trustee executed a Sale and Servicing Agreement.

"PSA") executed among the depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

## 2.    The Trusts Issue Securities Backed by the Loans

114.    Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the cash flow from the assets held by the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group.  The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

115.    The Certificates were issued pursuant to one of 19 Shelf Registration Statements filed with the SEC on Form S-3.  The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC.  The depositor affiliates of JPMorgan, Bear Stearns, WaMu, and Long Beach collectively filed 13 of the 19 Shelf Registration Statements.  Each Individual Defendant signed one or more of the 13 Shelf Registration Statements or amendments thereto which were filed by the depositor affiliates of JPMorgan, Bear Stearns, WaMu, and Long Beach.  The SEC filing number, registrants, signatories and filing dates for the 19 Shelf Registration Statements and amendments thereto, as well as the Certificates covered by the Shelf Registration Statements, are reflected in Table 3 below.

40

**Table 3**

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-141607 | 3/27/2007 | 4/23/2007 | J.P. Morgan Acceptance | JPMAC 2007-CH4, JPMAC 2007-CH3, JPMAC 2007-CH5 | Brian Bernard<br>Louis Schioppo, Jr.<br>Christine E. Cole<br>David M. Duzyk<br>William A. King<br>Edwin F. McMichael | Brian Bernard<br>Louis Schioppo, Jr.<br>Christine E. Cole<br>David M. Duzyk<br>William A. King<br>Edwin F. McMichael |
| 333-141255 | 3/13/2007 | 4/9/2007 | WaMu Acceptance | WMHE 2007-HE4, WMHE 2007-HE3 | Thomas G. Lehmann<br>David Beck<br>Diane Novak<br>Stephen Fortunato<br>Donald Wilhelm | Thomas G. Lehmann<br>David Beck<br>Diane Novak<br>Stephen Fortunato<br>Donald Wilhelm |
| 333-140247 | 1/26/2007 | 2/23/2007, 2/09/2007 | SAMI | BSMF 2007-AR3 | Jeffrey L. Verschleiser<br>Michael B. Nierenberg<br>Jeffrey Mayer<br>Thomas F. Marano | Jeffrey L. Verschleiser<br>Michael B. Nierenberg<br>Jeffrey Mayer<br>Thomas F. Marano |
| 333-130192 | 12/7/2005 | 8/2/2006, 4/3/2006, 3/13/2006 | J.P. Morgan Acceptance | JPALT 2007-A2, JPMMT 2006-A3, JPMAC 2006-CW1, JPMAC 2006-ACC1, JPMAC 2006-WMC2, JPMAC 2006-CW2, JPMAC 2006-NC2, JPMAC 2006-WMC3, JPMAC 2006-RM1, JPMAC 2006-CH2, JPMAC 2006-CH1, JPMAC 2006-HE3, JPMAC 2006-WMC4, JPMAC 2006-HE2, JPMAC 2006-NC1, JPMAC 2007-CH2 | David M. Duzyk<br>Louis Schioppo, Jr.<br>Christine E. Cole<br>Edwin F. McMichael | David M. Duzyk<br>Louis Schioppo, Jr.<br>Christine E. Cole<br>Edwin F. McMichael |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-131374 | 1/30/2006 | 3/31/2006, 3/28/2006, 3/27/2006, 3/6/2006, 3/3/2006 | BSABS | BSABS 2007-HE3, BSABS 2007-FS1, BSABS 2007-HE5, BSABS 2007-HE4, BSABS 2007-HE7, BSABS 2007-HE6, BSABS 2006-HE4, BSABS 2006-HE5, BSABS 2006-HE7, BSABS 2006-HE8, BSABS 2006-HE9, BSABS 2006-AQ1, BSABS 2006-HE10, BSABS 2007-HE1, BSABS 2007-HE2, BSMF 2006-SL6, BSMF 2006-SL5, BSMF 2007-SL1, BSMF 2007-SL2, NCMT 2007-1, SACO 2007-1, SACO 2007-2 | Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski | Joseph T. Jurkowski, Jr. Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski |
| 333-131252 | 1/24/2006 | 3/31/2006, 3/21/2006 | Long Beach Securities | LBMLT 2006-11, LBMLT 2006-4, LBMLT 2006-5, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-8, LBMLT 2006-9, LBMLT 2006-10 | Thomas W. Casey John F. Robinson Keith Johnson Suzanne Krahling Larry Breitbarth | Thomas W. Casey John F. Robinson Michael J. Giampaolo Stephen Fortunato Rolland Jurgens David H. Zielke |
| 333-132232 | 3/6/2006 | 3/10/2006 | SAMI | LUM 2006-3, SAMI 2006-AR4, BALTA 2006-2, BALTA 2006-3, BALTA 2006-4, GPMF 2006-AR3 | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano |
| 333-130795 | 12/30/2005 | 1/3/2006 | WaMu Acceptance | WMABS 2006-HE1, WMHE 2007-HE2, WMHE 2007-HE1, WAMU 2007-OA3, WMALT 2006-AR4, WMALT 2006-AR9, WMABS 2006-HE3, WMABS 2006-HE4, WMABS 2007-HE2, WMABS 2006-HE5, WMALT 2007-OA3, WMALT 2006-AR5, WMABS 2007-HE1, WMALT 2006-AR8, WMALT 2007-OA1, WMALT 2007-OA2 | Richard Careaga David Beck Diane Novak Thomas Green Rolland Jurgens | Richard Careaga David Beck Diane Novak Thomas Green Rolland Jurgens |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-127020 | 7/29/2005 | 8/15/2005 | J.P. Morgan Acceptance | JPMAC 2006-HE1, JPMAC 2006-FRE1, JPMAC 2006-FRE2, JPMAC 2006-WMC1, JPMAC 2005-WMC1, JPMAC 2005-FRE1, JPALT 2005-A2, JPMAC 2005-OPT2 | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole Edwin F. McMichael | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole William A. King Edwin F. McMichael |
| 333-125422 | 6/1/2005 | 6/14/2005 | BSABS | AHM 2005-4, BALTA 2006-1, BSABS 2006-HE2, BSABS 2005-HE12 | Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski | Joseph T. Jurkowski, Jr. Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski |
| 333-120916 | 12/1/2004 | 12/14/2004 | SAMI | GPMF 2005-AR5, BALTA 2005-10 | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano |
| 333-109318 | 9/30/2003 | 2/10/2004 | Long Beach Securities | LBMLT 2005-3, LBMLT 2006-WL1, LBMLT 2006-1, LBMLT 2006-WL2, LBMLT 2006-WL3, LBMLT 2006-2, LBMLT 2006-3 | Craig S. Davis Marangal I. Domingo Troy A. Gotschall Art Den Heyer Stephen Lobo | David H. Zielke Craig S. Davis Marangal I. Domingo Troy A. Gotschall Art Den Heyer Stephen Lobo |
| 333-103345 | 2/20/2003 | 3/7/2003 | WaMu Securities | WMALT 2005-9, WMALT 2005-10 | Michael J. Kula Craig S. Davis Marangal I. Domingo Marc K. Malone Michael L. Parker Thomas G. Lehmann Megan M. Davidson | Michael J. Kula Craig S. Davis Marangal I. Domingo Marc K. Malone Michael L. Parker Thomas G. Lehmann Megan M. Davidson |
| 333-124934 | 5/13/2005 | 5/31/2005 | Aegis Asset Backed Securities Corp. | AABST 2005-5 | D. Richard Thompson Pat Walden Orlando Figueroa | D. Richard Thompson Pat Walden Orlando Figueroa |
| 333-121581 | 12/31/2004 | Not applicable | American Home Mortgage Securities LLC | AHM 2005-1 | Michael Strauss Stephen Hozie Thomas McDonagh Alan Horn | Not applicable |
| 333-131895 | 2/16/2006 | 3/17/2006 | Argent Securities Inc. | ARSI 2006-M2 | Adam J. Bass John P. Grazer Andrew L. Stidd | Adam J. Bass John P. Grazer Andrew L. Stidd |
| 333-87146 | 4/29/2002 | 6/6/2002 | Bond Securitization, LLC | CBASS 2006-CB2 | James R. Pomposelli Christine E. Cole Dean Christianson Benjamin B. Abedine | James R. Pomposelli Christine E. Cole Dean Christianson Benjamin B. Abedine |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-136741 | 8/18/2006 | 9/18/2006 | Bond Securitization, LLC | CBASS 2006-CB7 | David M. Duzyk<br>Christian Greco<br>Benjamin B. Abedine<br>Christine E. Cole<br>Orlando Figueroa | David M. Duzyk<br>Christian Greco<br>Benjamin B. Abedine<br>Christine E. Cole<br>Orlando Figueroa |
| 333-125734 | 6/10/2005 | 6/22/2005 | People's Choice Home Loan Securities Corp. | PCHLT 2005-4 | Neil Kornswiet<br>Brad Plantiko | Neil Kornswiet<br>Brad Plantiko |

116.    The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in the collateral group and the entire securitization, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes, information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property, and information concerning whether the loans were delinquent.

117.    The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements.  The Forms 8-K attaching the PSAs for each Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 4 below.

**Table 4**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| AABST 2005-5 | 11/1/2005 | 11/10/2005 | 333-124934 |
| AHM 2005-1 | 4/3/2006 | 4/7/2005 | 333-121581 |
| AHM 2005-4 | 10/11/2005 | 10/24/2005 | 333-125422 |
| ARSI 2006-M2 | 8/29/2006 | 9/13/2006 | 333-131895 |
| BALTA 2005-10 | 12/29/2005 | 1/17/2006 | 333-120916 |
| BALTA 2006-1 | 2/1/2006 | 2/15/2006 | 333-125422 |
| BALTA 2006-2 | 3/30/2006 | 10/13/2006 | 333-132232 |
| BALTA 2006-3 | 5/2/2006 | 10/11/2006 | 333-132232 |
| BALTA 2006-4 | 7/18/2006 | 7/17/2006 | 333-132232 |
| BSABS 2005-HE12 | 12/27/2005 | 1/13/2006 | 333-125422 |
| BSABS 2006-AQ1 | 12/1/2006 | 12/19/2006 | 333-131374 |
| BSABS 2006-HE2 | 2/24/2006 | 3/15/2006 | 333-125422 |
| BSABS 2006-HE4 | 4/27/2006 | 5/15/2006 | 333-131374 |
| BSABS 2006-HE5 | 5/25/2006 | 6/15/2006 | 333-131374 |
| BSABS 2006-HE7 | 8/30/2006 | 9/25/2006 | 333-131374 |
| BSABS 2006-HE8 | 10/30/2006 | 11/14/2006 | 333-131374 |
| BSABS 2006-HE9 | 12/1/2006 | 12/20/2006 | 333-131374 |
| BSABS 2006-HE10 | 1/3/2007 | 1/17/2007 | 333-131374 |
| BSABS 2007-FS1 | 3/1/2007 | 3/27/2007 | 333-131374 |
| BSABS 2007-HE1 | 1/31/2007 | 2/15/2007 | 333-131374 |
| BSABS 2007-HE2 | 2/28/2007 | 3/15/2007 | 333-131374 |
| BSABS 2007-HE3 | 4/2/2007 | 4/20/2007 | 333-131374 |
| BSABS 2007-HE4 | 4/27/2007 | 5/24/2007 | 333-131374 |
| BSABS 2007-HE5 | 5/30/2007 | 6/15/2007 | 333-131374 |
| BSABS 2007-HE6 | 8/30/2007 | 9/19/2007 | 333-131374 |
| BSABS 2007-HE7 | 9/19/2007 | 10/5/2007 | 333-131374 |
| BSMF 2006-SL5 | 11/30/2006 | 12/20/2006 | 333-131374 |
| BSMF 2006-SL6 | 12/29/2006 | 1/17/2007 | 333-131374 |
| BSMF 2007-AR3 | 4/2/2007 | 4/16/2007 | 333-140247 |
| BSMF 2007-SL1 | 1/26/2007 | 2/20/2007 | 333-131374 |
| BSMF 2007-SL2 | 3/1/2007 | 8/7/2007 | 333-131374 |
| CBASS 2006-CB2 | 3/2/2006 | 3/16/2006 | 333-87146 |
| CBASS 2006-CB7 | 10/10/2006 | 10/20/2006 | 333-136741 |
| GPMF 2005-AR5 | 10/31/2005 | 11/15/2005 | 333-120916 |
| GPMF 2006-AR3 | 4/28/2006 | 5/15/2006 | 333-132232 |
| JPALT 2005-A2 | 12/28/2005 | 1/13/2006 | 333-127020 |

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| JPALT 2007-A2 | 6/1/2007 | 6/15/2007 | 333-130192 |
| JPMAC 2005-FRE1 | 11/29/2005 | 1/4/2006[7] | 333-127020 |
| JPMAC 2005-OPT2 | 12/22/2005 | 1/4/2006 | 333-127020 |
| JPMAC 2005-WMC1 | 10/25/2005 | 11/7/2005 | 333-127020 |
| JPMAC 2006-ACC1 | 6/5/2006 | 6/19/2006 | 333-130192 |
| JPMAC 2006-CH1 | 11/13/2006 | 11/29/2006 | 333-130192 |
| JPMAC 2006-CH2 | 12/13/2006 | 12/29/2006 | 333-130192 |
| JPMAC 2006-CW1 | 5/31/2006 | 6/15/2006 | 333-130192 |
| JPMAC 2006-CW2 | 8/9/2006 | 8/23/2006 | 333-130192 |
| JPMAC 2006-FRE1 | 1/27/2006 | 2/14/2006 | 333-127020 |
| JPMAC 2006-FRE2 | 3/30/2006 | 4/13/2006 | 333-127020 |
| JPMAC 2006-HE1 | 3/1/2006 | 3/10/2006 | 333-127020 |
| JPMAC 2006-HE2 | 6/30/2006 | 7/17/2006 | 333-130192 |
| JPMAC 2006-HE3 | 11/13/2006 | 11/27/2006 | 333-130192 |
| JPMAC 2006-NC1 | 4/17/2006 | 5/12/2006 | 333-130192 |
| JPMAC 2006-NC2 | 8/21/2006 | 9/7/2006 | 333-130192 |
| JPMAC 2006-RM1 | 9/28/2006 | 10/12/2006 | 333-130192 |
| JPMAC 2006-WMC1 | 3/31/2006 | 4/14/2006 | 333-127020 |
| JPMAC 2006-WMC2 | 6/22/2006 | 7/13/2006 | 333-130192 |
| JPMAC 2006-WMC3 | 9/13/2006 | 9/29/2006 | 333-130192 |
| JPMAC 2006-WMC4 | 12/20/2006 | 1/4/2007 | 333-130192 |
| JPMAC 2007-CH2 | 3/16/2007 | 4/3/2007 | 333-130192 |
| JPMAC 2007-CH3 | 5/11/2007 | 5/30/2007 | 333-141607 |
| JPMAC 2007-CH4 | 6/15/2007 | 7/2/2007 | 333-141607 |
| JPMAC 2007-CH5 | 7/10/2007 | 7/27/2007 | 333-141607 |
| JPMMT 2006-A3 | 4/28/2006 | 5/12/2006 | 333-130192 |
| LBMLT 2005-3 | 9/6/2005 | 9/22/2005 | 333-109318 |
| LBMLT 2006-1 | 2/2/2006 | 2/22/2006 | 333-109318 |
| LBMLT 2006-2 | 3/2/2006 | 3/22/2006 | 333-109318 |
| LBMLT 2006-3 | 4/5/2006 | 4/21/2006 | 333-109318 |
| LBMLT 2006-4 | 5/5/2006 | 5/24/2006 | 333-131252 |
| LBMLT 2006-5 | 6/14/2006 | 6/30/2006 | 333-131252 |
| LBMLT 2006-6 | 7/25/2006 | 8/8/2006 | 333-131252 |
| LBMLT 2006-7 | 8/28/2006 | 9/13/2006 | 333-131252 |
| LBMLT 2006-8 | 9/18/2006 | 10/6/2006 | 333-131252 |

[7] No PSA filed for the JPMAC 2005-FRE1 Securitization.  On this date, an 8-K referencing an existing PSA dated November 1, 2005 was filed with the SEC.

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| LBMLT 2006-9 | 10/10/2006 | 10/27/2006 | 333-131252 |
| LBMLT 2006-10 | 11/7/2006 | 11/22/2006 | 333-131252 |
| LBMLT 2006-11 | 12/13/2006 | 12/29/2006 | 333-131252 |
| LBMLT 2006-WL1 | 1/26/2006 | 2/23/2006 | 333-109318 |
| LBMLT 2006-WL2 | 1/30/2006 | 2/14/2006 | 333-109318 |
| LBMLT 2006-WL3 | 1/30/2006 | 2/14/2006 | 333-109318 |
| LUM 2006-3 | 5/1/2006 | 8/24/2006 | 333-132232 |
| NCMT 2007-1 | 7/13/2007 | 8/1/2007 | 333-131374 |
| PCHLT 2005-4 | 10/25/2005 | 11/10/2005 | 333-125734 |
| SACO 2007-1 | 1/16/2007 | 2/2/2007 | 333-131374 |
| SACO 2007-2 | 3/1/2007 | 3/29/2007 | 333-131374 |
| SAMI 2006-AR4 | 7/5/2006 | 7/18/2006[8] | 333-132232 |
| WAMU 2007-OA3 | 3/26/2007 | 4/11/2007 | 333-130795 |
| WMABS 2006-HE1 | 4/19/2006 | 5/5/2006 | 333-130795 |
| WMABS 2006-HE3 | 9/26/2006 | 10/12/2006 | 333-130795 |
| WMABS 2006-HE4 | 10/26/2006 | 11/13/2006 | 333-130795 |
| WMABS 2006-HE5 | 12/5/2006 | 12/22/2006 | 333-130795 |
| WMABS 2007-HE1 | 1/16/2007 | 1/31/2007 | 333-130795 |
| WMABS 2007-HE2 | 3/9/2007 | 3/28/2007 | 333-130795 |
| WMALT 2005-9 | 10/26/2005 | 11/10/2005 | 333-103345 |
| WMALT 2005-10 | 11/28/2005 | 12/14/2005 | 333-103345 |
| WMALT 2006-AR4 | 5/26/2006 | 6/14/2006 | 333-130795 |
| WMALT 2006-AR5 | 6/27/2006 | 7/13/2006 | 333-130795 |
| WMALT 2006-AR8 | 9/28/2006 | 10/13/2006 | 333-130795 |
| WMALT 2006-AR9 | 10/25/2006 | 11/13/2006 | 333-130795 |
| WMALT 2007-OA1 | 1/25/2007 | 2/12/2007 | 333-130795 |
| WMALT 2007-OA2 | 2/23/2007 | 3/13/2007 | 333-130795 |
| WMALT 2007-OA3 | 3/27/2007 | 4/12/2007 | 333-130795 |
| WMHE 2007-HE1 | 1/16/2007 | 1/31/2007 | 333-130795 |
| WMHE 2007-HE2 | 4/6/2007 | 4/25/2007 | 333-130795 |
| WMHE 2007-HE3 | 5/9/2007 | 5/25/2007 | 333-141255 |
| WMHE 2007-HE4 | 6/12/2007 | 6/28/2007 | 333-141255 |

---

[8]   No PSA was filed for the SAMI 2006-AR4 Securitization.  On this date, an 8-K referencing an existing PSA dated June 1, 2006 was filed with the SEC.

118.     The Certificates were issued pursuant to the PSAs, and Defendants J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.[9]

## II.     The Defendants' Participation in the Securitization Process

### A.     The Role of Each of the JPMorgan Defendants

119.     Each of the JPMorgan Defendants, including the JPMorgan Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the JPMorgan Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

120.     With respect to each JPMorgan Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the JPMorgan Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

---

[9]  J.P. Morgan Securities, BSC, and WaMu Capital were the selling underwriters for 96 of the Securitizations; for the remaining seven Securitizations, the selling underwriter was a non-party underwriter.  The selling underwriter for each Securitization is reflected below in Table 11 and Table 12.

### 1.    J.P. Morgan Acquisition

121.    J.P. Morgan Acquisition has been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, J.P. Morgan Acquisition securitized approximately $545 million, $4.5 billion, $24.1 billion, and $40.6 billion of residential mortgage loans, respectively.

122.    Defendant J.P. Morgan Acquisition was the sponsor of 27 of the 103 Securitizations.  In that capacity, J.P. Morgan Acquisition determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  J.P. Morgan Acquisition also selected the depositor that would be used to transfer the mortgage loans from J.P. Morgan Acquisition to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

123.    For the 27 Securitizations that it sponsored, J.P. Morgan Acquisition also conveyed the mortgage loans to the depositor for each Securitization pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.  In these agreements, J.P. Morgan Acquisition made certain representations and warranties to the depositor regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

### 2.    J.P. Morgan Acceptance

124.    Defendant J.P. Morgan Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation in 1988.  It is a special purpose entity

formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

125.     J.P. Morgan Acceptance was the depositor for 27 of the 103 Securitizations.  In its capacity as depositor, J.P. Morgan Acceptance purchased the mortgage loans from the sponsor pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement, as applicable.  J.P. Morgan Acceptance then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  J.P. Morgan Acceptance, together with the other JPMorgan Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.     J.P. Morgan Securities

126.     Defendant J.P. Morgan Securities was the lead underwriter for 30 of the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of Certificates to Fannie Mae and Freddie Mac and other investors.  J.P. Morgan Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 4.     JPMorgan Chase and JPMorgan Bank

127.     JPMorgan Chase and JPMorgan Bank employed their wholly-owned subsidiaries, J.P. Morgan Acquisition (direct subsidiary of JPMorgan Bank), J.P. Morgan Securities (direct subsidiary of JPMorgan Chase), and J.P. Morgan Acceptance (direct subsidiary of J.P. Morgan

Securities Holdings LLC, which is, in turn, a direct subsidiary of JPMorgan Chase), in key steps

of the securitization process.  Unlike typical arms' length securitizations, the JPMorgan

Securitizations involved various J.P. Morgan subsidiaries and affiliates at virtually each step in

the chain.  With respect to all 27 of the JPMorgan Securitizations, the sponsor was J.P. Morgan

Acquisition, the depositor was J.P. Morgan Acceptance, and the lead underwriter was J.P.

Morgan Securities.

128.    As the sole owner of J.P. Morgan Securities and J.P. Morgan Acceptance,

JPMorgan Chase had the practical ability to direct and control the actions of J.P. Morgan

Securities and J.P. Morgan Acceptance related to the Securitizations, and in fact exercised such

direction and control over the activities of J.P. Morgan Securities and J.P. Morgan Acceptance

related to the issuance and sale of the Certificates.

129.    As the sole owner of J.P. Morgan Acquisition, JPMorgan Bank had the practical

ability to direct and control the actions of J.P. Morgan Acquisition related to the Securitizations,

and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition

related to the issuance and sale of the Certificates.

130.    JPMorgan Chase and JPMorgan Bank expanded their share of the residential

mortgage-backed securitization market to increase revenue and profits.  The push to securitize

large volumes of mortgage loans contributed to the inclusion of untrue statements of material

facts and omissions of material facts in the Registration Statements.

### 5.    The JPMorgan Individual Defendants

131.    Defendant David M. Duzyk served as a President (Principal Executive Officer) of

Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon

information and belief worked in New York, NY.  Mr. Duzyk signed the Shelf Registration

Statements under file numbers 333-130192, 333-127020, and 333-141607 filed with the SEC on

December 7, 2005, July 29, 2005, and March 27, 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

132.    Defendant Louis Schioppo, Jr. served as a Controller and Chief Financial Officer (Principal Financial and Accounting Officer) of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY. Mr. Schioppo, Jr. signed the Shelf Registration Statements under file numbers 333-130192, 333-127020 and 333-141607 filed with the SEC on December 7, 2005, July 29, 2005 and March 27, 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

133.    Defendant Christine E. Cole served as a Director of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Ms. Cole signed the Shelf Registration Statements under file numbers 333-130192, 333-127020, and 333-141607 filed with the SEC on December 7, 2005, July 29, 2005,  and March 27, 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

134.    Defendant Edwin F. McMichael served as a Director of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief

worked in New York, NY.  Mr. McMichael signed the Shelf Registration Statements under file numbers 333-130192, 333-127020, and 333-141607 filed with the SEC on December 7, 2005, July 29, 2005, and March 27, 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

135.    Defendant William A. King served as a President (Principal Executive Officer) and Director of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. King signed the Shelf Registration Statement under file number 333-141607 filed with the SEC on March 27, 2007 and the related pre-effective amendment to the Shelf Registration Statements filed under numbers 333-141607 and 333-127020 on Form S-3/A filed with the SEC on or about the date noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

136.    Defendant Brian Bernard served as a President of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Bernard signed the Shelf Registration Statement under file number 333-141607 filed with the SEC on March 27, 2007 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the date noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### B.    The Role of Each of the Bear Stearns Entities

137.    Each of the Bear Stearns Entities, including the Bear Stearns Individual Defendants, had a role in the securitization process and the marketing for most or all of the

Certificates issued in connection with the Bear Stearns Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

138.    With respect to each Bear Stearns Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Bear Stearns Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.    EMC

139.    EMC has been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, EMC securitized approximately $20.9 billion, $48.4 billion, $74.5 billion, and $69.1 billion of residential mortgage loans, respectively.

140.    Defendant EMC was the sponsor of 32 of the 103 Securitizations.  In that capacity, EMC determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  EMC also selected the depositor that would be used to transfer the mortgage loans from EMC to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in

54

connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

141.    For the 32 Securitizations that it sponsored, EMC also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.  In these agreements, EMC made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

## 2.    SAMI and BSABS

142.    Defendants SAMI and BSABS have been engaged in the securitization of mortgage loans as depositors since their incorporations in 2003 and 2004, respectively.  They are special purpose entities formed for the solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

143.    Defendants SAMI and BSABS were the depositors for 9 and 26 of the 103 Securitizations, respectively.  In their capacity as depositors, SAMI and BSABS purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement, as applicable.  SAMI and BSABS then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  SAMI and BSABS, together with the other Bear Stearns Defendants, were also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of

the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.    BSC and J.P. Morgan Securities as Successor to BSC

144.    Defendant J.P. Morgan Securities is the successor-in-interest to BSC pursuant to the Merger.

145.    Defendant BSC was the lead underwriter for 38 of the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of Certificates to Fannie Mae and Freddie Mac and other investors.  BSC was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 4.    JPMorgan Chase as Successor to BSI

146.    Defendant JPMorgan Chase is the successor-in-interest to BSI pursuant to the Merger.

147.    BSI employed its wholly-owned subsidiaries, EMC, SAMI, BSABS, and BSC, in key steps of the securitization process.  Unlike typical arms' length securitizations, many of the Bear Stearns Securitizations involved various Bear Stearns subsidiaries and affiliates at virtually each step in the chain.  With respect to all 32 of the Bear Stearns Securitizations, the sponsor was EMC, the depositor was SAMI or BSABS, and the lead underwriter was BSC.

148.    As the sole owner of EMC, SAMI, BSABS, and BSC, BSI had the practical ability to direct and control the actions of EMC, SAMI, BSABS, and BSC related to the Securitizations, and in fact exercised such direction and control over the activities of EMC, SAMI, BSABS, and BSC related to the issuance and sale of the Certificates.

149.     BSI expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

### 5.     The Bear Stearns Individual Defendants

150.     Defendant Matthew E. Perkins served as a President (Principal Executive Officer) and Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Perkins signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374, filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

151.     Defendant Joseph T. Jurkowski, Jr. served as a Vice President of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Jurkowski signed the pre-effective amendments on Form S-3/A filed with the SEC to the Securitizations registered pursuant to the Shelf Registration Statements under file numbers 333-125422 and 333-131374 with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These pre-effective amendments to the Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

152.     Defendant Samuel L. Molinaro, Jr. served as a Treasurer (Principal Financial and Accounting Officer) and Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr.

Molinaro, Jr. signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374, filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

153.    Defendant Thomas F. Marano served as a Director of both Defendants Bear Stearns Asset Backed Securities I LLC and Structured Asset Mortgage Investments II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Marano signed the Shelf Registration Statements under file numbers 333-140247, 333-125422, 333-132232, 333-120916, and 333-131374 filed with the SEC on January 26, 2007, June 1, 2005, March 6, 2006, December 1, 2004, and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

154.    Defendant Kim Lutthans served as an Independent Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Ms. Lutthans signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374 filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

155.    Defendant Katherine Garniewski served as an Independent Director of Defendant Bear Sterns Asset-Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Ms. Garniewski signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374 filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

156.    Defendant Jeffrey Mayer served as a Director of Defendants Bear Sterns Asset-Backed Securities I LLC and Structured Asset Mortgage Investments II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Mayer signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916, filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

157.    Defendant Jeffrey L. Verschleiser served as President (Principal Executive Officer) of Defendant Structured Asset Management II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Verschleiser signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916 filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted

59

in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

158.    Defendant Michael B. Nierenberg served as a Treasurer (Principal Accounting and Financial Officer) of Defendant Structured Asset Management II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Nierenberg signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916 filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### C.    The Role of Each of the WaMu Entities

159.    Each of the WaMu Entities, including the WaMu Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the WaMu Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

160.    With respect to each WaMu Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the WaMu Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts

required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.     JPMorgan Bank as Successor to WaMu Bank

161.     Defendant JPMorgan Bank is the successor-in-interest to WaMu Bank pursuant to the PAA.

162.     WaMu Bank has been involved in the securitization of a variety of assets since its incorporation.  During the 2004, 2005 and 2006 fiscal years, WaMu Bank securitized approximately $34.7 billion, $71.6 billion, and $70.8 billion of residential mortgage loans, respectively.

163.     WaMu Bank was the sponsor or co-sponsor of 12 of the 103 Securitizations.   In that capacity, WaMu Bank determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  WaMu Bank also selected the depositor that would be used to transfer the mortgage loans from WaMu Bank to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

164.     For the 12 Securitizations that it sponsored or co-sponsored, WaMu Bank also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.  In these agreements, WaMu Bank made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

165.    Further, WaMu Bank employed its wholly-owned subsidiaries, WaMu Securities, WaMu Acceptance, and WaMu Capital in key steps of the securitization process.  Unlike typical arms' length securitizations, many of the WaMu Securitizations involved various WaMu subsidiaries and affiliates at virtually each step in the chain.  With respect to 20 of the 26 WaMu Securitizations, the sponsor was WaMu Bank or WaMu Securities, the depositor was WaMu Securities or WaMu Acceptance, and the lead underwriter was WaMu Capital.

166.    As the sole owner of WaMu Securities, WaMu Acceptance, and WaMu Capital, WaMu Bank had the practical ability to direct and control the actions of WaMu Securities, WaMu Acceptance, and WaMu Capital related to the Securitizations, and in fact exercised such direction and control over the activities of WaMu Securities, WaMu Acceptance, and WaMu Capital related to the issuance and sale of the Certificates.

167.    WaMu Bank expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

## 2.    WaMu Securities

168.    WaMu Securities has been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, WaMu Securities purchased approximately $26.1 billion, $10.8 billion, $11.3 billion, and $24.9 billion of residential mortgage loans, respectively, and securitized approximately $8.5 billion, $1.0 billion, $7.1 billion, and $17.1 billion of residential mortgage loans, respectively.

169.    Defendant WaMu Securities was the sponsor or co-sponsor of 15 of the 103 Securitizations.  In that capacity, WaMu Securities determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized,

determined distribution of principal and interest, and provided data to the credit rating agencies

to secure investment grade ratings for the GSE Certificates.  WaMu Securities also selected the

depositor that would be used to transfer the mortgage loans from WaMu Securities to the trusts,

and selected the underwriter for the Securitizations.  In its role as sponsor, WaMu Securities

knew and intended that the mortgage loans it purchased would be sold in connection with the

securitization process, and that certificates representing such loans would be issued by the

relevant trusts.

170.    For the 15 Securitizations that it sponsored or co-sponsored, WaMu Securities

also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage

Loan Purchase Agreement or Mortgage Loan Sale Agreement.  In these agreements, WaMu

Securities made certain representations and warranties to the depositors regarding the groups of

loans collateralizing the Certificates.  These representations and warranties were assigned by the

depositor to the trustee for the benefit of the Certificateholders.

171.    Defendant WaMu Securities also acted as its own depositor from 1979 until 2005.

In this role, it engaged in purchasing mortgage loans, filing registration statements with the SEC,

forming issuing trusts, assigning mortgage loans and all of its rights and interests in such

mortgage loans to the trustee for the benefit of the certificateholders, and depositing the

underlying mortgage loans into the issuing trusts.

172.    WaMu Securities was the depositor for two of the 103 Securitizations.  In its

capacity as depositor, WaMu Securities sold, transferred, or otherwise conveyed the mortgage

loans to be securitized to the trusts.  WaMu Securities, together with the other WaMu

Defendants, was also responsible for preparing and filing the Registration Statements pursuant to

which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the

benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.  WaMu Acceptance

173.  Defendant WaMu Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

174.  Defendant WaMu Acceptance was the depositor for 18 of the 103 Securitizations. In its capacity as depositor, WaMu Acceptance purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement, as applicable.  WaMu Acceptance then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  WaMu Acceptance, together with the other WaMu Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 4.  WaMu Capital

175.  Defendant WaMu Capital was the lead underwriter for 31 of the Securitizations. In that role, it was responsible for underwriting and managing the offer and sale of Certificates to Fannie Mae and Freddie Mac and other investors.  WaMu Capital was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material

64

misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 5.      The WaMu Individual Defendants

176.      Defendant Richard Careaga served as a First Vice President of WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Careaga signed the Shelf Registration Statement under file number 333-130795 filed with the SEC on December 30, 2005 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

177.      Defendant David Beck served as a Director and President (Principal Executive Officer) of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Beck signed the Shelf Registration Statements under file numbers 333-130795 and 333-141255 filed with the SEC on December 30, 2005 and March 13 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

178.      Defendant Diane Novak served as a Director of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations.  Ms. Novak signed the Shelf Registration Statements under file numbers 333-130795 and 333-141255 filed with the SEC on December 30, 2005 and March 13 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

179.      Defendant Thomas Green served as a Chief Financial Officer (Principal Financial Officer) of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations.

Mr. Green signed the Shelf Registration Statement under file numbers 333-130795 filed with the SEC on December 30, 2005 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitization noted in Table 3 below.

180.    Defendant Rolland Jurgens served as a Controller of Defendants Long Beach Securities Corporation and WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Jurgens signed the Shelf Registration Statement under file numbers 333-130795 filed with the SEC on December 30, 2005 and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  Mr. Jurgens also signed the pre-effective amendment filed with the SEC on March 21, 2006 for the Shelf Registration Statement under file number 333-131252.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

181.    Defendant Thomas G. Lehmann served as Director and President of Defendant WaMu Asset Acceptance Corporation and as First Vice President, Director and Senior Counsel of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.  Mr. Lehmann signed the Shelf Registration Statements under file numbers 333-141255 and 333-103345 filed with the SEC on March 13, 2007 and February 20, 2003, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

182.    Defendant Stephen Fortunato served as Chief Financial Officer of Defendants Long Beach Securities Corporation and WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Fortunato signed the Shelf Registration Statement under file number 333-

141255 filed with the SEC on March 13, 2007, and the related pre-effective amendment on Form

S-3/A filed with the SEC on or about the dates noted in Table 3 below.  Mr. Fortunato also

signed the pre-effective amendments filed with the SEC on March 21, 2006 and March 31, 2006

for the Shelf Registration Statement under file number 333-131252.  These Shelf Registration

Statements were filed on behalf of the Securitizations noted in Table 3 below.

183.    Defendant Donald Wilhelm served as Controller of Defendant WaMu Asset

Acceptance Corporation at the time of the Securitizations.  Mr. Wilhelm signed the Shelf

Registration Statement under file number 333-141255 filed with the SEC on March 13, 2007,

and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates

noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the

Securitization noted in Table 3 below.

184.    Defendant Michael J. Kula served as Director, Senior Vice President and Chief

Financial Officer of Defendant Washington Mutual Mortgage Securities Corporation at the time

of the Securitizations.  Mr. Kula signed the Shelf Registration Statement under file number 333-

103345 filed with the SEC on February 20, 2003, and the related pre-effective amendment on

Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf

Registration Statements were filed on behalf of the Securitization noted in Table 3 below.

185.    Defendant Craig S. Davis served as Director of Washington Mutual Mortgage

Securities Corporation at the time of the Securitizations.  Mr. Davis signed the Shelf Registration

Statements under file number 333-103345 filed with the SEC on February 20, 2003, and the

related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted

in Table 3 below.  These Shelf Registration Statements were filed on behalf of the

Securitizations noted in Table 3 below.

186.     Defendant Marc K. Malone served as a First Vice President and Controller (Principal Accounting Officer) of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.   Mr. Malone signed the Shelf Registration Statement under file number 333-103345 filed with the SEC on February 20, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the date noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

187.     Defendant Michael L. Parker served as a Director and President of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.   Mr. Parker signed the Shelf Registration Statement under file number 333-103345 filed with the SEC on February 20, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the date noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

188.     Defendant Megan M. Davidson served as a Director and Senior Vice President of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.  Ms. Davidson signed the Shelf Registration Statement under file number 333-103345 filed with the SEC on February 20, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the date noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### D.     The Role of Each of the Long Beach Entities

189.     Each of the Long Beach Entities, including the Long Beach Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the Long Beach Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the

mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

190.    With respect to each Long Beach Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Long Beach Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.    JPMorgan Bank as Successor to WaMu Bank and Long Beach Mortgage

191.    Defendant JPMorgan Bank is the successor-in-interest to WaMu Bank pursuant to the PAA.  WMI and then WaMu Bank operated Long Beach Mortgage as a wholly-owned subsidiary until closing it down in 2007.

192.    Long Beach Mortgage had been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, and 2005 fiscal years, Long Beach Mortgage securitized approximately $6.0 billion, $13.3 billion, and $15.4 billion of residential mortgage loans, respectively.

193.    Long Beach Mortgage was the sponsor of nine of the 103 Securitizations.   In that capacity, Long Beach Mortgage determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  Long Beach Mortgage also selected the depositor that would be

used to transfer the mortgage loans from Long Beach Mortgage to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

194.    For the nine Securitizations that it sponsored, Long Beach Mortgage also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage Loan Purchase Agreement.  In these agreements, Long Beach Mortgage made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

195.    Further, WaMu Bank employed its wholly-owned subsidiary, Long Beach Securities, in key steps of the securitization process.  Unlike typical arms' length securitizations, the Long Beach Securitizations involved various Long Beach subsidiaries and affiliates at virtually each step in the chain.  With respect to 11 of the Securitizations, the sponsor was WaMu Bank or Long Beach Mortgage, the depositor was Long Beach Securities, and the lead underwriter was WaMu Capital.

196.    As the sole owner of Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of Long Beach Securities related to the Securitizations, and in fact exercised such direction and control over the activities of Long Beach Securities related to the issuance and sale of the Certificates.

197.    Long Beach Mortgage expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of

mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

## 2.     Long Beach Securities

198.    Defendant Long Beach Securities has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

199.    Defendant Long Beach Securities was the depositor for 15 of the 103 Securitizations.   In its capacity as depositor, Long Beach Securities purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement, as applicable.  Long Beach Securities then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  Long Beach Securities, together with the other Long Beach Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

## 3.     The Long Beach Individual Defendants

200.    Defendant Craig S. Davis served as Director and President of Defendant Long Beach Securities at the time of the Securitizations.  Mr. Davis signed the Shelf Registration Statements under file number 333-109318 filed with the SEC on September 30, 2003 and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted

in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

201.    Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank at the time of the Securitizations.  Mr. Zielke signed the pre-effective amendments on Form S-3/A filed with the SEC to the Securitizations registered pursuant to the Shelf Registration Statements under file numbers 333-131252 and 333-109318 with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York. These pre-effective amendments to the Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

202.    Defendant Thomas W. Casey served as a Director of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Casey signed the Shelf Registration Statement under file number 333-131252 filed with the SEC January 24, 2006, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

203.    Defendant John F. Robinson served as a Director of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Robinson signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on January 24, 2006, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

204.    Defendant Keith Johnson served as a Director and President of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Johnson signed the Shelf

Registration Statement under file number 333-131252 filed with the SEC on January 24, 2006, filed with the SEC. This Shelf Registration Statement was filed on behalf of the Securitizations noted in Table 3 below.

205.    Defendant Suzanne Krahling served as a Chief Financial Officer and Senior Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations. Ms. Krahling signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on January 24, 2006, filed with the SEC. This Shelf Registration Statement was filed on behalf of the Securitizations noted in Table 3 below.

206.    Defendant Larry Breitbarth served as a Controller and Senior Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations. Mr. Breitbarth signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on January 24, 2006, filed with the SEC. This Registration Statement was filed on behalf of the Securitizations noted in Table 3 below.

207.    Defendant Marangal I. Domingo served as a Director and Chief Executive Officer (Principal Executive Officer) of Defendant Long Beach Securities Corporation and as a Director of Washington Mutual Mortgage Securities Corporation at the time of the Securitizations. Mr. Domingo signed the Shelf Registration Statements under file numbers 333-109318 and 333-103345 filed with the SEC on September 30, 2003 and February 20, 2003, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

208.    Defendant Troy A. Gotschall served as a Chief Operations Officer and Executive Vice President of Defendant Long Beach Securities Corporation at the time of the

Securitizations.  Mr. Gotschall signed the Shelf Registration Statement under file number 333-109318 filed with the SEC on September 30, 2003 and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

209.    Defendant Art Den Heyer served as a Controller and Assistant Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Heyer signed the Shelf Registration Statement under file number 333-109318 filed with the SEC on September 30, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

210.    Defendant Stephen Lobo served as a Treasurer and Senior Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Lobo signed the Shelf Registration Statement under file number 333-109318 filed with the SEC on September 30, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### E.    The Other Underwriter Defendants

211.    Defendants Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich were the seller underwriters for one of the 103 Securitizations each.  In that role, each was responsible for selling the Certificates to Fannie Mae and Freddie Mac and other investors.

212.    The Other Underwriter Defendants were also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### F.        Defendants' Failure To Conduct Proper Due Diligence

213.     The Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

214.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, J.P. Morgan Acceptance, BSABS, SAMI, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as the depositors, were paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and J.P. Morgan Securities, BSC, and WaMu Capital, as the underwriters, were paid a commission based on the amount they received from the sale of the Certificates to the public.  Moreover, because none of the Defendants assumed the credit risk of the underlying mortgage loans becoming delinquent or otherwise defaulting, there was little incentive to conduct full, complete, and meaningful due diligence of the statements in the Registration Statements relating to the underlying mortgage loans.

215.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate due diligence or otherwise to ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

216.     For instance, Defendants retained third-parties, including Clayton Holdings, Inc. ("Clayton") and The Bohan Group, Inc. ("Bohan"), to analyze the loans they were considering placing in their securitizations, but waived a significant number of loans into the Securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to

75

ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines. On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

217.    JPMorgan, Bear Stearns, WaMu, and Long Beach were negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to them by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements. Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, JPMorgan, Bear Stearns, WaMu, and Long Beach failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

218.    The Financial Crisis Inquiry Commission (the "FCIC")[10] found that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent, 16 percent, 27 percent, and 9 percent of the mortgage loans JPMorgan, Bear Stearns/EMC, WaMu Bank, and WaMu

---

[10]    The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to examine the causes, domestic and global, of the current financial and economic crisis in the United States.

Securities submitted, respectively, to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 51 percent, 42 percent, 29 percent, and 50 percent of the loans were subsequently waived in by JPMorgan, Bear Stearns/EMC, WaMu Bank, and WaMu Securities without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See The Financial Crisis Inquiry Report*, at 167, Jan. 2011, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

219.    As disclosed in a report as part of the NYAG's ongoing investigation of investment banking misconduct in underwriting mortgage-backed securities, Clayton routinely provided investment banks with detailed reports of loans that were not compliant with underwriting guidelines, but the investment banks, including JPMorgan, Bear Stearns, and WaMu, routinely overrode the exclusion of a significant percentage of rejected loans from purchase and securitization.

### 1.    The JPMorgan Defendants

220.    Many of the mortgage loans underlying the J.P. Morgan-sponsored and -deposited Securitizations were originated by non-party Chase Home Finance LLC ("CHF"), the home mortgage division of Defendant JPMorgan Bank.  CHF originated far more of the mortgage loans underlying the JPMorgan Securitizations than any other originator.  For six trusts, CHF was responsible for as many as 100 percent of the underlying mortgage loans.  Specifically, JPMorgan Bank, through CHF, originated all the loans in the following Securitizations: JPMAC 2006-CH1, JPMAC 2006-CH2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, and JPMAC 2007-CH5.

221.    By 2007, CHF was one of top overall mortgage originators by volume in the United States with an 8.6 percent market share.  CHF was also one of the top overall subprime mortgage originators by volume in the United States in 2007 with a 6.0 percent market share.

222.    J.P. Morgan Securities was, in turn, one of the largest issuers of private mortgage-backed securities in 2007 with a 5.7 market share.  From 2000 to 2007, JPMorgan increased its volume of subprime RMBS issuances from negligible to $11.4 billion, with a total issuance of $22.8 billion from 2005-2007, or the eleventh largest in the United States.

223.    CHF's departure from industry standards was confirmed by James Dimon, CEO of JPMorgan Chase.  On January 13, 2010, Mr. Dimon testified under oath to the Financial Crisis Inquiry Commission ("FCIC") that "the underwriting standards of our mortgage business should have been higher.  We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

224.    On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying."  This competition led to a reduction in diligence and oversight on the part of JPMorgan.  Buell stated that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating."

225.    On September 1, 2010, JPMorgan's Chief Risk Officer Barry Zubrow told the FCIC that "there was a tradeoff between certain financial covenants and protections versus a desire to maintain market share."

78

226.    The Federal Reserve of New York concluded in an April 15, 2008 report that JPMorgan needed to "strengthen [its] exposure measurement and limit framework around leveraged lending."  The report held that JPMorgan's "deterioration in the quality of the firm's consumer portfolios" resulted from "loosened underwriting standards" and "shortcomings in oversight and controls governing third party mortgage loan origination activities," as well as "breakdowns in the 'originate to distribute' model, namely weak underwriting standards and investor concentration risk in collateralized loans obligations."

227.    In his January 13, 2010 testimony, Mr. Dimon confirmed CHF's overreliance on third parties to originate loans, testifying that these broker-loans performed markedly worse: "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," admitting that "there were some unscrupulous mortgage salesmen and mortgage brokers.  And, you know, some people missold."

228.    When asked whether JPMorgan conducted stress tests in order to prevent its exposure to these systemic risks and what risk management procedures were in place, Mr. Dimon replied:  "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]." Mr. Dimon further confirmed this failure of basic due diligence when he was later quoted as saying,"[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds."

229.    Furthermore, Reuters reported on May 13, 2010 that the SEC and U.S. prosecutors were conducting a broad investigation of JPMorgan and five other major Wall Street

banks about whether they mislead investors about mortgage securities deals.  Criminal Probe

Targets 6 Wall Street Firms: Source, *Reuters* (May 13, 2010).

> **2.      The Bear Stearns Entities**

230.     Bear Stearns also sacrificed due diligence and process controls in order to both

increase its volume of mortgage originations and hasten its delivery of mortgage loans to the

RMBS market.  By 2007, EMC was one of the top overall subprime mortgage originators by

volume in the United States with a 4.1 percent market share.  BSC was, in turn, one of the largest

issuers of private mortgage-backed securities in 2007 with a 6.8 percent market share.  From

2005-2007, Bear Stearns' total volume of subprime RMBS issuances was $37.4 billion, or the

sixth largest in the United States.

231.     In 2005, BSC quietly changed its internal protocols to allow EMC to securitize

loans before the expiration of the 30- to 90-day early payment default period following the

acquisition of a loan by EMC.  This change allowed EMC to enhance earnings by increasing the

volume of its Securitizations.

232.     BSC's prior policy had been to keep loans in inventory until the early payment

default period was over.  Seasoning loans during this period prevented EMC from securitizing

loans that, according to its internal guidelines, were likely to "contain some form of

misrepresentations and should not have been made."  Securitizing these loans as quickly as

possible allowed EMC to avoid the possibility of a default or delinquency rendering them

unsecuritizable.

233.     BSC executives, such as Defendant Jeffrey Verschleiser, forcefully advocated

packaging loans purchased by EMC into securities as quickly as possible.  In a recently

published June 13, 2006 email, Mr. Verschleiser asserted that his office needed "to be certain we

can securitize the loans with 1 month [early payment default] before the [early payment default]

period expires." Similarly, recently published documents show that, in or about December 2005, Mr. Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in December for the conduit" by January.

234.    Internal communications confirm that EMC was securitizing large numbers of defective loans amid a break-down in its due diligence processes. In a recently published March 2006 email, BSC Vice President Robert Durden admitted that many loans purchased by EMC were securitized without any due diligence clearance: "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared. I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."

### 3.    The WaMu Entities

235.    WaMu Bank also let the demands of the market dictate its adherence to sound underwriting guidelines and securitization procedures. By 2007, WaMu Bank was one of the top overall mortgage originators by volume in the United States, with a 4.1 percent market share. WaMu Capital, in turn, was one of the largest issuers of mortgage-backed securities in 2007 with a 5.7 market share. From 2005-2007, WaMu Capital's total volume of subprime RMBS issuances was $11.3 billion.

236.    In 2005, with the market for conventional, fixed-rate loans drying up, WaMu Bank formalized a strategy to move away from low risk to high risk home loan origination. On April 13, 2010, James G. Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate Permanent Subcommittee on Investigations ("PSI") that WaMu Bank's focus had shifted "to becoming more of a higher risk, sub-prime lender . . . This effort was characterized by statements advocating that the company become either via acquisition or internal growth a dominant sub-prime lender."

237.    Documents released in April 2010 by the PSI show that, in April 2006, the President of WaMu Bank's Home Loans Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin Products."  The presentation showed that the least profitable loans were government-backed and fixed loans; the most profitable were Option ARM, Home Equity, and Subprime Loans.  Subprime loans, at 150 basis points, were eight times more profitable than a fixed loan at 19 basis points.

238.    In its push to generate more risky loan products, WaMu Bank pressed its sales agents to pump out a greater volume of loans with loose adherence to its own underwriting guidelines.  WaMu Bank gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and, ultimately, the compensation of the bank's executives.  In a *New York Times* article published December 27, 2008, Steven M. Knobel, the founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business with WaMu Bank until 2007, stated that "[i]t was the Wild West . . . If you were alive, they would give you a loan.  Actually, I think if you were dead, they would still give you a loan."

239.    WaMu Bank pushed its Option ARM loans on borrowers regardless of their sophistication, income level, or financial stability.  An Option ARM loan is typically a 30-year Adjustable Rate Mortgage ("ARM") that initially offers the borrower four monthly payment options:  (i) a specified minimum payment (which was typically lower than the interest payment and therefore caused the loan to grow, referred to as negative amortization), (ii) an interest-only payment, (iii) a 15-year fully amortizing payment, and (iv) a 30-year fully amortizing payment. The rate of an ARM loan also adjusts monthly and if the loan rate was higher than the required interest in the payment, the balance of the loan would increase (called negative amortization). Fay Chapman, WaMu Bank's former Chief Legal Officer, candidly admitted to the *Seattle Times*

82

in an article published on October 26, 2009, that "[m]ortgage brokers put people into the product who shouldn't have been."  In 2003, WaMu originated $32.3 billion of Option ARM loans.  By 2005, that number almost had doubled to $64.1 billion.

240.   WaMu Bank's employee compensation structure favored these types of high-risk home loans.  In a document entitled "2007 Product Strategy," WaMu Bank noted that it must "maintain a compensation structure that supports the high margin product strategy."  A compensation grid from 2007 shows the company paid the highest commissions on Option ARMs, subprime loans and home-equity loans:  A $300,000 Option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount.  The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes.  Likewise, a WaMu Bank "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Option ARM, Non-prime referrals and Home Equity Loans . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

241.   WaMu Bank could originate so many high-risk loans because its underwriting guidelines had become so loose that they were rendered meaningless.  In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.

242.   On September 28, 2007, WaMu Bank's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending.  The report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR."  It additionally concluded that fraud detection tools "are not being utilized effectively by

the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

243.    In early 2008, Radian Guaranty Inc., one of WaMu Bank's mortgage insurers, issued a similar report to WaMu Bank with the results of its review conducted from August 13, 2007 to September 28, 2007.  The objectives of the review were, *inter alia*, to determine WaMu Bank's "compliance with Radian's underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's underwriting decisions."  Radian gave WaMu Bank an overall rating of "Unacceptable."  Of 133 loans reviewed, it found 11 loans or 8 percent had "insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines."  Half of the delinquent loans reviewed had "questionable property values, occupancy and possible strawbuyers [sic]."

244.    Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger, WaMu Bank's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases causes our origination data to be suspect particularly with respect to DTI [Debt To Income ratio]."

245.    In a *Seattle Times* article published October 25, 2009, Tom Golon, a former senior home loan consultant for WaMu in Seattle, stated that Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down."  The WaMu staff was subjected to "total blanketing – e-mails, memos, meetings set up so people understood that this was what the company wanted them to do."

246.    Various witnesses with direct experience in WaMu Bank's underwriting operations also testified before the FCIC that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule.  For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual

84

where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions." Similarly, Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents." When she asked how they could possibly close it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it.'"

247.    WaMu Bank's appetite for volume kept it from diligently investigating the rampant disregard of underwriting guidelines that infected its origination business. Perhaps the most compelling evidence involves two top loan producers at two different WaMu Bank origination offices, called Montebello and Downey, in Southern California. Each of those loan officers made hundreds of millions of dollars in home loans each year and consistently won recognition for their efforts. Recently disclosed documents revealed that a 2005 internal WaMu Bank review found that loans from those two offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])." The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review." The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named." But virtually none of the proposed recommendations were implemented.

248.    Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its

mortgage loans, particularly among Option ARM loans.  WaMu thus made a deliberate decision at the highest levels to "off-load" these loans through securitization and sale to investors.

249.    Not only did WaMu decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans.  A September 2008 internal review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan. . . confirmed to contain suspicious activity from being sold to an investor."  In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud.  There is evidence that this control weakness has existed for some time."

### 4.    The Long Beach Entities

250.    Long Beach Mortgage was acquired by WMI in 1999.  Long Beach Mortgage served as WaMu Bank's subprime loan origination division until January 1, 2006, and thereafter was known as WaMu Bank's "specialty mortgage lending" channel.  Some of the programs at Long Beach Mortgage included stated income document programs for W-2 wage earners, a program that started in 2005.  Long Beach Mortgage would also approve 100 percent financing for stated-income borrowers with FICO scores as low as 500.

251.    There was also a "three letters of reference" program for self-employed borrowers, where a borrower only had to submit three letters of reference from anyone for whom they supposedly worked.  No attempt was made to verify the information in the letters of reference.  Some of the letters of reference that were considered acceptable included statements such as:  "So-and-so cuts my lawn and does a good job."  At Long Beach Mortgage, FICO scores ranged from 500-620, but Long Beach Mortgage salespeople considered a borrower with a 620 FICO score to have good credit.

252.     Borrowers could get a loan with no established FICO score merely by providing "three alternative trade lines."  An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent payment, or a note from a person claiming the borrower had repaid a personal debt.  Long Beach Mortgage originated a significant amount of these types of problematic loans.  These loans made up the majority of first payment defaults – *i.e.*, loans on which the borrower failed to make even the first payment – during the end of 2006.

253.     As a result of these and other practices, in January 2004, the FDIC and the State of Washington sent a report to WaMu's Board concerning, *inter alia*, "unsatisfactory underwriting practices at affiliate Long Beach Mortgage Company."  The recently released report noted an internal report dated July 31, 2003, which found that "40% (109 of 271) of loans reviewed were considered unacceptable due to one or more critical errors.  This raised concerns over [Long Beach Mortgage Company's] ability to meet the representations and warranty's [sic] made to facilitate sales of loan securitizations."  *FDIC/Washington State Joint Visitation Report of Washington Mutual Bank*, January 13, 2004.  It further noted that a second report in August 2003 had "reached similar conclusions and disclosed that [Long Beach Mortgage Company's] credit management and portfolio oversight practices were unsatisfactory."  *Id.*  The FDIC-Washington examiners found that, out of 4,000 loans reviewed, "approximately, 950 were deemed saleable, 800 were deemed unsalable, and the remainder contained deficiencies requiring remediation prior to sale."  *Id.*  The examiners concluded that "[t]he culture, practices, and systems at Long Beach Mortgage Company are inconsistent with the lending activity of the bank."  *Id.*

254.     In a recently published November 1, 2005 internal report entitled "LBMC Post Mortem," the authors concluded that Long Beach Mortgage Company's "[u]nderwriting guidelines are not consistently followed and conditions are not consistently or effectively met." What is more, "[u]nderwriters are not consistently recognizing non-arm's length transactions and/or underwriting associated risk effectively."

255.     Another recently surfaced April 17, 2006 report from WaMu's General Auditor, Randy Melby, to the Audit Committee of WaMu's Board of Directors, discussed Long Beach Mortgage Company's "relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel." Mr. Melby concluded that "[t]hese factors, coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality."

256.     Ten days later, on April 27, 2006, Steve Rotella, WaMu's COO, informed WaMu's Chairman and CEO, Kerry Killinger, that Long Beach Mortgage "delinquencies are up 140% and foreclosures close to 70% . . . First payment defaults are way up and the 2005 vintage is way up relative to previous years.  It is ugly." In another recently uncovered e-mail, Mr. Rotella commented two weeks later that "LBMC is terrible" due, among other things to, "repurchases, EPDs, manual underwriting, very weak servicing/collections practices and a weak staff."

257.     In a recently disclosed December 11, 2006 e-mail from Cynthia Abercrombie, Senior Vice President/Senior Risk Officer to Ron Cathcart, WaMu's Chief Enterprise Risk Officer, Ms. Abercrombie noted that post-funding reviews of Long Beach Mortgage loans identified the following issues:

- Appraisal deficiencies that could impact value and were not addressed;

88

- Material misrepresentations relating to credit evaluation;

- Legal documents were missing or contained errors or discrepancies;

- Credit evaluation or loan decision errors; and

- Required credit documentation was insufficient or missing from the file.

258. The conclusion of the reviews was "a lack of proper execution of the credit guidelines" and "weakness in controls around clearing conditions." In response, Mr. Cathcart admitted that "Long Beach represents a real problem for WaMu."

259. Long Beach employees were incentivized to disregard underwriting guidelines in favor of volume. The Long Beach 2006 Incentive Plan, for example, outlined four compensation tiers that were based on loan volume. The largest producers of loans made the most money because compensation was linked to volume and also earned a higher rate of commission.

260. On August 20, 2007, WaMu Audit Services issued a report (recently made public) entitled "Long Beach Mortgage Loan Origination & Underwriting." The report was sent to WaMu's most senior executives, including Mr. Killinger, Mr. Rotella, Mr. Melby, Mr. Schneider and Mr. Cathcart. Among its conclusions were:

- Underwriting guidelines established to mitigate the risk of unsound underwriting are not always followed and decision-making methodology is not always fully documented.

- [F]ocused areas of improvement for LMB are appraisal deficiencies, credit evaluation or loan decision errors, unaddressed fraud alerts, missing legal documents, material misrepresentations relating to credit evaluations, debt capacity or debt ratio error, missing title report, insufficient credit documentation, invalid or insufficient signing authority, misrepresentation in appraisal information, missing Final HUD 1 statements that when obtained had unaddressed issues.

- Policies and procedures defined [sic] to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed.

261.     In a December 21, 2009 interview with the *Huffington Post Investigative Fund*, Diane Kosch, a former member of Long Beach Mortgage's quality control team, stated that "[m]ost of the time everything that we wanted to stop the loan for went above our heads to upper management."  Quality team members became so suspicious, she said, that they started making copies of problem files to protect themselves.  Karen Weaver, a former underwriter in Long Beach Mortgage's Atlanta office, attested that a lot of brokers "were making up pay stubs and presenting that."  A former Long Beach Mortgage account executive for Colorado sales, Pam Tellinger, admitted she "knew brokers who were doing fraudulent documents all day long." Antoinette Hendry, a former underwriter and team manager at Long Beach in California, described how account executives would "offer kickbacks of money" to underwriters to get questionable loans approved.  Long Beach did not have the appropriate due diligence systems in place to monitor and prevent these events from occurring.

### G.     Liability of JPMorgan Chase and JPMorgan Bank as Successors in Interest

#### 1.     Liability of the JPMorgan Defendants as Successors in Interest to the Bear Stearns Entities

262.     On March 16, 2008, BSI entered into the Agreement and Plan of Merger with JPMorgan Chase for the purpose of consummating a "strategic business combination transaction" between the two entities.

263.     Pursuant to the Merger, BSI merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of JPMorgan Chase, making BSI a wholly-owned subsidiary of JPMorgan Chase.  As such, upon the May 30, 2008 effective date of the Merger, JPMorgan Chase became the ultimate corporate parent of BSI's subsidiaries BSC, EMC, SAMI and BSABS.

264.    JPMorgan took immediate control of Bear Stearns' business and personnel decisions, according to *The New York Times* in an article published April 6, 2008.  The article cited an internal JPMorgan memo revealing that "JPMorgan Chase, which is taking over the rival investment bank Bear Stearns, will dominate the management ranks of the combined investment banking and trading businesses."  Of the 26 executive positions in the new merged investment banking and trading division, only five would come from Bear Stearns.

265.    In a June 30, 2008 press release describing internal restructuring to be undertaken pursuant to the Merger, JPMorgan stated its intent to assume Bear Stearns and its debts, liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to JPMorgan Chase, resulting in a transfer of substantially all of Bear Stearns' assets to JPMorgan Chase. In connection with such transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-outstanding registered U.S. debt securities; (2) Bear Stearns' obligations relating to trust preferred securities; (3) Bear Stearns' then-outstanding foreign debt securities; and (4) Bear Stearns' guarantees of then-outstanding foreign debt securities issued by subsidiaries of Bear Stearns, in each case, in accordance with the agreements and indentures governing these securities.

266.    BSC subsequently merged with J.P. Morgan Securities and is now doing business as J.P. Morgan Securities.  JPMorgan's 2008 Annual Report described the transaction as a merger, stating that "[o]n October 1, 2008, J.P. Morgan Securities Inc. merged with and into Bear, Stearns & Co. Inc., and the surviving entity changed its name to J.P. Morgan Securities Inc."

267.    Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear visitors to J.P. Morgan Securities' website, and the EMC website, www.emcmortgagecorp.com, now identifies EMC as a brand of JPMorgan Bank.

268.    J.P. Morgan Securities was fully aware of the pending claims and potential claims against Bear Stearns when it consummated the merger.  J.P. Morgan Securities has further evinced its intent to assume Bear Stearns' liabilities by paying to defend and settle lawsuits brought against Bear Stearns.

269.    As a result of BSI's acquisition, JPMorgan Chase's "transfer of substantially all of Bear Stearns' assets to JPMorgan Chase," and explicit assumption of Bear Stearns' debt, JPMorgan Chase is the successor-in-interest to BSI and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSI.

270.    As a result of its merger with BSC, J.P. Morgan Securities is the successor-in-interest to BSC and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSC.

271.    Therefore, this action is brought against JPMorgan Chase as the successor to BSI and J.P. Morgan Securities as successor to BSC.  BSI is not a defendant in this action.

### 2.    Liability of the JPMorgan Defendants as Successors in Interest to the WaMu and Long Beach Entities

272.    On September 25, 2008, the Office of Thrift Supervision closed WaMu Bank and named the FDIC as receiver.  Shortly thereafter, the FDIC, in its corporate and receivership capacities, and JPMorgan Bank entered into a Purchase and Assumption Agreement for JPMorgan Bank to "purchase substantially all of the assets and assume all deposit and substantially all other liabilities of" WaMu Bank.  *See* PAA.

273.    The PAA described the assets purchased by JPMorgan Bank as:

**3.1    Assets Purchased by Assuming Bank.**  Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or

<u>arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing</u>.  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.  The subsidiaries,  joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a.  Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1 (emphasis added).

274.    Pursuant to the PAA, JPMorgan Bank purchased "all subsidiaries" of WaMu Bank, including WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities.  As such, WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities became wholly-owned subsidiaries of JPMorgan Bank.

275.    JPMorgan Bank also assumed nearly all the liabilities of WaMu Bank:

**2.1     <u>Liabilities Assumed by Assuming Bank.</u>**  Subject to Sections 2.5 [Borrower Claims] and 4.8 [Agreement with Respect to Certain Existing Agreements], the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) <u>and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records</u> of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").  Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

PAA § 2.1 (emphasis added).

276.    The only liabilities expressly disclaimed by JPMorgan Bank were "any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower . . . related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third

party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities."  PAA § 2.5.

277.    JPMorgan Bank thus assumed all liabilities relating to the WaMu Securitizations, as the WaMu Securitizations were "reflected on the Books and Records" of WaMu Bank as of the date of its closing, and were not expressly disclaimed by JPMorgan Bank in the PAA.

278.    The FDIC itself asserts that JPMorgan Bank assumed the liabilities associated with the securitization activities of WaMu Bank.  In a Reply Memorandum filed on February 11, 2011, in *Deutsche Bank Nat'l Trust Co. v. FDIC (as receiver for WaMu Bank) and JPMorgan Chase Bank, N.A.*, D.C. District Court, No. 09-1656 RMC, concerning whether WaMu Bank or the FDIC retained the trust-related liabilities for WaMu Bank's securitization activities, the FDIC asserted that "the liabilities and obligations at issue were assumed in their entirety by [JPMorgan Bank] under the P&A Agreement, thereby extinguishing any potential liability by FDIC Receiver."  *Deutsche* Docket #58 at 1.

279.    The FDIC also stated, in a November 22, 2010 filing, that "FDIC Receiver's exercise of the transfer provision[11] in this case is consistent with the general principle that when an entity purchases the assets of an ongoing business and expressly or impliedly assumes the related liabilities, the acquiring entity succeeds to the pre-sale debts and obligations of the business, thereby extinguishing the liability of the seller."  *Deutsche* Docket #54 at 38. Moreover, "[i]n connection with that purchase, FDIC Receiver transferred to [JPMorgan Bank],

---

[11]    "A liability is held by either FDIC Receiver or the assuming institution, not both, and FDIC Receiver's liability ends when the transferee's liability begins.  Here, [JPMorgan Bank] purchased substantially all of [WaMu Bank's] assets in a 'whole bank' transaction, including its ongoing banking operations and 'nationwide mortgage banking activities.'  Ex. 9, JPMorgan Bank 2009 Form 10-K (2/24/10) at 58, see [PAA] at 1."  *Deutsche* Docket #54 at 39.

and [JPMorgan Bank] expressly agreed to 'assume' and to 'pay, perform and discharge,' substantially all of [WaMu Bank's] liabilities." *Id. citing* PAA § 2.1.

280.   The Final Report of the Examiner ("Examiner's Report"), submitted by the court-appointed Examiner on November 1, 2010 during Washington Mutual, Inc.'s bankruptcy, further supports FHFA's and the FDIC's assertion that all liabilities associated with the WaMu Securitizations were transferred to JPMorgan Bank as a result of the PAA.  *In re Washington Mutual, Inc.*, No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (filed publicly with exhibits on Nov. 22, 2010).

281.   Per the exhibits to the Examiner's Report, the FDIC offered five different transaction structures to prospective bidders for the assets of WaMu Bank.  JPMorgan Bank elected to bid on what was described as "Transaction #3":

> **C.  Transaction #3 Whole Bank, All Deposits.**  Under this transaction, the Purchase and Assumption (Whole Bank), the Potential Acquirer whose Bid is accepted by the Corporation assumes the Assumed Deposits of the Bank and all other liabilities but specifically excluding the preferred stock, non-asset related defensive litigation, subordinated debt and senior debt, and purchases all of the assets of the Bank, excluding those assets identified as excluded assets in the Legal Documents and subject to the provisions thereof.

Exam. Report Ex. JPMCD 000001550.00009 (description); JPMCD_000002773.0001 (JPMorgan Bank Bid Form).  This is in contrast with Transactions #4 and #5, which offered JPMorgan Bank the option of assuming "only certain other liabilities."  *Id.*

282.   Additionally, during the drafting process, the FDIC posted a "FAQ" for potential acquirers with respect to the WaMu Bank transaction.  The FDIC's unequivocal position was that the mortgage securitization obligations passed to the acquirer:

> 9.  Are the off-balance sheet credit card portfolio and mortgage securitizations included in the transaction?  Do you expect the acquirer to assume the servicing obligations?  If there are pricing issues associated with the contracts (e.g., the pricing is disadvantageous to the assuming institution), can we take advantage of the FDIC's repudiation powers to effect a repricing?

> Answer: The bank's interests and obligations associated with the off-balance sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only contracts and obligations remaining in the receivership are subject to repudiation powers.

Examiner's Report Ex. JPMCD 000001550.00212 – JPMCD 000001550.00213.

283.    In fact, JPMorgan Bank knew and expressed concern that the PAA and Section 2.1, as drafted, included the transfer of liabilities relating to the WaMu securitizations from WaMu Bank to JPMorgan Bank.  On September 23, JPMorgan Bank wrote in an e-mail to the FDIC that

> Let's say there is a contract between the thrift and the Parent and that is included in the Books and Records (not something like "accrued for on the books of the Failed Bank," which probably would fix the problem) of the thrift at the time of closing.  Any liability under that contract is then arguably a liability reflected in the Books and Records.  Therefore one would most likely conclude that liabilities under that contract are assumed under 2.1 . . . So the way that [indemnification provision] 12.1 reads is we are indemnified for a claim by Wamu (shareholder of Failed Bank) with respect to that contract only to the extent the liability was not assumed -- indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing.  In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here.

Examiner's Report Ex. JPM_EX00034958, e-mail from Dan Cooney of JPMorgan Bank to David Gearin of the FDIC.  The language at issue was not altered, despite JPMorgan Bank's protests.

284.    The above-quoted passage—"indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing"—also demonstrates that, under the language of the PAA, JPMorgan Bank knew that it would be the appropriate successor for all liabilities and obligations not disclaimed in the PAA.  *Id.*

285.    Further, JPMorgan Chase's SEC filings following its purchase and assumption of WaMu Bank accounted for the additional liability associated with the WaMu Securitizations.  For instance, in a 424(b)(5) prospectus supplement, filed on December 12, 2009, JPMorgan

Chase cautions that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans . . . by us and certain of our subsidiaries, as well as entities acquired by us as part of the Bear Stearns, Washington Mutual and other transactions, could materially increase our costs and lower our profitability, and could materially and adversely impact our results of operations and financial condition."

286.    JPMorgan Bank was fully aware of the pending claims and potential claims against WaMu Bank when it purchased and assumed WaMu Bank's assets and liabilities. JPMorgan Bank has further evinced its intent to assume WaMu Banks' liabilities by paying to defend and settle lawsuits brought against WaMu Bank and its subsidiaries.

287.    Moreover, the former WaMu Bank website, www.wamu.com, redirects visitors to a JPMorgan Chase website proposing that visitors "update [their] favorites" to include www.chase.com.

288.    Similarly, the former WaMu Securities website, www.wamusecurities.com, redirects visitors to a JPMorgan Chase-branded website with the text "Washington Mutual Mortgage Securities Corp. (WMMSC), a wholly owned subsidiary of JPMorgan Chase Bank, National Association."

289.    As a result of the purchase and assumption of "substantially all of the assets and . . . all deposit and substantially all other liabilities of" WaMu Bank, JPMorgan Bank is the successor-in-interest to WaMu Bank and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of WaMu Bank.

290.    Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank.  WaMu Bank is not a defendant in this action.

III.     **The Registration Statements and the Prospectus Supplements**

A.     **Compliance With Underwriting Guidelines**

291.     The Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were supposed to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

292.     The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

293.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.

1.     **JPMorgan's Statements Regarding Compliance With Underwriting Guidelines**

294.     For example, the Prospectus Supplement for the JPMAC 2006-WMC1 Securitization, for which WMC Mortgage Corp. was the originator, J.P. Morgan Acquisition was the sponsor, J.P. Morgan Acceptance was the depositor, and J.P. Morgan Securities was the underwriter, stated that:  "The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the "Underwriting Guidelines") or (ii) purchased by WMC Mortgage Corp. after re-underwriting

98

the mortgage loans generally in accordance with the Underwriting Guidelines."  The Prospectus Supplement further stated that "The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

295.    The JPMAC 2006-WMC1 Prospectus Supplement stated that "WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception."  However, it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

296.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines."

297.    The Prospectus Supplement further stated that:  "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's

Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

298.    Additionally, the Prospectus Supplement claimed that:  "The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

299.    Moreover, the Prospectus Supplement stated that that WMC verified employment for every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplement stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC obtained "telephonic verification of employment."

300.    The Prospectus and Prospectus Supplement for each of the JPMorgan Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each JPMorgan Securitization are reflected in Appendix A to this Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the JPMorgan Securitizations did not adhere to their stated underwriting

guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

### 2. Bear Stearns's Statements Regarding Compliance With Underwriting Guidelines

301.    The Prospectus Supplements for the Bear Stearns Securitizations also contained several key statements with respect to the underwriting standards of the banks that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the BSABS 2007-HE7 Securitization, for which the Encore Credit division of Bear Stearns Residential Mortgage Corporation ("BSRM") was the originator, EMC was the sponsor, BSABS was the depositor, and BSC was the underwriter, stated that:  "The mortgage loans originated by BSRM were originated generally in accordance with guidelines (the 'BSRM Underwriting Guidelines') established by BSRM" and that "[t]he BSRM Underwriting Guidelines are intended to make sure that (i) the loan terms relate to the borrower's ability to repay and (ii) the value and marketability of the property are acceptable."

302.    The BSABS 2007-HE7 Prospectus Supplement stated that "[e]xceptions to the BSRM Underwriting Guidelines are considered" on a "case-by-case basis" but only upon "reasonable compensating factors" such as "validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrower's potential for increased earnings based on education, job training, etc."  Additionally, "[w]hen exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan, including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan."

303.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information. The mortgage loan file also contains a credit report on each applicant from an approved credit reporting company."

304.    The Prospectus Supplement further stated that:  "Under the BSRM Underwriting Guidelines, there are various risk categories used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher credit risk mortgage loans are graded in risk categories that permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments, liens that do not impair the lien position, or prior bankruptcies."

305.    Additionally, the Prospectus Supplement claimed that:  "The BSRM Underwriting Guidelines are applied in accordance with a procedure that complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property that conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of BSRM. The maximum allowable loan-to-value ratio varies based upon the income documentation, property type, creditworthiness, debt service-to-income ratio of the applicant and the overall risks associated with the loan decision."

306.    The Prospectus and Prospectus Supplement for each of the Bear Stearns

Securitizations had similar representations to those quoted above.   The relevant representations

in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting

standards for each Bear Stearns Securitization are reflected in Appendix A to this Complaint.   As

discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting

Loan Group for the Bear Stearns Securitizations did not adhere to their stated underwriting

guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus

Supplements false and misleading.

### 3.    WaMu's Statements Regarding Compliance With Underwriting Guidelines

307.    The Prospectus Supplement for the WaMu Securitizations also contained several

key statements with respect to the underwriting standards of the banks that originated the loans

in the Securitizations.   For example, the Prospectus Supplement for the WAMU 2007-OA3

Securitization, for which WaMu Bank was both the originator and sponsor, WaMu Acceptance

was the depositor, and WaMu Capital was the underwriter, stated that:  "All of the mortgage

loans owned by the Trust have been originated in accordance with the underwriting guidelines of

the sponsor as described in this section" and that "[t]he sponsor's underwriting guidelines

generally are intended to evaluate the prospective borrower's credit standing and repayment

ability and the value and adequacy of the mortgaged property as collateral."

308.    The WAMU 2007-OA3 Prospectus Supplement stated that "[e]xceptions to the

sponsor's loan program parameters may be made," however, it also stated that such exceptions

would be made "on a case-by-case basis" and only upon "compensating factors" such as "low

loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid

assets, stable employment and time in residence at the prospective borrower's current address,"

and furthermore, it stated that "the basis for the exception is documented, and in some cases the approval of a senior underwriter is required."

309.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history" and that "[t]o evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower."

310.    The Prospectus Supplement further stated that:  "In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")."

311.    The Prospectus and Prospectus Supplements for each of the WaMu Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each WaMu Securitization are reflected in Appendix A to this Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the WaMu Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

### 4.   Long Beach's Statements Regarding Compliance With Underwriting Guidelines

312.    The Prospectus Supplements for the Long Beach Securitizations also contained several key statements with respect to the underwriting standards of the banks that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the LBMLT 2006-11 Securitization, for which Long Beach Mortgage was the originator and sponsor, Long Beach Securities was the depositor, and WaMu Capital was the underwriter, stated that: "All of the mortgage loans owned by the trust have been, or will be, originated by [Long Beach Mortgage] through wholesale brokers or re-underwritten upon acquisition from correspondents by the sponsor generally in accordance with the Long Beach underwriting guidelines described in this section" and that "The Long Beach underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."

313.    The LBMLT 2006-11 Prospectus Supplement stated that Long Beach "may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the Long Beach underwriting risk category guidelines warrants an underwriting exception." and that "[i]t is expected that some of the mortgage loans owned by the trust will be underwriting exceptions," however, it also stated that such exceptions would be made "[o]n a case-by-case basis and only with the approval of an employee with appropriate risk level authority," and only upon "compensating factors" such as " low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the prospective borrower's current address."

314.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "During the underwriting or re-underwriting process, [Long Beach]

105

reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the Long Beach underwriting guidelines."

315. The Prospectus Supplement further stated that: "Under the Long Beach underwriting programs, various risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the prospective borrower's credit history and debt ratio…In general, higher credit risk mortgage loans are graded in categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Long Beach underwriting programs establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories."

316. Additionally, the Prospectus Supplement claimed that: "The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process. In most cases, properties in below average condition, including properties requiring major deferred maintenance, are not acceptable under the Long Beach underwriting programs. Each appraisal includes a market data

analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  Every independent appraisal is reviewed by an underwriter of the sponsor or its affiliate and is reviewed by one or more third party vendors which may refer the appraisal to the sponsor or one of its affiliates for additional further review before the loan is funded or re-underwritten.  Depending upon the original principal balance and loan-to-value ratio of the mortgaged property, the appraisal review may include an administrative review, technical review, desk review or field review of the original appraisal."

317.    Moreover, the Prospectus Supplement stated that for Long Beach "verification of employment is required for salaried prospective borrowers."  Indeed the Prospectus Supplement states that Long Beach "re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs."

318.    The Prospectus and Prospectus Supplements for each of the Long Beach Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Long Beach Securitization are reflected in Appendix A to this Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Long Beach Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

5.     **Statements Regarding Representations Made by the Originator and Seller**

319.    Further, for the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements described or referenced additional representations and warranties in the PSA or Mortgage Loan Purchase Agreement by the originator and sponsor concerning the mortgage loans underlying the Securitizations.  Such representations and warranties, which are described more fully for each Securitization in Appendix A, included: (i) the origination complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws and (ii) none of the mortgage loans exhibited a history of delinquency or were in default.

320.    Additionally, the JPMorgan, WaMu[12], and Long Beach-sponsored Securitizations, and the AABST 2005-5, ARSI 2006-M2, and CBASS 2006-CB7 Securitizations, contained "bringdown" language, which is described more fully for each of the above securitizations in Appendix A.  In each of these securitizations, the depositor "brought down" the representations and warranties of the originator and seller at the date of issuance, incorporating those representations into the depositor's representations to prospective investors.

321.    The JPMorgan and Long Beach-sponsored Securitizations, plus the AABST 2005-5, ARSI 2006-M2, and CBASS 2006-CB7 Securitizations, contained the following or substantially similar language that "brought down" the originator or seller representations:

> The depositor will not include any loan in the trust fund for any series of securities if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the loan as of the date of initial issuance of the related series of securities.

---

[12]    Except for WMALT 2005-9 and WMALT 2005-10.

322.     The WaMu-sponsored Securitizations contained the following language that "brought down" the originator or seller representations:

> The depositor will not transfer any mortgage loan to a trust if anything has come to the depositor's attention that would cause it to believe that the representations and warranties made in respect of a mortgage loan will not be accurate and complete in all material respects as of the Closing Date.

323.     The inclusion of these representations and the "bringdown" language in the Prospectuses and Prospectus Supplements had provided additional representations and assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's decision to purchase the Certificates.

### B.     Statements Regarding Occupancy Status of Borrower

324.     The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the

Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[13]

Table 5

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 94.34 | 0.68 | 4.97 |
| AHM 2005-1 | VIA | Group VI | 70.17 | 3.63 | 26.20 |
| AHM 2005-4 | IVA | Group IV | 67.42 | 4.37 | 28.21 |
| ARSI 2006-M2 | A1 | Group I | 85.97 | 0.78 | 13.25 |
| BALTA 2005-10 | II2A1 | Group II-2 | 44.53 | 13.96 | 41.51 |
| BALTA 2005-10 | II3A1 | Group II-3 | 65.56 | 3.50 | 30.94 |
| BALTA 2006-1 | II1A1 | Group II-1 | 52.92 | 8.95 | 38.13 |
| BALTA 2006-2 | II2A1 | Group II-2 | 68.82 | 8.91 | 22.27 |
| BALTA 2006-3 | II1A1 | Group II-1 | 27.93 | 16.20 | 55.87 |
| BALTA 2006-4 | I2A1 | Group I-2 | 34.09 | 7.02 | 58.89 |
| BALTA 2006-4 | III1A1 | Group III-1 | 88.56 | 6.58 | 4.86 |
| BSABS 2005-HE12 | IIA | Group II | 88.00 | 0.82 | 11.18 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 82.78 | 1.35 | 15.87 |
| BSABS 2006-HE2 | IIA | Group II | 76.11 | 1.08 | 22.81 |
| BSABS 2006-HE4 | IIA | Group II | 89.10 | 0.96 | 9.93 |
| BSABS 2006-HE5 | IIA | Group II | 86.90 | 0.91 | 12.19 |
| BSABS 2006-HE7 | II2A | Group II-2 | 92.02 | 0.43 | 7.55 |
| BSABS 2006-HE8 | II2A | Group II-2 | 94.75 | 0.22 | 5.03 |
| BSABS 2006-HE9 | IIA | Group II | 96.00 | 0.32 | 3.68 |
| BSABS 2006-HE9 | IIIA | Group III | 91.13 | 0.81 | 8.06 |
| BSABS 2006-HE10 | II2A | Group II-2 | 94.25 | 0.40 | 5.35 |
| BSABS 2006-HE10 | II3A | Group II-3 | 91.15 | 1.23 | 7.62 |
| BSABS 2007-FS1 | IIA | Group II | 98.80 | 0.00 | 1.20 |
| BSABS 2007-HE1 | II2A | Group II-2 | 94.75 | 0.80 | 4.45 |
| BSABS 2007-HE1 | II3A | Group II-3 | 89.24 | 1.18 | 9.58 |
| BSABS 2007-HE2 | II2A | Group II-2 | 93.73 | 0.74 | 5.54 |
| BSABS 2007-HE2 | II3A | Group II-3 | 88.94 | 1.33 | 9.73 |
| BSABS 2007-HE3 | IIA | Group II | 92.93 | 0.62 | 6.44 |
| BSABS 2007-HE3 | IIIA | Group III | 94.59 | 1.05 | 4.36 |
| BSABS 2007-HE4 | IIA | Group II | 89.99 | 1.08 | 8.92 |

---

[13]   Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| BSABS 2007-HE5 | IIA | Group II | 91.35 | 2.02 | 6.63 |
| BSABS 2007-HE5 | IIIA | Group III | 100.00 | 0.00 | 0.00 |
| BSABS 2007-HE6 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSABS 2007-HE7 | IIA1 | Group II | 91.96 | 1.26 | 6.77 |
| BSABS 2007-HE7 | IIIA1 | Group III | 94.63 | 1.02 | 4.35 |
| BSMF 2006-SL5 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2006-SL6 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 83.01 | 4.75 | 12.23 |
| BSMF 2007-SL1 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2007-SL2 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| CBASS 2006-CB2 | AV | Group 1 | 87.34 | 2.94 | 9.72 |
| CBASS 2006-CB7 | A1 | Group I | 85.79 | 2.29 | 11.93 |
| GPMF 2005-AR5 | IIA1 | Group II | 43.72 | 5.04 | 51.24 |
| GPMF 2006-AR3 | IIA1 | Group II | 46.09 | 5.85 | 48.06 |
| GPMF 2006-AR3 | IIA2 | Group II | 46.09 | 5.85 | 48.06 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 84.02 | 6.34 | 9.64 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 59.03 | 7.48 | 33.49 |
| JPMAC 2005-FRE1 | AI | Group I | 85.92 | 1.71 | 12.37 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 92.70 | 1.43 | 5.87 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 90.27 | 5.39 | 4.35 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 87.87 | 1.35 | 10.78 |
| JPMAC 2006-CH1 | A1 | Group 1 | 88.44 | 0.89 | 10.67 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 94.58 | 0.59 | 4.83 |
| JPMAC 2006-CW1 | A1A | Group 1 | 97.69 | 0.28 | 2.04 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 95.10 | 0.63 | 4.27 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 85.44 | 0.86 | 13.70 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 83.13 | 1.19 | 15.68 |
| JPMAC 2006-HE1 | A1 | Group 1 | 86.74 | 1.66 | 11.60 |
| JPMAC 2006-HE2 | A1 | Group 1 | 92.69 | 0.39 | 6.92 |
| JPMAC 2006-HE3 | A1 | Group 1 | 91.96 | 1.38 | 6.67 |
| JPMAC 2006-NC1 | A1 | Group 1 | 80.21 | 4.49 | 15.30 |
| JPMAC 2006-NC2 | A1A | Group 1 | 94.36 | 0.83 | 4.81 |
| JPMAC 2006-RM1 | A1A | Group 1 | 96.08 | 0.23 | 3.69 |
| JPMAC 2006-RM1 | A1B | Group 1 | 96.08 | 0.23 | 3.69 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 98.34 | 0.32 | 1.34 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 97.43 | 1.26 | 1.30 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 97.79 | 0.95 | 1.25 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 97.79 | 0.95 | 1.25 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 98.04 | 0.62 | 1.34 |

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| JPMAC 2006-WMC4 | A1B | Group 1 | 98.04 | 0.62 | 1.34 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 95.50 | 3.97 | 0.52 |
| JPMAC 2007-CH3 | A1A | Group 1 | 90.97 | 1.46 | 7.57 |
| JPMAC 2007-CH3 | A1B | Group 1 | 90.97 | 1.46 | 7.57 |
| JPMAC 2007-CH4 | A1 | Group 1 | 92.19 | 6.27 | 1.54 |
| JPMAC 2007-CH5 | A1 | Group 1 | 88.25 | 1.19 | 10.56 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 94.25 | 5.24 | 0.51 |
| LBMLT 2005-3 | IA | Group I | 96.90 | 0.26 | 2.84 |
| LBMLT 2006-1 | IA | Group I | 76.58 | 1.57 | 21.85 |
| LBMLT 2006-2 | IA | Group I | 77.52 | 1.60 | 20.88 |
| LBMLT 2006-3 | IA | Group I | 92.79 | 0.75 | 6.46 |
| LBMLT 2006-4 | IA | Group I | 95.06 | 0.27 | 4.68 |
| LBMLT 2006-5 | IA | Group I | 93.94 | 0.58 | 5.48 |
| LBMLT 2006-6 | IA | Group I | 96.73 | 0.39 | 2.87 |
| LBMLT 2006-7 | IA | Group I | 95.77 | 0.63 | 3.60 |
| LBMLT 2006-8 | IA | Group I | 94.14 | 0.63 | 5.24 |
| LBMLT 2006-9 | IA | Group I | 91.79 | 1.02 | 7.19 |
| LBMLT 2006-10 | IA | Group I | 92.45 | 0.56 | 6.99 |
| LBMLT 2006-11 | IA | Group I | 93.94 | 0.80 | 5.26 |
| LBMLT 2006-WL1 | IA2 | Group I | 81.38 | 1.25 | 17.37 |
| LBMLT 2006-WL1 | IA1 | Group I | 81.38 | 1.25 | 17.37 |
| LBMLT 2006-WL2 | IA | Group I | 82.02 | 1.01 | 16.97 |
| LBMLT 2006-WL3 | IA | Group I | 83.71 | 1.00 | 15.29 |
| LUM 2006-3 | II2A1 | Group II-2 | 73.56 | 3.32 | 23.12 |
| NCMT 2007-1 | 1A1 | Group 1 | 100.00 | 0.00 | 0.00 |
| PCHLT 2005-4 | 2A1 | Group 2 | 83.15 | 2.29 | 14.56 |
| SACO 2007-1 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| SACO 2007-2 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| SAMI 2006-AR4 | IA1 | Group I | 72.69 | 10.24 | 17.07 |
| WAMU 2007-OA3 | 1A | Group 1 | 51.00 | 12.02 | 36.98 |
| WMABS 2006-HE1 | IA | Group 1 | 89.73 | 0.49 | 9.78 |
| WMABS 2006-HE3 | IA | Group 1 | 90.13 | 0.52 | 9.34 |
| WMABS 2006-HE4 | IA | Group 1 | 91.03 | 0.67 | 8.30 |
| WMABS 2006-HE5 | IA | Group 1 | 91.57 | 0.96 | 7.47 |
| WMABS 2007-HE1 | IA | Group 1 | 90.50 | 0.17 | 9.32 |
| WMABS 2007-HE2 | IA | Group 1 | 91.68 | 1.15 | 7.18 |
| WMALT 2005-9 | 1CB | Group 1 | 0.00 | 0.00 | 100.00 |
| WMALT 2005-10 | 1CB | Group 1 | 0.00 | 11.39 | 88.61 |
| WMALT 2006-AR4 | 1A | Group 1 | 76.33 | 6.26 | 17.40 |

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| WMALT 2006-AR4 | 2A | Group 2 | 75.30 | 6.63 | 18.07 |
| WMALT 2006-AR4 | 3A | Group 3 | 78.93 | 2.60 | 18.47 |
| WMALT 2006-AR5 | 1A | Group 1 | 81.36 | 7.87 | 10.76 |
| WMALT 2006-AR5 | 2A | Group 2 | 68.33 | 9.25 | 22.42 |
| WMALT 2006-AR8 | 1A | Group 1 | 80.55 | 4.40 | 15.05 |
| WMALT 2006-AR9 | 1A | Group 1 | 78.49 | 10.50 | 11.01 |
| WMALT 2007-OA1 | 1A | Group 1 | 79.22 | 9.06 | 11.72 |
| WMALT 2007-OA2 | 1A | Group 1 | 79.33 | 5.59 | 15.08 |
| WMALT 2007-OA3 | 1A | Group 1 | 82.89 | 3.90 | 13.21 |
| WMALT 2007-OA3 | 3A | Group 3 | 60.04 | 8.23 | 31.73 |
| WMHE 2007-HE1 | IA | Group I | 93.53 | 1.03 | 5.44 |
| WMHE 2007-HE2 | IA | Group I | 91.79 | 1.23 | 6.98 |
| WMHE 2007-HE3 | IA | Group I | 94.16 | 1.24 | 4.59 |
| WMHE 2007-HE4 | IA | Group I | 92.96 | 1.84 | 5.20 |

325.    As Table 5 makes clear, the Prospectus Supplement for over 93 percent of the Securitizations reported that more than 50 percent of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (i.e. a second home or investment property).

326.    The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about the occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default and are more likely to care for their primary residence than borrowers who purchase homes as second homes or investments and live elsewhere, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

327.    Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small

113

differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in Section IV.A.1, the Registration Statement for each Securitization materially *overstated* the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C.       Statements Regarding Loan to Value Ratios

328.    The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

329.    The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

330.    The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups for each Securitization are reflected in Table 6 below.[14]

---

[14]    As used in this Complaint, "LTV" refers to the loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV

**Table 6**

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 63.41 | 0.00 |
| AHM 2005-1 | VIA | Group VI | 92.90 | 0.00 |
| AHM 2005-4 | IVA | Group IV | 94.45 | 0.00 |
| ARSI 2006-M2 | A1 | Group I | 45.87 | 0.00 |
| BALTA 2005-10 | II2A1 | Group II-2 | 98.22 | 0.00 |
| BALTA 2005-10 | II3A1 | Group II-3 | 98.52 | 0.00 |
| BALTA 2006-1 | III1A1 | Group II-1 | 97.74 | 0.00 |
| BALTA 2006-2 | II2A1 | Group II-2 | 99.19 | 0.00 |
| BALTA 2006-3 | II1A1 | Group II-1 | 97.70 | 0.00 |
| BALTA 2006-4 | I2A1 | Group I-2 | 98.52 | 0.00 |
| BALTA 2006-4 | III1A1 | Group III-1 | 83.43 | 0.00 |
| BSABS 2005-HE12 | IIA | Group II | 58.04 | 0.00 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 50.91 | 0.00 |
| BSABS 2006-HE2 | IIA | Group II | 50.24 | 0.00 |
| BSABS 2006-HE4 | IIA | Group II | 66.09 | 0.00 |
| BSABS 2006-HE5 | IIA | Group II | 52.23 | 0.00 |
| BSABS 2006-HE7 | II2A | Group II-2 | 58.48 | 0.00 |
| BSABS 2006-HE8 | II2A | Group II-2 | 59.19 | 0.00 |
| BSABS 2006-HE9 | IIA | Group II | 48.60 | 0.00 |
| BSABS 2006-HE9 | IIIA | Group III | 50.00 | 0.00 |
| BSABS 2006-HE10 | II2A | Group II-2 | 55.06 | 0.00 |
| BSABS 2006-HE10 | II3A | Group II-3 | 51.39 | 0.00 |
| BSABS 2007-FS1 | IIA | Group II | 36.55 | 0.00 |
| BSABS 2007-HE1 | II2A | Group II-2 | 54.46 | 0.00 |
| BSABS 2007-HE1 | II3A | Group II-3 | 52.89 | 0.00 |
| BSABS 2007-HE2 | II2A | Group II-2 | 39.16 | 0.00 |
| BSABS 2007-HE2 | II3A | Group II-3 | 35.32 | 0.00 |
| BSABS 2007-HE3 | IIA | Group II | 44.19 | 0.00 |
| BSABS 2007-HE3 | IIIA | Group III | 49.54 | 0.00 |
| BSABS 2007-HE4 | IIA | Group II | 53.46 | 0.00 |
| BSABS 2007-HE5 | IIA | Group II | 61.17 | 0.00 |
| BSABS 2007-HE5 | IIIA | Group III | 48.36 | 0.00 |
| BSABS 2007-HE6 | IIA | Group II | 54.31 | 0.00 |

calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined loan-to-value ratio, or "CLTV").

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| BSABS 2007-HE7 | IIA1 | Group II | 66.83 | 0.00 |
| BSABS 2007-HE7 | IIIA1 | Group III | 74.70 | 0.00 |
| BSMF 2006-SL5 | IIA | Group II | 1.93 | 0.00 |
| BSMF 2006-SL6 | IIA | Group II | 3.62 | 0.00 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 100.00 | 0.00 |
| BSMF 2007-SL1 | IIA | Group II | 0.47 | 0.00 |
| BSMF 2007-SL2 | IIA | Group II | 1.77 | 0.00 |
| CBASS 2006-CB2 | AV | Group 1 | 64.44 | 0.04 |
| CBASS 2006-CB7 | A1 | Group I | 45.11 | 0.00 |
| GPMF 2005-AR5 | IIA1 | Group II | 96.48 | 0.00 |
| GPMF 2006-AR3 | IIA1 | Group II | 97.93 | 0.00 |
| GPMF 2006-AR3 | IIA2 | Group II | 97.93 | 0.00 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 94.54 | 0.00 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 92.37 | 0.00 |
| JPMAC 2005-FRE1 | AI | Group I | 52.82 | 0.00 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 70.09 | 0.00 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 63.36 | 0.00 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 52.46 | 0.00 |
| JPMAC 2006-CH1 | A1 | Group 1 | 53.08 | 0.00 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 67.63 | 0.00 |
| JPMAC 2006-CW1 | A1A | Group 1 | 71.17 | 0.00 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 66.24 | 0.00 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 59.44 | 0.00 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 52.73 | 0.00 |
| JPMAC 2006-HE1 | A1 | Group 1 | 64.92 | 0.00 |
| JPMAC 2006-HE2 | A1 | Group 1 | 76.16 | 0.00 |
| JPMAC 2006-HE3 | A1 | Group 1 | 43.50 | 0.00 |
| JPMAC 2006-NC1 | A1 | Group 1 | 56.25 | 0.00 |
| JPMAC 2006-NC2 | A1A | Group 1 | 57.98 | 0.00 |
| JPMAC 2006-RM1 | A1A | Group 1 | 56.97 | 0.00 |
| JPMAC 2006-RM1 | A1B | Group 1 | 56.97 | 0.00 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 62.34 | 0.00 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 68.40 | 0.00 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 66.96 | 0.00 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 66.96 | 0.00 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 64.62 | 0.00 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 64.62 | 0.00 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 57.39 | 0.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| JPMAC 2007-CH3 | A1A | Group 1 | 63.36 | 0.00 |
| JPMAC 2007-CH3 | A1B | Group 1 | 63.36 | 0.00 |
| JPMAC 2007-CH4 | A1 | Group 1 | 56.35 | 0.00 |
| JPMAC 2007-CH5 | A1 | Group 1 | 50.85 | 0.00 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 96.71 | 0.00 |
| LBMLT 2005-3 | IA | Group I | 100.00 | 0.00 |
| LBMLT 2006-1 | IA | Group I | 72.87 | 0.00 |
| LBMLT 2006-2 | IA | Group I | 67.64 | 0.00 |
| LBMLT 2006-3 | IA | Group I | 75.85 | 0.00 |
| LBMLT 2006-4 | IA | Group I | 81.33 | 0.00 |
| LBMLT 2006-5 | IA | Group I | 74.73 | 0.00 |
| LBMLT 2006-6 | IA | Group I | 28.45 | 0.00 |
| LBMLT 2006-7 | IA | Group I | 22.74 | 0.00 |
| LBMLT 2006-8 | IA | Group I | 70.66 | 0.00 |
| LBMLT 2006-9 | IA | Group I | 63.13 | 0.00 |
| LBMLT 2006-10 | IA | Group I | 59.81 | 0.00 |
| LBMLT 2006-11 | IA | Group I | 61.67 | 0.00 |
| LBMLT 2006-WL1 | IA1 | Group I | 70.76 | 0.00 |
| LBMLT 2006-WL1 | IA2 | Group I | 70.76 | 0.00 |
| LBMLT 2006-WL2 | IA | Group I | 19.23 | 0.00 |
| LBMLT 2006-WL3 | IA | Group I | 21.86 | 0.00 |
| LUM 2006-3 | II2A1 | Group II-2 | 96.85 | 0.00 |
| NCMT 2007-1 | 1A1 | Group 1 | 48.06 | 0.00 |
| PCHLT 2005-4 | 2A1 | Group 2 | 59.05 | 0.00 |
| SACO 2007-1 | IIA | Group II | 2.54 | 0.00 |
| SACO 2007-2 | IIA | Group II | 1.17 | 0.00 |
| SAMI 2006-AR4 | IA1 | Group I | 91.65 | 0.00 |
| WAMU 2007-OA3 | 1A | Group 1 | 93.43 | 0.00 |
| WMABS 2006-HE1 | IA | Group I | 59.84 | 0.00 |
| WMABS 2006-HE3 | IA | Group I | 40.79 | 0.00 |
| WMABS 2006-HE4 | IA | Group I | 22.83 | 0.00 |
| WMABS 2006-HE5 | IA | Group I | 49.18 | 0.00 |
| WMABS 2007-HE1 | IA | Group I | 62.14 | 0.00 |
| WMABS 2007-HE2 | IA | Group I | 60.98 | 0.00 |
| WMALT 2005-9 | 1CB | Group 1 | 89.08 | 0.00 |
| WMALT 2005-10 | 1CB | Group 1 | 94.88 | 0.00 |
| WMALT 2006-AR4 | 1A | Group 1 | 77.29 | 0.00 |
| WMALT 2006-AR4 | 2A | Group 2 | 90.48 | 0.00 |

117

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| WMALT 2006-AR4 | 3A | Group 3 | 76.36 | 0.00 |
| WMALT 2006-AR5 | 1A | Group 1 | 70.75 | 0.00 |
| WMALT 2006-AR5 | 2A | Group 2 | 76.48 | 0.00 |
| WMALT 2006-AR8 | 1A | Group 1 | 77.21 | 0.00 |
| WMALT 2006-AR9 | 1A | Group 1 | 76.47 | 0.00 |
| WMALT 2007-OA1 | 1A | Group 1 | 45.17 | 0.00 |
| WMALT 2007-OA2 | 1A | Group 1 | 46.97 | 0.00 |
| WMALT 2007-OA3 | 1A | Group 1 | 49.34 | 0.00 |
| WMALT 2007-OA3 | 3A | Group 3 | 90.37 | 0.00 |
| WMHE 2007-HE1 | IA | Group I | 60.41 | 0.00 |
| WMHE 2007-HE2 | IA | Group I | 58.78 | 0.00 |
| WMHE 2007-HE3 | IA | Group I | 59.11 | 0.00 |
| WMHE 2007-HE4 | IA | Group I | 57.07 | 0.00 |

331.    As Table 6 makes clear, the Prospectus Supplements for over 77 percent of the Securitizations reported that 50 percent or more of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less, and the Prospectus Supplement for nearly all of the Securitizations reported that *zero* mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent, with the lone exception (CBASS 2006-CB2) reporting that 0.04 percent of the mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

332.    The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

333.    Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in Section IV.A.2, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.[15]

### D.    Statements Regarding Credit Ratings

334.    Credit ratings are assigned to the tranches of securities issued in mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe the various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.

---

[15]    The eleven exceptions are BSMF 2006-SL5, BSMF 2007-SL1, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-WL2, LBMLT 2006-WL3, SACO 2007-1, SACO 2007-2, WMABS 2006-HE4, WMALT 2007-OA1, and WMALT 2007-OA2 for which the Registration Statement understated the percentage of loans with an LTV ratio above 100 percent by 51.87 percent, 60.70 percent, 14.00 percent, 14.38 percent, 9.40 percent, 10.39 percent, 57.82 percent, 54.37 percent, 13.52 percent, 13.31 percent, and 11.93 percent, respectively, but did not overstate the percentage of loans with an LTV ratio at or less than 80 percent.

Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

335.    Rating agencies determine the credit rating for each tranche of securities issued in a mortgage backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor provided loan level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[16]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificateholders.  If the collateral within the securitization is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

336.    Credit ratings have been an important tool to gauge risk when making investment decisions.  In testimony before the Senate PSI, Susan Barnes, the North American Practice Leader for residential mortgage-backed securities at S&P from 2005 to 2008, confirmed that the

---

[16]  "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

rating agencies relied upon investment banks to provide accurate information about the loan

pools:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations. **S&P relies on the data produced by others and reported to both S&P and investors about those loans. . . .S&P does not receive the original loan files for the loans in the pool.** Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

Senate Homeland Security and Governmental Affairs Subcommittee on Investigations, Hearing

on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, Apr. 23, 2010

(emphasis added).

337.    For almost a hundred years, investors like pension funds, municipalities,

insurance companies, and university endowments have relied heavily on credit ratings to assist

them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's

respective internal policies limited their purchases of private label residential mortgage-backed

securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds

(or their equivalent).

338.    Each tranche of Securities in the Securitizations received a credit rating upon

issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the

credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for

each of the GSE Certificates was "investment grade," almost always AAA or its equivalent.  The

accuracy of these ratings was material to a reasonable investor's decision to purchase the

Certificates.  As set forth in Table 9 below, the ratings for the Securitizations were inflated as a

result of Defendants' provision of incorrect data concerning the attributes of the underlying

mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the

GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

IV.     **Falsity Of Statements in the Registration Statements and Prospectus Supplements**

A.      **The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False**

339.    An analysis of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically-significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations.  The data analysis demonstrates that the data concerning owner occupancy and LTV ratios was materially false and misleading.

1.     **Owner Occupancy Data Was Materially False**

340.    The data analysis has revealed that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated.  In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

341.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, (i) whether, months after the loan closed, the borrower's tax bill was being mailed to the property securing the mortgage loan or to a different address; (ii) whether the borrower had claimed a tax exemption on the property; and (iii) whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an

investment property, both of which make it much more likely that a borrower will not repay the loan

342.     A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.  For example, for the JPMAC 2006-WMC2 Securitization, for which J.P. Morgan Acquisition was the sponsor and J.P. Morgan Securities was the underwriter, the Prospectus Supplement stated that 2.57 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.  But the data analysis revealed that for 12.43 percent of the properties represented as owner-occupied, the owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 14.68 percent, more than *five times* the percentage reported in the Prospectus Supplement.[17]

343.     The data analysis revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties.  The true percentage of non-owner occupied properties, as determined by the data analysis, versus the percentage stated in the Prospectus Supplement for each Securitization is reflected in Table 7 below.  Table 7 demonstrates that the Prospectus Supplements for the Securitizations understated the percentage of non-owner occupied properties by at least 2.77 percent,[18] and for many Securitizations by 10 percent or more.

---

[17]     This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 2.57 percent) and (b) the product of (i) the stated owner-occupied percentage (here, 97.43 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 12.43 percent).

[18]     The two exceptions are the WMALT 2005-9 and WMALT 2005-10 securitizations.

344.    Specifically, the data analysis revealed that the Prospectus Supplements for the JPMorgan Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 11.14 percent.

345.    Likewise, the data analysis revealed that the Prospectus Supplements for the Bear Stearns Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 9.77 percent.

346.    The data analysis also revealed that the Prospectus Supplements for the WaMu Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 11.95 percent.[19]

347.    The data analysis also revealed that the Prospectus Supplements for the Long Beach Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 10.22 percent.

---

[19]    This calculation excludes the WMALT 2005-9 and WMALT 2005-10 Securitizations, for which none of the properties were reported by the prospectus supplements as being owner occupied.

**Table 7**

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 5.66 | 12.31 | 17.27 | 11.61 |
| AHM 2005-1 | VIA | Group VI | 29.83 | 12.91 | 38.89 | 9.06 |
| AHM 2005-4 | IVA | Group IV | 32.58 | 12.37 | 40.92 | 8.34 |
| ARSI 2006-M2 | A1 | Group I | 14.03 | 7.98 | 20.89 | 6.86 |
| BALTA 2005-10 | II2A1 | Group II-2 | 55.47 | 14.34 | 61.86 | 6.39 |
| BALTA 2005-10 | II3A1 | Group II-3 | 34.44 | 12.18 | 42.42 | 7.98 |
| BALTA 2006-1 | II1A1 | Group II-1 | 47.08 | 13.61 | 54.28 | 7.20 |
| BALTA 2006-2 | II2A1 | Group II-2 | 31.18 | 15.43 | 41.80 | 10.62 |
| BALTA 2006-3 | II1A1 | Group II-1 | 72.07 | 9.92 | 74.84 | 2.77 |
| BALTA 2006-4 | I2A1 | Group I-2 | 65.91 | 19.70 | 72.63 | 6.72 |
| BALTA 2006-4 | III1A1 | Group III-1 | 11.44 | 12.72 | 22.71 | 11.27 |
| BSABS 2005-HE12 | IIA | Group II | 12.00 | 12.48 | 22.98 | 10.98 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 17.22 | 10.00 | 25.50 | 8.28 |
| BSABS 2006-HE2 | IIA | Group II | 23.89 | 11.84 | 32.90 | 9.01 |
| BSABS 2006-HE4 | IIA | Group II | 10.90 | 13.82 | 23.21 | 12.31 |
| BSABS 2006-HE5 | IIA | Group II | 13.10 | 11.89 | 23.43 | 10.33 |
| BSABS 2006-HE7 | II2A | Group II-2 | 7.98 | 13.66 | 20.55 | 12.57 |
| BSABS 2006-HE8 | II2A | Group II-2 | 5.25 | 10.93 | 15.61 | 10.36 |
| BSABS 2006-HE9 | IIA | Group II | 4.00 | 10.86 | 14.43 | 10.43 |
| BSABS 2006-HE9 | IIIA | Group III | 8.87 | 11.42 | 19.28 | 10.41 |
| BSABS 2006-HE10 | II2A | Group II-2 | 5.75 | 11.56 | 16.65 | 10.89 |
| BSABS 2006-HE10 | II3A | Group II-3 | 8.85 | 12.47 | 20.22 | 11.37 |
| BSABS 2007-FS1 | IIA | Group II | 1.20 | 7.17 | 8.28 | 7.08 |
| BSABS 2007-HE1 | II2A | Group II-2 | 5.25 | 11.28 | 15.94 | 10.68 |
| BSABS 2007-HE1 | II3A | Group II-3 | 10.76 | 9.89 | 19.59 | 8.83 |
| BSABS 2007-HE2 | II2A | Group II-2 | 6.27 | 7.02 | 12.85 | 6.58 |
| BSABS 2007-HE2 | II3A | Group II-3 | 11.06 | 7.14 | 17.41 | 6.35 |
| BSABS 2007-HE3 | IIA | Group II | 7.07 | 10.81 | 17.12 | 10.05 |
| BSABS 2007-HE3 | IIIA | Group III | 5.41 | 9.07 | 13.99 | 8.58 |
| BSABS 2007-HE4 | IIA | Group II | 10.01 | 9.86 | 18.88 | 8.87 |

---

[20] "Strong indication" is defined for purposes of this Complaint as failing two or more owner occupancy tests, as explained in paragraph 341.

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| BSABS 2007-HE5 | IIA | Group II | 8.65 | 9.60 | 17.41 | 8.76 |
| BSABS 2007-HE5 | IIIA | Group III | 0.00 | 9.29 | 9.29 | 9.29 |
| BSABS 2007-HE6 | IIA | Group II | 0.00 | 10.91 | 10.91 | 10.91 |
| BSABS 2007-HE7 | IIA1 | Group II | 8.04 | 10.82 | 17.99 | 9.95 |
| BSABS 2007-HE7 | IIIA1 | Group III | 5.37 | 10.39 | 15.20 | 9.83 |
| BSMF 2006-SL5 | IIA | Group II | 0.00 | 14.15 | 14.15 | 14.15 |
| BSMF 2006-SL6 | IIA | Group II | 0.00 | 13.86 | 13.86 | 13.86 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 16.99 | 13.41 | 28.12 | 11.13 |
| BSMF 2007-SL1 | IIA | Group II | 0.00 | 12.08 | 12.08 | 12.08 |
| BSMF 2007-SL2 | IIA | Group II | 0.00 | 10.74 | 10.74 | 10.74 |
| CBASS 2006-CB2 | AV | Group 1 | 12.66 | 12.01 | 23.15 | 10.49 |
| CBASS 2006-CB7 | A1 | Group I | 14.21 | 8.59 | 21.58 | 7.37 |
| GPMF 2005-AR5 | IIA1 | Group II | 56.28 | 15.55 | 63.08 | 6.80 |
| GPMF 2006-AR3 | IIA1 | Group II | 53.91 | 19.05 | 62.69 | 8.78 |
| GPMF 2006-AR3 | IIA2 | Group II | 53.91 | 19.05 | 62.69 | 8.78 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 15.98 | 12.96 | 26.86 | 10.88 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 40.97 | 12.85 | 48.56 | 7.59 |
| JPMAC 2005-FRE1 | AI | Group I | 14.08 | 13.63 | 25.79 | 11.71 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 7.30 | 9.61 | 16.21 | 8.91 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 9.73 | 14.14 | 22.49 | 12.76 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 12.13 | 13.33 | 23.84 | 11.71 |
| JPMAC 2006-CH1 | A1 | Group 1 | 11.56 | 11.37 | 21.62 | 10.06 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 5.42 | 11.87 | 16.65 | 11.23 |
| JPMAC 2006-CW1 | A1A | Group 1 | 2.31 | 10.11 | 12.19 | 9.88 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 4.90 | 12.94 | 17.21 | 12.31 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 14.56 | 15.13 | 27.49 | 12.93 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 16.87 | 13.18 | 27.83 | 10.96 |
| JPMAC 2006-HE1 | A1 | Group 1 | 13.26 | 12.47 | 24.08 | 10.82 |
| JPMAC 2006-HE2 | A1 | Group 1 | 7.31 | 10.22 | 16.78 | 9.47 |
| JPMAC 2006-HE3 | A1 | Group 1 | 8.04 | 14.78 | 21.63 | 13.59 |
| JPMAC 2006-NC1 | A1 | Group 1 | 19.79 | 12.19 | 29.57 | 9.78 |
| JPMAC 2006-NC2 | A1A | Group 1 | 5.64 | 10.18 | 15.25 | 9.61 |
| JPMAC 2006-RM1 | A1A | Group 1 | 3.92 | 12.03 | 15.47 | 11.55 |
| JPMAC 2006-RM1 | A1B | Group 1 | 3.92 | 12.03 | 15.47 | 11.55 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 1.66 | 11.41 | 12.88 | 11.22 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| JPMAC 2006-WMC2 | A1 | Group 1 | 2.57 | 12.43 | 14.68 | 12.11 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 2.21 | 13.66 | 15.57 | 13.36 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 2.21 | 13.66 | 15.57 | 13.36 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 1.96 | 10.78 | 12.53 | 10.57 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 1.96 | 10.78 | 12.53 | 10.57 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 4.50 | 11.17 | 15.17 | 10.67 |
| JPMAC 2007-CH3 | A1A | Group 1 | 9.03 | 10.62 | 18.70 | 9.67 |
| JPMAC 2007-CH3 | A1B | Group 1 | 9.03 | 10.62 | 18.70 | 9.67 |
| JPMAC 2007-CH4 | A1 | Group 1 | 7.81 | 12.66 | 19.48 | 11.67 |
| JPMAC 2007-CH5 | A1 | Group 1 | 11.75 | 9.68 | 20.30 | 8.55 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 5.75 | 17.56 | 22.30 | 16.55 |
| LBMLT 2005-3 | IA | Group I | 3.10 | 11.41 | 14.16 | 11.06 |
| LBMLT 2006-1 | IA | Group I | 23.42 | 10.34 | 31.34 | 7.92 |
| LBMLT 2006-2 | IA | Group I | 22.48 | 11.98 | 31.77 | 9.29 |
| LBMLT 2006-3 | IA | Group I | 7.21 | 12.50 | 18.81 | 11.60 |
| LBMLT 2006-4 | IA | Group I | 4.94 | 13.05 | 17.35 | 12.41 |
| LBMLT 2006-5 | IA | Group I | 6.06 | 11.57 | 16.93 | 10.87 |
| LBMLT 2006-6 | IA | Group I | 3.27 | 12.94 | 15.78 | 12.51 |
| LBMLT 2006-7 | IA | Group I | 4.23 | 13.82 | 17.47 | 13.24 |
| LBMLT 2006-8 | IA | Group I | 5.86 | 14.42 | 19.43 | 13.57 |
| LBMLT 2006-9 | IA | Group I | 8.21 | 12.90 | 20.05 | 11.84 |
| LBMLT 2006-10 | IA | Group I | 7.55 | 14.52 | 20.97 | 13.42 |
| LBMLT 2006-11 | IA | Group I | 6.06 | 14.37 | 19.56 | 13.50 |
| LBMLT 2006-WL1 | IA1 | Group I | 18.62 | 11.33 | 27.84 | 9.22 |
| LBMLT 2006-WL1 | IA2 | Group I | 18.62 | 11.33 | 27.84 | 9.22 |
| LBMLT 2006-WL2 | IA | Group I | 17.98 | 13.41 | 28.98 | 11.00 |
| LBMLT 2006-WL3 | IA | Group I | 16.29 | 11.48 | 25.90 | 9.61 |
| LUM 2006-3 | II2A1 | Group II-2 | 26.44 | 13.97 | 36.72 | 10.28 |
| NCMT 2007-1 | 1A1 | Group 1 | 0.00 | 11.15 | 11.15 | 11.15 |
| PCHLT 2005-4 | 2A1 | Group 2 | 16.85 | 15.81 | 30.00 | 13.15 |
| SACO 2007-1 | IIA | Group II | 0.00 | 11.19 | 11.19 | 11.19 |
| SACO 2007-2 | IIA | Group II | 0.00 | 12.86 | 12.86 | 12.86 |
| SAMI 2006-AR4 | IA1 | Group I | 27.31 | 19.81 | 41.71 | 14.40 |
| WAMU 2007-OA3 | 1A | Group 1 | 49.00 | 13.04 | 55.65 | 6.65 |
| WMABS 2006-HE1 | IA | Group 1 | 10.27 | 9.79 | 19.05 | 8.78 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| WMABS 2006-HE3 | IA | Group I | 9.87 | 10.75 | 19.56 | 9.69 |
| WMABS 2006-HE4 | IA | Group I | 8.97 | 10.62 | 18.64 | 9.67 |
| WMABS 2006-HE5 | IA | Group I | 8.43 | 10.59 | 18.13 | 9.70 |
| WMABS 2007-HE1 | IA | Group I | 9.50 | 11.92 | 20.29 | 10.79 |
| WMABS 2007-HE2 | IA | Group I | 8.32 | 11.85 | 19.18 | 10.86 |
| WMALT 2005-9 | 1CB | Group 1 | 100.00 | n/a | n/a | n/a |
| WMALT 2005-10 | 1CB | Group 1 | 100.00 | n/a | n/a | n/a |
| WMALT 2006-AR4 | 1A | Group 1 | 23.67 | 18.91 | 38.10 | 14.43 |
| WMALT 2006-AR4 | 2A | Group 2 | 24.70 | 18.78 | 38.84 | 14.14 |
| WMALT 2006-AR4 | 3A | Group 3 | 21.07 | 13.44 | 31.68 | 10.61 |
| WMALT 2006-AR5 | 1A | Group 1 | 18.64 | 22.95 | 37.31 | 18.67 |
| WMALT 2006-AR5 | 2A | Group 2 | 31.67 | 17.20 | 43.42 | 11.75 |
| WMALT 2006-AR8 | 1A | Group 1 | 19.45 | 13.27 | 30.14 | 10.69 |
| WMALT 2006-AR9 | 1A | Group 1 | 21.51 | 15.64 | 33.79 | 12.28 |
| WMALT 2007-OA1 | 1A | Group 1 | 20.78 | 14.67 | 32.40 | 11.62 |
| WMALT 2007-OA2 | 1A | Group 1 | 20.67 | 13.98 | 31.76 | 11.09 |
| WMALT 2007-OA3 | 1A | Group 1 | 17.11 | 14.14 | 28.83 | 11.72 |
| WMALT 2007-OA3 | 3A | Group 3 | 39.96 | 17.57 | 50.51 | 10.55 |
| WMHE 2007-HE1 | IA | Group I | 6.47 | 15.68 | 21.14 | 14.67 |
| WMHE 2007-HE2 | IA | Group I | 8.21 | 14.71 | 21.71 | 13.50 |
| WMHE 2007-HE3 | IA | Group I | 5.84 | 13.14 | 18.21 | 12.37 |
| WMHE 2007-HE4 | IA | Group I | 7.04 | 13.19 | 19.30 | 12.26 |

## 2. Loan-to-Value Data Was Materially False

348. The data analysis has further revealed that the LTV ratios disclosed in the

Prospectus Supplements were materially false and understated, as more specifically set out

below.  For each of the sampled loans, an industry standard automated valuation model

("AVM") was used to calculate the value of the underlying property at the time the mortgage

loan was originated.  Retroactive AVMs are routinely used in the industry as a way of valuing

properties during prequalification, origination, portfolio review, and servicing.  Such AVMs rely

upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

349.    Applying the AVM to the available data for the properties securing the sampled loans shows that the retroactive appraised value given to such properties was significantly higher than the actual value of such properties.  The result of this overstatement of property values is a material understatement of LTV.  That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default

350.    For example, for the JPMAC 2006-WMC2 Securitization, which was sponsored by J.P. Morgan Acquisition and underwritten by J.P. Morgan Securities, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent. In fact, 16.36 percent of the sample of loans included in the data analysis had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 68.40 percent of the loans had LTV ratios at or below 80 percent.  The data analysis indicated that only 39.78 percent of the loans had LTV ratios at or below 80 percent.

351.    The data analysis revealed that for each Securitization, the Prospectus Supplement misrepresented both the percentage of loans with an LTV ratio that were above 100 percent and the percentage of loans that had an LTV ratio at or below 80 percent.  Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the

percentage reported in the Prospectus Supplement.  The percentages listed in Table 8 were calculated by aggregated principal balance.

Table 8

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 63.41 | 43.07 | 0.00 | 14.00 |
| AHM 2005-1 | VIA | Group VI | 92.90 | 66.10 | 0.00 | 7.24 |
| AHM 2005-4 | IVA | Group IV | 94.45 | 59.16 | 0.00 | 6.79 |
| ARSI 2006-M2 | A1 | Group I | 45.87 | 34.51 | 0.00 | 20.46 |
| BALTA 2005-10 | II2A1 | Group II-2 | 98.22 | 56.28 | 0.00 | 8.44 |
| BALTA 2005-10 | II3A1 | Group II-3 | 98.52 | 52.84 | 0.00 | 9.15 |
| BALTA 2006-1 | II1A1 | Group II-1 | 97.74 | 50.60 | 0.00 | 8.70 |
| BALTA 2006-2 | II2A1 | Group II-2 | 99.19 | 50.12 | 0.00 | 6.34 |
| BALTA 2006-3 | II1A1 | Group II-1 | 97.70 | 57.00 | 0.00 | 5.89 |
| BALTA 2006-4 | I2A1 | Group I-2 | 98.52 | 48.73 | 0.00 | 10.99 |
| BALTA 2006-4 | III1A1 | Group III-1 | 83.43 | 46.04 | 0.00 | 9.54 |
| BSABS 2005-HE12 | IIA | Group II | 58.04 | 43.54 | 0.00 | 14.63 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 50.91 | 35.48 | 0.00 | 22.58 |
| BSABS 2006-HE2 | IIA | Group II | 50.24 | 41.35 | 0.00 | 11.53 |
| BSABS 2006-HE4 | IIA | Group II | 66.09 | 45.72 | 0.00 | 16.29 |
| BSABS 2006-HE5 | IIA | Group II | 52.23 | 40.68 | 0.00 | 16.95 |
| BSABS 2006-HE7 | II2A | Group II-2 | 58.48 | 37.56 | 0.00 | 18.92 |
| BSABS 2006-HE8 | II2A | Group II-2 | 59.19 | 38.94 | 0.00 | 14.60 |
| BSABS 2006-HE9 | IIA | Group II | 48.60 | 33.89 | 0.00 | 17.58 |
| BSABS 2006-HE9 | IIIA | Group III | 50.00 | 33.13 | 0.00 | 20.19 |
| BSABS 2006-HE10 | II2A | Group II-2 | 55.06 | 33.65 | 0.00 | 24.09 |
| BSABS 2006-HE10 | II3A | Group II-3 | 51.39 | 31.48 | 0.00 | 21.97 |
| BSABS 2007-FS1 | IIA | Group II | 36.55 | 27.16 | 0.00 | 21.34 |
| BSABS 2007-HE1 | II2A | Group II-2 | 54.46 | 33.98 | 0.00 | 23.71 |
| BSABS 2007-HE1 | II3A | Group II-3 | 52.89 | 31.21 | 0.00 | 21.71 |
| BSABS 2007-HE2 | II2A | Group II-2 | 39.16 | 18.82 | 0.00 | 27.06 |
| BSABS 2007-HE2 | II3A | Group II-3 | 35.32 | 19.49 | 0.00 | 32.78 |
| BSABS 2007-HE3 | IIA | Group II | 44.19 | 27.66 | 0.00 | 30.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| BSABS 2007-HE3 | IIIA | Group III | 49.54 | 31.46 | 0.00 | 23.38 |
| BSABS 2007-HE4 | IIA | Group II | 53.46 | 32.64 | 0.00 | 25.94 |
| BSABS 2007-HE5 | IIA | Group II | 61.17 | 39.46 | 0.00 | 19.43 |
| BSABS 2007-HE5 | IIIA | Group III | 48.36 | 33.12 | 0.00 | 26.96 |
| BSABS 2007-HE6 | IIA | Group II | 54.31 | 31.62 | 0.00 | 26.95 |
| BSABS 2007-HE7 | IIA1 | Group II | 66.83 | 37.42 | 0.00 | 23.78 |
| BSABS 2007-HE7 | IIIA1 | Group III | 74.70 | 46.92 | 0.00 | 17.14 |
| BSMF 2006-SL5 | IIA | Group II | 1.93 | 3.10 | 0.00 | 51.87 |
| BSMF 2006-SL6 | IIA | Group II | 3.62 | 3.52 | 0.00 | 57.15 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 100.00 | 44.98 | 0.00 | 13.10 |
| BSMF 2007-SL1 | IIA | Group II | 0.47 | 1.12 | 0.00 | 60.70 |
| BSMF 2007-SL2 | IIA | Group II | 1.77 | 1.72 | 0.00 | 57.28 |
| CBASS 2006-CB2 | AV | Group 1 | 64.44 | 45.98 | 0.04 | 12.59 |
| CBASS 2006-CB7 | A1 | Group I | 45.11 | 32.70 | 0.00 | 26.28 |
| GPMF 2005-AR5 | IIA1 | Group II | 96.48 | 57.02 | 0.00 | 7.00 |
| GPMF 2006-AR3 | IIA1 | Group II | 97.93 | 52.84 | 0.00 | 6.57 |
| GPMF 2006-AR3 | IIA2 | Group II | 97.93 | 52.84 | 0.00 | 6.57 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 94.54 | 55.96 | 0.00 | 6.76 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 92.37 | 47.58 | 0.00 | 12.11 |
| JPMAC 2005-FRE1 | AI | Group I | 52.82 | 32.47 | 0.00 | 15.74 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 70.09 | 40.37 | 0.00 | 12.83 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 63.36 | 45.43 | 0.00 | 12.48 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 52.46 | 35.01 | 0.00 | 16.89 |
| JPMAC 2006-CH1 | A1 | Group 1 | 53.08 | 37.64 | 0.00 | 17.82 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 67.63 | 41.03 | 0.00 | 15.05 |
| JPMAC 2006-CW1 | A1A | Group 1 | 71.17 | 52.52 | 0.00 | 6.70 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 66.24 | 46.93 | 0.00 | 10.50 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 59.44 | 39.00 | 0.00 | 15.43 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 52.73 | 34.03 | 0.00 | 16.16 |
| JPMAC 2006-HE1 | A1 | Group 1 | 64.92 | 41.62 | 0.00 | 13.48 |
| JPMAC 2006-HE2 | A1 | Group 1 | 76.16 | 45.54 | 0.00 | 13.57 |
| JPMAC 2006-HE3 | A1 | Group 1 | 43.50 | 25.93 | 0.00 | 21.82 |
| JPMAC 2006-NC1 | A1 | Group 1 | 56.25 | 41.84 | 0.00 | 13.96 |
| JPMAC 2006-NC2 | A1A | Group 1 | 57.98 | 43.74 | 0.00 | 16.63 |

131

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| JPMAC 2006-RM1 | A1A | Group 1 | 56.97 | 35.04 | 0.00 | 19.26 |
| JPMAC 2006-RM1 | A1B | Group 1 | 56.97 | 35.04 | 0.00 | 19.26 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 62.34 | 43.20 | 0.00 | 16.73 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 68.40 | 39.78 | 0.00 | 16.36 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 66.96 | 39.31 | 0.00 | 18.24 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 66.96 | 39.31 | 0.00 | 18.24 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 64.62 | 31.19 | 0.00 | 23.87 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 64.62 | 31.19 | 0.00 | 23.87 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 57.39 | 41.12 | 0.00 | 15.37 |
| JPMAC 2007-CH3 | A1A | Group 1 | 63.36 | 38.00 | 0.00 | 16.62 |
| JPMAC 2007-CH3 | A1B | Group 1 | 63.36 | 38.00 | 0.00 | 16.62 |
| JPMAC 2007-CH4 | A1 | Group 1 | 56.35 | 40.32 | 0.00 | 17.85 |
| JPMAC 2007-CH5 | A1 | Group 1 | 50.85 | 32.39 | 0.00 | 22.13 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 96.71 | 54.52 | 0.00 | 5.81 |
| LBMLT 2005-3 | IA | Group I | 100.00 | 56.13 | 0.00 | 6.45 |
| LBMLT 2006-1 | IA | Group I | 72.87 | 50.10 | 0.00 | 11.25 |
| LBMLT 2006-2 | IA | Group I | 67.64 | 42.70 | 0.00 | 11.94 |
| LBMLT 2006-3 | IA | Group I | 75.85 | 46.02 | 0.00 | 12.74 |
| LBMLT 2006-4 | IA | Group I | 81.33 | 40.50 | 0.00 | 12.40 |
| LBMLT 2006-5 | IA | Group I | 74.73 | 46.95 | 0.00 | 12.34 |
| LBMLT 2006-6 | IA | Group I | 28.45 | 29.62 | 0.00 | 14.00 |
| LBMLT 2006-7 | IA | Group I | 22.74 | 24.05 | 0.00 | 14.38 |
| LBMLT 2006-8 | IA | Group I | 70.66 | 44.13 | 0.00 | 16.70 |
| LBMLT 2006-9 | IA | Group I | 63.13 | 34.87 | 0.00 | 19.60 |
| LBMLT 2006-10 | IA | Group I | 59.81 | 36.05 | 0.00 | 20.72 |
| LBMLT 2006-11 | IA | Group I | 61.67 | 36.74 | 0.00 | 21.35 |
| LBMLT 2006-WL1 | IA1 | Group I | 70.76 | 46.32 | 0.00 | 11.69 |
| LBMLT 2006-WL1 | IA2 | Group I | 70.76 | 46.32 | 0.00 | 11.69 |
| LBMLT 2006-WL2 | IA | Group I | 19.23 | 25.15 | 0.00 | 9.40 |
| LBMLT 2006-WL3 | IA | Group I | 21.86 | 23.17 | 0.00 | 14.57 |
| LUM 2006-3 | II2A1 | Group II-2 | 96.85 | 55.23 | 0.00 | 7.03 |
| NCMT 2007-1 | 1A1 | Group 1 | 48.06 | 31.51 | 0.00 | 27.78 |
| PCHLT 2005-4 | 2A1 | Group 2 | 59.05 | 43.48 | 0.00 | 14.71 |
| SACO 2007-1 | IIA | Group II | 2.54 | 3.17 | 0.00 | 57.82 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| SACO 2007-2 | IIA | Group II | 1.17 | 2.71 | 0.00 | 54.37 |
| SAMI 2006-AR4 | IA1 | Group I | 91.65 | 46.49 | 0.00 | 9.55 |
| WAMU 2007-OA3 | 1A | Group 1 | 93.43 | 64.08 | 0.00 | 10.53 |
| WMABS 2006-HE1 | IA | Group 1 | 59.84 | 42.14 | 0.00 | 15.51 |
| WMABS 2006-HE3 | IA | Group 1 | 40.79 | 32.96 | 0.00 | 19.52 |
| WMABS 2006-HE4 | IA | Group 1 | 22.83 | 29.10 | 0.00 | 13.52 |
| WMABS 2006-HE5 | IA | Group 1 | 49.18 | 21.97 | 0.00 | 24.78 |
| WMABS 2007-HE1 | IA | Group 1 | 62.14 | 34.22 | 0.00 | 21.30 |
| WMABS 2007-HE2 | IA | Group 1 | 60.98 | 33.29 | 0.00 | 21.95 |
| WMALT 2005-9 | 1CB | Group 1 | 89.08 | 77.70 | 0.00 | 3.72 |
| WMALT 2005-10 | 1CB | Group 1 | 94.88 | 72.62 | 0.00 | 6.39 |
| WMALT 2006-AR4 | 1A | Group 1 | 77.29 | 54.58 | 0.00 | 10.21 |
| WMALT 2006-AR4 | 2A | Group 2 | 90.48 | 66.33 | 0.00 | 6.67 |
| WMALT 2006-AR4 | 3A | Group 3 | 76.36 | 55.17 | 0.00 | 9.10 |
| WMALT 2006-AR5 | 1A | Group 1 | 70.75 | 51.69 | 0.00 | 11.03 |
| WMALT 2006-AR5 | 2A | Group 2 | 76.48 | 57.57 | 0.00 | 6.65 |
| WMALT 2006-AR8 | 1A | Group 1 | 77.21 | 53.16 | 0.00 | 9.87 |
| WMALT 2006-AR9 | 1A | Group 1 | 76.47 | 45.61 | 0.00 | 14.58 |
| WMALT 2007-OA1 | 1A | Group 1 | 45.17 | 47.68 | 0.00 | 13.31 |
| WMALT 2007-OA2 | 1A | Group 1 | 46.97 | 48.02 | 0.00 | 11.93 |
| WMALT 2007-OA3 | 1A | Group 1 | 49.34 | 42.86 | 0.00 | 14.37 |
| WMALT 2007-OA3 | 3A | Group 3 | 90.37 | 47.97 | 0.00 | 18.12 |
| WMHE 2007-HE1 | IA | Group I | 60.41 | 38.83 | 0.00 | 23.08 |
| WMHE 2007-HE2 | IA | Group I | 58.78 | 40.12 | 0.00 | 22.89 |
| WMHE 2007-HE3 | IA | Group I | 59.11 | 37.65 | 0.00 | 21.59 |
| WMHE 2007-HE4 | IA | Group I | 57.07 | 34.97 | 0.00 | 26.24 |

352.    As Table 8 demonstrates, the Prospectus Supplements for all but one of the

Securitizations reported that none of the mortgage loans in the Supporting Loan Groups had an

LTV ratio over 100 percent.  In contrast, the data analysis revealed that at least 3.72 percent of

the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.

353.    These inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices and, providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011).

> **B.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

354.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by systematically misreported owner-occupancy and LTV statistics, discussed above, and by (1) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting

guidelines during the relevant period; (2) the collapse of the Certificates' credit ratings; and (3) the surge in delinquency and default in the mortgages in the Securitizations.

        **1.**        **Government Investigations and Private Actions Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines**

355.    The abandonment of underwriting guidelines is further confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by the Defendants in the Securitizations.

356.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. WMC, Fremont, and Countrywide, which originated many of the loans for the Securitizations at issue here, were all on that list. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release (Nov. 13, 2008), *available at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.

357.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be

sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were.

358.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"  *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

### (a)      WMC Mortgage Corp.

359.    WMC originated the majority of the loans in the JPMAC 2005-WMC1, JPMAC 2006-WMC1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-WMC4, and WMABS 2007-HE2 Securitizations.

360.    WMC employed reckless underwriting standards and practices, as described more fully below, that resulted in a huge amount of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.  General Electric, which had purchased

WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year. *See, e.g.*, Diane Brady, Adventures of a Subprime Survivor, *Bloomberg Businessweek*, Oct. 29, 2007 (available at http://www.businessweek.com/magazine/content/07_44/b4056074.htm).

361.    WMC's reckless loan originating practices were noticed by regulatory authorities. In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees (the "Statement of Charges") against WMC Mortgage and its principal owners individually. *See* Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008. The Statement of Charges referenced a review of 86 loan files, which revealed that at least 76 loans were defective or otherwise in violation of Washington state law. *Id.* Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington State deceptive and unfair practices laws. *Id.*

### (b)    Fremont Investment & Loan

362.    Fremont originated the majority of the loans in the PMAC 2005-FRE1, JPMAC 2006-FRE1, JPMAC 2006-FRE2, and NCMT 2007-1 Securitizations. Fremont was one of the country's largest subprime lenders and originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.

363.    On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont for an array of "unfair and deceptive business conduct," "on a broad scale." *See* Complaint, *Commonwealth v. Fremont Investment &*

*Loan and Fremont General Corp.*, No. 07-4373 (Mass. Super. Ct.) (the "Fremont Complaint"). According to the Massachusetts Attorney General's complaint, Fremont "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores."  *See* Fremont Complaint.

364.    On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008). The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

(c)     **Countrywide Home Loans, Inc.**

365.    Countrywide originated the majority of the loans in the BALTA 2006-4, JPMAC 2006-CW1, and JPMAC 2006-CW2 Securitizations.

366.    In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission of the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").  The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

367.    Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of Countrywide's underwriting processes. The court noted that the SEC presented evidence that Countrywide "routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the

secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines …."  The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines …."  *S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

368.    The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards.  For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

### (d)    Greenpoint Mortgage Funding, Inc.

369.    GreenPoint originated the majority of the loans in trusts GPMF 2005-AR5 and GPMF 2006-AR3.

370.    GreenPoint systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no-documentation or limited-documentation loans to individuals without sound credit histories.  In November 2008, Business Week Magazine reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay back the loans.

GreenPoint's parent corporation, Capital One Financial Corp., eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

371.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California, 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.

372.    GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated. For example, in *U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.,* No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009), a consultant's investigation concluded that 93 percent of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting. The investigation found that GreenPoint loans suffered from serious defects including:

- Pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower.

- Violations of GreenPoint's own underwriting guidelines and prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

- Misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property.

- Inflated appraisal values.

373.    On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim,

holding that discovery would be required to determine whether GreenPoint would be required

under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual

loans identified by U.S. Bank.

> **2.      The Collapse of the Certificates' Credit Ratings Further Indicates
> that the Mortgage Loans Were Not Originated in Adherence to the
> Stated Underwriting Guidelines**

374.    The total collapse in the credit ratings of the GSE Certificates, typically from

AAA or its equivalent to non-investment speculative grade, is further evidence of the originators'

systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were

impaired from the start.

375.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally

assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of

the mortgage loan collateral and underwriting practices set forth in the Registration Statements.

These ratings were artificially inflated, however, as a result of the very same misrepresentations

that the Defendants made to investors in the Prospectus Supplements.

376.    JPMorgan, Bear Stearns, WaMu, and Long Beach provided, or caused to be

provided, loan level information to the rating agencies that they relied upon in order to calculate

the Certificates' assigned ratings, including the borrower's LTV ratio, debt-to-income ratio,

owner occupancy status, and other loan level information described in aggregation reports in the

Prospectus Supplements.  Because the information that JPMorgan, Bear Stearns, WaMu and

Long Beach provided or caused to be provided was false, the ratings were inflated and the level

of subordination that the rating agencies required for the sale of AAA (or its equivalent)

certificates was inadequate to provide investors with the level of protection that those ratings

signified.  As a result, the GSEs paid Defendants inflated prices for purported AAA (or its

equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss and carried inadequate credit enhancement.

377.    Since the issuance of the Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. Table 9 details the extent of the downgrades.[21]

**Table 9**

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| AABST 2005-5 | IIA | Aaa/AAA/AAA | B2/AAA/CCC |
| AHM 2005-1 | VIA | Aaa/AAA /-- | B3/--/-- |
| AHM 2005-4 | IVA | Aaa/AAA/-- | Caa3/CCC/-- |
| ARSI 2006-M2 | A1 | Aaa/AAA/AAA | Caa2/CCC/C |
| BALTA 2005-10 | II2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2005-10 | II3A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-1 | II1A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-2 | II2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-3 | III1A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-4 | I2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-4 | III1A1 | Aaa/AAA/-- | Caa3/CC/-- |
| BSABS 2005-HE12 | IIA | Aaa/AAA/-- | Aa3/AA/-- |
| BSABS 2006-AQ1 | I2A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE2 | IIA | Aaa/AAA/-- | Ba3/AAA/-- |
| BSABS 2006-HE4 | IIA | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2006-HE5 | IIA | Aaa /AAA/-- | Caa2/A/-- |
| BSABS 2006-HE7 | II2A | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2006-HE8 | II2A | Aaa/AAA/-- | B1/B-/-- |
| BSABS 2006-HE9 | IIA | Aaa/AAA/-- | Caa3/B/-- |
| BSABS 2006-HE9 | IIIA | Aaa/AAA/-- | Caa3/B/-- |
| BSABS 2006-HE10 | II2A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE10 | II3A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-FS1 | IIA | Aaa/AAA/-- | Ca/B-/-- |

---

[21]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| BSABS 2007-HE1 | II2A | Aaa/AAA/-- | Caa3/BB+/-- |
| BSABS 2007-HE1 | II3A | Aaa/AAA/-- | Caa3/BBB-/-- |
| BSABS 2007-HE2 | II2A | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2007-HE2 | II3A | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2007-HE3 | IIA | Aaa/AAA/-- | Caa3/B-/-- |
| BSABS 2007-HE3 | IIIA | Aaa/AAA/-- | Caa3/B-/-- |
| BSABS 2007-HE4 | IIA | Aaa/AAA/-- | Caa2/CCC/-- |
| BSABS 2007-HE5 | IIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE5 | IIIA | Aaa/AAA/-- | Caa2/CCC/-- |
| BSABS 2007-HE6 | IIA | Aaa/--/AAA | Ca/--/C |
| BSABS 2007-HE7 | IIA1 | Aaa/AAA/-- | Caa3/B-/-- |
| BSABS 2007-HE7 | IIIA1 | Aaa/AAA/-- | Ca/B-/-- |
| BSMF 2006-SL5 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2006-SL6 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2007-AR3 | II2A1 | Aaa/AAA/-- | Ca/CC/-- |
| BSMF 2007-SL1 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2007-SL2 | IIA | Aaa/AAA/-- | C/D/-- |
| CBASS 2006-CB2 | AV | Aaa/AAA/AAA | Caa2/BB+/CCC |
| CBASS 2006-CB7 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| GPMF 2005-AR5 | IIA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| GPMF 2006-AR3 | IIA1 | Aaa/AAA/-- | Caa3/BB/-- |
| GPMF 2006-AR3 | IIA2 | Aaa/AAA/-- | C/D/-- |
| JPALT 2005-A2 | 2A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| JPALT 2007-A2 | 11A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2005-FRE1 | AI | Aaa/AAA/AAA | Ba3/AA+/BB |
| JPMAC 2005-OPT2 | A1A | Aaa/AAA/AAA | Aa2/AAA/A |
| JPMAC 2005-WMC1 | A1 | Aaa/AAA/AAA | Aaa/AAA/AAA |
| JPMAC 2006-ACC1 | A1 | Aaa/AAA/AAA | Ba3/B+/CCC |
| JPMAC 2006-CH1 | A1 | Aaa/AAA/AAA | B2/A/CCC |
| JPMAC 2006-CH2 | AV1 | Aaa/AAA/AAA | Caa3/CCC/C |
| JPMAC 2006-CW1 | A1A | Aaa/AAA/AAA | Aa3/AAA/BB |
| JPMAC 2006-CW2 | AV1 | Aaa/AAA/AAA | B1/B-/CC |
| JPMAC 2006-FRE1 | A1 | Aaa/AAA/AAA | Ba3/B/CCC |
| JPMAC 2006-FRE2 | A1 | Aaa/AAA/AAA | Ba3/B-/CCC |
| JPMAC 2006-HE1 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2006-HE2 | A1 | Aaa/AAA/AAA | Caa2/CCC/CC |
| JPMAC 2006-HE3 | A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2006-NC1 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2006-NC2 | A1A | Aaa/AAA/AAA | Aa3/B+/BB |
| JPMAC 2006-RM1 | A1A | Aaa/AAA/AAA | Caa2/CCC/CC |

144

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| JPMAC 2006-RM1 | A1B | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2006-WMC1 | A1 | Aaa/AAA/AAA | B3/B+/CCC |
| JPMAC 2006-WMC2 | A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2006-WMC3 | A1SS | Aaa/AAA/AAA | B2/CCC/CC |
| JPMAC 2006-WMC3 | A1MZ | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2006-WMC4 | A1A | Aaa/AAA/AAA | Caa3/CCC/C |
| JPMAC 2006-WMC4 | A1B | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2007-CH2 | AV1 | Aaa/AAA/AAA | B3/B/CCC |
| JPMAC 2007-CH3 | A1A | Aaa/AAA/AAA | B3/CCC/CC |
| JPMAC 2007-CH3 | A1B | Aaa/AAA/AAA | Ca/CCC/CC |
| JPMAC 2007-CH4 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2007-CH5 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMMT 2006-A3 | 1A1 | Aaa/--/AAA | Caa3/--/C |
| LBMLT 2005-3 | IA | Aaa/AAA/AAA | Ca/CCC/CC |
| LBMLT 2006-1 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-2 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-3 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-4 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-5 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-6 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-7 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-8 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-9 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-10 | IA | Aaa/AAA/-- | Caa2/CCC/-- |
| LBMLT 2006-11 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-WL1 | IA1 | Aaa/AAA/-- | Caa1/BB/-- |
| LBMLT 2006-WL1 | IA2 | Aaa/AAA/-- | B1/BB/-- |
| LBMLT 2006-WL2 | IA | Aaa/AAA/AAA | Caa3/B-/C |
| LBMLT 2006-WL3 | IA | Aaa/AAA/AAA | Caa3/B-/C |
| LUM 2006-3 | II2A1 | Aaa/--/AAA | Caa3/--/D |
| NCMT 2007-1 | 1A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| PCHLT 2005-4 | 2A1 | Aaa/AAA/AAA | Ba1/BBB+/BB |
| SACO 2007-1 | IIA | Aaa/AAA/-- | C/D/-- |
| SACO 2007-2 | IIA | Aaa/AAA/-- | C/D/-- |
| SAMI 2006-AR4 | IA1 | Aaa/AAA/-- | Ca/CC/-- |
| WAMU 2007-OA3 | 1A | Aaa/AAA/-- | Caa3/CCC/-- |
| WMABS 2006-HE1 | IA | Aaa/AAA/AAA | Caa3/CCC/CC |
| WMABS 2006-HE3 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2006-HE4 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2006-HE5 | IA | Aaa/AAA/-- | Ca/CCC/-- |

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| WMABS 2007-HE1 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2007-HE2 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2005-9 | 1CB | Aaa/AAA/-- | Caa2/CCC/-- |
| WMALT 2005-10 | 1CB | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR4 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR4 | 2A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR4 | 3A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR5 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR5 | 2A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR8 | 1A | Aaa/AAA/-- | Ca/CC/-- |
| WMALT 2006-AR9 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA1 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA2 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA3 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA3 | 3A | Aaa/AAA/-- | Ca/CC/-- |
| WMHE 2007-HE1 | IA | Aaa/AAA/-- | Caa2/CCC/-- |
| WMHE 2007-HE2 | IA | Aaa/AAA/AAA | Caa3/CCC/C |
| WMHE 2007-HE3 | IA | Aaa/AAA/AAA | Caa2/B-/CC |
| WMHE 2007-HE4 | IA | Aaa/AAA/-- | Caa2/CCC/-- |

### 3. The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

378. Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders. The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

379. Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and

delinquencies than occurred here.  Table 10 reflects the percentage of loans in the Supporting

Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

**Table 10**

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 35.60 |
| AHM 2005-1 | VIA | Group VI | 22.40 |
| AHM 2005-4 | IVA | Group IV | 29.11 |
| ARSI 2006-M2 | A1 | Group I | 36.46 |
| BALTA 2005-10 | II2A1 | Group II-2 | 32.88 |
| BALTA 2005-10 | II3A1 | Group II-3 | 37.55 |
| BALTA 2006-1 | II1A1 | Group II-1 | 39.11 |
| BALTA 2006-2 | II2A1 | Group II-2 | 38.36 |
| BALTA 2006-3 | II1A1 | Group II-1 | 44.37 |
| BALTA 2006-4 | I2A1 | Group I-2 | 60.60 |
| BALTA 2006-4 | III1A1 | Group III-1 | 37.39 |
| BSABS 2005-HE12 | IIA | Group II | 55.84 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 63.33 |
| BSABS 2006-HE2 | IIA | Group II | 58.08 |
| BSABS 2006-HE4 | IIA | Group II | 54.93 |
| BSABS 2006-HE5 | IIA | Group II | 57.38 |
| BSABS 2006-HE7 | II2A | Group II-2 | 59.29 |
| BSABS 2006-HE8 | II2A | Group II-2 | 56.11 |
| BSABS 2006-HE9 | IIA | Group II | 59.13 |
| BSABS 2006-HE9 | IIIA | Group III | 59.66 |
| BSABS 2006-HE10 | II2A | Group II-2 | 61.76 |
| BSABS 2006-HE10 | II3A | Group II-3 | 61.19 |
| BSABS 2007-FS1 | IIA | Group II | 61.24 |
| BSABS 2007-HE1 | II2A | Group II-2 | 58.11 |
| BSABS 2007-HE1 | II3A | Group II-3 | 55.91 |
| BSABS 2007-HE2 | II2A | Group II-2 | 62.69 |
| BSABS 2007-HE2 | II3A | Group II-3 | 68.22 |
| BSABS 2007-HE3 | IIA | Group II | 59.80 |
| BSABS 2007-HE3 | IIIA | Group III | 59.67 |
| BSABS 2007-HE4 | IIA | Group II | 38.41 |
| BSABS 2007-HE5 | IIA | Group II | 53.23 |
| BSABS 2007-HE5 | IIIA | Group III | 51.90 |
| BSABS 2007-HE6 | IIA | Group II | 59.56 |
| BSABS 2007-HE7 | IIA1 | Group II | 57.73 |

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| BSABS 2007-HE7 | IIIA1 | Group III | 57.36 |
| BSMF 2006-SL5 | IIA | Group II | 24.34 |
| BSMF 2006-SL6 | IIA | Group II | 32.33 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 58.43 |
| BSMF 2007-SL1 | IIA | Group II | 32.64 |
| BSMF 2007-SL2 | IIA | Group II | 20.31 |
| CBASS 2006-CB2 | AV | Group 1 | 46.82 |
| CBASS 2006-CB7 | A1 | Group I | 50.80 |
| GPMF 2005-AR5 | IIA1 | Group II | 50.08 |
| GPMF 2006-AR3 | IIA1 | Group II | 56.45 |
| GPMF 2006-AR3 | IIA2 | Group II | 56.45 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 23.68 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 54.12 |
| JPMAC 2005-FRE1 | AI | Group I | 44.69 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 36.17 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 50.44 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 57.48 |
| JPMAC 2006-CH1 | A1 | Group 1 | 45.85 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 50.82 |
| JPMAC 2006-CW1 | A1A | Group 1 | 70.65 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 62.47 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 55.13 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 54.63 |
| JPMAC 2006-HE1 | A1 | Group 1 | 50.34 |
| JPMAC 2006-HE2 | A1 | Group 1 | 55.43 |
| JPMAC 2006-HE3 | A1 | Group 1 | 56.37 |
| JPMAC 2006-NC1 | A1 | Group 1 | 47.13 |
| JPMAC 2006-NC2 | A1A | Group 1 | 43.66 |
| JPMAC 2006-RM1 | A1A | Group 1 | 50.31 |
| JPMAC 2006-RM1 | A1B | Group 1 | 50.31 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 51.22 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 55.31 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 53.37 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 53.37 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 55.15 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 55.15 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 44.65 |
| JPMAC 2007-CH3 | A1A | Group 1 | 49.56 |
| JPMAC 2007-CH3 | A1B | Group 1 | 49.56 |
| JPMAC 2007-CH4 | A1 | Group 1 | 47.83 |

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| JPMAC 2007-CH5 | A1 | Group 1 | 52.97 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 27.43 |
| LBMLT 2005-3 | IA | Group I | 56.21 |
| LBMLT 2006-1 | IA | Group I | 55.96 |
| LBMLT 2006-2 | IA | Group I | 57.68 |
| LBMLT 2006-3 | IA | Group I | 56.85 |
| LBMLT 2006-4 | IA | Group I | 57.25 |
| LBMLT 2006-5 | IA | Group I | 57.61 |
| LBMLT 2006-6 | IA | Group I | 53.79 |
| LBMLT 2006-7 | IA | Group I | 56.39 |
| LBMLT 2006-8 | IA | Group I | 52.80 |
| LBMLT 2006-9 | IA | Group I | 57.55 |
| LBMLT 2006-10 | IA | Group I | 56.91 |
| LBMLT 2006-11 | IA | Group I | 53.95 |
| LBMLT 2006-WL1 | IA1 | Group I | 52.40 |
| LBMLT 2006-WL1 | IA2 | Group I | 52.40 |
| LBMLT 2006-WL2 | IA | Group I | 55.55 |
| LBMLT 2006-WL3 | IA | Group I | 55.23 |
| LUM 2006-3 | II2A1 | Group II-2 | 24.98 |
| NCMT 2007-1 | 1A1 | Group 1 | 34.50 |
| PCHLT 2005-4 | 2A1 | Group 2 | 48.00 |
| SACO 2007-1 | IIA | Group II | 17.96 |
| SACO 2007-2 | IIA | Group II | 15.01 |
| SAMI 2006-AR4 | IA1 | Group I | 43.54 |
| WAMU 2007-OA3 | 1A | Group 1 | 33.87 |
| WMABS 2006-HE1 | IA | Group I | 34.69 |
| WMABS 2006-HE3 | IA | Group I | 55.97 |
| WMABS 2006-HE4 | IA | Group I | 48.87 |
| WMABS 2006-HE5 | IA | Group I | 53.16 |
| WMABS 2007-HE1 | IA | Group I | 56.11 |
| WMABS 2007-HE2 | IA | Group I | 55.54 |
| WMALT 2005-9 | 1CB | Group 1 | 18.42 |
| WMALT 2005-10 | 1CB | Group 1 | 24.72 |
| WMALT 2006-AR4 | 1A | Group 1 | 53.25 |
| WMALT 2006-AR4 | 2A | Group 2 | 56.63 |
| WMALT 2006-AR4 | 3A | Group 3 | 49.36 |
| WMALT 2006-AR5 | 1A | Group 1 | 51.62 |
| WMALT 2006-AR5 | 2A | Group 2 | 55.04 |
| WMALT 2006-AR8 | 1A | Group 1 | 45.56 |
| WMALT 2006-AR9 | 1A | Group 1 | 51.27 |

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| WMALT 2007-OA1 | 1A | Group 1 | 51.74 |
| WMALT 2007-OA2 | 1A | Group 1 | 51.23 |
| WMALT 2007-OA3 | 1A | Group 1 | 47.64 |
| WMALT 2007-OA3 | 3A | Group 3 | 47.74 |
| WMHE 2007-HE1 | IA | Group I | 48.65 |
| WMHE 2007-HE2 | IA | Group I | 55.76 |
| WMHE 2007-HE3 | IA | Group I | 53.06 |
| WMHE 2007-HE4 | IA | Group I | 58.34 |

380.    The confirmed misstatements concerning owner occupancy and LTV ratios, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, the extraordinary drop in credit rating, and the rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.    Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach Knew Their Representations Were False

381.    The allegations in this Section V are made in support of Plaintiff's common law fraud and aiding and abetting fraud claims, and *not* in support of Plaintiff's claims under (i) Sections 11, 12(a)(2) and 15 of the Securities Act, (ii) Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, (iii) Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, or (iv) negligent misrepresentation, which are based solely on strict liability and negligence.

### A.    JPMorgan, Bear Stearns, WaMu, and Long Beach Had Actual Knowledge From Their Due Diligence That They Were Securitizing Defective Loans

382.    JPMorgan, Bear Stearns, WaMu, and Long Beach originated and acquired from the loan originators the underlying mortgage loans in the 94 Securitizations they sponsored.

JPMorgan, Bear Stearns, WaMu, and Long Beach performed due diligence to determine the quality of the loans they were purchasing.  JPMorgan, Bear Stearns, WaMu, and Long Beach also conducted due diligence on the originators from whom they were purchasing loans, and on the loans included in each offering to determine whether such loans complied with the applicable underwriting guidelines.

383.    The Registration Statements of JPMorgan, Bear Stearns, WaMu, and Long Beach represented that the loans were underwritten in accordance with their respective underwriting guidelines and contained further assurances of quality control and due diligence.  For example, WaMu represented that it conducted due diligence on third-party lenders who originated loans for the securitization and that they carefully inspected the loan seller's underwriting standards:

> In initially approving a mortgage loan seller, the sponsor takes into account the following: annual origination volume, tenure of business and key staff in originating loans, policies and procedures for originating loans including quality control and appraisal review, review audits performed on mortgage loan seller by rating agencies, regulatory agencies and government sponsored entities, the mortgage loan seller's financial statements, errors and omissions insurance coverage and fidelity bond and liability insurance coverage.  Approved mortgage loan sellers' financial statements, insurance coverage and new review audits are reviewed on an annual basis.  **Additionally, the sponsor performs a monthly ongoing performance review of previously purchased mortgage loans for trends in delinquencies, losses and repurchases.  The mortgage loan sellers' underwriting guidelines are reviewed for consistency with the sponsor's credit parameters and conformity with the underwriting standards** described under 'Underwriting of the Mortgage Loans' below and are either approved or approved with exceptions.

> WMALT 2007-OA1 Prospectus Supplement, at S-37 (filed Jan. 25, 2007) (emphasis added).

384.    In another example, Bear Stearns represented that "[p]erforming loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase" with the loans being "reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws."  BSABS 2006-HE8 Prospectus Supplement.  Further, Bear

Stearns represented that "[p]erforming loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor." *Id*.

385.   WaMu made similar representations.  For example, the WMALT 2007-OA1 Prospectus Supplement also provided that "[t]he sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers.  Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase.  Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers." *Id.* at S-41.

386.   Similar assurances and representations are made in the Prospectus Supplements for the other GSE Certificates.  Thus, by virtue of their roles as sponsors and their own independent due diligence, JPMorgan, Bear Stearns, WaMu, and Long Beach had access to information regarding the true credit quality of the loans collateralizing the Securitizations that they sponsored.

387.   JPMorgan, Bear Stearns, WaMu, and Long Beach knew or recklessly disregarded the fact that certain loan originators were not originating loans in accordance with their underwriting guidelines.  WaMu, for example, had long been put on notice of their poor underwriting standards by regulators.  As stated in the PSI: "From 2004 to 2008, WaMu's regulators also repeatedly criticized WaMu's failure to exercise sufficient oversight of its loan personnel to reduce excessive loan error and exception rates that allowed the issuance of loans in violation of WaMu's credit standards."  According to Lawrence Carter, the Office of Thrift

Supervision Examiner-in-Chief at WaMu, WaMu President of Home Loans Craig Chapman, had

"been going around the country visiting home lending and fulfillment offices.  His view is that

band-aids have been used to address past issues and that there is a fundamental absence of

process."

388.    Documents recently released by a third-party due diligence firm, Clayton, confirm

that JPMorgan, Bear Stearns, and Long Beach were aware—on a daily basis—of the weakness in

the loan pools and in the underwriting standards of the originators they used in their residential

mortgage backed securitizations.  As discussed above, according to an internal Clayton

"Trending Report" made public by the Government in conjunction with testimony given in

September 2010, JPMorgan, Bear Stearns, and WaMu were informed that a significant percent of

the loans Clayton reviewed for their respective sponsor entities "failed to meet guidelines."

These loans were not properly approved as "exception loans" because they did not have any

"compensating factors."

389.    JPMorgan, Bear Stearns, and WaMu were informed that 27 percent, 16 percent,

27 percent, and 9 percent of the loans reviewed by Clayton for J.P. Morgan Acquisition, EMC,

WaMu Bank, and WaMu Securities, respectively, were not underwritten according to

represented underwriting standards.

390.    Confronted with such a high failure rate, JPMorgan, Bear Stearns, and WaMu

should have either rejected the pool outright, increased oversight of their own internal

underwriting, or investigated whether the third-party originators involved could be considered a

trusted source of loans in the future.  Even assuming JPMorgan, Bear Stearns, and WaMu

incredibly believed a 27 percent, 16 percent, 27 percent, or 9 percent failure rate could be

chalked up to "sampling error" (due to the fact that Clayton Holdings did not review every loan

in a pool), the proper response would have been to increase the sample size to test that hypothesis.

391.    Instead, JPMorgan, Bear Stearns, and WaMu continued to carry on with their own poor internal underwriting and work with problematic originators.  Moreover, not only did they fail to expand the sample size to truly investigate the problems, they failed to disclose the red flags revealed by Clayton's review to the GSEs.  According to Clayton's "Trending Report," JPMorgan, Bear Stearns, and WaMu "waived in" to their pools 51 percent, 42 percent, 29 percent, and 50 percent, for J.P. Morgan Acquisition, EMC, WaMu Bank, and WaMu Securities, respectively, of the defective loans that Clayton had identified as being outside the guidelines.

392.    Clayton's "Trending Report" provides compelling evidence that JPMorgan, Bear Stearns, and WaMu knew they were securitizing defective loans and selling the resulting securities to investors like Fannie Mae and Freddie Mac.  According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, through their numerous roles as underwriter and sponsor, JPMorgan, Bear Stearns, and WaMu were made fully aware on a regular basis that a significant percentage of their loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying securities sold to investors, such as those collateralizing the GSE Certificates.

393.    Not only did JPMorgan, Bear Stearns, and WaMu let poor loans pass into their securitizations in exchange for underwriting and securitization fees, they also took the fraud further, affirmatively seeking to profit from this knowledge.  Rather than rejecting these loans from the loan pool, as they should have, JPMorgan, Bear Stearns, and WaMu used the evidence of underwriting defects to negotiate lower prices for the loans and thus boost their own profits. According to the September 2010 FCIC testimony of Clayton's former president, D. Keith

Johnson, the banks would use the exception reports to force a lower price for itself, and not to benefit investors at all:

> I don't think that we added any value to the investor, the end investor, to get down to your point.  I think only our value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies.

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.  In other words, rather than exclude defective loans from collateral pools, or cease doing business with consistently failing originators, investment banks like JPMorgan, Bear Stearns, and WaMu would instead use the Clayton data simply to insist on a lower price from the loan originators, thereby increasing their own profits while the defective loans were included in the pools for securitization.

394.    Further, JPMorgan, Bear Stearns, WaMu, and Long Beach failed to disclose the defect rates and other misinformation found in the Registration Statements to the credit ratings agencies that depended on the information provided by the GSEs in determining the credit rating of a Securitization.  JPMorgan, Bear Stearns, WaMu, and Long Beach fed the ratings agencies the same false loan level data regarding loan-to-value ratios, owner-occupancy status, home values, and debt-to-income ratios that they provided to investors in aggregate form in the Prospectuses and Prospectus Supplements.  The rating agencies then input this false data into their quantitative models to assess the credit risk associated with the RMBS, project likely future defaults, and ultimately, determine the ratings on the RMBS products of JPMorgan, Bear Stearns, WaMu, and Long Beach.  As a result, Defendants essentially pre-determined the ratings by feeding bad data into the ratings system.

**B.**     **JPMorgan Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors**

395.     The evidence discussed above not only shows that the representations were untrue, but also that JPMorgan knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates.  As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed JPMorgan that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans JPMorgan submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 27 percent of mortgage loans that Clayton found defective, 51 percent were subsequently waived in by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  JPMorgan's waiver of over *half* of the defective loans shows that JPMorgan knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

396.     As discussed above, the strikingly high number of JPMorgan's loans that were rejected by third party due diligence firms, yet subsequently "waived" into securitizations by JPMorgan, demonstrates JPMorgan's knowledge that defective loans were being included in their offerings.

397.     Through its various affiliates and subsidiaries, JPMorgan participated in every step of the securitization process, from the origination and servicing of the mortgage loans, to the sponsoring and structuring of the securitization, to the underwriting and marketing of the Certificates.  This vertical integration allowed JPMorgan to control and manipulate the loan level

documentation and the value at which properties were appraised, and to ensure that loans would be approved by its loan underwriters.  By virtue of their control over each step in the securitization process, JPMorgan had knowledge of the true characteristics and credit quality of the mortgage loans.

398.     JPMorgan also purchased mortgages to securitize from third-party originators. While JPMorgan could have examined the loan files themselves as part of its due diligence process, JPMorgan instead used third-party due diligence firms like Clayton to examine only a small percentage of the loan files.  In instances where the third party due diligence firms rated the loans as failing to meet the underwriting standards, JPMorgan often chose to include such defective loans in the securitizations, thereby passing the risk of delinquency and default to investors.

399.     JPMorgan continued this behavior during the worst period of the financial crisis. As investors were demanding that JPMorgan's newly acquired subsidiary, Bear Stearns, repurchase mortgage loans that were not underwritten to represented standards of quality, JPMorgan was denying those repurchase requests while simultaneously making repurchase demands for the very same loans from the originator, Capital One Financial Corp.  In a June 26, 2008 letter to Capital One, Allison Malkin, an executive director with J.P. Morgan Securities (the entity with which BSC was eventually merged), stated "that it is [Bear Stearns'] position that these breaches materially and adversely affect the value" of the mortgage loans.  "JPMorgan Refused Mortgage Repurchases It Also Sought, Ambac Says," *Bloomberg* (Jan. 24, 2011)

400.     JPMorgan's own subprime lender, Chase Home Finance LLC ("CHF"), originated all or the majority of the mortgage loans underlying the JPMAC 2006-CH1, JPMAC 2006-CH2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, and JPMAC 2007-CH5

Securitizations.  CHF also originated a significant number of the mortgage loans underlying the JPALT 2005-A2 Securitization.  CHF is a wholly-owned subsidiary of JPMorgan Bank. JPMorgan Bank directed and controlled the business operations of CHF as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.

401.    JPMorgan abandoned its underwriting standards and condoned fraud by encouraging its employees to ignore and manipulate JPMorgan's automated underwriting system, called "ZiPPY."  "Chase mortgage memo pushes 'Cheats & Tricks,'" *The Oregonian* (March 27, 2008).  CHF went so far as to explicitly instruct loan originators to falsify loan information in order to elicit approval from the ZiPPY automated underwriting system for stated income loans of poor quality.  At internal memorandum circulated by CHF in its Portland, Oregon office titled "Cheats & Tricks" gave originators tips on how to circumvent the underwriting system, including exhortations that a mortgage should "Never Fear!!" because ZiPPY "can be adjusted" to "get the findings you need."  The memorandum encouraged brokers to game the ZiPPY system because "[i]t's super easy!  Give it a try!"  It provided the following "handy steps" in order to gain approval for an otherwise rejected Stated Income / Stated Asset loan application:

(1)  In the income section of your 1003, make sure you input all income in base income.  **DO NOT break it down by overtime, commissions or bonus.**

(2)  NO GIFT FUNDS!  If your borrower is getting a gift, add it to a bank account along with the rest of the assets.  Be sure to remove any mention of gift funds on the rest of your 1003.

(3)  If you do not get Stated/Stated, **try resubmitting with slightly higher income.  Inch it up $500 to see if you can get the findings you want.**  Do the same for assets.

(emphasis added).

402. Through these and other techniques, JPMorgan was able to substantially increase the volume of mortgage loans that it originated and securitized by abandoning its underwriting standards.

403. By 2006, however, JPMorgan had grown alarmed at the increasing rate of late payments in its subprime portfolio. As the poor quality of these mortgage loans became apparent, JPMorgan decided to exit its subprime positions. This decision came from JPMorgan's CEO, Jamie Dimon, evidencing knowledge of the perilous state of the JPMorgan's subprime assets by JPMorgan senior management. An article in *Bloomberg* on February 17, 2010 revealed that JPMorgan CEO Jamie Dimon was fully aware that its residential mortgage backed securities were of poor and deteriorating credit quality and that he attempted to shed the associated risk from JPMorgan's own balance sheet. The article reported that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions." In late 2008, *Fortune Magazine* quoted the same October 2006 phone conversation, where Mr. Dimon instructed Mr. King to sell JPMorgan's positions: "I really want you to watch out for subprime! . . . We need to sell a lot of our positions. I've seen it before. This stuff could go up in smoke!" "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," *Fortune Magazine* (September 2, 2008). By the end of 2006, JPMorgan had unloaded $12 billion in subprime assets that JPMorgan itself had originated. *Id.*

404. Despite Mr. Dimon's view that JPMorgan's subprime holdings "could go up in smoke!" and JPMorgan's decision to sell its own holdings in subprime assets, JPMorgan continued to originate and securitize poorly underwritten mortgage loans and vouch for their quality. This was the time period in which the GSEs acquired a significant amount of the

JPMorgan Certificates, relying on JPMorgan's representations that the mortgage loans were underwritten in accordance with JPMorgan's purported underwriting standards.

405.    JPMorgan waived a significant (over 51 percent)  number of the loans rejected by its third-party due diligence firm into loan pools for securitization.  JPMorgan also abandoned its underwriting standards in directing its employees to enter untrue and misleading information into its automated underwriting system in order to generate approvals for loans that would otherwise be rejected.  Finally, JPMorgan CEO Jamie Dimon himself knew that subprime positions were risky and dangerous; all the while JPMorgan continued to originate, acquire and securitize defective and credit-impaired loans for inclusion in its securitizations.  These loans collateralized the certificates issued in connection with such securitizations, which were sold to investors like the GSEs.  These facts demonstrate that JPMorgan knew its representations were false but nonetheless was willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

        **C.**      **Bear Stearns Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors**

406.    The evidence discussed above not only shows that the representations were untrue, but also that Bear Stearns knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates.  As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed Bear Stearns that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 16 percent of the mortgage

loans Bear Stearns submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 16 percent of mortgage loans that Clayton found defective, 42 percent were subsequently waived in by Bear Stearns without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here. Bear Stearns' waiver of 42 percent of the defective loans shows that Bear Stearns knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

407. Bear Stearns' collapse and subsequent acquisition by JPMorgan has been the subject of intense public scrutiny and investigation, most notably by the FCIC. In February 2011, the FCIC released interviews with Bear Stearns executives regarding its role in the origination, acquisition, and securitization of mortgage loans. The documentary evidence revealed widespread fraudulent conduct on the part of Bear Stearns. Such fraudulent conduct has been the basis for both investigation and litigation by public officials, including the Attorney General of Oregon, who filed an action on behalf of the Oregon Public Employees Retirement Fund against Bear Stearns for misrepresentations in its role as issuer and underwriter in the sale of certificates. *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 08 Civ. 8093 (SDNY).

408. Through its various affiliates and subsidiaries, Bear Stearns participated in every step of the securitization process, from the origination and servicing of the mortgage loans to the sponsoring and structuring of the securitization, to the underwriting and marketing of the Certificates. This vertical integration allowed Bear Stearns to control and manipulate the loan level documentation, to knowingly choose poor quality mortgage loans for securitization as a method of off-loading the loans to investors as soon as possible, and to selectively make repurchase claims of originators while simultaneously denying those of investors. By virtue of

their control over each step in the securitization process, Bear Stearns had knowledge of the true characteristics and credit quality of the mortgage loans.

409.    Bear Stearns' own subprime lender, EMC, originated or acquired all or the majority of the mortgage loans underlying the BALTA 2005-10, BALTA 2006-1, BALTA 2006-2, BALTA 2006-4, BSMF 2006-SL5, BSMF 2006-SL6, BSMF 2007-SL1, and BSMF 2007-SL2 Securitizations.  EMC also originated or acquired a significant number of the mortgage loans underlying the BSABS 2007-HE1 and BSMF 2007-AR3 Securitizations.  EMC was a wholly-owned subsidiary of BSI and is now a subsidiary of JPMorgan Bank.

410.    Encore Credit, a division of Bear Stearns Residential Mortgage Corporation ("BSRM"), originated the mortgage loans underlying the WMABS 2006-HE3, BSABS 2006-HE9, BSABS 2007-HE4, BSABS 2007-HE5, BSABS 2007-HE6, and BSABS 2007-HE7 Securitizations.  Encore Credit and BSRM also originated a significant number of the mortgage loans underlying the BSABS 2007-HE1, BSABS 2007-HE5, BSMF 2007-SL1, and BSMF 2007-SL2 Securitizations.  BSRM was a wholly-owned subsidiary of BSI and is now believed to be a subsidiary of JPMorgan Chase.

411.    Bear Stearns directed and controlled the business operations of EMC and Encore Credit as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.  EMC began acquiring subprime loans in 2003.  From 2004 to 2007, EMC more than doubled the volume of subprime loans it acquired for securitization, from over $27 billion in 2004 to over $80 billion in 2007.  BSRM began originating mortgage loans in 2005.  In 2006, BSRM originated over $4 billion in mortgages.  Bear Stearns securitized these loans through BSC, its underwriting affiliate.  According to *Inside Mortgage Finance*, BSC underwrote approximately $130.8 billion and $103.4 billion of mortgage-backed securities in 2005 and 2006,

respectively.  It was the first and third largest underwriter of non-agency mortgage-backed

securities in those years.  Bear Stearns' mortgage securitization business helped to increase Bear

Stearns' revenue by over 123 percent from 2003 to 2006.

412.    Like JPMorgan, Bear Stearns used third-party due diligence firms such as Clayton

to review whether the loans Bear Stearns intended to acquire for securitization were underwritten

in accordance with applicable underwriting standards.  If a loan did not comply with

underwriting guidelines, Bear Stearns could (i) demand that the originator cure the defect, (ii)

reject the loan for inclusion in the securitization, or (iii) accept the defective loan as part of the

loan pool for purchase.  As its appetite for mortgage loans to securitize grew, Bear Stearns

rejected fewer and fewer defective loans.  Bear Stearns made use of the exception process to

waive defective loans into the loan pool, effectively abandoning its underwriting standards.  The

vast majority of these loans did not have sufficient compensating factors to justify these

exceptions.  In testimony to the FCIC in September 2010, former Clayton President Keith

Johnson said that investment banks like Bear Stearns were aware that valid compensating factors

did not exist, and used these defects as leverage to negotiate a lower purchase price for the loans.

Internal communications from Bear Stearns, discussed below, confirm that Bear Stearns would

simultaneously deny repurchase demands from investors while making such repurchase demands

on originators for the same loans.  As such, Bear Stearns knowingly securitized, marketed, and

sold loans that did not meet its underwriting standards.

413.    Bear Stearns' management was so eager to securitize as many mortgage loans as

possible that it abandoned any adherence to underwriting or due diligence standards.  On

February 11, 2005, Bear Stearns Senior Managing Director Mary Haggerty e-mailed Vice

President of Due Diligence John Mongelluzo with instructions to reduce the amount of due

diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."

414.    Third-party due diligence firms were also told to reduce due diligence.  In an e-mail dated April 5, 2007, an EMC Assistant Manager for Quality Control Underwriting and Vendor Management ordered Adfitech, Inc. ("Adfitech") not to take efforts to verify information in a loan file, directing:

- "Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS,"

- Do not "make phone calls on employment," and

- "Occupancy misrep is not a securitization breach."

415.    Bear Stearns Internal Audit Reports also described the various reductions in due diligence.  According to February 28, 2006, and June 22, 2006 reports, Bear Stearns would reduce the number of loans in the loan samples that were reviewed as part of the due diligence process, conduct due diligence only after the loans were purchased ("post-closing" due diligence), eliminate internal reports on defective loans, and conduct no due diligence if such due diligence would interfere with mortgage loan pools being securitized.  *The Atlantic* confirmed this abandonment of reasonable due diligence procedures in a May 2010 article describing:

- how Bear Stearns pressured EMC analysts to perform their due diligence of the underlying mortgages in only one to three days;

- how Bear Stearns encouraged EMC analysts to falsify loan data (including FICO scores) if the loan file was missing the requisite information; and

- how Bear Stearns pushed EMC analysts to avoid investigating a potentially bad loan and instead focus on making it "fit."

"E-mails Suggest Bear Stearns Cheated Clients Out of Billions," *The Atlantic* (Jan. 25, 2011)

416.   Former EMC mortgage analyst Matthew Van Leeuwen, an employee from 2004 to 2006, confirmed in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," so that if there were "outstanding data issues" analysts should just "fill in the holes."  The pressure was directed from the top of Bear Stearns' corporate structure.  For example, EMC's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, told her staff to do "whatever is necessary" to meet Bear Stearns' objectives for desired loan production.  Her April 14, 2006 e-mail further stated:

> I refuse to receive any more emails . . . questioning why we're not funding more loans each day.  I'm holding each of you responsible for making sure we fund at least 500 each and every day. . . . [I]f we have 500+ loans in this office we MUST find a way to . . . buy them. . . . I expect to see 500+ each day. . . . I'll do whatever is necessary to make sure you're successful in meeting this objective.

417.   Not surprisingly, given the abandonment of due diligence and underwriting standards by Bear Stearns, loans acquired by Bear Stearns began to default at an increasing rate. These triggered concern in Bear Stearns as early as 2005.  Rather than improving the quality of loans acquired for securitization, Bear Stearns reacted by changing the time period in which Bear Stearns was required to hold loans it acquired.  Previously, Bear Stearns was required to hold third-party loans in inventory for between 30 and 90 days before the loans could be securitized. This allowed Bear Stearns to determine whether any of the loans would suffer from an early payment default.  In 2006, Bear Stearns stopped screening out these defective loans and instead required that all mortgage loans be securitized before the early payment default period expired. Bear Stearns Senior Managing Director Jeffrey Verschleiser confirmed the revised protocol in a June 13, 2006 e-mail to Haggerty stating that they need  "to be certain we can securitize the loans with 1 month epd before the epd period expires."  This desire to unload bad mortgage loans by selling them to other investors through the securitization process was further evidenced by a May 5, 2007 e-mail from Bear Stearns Managing Director Keith Lind, who demanded "to know

why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????"

418.    In addition to purposely acquiring and securitizing defective loans that did not meet their represented underwriting guidelines and selling them to investors, Bear Stearns' subprime subsidiary, EMC, further profited from these bad loans by making repurchase claims against the originator of the loans.  Repurchase claims are derived from rights found in mortgage loan purchase agreements, whereby the originator makes representations to the sponsor (EMC) that the loans were underwritten in accordance with certain underwriting standards.  If the sponsor (EMC) discovers this not to be the case, it can request that the originator repurchase any affected loans.  Similarly, the PSA between EMC and the trust requires that EMC repurchase any loans it knows are defective.  Instead of seeking the actual repurchase of these bad loans, however—which would remove the loans from the trust and compensate the certificateholders— EMC settled its repurchase claims and kept the settlement proceeds for itself.  EMC did not pass the proceeds of these repurchase claims on to the trust.

419.    EMC came to several such settlement agreements and other arrangements as part of its repurchase scheme.  On January 30, 2007, an originator agreed to pay over $2.5 million to EMC "in lieu of repurchasing the Defective Loans."  On December 18, 2007, an originator agreed to pay almost $12 million "for full payment and satisfaction of the Monetary Claims, and the balance of the Settlement Amount (if any) for settlement of the Defective Loans."  On October 1, 2007, an originator agreed to pay $1 million "in lieu of repurchasing the Defective Loans."  According to an internal presentation requested by Bear Stearns' Managing Director and Head of Mortgage-Backed Securities, Thomas Marano, EMC received $1.9 billion from April 2006 to April 2007 in claim resolutions, with most resolutions being settlements.  Bear

Stearns would also accept discounts on future loan purchasers instead of immediate cash settlements, valuing these arrangements at $367 million for the period beginning in 2007 through the first quarter of 2008.  *See also* "E-mails Suggest Bear Stearns Cheated Clients Out of Billions," *The Atlantic* (Jan. 25, 2011).

420.    These funds should have been passed to the trusts but Bear Stearns did not disclose its repurchase settlements with certificateholders in the trust.  In a December 11, 2009 deposition, Bear Stearns' Deal Manager Robert Durden could not identify a single "instance in which EMC or Bear Stearns disclosed to Ambac or other investors that it was recovering on EPDs from originators with respect to securitized mortgage loans, pocketing the money and not putting it into the trust."  Bear Stearns knew this practice breached its representations and warranties made to purchasers of certificates: PriceWaterhouseCoopers advised Bear Stearns that the program was contrary to "common industry practices, the expectation of investors and . . . the provisions in the [deal documents]" in an August 31, 2006 audit, and, according to EMC President Stephen Golden, EMC concluded that it could not retain funds in connection with the repurchase claims in mid-2007.  Despite this advice, EMC reached two such agreements in the latter half of 2007 and continued to fail to remit the proceeds to the trust. PricewaterhouseCoopers LLP, Bear Stearns/EMC UPB Break Repurchase Project Audit Report, August 31, 2006 (Haas Decl., Ex. 18, EMC-AMB 006803209).

421.    Bear Stearns also abused its reduced documentation programs, including its stated income, low documentation, and no documentation loan programs in its pursuit to originate as many loans as possible.  Low documentation loan programs were originally designed for self-employed business owners and professionals with high credit scores and loans with low loan-to-value ratios.  Despite representations in the Registration Statements that low documentation

loans adhered to traditional underwriting standards, low documentation loan programs were instead used as a tactic to circumvent Bear Stearns' underwriting standards altogether.

422.    A Bear Stearns Internal Audit Report dated February 28, 2006 revealed that Bear Stearns systematically issued reduced documentation loans to borrowers who misrepresented their income, assets, employment, and intentions to occupy purchased properties.  Bear Stearns loan officers were encouraged to ignore red flags and close the loans regardless.  Former EMC Mortgage Analyst Matthew Van Leeuwen explained in a March 30, 2009 e-mail that a "missing credit score would magically become a 680 in Bear's system, things like that."  Stated Income loans were typically approved even if the stated income could not be verified as reasonable by sources like Salary.com or support in the loan application.

423.    The evidence discussed above reveals that Bear Stearns had knowledge that it had, in fact, completely abandoned its underwriting standards.  Bear Stearns waived a significant number of loans rejected by its third-party due diligence firm into loan pools for securitization. Bear Stearns packaged loans for securitization at an earlier and earlier date, effectively gutting any sort of due diligence and thereby passing the risk of default onto the certificateholders. Senior management of Bear Stearns also directed its employees to abandon purported underwriting standards by not verifying employment or checking credit reports—all in the pursuit of increased volume and market share.  Further, Bear Stearns demanded that originators repurchase loans and then retained the payments received, as opposed to remitting such funds to the trusts.  These facts demonstrate that Bear Stearns knew its representations were false, but nonetheless was willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

D.     **WaMu and Long Beach Knew Their Representations Were False And Were Willing to Capitalize On Their Unique Knowledge At The Expense of Investors**

424.   The evidence discussed above not only shows that the representations were untrue, but also that WaMu and Long Beach knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates.  As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed WaMu that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans WaMu Bank submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 27 percent of mortgage loans that Clayton found defective, 29 percent were subsequently waived in by WaMu without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  WaMu's waiver of nearly a third of the defective loans shows that WaMu knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

425.   Like JPMorgan and Bear Stearns, WaMu and its Long Beach subsidiaries also systematically abandoned their underwriting standards in pursuit of greater volumes of mortgage loans to securitize and sell to investors.  As part of its strategy to grow and become a vertically integrated origination and securitization operation, WaMu acquired Long Beach Mortgage in 1999, thereby securing an in-house subprime originator, and also acquired WaMu Capital, thereby giving WaMu an in-house underwriter that could control the underwriting process and retain securitization underwriting fees.  By virtue of their control over each step in the

169

securitization process, WaMu and Long Beach and their senior management had actual

knowledge of the true characteristics and credit quality of the mortgage loans.

426.   Long Beach Mortgage, which was exclusively a subprime lender, originated all or

the majority of the mortgage loans underlying the LBMLT 2005-3, LBMLT 2006-2, LBMLT

2006-3, LBMLT 2006-4, LBMLT 2006-5, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-8,

LBMLT 2006-9, LBMLT 2006-10, LBMLT 2006-11, LBMLT 2006-WL1, LBMLT 2006-WL2,

LBMLT 2006-WL3, WMABS 2006-HE1, WMHE 2007-HE1, WMHE 2007-HE2, WMHE

2007-HE3, and WMHE 2007-HE4 Securitizations.  Long Beach Mortgage, formerly a WaMu

Bank subsidiary, became a division of WaMu Bank in July 2006 and was shut down in 2007.  In

addition, WaMu Bank itself originated all or the majority of the mortgage loans underlying the

WAMU 2007-OA3 Securitization.

427.   WaMu directed and controlled the business operations of Long Beach Mortgage

as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.  In

2000, Long Beach originated and securitized approximately $2.5 billion in subprime mortgage

loans; in 2006, it securitized nearly $30 billion in subprime home loans.  *PSI Report*, p. 54.

WaMu accomplished this rapid pace of growth by allowing and encouraging employees to

ignore its purported underwriting standards.

428.   WaMu's management purposely originated and securitized increasingly risky

mortgage loans in order to grow market share.  WaMu's strategy is made clear by internal

documents that called for riskier and riskier lending activities:

- A June 2004 Strategic Direction Memorandum wherein WaMu CEO Kerry
  Killinger, in presented a five-year strategic plan to take on "more credit risk (with
  more home equity, Alt A and non-prime residential loans) over the next five
  years," in the belief that "[a]bove average creation of shareholder value requires
  significant risk taking."

- A January 2005 presentation to the board of directors entitled "Higher Risk Lending Strategy 'Asset Allocation Initiative'" that advocated WaMu's strategic shift from originating low risk fixed rate and government-backed loans to high risk subprime, Option ARM and home equity loans.

- A June 2005 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger called for WaMu to increase its market share of Option ARM, home equity, subprime and Alt A loans to over 10 percent.

- An April 18, 2006 presentation titled "Home Loans Discussion, Board of Directors Meeting" that described WaMu's plan to increase the percentage of its loans that were considered high risk from 49 percent in 2005 to 82 percent by 2008; the presentation also described how subprime loans were eight times as profitable as government-backed loans.

- A June 12, 2006 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger noted that "Wall Street appears to assign higher P/Es to companies embracing credit risk and penalizes companies with higher interest-rate and operating risks," further encouraging riskier lending practices.

- A June 18, 2007 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger stressed WaMu's emphasis on "higher-risk adjusted return products such as home equity, sub-prime first mortgages, Alt A mortgages and proprietary products such as Mortgage Plus."

429.  WaMu expanded into higher risk loan products while simultaneously abandoning its stated underwriting standards through the use of exceptions.  James G. Vanasek, WaMu's Chief Risk Officer until 2005, acknowledged to the Senate PSI that exceptions were "a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions." *PSI Hearing*, April 13, 2010.  The Office of Thrift Supervision issued a Report of Examination to WaMu in August 2005, stating that it "remain[ed] concerned with the number of underwriting exceptions and with issues that evidence lack of compliance with bank policy."  The OTS followed up with a May 2006 Findings Memorandum, stating that the loans it reviewed did not have exceptions and "probably should not have been made." *PSI Report*, p. 180.

430.     In a 2005 internal memorandum, Mr. Vanasek described WaMu's own loan sales

team as "infectious and dangerous," "aggressive, and often times abusive" in response to his

attempts to enforce a "more disciplined underwriting approach." *PSI Report*, p. 143.  Mr.

Vanasek further testified to the Senate PSI that if an underwriter rejected a loan application, "the

loans were always escalated up, so if they declined a loan, it was escalated to a higher level, a

marketing officer who would ultimately approve." *PSI Hearing*, April 13, 2010.  Keysha

Cooper, a WaMu Senior Mortgage Underwriter from 2003-2007 stated in a November 1, 2008

*New York Times* article, "I swear 60 percent of the loans I approved I was made to."  "At WaMu,

a loan factory," *The New York Times* (Nov. 2, 2008).

431.     In addition, contrary to its guidelines and prudent standards of underwriting,

WaMu used the starter interest rate as the qualifying rate as opposed to the eventual, higher

interest rate, thereby resulting in a "payment shock" if the interest rate increased.  WaMu also

focused on borrower credit scores in originating loans, as opposed to verifying borrower income

and assets.

432.     WaMu encouraged its employees to avoid investigating red flags.  According to a

December 27, 2008 *New York Times* article, John D. Parsons, a WaMu mortgage processing

supervisor, stated that he "was accustomed to seeing baby sitters claiming salaries worthy of

college presidents, and schoolteachers with incomes rivaling stockbrokers," but that WaMu "was

all about saying yes."  "Saying Yes, WaMu Built Empire on Shaky Loans," *The New York Times*

(December 27, 2008).  Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle

Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file.'"   "Part One:

Reckless Strategies Doomed WaMu," *The Seattle Times* (October 25, 2009).  She would "take

the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here?  We're just going to take this stuff and throw it out." *Id.*

433.    A PSI hearing exhibit details admissions by several WaMu employees to falsifying loan documentation in order to approve more loans.  *PSI Hearing*, Ex. 30.  A Westlake Village loan office sales associate stated that sales team members would "cut and paste the current borrower's name and address" onto the old bank statements.  *PSI Hearing*, Ex. 31.

434.    Karen Weaver, a former Long Beach underwriter, acknowledged that brokers "were making up pay stubs and presenting that."  "At Top Subprime Mortgage Lender, Policies Were An Invitation To Fraud," *Huffington Post* (Dec. 21, 2009).  Anoinette Hendryx, a former Long Beach manager and underwriter, said that account executives would "offer kickbacks of money" to underwriters to get bad loans approved.  *Id.*

435.    WaMu's strategy of approving virtually every loan was successful in increasing its volume of loans originated at the sacrifice of quality.  This has been confirmed by WaMu employees and insiders.  In the same *New York Times* article, WaMu senior underwriter Keysha Cooper acknowledged that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?"  A former WaMu senior home consultant told the *Seattle Times* in the October 25, 2009 article discussed above that WaMu employees were subject to "total blanketing – emails, memos, meetings set up so people understood that this was what the company wanted them to do."

436.    WaMu senior management was aware that its personnel ignored WaMu's stated underwriting standards, and even sought to benefit from this asymmetrical knowledge.  The minutes of a December 2006 WaMu Risk Committee Meeting reflect that "delinquency behavior

was flagged in October [2006] for further review and analysis . . . . The primary factors contributing to increased delinquency appear to be caused by process issues including the sale and securitization of delinquent loans, loans not underwritten to standards, lower credit quality loans and seller servicers reporting false delinquent payment status."  Despite this concern for rising delinquencies, Cheryl Feltgen, WaMu's Chief Risk Officer, wrote in a February 2007 e-mail that  WaMu was "contemplating selling a larger portion of our Option ARMs than we have in the recent past.  Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the market seems not to be yet discounting a lot for those factors."  In other words, WaMu sought "arbitrage" of its loan portfolio by selling risky and increasingly delinquent loans to investors who were not aware that WaMu had systematically abandoned its underwriting standards.

437.    WaMu avoided taking losses on these poor quality loans by packaging them into mortgage-backed securities and selling them to investors who were not aware of WaMu's systematic abandonment of its purported underwriting standards.  A January 2005 presentation to the WaMu board of directors titled "Higher Risk Lending Strategy" highlighted the success of this strategy because "[c]redit-related losses from newly originated [High Risk Loan] portfolio . . . will occur several years after origination."  Mr. Vanasek, in his testimony before the PSI, was asked by Senator Levin: "Is it fair to say that WaMu was not particularly worried about the risk associated with Long Beach subprime mortgages because it sold those loans and passed the risk on to investors?"  Mr. Vanasek responded:  "Yes, I would say that was a fair characterization."

438.    WaMu accelerated its strategy to sell as many high risk loans as possible as the housing market worsened.  WaMu Executive Vice President and securitization chief, David

Beck, wrote in a February 2007 e-mail that "[t]he performance of newly minted option arm loans is causing us problems. Cheryl can validate but my view is our alt a (high margin) option arms [are] not performing well. We should address selling 1Q as soon as we can before we loose [sic] the [opportunity]." Cheryl Feltgen, the Chief Risk Officer for WaMu Home Loans, confirmed her acceptance of this strategy, stating "[t]here is a meltdown in the subprime market which is creating a 'flight to quality.' . . . This seems to me to be a great time to sell as many Option ARMs as we possibly can. [CEO] Kerry Killinger was certainly encouraging us to think seriously about it at the MBR last week." WaMu was particularly concerned about the Long Beach loans as they had the highest rates of default. To help offset that risk, WaMu COO Stephen Rotella told WaMu CEO Kerry Killinger that he "asked the guys to work with Beck's group to see if we could package and sell any of the bad portfolio product flat."

439.    WaMu knew that the loans it was securitizing and selling to investors had fraudulent information. One internal report "WaMu Risk Mitigation and Mortgage Fraud 2008 Targeted Review," completed in September 2008, confirmed that WaMu had sold loans to investors after WaMu's internal controls had identified loans as fraudulent. "The controls that are intended to prevent the sale of loans that have been confirmed by Risk Mitigation to contain misrepresentations or fraud are not currently effective. There is not a systematic process to prevent a loan in the Risk Mitigation Inventory and/or confirmed to contain suspicious activity from being sold to an investor. ... Of the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time." A 2008 study by WaMu's Corporate Credit Review team confirmed that WaMu's had allocated far too few resources to monitoring and combating fraud.

"Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors."

440.    Long Beach in particular was known to be a source of fraudulently originated loans.  One internal audit from 2005 found that Long Beach suffered from "[r]elaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel. . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool."  Ronald Cathcart, the Chief Enterprise Risk Officer for WaMu, noted in a 2007 e-mail that, for Long Beach, "deterioration was accelerating in recent vintages with each vintage since 2002 having performed worse than the prior vintage."  Mr. Cathcart cited "[a]ppraisal deficiencies . . . . Material misrepresentations . . . Legal documents were missing or contained errors or discrepancies . . . loan decision errors" as the cause.  WaMu shut down Long Beach in June 2007, incorporating the former subsidiary as WaMu's "Wholesale Specialty Lending" channel.

441.    WaMu, itself wary of holding risky or poorly underwritten loans, conducted internal studies to determine the risk of its loan holdings.  WaMu did not inform investors of the results of these studies.  During his testimony before the PSI, Senator Levin asked David Beck, WaMu's Executive Vice President and head of securitization, about whether WaMu disclosed its findings to investors: "Did they know, were they informed that loans with those or some of those characteristics had a greater propensity towards delinquency in WaMu's analysis?"  Mr. Beck confirmed: "They were not told of the WaMu analysis."

442.    WaMu was very aware of the risk of purchasing poorly underwritten and risky loans and retaining them on its balance sheet.  As such, WaMu made an effort to purchase and retain only higher quality loans on its books.  Mr. Vanasek told the PSI that "some subprime

mortgage loans purchased from others, namely Ameriquest, were retained on the balance sheet.

They tended to be higher quality subprime loans and they were monitored very closely." Senator

Coburn asked for confirmation: "So basically, you were buying higher quality subprime loans

from competitors than you were selling to the market." Mr. Vanasek responded, "Correct."

443.    WaMu falsely overstated appraisals in order to secure low LTV ratios for

mortgages, thereby making the loans more attractive to prospective purchasers of certificates.

WaMu utilized two appraisal management companies, eAppraiseIT and Lender's Service, Inc.

("LSI"), to oversee the appraisals of its loans. Documents produced in the New York Attorney

General's suit against eAppraiseIT and its parent First American, *New York v. First American

Corp. (eAppraiseIT)*, reveals that WaMu selected individual appraisers who were willing to

produce false, inflated appraisals and refused to hire appraisers who maintained their

independence. *New York v. First American Corp and First American eAppraiseIT*, No.

1:2007cv10397 (NY. Sup. Ct. 2007). WaMu rebuked any sign of independence in its appraisers,

returning appraisals it deemed too low to eAppraiseIT for "reconsideration" and shifting its

business to a competitor of eAppraiseIT when one regional office refused to compromise its

independence.

444.    eAppraiseIT's management was initially resistant to this pressure from WaMu but

eventually was pressured into sacrificing its independence to meet WaMu's demands.

eAppraiseIT's President complained in an August 9, 2006 e-mail to WaMu that "[t]he Wamu

internal staff . . . admonish us to be certain we solve the [requests for reconsideration of

appraisal] issue quickly or we will all be in for some pretty rough seas." An August 15, 2006 e-

mail to eAppraiseIT's president reflects an eAppraiseIT Executive Vice President complaining

because WaMu's loan officers demanded that eAppraiseIT's appraisers "tell them specifically

what they needed." However, on September 14, 2006, that same executive VP wrote that eAppraiseIT was "studying allowing [the manager's] group a little flexibility to raise the value 5% with a cap of $50k if it is fully justified." Eventually, all independence would be lost, as confirmed by the eAppraiseIT's Chief Appraiser, Peter Gailitis, who stated in an August 10, 2010 sworn affidavit that "the pressure from WaMu sales staff to 'hit value' continued throughout the time I was with [eAppraiseIT] . . . Requests from WaMu loan officers to increase values would come in various forms . . . to the effect of 'we need X value' or 'we need to hit' a certain value in order to make the deal go through."

445. WaMu used the influence and leverage of its continued business to turn eAppraiseIT into virtually a captive appraiser. eAppraiseIT hired over 60 former WaMu appraisal office employees as staff appraisers and Appraisal Business Managers ("ABM"), reflecting eAppraiseIT's recognition that hiring former WaMu employees was "instrumental in [eAppraiseIT's] relational and operational success with [WaMu's] sales force." WaMu directed that its former employees, now comprising a third of eAppraiseIT's staff, would deal with any requests by WaMu for reconsideration of appraisals. When eAppraiseIT's office in Northern California refused to comply with WaMu's requests, WaMu moved all its Northern California business to a competitor, LSI.

446. WaMu further compromised the independence of appraisers and the quality of appraisal values by requiring eAppraiseIT and LSI to use WaMu's own selected list of appraisers. WaMu knew that these appraisers would deliver the inflated values they required to make the mortgage loans look attractive to potential investors. eAppraiseIT's President recapped WaMu's strategy in a February 22, 2007 e-mail to senior executives at eAppraiseIT's parent company, First American. He wrote: "We had a joint call with Wamu and LSI today. The

attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's 'Proven Appraisers.' . . . We will pay their appraisers whatever they demand.  Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value."

447.    Despite the Office of Thrift Supervision's 2005 guidance that "Staff responsible for the development and maintenance of the [approved loan appraiser] list should be independent of the loan production process," WaMu, eAppraiseIT, and LSI decided in a March 1, 2007 meeting that, according to the minutes, a "Proven Appraiser List is being created. This will replace the WaMu preferred list.  The initial list of names will be provided by lending. . . Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority Basis." eAppraiseIT informed its staff in an April 17, 2007 e-mail that WaMu "decided to construct their own appraisal panel, now known as the wamu proven panel, and instructed the [appraisal managers] to utilize appraisers from this panel whenever possible. The end result is that if you are not on this proven panel it is very unlikely you will receive wamu work."

448.    LSI received the same treatment from WaMu.  If LSI wanted to use a appraiser that wasn't on WaMu's Proven Appraiser List, LSI had to provide a justification.  A 2007 Memorandum by eAppraiseIT Executive Vice President attached to an April 17, 2007 email drafted by eAppraiseIT President sent to First American Corp executives stated that "we need a short sentence in the message log so that we can monitor, – AND most important - lending can see why you didn't assign to a PAL service provider. Not using a PAL appraiser will be an issue so we need to ensure we've covered our bases as to why they're not utilized."

449.    According to the New York Attorney General's complaint, when one appraiser refused to reconsider the values of five appraisals he was removed from the proven appraiser list

by WaMu.  He was told by a WaMu employee that "many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high value to permit the loans to close."  *See Complaint, New York v. First American & eAppraiseIT,* No. 1:2007cv10397, *2007 WL 6420430 (N.Y.Sup. Nov. 1, 2007).*

450.    Indeed, the situation was best summed up by one of WaMu's former employees. On April 27, 2007, a former WaMu Oversight officer, Sabina Senorans, who had moved to sales wrote in an e-mail: "The sales people finally got their way at WAMU. The appraisal list that Eappraiseit and LSI is using has been totally scrubbed, but instead of keeping good appraisers, they went for the Badd [sic] ones . . . So many appraisers have been knocked off the list. . . . I did manage to salvage a few in Nassau County, but other area, forget about it.  Now sales can easily threaten to take an appraiser off their list if they cannnot [sic] get what they want.  Scary, huh?" In her February 20, 2009 deposition, the Sabina Senorans testified that the "people who are good appraisers were removed at the request of the loan officers and the sales staff."

451.    Such improper influence by WaMu and lack of independence on the part of appraisers was confirmed by the Office of Thrift Supervision in July 2008.  The OTS investigated WaMu's appraisal practices and found that "[n]umerous instances were identified where, because of undue influence on the appraiser, values were increased without supporting documentation" and constituted "unsafe or unsound banking practices."  *PSI Report*, p. 190.

452.    eAppraiseIT recognized WaMu's practices for what they were:  In an e-mail dated September 13, 2006, eAppraiseIT's President, Anthony Merlo, wrote to WaMu's executives that "[t]he issue is getting outrageously unethical and now border line [sic] dangerous.  Please respond what you will do to have this stopped within the Wamu organization."  eAppraiseIT's

President then forwarded the e-mail to First American executives, noting: "I need to clamp down, especially since we warrant appraisals.  It's pure pressure to commit fraud."  In spite of these concerns, eAppraiseIT continued its work for WaMu, conducting over 260,000 appraisals for WaMu, until the fall of 2007 when the New York Attorney General brought its action.

453.    WaMu also developed a series of internal practices that directly led to the origination and securitization of fraudulent loans.  First, as discussed above, WaMu tied bonuses to the number of loans closed by a loan officer, thereby encouraging employees to be more concerned with volume than quality.  Second, WaMu adopted a plan to pay for "overages," which were payments to loan officers who sold mortgages to clients at a higher rate of interest than the rate for which the client was qualified.  A 2008 WaMu internal study titled "AIG/UG and OTS Allegation of Loan Frauds Originated by [redacted employee]" found that these compensation practices lead to unsound underwriting.  The memorandum concluded that because volume was emphasized above all else, "the temptation to advise the borrower on means and methods to game the system may occur.  Our compensation and reward structure is heavily tilted for these employees toward production of closed loans."

454.    WaMu's Chief Risk Officer, Mr. Vanasek, confirmed these findings in his testimony to the Senate PSI.  "Because of the compensation systems rewarding volume versus quality and the independent structure of the originators, I am confident at times borrowers were coached to fill out applications with overstated incomes or net worth to meet the minimum underwriting requirements.  Catching this kind of fraud was difficult at best and required the support of line management.  Not surprisingly, loan originators constantly threatened to quit and go to Countrywide or elsewhere if the loan applications were not approved."  *PSI Report*, p. 103.

455.    The internal corporate culture at WaMu emphasized market growth over sound risk management.  Mr. Vanasek and his risk department repeatedly issues warnings to WaMu's senior management concerning WaMu's origination and acquisition of mortgage loans of increasingly poor credit quality.  In a February 28, 2005 memorandum to WaMu CEO Kerry Killinger and others members of the Executive Committee, Mr. Vanasek warned that "[m]y credit team and I fear that we are considering expanding our risk appetite beyond the '05 Plan at exactly the wrong point in the cycle … the market is over heated in many key areas of the country."  In another 2005 memorandum, Mr. Vanasek warned WaMu that the increasing use of Option ARM loans would result in a high number of defaulted mortgages, stating: "The organization is at significant risk in its Option ARM and Hybrid portfolio of payment shock created by abnormally low Start – or teaser – rates, and aggressively low underwriting rates.... It is our contention that in the upwardly sloping rate environment and expected flattening of housing appreciation, we are putting borrowers into homes that they simply cannot afford."

456.    WaMu's senior management ignored these repeated warnings and created a corporate culture that empowered sales at the expense of risk management.  WaMu's management told risk managers, via an October 31, 2005 memorandum, that they had to "shift [their] ways of thinking" from being a "regulatory burden" that restricted lending operations to being a "customer service" that supported WaMu's aggressive growth strategy.  WaMu's Chief Compliance and Risk Oversight Officer, Melissa Martinez, told risk managers they had to rely less on loan documentation and more on automated underwriting systems.

457.    In 2004, WaMu promoted a new advertising slogan called "The Power of Yes." Mr. Vanasek told the Senate PSI that "[t]he implication of that statement was that Washington

Mutual would find some way to make a loan.  The tag line symbolized the management attitude about mortgage lending more clearly than anything I can tell you." *PSI Report*, p. 146.

458.    Those executives who dissented from WaMu's aggressive growth strategy were generally dismissed or asked to leave.  Indeed, Mr. Vanasek retired in December 2005 due to a lack of management support for his attempts at reigning in WaMu's aggressive lending.  When he left, WaMu subordinated the risk department to the business division.  WaMu continued its risky lending.  Ronald Cathcart, the Chief Enterprise Risk Officer for WaMu, told the Senate PSI: "By February 2008, I had been so fully isolated that I initiated a meeting with the Director, where I advised that I was being marginalized by senior management to the point that I was no longer able to discharge my responsibilities as Chief Enterprise Risk Officer of WaMu.  Within several weeks, I was terminated by the Chairman." *PSI Report*, p. 115.

459.    This evidence, which has been exhaustively documented in the Senate PSI Report and other government sources, reveals that WaMu and Long Beach knew that their underwriting standards had been utterly abandoned.  WaMu and Long Beach pressured their employees to rubber stamp loans; effectively gutting any sort of due diligence and making employment contingent on an employees' willingness to close as many loans as possible.  WaMu's own internal controls indicated the poor credit quality of WaMu and Long Beach mortgage loans, which WaMu and Long Beach proceeded to sell into securitizations regardless, capitalizing on their asymmetrical information.  WaMu also knew that its internal controls were inadequate.  Further, WaMu actively sought to elicit false and misleading valuations from supposedly "independent" appraisers.  Finally, WaMu fired, forced out, or ignored any employees who attempted to put an end to WaMu's fraudulent and reckless behavior.  These facts demonstrate

that WaMu and Long Beach knew their representations were false and, in spite of this, were willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

**VI.  The GSEs Justifiably Relied on the Representations of JPMorgan, Bear Stearns, WaMu, and Long Beach**

460.    Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by JPMorgan, Bear Stearns, WaMu, and Long Beach in their capacities as the sponsor, depositor, and lead and selling underwriter for the 94 JPMorgan, Bear Stearns, WaMu, and Long Beach-sponsored Securitizations.  JPMorgan, Bear Stearns, WaMu, and Long Beach provided term sheets to the GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

461.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P. Morgan Securities, BSC, and WaMu Capital relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

462.    JPMorgan, Bear Stearns, WaMu, and Long Beach in their capacities as the sponsors, depositors, and lead and selling underwriters for the 94 JPMorgan, Bear Stearns,

WaMu, and Long Beach-sponsored Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies.  The credit rating agencies based their ratings on the information provided to them by JPMorgan, Bear Stearns, WaMu, and Long Beach, and the agencies' anticipated ratings of the Certificates were dependant on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of representations of JPMorgan, Bear Stearns, WaMu, and Long Beach in the term sheets and Prospectus Supplements.

463.    In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

464.    In purchasing the GSE Certificates, the GSEs justifiably relied on the false representations and omissions of material fact, detailed above, that were made by JPMorgan, Bear Stearns, WaMu, and Long Beach, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

465.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

## VII.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages

466.    In total, between September 7, 2005 and September 19, 2007, Fannie Mae and Freddie Mac purchased over $33 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Tables 11 and 12 reflect Fannie Mae's and Freddie Mac's purchases of the Certificates, respectively.[22]

### Table 11

| Transaction | Tranche | CUSIP | Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| BALTA 2005-10 | II3A1 | 07386HZG9 | 12/30/2005 | $569,686,000.00 | 101.1406 | BSC |
| BALTA 2006-4 | I2A1 | 073871AC9 | 6/30/2006 | $403,000,000.00 | 100 | BSC |
| BALTA 2006-4 | III1A1 | 073871BL8 | 6/30/2006 | $132,532,000.00 | 99.3125 | BSC |
| BSABS 2006-HE9 | IIA | 07389MAD9 | 11/30/2006 | $218,304,000.00 | 100 | BSC |
| BSABS 2006-HE10 | II2A | 07389RAR7 | 12/29/2006 | $201,892,000.00 | 100 | BSC |
| BSABS 2007-FS1 | IIA | 073855AG3 | 2/28/2007 | $70,635,000.00 | 99.9935 | BSC |
| BSABS 2007-HE1 | II2A | 07389UAR0 | 1/30/2007 | $118,512,000.00 | 100 | BSC |
| BSABS 2007-HE2 | II2A | 07389YAE1 | 2/28/2007 | $75,162,000.00 | 100 | BSC |
| BSABS 2007-HE3 | IIA | 073852AE5 | 3/30/2007 | $131,715,000.00 | 100 | BSC |
| BSABS 2007-HE3 | IIIA | 073852AF2 | 3/30/2007 | $90,354,000.00 | 100 | BSC |
| BSABS 2007-HE4 | IIA | 07386RAE9 | 4/30/2007 | $210,625,000.00 | 100 | BSC |
| BSABS 2007-HE5 | IIA | 073859AE0 | 5/30/2007 | $99,922,000.00 | 100 | BSC |
| BSABS 2007-HE7 | IIA1 | 07387VAC3 | 9/19/2007 | $137,892,000.00 | 100 | BSC |
| BSABS 2007-HE7 | IIIA1 | 07387VAE9 | 9/19/2007 | $69,504,000.00 | 100 | BSC |
| GPMF 2005-AR5 | IIA1 | 39538WEE4 | 10/31/2005 | $470,923,000.00 | 100 | BSC |
| GPMF 2006-AR3 | IIA1 | 39538WHA9 | 4/28/2006 | $492,223,000.00 | 100 | BSC |
| GPMF 2006-AR3 | IIA2 | 39538WHB7 | 4/28/2006 | $259,690,000.00 | 100 | BSC |
| JPALT 2005-A2 | 2A1 | 46627MBS5 | 12/29/2005 | $68,406,000.00 | 100.1484 | J.P. Morgan Securities |
| JPMAC 2005-OPT2 | A1A | 46626LEF3 | 12/21/2005 | $311,578,000.00 | 100 | J.P. Morgan Securities |

---

[22]    Purchased securities in Tables 11 and 12 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | Tranche | CUSIP | Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| JPMAC 2006-CW1 | A1A | 46628MAA4 | 5/31/2006 | $213,081,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE3 | A1 | 46629VAA3 | 11/10/2006 | $189,800,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-NC2 | A1A | 46629HAA4 | 8/23/2006 | $223,083,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-RM1 | A1A | 46629NAA1 | 9/27/2006 | $230,853,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-RM1 | A1B | 46629NAB9 | 9/27/2006 | $57,713,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC1 | A1 | 46626LJK7 | 3/30/2006 | $161,500,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC2 | A1 | 46628TAA9 | 6/28/2006 | $324,255,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC3 | A1SS | 46629KAA7 | 9/14/2006 | $175,270,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC3 | A1MZ | 46629KAB5 | 9/14/2006 | $43,817,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC4 | A1A | 46630BAA4 | 12/20/2006 | $376,675,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC4 | A1B | 46630BAB2 | 12/20/2006 | $41,853,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH3 | A1A | 46630XAA6 | 5/15/2007 | $374,118,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH3 | A1B | 46630XAB4 | 5/15/2007 | $41,569,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH5 | A1 | 46631KAA3 | 7/12/2007 | $304,336,000.00 | 100 | J.P. Morgan Securities |
| JPMMT 2006-A3 | 1A1 | 46628KAA8 | 4/28/2006 5/2/2006 | $174,498,090.91 | 99.6914 99.5430 | J.P. Morgan Securities |
| LBMLT 2006-3 | IA | 542514UG7 | 4/6/2006 | $256,950,500.00 | 100 | WaMu Capital |
| LBMLT 2006-4 | IA | 54251MAA2 | 5/9/2006 | $393,834,000.00 | 100 | WaMu Capital |
| LBMLT 2006-WL1 | IA2 | 542514QQ0 | 2/8/2006 | $256,209,000.00 | 100 | Goldman Sachs |
| LBMLT 2006-WL2 | IA | 542514RZ9 | 1/30/2006 | $462,263,000.00 | 100 | Lehman Brothers Inc. |
| LUM 2006-3 | II2A1 | 55027AAD2 | 7/3/2006 | $143,433,854.79 | 99.1289 | Citigroup |
| WMALT 2005-9 | 1CB | 93934FEL2 | 10/31/2005 | $69,400,400.00 | 101.5156 | WaMu Capital |
| WMALT 2005-10 | 1CB | 93934FFY3 | 11/30/2005 | $62,532,200.00 | 102.5938 | WaMu Capital |

**Table 12**

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | 00764MHD2 | 10/28/2005 | $500,000,000.00 | 100 | BSC |
| AHM 2005-1 | VIA | 02660TDH3 | 4/28/2006 | $251,446,839.54 | 99.234375 | BSC |
| AHM 2005-4 | IVA | 02660TGV9 | 2/1/2006 | $556,435,000.00 | 99.203125 | BSC |
| ARSI 2006-M2 | A1 | 04013BAR3 | 8/29/2006 | $717,382,000.00 | 100 | J.P. Morgan Securities |

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| BALTA 2005-10 | II2A1 | 07386HZE4 | 12/30/2005 | $407,783,000.00 | 100.9199219 | BSC |
| BALTA 2006-1 | III1A1 | 07386HB75 | 2/28/2006 | $208,000,000.00 | 99.7890625 | BSC |
| BALTA 2006-2 | II2A1 | 07386HF30 | 3/31/2006 | $381,136,000.00 | 100.671875 | BSC |
| BALTA 2006-3 | III1A1 | 07386HK83 | 4/28/2006 | $276,267,000.00 | 100 | BSC |
| BALTA 2006-4 | I2A1 | 073871AC9 | 6/30/2006 | $404,809,000.00 | 100 | BSC |
| BSABS 2005-HE12 | IIA | 0738795P9 | 12/30/2005 | $302,737,000.00 | 100 | BSC |
| BSABS 2006-AQ1 | I2A | 07389PAD2 | 11/30/2006 | $192,142,000.00 | 100 | BSC |
| BSABS 2006-HE2 | IIA | 07387UEL1 | 2/28/2006 | $241,697,000.00 | 100 | BSC |
| BSABS 2006-HE4 | IIA | 07388AAD6 | 4/28/2006 | $264,889,000.00 | 100 | BSC |
| BSABS 2006-HE5 | IIA | 07388CAD2 | 5/30/2006 | $162,020,000.00 | 100 | BSC |
| BSABS 2006-HE7 | II2A | 07388HAR0 | 8/30/2006 | $100,275,000.00 | 100 | BSC |
| BSABS 2006-HE8 | II2A | 07388JAR6 | 10/30/2006 | $51,306,000.00 | 100 | BSC |
| BSABS 2006-HE9 | IIIA | 07389MAE7 | 11/30/2006 | $236,045,000.00 | 100 | BSC |
| BSABS 2006-HE10 | II3A | 07389RAS5 | 12/29/2006 | $132,221,000.00 | 100 | BSC |
| BSABS 2007-HE1 | II3A | 07389UAS8 | 1/30/2007 | $92,100,000.00 | 100 | BSC |
| BSABS 2007-HE2 | II3A | 07389YAF8 | 2/28/2007 | $77,349,000.00 | 100 | BSC |
| BSABS 2007-HE5 | IIIA | 073859AF7 | 5/30/2007 | $122,752,000.00 | 100 | BSC |
| BSABS 2007-HE6 | IIA | 07387YAE3 | 8/30/2007 | $291,210,000.00 | 100 | BSC |
| BSMF 2006-SL5 | IIA | 07401HAB8 | 11/30/2006 | $23,706,000.00 | 100 | BSC |
| BSMF 2006-SL6 | IIA | 07400LAT1 | 12/29/2006 | $20,279,000.00 | 100 | BSC |
| BSMF 2007-AR3 | II2A1 | 07401VAS0 | 3/30/2007 | $241,679,000.00 | 100 | BSC |
| BSMF 2007-SL1 | IIA | 07401PAB0 | 1/30/2007 | $24,050,000.00 | 100 | BSC |
| BSMF 2007-SL2 | IIA | 07401RAB6 | 2/28/2007 | $21,671,000.00 | 100 | BSC |
| CBASS 2006-CB2 | AV | 12498NAW3 | 2/28/2006 | $347,712,000.00 | 100 | J.P. Morgan Securities |
| CBASS 2006-CB7 | A1 | 12479DAA6 | 10/5/2006 | $385,237,000.00 | 100 | J.P. Morgan Securities |
| JPALT 2007-A2 | 11A1 | 466278AA6 | 5/31/2007 | $369,061,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2005-FRE1 | AI | 46626LBU3 | 11/29/2005 | $274,516,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2005-WMC1 | A1 | 46626LBD1 | 10/27/2005 | $404,000,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-ACC1 | A1 | 46628RAA3 | 6/2/2006 | $266,700,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CH1 | A1 | 46629TAA8 | 11/14/2006 | $149,925,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CH2 | AV1 | 46629QAS5 | 12/14/2006 | $900,296,000.00 | 100 | J.P. Morgan Securities |

188

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| JPMAC 2006-CW2 | AV1 | 46629BAN9 | 8/8/2006 | $410,588,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-FRE1 | A1 | 46626LFX3 | 1/27/2006 | $279,696,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-FRE2 | A1 | 46626LGX2 | 3/29/2006 | $267,476,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE1 | A1 | 46626LGT1 | 2/28/2006 | $166,827,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE2 | A1 | 46625SAA4 | 6/30/2006 | $171,430,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-NC1 | A1 | 46626LJL5 | 4/27/2006 | $345,251,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH2 | AV1 | 46630MAS1 | 3/15/2007 | $234,600,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH4 | A1 | 46630CAA2 | 6/15/2007 | $435,000,000.00 | 100 | J.P. Morgan Securities |
| LBMLT 2005-3 | IA | 542514NT7 | 9/7/2005 | $604,830,000.00 | 100 | Lehman Brothers Inc. |
| LBMLT 2006-1 | IA | 542514RH9 | 2/7/2006 | $870,736,000.00 | 100 | Credit Suisse |
| LBMLT 2006-2 | IA | 542514TQ7 | 3/7/2006 | $1,101,891,000.00 | 100 | RBS Greenwich |
| LBMLT 2006-3 | IA | 542514UG7 | 4/6/2006 | $256,950,500.00 | 100 | WaMu Capital |
| LBMLT 2006-4 | IA | 54251MAA2 | 5/9/2006 | $393,834,000.00 | 100 | WaMu Capital |
| LBMLT 2006-5 | IA | 54251PAA5 | 6/15/2006 | $631,423,000.00 | 100 | WaMu Capital |
| LBMLT 2006-6 | IA | 54251RAA1 | 7/26/2006 | $415,891,000.00 | 100 | WaMu Capital |
| LBMLT 2006-7 | IA | 54251TAA7 | 8/30/2006 | $360,139,000.00 | 100 | WaMu Capital |
| LBMLT 2006-8 | IA | 54251UAA4 | 9/21/2006 | $366,091,000.00 | 100 | WaMu Capital |
| LBMLT 2006-9 | IA | 54251WAA0 | 10/12/2006 | $420,396,000.00 | 100 | WaMu Capital |
| LBMLT 2006-10 | IA | 54251YAA6 | 11/9/2006 | $288,380,000.00 | 100 | WaMu Capital |
| LBMLT 2006-11 | IA | 542512AA6 | 12/14/2006 | $408,047,000.00 | 100 | WaMu Capital |
| LBMLT 2006-WL1 | IA1 | 542514QP2 | 2/8/2006 | $284,678,000.00 | 100 | Goldman Sachs |
| LBMLT 2006-WL3 | IA | 542514SS4 | 1/30/2006 | $440,218,000.00 | 100 | Lehman Brothers Inc. |
| NCMT 2007-1 | 1A1 | 65106FAA0 | 7/12/2007 | $370,224,000.00 | 100 | BSC |
| PCHLT 2005-4 | 2A1 | 71085PDF7 | 10/26/2005 | $433,582,000.00 | 100 | BSC |
| SACO 2007-1 | IIA | 785814AB0 | 1/16/2007 | $50,429,000.00 | 100 | BSC |
| SACO 2007-2 | IIA | 78581NAB8 | 2/28/2007 | $20,226,000.00 | 100 | BSC |
| SAMI 2006-AR4 | IA1 | 86360QAA3 | 6/30/2006 | $316,180,000.00 | 100 | BSC |
| WAMU 2007-OA3 | 1A | 93364AAA0 | 3/27/2007 | $140,139,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE1 | IA | 92925CEP3 | 4/20/2006 | $53,578,000.00 | 100 | WaMu Capital |

189

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| WMABS 2006-HE3 | IA | 93934MAA5 | 9/27/2006 | $175,828,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE4 | IA | 93934QAA6 | 10/27/2006 | $117,798,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE5 | IA | 93934XAA1 | 12/7/2006 | $269,063,000.00 | 100 | WaMu Capital |
| WMABS 2007-HE1 | IA | 93935KAA8 | 1/17/2007 | $115,217,000.00 | 99.9908 | WaMu Capital |
| WMABS 2007-HE2 | IA | 93934TAA0 | 3/13/2007 | $286,276,000.00 | 100 | WaMu Capital |
| WMALT 2006-AR4 | 1A | 939345AA2 | 5/30/2006 | $76,071,000.00 | 99.75 | WaMu Capital |
| WMALT 2006-AR4 | 2A | 939345AB0 | 5/30/2006 | $69,518,000.00 | 99.796875 | WaMu Capital |
| WMALT 2006-AR4 | 3A | 939345AC8 | 5/30/2006 | $251,313,000.00 | 99.859375 | WaMu Capital |
| WMALT 2006-AR5 | 1A | 93935AAA0 | 6/28/2006 | $74,766,000.00 | 99.65625 | WaMu Capital |
| WMALT 2006-AR5 | 2A | 93935AAB8 | 6/28/2006 | $57,966,000.00 | 99.65625 | WaMu Capital |
| WMALT 2006-AR8 | 1A | 93935LAA6 | 9/28/2006 | $211,150,000.00 | 100 | WaMu Capital |
| WMALT 2006-AR9 | 1A | 939346AA0 | 10/26/2006 | $270,142,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA1 | 1A | 93935NAA2 | 1/26/2007 | $255,047,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA2 | 1A | 93935QAA5 | 2/26/2007 | $222,967,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA3 | 1A | 939355AA1 | 3/28/2007 | $230,966,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA3 | 3A | 939355AC7 | 3/28/2007 | $195,998,000.00 | 100 | WaMu Capital |
| WMHE 2007-HE1 | IA | 933631AA1 | 1/16/2007 | $368,226,000.00 | 100 | WaMu Capital |
| WMHE 2007-HE2 | IA | 92926SAA4 | 4/10/2007 | $491,550,000.00 | 99.9781 | WaMu Capital |
| WMHE 2007-HE3 | IA | 93364EAA2 | 5/10/2007 | $372,475,000.00 | 100 | WaMu Capital |
| WMHE 2007-HE4 | IA | 93363XAA1 | 6/13/2007 | $249,921,000.00 | 100 | WaMu Capital |

467.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the GSE Certificates.

190

468.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without limitation depreciation in the value of the securities.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

469.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

470.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates.

471.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the Certificates or similar certificates in the secondary market, Defendants proximately caused billions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, RBS Greenwich, David Beck, Brian Bernard, Larry Breitbarth, Richard Careaga, Thomas W. Casey, Christine E. Cole, David M. Duzyk, Stephen Fortunato, Katherine Garniewski, Michael J. Giampaolo, Thomas Green, Keith Johnson, Rolland Jurgens, Joseph T. Jurkowski, Jr., William A. King, Suzanne Krahling, Thomas G. Lehmann, Kim Lutthans, Thomas F. Marano, Jeffrey Mayer, Edwin F. McMichael, Samuel L. Molinaro, Jr., Michael B. Nierenberg, Diane Novak, Matthew E. Perkins, John F. Robinson, Louis Schioppo, Jr., Jeffrey L. Verschleiser, Donald Wilhelm, and David H. Zielke)**

472.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460 through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

473.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against Defendants J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich with respect to each of the Registration Statements.  This claim is also brought against (i) Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, and (ii) David Beck, Brian Bernard, Larry Breitbarth, Richard Careaga, Thomas W. Casey, Christine E. Cole, David M. Duzyk, Stephen Fortunato, Katherine Garniewski, Michael J. Giampaolo, Thomas Green, Keith Johnson, Rolland Jurgens, Joseph T. Jurkowski, Jr., William King, Suzanne Krahling, Thomas G. Lehmann, Kim Lutthans, Thomas F. Marano, Jeffrey Mayer, Edwin F. McMichael, Samuel L. Molinaro, Jr., Michael B. Nierenberg, Diane Novak, Matthew E. Perkins, John F. Robinson, Louis Schioppo, Jr., Jeffrey L. Verschleiser, Donald Wilhelm, and David H. Zielke (the foregoing Individual Defendants collectively referred to as

192

the "Section 11 Individual Defendants"), each with respect to the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that registered securities that were bona fide offered to the public on or after September 6, 2005.

474.    Defendants J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich are strictly liable for making false and materially misleading misstatements in each of the Registration Statements, and for omitting facts necessary to make the facts stated therein not misleading.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, and the Section 11 Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 74 of the 103 Securitizations (as specified in Tables 2 and 3 above), including the related Prospectus Supplements, and for omitting facts necessary to make the facts stated therein not misleading.

475.    Defendant J.P. Morgan Securities served as the lead underwriter of 30 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 30 Securitizations.

476.    Defendant BSC served as the lead underwriter of 38 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 38 Securitizations.

477.     Defendant WaMu Capital served as the lead underwriter of 31 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 31 Securitizations.

478.     Defendant Citigroup served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

479.     Defendant Credit Suisse served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

480.     Defendant Goldman Sachs served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

481.     Defendant RBS Greenwich served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

482.     Defendant J.P. Morgan Acceptance filed three Registration Statements under which 27 of the 103 Securitizations were carried out.  As depositor, Defendant J.P. Morgan Acceptance is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, J.P. Morgan Acceptance is liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141607 and 333-130192 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

194

483.     Defendants SAMI and BSABS filed five Registration Statements under which 35 of the 103 Securitizations were carried out.  As depositors, Defendants SAMI and BSABS are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, SAMI and BSABS are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-140247, 333-131374, and 333-132232 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

484.     Defendants WaMu Securities and WaMu Acceptance filed three Registration Statements under which 20 of the 103 Securitizations were carried out.  As depositors, Defendants WaMu Securities and WaMu Acceptance are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, WaMu Securities and WaMu Acceptance are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141255 and 333-130795 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

485.     Defendant Long Beach Securities filed two Registration Statements under which 15 of the 103 Securitizations were carried out.  As depositor, Defendant Long Beach Securities is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, Long Beach Securities is liable under Section 11 of

the Securities Act for the misstatements and omissions in the 333-131252 Registration Statement that registered securities that were bona fide offered to the public on or after September 6, 2005.

486.    At the time Defendant J.P. Morgan Acceptance filed three Registration Statements applicable to 27 of the Securitizations, the JPMorgan Section 11 Individual Defendants were officers and/or directors of J.P. Morgan Acceptance.  In addition, the JPMorgan Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the JPMorgan Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141607 and 333-130192 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

487.    At the time Defendants SAMI and BSABS filed five Registration Statements applicable to 35 of the Securitizations, the Bear Stearns Section 11 Individual Defendants were officers and/or directors of SAMI and BSABS.  In addition, the Bear Stearns Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Bear Stearns Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-140247, 333-131374, and 333-132232 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

488.    At the time Defendants WaMu Securities and WaMu Acceptance filed three Registration Statements applicable to 20 of the Securitizations, the WaMu Section 11 Individual Defendants were officers and/or directors of WaMu Securities and WaMu Acceptance.  In

addition, the WaMu Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the WaMu Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141255 and 333-130795 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

489.    At the time Defendant Long Beach Securities filed two Registration Statements applicable to 15 of the Securitizations, the Long Beach Section 11 Individual Defendants were officers and/or directors of Long Beach Securities.  In addition, the Long Beach Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Long Beach Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-131252 Registration that registered securities that were bona fide offered to the public on or after September 6, 2005.

490.    At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

491.    The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to, among other things, compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

492.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements.  Fannie Mae and Freddie Mac made these purchases in the primary market or, for the LUM 2006-3 Securitization, shortly after issuance.  At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

493.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich owed Fannie Mae, Freddie Mac and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Individual Defendants owed the same duty with respect to the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that they signed that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 74 of the Securitizations.

494.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, RBS Greenwich and the Section 11 Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.  In addition, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu

Acceptance, and Long Beach Securities, though subject to strict liability without regard to whether they performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

495.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

496.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

497.    By reason of the conduct herein alleged, Defendants J.P. Morgan Securities, J.P. Morgan Acceptance, BSC, SAMI, BSABS, WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Securities, Citigroup, Credit Suisse, Goldman Sachs, RBS Greenwich, and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

**Violation of Section 12(a)(2) of the Securities Act of 1933**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,**
**Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse,**
**Goldman Sachs, and RBS Greenwich)**

498.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460 through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

499.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements in the Securitizations listed in Table 1, against J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich as underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities as depositors (collectively, the "Section 12(a)(2) Defendants").

500.    This claim is predicated upon J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich's negligence in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in Table 1 that were purchased in the primary market, other than the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations, for which none of the Defendants were the selling underwriter and as to which the allegations in this section to do not apply.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities acted negligently in making materially false and misleading statements in the Prospectuses for the

Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

501.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

502.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich participated in drafting the Prospectuses.

503.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

504.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

505.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 97 Securitizations under those Registration Statements.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac.

506.    With respect to the 97 Securitizations for which they filed Registration Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting the Prospectuses.

507.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

508.    Each of the Section 12(a)(2) Defendants actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

509.     Each of the Prospectuses contained material misstatements of fact and omitted information to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

510.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

511.     The Section 12(a)(2) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

512.     J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich owed to Fannie Mae and Freddie Mac, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the 97 Registration Statements filed by them.

513.     The Section 12(a)(2) Defendants failed to exercise such reasonable care.  These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

514.    In contrast, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  Had GSEs known of those untruths and omissions, they would not have purchased the GSE Certificates.

515.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses, except for LUM 2006-3, which it acquired shortly after issuance.

516.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

517.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933
(Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan
Acquisition, EMC, WaMu Securities, and the Individual Defendants)**

518.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460 through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

519.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against JPMorgan Chase (both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants (collectively the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

520.    The JPMorgan Individual Defendants at all relevant times participated in the operation and management of J.P. Morgan Acceptance and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance. Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance. Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian Bernard served as President of J.P. Morgan Acceptance.

521.    The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs.

Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS.  Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served as Treasurer of SAMI.

522.    The WaMu Individual Defendants at all relevant times participated in the operation and management of WaMu Securities and/or WaMu Acceptance and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu Acceptance.  Defendant Thomas Green served as Chief Financial Officer of WaMu Acceptance.  Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as Controller of WaMu Acceptance.  Defendant Michael J. Kula served as Director, Senior Vice President and Chief Financial Officer of WaMu Securities.  Defendant Craig S. Davis served as Director of WaMu Securities.  Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities.  Defendant Michael L. Parker served as Director and President of WaMu

Securities.   Defendant Megan M. Davidson served as Director and Senior Vice President of WaMu Securities.  Defendant Marangal I. Domingo served as Director of WaMu Securities.

523.     The Long Beach Individual Defendants at all relevant times participated in the operation and management of Long Beach Securities and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs. Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities. Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities. Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities.  Defendant Craig S. Davis served as Director and President of Long Beach Securities. Defendant Marangal I. Domingo served as Director and Chief Executive Officer of Long Beach Securities.  Defendant Troy A. Gotschall served as Chief Operations Officer and Executive Vice President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as Controller of Long Beach Securities.

524.     Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is

associated with as set forth above.  These materials contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

525.    Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the three Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

526.    Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the three Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

527.    Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance.  In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of the three Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses

and Prospectus Supplements, which pertained to 27 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

528.    Defendant EMC was the sponsor for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting SAMI and BSABS as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

529.    Defendant EMC also acted as the seller of the mortgage loans for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.

530.    Defendant EMC also controlled all aspects of the businesses of SAMI and BSABS, as SAMI and BSABS were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of EMC overlapped with the officers and directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able to, and did in fact, control the contents of the five Registration Statements filed by SAMI and BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35

Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

531.     This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

532.     Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

533.     Non-party WaMu Bank also controlled all aspects of the businesses of WaMu Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu

Acceptance.  In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

534.    Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

535.    Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

536.    Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of

211

the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses

and Prospectus Supplements, which pertained to 20 Securitizations and which contained material

misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

537.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-

interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and,

later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under

the two Registration Statements filed by Defendant Long Beach Securities, and culpably

participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the

offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage

loans to be securitized, determining the structure of the Securitizations, selecting Long Beach

Securities as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor,

Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in

connection with the securitization process, and that certificates representing the ownership

interests of investors in the mortgages would be issued by the relevant trusts.

538.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also acted as the seller of the mortgage loans for the nine

Securitizations carried out under the two Registration Statements filed by Defendant Long Beach

Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a

Mortgage Loan Purchase Agreement.

539.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as

Long Beach Securities was merely a special purpose entity that was created for the purpose of

acting as a pass-through for the issuance of certain of the Certificates.  Upon information and

belief, the officers and directors of Long Beach Mortgage overlapped with the officers and directors of Long Beach Securities.  In addition, because of its position as sponsor, Long Beach Mortgage was able to, and did in fact, control the contents of the two Registration Statements filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

540.    Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition.  Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition.  As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

541.    JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

542.    JPMorgan Bank culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

543.    Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance.  Defendant JPMorgan Chase wholly

owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities.  As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

544.    JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

545.    JPMorgan Chase culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

546.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach

Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu

Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach

Securities in issuing and selling the Certificates, and in fact, exercised such direction and control

over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach

Mortgage, and Long Beach Securities in connection with the issuance and sale of the

Certificates.

547.    Non-party WaMu Bank expanded its share of the residential mortgage-backed

securitization market in order to increase revenue and profits.  The push to securitize large

volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements.

548.    Non-party WaMu Bank culpably participated in the violations of Section 11 and

12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to

misrepresent the mortgage loans' characteristics in the Registration Statements and establish

special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach

Securities and the issuing trusts to serve as conduits for the mortgage loans.

549.    This claim is against Defendant JPMorgan Chase in its capacity as successor-in-

interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and

BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of

BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of

BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised

such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection

with the issuance and sale of the Certificates.

550.     Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

551.     Non-party BSI culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

552.     The Section 15 Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

553.     Fannie Mae and Freddie Mac purchased in the primary market, or, for the LUM 2006-3 Securitization, shortly after issuance, Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

554.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

555.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

556.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

**Violation of Section 13.1-522(A)(ii) of the Virginia Code**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich)**

557.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460 through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

558.    This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 12 above that were purchased by Freddie Mac on or after September 6, 2006.  This claim is brought against J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich as underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities as depositors (collectively, the "Section 13.1-522(A)(ii) Defendants").

559.    This claim is predicated upon the negligence of J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in Table 1, other than the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations, for which none of the Defendants were the selling underwriter and as to which the allegations in this section to do not apply.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities acted negligently in making materially false and

218

misleading statements in the Prospectuses for the Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

560.   J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

561.   J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich participated in drafting the Prospectuses.

562.   J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

563.   J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

564.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 97 Securitizations under those Registration Statements.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.

565.    With respect to the 97 Securitizations for which they filed Registration Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting the Prospectuses.

566.    Each of the Section 13.1-522(A)(ii) Defendants actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

567.    Each of the Prospectuses contained material misstatements of fact and omitted information to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

568.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

569.     The Section 13.1-522(A)(ii) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

570.     J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich owed to Freddie Mac, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the 97 Registration Statements filed by them.

571.     The Section 13.1-522(A)(ii) Defendants failed to exercise such reasonable care. These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

572.     In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  Had Freddie Mac known of those untruths and omissions, it would not have purchased the GSE Certificates.

573.    Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

574.    The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank. This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FIFTH CAUSE OF ACTION

**Violation of Section 13.1-522(C) of the Virginia Code**
**(Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan**
**Acquisition, EMC, WaMu Securities, and the Individual Defendants)**

575.     Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460

through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly

excludes any allegation that could be construed as alleging fraud.

576.     This claim is brought by Plaintiff pursuant to Section 13.1-522(C) of the Virginia

Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of

action pertain only to those GSE Certificates identified in Table 12 above that were purchased by

Freddie Mac on or after September 6, 2006.  This claim is brought against JPMorgan Chase

(both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and

as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu

Securities, and the Individual Defendants (collectively the "Section 13.1-522(C) Defendants")

for controlling-person liability with regard to the Fourth Cause of Action set forth above.

577.     The JPMorgan Individual Defendants at all relevant times participated in the

operation and management of J.P. Morgan Acceptance and its related subsidiaries, and

conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's

business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance.

Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan

Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance.

Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant

William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian

Bernard served as President of J.P. Morgan Acceptance.

578.    The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs. Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS. Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served as Treasurer of SAMI.

579.    The WaMu Individual Defendants at all relevant times participated in the operation and management of WaMu Securities and/or WaMu Acceptance and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu Acceptance.  Defendant Thomas Green served as Chief Financial Officer of WaMu Acceptance. Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as Controller of WaMu Acceptance.  Defendant Michael J. Kula served as Director, Senior Vice President and

224

Chief Financial Officer of WaMu Securities.  Defendant Craig S. Davis served as Director of WaMu Securities.  Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities.  Defendant Michael L. Parker served as Director and President of WaMu Securities.   Defendant Megan M. Davidson served as Director and Senior Vice President of WaMu Securities.  Defendant Marangal I. Domingo served as Director of WaMu Securities.

580.    The Long Beach Individual Defendants at all relevant times participated in the operation and management of Long Beach Securities and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs. Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities. Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities. Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities.  Defendant Craig S. Davis served as Director and President of Long Beach Securities. Defendant Marangal I. Domingo served as Director and Chief Executive Officer of Long Beach Securities.  Defendant Troy A. Gotschall served as Chief Operations Officer and Executive Vice President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as Controller of Long Beach Securities.

581.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.

582.    Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

583.    Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

584.    Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance.  In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of

the five Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 27 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

585.    Defendant EMC was the sponsor for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting SAMI and BSABS as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

586.    Defendant EMC also acted as the seller of the mortgage loans for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.

587.    Defendant EMC also controlled all aspects of the businesses of SAMI and BSABS, as SAMI and BSABS were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of EMC overlapped with the officers and directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able to, and did in fact, control the contents of the five Registration Statements filed by SAMI and

BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

588.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

589.    Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

590.    Non-party WaMu Bank also controlled all aspects of the businesses of WaMu Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of

WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

591.    Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

592.    Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

593.    Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance.  In addition, because of its

229

position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

594.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under the two Registration Statements filed by Defendant Long Beach Securities, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting Long Beach Securities as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

595.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, also acted as the seller of the mortgage loans for the nine Securitizations carried out under the two Registration Statements filed by Defendant Long Beach Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a Mortgage Loan Purchase Agreement.

596.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as Long Beach Securities was merely a special purpose entity that was created for the purpose of

acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of Long Beach Mortgage overlapped with the officers and directors of Long Beach Securities.  In addition, because of its position as sponsor, Long Beach Mortgage was able to, and did in fact, control the contents of the two Registration Statements filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

597.    Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition.  Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition.  As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

598.    JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

599.    JPMorgan Bank culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

600. Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance. Defendant JPMorgan Chase wholly owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities. As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

601. JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

602. JPMorgan Chase culpably participated in the violations of Section 13.1-522(A)(ii) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

603. This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank. Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities. WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance,

232

Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in connection with the issuance and sale of the Certificates.

604.     Non-party WaMu Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

605.     Non-party WaMu Bank culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach Securities and the issuing trusts to serve as conduits for the mortgage loans.

606.     This claim is against Defendant JPMorgan Chase in its capacity as successor-in-interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised

such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection with the issuance and sale of the Certificates.

607.    Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

608.    Non-party BSI culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

609.    The Section 13.1-522(C) Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

610.    Freddie Mac purchased in the primary market the GSE Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

611.     Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

612.     Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

613.     The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank. This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

**Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,
Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and
Goldman Sachs)**

614.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460

through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly

excludes any allegation that could be construed as alleging fraud.

615.    This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District

of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in

this cause of action pertain only to those GSE Certificates identified in Table 11 above that were

purchased by Fannie Mae.  This claim is brought against J.P. Morgan Securities (both in its own

capacity and as successor to BSC), BSC, WaMu Capital, Citigroup, and Goldman Sachs as

underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu

Acceptance, and Long Beach Securities as depositors (collectively, the "Section 31-

5606.05(a)(1)(B) Defendants").

616.    This claim is predicated upon the negligence of J.P. Morgan Securities, BSC,

WaMu Capital, Citigroup and Goldman Sachs in making materially false and misleading

statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter

referred to in this Section as "Prospectuses") for the Securitizations listed in Table 1, other than

the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations, for which none of the Defendants

were the selling underwriter and as to which the allegations in this section to do not apply.

Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and

Long Beach Securities acted negligently in making materially false and misleading statements in

236

the Prospectuses for the Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

617.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered the Certificates publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

618.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs participated in drafting the Prospectuses.

619.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs successfully solicited Fannie Mae's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

620.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

621.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the

237

primary documents each used to sell Certificates for the 97 Securitizations under those

Registration Statements.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu

Acceptance, and Long Beach Securities offered the Certificates publicly and actively solicited

their sale, including to Fannie Mae.

622.    With respect to the 97 Securitizations for which they filed Registration

Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and

Long Beach Securities offered the GSE Certificates to Fannie Mae by means of Prospectuses

which contained untrue statements of material facts and omitted to state material facts necessary

to make the statements, in light of the circumstances under which they were made, not

misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS, WaMu

Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting

the Prospectuses.

623.    Each of the Section 31-5606.05(a)(1)(B) Defendants actively participated in the

solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit

themselves.  Such solicitation included assisting in preparing the Registration Statements, filing

the Registration Statements, and assisting in marketing the GSE Certificates.

624.    Each of the Prospectuses contained material misstatements of fact and omitted

information to make the facts stated therein not misleading.  The facts misstated and omitted

were material to a reasonable investor reviewing the Prospectuses.

625.    The untrue statements of material facts and omissions of material fact in the

Registration Statements, which include the Prospectuses, are set forth above in Section IV, and

pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and

accurate credit ratings.

626.     The Section 31-5606.05(a)(1)(B) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

627.     J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs owed to Fannie Mae, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the 97 Registration Statements filed by them.

628.     The Section 31-5606.05(a)(1)(B) Defendants failed to exercise such reasonable care.  These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

629.     In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  Had Fannie Mae known of those untruths and omissions, it would not have purchased the GSE Certificates.

630.     Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

631.     The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae

and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SEVENTH CAUSE OF ACTION

**Violation of Section 31-5606.05(c) of the District of Columbia Code
(Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan
Acquisition, EMC, WaMu Securities, and the Individual Defendants)**

632.     Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460 through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

633.     This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, that were purchased by Fannie Mae.  This claim is brought against JPMorgan Chase (both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants (collectively the "Section 31-5606.05(c) Defendants") for controlling-person liability with regard to the Sixth Cause of Action set forth above.

634.     The JPMorgan Individual Defendants at all relevant times participated in the operation and management of J.P. Morgan Acceptance and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance. Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance. Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian Bernard served as President of J.P. Morgan Acceptance.

635.     The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs. Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS. Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served as Treasurer of SAMI.

636.     The WaMu Individual Defendants at all relevant times participated in the operation and management of WaMu Securities and/or WaMu Acceptance and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu Acceptance.  Defendant Thomas Green served as Chief Financial Officer of WaMu Acceptance. Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as Controller of WaMu Acceptance.  Defendant Michael J. Kula served as Director, Senior Vice President and

Chief Financial Officer of WaMu Securities.  Defendant Craig S. Davis served as Director of

WaMu Securities.  Defendant Marc K. Malone served as First Vice President and Controller of

WaMu Securities.  Defendant Michael L. Parker served as Director and President of WaMu

Securities.   Defendant Megan M. Davidson served as Director and Senior Vice President of

WaMu Securities.  Defendant Marangal I. Domingo served as Director of WaMu Securities.

637.    The Long Beach Individual Defendants at all relevant times participated in the

operation and management of Long Beach Securities and its related subsidiaries, and conducted

and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs.

Defendant David H. Zielke served as First Vice President and Assistant General Counsel of

WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities.

Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith

Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne

Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities.

Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach

Securities.  Defendant Craig S. Davis served as Director and President of Long Beach Securities.

Defendant Marangal I. Domingo served as Director and Chief Executive Officer of Long Beach

Securities.  Defendant Troy A. Gotschall served as Chief Operations Officer and Executive Vice

President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and

Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer

and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as

Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as

Controller of Long Beach Securities.

638.     Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.

639.     Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

640.     Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

641.     Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance.  In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of

the five Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses

and Prospectus Supplements, which pertained to 27 Securitizations and which contained material

misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

642.     Defendant EMC was the sponsor for the 32 Securitizations carried out under the

five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in

the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the

GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be

securitized, determining the structure of the Securitizations, selecting SAMI and BSABS as the

special purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and

intended that the mortgage loans it purchased would be sold in connection with the securitization

process, and that certificates representing the ownership interests of investors in the mortgages

would be issued by the relevant trusts.

643.     Defendant EMC also acted as the seller of the mortgage loans for the 32

Securitizations carried out under the five Registration Statements filed by Defendants SAMI and

BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage

Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment

Agreement.

644.     Defendant EMC also controlled all aspects of the businesses of SAMI and

BSABS, as SAMI and BSABS were merely special purpose entities that were created for the

purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon

information and belief, the officers and directors of EMC overlapped with the officers and

directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able

to, and did in fact, control the contents of the five Registration Statements filed by SAMI and

BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35
Securitizations and which contained material misstatements of fact and omitted facts necessary
to make the facts stated therein not misleading.

645.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-
interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20
Securitizations carried out under three of the Registration Statements filed by Defendants WaMu
Securities and WaMu Acceptance, and culpably participated in the violations of Section 31-
5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating
these Securitizations, purchasing the mortgage loans to be securitized, determining the structure
of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose
vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended
that the mortgage loans it purchased would be sold in connection with the securitization process,
and that certificates representing the ownership interests of investors in the mortgages would be
issued by the relevant trusts.

646.    Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the
20 Securitizations carried out under three of the Registration Statements filed by Defendants
WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu
Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or
Mortgage Loan Sale Agreement.

647.    Non-party WaMu Bank also controlled all aspects of the businesses of WaMu
Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely
special purpose entities that were created for the purpose of acting as pass-throughs for the
issuance of certain of the Certificates.  Upon information and belief, the officers and directors of

WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu Acceptance. In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

648.      Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters. In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

649.      Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

650.      Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance. In addition, because of its

position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of

the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses

and Prospectus Supplements, which pertained to 20 Securitizations and which contained material

misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

651.     This claim is against Defendant JPMorgan Bank in its capacity as successor-in-

interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and,

later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under

the two Registration Statements filed by Defendant Long Beach Securities, and culpably

participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the

offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage

loans to be securitized, determining the structure of the Securitizations, selecting Long Beach

Securities as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor,

Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in

connection with the securitization process, and that certificates representing the ownership

interests of investors in the mortgages would be issued by the relevant trusts.

652.     Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also acted as the seller of the mortgage loans for the nine

Securitizations carried out under the two Registration Statements filed by Defendant Long Beach

Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a

Mortgage Loan Purchase Agreement.

653.     Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as

Long Beach Securities was merely a special purpose entity that was created for the purpose of

acting as a pass-through for the issuance of certain of the Certificates. Upon information and belief, the officers and directors of Long Beach Mortgage overlapped with the officers and directors of Long Beach Securities. In addition, because of its position as sponsor, Long Beach Mortgage was able to, and did in fact, control the contents of the two Registration Statements filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

654.    Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition. Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition. As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

655.    JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

656.    JPMorgan Bank culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

657.    Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance.  Defendant JPMorgan Chase wholly owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities.  As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

658.    JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

659.    JPMorgan Chase culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

660.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance,

Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu

Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach

Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu

Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach

Securities in issuing and selling the Certificates, and in fact, exercised such direction and control

over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach

Mortgage, and Long Beach Securities in connection with the issuance and sale of the

Certificates.

661.    Non-party WaMu Bank expanded its share of the residential mortgage-backed

securitization market in order to increase revenue and profits.  The push to securitize large

volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements.

662.    Non-party WaMu Bank culpably participated in the violations of Section 31-

5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to

misrepresent the mortgage loans' characteristics in the Registration Statements and establish

special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach

Securities and the issuing trusts to serve as conduits for the mortgage loans.

663.    This claim is against Defendant JPMorgan Chase in its capacity as successor-in-

interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and

BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of

BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of

BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised

such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection with the issuance and sale of the Certificates.

664.     Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

665.     Non-party BSI culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

666.     The Section 31-5606.05(c) Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

667.     Fannie Mae purchased in the primary market, or, for the LUM 2006-3 Securitization, shortly after issuance, Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

668.    Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

669.    Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

670.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## EIGHTH CAUSE OF ACTION

**Common Law Negligent Misrepresentation**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,**
**Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit**
**Suisse, Goldman Sachs, and RBS Greenwich)**

671.    Plaintiff realleges each allegation in paragraphs 1 through 471 above as if fully set forth herein.

672.    This is a claim for common law negligent misrepresentation against Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich.

673.    Between September 7, 2005 and September 19, 2007, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich sold the GSE Certificates to the GSEs as described above.  Because J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities owned and then conveyed the underlying mortgage loans that collateralized the Securitizations for which they served as depositors, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations through their possession of the loan files and other documentation.

674.    Likewise, as lead underwriters for 99 of the Securitizations, J.P. Morgan Securities, BSC, and WaMu Capital were each obligated—and had the opportunity—to perform sufficient due diligence to ensure that the Registration Statements for those Securitizations, including without limitation the corresponding Prospectus Supplements, did not contain an

untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  As a result of this privileged position as underwriter—which gave each access to loan file information and obligated each to perform adequate due diligence to ensure the accuracy of the Registration Statements—J.P. Morgan Securities, BSC, and WaMu Capital had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

675.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates.  Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis.  The GSEs therefore reasonably relied on the knowledge and express representations of J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich made prior to the closing of the Securitizations regarding the underlying mortgage loans.

676.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich were aware that the GSEs reasonably relied on their reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and that the GSEs depended upon these Defendants for complete, accurate, and timely information.  The standards under

255

which the underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.  In purchasing the GSE Certificates from J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich, the GSEs relied on their long-standing relationship with those Defendants, and the purchases were made, in part, in reliance on that relationship.

677.    Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the terms sheets and Prospectus Supplements.

678.    In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich had a duty to correct misimpressions left by their statements, including with respect to any "half truths."  The GSEs were entitled to rely upon the representations of J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

679.    The GSEs reasonably relied on the information J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich did provide, and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich knew that the GSEs were acting in reliance on such information.  The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of the misrepresentations, including any half truths, of J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich.

680.     The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## NINTH CAUSE OF ACTION

### Common Law Fraud
### (Against J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital)

681.    Plaintiff realleges each allegation in paragraphs 1 through 471 above as if fully set forth herein.

682.    This is a claim for common law fraud against Defendants J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank (in its capacity as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital with respect to the Securitizations J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, or Long Beach Mortgage sponsored.  JPMorgan Bank is the successor to WaMu Bank and Long Beach Mortgage.  J.P. Morgan Securities is the successor to BSC.

683.    The material representations set forth above were fraudulent, and the representations of J.P. Morgan Securities, BSC, and WaMu Capital falsely and misleadingly misrepresented and omitted material statements of fact.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.  The representations on which the GSEs relied were directly communicated to them by J.P. Morgan Securities, BSC, and WaMu Capital.  J.P. Morgan Securities, BSC, and WaMu Capital knew, or were reckless in not knowing, that their representations and omissions were false and/or misleading at the time they

were made.  J.P. Morgan Securities, BSC, and WaMu Capital made the misleading statements

for the purpose of inducing the GSEs to purchase the GSE Certificates.

684.    The basis for the false representations in the term sheets and Prospectus

Supplements that J.P. Morgan Securities, BSC, and WaMu Capital made to the GSEs was

information that J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach

Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach

Securities provided to J.P. Morgan Securities, BSC, and WaMu Capital as to the strength of the

collateral underlying the GSE Certificates and the structure of the Securitizations.  J.P. Morgan

Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P. Morgan

Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities communicated this

information to J.P. Morgan Securities, BSC, and WaMu Capital with the knowledge and intent

that J.P. Morgan Securities, BSC, and WaMu Capital would communicate this information to

purchasers of the GSE Certificates.  J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu

Securities, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance,

and Long Beach Securities each had reason to expect that the GSEs were among the class of

persons who would receive and rely on such representations.

685.    Each of J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long

Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach

Securities, J.P. Morgan Securities, BSC, and WaMu Capital intended that the above misleading

statements were to be made for the purpose of inducing the GSEs to purchase the GSE

Certificates.

686.    The GSEs justifiably relied on the false representations and misleading omissions

of J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P.

Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital.

687.     Had the GSEs known the true facts regarding the underwriting practices of JPMorgan, Bear Stearns, WaMu, and Long Beach, and the quality of the mortgage loans collateralizing the GSE Certificates, they would not have purchased the GSE Certificates.

688.     As a result of the foregoing, the GSEs have suffered damages according to proof. In the alternative, Plaintiff hereby demands rescission and makes any necessary tender of the GSE Certificates.

689.     The misconduct of JPMorgan, Bear Stearns, WaMu, and Long Beach was intentional and wanton.  The immediate victims of their fraud was Fannie Mae and Freddie Mac, two Government-sponsored entities whose primary mission is assuring affordable housing to millions of Americans.  Further, the public nature of the harm caused by JPMorgan, Bear Stearns, WaMu, and Long Beach is apparent—and conclusively demonstrated by—in the congressional hearings and federal enforcement actions that have been pursued against JPMorgan, Bear Stearns, WaMu, and Long Beach as a direct result of their fraudulent conduct at issue in this Complaint.  *See, e.g.*, the Senate PSI Report, *passim*; the FCIC Report, *passim*; "Criminal Probe Targets 6 Wall Street Firms: Source," *Reuters* (May 13, 2010); "JPMorgan Said to Face SEC Subpoena Along With Credit Suisse," *Bloomberg* (May 6, 2011); "Feds Investigate Washington Mutual Failure," *Associated Press* (Oct. 16, 2008); "Washington Mutual Created 'Mortgage Time Bomb,' Senate Panel Says," *Los Angeles Times* (Apr. 13, 2010).  Punitive damages are therefore warranted for the actions of JPMorgan, Bear Stearns, WaMu, and Long Beach in order to punish, deter them from future misconduct, and protect the public.

690.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## TENTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### (Against J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities)

691.    Plaintiff realleges each allegation in paragraphs 1 through 471 above as if fully set forth herein.

692.    This is a claim for aiding and abetting fraud against Defendants J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank (in its capacity as successor to WaMu Bank), J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities with respect to the Securitizations sponsored by J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage.  JPMorgan Bank is the successor to WaMu Bank and Long Beach Mortgage.

693.    J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage, as sponsors for 94 of the Securitizations, substantially assisted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud by choosing which mortgage loans would be included in those Securitizations, even though they *knew* the loans had been underwritten to shoddy standards.  The actions of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage in assisting in the origination of, and then purchasing, poorly underwritten loans was an integral part of the Securitizations.

694.    Likewise, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as depositors for 97 of the Securitizations, substantially assisted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud by issuing the Registration Statements that were used to offer publicly the Certificates.  As the issuer of the Certificates, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach

263

Securities were an integral part of the sale of the Certificates to the GSEs by J.P. Morgan

Securities, BSC, and WaMu Capital.

695.    As described above, J.P. Morgan Securities, BSC, and WaMu Capital made

fraudulent and untrue statements of material fact and omitted to state material facts regarding the

true credit quality of the GSE Certificates, the true rate of owner occupancy, the true LTV and

CLTV ratio of the underlying mortgage loans, and compliance by the originators with applicable

underwriting guidelines.

696.    Each of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long

Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach

Securities had unique access to the loan files, and therefore was aware of the extreme weakness

of the loans.  In fact, JPMorgan, Bear Stearns, WaMu, and Long Beach during the same period

they were selling the GSE Certificates to the GSEs were also engaging in putback requests with

originators and other parties based upon the weakness of the underlying loans.  Accordingly, J.P.

Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan

Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities were aware that the

representations and omissions of J.P. Morgan Securities, BSC, and WaMu Capital were

fraudulent.

697.    The central role of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu

Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and

Long Beach Securities in J.P. Morgan Securities', BSC's, and WaMu Capital's vertically

integrated sales strategy for the Certificates substantially assisted in J.P. Morgan Securities',

BSC's, and WaMu Capital's fraud.  J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu

Bank, and Long Beach Mortgage, as the purchasers of the underlying mortgage loans, worked

closely with J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as the vehicles for securitizing the mortgage loans, which in turn worked closely with J.P. Morgan Securities, BSC, and WaMu Capital, as the distribution arms for the Certificates that were collateralized by those mortgage loans and then sold to the GSEs. J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities worked hand-in-glove to provide J.P. Morgan Securities, BSC, and WaMu Capital with Certificates that it could fraudulently sell to the GSEs.

698.    J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities provided substantial assistance in J.P. Morgan Securities', BSC's, and WaMu Capital's fraud that played a significant and material role in inducing the GSEs to purchase the GSE Certificates.  As a direct, proximate and foreseeable result of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities aiding and abetting J.P. Morgan Securities, BSC, and WaMu Capital in their fraud against the GSEs, the GSEs have been damaged in an amount to be determined at trial.

699.    Because J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities aided and abetted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud willfully and wantonly, and because, by their acts, J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities knowingly affected the general public, including but not

limited to all persons with interests in the Certificates, Plaintiff is entitled to recover punitive damages.

700.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## ELEVENTH CAUSE OF ACTION

### Successor and Vicarious Liability
### (Against JPMorgan Chase, J.P. Morgan Securities, and JPMorgan Bank)

701.    Plaintiff realleges each allegation in paragraphs 1 through 471 above as if fully set forth herein.

702.    Defendant JPMorgan Chase is the successor to BSI, pursuant to the Merger.  J.P. Morgan Chase is liable for BSI's wrongdoing, in its entirety, under common law, because BSI merged and consolidated with JPMorgan Chase, because JPMorgan Chase has expressly or impliedly assumed BSI's tort liabilities, and because JPMorgan Chase is a mere continuation of BSI.  This action is thus brought against JPMorgan Chase both in its own capacity and as successor to BSI.

703.    Defendant J.P. Morgan Securities is the successor to BSC, pursuant to the Merger. J.P. Morgan Securities is liable for BSC's wrongdoing, in its entirety, under common law, because BSC merged and consolidated with J. P. Morgan Securities, because J.P. Morgan Securities has expressly or impliedly assumed BSC's tort liabilities, and because J.P. Morgan Securities is a mere continuation of BSC.  This action is thus brought against J.P. Morgan Securities both in its own capacity and as successor to BSC.

704.    Defendant JPMorgan Bank succeeded to WaMu Bank's liabilities pursuant to the PAA.  JPMorgan Bank is liable for WaMu Bank's wrongdoing, in its entirety, under common law, because WaMu Bank merged and consolidated with JPMorgan Bank, because JPMorgan Bank has expressly or impliedly assumed WaMu Bank's tort liabilities, and because JPMorgan Bank is a mere continuation of WaMu Bank.  This action is thus brought against JPMorgan Bank both in its own capacity and as successor to WaMu Bank.

705.    The time period from June 16, 2009 through July 31, 2011 has been tolled for

statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae

and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS,

SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach

Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July

14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue

of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae,

Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance,

EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities,

Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the

date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus

timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

706.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but

including:

      a.      Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

      b.      Each GSE's monetary losses, including any diminution in value of the GSE Certificates, as well as lost principal and lost interest payments thereon;

      c.      Punitive damages;

      d.      Attorneys' fees and costs;

      e.      Prejudgment interest at the maximum legal rate; and

      f.       Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

707.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:     New York, New York
              September 2, 2011

                                QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP

                                By: _____
                                    Philippe Z. Selendy
                                    Manisha M. Sheth

                                51 Madison Avenue, 22nd Floor
                                New York, New York  10010-1601
                                (212) 849-7000

                                *Attorneys for Plaintiff Federal Housing
                                Finance Agency*