

JUN 13 2012
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

               Plaintiff,

        -against-

JPMORGAN CHASE & CO.; JPMORGAN
CHASE BANK, N.A.; J.P. MORGAN
MORTGAGE ACQUISITION
CORPORATION; J.P. MORGAN
SECURITIES LLC (f/k/a J.P. MORGAN
SECURITIES INC.); J.P. MORGAN
ACCEPTANCE CORPORATION I; EMC
MORTGAGE LLC (f/k/a EMC MORTGAGE
CORPORATION); BEAR STEARNS & CO.,
INC.; STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC.; BEAR STEARNS
ASSET BACKED SECURITIES I LLC;
WAMU ASSET ACCEPTANCE
CORPORATION; WAMU CAPITAL
CORPORATION; WASHINGTON
MUTUAL MORTGAGE SECURITIES
CORPORATION; LONG BEACH
SECURITIES CORPORATION;
CITIGROUP GLOBAL MARKETS, INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
GOLDMAN, SACHS & CO.; RBS
SECURITIES, INC.; DAVID M. DUZYK;
LOUIS SCHIOPPO, JR.; CHRISTINE E.
COLE; EDWIN F. MCMICHAEL; WILLIAM
A. KING; BRIAN BERNARD; MATTHEW
E. PERKINS; JOSEPH T. JURKOWSKI, JR.;
SAMUEL L. MOLINARO, JR.; THOMAS F.
MARANO; KIM LUTTHANS; KATHERINE
GARNIEWSKI; JEFFREY MAYER;
JEFFREY L. VERSCHLEISER; MICHAEL
B. NIERENBERG; RICHARD CAREAGA;
DAVID BECK; DIANE NOVAK;

11 CV. 6188 (DLC)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

ROLLAND JURGENS; THOMAS G.
LEHMANN; STEPHEN FORTUNATO;
DONALD WILHELM; MARC K. MALONE;
MICHAEL L. PARKER; DAVID H. ZIELKE;
THOMAS W. CASEY; JOHN F.
ROBINSON; KEITH JOHNSON; SUZANNE
KRAHLING; LARRY BREITBARTH; ART
DEN HEYER; AND STEPHEN LOBO

Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................................2

PARTIES ........................................................................................................13

    *The Plaintiff and the GSEs*................................................................13

    *The JPMorgan Entities* ....................................................................14

    *The Bear Stearns Entities*................................................................17

    *The WaMu Entities*...........................................................................21

    *The Long Beach Entities* ..................................................................25

    *The Other Underwriter Defendants* .................................................29

    *The Non-Party Originators*...............................................................30

JURISDICTION AND VENUE ........................................................................31

FACTUAL ALLEGATIONS ............................................................................32

I.    The Securitizations............................................................................32

    A.    Residential Mortgage-Backed Securitizations In General....................32

    B.    The Securitizations At Issue In This Case .........................................33

    C.    The Securitization Process...................................................................39

        1.    J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, and Long Beach Mortgage Transfer The Mortgage Loans To Special Purpose Trusts....................................................................39

        2.    The Trusts Issue Securities Backed by the Loans....................41

II.    The Defendants' Participation in the Securitization Process ...........50

    A.    The Role of Each of the JPMorgan Defendants....................................50

        1.    J.P. Morgan Acquisition ...........................................................50

        2.    J.P. Morgan Acceptance ............................................................51

        3.    J.P. Morgan Securities ...............................................................52

i

4.      JPMorgan Chase and JPMorgan Bank......................................................52

5.      The JPMorgan Individual Defendants .........................................................53

B.    The Role of Each of the Bear Stearns Entities .....................................................56

1.      EMC ........................................................................................................56

2.      SAMI and BSABS ...................................................................................57

3.      BSC and J.P. Morgan Securities as Successor to BSC .............................58

4.      JPMorgan Chase as Successor to BSI.......................................................58

5.      The Bear Stearns Individual Defendants ...................................................59

C.    The Role of Each of the WaMu Entities ...............................................................63

1.      JPMorgan Bank as Successor to WaMu Bank...........................................63

2.      WaMu Securities......................................................................................65

3.      WaMu Acceptance ...................................................................................66

4.      WaMu Capital..........................................................................................67

5.      The WaMu Individual Defendants.............................................................67

D.    The Role of Each of the Long Beach Entities.......................................................70

1.      JPMorgan Bank as Successor to WaMu Bank and Long Beach
        Mortgage .................................................................................................71

2.      Long Beach Securities .............................................................................72

3.      The Long Beach Individual Defendants ....................................................73

E.    The Other Underwriter Defendants ......................................................................75

F.    Defendants' Failure To Conduct Proper Due Diligence.......................................76

1.      The JPMorgan Defendants........................................................................78

2.      The Bear Stearns Entities.........................................................................82

3.      The WaMu Entities ..................................................................................86

4.      The Long Beach Entities...........................................................................92

G.    Liability of JPMorgan Chase and JPMorgan Bank as Successors in Interest........97

          1.      Liability of the JPMorgan Defendants as Successors in Interest to
                  the Bear Stearns Entities ..............................................................97

          2.      Liability of the JPMorgan Defendants as Successors in Interest to
                  the WaMu and Long Beach Entities ............................................99

III.    The Statements in the Registration Statements............................................105

        A.      Compliance With Underwriting Guidelines .......................................105

          1.      JPMorgan's Statements Regarding Compliance With Underwriting
                  Guidelines ...................................................................................106

          2.      Bear Stearns's Statements Regarding Compliance With
                  Underwriting Guidelines..............................................................108

          3.      WaMu's Statements Regarding Compliance With Underwriting
                  Guidelines ...................................................................................110

          4.      Long Beach's Statements Regarding Compliance With
                  Underwriting Guidelines...............................................................112

          5.      Statements Regarding Representations Made by the Originator and
                  Seller ...........................................................................................115

        B.      Statements Regarding Occupancy Status of Borrower.......................117

        C.      Statements Regarding Loan to Value Ratios .....................................122

        D.      Statements Regarding Credit Ratings ................................................127

IV.     Falsity Of Statements in the Prospectus Supplements..................................130

        A.      The Statistical Data Provided in the Prospectus Supplements Concerning
                Owner Occupancy and LTV Ratios Was Materially False Or Misleading ........130

          1.      Owner Occupancy Data Was Materially False........................130

          2.      Loan-to-Value Data Was Materially False ..............................137

        B.      The Originators of the Underlying Mortgage Loans Systematically
                Disregarded Their Underwriting Guidelines .....................................144

          1.      A Forensic Review of Loan Files Has Revealed Pervasive Failures
                  to Adhere to Underwriting Guidelines.......................................144

          2.      Both Government and Private Investigations Have Confirmed That
                  the Originators of the Loans in the Securitizations Systematically
                  Failed to Adhere to Their Underwriting Guidelines ................169

3.      Government Investigations Have Also Revealed That Appraisers Were Pressured To Issue Inflated Appraisals ..........................................187

4.      The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ...............................................................188

5.      The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ...................................193

V.      Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach Knew Their Representations Were False .......................................................................197

A.      JPMorgan, Bear Stearns, WaMu, and Long Beach Had Actual Knowledge From Their Due Diligence That They Were Securitizing Defective Loans ........197

B.      JPMorgan Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors ..................202

C.      Bear Stearns Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors ..................208

D.      WaMu and Long Beach Knew Their Representations Were False And Were Willing to Capitalize On Their Unique Knowledge At The Expense of Investors.......................................................................................217

VI.     The GSEs Justifiably Relied on the Representations of JPMorgan, Bear  Stearns, WaMu, and Long Beach ...........................................................................232

VII.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages ...........................................................................237

VIII.   Tolling of the Securities Act of 1933 Claims .................................................243

A.      The JPMorgan *Plumbers* Class Action ...............................................243

B.      The JPMorgan *Fort Worth* Class Action ............................................244

C.      The Bear Stearns Class Action .........................................................245

FIRST CAUSE OF ACTION ...........................................................................247

Violation of Section 11 of the Securities Act of 1933 ...............................................247

SECOND CAUSE OF ACTION .......................................................................256

Violation of Section 12(a)(2) of the Securities Act of 1933........................................256

iv

THIRD CAUSE OF ACTION ...................................................................................................262

Violation of Section 15 of the Securities Act of 1933 ...............................................................262

FOURTH CAUSE OF ACTION ..............................................................................................275

Violation of Section 13.1-522(A)(ii) of the Virginia Code .......................................................275

FIFTH CAUSE OF ACTION ...................................................................................................280

Violation of Section 13.1-522(C) of the Virginia Code ...........................................................280

SIXTH CAUSE OF ACTION ...................................................................................................293

Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code.............................293

SEVENTH CAUSE OF ACTION .............................................................................................298

Violation of Section 31-5606.05(c) of the District of Columbia Code......................................298

EIGHTH CAUSE OF ACTION ...............................................................................................311

Common Law Fraud .................................................................................................................311

NINTH CAUSE OF ACTION...................................................................................................315

Aiding and Abetting Fraud .......................................................................................................315

TENTH CAUSE OF ACTION ..................................................................................................319

Successor and Vicarious Liability ...........................................................................................319

PRAYER FOR RELIEF ...........................................................................................................320

JURY TRIAL DEMANDED .....................................................................................................321

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Amended Complaint herein against JPMorgan Chase & Co. ("JPMorgan Chase"); JPMorgan Chase Bank, N.A. ("JPMorgan Bank"); J.P. Morgan Mortgage Acquisition Corporation ("J.P. Morgan Acquisition"); J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.) ("J.P. Morgan Securities"); J.P. Morgan Acceptance Corporation I  ("J.P. Morgan Acceptance") (collectively, the "JPMorgan Defendants"); Bear Stearns & Co. Inc. ("BSC"); EMC Mortgage LLC (f/k/a EMC Mortgage Corporation) ("EMC"); Structured Asset Mortgage Investments II Inc. ("SAMI"); Bear Stearns Asset Backed Securities LLC  ("BSABS") (collectively, the "Bear Stearns Defendants"); WaMu Asset Acceptance Corporation ("WaMu Acceptance"); WaMu Capital Corporation ("WaMu Capital"); Washington Mutual Mortgage Securities Corporation ("WaMu Securities") (collectively, the "WaMu Defendants"); Long Beach Securities Corporation ("Long Beach Securities"); Citigroup Global Markets, Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman, Sachs & Co. ("Goldman Sachs"), and RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc. ("RBS Greenwich") (collectively, the "Other Underwriter Defendants"); David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, Edwin F. McMichael, William A. King, Brian Bernard, Matthew E. Perkins, Joseph T. Jurkowski, Jr., Samuel L. Molinaro, Jr., Thomas F. Marano, Kim Lutthans, Katherine Garniewski, Jeffrey Mayer, Jeffrey L. Verschleiser, Michael B. Nierenberg, Richard Careaga, David Beck, Diane Novak, Rolland Jurgens, Thomas G. Lehmann, Stephen Fortunato, Donald Wilhelm, Marc K. Malone, Michael L. Parker, David H. Zielke, Thomas W. Casey, John F. Robinson, Keith Johnson, Suzanne Krahling, Larry Breitbarth, Art Den Heyer, and Stephen

Lobo (the "Individual Defendants") (together with the JPMorgan Defendants, the Bear Stearns Defendants, the WaMu Defendants, Long Beach Securities, and the Other Underwriter Defendants, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans.  These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes common law fraud and aiding and abetting fraud.

2.      Between September 7, 2005 and September 19, 2007, Fannie Mae and Freddie Mac purchased over $33 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 103 securitizations sponsored by J.P. Morgan Acquisition, EMC, Washington Mutual Bank ("WaMu Bank"), WaMu Securities, and Long Beach Mortgage Company ("Long Beach Mortgage") and/or underwritten by J.P. Morgan

Securities, BSC, and WaMu Capital.[1]  The GSE Certificates purchased by Fannie Mae and

Freddie Mac, along with date and amount of purchases, are listed below in Tables 11 and 12.

The 103 securitizations at issue (collectively, the "Securitizations") are listed in Table 1:

**Table 1**

| Full Name | Abbreviation |
|---|---|
| Aegis Asset Backed Securities Trust Mortgage Pass-Through Certificates, Series 2005-5 | AABST 2005-5 |
| American Home Mortgage Investment Trust 2005-1, Mortgage-Backed Notes, Series 2005-1 | AHM 2005-1 |
| American Home Mortgage Investment Trust 2005-4, Mortgage-Backed Grantor Trust Certificates, Series 2005-4 | AHM 2005-4 |
| Argent Securities Trust 2006-M2, Asset-Backed Pass-Through Certificates, Series 2006-M2 | ARSI 2006-M2 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2005-10 | BALTA 2005-10 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-1 | BALTA 2006-1 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-2 | BALTA 2006-2 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-3 | BALTA 2006-3 |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-4 | BALTA 2006-4 |
| Bear Stearns Asset Backed Securities I Trust 2005-HE12, Asset-Backed Certificates, Series 2005-HE12 | BSABS 2005-HE12 |
| Bear Stearns Asset Backed Securities I Trust 2006-AQ1, Asset-Backed Certificates, Series 2006-AQ1 | BSABS 2006-AQ1 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE2, Asset-Backed Certificates, Series 2006-HE2 | BSABS 2006-HE2 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE4, Asset-Backed Certificates, Series 2006-HE4 | BSABS 2006-HE4 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE5, Asset-Backed Certificates, Series 2006-HE5 | BSABS 2006-HE5 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE7, Asset-Backed Certificates, Series 2006-HE7 | BSABS 2006-HE7 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE8, Asset-Backed Certificates, Series 2006-HE8 | BSABS 2006-HE8 |
| Bear Stearns Asset Backed Securities I Trust 2006-HE9, Asset-Backed Certificates, Series 2006-HE9 | BSABS 2006-HE9 |

---

[1]  For purposes of this Amended Complaint, the securities issued under the Registration Statements (as defined in note 2 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

| Full Name | Abbreviation |
|---|---|
| Bear Stearns Asset Backed Securities I Trust 2006-HE10, Asset-Backed Certificates, Series 2006-HE10 | BSABS 2006-HE10 |
| Bear Stearns Asset Backed Securities I Trust 2007-FS1, Asset-Backed Certificates, Series 2007-FS1 | BSABS 2007-FS1 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE1, Asset-Backed Certificates, Series 2007-HE1 | BSABS 2007-HE1 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE2, Asset-Backed Certificates, Series 2007-HE2 | BSABS 2007-HE2 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE3, Asset-Backed Certificates, Series 2007-HE3 | BSABS 2007-HE3 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE4, Asset-Backed Certificates, Series 2007-HE4 | BSABS 2007-HE4 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE5, Asset-Backed Certificates, Series 2007-HE5 | BSABS 2007-HE5 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE6, Asset-Backed Certificates, Series 2007-HE6 | BSABS 2007-HE6 |
| Bear Stearns Asset Backed Securities I Trust 2007-HE7, Asset-Backed Certificates, Series 2007-HE7 | BSABS 2007-HE7 |
| Bear Stearns Mortgage Funding Trust 2006-SL5, Mortgage-Backed Certificates, Series 2006-SL5 | BSMF 2006-SL5 |
| Bear Stearns Mortgage Funding Trust 2006-SL6, Mortgage-Backed Certificates, Series 2006-SL6 | BSMF 2006-SL6 |
| Bear Stearns Mortgage Funding Trust 2007-AR3, Mortgage Pass-Through Certificates, Series 2007-AR3 | BSMF 2007-AR3 |
| Bear Stearns Mortgage Funding Trust 2007-SL1, Mortgage-Backed Certificates, Series 2007-SL1 | BSMF 2007-SL1 |
| Bear Stearns Mortgage Funding Trust 2007-SL2,Mortgage-Backed Certificates, Series 2007-SL2 | BSMF 2007-SL2 |
| C-BASS 2006-CB2 Trust, C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB2 | CBASS 2006-CB2 |
| C-BASS 2006-CB7 Trust, C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB7 | CBASS 2006-CB7 |
| GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5 | GPMF 2005-AR5 |
| GreenPoint Mortgage Funding Trust 2006-AR3, Mortgage Pass-Through Certificates, Series 2006-AR3 | GPMF 2006-AR3 |
| J.P. Morgan Alternative Loan Trust 2005-A2, Mortgage Pass-Through Certificates, Series 2005-A2 | JPALT 2005-A2 |
| J.P. Morgan Alternative Loan Trust 2007-A2, Mortgage Pass-Through Certificates, Series 2007-A2 | JPALT 2007-A2 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-FRE1, Asset-Backed Pass-Through Certificates, Series 2005-FRE1 | JPMAC 2005-FRE1 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-OPT2, Asset-Backed Pass-Through Certificates, Series 2005-OPT2 | JPMAC 2005-OPT2 |
| J.P. Morgan Mortgage Acquisition Corp. 2005-WMC1, Asset-Backed Pass-Through Certificates, Series 2005-WMC1 | JPMAC 2005-WMC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1, Asset-Backed Pass-Through Certificates, Series 2006-ACC1 | JPMAC 2006-ACC1 |

| Full Name | Abbreviation |
|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-CH1, Asset-Backed Pass-Through Certificates, Series 2006-CH1 | JPMAC 2006-CH1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2, Asset-Backed Pass-Through Certificates, Series 2006-CH2 | JPMAC 2006-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CW1, Asset-Backed Pass-Through Certificates, Series 2006-CW1 | JPMAC 2006-CW1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CW2, Asset-Backed Pass-Through Certificates, Series 2006-CW2 | JPMAC 2006-CW2 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-FRE1, Asset-Backed Pass-Through Certificates, Series 2006-FRE1 | JPMAC 2006-FRE1 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-FRE2, Asset-Backed Pass-Through Certificates, Series 2006-FRE2 | JPMAC 2006-FRE2 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1, Asset-Backed Pass-Through Certificates, Series 2006-HE1 | JPMAC 2006-HE1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2, Asset-Backed Pass Through Certificates, Series 2006-HE2 | JPMAC 2006-HE2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE3, Asset-Backed Pass Through Certificates, Series 2006-HE3 | JPMAC 2006-HE3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1, Asset-Backed Pass Through Certificates, Series 2006-NC1 | JPMAC 2006-NC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset-Backed Pass Through Certificates, Series 2006-NC2 | JPMAC 2006-NC2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1, Asset-Backed Pass Through Certificates, Series 2006-RM1 | JPMAC 2006-RM1 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-WMC1, Asset-Backed Pass-Through Certificates, Series 2006-WMC1 | JPMAC 2006-WMC1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2, Asset-Backed Pass Through Certificates, Series 2006-WMC2 | JPMAC 2006-WMC2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3, Asset-Backed Pass Through Certificates, Series 2006-WMC3 | JPMAC 2006-WMC3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Asset-Backed Pass Through Certificates, Series 2006-WMC4 | JPMAC 2006-WMC4 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2, Asset-Backed Pass Through Certificates, Series 2007-CH2 | JPMAC 2007-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3, Asset-Backed Pass Through Certificates, Series 2007-CH3 | JPMAC 2007-CH3 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4, Asset-Backed Pass Through Certificates, Series 2007-CH4 | JPMAC 2007-CH4 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5, Asset-Backed Pass Through Certificates, Series 2007-CH5 | JPMAC 2007-CH5 |
| J.P. Morgan Mortgage Trust 2006-A3, Mortgage Pass-Through Certificates, Series 2006-A3 | JPMMT 2006-A3 |
| Long Beach Mortgage Loan Trust 2005-3, Asset-Backed Certificates, Series 2005-3 | LBMLT 2005-3 |
| Long Beach Mortgage Loan Trust 2006-1, Asset-Backed Certificates, Series 2006-1 | LBMLT 2006-1 |
| Long Beach Mortgage Loan Trust 2006-2, Asset-Backed Certificates, Series 2006-2 | LBMLT 2006-2 |

| Full Name | Abbreviation |
|---|---|
| Long Beach Mortgage Loan Trust 2006-3, Asset-Backed Certificates, Series 2006-3 | LBMLT 2006-3 |
| Long Beach Mortgage Loan Trust 2006-4, Asset-Backed Certificates, Series 2006-4 | LBMLT 2006-4 |
| Long Beach Mortgage Loan Trust 2006-5, Asset-Backed Certificates, Series 2006-5 | LBMLT 2006-5 |
| Long Beach Mortgage Loan Trust 2006-6, Asset-Backed Certificates, Series 2006-6 | LBMLT 2006-6 |
| Long Beach Mortgage Loan Trust 2006-7, Asset-Backed Certificates, Series 2006-7 | LBMLT 2006-7 |
| Long Beach Mortgage Loan Trust 2006-8, Asset-Backed Certificates, Series 2006-8 | LBMLT 2006-8 |
| Long Beach Mortgage Loan Trust 2006-9, Asset-Backed Certificates, Series 2006-9 | LBMLT 2006-9 |
| Long Beach Mortgage Loan Trust 2006-10, Asset-Backed Certificates, Series 2006-10 | LBMLT 2006-10 |
| Long Beach Mortgage Loan Trust 2006-11, Asset-Backed Certificates, Series 2006-11 | LBMLT 2006-11 |
| Long Beach Mortgage Loan Trust 2006-WL1, Asset-Backed Certificates, Series 2006-WL1 | LBMLT 2006-WL1 |
| Long Beach Mortgage Loan Trust 2006-WL2, Asset-Backed Certificates, Series 2006-WL2 | LBMLT 2006-WL2 |
| Long Beach Mortgage Loan Trust 2006-WL3, Asset-Backed Certificates, Series 2006-WL3 | LBMLT 2006-WL3 |
| Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 | LUM 2006-3 |
| Newcastle Mortgage Securities Trust 2007-1, Asset-Backed Notes, Series 2007-1 | NCMT 2007-1 |
| People's Choice Home Loan Securities Trust Series 2005-4, Mortgage-Backed Notes Series 2005-4 | PCHLT 2005-4 |
| SACO I Trust 2007-1, Mortgage-Backed Certificates, Series 2007-1 | SACO 2007-1 |
| SACO I Trust 2007-2, Mortgage-Backed Certificates, Series 2007-2 | SACO 2007-2 |
| Structured Asset Mortgage Investments II Trust 2006-AR4, Mortgage Pass-Through Certificates, Series 2006-AR4 | SAMI 2006-AR4 |
| WaMu Mortgage Pass-Through Certificates Series 2007-OA3 Trust, WaMu Mortgage Pass-Through Certificates, Series 2007-OA3 | WAMU 2007-OA3 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE1 Trust | WMABS 2006-HE1 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE3 Trust | WMABS 2006-HE3 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE4 Trust | WMABS 2006-HE4 |
| Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 Trust | WMABS 2006-HE5 |
| Washington Mutual Asset-Backed Certificates, WMABS Series 2007-HE1 Trust | WMABS 2007-HE1 |

| Full Name | Abbreviation |
|---|---|
| Washington Mutual Asset-Backed Certificates WMABS Series 2007-HE2 Trust | WMABS 2007-HE2 |
| Washington Mutual  Mortgage Pass-Through Certificates, WMALT Series 2005-9 Trust | WMALT 2005-9 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-10 Trust | WMALT 2005-10 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Trust | WMALT 2006-AR4 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust | WMALT 2006-AR5 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust | WMALT 2006-AR8 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006- AR9 Trust | WMALT 2006-AR9 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 Trust | WMALT 2007-OA1 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007- OA2 Trust | WMALT 2007-OA2 |
| Washington Mutual Mortgage Pass- Through Certificates, WMALT Series 2007-OA3 Trust | WMALT 2007-OA3 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE1 Trust | WMHE 2007-HE1 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust | WMHE 2007-HE2 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | WMHE 2007-HE3 |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust | WMHE 2007-HE4 |

3.     The Certificates were offered for sale pursuant to one of 19 shelf registration statements (the "Registration Statements") filed with the Securities and Exchange Commission (the "SEC").  Defendants J.P. Morgan Acceptance, BSABS, SAMI, WaMu Securities, WaMu Acceptance, and Long Beach Securities filed 13 Shelf Registration Statements that pertained to 97 of the Securitizations at issue in this action.  The Individual Defendants signed one or more of those 13 Shelf Registration Statements, and the amendments thereto.  Aegis Asset Backed Securities Corp., American Home Mortgage Securities LLC, Argent Securities Inc., Bond Securitization, LLC, and People's Choice Home Loan Securities Corp. filed the six remaining Shelf Registration Statements.  With respect to all but four of the Securitizations, J.P. Morgan Securities, BSC, or WaMu Capital was the lead underwriter, and, with respect to all but seven of

the Securitizations, J.P. Morgan Securities, BSC, or WaMu Capital was the underwriter who sold the Certificates to the GSEs.

4.       For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization.[2]  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.       The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such statements were material to a reasonable investor's decision to invest in mortgage-backed securities, and thus, the GSEs' decision to purchase the GSE Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and had materially poorer credit quality than what was represented in the Registration Statements.

6.       For example, a forensic review of 1,061 loan origination files in the loan groups backing the GSE Certificates for the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Securitizations has revealed that, for the vast majority of loans reviewed in those Securitizations, there were numerous significant violations of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to

---

[2]   The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan. Adherence to underwriting guidelines, particularly on key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.      The Registration Statements also contained statistical summaries of the collateral groups and entire portfolio of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges. This information was material to reasonable investors. However, a loan level analysis of a sample of loans for each Securitization – a review that encompassed thousands of mortgages across all of the Securitizations – has revealed that these statistics were false and omitted material facts due to widespread falsification of occupancy status, property values, and other key characteristics of the mortgage loans.

8.      For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of the Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property. The loan level analysis reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements. Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans and the actual ability of the individual mortgage holders to satisfy their debts.

9.      Defendants J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich (which lead underwrote and then sold the GSE

Certificates to the GSEs); and Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities (which acted as the depositors in 97 of the Securitizations); and the Individual Defendants (who signed the Registration Statements with respect to 97 of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

10.     Defendants J.P. Morgan Acquisition, JPMorgan Bank, and JPMorgan Chase are likewise responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants J.P. Morgan Acceptance and J.P. Morgan Securities.

11.     J.P. Morgan Acceptance was a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC and JPMorgan Chase.  J.P. Morgan Securities was likewise a wholly-owned subsidiary of JPMorgan Chase.

12.     J.P. Morgan Acquisition and JPMorgan Chase directly participated in and exercised dominion and control over the business operations of Defendant J.P. Morgan Acceptance.  JPMorgan Chase directly participated in and exercised dominion and control over the business operations of Defendant J.P. Morgan Securities.

13.     Defendants EMC, J.P. Morgan Securities, and JPMorgan Chase (as successor to non-party The Bear Stearns Companies, Inc. ("BSI")), are likewise responsible, either directly or as successors-in-interest, for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants SAMI, BSABS,

and BSC.  J.P. Morgan Securities is the successor-in-interest to BSC and JPMorgan Chase is the successor-in-interest to BSI.

14.    SAMI and BSABS were wholly-owned subsidiaries of BSI, which was acquired by JPMorgan Chase, making SAMI and BSABS wholly-owned subsidiaries of JPMorgan Chase. BSC was likewise a wholly-owned subsidiary of BSI, which was acquired by JPMorgan Chase, making BSC a wholly-owned subsidiary of JPMorgan Chase.  BSC also merged into J.P. Morgan Securities, a wholly-owned subsidiary of JPMorgan Chase.

15.    EMC and BSI directly participated in and exercised dominion and control over the business operations of Defendants SAMI and BSABS.  BSI directly participated in and exercised dominion and control over the business operations of Defendant BSC.  JPMorgan Chase is the successor-in-interest to BSI as a result of the acquisition of BSI by JPMorgan Chase, and J.P. Morgan Securities is the successor-in-interest to BSC as a result of a merger between BSC and J.P. Morgan Securities.

16.    Non-party WaMu Bank and Defendant JPMorgan Bank are likewise responsible, either directly or as successor-in-interest, for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants WaMu Securities, WaMu Acceptance, and WaMu Capital.  JPMorgan Bank is the successor-in-interest to WaMu Bank.

17.    WaMu Securities and WaMu Acceptance were wholly-owned subsidiaries of WaMu Bank, the assets, subsidiaries, and liabilities of which were acquired by JPMorgan Bank, making WaMu Securities and WaMu Acceptance wholly-owned subsidiaries of JPMorgan Bank. WaMu Capital was likewise a wholly-owned subsidiary of WaMu Bank, the assets, subsidiaries,

and liabilities of which were acquired by JPMorgan Bank, making WaMu Capital a wholly-owned subsidiary of JPMorgan Bank.

18.     WaMu Bank directly participated in and exercised dominion and control over the business operations of Defendants WaMu Securities and WaMu Acceptance.  WaMu Bank directly participated in and exercised dominion and control over the business operations of Defendant WaMu Capital.  JPMorgan Bank is the successor-in-interest to WaMu Bank as a result of the acquisition of WaMu Bank's assets, subsidiaries, and liabilities by JPMorgan Bank.

19.     Non-parties WaMu Bank and Long Beach Mortgage and Defendant JPMorgan Bank are likewise responsible, either directly or as successor-in-interest, for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendant Long Beach Securities.  JPMorgan Bank is the successor-in-interest to WaMu Bank and Long Beach Mortgage.

20.     Long Beach Securities was a wholly-owned subsidiary of WaMu Bank, the assets, subsidiaries, and liabilities of which were acquired by JPMorgan Bank, making Long Beach Securities a wholly-owned subsidiary of JPMorgan Bank.

21.     WaMu Bank and Long Beach Mortgage directly participated in and exercised dominion and control over the business operations of Defendant Long Beach Securities. JPMorgan Bank is the successor-in-interest to WaMu Bank and Long Beach Mortgage as a result of the acquisition of WaMu Bank's assets, subsidiaries, and liabilities by JPMorgan Bank.

22.     Fannie Mae and Freddie Mac purchased over $33 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material fact concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans.  As a

result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

23.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law fraud and aiding and abetting fraud.

## PARTIES

### *The Plaintiff and the GSEs*

24.     The Federal Housing Finance Agency is a federal agency located at Constitution Center, 400 7th Street, SW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

25.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### The JPMorgan Entities

26.    Defendant JPMorgan Chase is a Delaware financial holding company with its principal place of business in New York, New York.  JPMorgan Chase is a global financial services firm and one of the largest banking institutions in the United States.  JPMorgan Chase is the sole owner of Defendants JPMorgan Bank and J.P. Morgan Securities and is the ultimate owner of Defendants J.P. Morgan Acquisition and J.P. Morgan Acceptance.  JPMorgan Chase is also the successor-in-interest to BSI.

27.    Defendant JPMorgan Bank is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase, a Delaware corporation, and the sole owner of J.P. Morgan Acquisition.  Its main office is located in Columbus, Ohio.  JPMorgan Bank is a commercial bank that is chartered, and its business is subject to examination and regulation by, the Office of the Comptroller of Currency ("OCC").  It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").  JPMorgan Bank is also the successor-in-interest to Washington Mutual Bank.

28.    Defendant J.P. Morgan Securities is a Delaware corporation with its principal place of business at 277 Park Avenue, New York, New York 10017.  J.P. Morgan Securities was formerly known as J.P. Morgan Securities, Inc.  On or about September 1, 2010, JP Morgan Securities Inc. was converted into a limited liability company, namely, J.P. Morgan Securities, LLC.  J.P. Morgan Securities, a SEC-registered broker-dealer, engages in investment banking activities in the United States and is the primary nonbank subsidiary of JPMorgan Chase.  J.P. Morgan Securities was the lead underwriter for 30 of the Securitizations, and was intimately involved in the offerings.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 30 of the 103 Securitizations from J.P. Morgan Securities in its capacity as underwriter of the Securitizations.

14

29.      Defendant J.P. Morgan Acquisition is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Acquisition is a direct, wholly-owned subsidiary of JPMorgan Bank.  J.P. Morgan Acquisition was the sponsor of 27 of the Securitizations.

30.      Defendant J.P. Morgan Acceptance is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Acceptance is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC which, in turn, is a direct, wholly-owned subsidiary of JPMorgan Chase.  J.P. Morgan Acceptance was the depositor for 27 of the Securitizations.  J.P. Morgan Acceptance, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing various reports required under the Securities Exchange Act of 1934.

31.      JPMorgan Chase, JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Securities, and J.P. Morgan Acceptance are collectively referred to herein as "JPMorgan."  An organizational chart of JPMorgan is set forth below.  An organizational chart of the JPMorgan Defendants is set forth below.



32.     Defendant David M. Duzyk served as President of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  According to William Buell, former Managing Director at J.P. Morgan Securities, David M. Duzyk was also employed by J.P. Morgan Securities and was responsible for the due diligence of loan files prior to securitization.  *See* "William Buell. JPMorgan Chase," FCIC at Stanford Law School Resource Library (Sept. 15, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.

33.     Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

16

34.     Defendant Christine E. Cole served as a Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant Christine E. Cole also served as the co-head of securitized products of JPMorgan at the time of the Securitizations.

35.     Defendant Edwin F. McMichael served as a Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

36.     Defendant William A. King served as President and Director of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant William A. King also served as a Director of J.P. Morgan Securities and the co-head of securitized products of JPMorgan at the time of Securitizations.

37.     Defendant Brian Bernard served as President of J.P. Morgan Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

### *The Bear Stearns Entities*

38.     Non-party BSI was, at all relevant times, a holding company that provided investment banking, securities, and derivative trading services to its clients through its broker-dealer and banking subsidiaries.  BSI was the sole owner, at the time of the Securitizations, of BSC, EMC, SAMI, and BSABS.  On March 16, 2008, BSI entered into an Agreement and Plan of Merger (the "Merger") with JPMorgan Chase to merge with Bear Stearns Merger Corporation ("BSMC"), a wholly-owned subsidiary of JPMorgan Chase, making BSI a wholly-owned subsidiary of JPMorgan Chase.  Therefore, this action is brought against JPMorgan Chase as the successor to BSI.  BSI is not a defendant in this action.

17

39.     Defendant BSC was, at all relevant times, an SEC-registered broker-dealer with its principal place of business at 383 Madison Avenue, New York, New York 10179.  BSC was a wholly-owned subsidiary of BSI.  BSC directed the activities of its affiliates EMC, SAMI, and BSABS.  BSC was the lead underwriter for 38 of the Securitizations, and was intimately involved in the offerings.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 37 of the 103 Securitizations from BSC in its capacity as underwriter of the Securitizations.  On or about October 1, 2008, following the Merger effective May 30, 2008, BSC merged with a subsidiary of JPMorgan Chase, Defendant J.P. Morgan Securities, and is now doing business as J.P. Morgan Securities.  All allegations against BSC are thus made against its successor-in-interest, J.P. Morgan Securities, as well.

40.     Defendant EMC is incorporated in the State of Delaware and was, at all relevant times, a wholly-owned subsidiary of BSI.  EMC was formerly known as EMC Mortgage Corporation.  On or about March 31, 2011, it was concerted to a limited liability company and became known as EMC Mortgage LLC.  EMC was organized for the purpose of acquiring, holding, servicing, and securitizing mortgage loans and mortgage securities.  EMC was the sponsor of 32 of the Securitizations.  As a result of the Merger between BSI and JPMorgan Chase, EMC became a wholly-owned subsidiary of JPMorgan Chase.

41.     Defendant SAMI was, at all relevant times, a Delaware corporation with its principal place of business at 383 Madison Avenue, New York, New York 10179.  SAMI was a wholly-owned subsidiary of BSI.  SAMI was the depositor for nine of the Securitizations.  SAMI, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.  As a result of

the Merger between BSI and JPMorgan Chase, SAMI became a wholly-owned subsidiary of JPMorgan Chase.

42.     Defendant BSABS was, at all relevant times, a Delaware limited liability company with its principal place of business at 383 Madison Avenue, New York, New York 10179.  BSABS was a wholly-owned subsidiary of BSI.  BSABS was the depositor for 26 of the Securitizations.  BSABS, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934. As a result of the Merger between BSI and JPMorgan Chase, BSABS became a wholly-owned subsidiary of JPMorgan Chase.

43.     BSC, EMC, SAMI, BSABS, J.P. Morgan Securities (as successor-in-interest to BSC), and JPMorgan Chase (as successor-in-interest to BSI), are collectively referred to herein as "Bear Stearns."  An organizational chart of Bear Stearns is set forth below.



44.     Defendant Matthew E. Perkins served as President and Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

45.     Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

46.     Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant Samuel L. Molinaro, Jr. also served as Chief Financial Officer and Director of BSC at the time of the Securitizations.

47.     Defendant Thomas F. Marano served as a Director of BSABS and as a Director of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant Thomas F. Marano also served as a Director of EMC and BSC at the time of the Securitizations.

48.     Defendant Kim Lutthans served as an Independent Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

49.     Defendant Katherine Garniewski served as an Independent Director of BSABS at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.

50.     Defendant Jeffrey Mayer served as a Director of BSABS and as a Director of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements

and the amendments thereto and did so in New York.  Defendant Jeffrey Mayer also served as a Director of EMC and BSC at the time of the Securitizations.

51.     Defendant Jeffrey L. Verschleiser served as President of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant Jeffrey L. Verschleiser also served as a Director of BSC at the time of the Securitizations.

52.     Defendant Michael B. Nierenberg served as Treasurer of SAMI at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto and did so in New York.  Defendant Michael B. Nierenberg also served as a Director of BSC at the time of the Securitizations.

### The WaMu Entities

53.     At all relevant times, WaMu Bank was a federal savings (or thrift) association that provided financial services to consumer and commercial clients.  WaMu Bank was the sole owner, at the time of the Securitizations, of WaMu Capital, WaMu Acceptance, and WaMu Securities.  WaMu Bank was also the sponsor or co-sponsor of 12 of the Securitizations.  On September 25, 2008, JPMorgan Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPMorgan Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including WaMu Capital, WaMu Acceptance, and WaMu Securities.  Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank.  WaMu Bank is not a defendant in this action.

54.     Defendant WaMu Capital was, at all relevant times, an SEC-registered broker-dealer principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WaMu Capital was a wholly-owned subsidiary of WaMu Bank.  WaMu Capital was the lead underwriter for 31 of the Securitizations, and was intimately involved in the offerings.  Fannie

Mae and Freddie Mac purchased the GSE Certificates for 29 of the 103 Securitizations from WaMu Capital in its capacity as underwriter of the Securitizations.  WaMu Capital is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

55.     Defendant WaMu Acceptance was, at all relevant times, a wholly-owned subsidiary of WaMu Bank and was principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WaMu Acceptance was the depositor for 18 of the Securitizations. WaMu Acceptance, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934. WaMu Acceptance is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

56.     Defendant WaMu Securities is a Delaware corporation and was, at all relevant times, a wholly-owned, special-purpose subsidiary of WaMu Bank with its principal offices located in Vernon Hills, Illinois.  WaMu Securities was the sponsor of 15 of the Securitizations. WaMu Securities was the depositor for two of the Securitizations.  WaMu Securities, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.  WaMu Securities is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

57.     WaMu Capital, WaMu Acceptance, WaMu Securities, and JPMorgan Bank (as successor-in-interest to WaMu Bank) are collectively referred to herein as "WaMu."  An organizational chart of WaMu is set forth below.



58.     Defendant Richard Careaga served as First Vice President of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.  Defendant Richard Careaga also served as Secretary of WaMu Capital at the time of the Securitizations.

59.     Defendant David Beck served as President and Director of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.  Defendant David Beck also served as Senior Vice President of Long Beach Mortgage at the time of the Securitizations.

60.     Defendant Diane Novak served as a Director of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

61.     Defendant Rolland Jurgens served as Controller of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

62.     Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

63.     Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

64.     Defendant Donald Wilhelm served as Controller of WaMu Acceptance at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.  Defendant Donald Wilhelm also served as Treasurer of WaMu Capital at the time of the Securitizations.

65.     Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

66.     Defendant Michael L. Parker served as President and Director of WaMu Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

### The Long Beach Entities

67.     At all relevant times, WaMu Bank was a federal savings (or thrift) association that provided financial services to consumer and commercial clients.  WaMu Bank was the sole owner, at the time of the Securitizations, of Long Beach Mortgage and Long Beach Securities.  On September 25, 2008, JPMorgan Bank entered into the PAA with the FDIC, under which JPMorgan Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase all of WaMu Bank's assets, including Long Beach Mortgage and Long Beach Securities.  Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank.  WaMu Bank is not a defendant in this action.

68.     Long Beach Mortgage was one of the largest subprime originators in the country.  Long Beach Mortgage was acquired by Washington Mutual, Inc. ("WMI") in 1999.  At all relevant times, WMI was a savings and loan holding company incorporated in Washington State, subject to regulation by the Office of Thrift Supervision ("OTS"), and was the parent company of WaMu Bank.  From December 2000 to March 2006, Long Beach Mortgage operated as a subsidiary of WMI.  In March 2006, Long Beach Mortgage became a wholly-owned subsidiary of WaMu Bank.  From March 2006 to July 2006, Long Beach Mortgage operated as a subsidiary of WaMu Bank and was WaMu Bank's primary subprime originator.  In July 2006, Long Beach Mortgage was wholly integrated into its parent company and became a division of WaMu Bank, operating as its "Specialty Wholesale Lending" channel.  Long Beach Mortgage was the sponsor for nine of the Securitizations.  WaMu Bank shut down Long Beach Mortgage in 2007.  The liabilities associated with Long Beach Mortgage's securitization activities were assumed by JPMorgan Bank, successor-in-interest to WaMu Bank and Long Beach Mortgage.  Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank and Long Beach Mortgage.  WMI, WaMu Bank, and Long Beach Mortgage are not defendants in this action.

69.     Defendant Long Beach Securities is a Delaware corporation and was, at all relevant times, a wholly-owned subsidiary of WaMu Bank with a principal place of business at 1100 Town & Country Road, Orange, California 92868.  Long Beach Securities was the depositor for 15 of the Securitizations.  Long Beach Securities, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.  Long Beach Securities is not currently affiliated with WaMu Bank and is now a wholly-owned subsidiary of JPMorgan Bank, successor-in-interest to WaMu Bank.

70.     Long Beach Securities and JPMorgan Bank (as successor to WaMu Bank and Long Beach Mortgage) are collectively referred to herein as the "Long Beach."  An organizational chart of Long Beach is set forth below.



71.     Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank at the time of the Securitizations and signed certain of the amendments to the Shelf Registration Statements.

72.     Defendant Thomas W. Casey served as a Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.  Defendant Thomas W. Casey also served as a Director and Executive Vice President at Long Beach Mortgage at the time of the Securitizations.

73.     Defendant John F. Robinson served as a Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the

amendments thereto.  Defendant John F. Robinson also served as a Director of Long Beach Mortgage at the time of the Securitizations.

74.     Defendant Keith Johnson served as President and Director of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.  Defendant Keith Johnson also served as a Director and Senior Vice President of Long Beach Mortgage at the time of the Securitizations.

75.     Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

76.     Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

77.     Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

78.     Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

79.     Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

80.     Defendant Rolland Jurgens served as Controller of Long Beach Securities at the time of the Securitizations and signed certain of the Shelf Registration Statements and the amendments thereto.

81.     No recovery is sought in this action against any bankrupt entity or any entity in receivership.

### The Other Underwriter Defendants

82.     Defendant CitiGroup Global Markets, Inc., formerly known as Salomon Smith Barney or Smith Barney, is a New York corporation with its principal place of business at 388 Greenwich St. in New York, New York.  Citigroup is a registered broker-dealer with the SEC, and is a wholly owned subsidiary of Citigroup, Inc.  Citigroup served as the selling underwriter for the LUM 2006-3 Securitization and was intimately involved in the offering and sale of the LUM 2006-3 Certificates to Fannie Mae.

83.     Defendant Credit Suisse Securities (USA) LLC is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.  Credit Suisse served as the selling underwriter for the LBMLT 2006-1 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-1 Certificates to Fannie Mae and Freddie Mac.

84.     Defendant Goldman, Sachs & Co. is incorporated in New York and has its principal executive offices at 200 West Street in New York, New York.  Goldman Sachs is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and is its principal U.S. broker-dealer.  Goldman Sachs served as the selling underwriter for the LBMLT 2006-WL1 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-WL1 Certificates to Fannie Mae and Freddie Mac.

85.     Defendant RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc. was founded in 1981 and acquired by RBS Group in 2000.  RBS Greenwich is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the largest underwriters of mortgage and other asset-backed securities in the United States.  RBS Greenwich served as the selling underwriter for the LBMLT 2006-2 Securitization and was intimately involved in the offering and sale of the LBMLT 2006-WL1 Certificates to Freddie Mac.

### The Non-Party Originators

86.     In addition, many of the loans underlying the Certificates were acquired by the sponsor for each Securitization from unaffiliated non-party mortgage originators.[3]  The unaffiliated originators responsible for the loans underlying the Certificates included WMC Mortgage Corp. ("WMC Mortgage"); Fremont Investment & Loan ("Fremont"); Countrywide Home Loans, Inc. ("Countrywide"); GreenPoint Mortgage Funding, Inc. ("GreenPoint"); Argent Mortgage Company, LLC ("Argent"); New Century Mortgage Corporation ("New Century"); American Home Mortgage Investment Corp. and its subsidiary American Home Mortgage Corp. (collectively, "American Home"); and Option One Mortgage Corporation ("Option One") among others.

87.     The Certificates were issued by a trust established by the depositor.  The issuing trusts for each Securitization are listed in paragraph 2.

---

[3]  J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, and Long Beach Mortgage were the sponsors for 94 of the Securitizations.  The remaining nine Securitizations were sponsored by non-parties.  In particular, Aegis Mortgage Corporation; American Home Mortgage Acceptance, Inc.; Newcastle Investment Corporation; Luminent Mortgage Capital, Inc.; People's Choice Funding, Inc.; Credit-Based Asset Servicing and Securitization LLC; and Ameriquest Mortgage Company each sponsored one or more of those nine Securitizations.  The sponsor for each Securitization is included in Table 2, below at paragraph 97.

## JURISDICTION AND VENUE

88.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

89.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C.  §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

90.     This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claims of fraud and aiding and abetting fraud, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

91.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Several of the Defendants are principally located in this district, several of the Individual Defendants reside in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements occurred in substantial part within this District.  Defendants are also subject to personal jurisdiction in this District.

# FACTUAL ALLEGATIONS

I.    **The Securitizations**

    A.    **Residential Mortgage-Backed Securitizations In General**

92.    Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

93.    The most common form of securitization of mortgage loans involves a sponsor or seller – the entity that acquires or originates the mortgage loans and initiates the securitization – and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is established pursuant to a pooling and servicing agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . .  and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No.  34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

94.    Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups of mortgage loans.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  Within this framework, the purchasers of the securities acquire rights to

32

the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

95.    Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement.  Underwriters sell the certificates to investors.

96.    A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

###    B.    The Securitizations At Issue In This Case

97.    This case involves the 103 Securitizations listed in Table 1, above at paragraph 2.  JPMorgan served as the lead underwriter for 30 of the Securitizations; in 27 of the Securitizations, JPMorgan also served as sponsor and, in 27 of the Securitizations, JPMorgan was also the depositor and therefore the issuer and offeror of the Certificates.  Bear Stearns served as the lead underwriter for 38 of the Securitizations; in 32 of the Securitizations, Bear Stearns also served as sponsor and, in 35 of the Securitizations, Bear Stearns was also the depositor and therefore the issuer and offeror of the Certificates.  WaMu served as the lead

33

underwriter for 31 of the Securitizations; in 35 of the Securitizations, WaMu or Long Beach also served as sponsor and, in 35 of the Securitizations, WaMu or Long Beach was also the depositor and therefore the issuer and offeror of the Certificates.  The GSE Certificates correlate to 127 tranches[4] of the 103 Securitizations.[5]  For each of the 103 Securitizations, Table 2 identifies the: (1) the sponsor; (2) the depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches purchased by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE Certificates for that Securitization (referred to as the "Supporting Loan Groups").

**Table 2**

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Aegis Mortgage Corp. | Aegis Asset Backed Securities Corp. | BSC | $500,000,000 | 10/28/2005 | Pool 2 |
| AHM 2005-1 | VIA | American Home Mortgage Acceptance, Inc. | American Home Mortgage Securities LLC | BSC | $337,000,000 | 4/25/2006 | Group VI |
| AHM 2005-4 | IVA | American Home Mortgage Acceptance, Inc. | BSABS | BSC | $556,435,000 | 10/7/2005 | Group IV |
| ARSI 2006-M2 | A1 | Ameriquest Mortgage Company | Argent Securities Inc. | J.P. Morgan Securities (co-lead with Citigroup) | $717,382,000 | 8/29/2006 | Group I |
| BALTA 2005-10 | II2A1 | EMC | SAMI | BSC | $407,783,000 | 12/30/2005 | Group II-2 |
| BALTA 2005-10 | II3A1 | EMC | SAMI | BSC | $569,686,000 | 12/30/2005 | Group II-3 |
| BALTA 2006-1 | III1A1 | EMC | BSABS | BSC | $300,000,000 | 1/31/2006 | Group II-1 |
| BALTA 2006-2 | II2A1 | EMC | SAMI | BSC | $431,361,000 | 3/31/2006 | Group II-2 |
| BALTA 2006-3 | III1A1 | EMC | SAMI | BSC | $276,267,000 | 4/28/2006 | Group II-1 |
| BALTA 2006-4 | I2A1 | EMC | SAMI | BSC | $807,809,000 | 6/30/2006 | Group I-2 |

---

[4]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

[5]   For example, the GSEs purchased Certificates issued pursuant to both the A1A and A1B tranches of the JPMAC 2006-RM1 Securitization.

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| BALTA 2006-4 | III1A1 | EMC | SAMI | BSC | $132,532,000 | 6/30/2006 | Group III-1 |
| BSABS 2005-HE12 | IIA | EMC | BSABS | BSC | $302,737,000 | 12/30/2005 | Group II |
| BSABS 2006-AQ1 | I2A | EMC | BSABS | BSC | $192,142,000 | 11/30/2006 | Group I-2 |
| BSABS 2006-HE2 | IIA | EMC | BSABS | BSC | $241,697,000 | 2/28/2006 | Group II |
| BSABS 2006-HE4 | IIA | EMC | BSABS | BSC | $264,889,000 | 4/28/2006 | Group II |
| BSABS 2006-HE5 | IIA | EMC | BSABS | BSC | $162,020,000 | 5/30/2006 | Group II |
| BSABS 2006-HE7 | II2A | EMC | BSABS | BSC | $100,275,000 | 8/30/2006 | Group II-2 |
| BSABS 2006-HE8 | II2A | EMC | BSABS | BSC | $51,306,000 | 10/30/2006 | Group II-2 |
| BSABS 2006-HE9 | IIA | EMC | BSABS | BSC | $218,304,000 | 11/30/2006 | Group II |
| BSABS 2006-HE9 | IIIA | EMC | BSABS | BSC | $236,045,000 | 11/30/2006 | Group III |
| BSABS 2006-HE10 | II2A | EMC | BSABS | BSC | $201,892,000 | 12/29/2006 | Group II-2 |
| BSABS 2006-HE10 | II3A | EMC | BSABS | BSC | $132,221,000 | 12/29/2006 | Group II-3 |
| BSABS 2007-FS1 | IIA | EMC | BSABS | BSC | $70,635,000 | 2/28/2006 | Group II |
| BSABS 2007-HE1 | II2A | EMC | BSABS | BSC | $118,512,000 | 1/30/2007 | Group II-2 |
| BSABS 2007-HE1 | II3A | EMC | BSABS | BSC | $92,100,000 | 1/30/2007 | Group II-3 |
| BSABS 2007-HE2 | II2A | EMC | BSABS | BSC | $75,162,000 | 2/28/2007 | Group II-2 |
| BSABS 2007-HE2 | II3A | EMC | BSABS | BSC | $77,349,000 | 2/28/2007 | Group II-3 |
| BSABS 2007-HE3 | IIA | EMC | BSABS | BSC | $131,715,000 | 3/30/2007 | Group II |
| BSABS 2007-HE3 | IIIA | EMC | BSABS | BSC | $90,354,000 | 3/30/2007 | Group III |
| BSABS 2007-HE4 | IIA | EMC | BSABS | BSC | $210,625,000 | 4/30/2007 | Group II |
| BSABS 2007-HE5 | IIA | EMC | BSABS | BSC | $99,922,000 | 5/30/2007 | Group II |
| BSABS 2007-HE5 | IIIA | EMC | BSABS | BSC | $122,752,000 | 5/30/2007 | Group III |
| BSABS 2007-HE6 | IIA | EMC | BSABS | BSC | $291,210,000 | 8/30/2007 | Group II |
| BSABS 2007-HE7 | IIA1 | EMC | BSABS | BSC | $137,892,000 | 9/19/2007 | Group II |
| BSABS 2007-HE7 | IIIA1 | EMC | BSABS | BSC | $69,504,000 | 9/19/2007 | Group III |
| BSMF 2006-SL5 | IIA | EMC | BSABS | BSC | $23,706,000 | 11/30/2006 | Group II |
| BSMF 2006-SL6 | IIA | EMC | BSABS | BSC | $20,279,000 | 12/29/2006 | Group II |
| BSMF 2007-AR3 | II2A1 | EMC | SAMI | BSC | $241,679,000 | 3/30/2007 | Group II-2 |
| BSMF 2007-SL1 | IIA | EMC | BSABS | BSC | $24,050,000 | 1/30/2007 | Group II |
| BSMF 2007-SL2 | IIA | EMC | BSABS | BSC | $21,671,000 | 2/28/2007 | Group II |
| CBASS 2006-CB2 | AV | Credit-Based Asset Servicing and Securitization LLC | Bond Securitization, LLC | J.P. Morgan Securities | $347,712,000 | 2/28/2006 | Group 1 |
| CBASS 2006-CB7 | A1 | Credit-Based Asset Servicing and Securitization LLC | Bond Securitization, LLC | J.P. Morgan Securities | $385,237,000 | 10/5/2006 | Group I |
| GPMF 2005-AR5 | IIA1 | EMC | SAMI | BSC | $470,923,000 | 10/31/2005 | Group II |
| GPMF 2006-AR3 | IIA1 | EMC | SAMI | BSC | $492,223,000 | 4/28/2006 | Group II |
| GPMF 2006-AR3 | IIA2 | EMC | SAMI | BSC | $259,690,000 | 4/28/2006 | Group II |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| JPALT 2005-A2 | 2A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $68,406,000 | 12/29/2005 | Pool 2 |
| JPALT 2007-A2 | 11A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $369,061,000 | 5/31/2007 | Pool 1A |
| JPMAC 2005-FRE1 | AI | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $274,516,000 | 11/29/2005 | Group I |
| JPMAC 2005-OPT2 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $311,578,000 | 12/21/2005 | Group 1 |
| JPMAC 2005-WMC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $404,000,000 | 10/27/2005 | Group 1 |
| JPMAC 2006-ACC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $266,700,000 | 6/2/2006 | Group 1 |
| JPMAC 2006-CH1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $149,925,000 | 11/14/2006 | Group 1 |
| JPMAC 2006-CH2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $900,296,000 | 12/14/2006 | Group 2-A |
| JPMAC 2006-CW1 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $213,081,000 | 5/31/2006 | Group 1 |
| JPMAC 2006-CW2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $410,588,000 | 8/8/2006 | Group 2 |
| JPMAC 2006-FRE1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $279,696,000 | 1/27/2006 | Group 1 |
| JPMAC 2006-FRE2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $267,476,000 | 3/29/2006 | Group 1 |
| JPMAC 2006-HE1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $166,827,000 | 2/28/2006 | Group 1 |
| JPMAC 2006-HE2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $171,430,000 | 6/30/2006 | Group 1 |
| JPMAC 2006-HE3 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $189,800,000 | 11/10/2006 | Group 1 |
| JPMAC 2006-NC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $345,251,000 | 4/27/2006 | Group 1 |
| JPMAC 2006-NC2 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $223,083,000 | 8/23/2006 | Group 1 |
| JPMAC 2006-RM1 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $230,853,000 | 9/27/2006 | Group 1 |
| JPMAC 2006-RM1 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $57,713,000 | 9/27/2006 | Group 1 |
| JPMAC 2006-WMC1 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $161,500,000 | 3/30/2006 | Group 1 |
| JPMAC 2006-WMC2 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $324,255,000 | 6/28/2006 | Group 1 |
| JPMAC 2006-WMC3 | A1SS | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $175,270,000 | 9/14/2006 | Group 1 |
| JPMAC 2006-WMC3 | A1MZ | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $43,817,000 | 9/14/2006 | Group 1 |
| JPMAC 2006-WMC4 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $376,675,000 | 12/20/2006 | Group 1 |
| JPMAC 2006-WMC4 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $41,853,000 | 12/20/2006 | Group 1 |
| JPMAC 2007-CH2 | AV1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $234,600,000 | 3/15/2007 | Group 2-A |
| JPMAC 2007-CH3 | A1A | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $374,118,000 | 5/15/2007 | Group 1 |
| JPMAC 2007-CH3 | A1B | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $41,569,000 | 5/15/2007 | Group 1 |
| JPMAC 2007-CH4 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $435,000,000 | 6/15/2007 | Group 1 |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| JPMAC 2007-CH5 | A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $304,336,000 | 7/12/2007 | Group 1 |
| JPMMT 2006-A3 | 1A1 | J.P. Morgan Acquisition | J.P. Morgan Acceptance | J.P. Morgan Securities | $174,568,800 | 7/12/2007 | Pool 1 |
| LBMLT 2005-3 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with Lehman Brothers Inc.) | $604,830,000 | 9/7/2005 | Group I |
| LBMLT 2006-1 | IA | Long Beach Mortgage | Long Beach Securities | Credit Suisse | $870,736,000 | 2/7/2006 | Group I |
| LBMLT 2006-2 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with RBS Greenwich) | $1,101,891,000 | 3/7/2006 | Group I |
| LBMLT 2006-3 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital | $513,901,000 | 4/6/2006 | Group I |
| LBMLT 2006-4 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital (co-lead with Lehman Brothers Inc.) | $787,668,000 | 5/9/2006 | Group I |
| LBMLT 2006-5 | IA | Long Beach Mortgage | Long Beach Securities | WaMu Capital | $631,423,000 | 6/15/2006 | Group I |
| LBMLT 2006-6 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $415,891,000 | 7/26/2006 | Group I |
| LBMLT 2006-7 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $360,139,000 | 8/30/2006 | Group I |
| LBMLT 2006-8 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $366,091,000 | 9/21/2006 | Group I |
| LBMLT 2006-9 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $420,396,000 | 10/12/2006 | Group I |
| LBMLT 2006-10 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $288,380,000 | 11/9/2006 | Group I |
| LBMLT 2006-11 | IA | WaMu Bank | Long Beach Securities | WaMu Capital | $408,047,000 | 12/14/2006 | Group I |
| LBMLT 2006-WL1 | IA1 | Long Beach Mortgage | Long Beach Securities | Goldman Sachs | $284,678,000 | 2/8/2006 | Group I |
| LBMLT 2006-WL1 | IA2 | Long Beach Mortgage | Long Beach Securities | Goldman Sachs | $256,210,000 | 2/8/2006 | Group I |
| LBMLT 2006-WL2 | IA | Long Beach Mortgage | Long Beach Securities | Lehman Brothers Inc. | $462,263,000 | 10/12/2006 | Group I |
| LBMLT 2006-WL3 | IA | Long Beach Mortgage | Long Beach Securities | Lehman Brothers Inc. | $440,218,000 | 1/30/2006 | Group I |
| LUM 2006-3 | II2A1 | Luminent Mortgage Capital, Inc. | SAMI | BSC | $147,795,000 | 4/28/2006 | Group II-2 |
| NCMT 2007-1 | 1A1 | Newcastle Investment Corp. | BSABS | BSC | $370,224,000 | 7/12/2007 | Group 1 |
| PCHLT 2005-4 | 2A1 | People's Choice Funding, Inc. | People's Choice Home Loan Securities Corp. | BSC | $433,582,000 | 10/26/2005 | Group 2 |
| SACO 2007-1 | IIA | EMC | BSABS | BSC | $50,429,000 | 1/16/2007 | Group II |
| SACO 2007-2 | IIA | EMC | BSABS | BSC | $20,226,000 | 2/28/2007 | Group II |
| SAMI 2006-AR4 | IA1 | EMC | SAMI | BSC | $316,180,000 | 6/30/2006 | Group I |

37

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| WAMU 2007-OA3 | 1A | WaMu Bank | WaMu Acceptance | WaMu Capital | $140,139,000 | 3/27/2007 | Group 1 |
| WMABS 2006-HE1 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $53,578,000 | 4/20/2006 | Group 1 |
| WMABS 2006-HE3 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $175,828,000 | 9/27/2006 | Group I |
| WMABS 2006-HE4 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $117,798,000 | 10/27/2006 | Group I |
| WMABS 2006-HE5 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $269,063,000 | 12/7/2006 | Group I |
| WMABS 2007-HE1 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $115,217,000 | 1/16/2007 | Group I |
| WMABS 2007-HE2 | IA | WaMu Securities | WaMu Acceptance | WaMu Capital | $286,276,000 | 3/13/2007 | Group I |
| WMALT 2005-9 | 1CB | WaMu Securities | WaMu Securities | WaMu Capital | $69,400,400 | 10/31/2005 | Group 1 |
| WMALT 2005-10 | 1CB | WaMu Securities | WaMu Securities | WaMu Capital | $62,532,200 | 11/30/2005 | Group 1 |
| WMALT 2006-AR4 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $76,071,000 | 5/30/2006 | Group 1 |
| WMALT 2006-AR4 | 2A | WaMu Securities | WaMu Acceptance | WaMu Capital | $69,518,000 | 5/30/2006 | Group 2 |
| WMALT 2006-AR4 | 3A | WaMu Securities | WaMu Acceptance | WaMu Capital | $251,313,000 | 5/30/2006 | Group 3 |
| WMALT 2006-AR5 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $74,766,000 | 6/28/2006 | Group 1 |
| WMALT 2006-AR5 | 2A | WaMu Securities | WaMu Acceptance | WaMu Capital | $57,966,000 | 6/28/2006 | Group 2 |
| WMALT 2006-AR8 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $211,150,000 | 9/28/2006 | Group 1 |
| WMALT 2006-AR9 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $270,142,000 | 10/26/2006 | Group 1 |
| WMALT 2007-OA1 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $255,047,000 | 1/26/2007 | Group 1 |
| WMALT 2007-OA2 | 1A | WaMu Securities | WaMu Acceptance | WaMu Capital | $222,967,000 | 2/26/2007 | Group 1 |
| WMALT 2007-OA3 | 1A | WaMu Securities & WaMu Bank | WaMu Acceptance | WaMu Capital | $230,966,000 | 3/28/2007 | Group 1 |
| WMALT 2007-OA3 | 3A | WaMu Securities & WaMu Bank | WaMu Acceptance | WaMu Capital | $195,998,000 | 3/28/2007 | Group 3 |
| WMHE 2007-HE1 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $368,226,000 | 1/16/2007 | Group I |
| WMHE 2007-HE2 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $491,550,000 | 4/10/2007 | Group I |
| WMHE 2007-HE3 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $372,475,000 | 5/10/2007 | Group I |
| WMHE 2007-HE4 | IA | WaMu Bank | WaMu Acceptance | WaMu Capital | $249,921,000 | 6/13/2007 | Group I |

C.       **The Securitization Process**

1.       **J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu
Securities, and Long Beach Mortgage Transfer The Mortgage
Loans To Special Purpose Trusts**

98.      As the sponsor for 27 of the 103 Securitizations (the "JPMorgan Securitizations"),

J.P. Morgan Acquisition purchased the mortgage loans underlying the Certificates for those 27

Securitizations after they were originated, either directly from the originators or through

affiliates of the originators.

99.      As the sponsor for 32 of the 103 Securitizations (the "Bear Stearns

Securitizations"), EMC purchased the mortgage loans underlying the Certificates for those 32

Securitizations after they were originated, either directly from the originators or through

affiliates of the originators.

100.     As the sponsors or co-sponsors for 26 of the 103 Securitizations (the "WaMu

Securitizations"), WaMu Bank and WaMu Securities purchased the mortgage loans underlying

the Certificates for those 26 Securitizations after they were originated, either directly from the

originators or through affiliates of the originators.

101.     As the sponsor for nine of the 103 Securitizations (the "Long Beach

Securitizations"), Long Beach Mortgage purchased the mortgage loans underlying the

Certificates for those nine Securitizations after they were originated, either directly from the

originators or through affiliates of the originators.

102.     Non-party sponsors Aegis Mortgage Corporation, American Home Mortgage

Acceptance, Inc., Newcastle Investment Corporation, Luminent Mortgage Capital, Inc., People's

Choice Funding, Inc., Credit-Based Asset Servicing and Securitization LLC, and Ameriquest

Mortgage Company were each a sponsor of one or more of the remaining nine Securitizations.

The sponsor for each Securitization is included above in Table 2, above at paragraph 97.

39

103.    J.P. Morgan Acquisition then sold the mortgage loans for the 27 Securitizations that it sponsored to the depositor, J.P. Morgan Acceptance, which is a JPMorgan-affiliated entity. EMC then sold the mortgage loans for the 32 Securitizations that it sponsored to one of two depositors, SAMI and BSABS, both of which are Bear Stearns-affiliated entities.  WaMu Bank then sold the mortgage loans for the 12 Securitizations that it sponsored or co-sponsored to one of two depositors, WaMu Acceptance or Long Beach Securities, one of which is a WaMu-affiliated entity and one of which is a Long Beach-affiliated entity.  WaMu Securities then sold the mortgage loans for 13 of the 15 Securitizations that it sponsored or co-sponsored to WaMu Acceptance, which is a WaMu-affiliated entity.  WaMu Securities itself acted as the depositor for the remaining two Securitizations that it sponsored.  Long Beach Mortgage then sold the mortgage loans for the nine Securitizations that it sponsored to the depositor, Long Beach Securities, which is a Long Beach-affiliated entity.

104.    With respect to three of the remaining nine Securitizations, non-parties American Home Mortgage Acceptance, Inc. and Newcastle Investment Corp. sold the mortgage loans to Defendant BSABS for the AHM 2005-4 and NCMT 2007-1 Securitizations, respectively, and Luminent Mortgage Capital, Inc. sold the mortgage loans to Defendant SAMI for the LUM 2006-3 Securitization.  With respect to the remaining six Securitizations, non-party sponsors sold the mortgage loans to non-party depositors, as reflected above in Table 2; Defendant J.P. Morgan Securities was the lead or co-lead underwriter and selling underwriter for the ARSI 2006-M2, CBASS 2006-CB2, and CBASS 2006-CB7 Securitizations; Defendant BSC was the lead or co-lead underwriter and selling underwriter for the AABST 2005-5, AHM 2005-1, and PCHLT 2005-4 Securitizations.

105.    Both J.P. Morgan Acquisition (sponsor) and J.P. Morgan Acceptance (depositor) were controlled by their ultimate parent, JPMorgan Chase.  Both EMC (sponsor) and SAMI and BSABS (depositors) were controlled by their ultimate parent, BSI.  Both WaMu Securities (sponsor and depositor) and WaMu Acceptance (depositor) were controlled by their ultimate parent, WaMu Bank, who also was a sponsor.  Both Long Beach Mortgage (sponsor) and Long Beach Securities (depositor) were controlled by their ultimate parent, WaMu Bank, who also was a sponsor.  The sole purpose of the depositor, and the common law trusts created through this process, was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

106.    The transfer of the mortgage loans to the trust was generally effected by means of either a Pooling and Servicing Agreement or other agreement of substantially similar effect[6] (a "PSA") executed among the depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

## 2.    The Trusts Issue Securities Backed by the Loans

107.    Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the cash flow from the assets held by the corresponding trust.  Each

_____

[6]   In AHM 2005-1 and AHM 2005-4, the trustee executed a Trust Agreement; in JPMAC 2006-CW1, the trustee executed a Pooling Agreement; and in PCHLT 2005-4, the trustee executed a Sale and Servicing Agreement.

Certificate entitles its holder to a specified portion of the cash flows from the underlying

mortgages in the Supporting Loan Group.  The level of risk inherent in the Certificates was a

function of the capital structure of the related transaction and the credit quality of the underlying

mortgages.

108.    The Certificates were issued pursuant to one of 19 Shelf Registration Statements

filed with the SEC on Form S-3.  The Shelf Registration Statements were amended by one or

more Forms S-3/A filed with the SEC.  The depositor affiliates of JPMorgan, Bear Stearns,

WaMu, and Long Beach collectively filed 13 of the 19 Shelf Registration Statements.  Each

Individual Defendant signed one or more of the 13 Shelf Registration Statements or amendments

thereto which were filed by the depositor affiliates of JPMorgan, Bear Stearns, WaMu, and Long

Beach.  The SEC filing number, registrants, signatories and filing dates for the 19 Shelf

Registration Statements and amendments thereto, as well as the Certificates covered by the Shelf

Registration Statements, are reflected in Table 3 below.

**Table 3**

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-141607 | 3/27/2007 | 4/23/2007 | J.P. Morgan Acceptance | JPMAC 2007-CH4, JPMAC 2007-CH3, JPMAC 2007-CH5 | Brian Bernard Louis Schioppo, Jr. Christine E. Cole David M. Duzyk William A. King Edwin F. McMichael | Brian Bernard Louis Schioppo, Jr. Christine E. Cole David M. Duzyk William A. King Edwin F. McMichael |
| 333-141255 | 3/13/2007 | 4/9/2007 | WaMu Acceptance | WMHE 2007-HE4, WMHE 2007-HE3 | Thomas G. Lehmann David Beck Diane Novak Stephen Fortunato Donald Wilhelm | Thomas G. Lehmann David Beck Diane Novak Stephen Fortunato Donald Wilhelm |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-140247 | 1/26/2007 | 2/23/2007, 2/09/2007 | SAMI | BSMF 2007-AR3 | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano |
| 333-130192 | 12/7/2005 | 8/2/2006, 4/3/2006, 3/13/2006 | J.P. Morgan Acceptance | JPALT 2007-A2, JPMMT 2006-A3, JPMAC 2006-CW1, JPMAC 2006-ACC1, JPMAC 2006-WMC2, JPMAC 2006-CW2, JPMAC 2006-NC2, JPMAC 2006-WMC3, JPMAC 2006-RM1, JPMAC 2006-CH2, JPMAC 2006-CH1, JPMAC 2006-HE3, JPMAC 2006-WMC4, JPMAC 2006-HE2, JPMAC 2006-NC1, JPMAC 2007-CH2 | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole Edwin F. McMichael | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole Edwin F. McMichael |
| 333-131374 | 1/30/2006 | 3/31/2006, 3/28/2006, 3/27/2006, 3/6/2006, 3/3/2006 | BSABS | BSABS 2007-HE3, BSABS 2007-FS1, BSABS 2007-HE5, BSABS 2007-HE4, BSABS 2007-HE7, BSABS 2007-HE6, BSABS 2006-HE4, BSABS 2006-HE5, BSABS 2006-HE7, BSABS 2007-HE8, BSABS 2006-HE9, BSABS 2006-AQ1, BSABS 2006-HE10, BSABS 2007-HE1, BSABS 2007-HE2, BSMF 2006-SL6, BSMF 2006-SL5, BSMF 2007-SL1, BSMF 2007-SL2, NCMT 2007-1, SACO 2007-1, SACO 2007-2 | Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski | Joseph T. Jurkowski, Jr. Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski |
| 333-131252 | 1/24/2006 | 3/31/2006, 3/21/2006 | Long Beach Securities | LBMLT 2006-11, LBMLT 2006-4, LBMLT 2006-5, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-8, LBMLT 2006-9, LBMLT 2006-10 | Thomas W. Casey John F. Robinson Keith Johnson Suzanne Krahling Larry Breitbarth | Thomas W. Casey John F. Robinson Michael J. Giampaolo Stephen Fortunato Rolland Jurgens David H. Zielke |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-132232 | 3/6/2006 | 3/10/2006 | SAMI | LUM 2006-3, SAMI 2006-AR4, BALTA 2006-2, BALTA 2006-3, BALTA 2006-4, GPMF 2006-AR3 | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano |
| 333-130795 | 12/30/2005 | 1/3/2006 | WaMu Acceptance | WMABS 2006-HE1, WMHE 2007-HE2, WMHE 2007-HE1, WAMU 2007-OA3, WMALT 2006-AR4, WMALT 2006-AR9, WMABS 2006-HE3, WMABS 2006-HE4, WMABS 2007-HE2, WMABS 2006-HE5, WMALT 2007-OA3, WMALT 2006-AR5, WMABS 2007-HE1, WMALT 2006-AR8, WMALT 2007-OA1, WMALT 2007-OA2 | Richard Careaga David Beck Diane Novak Thomas Green Rolland Jurgens | Richard Careaga David Beck Diane Novak Thomas Green Rolland Jurgens |
| 333-127020 | 7/29/2005 | 8/15/2005 | J.P. Morgan Acceptance | JPMAC 2006-HE1, JPMAC 2006-FRE1, JPMAC 2006-FRE2, JPMAC 2006-WMC1, JPMAC 2005-WMC1, JPMAC 2005-FRE1, JPALT 2005-A2, JPMAC 2005-OPT2 | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole Edwin F. McMichael | David M. Duzyk Louis Schioppo, Jr. Christine E. Cole William A. King Edwin F. McMichael |
| 333-125422 | 6/1/2005 | 6/14/2005 | BSABS | AHM 2005-4, BALTA 2006-1, BSABS 2006-HE2, BSABS 2005-HE12 | Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski | Joseph T. Jurkowski, Jr. Matthew E. Perkins Samuel L. Molinaro, Jr. Thomas F. Marano Kim Lutthans Katherine Garniewski |
| 333-120916 | 12/1/2004 | 12/14/2004 | SAMI | GPMF 2005-AR5, BALTA 2005-10 | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano | Jeffrey L. Verschleiser Michael B. Nierenberg Jeffrey Mayer Thomas F. Marano |
| 333-109318 | 9/30/2003 | 2/10/2004 | Long Beach Securities | LBMLT 2005-3, LBMLT 2006-WL1, LBMLT 2006-1, LBMLT 2006-WL2, LBMLT 2006-WL3, LBMLT 2006-2, LBMLT 2006-3 | Craig S. Davis Marangal I. Domingo Troy A. Gotschall Art Den Heyer Stephen Lobo | David H. Zielke Craig S. Davis Marangal I. Domingo Troy A. Gotschall Art Den Heyer Stephen Lobo |

| SEC File Number | Date Registration Statement Filed | Date(s) Amended Registration Statements Filed | Registrant(s) | Related Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-103345 | 2/20/2003 | 3/7/2003 | WaMu Securities | WMALT 2005-9, WMALT 2005-10 | Michael J. Kula Craig S. Davis Marangal I. Domingo Marc K. Malone Michael L. Parker Thomas G. Lehmann Megan M. Davidson | Michael J. Kula Craig S. Davis Marangal I. Domingo Marc K. Malone Michael L. Parker Thomas G. Lehmann Megan M. Davidson |
| 333-124934 | 5/13/2005 | 5/31/2005 | Aegis Asset Backed Securities Corp. | AABST 2005-5 | D. Richard Thompson Pat Walden Orlando Figueroa | D. Richard Thompson Pat Walden Orlando Figueroa |
| 333-121581 | 12/31/2004 | Not applicable | American Home Mortgage Securities LLC | AHM 2005-1 | Michael Strauss Stephen Hozie Thomas McDonagh Alan Horn | Not applicable |
| 333-131895 | 2/16/2006 | 3/17/2006 | Argent Securities Inc. | ARSI 2006-M2 | Adam J. Bass John P. Grazer Andrew L. Stidd | Adam J. Bass John P. Grazer Andrew L. Stidd |
| 333-87146 | 4/29/2002 | 6/6/2002 | Bond Securitization, LLC | CBASS 2006-CB2 | James R. Pomposelli Christine E. Cole Dean Christianson Benjamin B. Abedine | James R. Pomposelli Christine E. Cole Dean Christianson Benjamin B. Abedine |
| 333-136741 | 8/18/2006 | 9/18/2006 | Bond Securitization, LLC | CBASS 2006-CB7 | David M. Duzyk Christian Greco Benjamin B. Abedine Christine E. Cole Orlando Figueroa | David M. Duzyk Christian Greco Benjamin B. Abedine Christine E. Cole Orlando Figueroa |
| 333-125734 | 6/10/2005 | 6/22/2005 | People's Choice Home Loan Securities Corp. | PCHLT 2005-4 | Neil Kornswiet Brad Plantiko | Neil Kornswiet Brad Plantiko |

109.    The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in the collateral group and the entire securitization, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the geographic distribution of the loans, the extent to which the

loans were for purchase or refinance purposes, information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property, and information concerning whether the loans were delinquent.

110.    The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements.  The Forms 8-K attaching the PSAs for each Securitization were also filed with the SEC.  The dates on which the Prospectus Supplement and Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 4 below.

**Table 4**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| AABST 2005-5 | 11/1/2005 | 11/10/2005 | 333-124934 |
| AHM 2005-1 | 4/3/2006 | 4/7/2005 | 333-121581 |
| AHM 2005-4 | 10/11/2005 | 10/24/2005 | 333-125422 |
| ARSI 2006-M2 | 8/29/2006 | 9/13/2006 | 333-131895 |
| BALTA 2005-10 | 12/29/2005 | 1/17/2006 | 333-120916 |
| BALTA 2006-1 | 2/1/2006 | 2/15/2006 | 333-125422 |
| BALTA 2006-2 | 3/30/2006 | 10/13/2006 | 333-132232 |
| BALTA 2006-3 | 5/2/2006 | 10/11/2006 | 333-132232 |
| BALTA 2006-4 | 7/18/2006 | 7/17/2006 | 333-132232 |
| BSABS 2005-HE12 | 12/27/2005 | 1/13/2006 | 333-125422 |
| BSABS 2006-AQ1 | 12/1/2006 | 12/19/2006 | 333-131374 |
| BSABS 2006-HE2 | 2/24/2006 | 3/15/2006 | 333-125422 |
| BSABS 2006-HE4 | 4/27/2006 | 5/15/2006 | 333-131374 |
| BSABS 2006-HE5 | 5/25/2006 | 6/15/2006 | 333-131374 |
| BSABS 2006-HE7 | 8/30/2006 | 9/25/2006 | 333-131374 |
| BSABS 2006-HE8 | 10/30/2006 | 11/14/2006 | 333-131374 |
| BSABS 2006-HE9 | 12/1/2006 | 12/20/2006 | 333-131374 |
| BSABS 2006-HE10 | 1/3/2007 | 1/17/2007 | 333-131374 |
| BSABS 2007-FS1 | 3/1/2007 | 3/27/2007 | 333-131374 |
| BSABS 2007-HE1 | 1/31/2007 | 2/15/2007 | 333-131374 |
| BSABS 2007-HE2 | 2/28/2007 | 3/15/2007 | 333-131374 |
| BSABS 2007-HE3 | 4/2/2007 | 4/20/2007 | 333-131374 |

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| BSABS 2007-HE4 | 4/27/2007 | 5/24/2007 | 333-131374 |
| BSABS 2007-HE5 | 5/30/2007 | 6/15/2007 | 333-131374 |
| BSABS 2007-HE6 | 8/30/2007 | 9/19/2007 | 333-131374 |
| BSABS 2007-HE7 | 9/19/2007 | 10/5/2007 | 333-131374 |
| BSMF 2006-SL5 | 11/30/2006 | 12/20/2006 | 333-131374 |
| BSMF 2006-SL6 | 12/29/2006 | 1/17/2007 | 333-131374 |
| BSMF 2007-AR3 | 4/2/2007 | 4/16/2007 | 333-140247 |
| BSMF 2007-SL1 | 1/26/2007 | 2/20/2007 | 333-131374 |
| BSMF 2007-SL2 | 3/1/2007 | 8/7/2007 | 333-131374 |
| CBASS 2006-CB2 | 3/2/2006 | 3/16/2006 | 333-87146 |
| CBASS 2006-CB7 | 10/10/2006 | 10/20/2006 | 333-136741 |
| GPMF 2005-AR5 | 10/31/2005 | 11/15/2005 | 333-120916 |
| GPMF 2006-AR3 | 4/28/2006 | 5/15/2006 | 333-132232 |
| JPALT 2005-A2 | 12/28/2005 | 1/13/2006 | 333-127020 |
| JPALT 2007-A2 | 6/1/2007 | 6/15/2007 | 333-130192 |
| JPMAC 2005-FRE1 | 11/29/2005 | 1/4/2006[7] | 333-127020 |
| JPMAC 2005-OPT2 | 12/22/2005 | 1/4/2006 | 333-127020 |
| JPMAC 2005-WMC1 | 10/25/2005 | 11/7/2005 | 333-127020 |
| JPMAC 2006-ACC1 | 6/5/2006 | 6/19/2006 | 333-130192 |
| JPMAC 2006-CH1 | 11/13/2006 | 11/29/2006 | 333-130192 |
| JPMAC 2006-CH2 | 12/13/2006 | 12/29/2006 | 333-130192 |
| JPMAC 2006-CW1 | 5/31/2006 | 6/15/2006 | 333-130192 |
| JPMAC 2006-CW2 | 8/9/2006 | 8/23/2006 | 333-130192 |
| JPMAC 2006-FRE1 | 1/27/2006 | 2/14/2006 | 333-127020 |
| JPMAC 2006-FRE2 | 3/30/2006 | 4/13/2006 | 333-127020 |
| JPMAC 2006-HE1 | 3/1/2006 | 3/10/2006 | 333-127020 |
| JPMAC 2006-HE2 | 6/30/2006 | 7/17/2006 | 333-130192 |
| JPMAC 2006-HE3 | 11/13/2006 | 11/27/2006 | 333-130192 |
| JPMAC 2006-NC1 | 4/17/2006 | 5/12/2006 | 333-130192 |
| JPMAC 2006-NC2 | 8/21/2006 | 9/7/2006 | 333-130192 |
| JPMAC 2006-RM1 | 9/28/2006 | 10/12/2006 | 333-130192 |
| JPMAC 2006-WMC1 | 3/31/2006 | 4/14/2006 | 333-127020 |
| JPMAC 2006-WMC2 | 6/22/2006 | 7/13/2006 | 333-130192 |
| JPMAC 2006-WMC3 | 9/13/2006 | 9/29/2006 | 333-130192 |
| JPMAC 2006-WMC4 | 12/20/2006 | 1/4/2007 | 333-130192 |

[7]   No PSA was filed for the JPMAC 2005-FRE1 Securitization.  On this date, an 8-K referencing a PSA dated November 1, 2005 was filed with the SEC.

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| JPMAC 2007-CH2 | 3/16/2007 | 4/3/2007 | 333-130192 |
| JPMAC 2007-CH3 | 5/11/2007 | 5/30/2007 | 333-141607 |
| JPMAC 2007-CH4 | 6/15/2007 | 7/2/2007 | 333-141607 |
| JPMAC 2007-CH5 | 7/10/2007 | 7/27/2007 | 333-141607 |
| JPMMT 2006-A3 | 4/28/2006 | 5/12/2006 | 333-130192 |
| LBMLT 2005-3 | 9/6/2005 | 9/22/2005 | 333-109318 |
| LBMLT 2006-1 | 2/2/2006 | 2/22/2006 | 333-109318 |
| LBMLT 2006-2 | 3/2/2006 | 3/22/2006 | 333-109318 |
| LBMLT 2006-3 | 4/5/2006 | 4/21/2006 | 333-109318 |
| LBMLT 2006-4 | 5/5/2006 | 5/24/2006 | 333-131252 |
| LBMLT 2006-5 | 6/14/2006 | 6/30/2006 | 333-131252 |
| LBMLT 2006-6 | 7/25/2006 | 8/8/2006 | 333-131252 |
| LBMLT 2006-7 | 8/28/2006 | 9/13/2006 | 333-131252 |
| LBMLT 2006-8 | 9/18/2006 | 10/6/2006 | 333-131252 |
| LBMLT 2006-9 | 10/10/2006 | 10/27/2006 | 333-131252 |
| LBMLT 2006-10 | 11/7/2006 | 11/22/2006 | 333-131252 |
| LBMLT 2006-11 | 12/13/2006 | 12/29/2006 | 333-131252 |
| LBMLT 2006-WL1 | 1/26/2006 | 2/23/2006 | 333-109318 |
| LBMLT 2006-WL2 | 1/30/2006 | 2/14/2006 | 333-109318 |
| LBMLT 2006-WL3 | 1/30/2006 | 2/14/2006 | 333-109318 |
| LUM 2006-3 | 5/1/2006 | 8/24/2006 | 333-132232 |
| NCMT 2007-1 | 7/13/2007 | 8/1/2007 | 333-131374 |
| PCHLT 2005-4 | 10/25/2005 | 11/10/2005 | 333-125734 |
| SACO 2007-1 | 1/16/2007 | 2/2/2007 | 333-131374 |
| SACO 2007-2 | 3/1/2007 | 3/29/2007 | 333-131374 |
| SAMI 2006-AR4 | 7/5/2006 | 7/18/2006[8] | 333-132232 |
| WAMU 2007-OA3 | 3/26/2007 | 4/11/2007 | 333-130795 |
| WMABS 2006-HE1 | 4/19/2006 | 5/5/2006 | 333-130795 |
| WMABS 2006-HE3 | 9/26/2006 | 10/12/2006 | 333-130795 |
| WMABS 2006-HE4 | 10/26/2006 | 11/13/2006 | 333-130795 |
| WMABS 2006-HE5 | 12/5/2006 | 12/22/2006 | 333-130795 |
| WMABS 2007-HE1 | 1/16/2007 | 1/31/2007 | 333-130795 |
| WMABS 2007-HE2 | 3/9/2007 | 3/28/2007 | 333-130795 |
| WMALT 2005-9 | 10/26/2005 | 11/10/2005 | 333-103345 |
| WMALT 2005-10 | 11/28/2005 | 12/14/2005 | 333-103345 |

---

[8]   No PSA was filed for the SAMI 2006-AR4 Securitization.  On this date, an 8-K referencing an existing PSA dated June 1, 2006 was filed with the SEC.

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing Number of Related Registration Statement |
|---|---|---|---|
| WMALT 2006-AR4 | 5/26/2006 | 6/14/2006 | 333-130795 |
| WMALT 2006-AR5 | 6/27/2006 | 7/13/2006 | 333-130795 |
| WMALT 2006-AR8 | 9/28/2006 | 10/13/2006 | 333-130795 |
| WMALT 2006-AR9 | 10/25/2006 | 11/13/2006 | 333-130795 |
| WMALT 2007-OA1 | 1/25/2007 | 2/12/2007 | 333-130795 |
| WMALT 2007-OA2 | 2/23/2007 | 3/13/2007 | 333-130795 |
| WMALT 2007-OA3 | 3/27/2007 | 4/12/2007 | 333-130795 |
| WMHE 2007-HE1 | 1/16/2007 | 1/31/2007 | 333-130795 |
| WMHE 2007-HE2 | 4/6/2007 | 4/25/2007 | 333-130795 |
| WMHE 2007-HE3 | 5/9/2007 | 5/25/2007 | 333-141255 |
| WMHE 2007-HE4 | 6/12/2007 | 6/28/2007 | 333-141255 |

111. The Certificates were issued pursuant to the PSAs, and Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.[9]

112. Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich targeted Fannie Mae in Washington, DC and Freddie Mac in Virginia. Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich sent offering materials,

---

[9] J.P. Morgan Securities, BSC, and WaMu Capital were the selling underwriters for 96 of the Securitizations; for the remaining seven Securitizations, the selling underwriter was a non-party underwriter. The selling underwriter for each Securitization is reflected below in Table 11 and Table 12.

including the Prospectuses and Prospectus Supplements, to Fannie Mae in Washington, DC and

Freddie Mac in Virginia.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu

Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu

Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich knew that Fannie Mae

was located in the District of Columbia and that Freddie Mac was located in Virginia.

## II.    The Defendants' Participation in the Securitization Process

### A.    The Role of Each of the JPMorgan Defendants

113.    Each of the JPMorgan Defendants, including the JPMorgan Individual

Defendants, had a role in the securitization process and the marketing for most or all of the

Certificates issued in connection with the JPMorgan Securitizations, which included purchasing

the mortgage loans from the originators, structuring the Securitizations, selling the mortgage

loans to the depositor, transferring the mortgage loans to the trustee on behalf of the

Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates,

and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

114.    With respect to each JPMorgan Securitization, the depositor, underwriters, and

Individual Defendants who signed the Registration Statement, as well as the JPMorgan

Defendants who exercised control over their activities, are liable, jointly and severally, as

participants in the registration, issuance and offering of the Certificates, including issuing,

causing, or making materially misleading statements in the Registration Statement, and omitting

material facts required to be stated therein or necessary to make the statements contained therein

not misleading.

#### 1.    J.P. Morgan Acquisition

115.    J.P. Morgan Acquisition has been involved in the securitization of a variety of

assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, J.P. Morgan

Acquisition securitized approximately $545 million, $4.5 billion, $24.1 billion, and $40.6 billion of residential mortgage loans, respectively.

116.    Defendant J.P. Morgan Acquisition was the sponsor of 27 of the 103 Securitizations.  In that capacity, J.P. Morgan Acquisition determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  J.P. Morgan Acquisition also selected the depositor that would be used to transfer the mortgage loans from J.P. Morgan Acquisition to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

117.    For the 27 Securitizations that it sponsored, J.P. Morgan Acquisition also conveyed the mortgage loans to the depositor for each Securitization pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.  In these agreements, J.P. Morgan Acquisition made certain representations and warranties to the depositor regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

### 2.    J.P. Morgan Acceptance

118.    Defendant J.P. Morgan Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation in 1988.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in

such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

119.     J.P. Morgan Acceptance was the depositor for 27 of the 103 Securitizations.  In its capacity as depositor, J.P. Morgan Acceptance purchased the mortgage loans from the sponsor pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement, as applicable.  J.P. Morgan Acceptance then sold, transferred, or otherwise conveyed the loans to be securitized to the trusts.  J.P. Morgan Acceptance, together with the other JPMorgan Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.     J.P. Morgan Securities

120.     Defendant J.P. Morgan Securities was the lead underwriter for 30 of the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of Certificates to Fannie Mae and Freddie Mac and other investors.  J.P. Morgan Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 4.     JPMorgan Chase and JPMorgan Bank

121.     JPMorgan Chase and JPMorgan Bank employed their wholly-owned subsidiaries, J.P. Morgan Acquisition (direct subsidiary of JPMorgan Bank), J.P. Morgan Securities (direct subsidiary of JPMorgan Chase), and J.P. Morgan Acceptance (direct subsidiary of J.P. Morgan Securities Holdings LLC, which is, in turn, a direct subsidiary of JPMorgan Chase), in key steps of the securitization process.  Unlike typical arms' length securitizations, the JPMorgan

52

Securitizations involved various J.P. Morgan subsidiaries and affiliates at virtually each step in the chain. With respect to all 27 of the JPMorgan Securitizations, the sponsor was J.P. Morgan Acquisition, the depositor was J.P. Morgan Acceptance, and the lead underwriter was J.P. Morgan Securities.

122.    As the sole owner of J.P. Morgan Securities and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions of J.P. Morgan Securities and J.P. Morgan Acceptance related to the Securitizations, and in fact exercised such direction and control over the activities of J.P. Morgan Securities and J.P. Morgan Acceptance related to the issuance and sale of the Certificates.

123.    As the sole owner of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition related to the Securitizations, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition related to the issuance and sale of the Certificates.

124.    JPMorgan Chase and JPMorgan Bank expanded their share of the residential mortgage-backed securitization market to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

### 5.    The JPMorgan Individual Defendants

125.    Defendant David M. Duzyk served as a President (Principal Executive Officer) of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.   According to William Buell, former Managing Director at J.P. Morgan Securities, David M. Duzyk was also employed by J.P. Morgan Securities and was responsible for the due diligence of loan files prior to securitization. *See* "William Buell. JPMorgan Chase," FCIC at Stanford Law School Resource Library (Sept.

53

15, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.  Mr. Duzyk signed the

Shelf Registration Statements under file numbers 333-130192, 333-127020, and 333-141607

filed with the SEC on December 7, 2005, July 29, 2005, and March 27, 2007, respectively, and

the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates

noted in Table 3 below, and on information and belief, did so in New York.  These Shelf

Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

126.    Defendant Louis Schioppo, Jr. served as a Controller and Chief Financial Officer

(Principal Financial and Accounting Officer) of Defendant J.P. Morgan Acceptance Corporation

I at the time of the Securitizations and upon information and belief worked in New York, NY.

Mr. Schioppo, Jr. signed the Shelf Registration Statements under file numbers 333-130192, 333-

127020 and 333-141607 filed with the SEC on December 7, 2005, July 29, 2005 and March 27,

2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC

on or about the dates noted in Table 3 below, and on information and belief, did so in New York.

These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3

below.

127.    Defendant Christine E. Cole served as a Director of Defendant J.P. Morgan

Acceptance Corporation I at the time of the Securitizations and upon information and belief

worked in New York, NY.  Defendant Christine E. Cole also served as the co-head of securitized

products of JPMorgan at the time of the Securitizations.  Ms. Cole signed the Shelf Registration

Statements under file numbers 333-130192, 333-127020, and 333-141607 filed with the SEC on

December 7, 2005, July 29, 2005,  and March 27, 2007, respectively, and the related pre-

effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3

below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

128.    Defendant Edwin F. McMichael served as a Director of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. McMichael signed the Shelf Registration Statements under file numbers 333-130192, 333-127020, and 333-141607 filed with the SEC on December 7, 2005, July 29, 2005, and March 27, 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

129.    Defendant William A. King served as a President (Principal Executive Officer) and Director of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Defendant William A. King also served as a Director of J.P. Morgan Securities and the co-head of securitized products of JPMorgan at the time of Securitizations.  Mr. King signed the Shelf Registration Statement under file number 333-141607 filed with the SEC on March 27, 2007 and the related pre-effective amendment to the Shelf Registration Statements filed under numbers 333-141607 and 333-127020 on Form S-3/A filed with the SEC on or about the date noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

130.    Defendant Brian Bernard served as a President of Defendant J.P. Morgan Acceptance Corporation I at the time of the Securitizations and upon information and belief worked in New York, NY.  Mr. Bernard signed the Shelf Registration Statement under file

number 333-141607 filed with the SEC on March 27, 2007 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the date noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### B.      The Role of Each of the Bear Stearns Entities

131.      Each of the Bear Stearns Entities, including the Bear Stearns Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the Bear Stearns Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

132.      With respect to each Bear Stearns Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Bear Stearns Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.      EMC

133.      EMC has been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, EMC securitized approximately $20.9 billion, $48.4 billion, $74.5 billion, and $69.1 billion of residential mortgage loans, respectively.

134.    Defendant EMC was the sponsor of 32 of the 103 Securitizations.  In that capacity, EMC determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  EMC also selected the depositor that would be used to transfer the mortgage loans from EMC to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

135.    For the 32 Securitizations that it sponsored, EMC also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.  In these agreements, EMC made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

### 2.    SAMI and BSABS

136.    Defendants SAMI and BSABS have been engaged in the securitization of mortgage loans as depositors since their incorporations in 2003 and 2004, respectively.  They are special purpose entities formed for the solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

137.    Defendants SAMI and BSABS were the depositors for 9 and 26 of the 103 Securitizations, respectively.  In their capacity as depositors, SAMI and BSABS purchased the

57

mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement, Stock and

Mortgage Loan Purchase Agreement, or Assignment Agreement, as applicable. SAMI and

BSABS then sold, transferred, or otherwise conveyed the loans to be securitized to the trusts.

SAMI and BSABS, together with the other Bear Stearns Defendants, were also responsible for

preparing and filing the Registration Statements pursuant to which the Certificates were offered

for sale. The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and

issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie

Mac.

### 3.     BSC and J.P. Morgan Securities as Successor to BSC

138.    Defendant J.P. Morgan Securities is the successor-in-interest to BSC pursuant to

the Merger.

139.    Defendant BSC was the lead underwriter for 38 of the Securitizations. In that

role, it was responsible for underwriting and managing the offer and sale of Certificates to

Fannie Mae and Freddie Mac and other investors. BSC was also obligated to conduct

meaningful due diligence to ensure that the Registration Statements did not contain any material

misstatements or omissions, including the manner in which the underlying mortgage loans were

originated, transferred, and underwritten.

### 4.     JPMorgan Chase as Successor to BSI

140.    Defendant JPMorgan Chase is the successor-in-interest to BSI pursuant to the

Merger.

141.    BSI employed its wholly-owned subsidiaries, EMC, SAMI, BSABS, and BSC, in

key steps of the securitization process. Unlike typical arms' length securitizations, many of the

Bear Stearns Securitizations involved various Bear Stearns subsidiaries and affiliates at virtually

each step in the chain.  With respect to all 32 of the Bear Stearns Securitizations, the sponsor was

EMC, the depositor was SAMI or BSABS, and the lead underwriter was BSC.

142.    As the sole owner of EMC, SAMI, BSABS, and BSC, BSI had the practical

ability to direct and control the actions of EMC, SAMI, BSABS, and BSC related to the

Securitizations, and in fact exercised such direction and control over the activities of EMC,

SAMI, BSABS, and BSC related to the issuance and sale of the Certificates.

143.    BSI expanded its share of the residential mortgage-backed securitization market

to increase revenue and profits.  The push to securitize large volumes of mortgage loans

contributed to the inclusion of untrue statements of material facts and omissions of material facts

in the Registration Statements.

### 5.    The Bear Stearns Individual Defendants

144.    Defendant Matthew E. Perkins served as a President (Principal Executive Officer)

and Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the

Securitizations and upon information and belief worked in New York, NY.  Mr. Perkins signed

the Shelf Registration Statements under file numbers 333-125422 and 333-131374, filed with the

SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective

amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below,

and on information and belief, did so in New York.  These Shelf Registration Statements were

filed on behalf of the Securitizations noted in Table 3 below.

145.    Defendant Joseph T. Jurkowski, Jr. served as a Vice President of Defendant Bear

Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information

and belief worked in New York, NY.  Mr. Jurkowski signed the pre-effective amendments on

Form S-3/A filed with the SEC to the Securitizations registered pursuant to the Shelf

Registration Statements under file numbers 333-125422 and 333-131374 with the SEC on or

about the dates noted in Table 3 below, and on information and belief, did so in New York. These pre-effective amendments to the Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

146.     Defendant Samuel L. Molinaro, Jr. served as a Treasurer (Principal Financial and Accounting Officer) and Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY. Defendant Samuel L. Molinaro, Jr. also served as Chief Financial Officer and Director of BSC at the time of the Securitizations.  Mr. Molinaro, Jr. signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374, filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

147.     Defendant Thomas F. Marano served as a Director of both Defendants Bear Stearns Asset Backed Securities I LLC and Structured Asset Mortgage Investments II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY. Defendant Thomas F. Marano also served as a Director of EMC and BSC at the time of the Securitizations.  Mr. Marano signed the Shelf Registration Statements under file numbers 333-140247, 333-125422, 333-132232, 333-120916, and 333-131374 filed with the SEC on January 26, 2007, June 1, 2005, March 6, 2006, December 1, 2004, and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

148.    Defendant Kim Lutthans served as an Independent Director of Defendant Bear Stearns Asset Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Ms. Lutthans signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374 filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

149.    Defendant Katherine Garniewski served as an Independent Director of Defendant Bear Sterns Asset-Backed Securities I LLC at the time of the Securitizations and upon information and belief worked in New York, NY.  Ms. Garniewski signed the Shelf Registration Statements under file numbers 333-125422 and 333-131374 filed with the SEC on June 1, 2005 and January 30, 2006, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

150.    Defendant Jeffrey Mayer served as a Director of Defendants Bear Sterns Asset-Backed Securities I LLC and Structured Asset Mortgage Investments II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Defendant Jeffrey Mayer also served as a Director of EMC and BSC at the time of the Securitizations.  Mr. Mayer signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916, filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or

61

about the dates noted in Table 3 below, and on information and belief, did so in New York. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

151.     Defendant Jeffrey L. Verschleiser served as President (Principal Executive Officer) of Defendant Structured Asset Management II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Defendant Jeffrey L. Verschleiser also served as a Director of BSC at the time of the Securitizations.  Mr. Verschleiser signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916 filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

152.     Defendant Michael B. Nierenberg served as a Treasurer (Principal Accounting and Financial Officer) of Defendant Structured Asset Management II Inc. at the time of the Securitizations and upon information and belief worked in New York, NY.  Defendant Michael B. Nierenberg also served as a Director of BSC at the time of the Securitizations.  Mr. Nierenberg signed the Shelf Registration Statements under file numbers 333-140247, 333-132232, and 333-120916 filed with the SEC on January 26, 2007, March 6, 2006, and December 1, 2004, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### C.   The Role of Each of the WaMu Entities

153.   Each of the WaMu Entities, including the WaMu Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the WaMu Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

154.   With respect to each WaMu Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the WaMu Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.   JPMorgan Bank as Successor to WaMu Bank

155.   Defendant JPMorgan Bank is the successor-in-interest to WaMu Bank pursuant to the PAA.

156.   WaMu Bank has been involved in the securitization of a variety of assets since its incorporation.  During the 2004, 2005 and 2006 fiscal years, WaMu Bank securitized approximately $34.7 billion, $71.6 billion, and $70.8 billion of residential mortgage loans, respectively.

157.   WaMu Bank was the sponsor or co-sponsor of 12 of the 103 Securitizations.   In that capacity, WaMu Bank determined the structure of the Securitizations, initiated the

Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates. WaMu Bank also selected the depositor that would be used to transfer the mortgage loans from WaMu Bank to the trusts, and selected the underwriter for the Securitizations. In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

158.    For the 12 Securitizations that it sponsored or co-sponsored, WaMu Bank also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement. In these agreements, WaMu Bank made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates. These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

159.    Further, WaMu Bank employed its wholly-owned subsidiaries, WaMu Securities, WaMu Acceptance, and WaMu Capital in key steps of the securitization process. Unlike typical arms' length securitizations, many of the WaMu Securitizations involved various WaMu subsidiaries and affiliates at virtually each step in the chain. With respect to 20 of the 26 WaMu Securitizations, the sponsor was WaMu Bank or WaMu Securities, the depositor was WaMu Securities or WaMu Acceptance, and the lead underwriter was WaMu Capital.

160.    As the sole owner of WaMu Securities, WaMu Acceptance, and WaMu Capital, WaMu Bank had the practical ability to direct and control the actions of WaMu Securities, WaMu Acceptance, and WaMu Capital related to the Securitizations, and in fact exercised such

direction and control over the activities of WaMu Securities, WaMu Acceptance, and WaMu Capital related to the issuance and sale of the Certificates.

161.    WaMu Bank expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

## 2.    WaMu Securities

162.    WaMu Securities has been involved in the securitization of a variety of assets since its incorporation.  During the 2003, 2004, 2005 and 2006 fiscal years, WaMu Securities purchased approximately $26.1 billion, $10.8 billion, $11.3 billion, and $24.9 billion of residential mortgage loans, respectively, and securitized approximately $8.5 billion, $1.0 billion, $7.1 billion, and $17.1 billion of residential mortgage loans, respectively.

163.    Defendant WaMu Securities was the sponsor or co-sponsor of 15 of the 103 Securitizations.  In that capacity, WaMu Securities determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  WaMu Securities also selected the depositor that would be used to transfer the mortgage loans from WaMu Securities to the trusts, and selected the underwriter for the Securitizations.  In its role as sponsor, WaMu Securities knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

164.    For the 15 Securitizations that it sponsored or co-sponsored, WaMu Securities also conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage

Loan Purchase Agreement or Mortgage Loan Sale Agreement.  In these agreements, WaMu Securities made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

165.    Defendant WaMu Securities also acted as its own depositor from 1979 until 2005.  In this role, it engaged in purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

166.    WaMu Securities was the depositor for two of the 103 Securitizations.  In its capacity as depositor, WaMu Securities sold, transferred, or otherwise conveyed the loans to be securitized to the trusts.  WaMu Securities, together with the other WaMu Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.    WaMu Acceptance

167.    Defendant WaMu Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

66

168.     Defendant WaMu Acceptance was the depositor for 18 of the 103 Securitizations. In its capacity as depositor, WaMu Acceptance purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement, as applicable.  WaMu Acceptance then sold, transferred, or otherwise conveyed the loans to be securitized to the trusts.  WaMu Acceptance, together with the other WaMu Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 4.     WaMu Capital

169.     Defendant WaMu Capital was the lead underwriter for 31 of the Securitizations. In that role, it was responsible for underwriting and managing the offer and sale of Certificates to Fannie Mae and Freddie Mac and other investors.  WaMu Capital was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 5.     The WaMu Individual Defendants

170.     Defendant Richard Careaga served as a First Vice President of WaMu Asset Acceptance Corporation at the time of the Securitizations.  Defendant Richard Careaga also served as Secretary of WaMu Capital at the time of the Securitizations.  Mr. Careaga signed the Shelf Registration Statement under file number 333-130795 filed with the SEC on December 30, 2005 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

67

171.    Defendant David Beck served as a Director and President (Principal Executive Officer) of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations. Defendant David Beck also served as Senior Vice President of Long Beach Mortgage at the time of the Securitizations.  Mr. Beck signed the Shelf Registration Statements under file numbers 333-130795 and 333-141255 filed with the SEC on December 30, 2005 and March 13 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

172.    Defendant Diane Novak served as a Director of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations.  Ms. Novak signed the Shelf Registration Statements under file numbers 333-130795 and 333-141255 filed with the SEC on December 30, 2005 and March 13 2007, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

173.    Defendant Rolland Jurgens served as a Controller of Defendants Long Beach Securities Corporation and WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Jurgens signed the Shelf Registration Statement under file numbers 333-130795 filed with the SEC on December 30, 2005 and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  Mr. Jurgens also signed the pre-effective amendment filed with the SEC on March 21, 2006 for the Shelf Registration Statement under file number 333-131252.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

174.     Defendant Thomas G. Lehmann served as Director and President of Defendant WaMu Asset Acceptance Corporation and as First Vice President, Director and Senior Counsel of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.  Mr. Lehmann signed the Shelf Registration Statements under file numbers 333-141255 and 333-103345 filed with the SEC on March 13, 2007 and February 20, 2003, respectively, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

175.     Defendant Stephen Fortunato served as Chief Financial Officer of Defendants Long Beach Securities Corporation and WaMu Asset Acceptance Corporation at the time of the Securitizations.  Mr. Fortunato signed the Shelf Registration Statement under file number 333-141255 filed with the SEC on March 13, 2007, and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  Mr. Fortunato also signed the pre-effective amendments filed with the SEC on March 21, 2006 and March 31, 2006 for the Shelf Registration Statement under file number 333-131252.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

176.     Defendant Donald Wilhelm served as Controller of Defendant WaMu Asset Acceptance Corporation at the time of the Securitizations.  Defendant Donald Wilhelm also served as Treasurer of WaMu Capital at the time of the Securitizations.  Mr. Wilhelm signed the Shelf Registration Statement under file number 333-141255 filed with the SEC on March 13, 2007, and the related pre-effective amendment on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitization noted in Table 3 below.

177.     Defendant Marc K. Malone served as a First Vice President and Controller (Principal Accounting Officer) of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.   Mr. Malone signed the Shelf Registration Statement under file number 333-103345 filed with the SEC on February 20, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the date noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

178.     Defendant Michael L. Parker served as a Director and President of Defendant Washington Mutual Mortgage Securities Corporation at the time of the Securitizations.   Mr. Parker signed the Shelf Registration Statement under file number 333-103345 filed with the SEC on February 20, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the date noted in Table 3 below.  These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### D.     The Role of Each of the Long Beach Entities

179.     Each of the Long Beach Entities, including the Long Beach Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates issued in connection with the Long Beach Securitizations, which included purchasing the mortgage loans from the originators, structuring the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

180.     With respect to each Long Beach Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Long Beach Defendants who exercised control over their activities, are liable, jointly and severally, as

70

participants in the registration, issuance and offering of the Certificates, including issuing,

causing, or making materially misleading statements in the Registration Statement, and omitting

material facts required to be stated therein or necessary to make the statements contained therein

not misleading.

### 1. JPMorgan Bank as Successor to WaMu Bank and Long Beach Mortgage

181.    Defendant JPMorgan Bank is the successor-in-interest to WaMu Bank pursuant to

the PAA.  WMI and then WaMu Bank operated Long Beach Mortgage as a wholly-owned

subsidiary until closing it down in 2007.

182.    Long Beach Mortgage had been involved in the securitization of a variety of

assets since its incorporation.  During the 2003, 2004, and 2005 fiscal years, Long Beach

Mortgage securitized approximately $6.0 billion, $13.3 billion, and $15.4 billion of residential

mortgage loans, respectively.

183.    Long Beach Mortgage was the sponsor of nine of the 103 Securitizations.   In that

capacity, Long Beach Mortgage determined the structure of the Securitizations, initiated the

Securitizations, purchased the mortgage loans to be securitized, determined distribution of

principal and interest, and provided data to the credit rating agencies to secure investment grade

ratings for the GSE Certificates.  Long Beach Mortgage also selected the depositor that would be

used to transfer the mortgage loans from Long Beach Mortgage to the trusts, and selected the

underwriter for the Securitizations.  In its role as sponsor, Long Beach Mortgage knew and

intended that the mortgage loans it purchased would be sold in connection with the securitization

process, and that certificates representing such loans would be issued by the relevant trusts.

184.    For the nine Securitizations that it sponsored, Long Beach Mortgage also

conveyed the mortgage loans to the depositor for each Securitization pursuant to a Mortgage

Loan Purchase Agreement.  In these agreements, Long Beach Mortgage made certain representations and warranties to the depositors regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by the depositor to the trustee for the benefit of the Certificateholders.

185.    Further, WaMu Bank employed its wholly-owned subsidiary, Long Beach Securities, in key steps of the securitization process.  Unlike typical arms' length securitizations, the Long Beach Securitizations involved various Long Beach subsidiaries and affiliates at virtually each step in the chain.  With respect to 11 of the Securitizations, the sponsor was WaMu Bank or Long Beach Mortgage, the depositor was Long Beach Securities, and the lead underwriter was WaMu Capital.

186.    As the sole owner of Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of Long Beach Securities related to the Securitizations, and in fact exercised such direction and control over the activities of Long Beach Securities related to the issuance and sale of the Certificates.

187.    Long Beach Mortgage expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

### 2.    Long Beach Securities

188.    Defendant Long Beach Securities has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such

mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

189.    Defendant Long Beach Securities was the depositor for 15 of the 103 Securitizations.  In its capacity as depositor, Long Beach Securities purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement, as applicable.  Long Beach Securities then sold, transferred, or otherwise conveyed the loans to be securitized to the trusts.  Long Beach Securities, together with the other Long Beach Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.      The Long Beach Individual Defendants

190.    Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank at the time of the Securitizations.  Mr. Zielke signed the pre-effective amendments on Form S-3/A filed with the SEC to the Securitizations registered pursuant to the Shelf Registration Statements under file numbers 333-131252 and 333-109318 with the SEC on or about the dates noted in Table 3 below, and on information and belief, did so in New York. These pre-effective amendments to the Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

191.    Defendant Thomas W. Casey served as a Director of Defendant Long Beach Securities Corporation at the time of the Securitizations.  Defendant Thomas W. Casey also served as a Director and Executive Vice President of Long Beach Mortgage at the time of the Securitizations.  Mr. Casey signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on January 24, 2006, and the related pre-effective amendments on

Form S-3/A filed with the SEC on or about the dates noted in Table 3 below.  These Shelf

Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

192.    Defendant John F. Robinson served as a Director of Defendant Long Beach

Securities Corporation at the time of the Securitizations.  Defendant John F. Robinson also

served as a Director of Long Beach Mortgage at the time of the Securitizations.  Mr. Robinson

signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on

January 24, 2006, and the related pre-effective amendments on Form S-3/A filed with the SEC

on or about the dates noted in Table 3 below.  These Registration Statements were filed on behalf

of the Securitizations noted in Table 3 below.

193.    Defendant Keith Johnson served as a Director and President of Defendant Long

Beach Securities Corporation at the time of the Securitizations.  Defendant Keith Johnson also

served as a Director and Senior Vice President of Long Beach Mortgage at the time of the

Securitizations.  Mr. Johnson signed the Shelf Registration Statement under file number 333-

131252 filed with the SEC on January 24, 2006, filed with the SEC.  This Shelf Registration

Statement was filed on behalf of the Securitizations noted in Table 3 below.

194.    Defendant Suzanne Krahling served as a Chief Financial Officer and Senior Vice

President of Defendant Long Beach Securities Corporation at the time of the Securitizations.

Ms. Krahling signed the Shelf Registration Statement under file number 333-131252 filed with

the SEC on January 24, 2006, filed with the SEC.  This Shelf Registration Statement was filed on

behalf of the Securitizations noted in Table 3 below.

195.    Defendant Larry Breitbarth served as a Controller and Senior Vice President of

Defendant Long Beach Securities Corporation at the time of the Securitizations.  Mr. Breitbarth

signed the Shelf Registration Statement under file number 333-131252 filed with the SEC on

January 24, 2006, filed with the SEC. This Registration Statement was filed on behalf of the Securitizations noted in Table 3 below.

196.     Defendant Art Den Heyer served as a Controller and Assistant Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations. Mr. Heyer signed the Shelf Registration Statement under file number 333-109318 filed with the SEC on September 30, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below. These Shelf Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

197.     Defendant Stephen Lobo served as a Treasurer and Senior Vice President of Defendant Long Beach Securities Corporation at the time of the Securitizations. Mr. Lobo signed the Shelf Registration Statement under file number 333-109318 filed with the SEC on September 30, 2003, and the related pre-effective amendments on Form S-3/A filed with the SEC on or about the dates noted in Table 3 below. These Registration Statements were filed on behalf of the Securitizations noted in Table 3 below.

### E.     The Other Underwriter Defendants

198.     Defendants Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich were the seller underwriters for one of the 103 Securitizations each. In that role, each was responsible for selling the Certificates to Fannie Mae and Freddie Mac and other investors.

199.     The Other Underwriter Defendants were also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### F.        Defendants' Failure To Conduct Proper Due Diligence

200.    The Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

201.    Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, J.P. Morgan Acceptance, BSABS, SAMI, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as the depositors, were paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and J.P. Morgan Securities, BSC, and WaMu Capital, as the underwriters, were paid a commission based on the amount they received from the sale of the Certificates to the public.  Moreover, because none of the Defendants assumed the credit risk of the underlying mortgage loans becoming delinquent or otherwise defaulting, there was little incentive to conduct full, complete, and meaningful due diligence of the statements in the Registration Statements relating to the underlying mortgage loans.

202.    The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate due diligence or otherwise to ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

203.    For instance, Defendants retained third-parties, including Clayton Holdings, Inc. ("Clayton") and The Bohan Group, Inc. ("Bohan"), to analyze the loans they were considering placing in their securitizations, but waived a significant number of loans into the securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to

76

ensure that these loans had in fact been underwritten in accordance with applicable guidelines or

had compensating factors that excused the loans' non-compliance with those guidelines.  On

January 27, 2008, Clayton revealed that it had entered into an agreement with the New York

Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence

reports, including copies of the actual reports provided to its clients.  According to *The New York*

*Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a

significant deterioration of lending standards and a parallel jump in lending expectations" and

"some investment banks directed Clayton to halve the sample of loans it evaluated in each

portfolio."

204.    JPMorgan, Bear Stearns, WaMu, and Long Beach were negligent in allowing into

the Securitizations a substantial number of mortgage loans that, as reported to them by third-

party due diligence firms, did not conform to the underwriting standards stated in the applicable

registration statements, including prospectuses and prospectus supplements.  Even upon learning

from the third-party due diligence firms that there were high percentages of defective or at least

questionable loans in the sample of loans reviewed by the third-party due diligence firms,

JPMorgan, Bear Stearns, WaMu, and Long Beach failed to exclude many of these loans from the

Securitizations.  They also failed to take any additional steps to verify that the population of

loans in the Securitizations did not include a similar percentage of defective and/or questionable

loans.

205.    The Financial Crisis Inquiry Commission (the "FCIC")[10] found that in the period

from the first quarter of 2006 to the second quarter of 2007, 27 percent, 16 percent, 27 percent,

---

[10]    The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and
Recovery Act of 2009, and was established to examine the causes, domestic and global, of the
current financial and economic crisis in the United States.

and 9 percent of the mortgage loans JPMorgan, Bear Stearns/EMC, WaMu Bank, and WaMu

Securities submitted, respectively, to Clayton to review in RMBS loan pools were rejected by

Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that

Clayton found defective, 51 percent, 42 percent, 29 percent, and 50 percent of the loans were

subsequently waived in by JPMorgan, Bear Stearns/EMC, WaMu Bank, and WaMu Securities

without proper consideration and analysis of compensating factors and included in

securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.[11]

206.    As disclosed in a report as part of the NYAG's ongoing investigation of

investment banking misconduct in underwriting mortgage-backed securities, Clayton routinely

provided investment banks with detailed reports of loans that were not compliant with

underwriting guidelines, but the investment banks, including JPMorgan, Bear Stearns, and

WaMu, routinely overrode the exclusion of a significant percentage of rejected loans from

purchase and securitization.

### 1.    The JPMorgan Defendants

207.    Many of the mortgage loans underlying the J.P. Morgan-sponsored and -deposited

Securitizations were originated by non-party Chase Home Finance LLC ("CHF"), the home

mortgage division of Defendant JPMorgan Bank.  CHF originated far more of the mortgage

loans underlying the JPMorgan Securitizations than any other originator.  For six trusts, CHF

was responsible for as many as 100 percent of the underlying mortgage loans.  Specifically,

JPMorgan Bank, through CHF, originated all the loans in the following Securitizations: JPMAC

---

[11]    *See The Financial Crisis Inquiry Report*, at 167, Jan. 2011, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.  *See also* Clayton Trending Reports, available at http://fcic.law.Stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

2006-CH1, JPMAC 2006-CH2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, and

JPMAC 2007-CH5.

208.    By 2007, CHF was one of top overall mortgage originators by volume in the

United States with an 8.6 percent market share.  CHF was also one of the top overall subprime

mortgage originators by volume in the United States in 2007 with a 6.0 percent market share.

209.    J.P. Morgan Securities was, in turn, one of the largest issuers of private mortgage-

backed securities in 2007 with a 5.7 market share.  From 2000 to 2007, JPMorgan increased its

volume of subprime RMBS issuances from negligible to $11.4 billion, with a total issuance of

$22.8 billion from 2005-2007, or the eleventh largest in the United States.

210.    Despite this aggressive growth in mortgage lending and securitization, JPMorgan

performed increasingly cursory due diligence on the loans it securitized.  For example, William

Buell, former Managing Director of the Contract Finance Group at J.P. Morgan Securities, which

was responsible for evaluating and purchasing residential loans in a whole loan format, stated

during an FCIC interview that J.P. Morgan Securities had only a small due diligence team of no

more than five or six staff members.  This small team was primarily responsible for the due

diligence of up to $2 billion in loans per month.  *See* "William Buell. JPMorgan Chase," FCIC at

Stanford Law School Resource Library (Sept. 15, 2010), *available at*

http://fcic.law.stanford.edu/resource/interviews.

211.    The Federal Reserve of New York concluded in an April 15, 2008 report that

JPMorgan needed to "strengthen [its] exposure measurement and limit framework around

leveraged lending."  The report held that JPMorgan's "deterioration in the quality of the firm's

consumer portfolios" resulted from "loosened underwriting standards" and "shortcomings in

oversight and controls governing third party mortgage loan origination activities," as well as

"breakdowns in the 'originate to distribute' model, namely weak underwriting standards and investor concentration risk in collateralized loans obligations."  *See* "Annual Report of Inspection of JPMorgan Chase & Co.," Federal Reserve Bank of New York (Apr. 15, 2008), *available at* http://fcic.law.stanford.edu/documents/view/2097.

212.    CHF's departure from industry standards was confirmed by Jamie Dimon, CEO of JPMorgan Chase.  On January 13, 2010, Mr. Dimon testified under oath to the Financial Crisis Inquiry Commission ("FCIC") that "the underwriting standards in our mortgage business, for example, should have been higher, and we wish we had done an even better job in managing our leveraged lending and mortgage-backed securities exposures."  JPMorgan also "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios," admitted Dimon.  Dimon further testified that JPMorgan would, in the wake of the financial crisis, enhance its mortgage underwriting standards, "returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

213.    In his January 13, 2010 testimony, Mr. Dimon confirmed CHF's overreliance on third parties to originate loans, testifying that these broker-loans performed markedly worse: "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," admitting that "there were some unscrupulous mortgage salesmen and mortgage brokers.  And, you know, some people missold."  Mr. Dimon further added that, following the financial crisis, JPMorgan "also closed down all business originated by mortgage brokers.  Our worst mistake over the past several years was not doing this sooner."

214.     When asked whether JPMorgan conducted stress tests in order to prevent its exposure to these systemic risks and what risk management procedures were in place, Mr. Dimon replied:  "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]." Mr. Dimon further confirmed this failure of basic due diligence when he was later quoted as saying,"[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds."

215.     On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying."  This competition led to a reduction in diligence and oversight on the part of JPMorgan. Buell stated that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating."

216.     On September 1, 2010, JPMorgan's Chief Risk Officer Barry Zubrow told the FCIC that "there was a tradeoff between certain financial covenants and protections versus a desire to maintain market share."

217.     Furthermore, Reuters reported on May 13, 2010 that the SEC and U.S. prosecutors were conducting a broad investigation of JPMorgan and five other major Wall Street banks about whether they mislead investors about mortgage securities deals.  Criminal Probe Targets 6 Wall Street Firms: Source, *Reuters* (May 13, 2010).

218.     On February 9, 2012, state and federal authorities, including the Department of Justice, the Department of Housing and Urban Development, the Consumer Financial Protection

Bureau, and the State Attorneys General, announced that they had reached a settlement with JPMorgan Chase and four others banks relating to the abuse in origination, servicing, and foreclosure of residential mortgage loans. JPMorgan Chase's share of the total settlement value was $5.3 billion.

219.    On May 10, 2012, JPMorgan Chase filed a 10-Q stating that the SEC had advised JPMorgan that it was considering recommending further civil or administrative actions as a result of two separate investigations the SEC was conducting. The 10-Q reported that

> [T]he Firm has also received, and responded to, a number of subpoenas and informal requests for information from federal and state authorities concerning mortgage-related matters, including inquiries concerning a number of transactions involving the Firm's origination and purchase of whole loans, underwriting and issuance of MBS, treatment of early payment defaults and potential violations of securitization representations and warranties, reserves and due diligence in connection with securitizations. In January 2012, the Firm was advised by SEC staff that they are considering recommending to the Commission that civil or administrative actions be pursued arising out of two separate investigations they have been conducting.

220.    The 10-Q filed by JPMorgan Chase stated that the first investigation involved potential claims against J.P. Morgan Securities and J.P. Morgan Acceptance over due diligence conducted for two mortgage-backed securitizations and their corresponding disclosures. The second investigation involved potential claims against the Bear Stearns entities, JPMorgan Chase, and J.P. Morgan Securities relating to "settlements of claims against originators involving loans included in a number of Bear Stearns securitizations."

## 2.    The Bear Stearns Entities

221.    Bear Stearns also sacrificed due diligence and process controls in order to both increase its volume of mortgage originations and hasten its delivery of mortgage loans to the RMBS market. By 2007, EMC was one of the top overall subprime mortgage originators by volume in the United States with a 4.1 percent market share. BSC was, in turn, one of the largest

issuers of private mortgage-backed securities in 2007 with a 6.8 percent market share.  From 2005-2007, Bear Stearns' total volume of subprime RMBS issuances was $37.4 billion, or the sixth largest in the United States.

222.     The statements of confidential witnesses confirm that Bear Stearns demonstrated a rampant disregard for its underwriting guidelines and effective due diligence controls in its pursuit of greater loan origination volume.  Confidential Witness 1 ("CW1"), a former senior underwriter for Bear Stearns Residential Mortgage ("BSRM") (an affiliate of Bear Stearns that originated loans collateralizing many of the Bear Stearns Certificates) during the relevant time period, stated that many of the loans presented for underwriting had already been reviewed and processed several times.  Supervisors pressured CW1 to push the loans through.  If CW1 declined to approve a loan, supervisors insisted that CW1 was not following guidelines.  CW1 stated that many of the loans should have been declined because they had unreasonable stated incomes or the income was not verified, but CW1 was forced to approve the loans regardless.  If an underwriter questioned the income statements, supervisors would question the underwriter's adherence to the guidelines and threaten to fire them.

223.     Confidential Witness 2 ("CW2"), another former underwriter for Bear Stearns Residential Mortgage during the relevant time period, confirms that underwriters were not permitted to investigate or question an applicant's ability to pay back the loan.  The underwriters in CW2's office were told to approve the loans and to not perform any due diligence as this would upset the loan brokers.  These instructions came from senior management.  If CW2 refused to approve a loan, the loan would be elevated to someone more senior who would approve the loan.  Further, CW2 believed that many of the loan applications contained fraudulent documents.  CW2 believed that these fraudulent documents were coming from the broker level,

but the underwriters were only permitted to perform a limited amount of due diligence.  The underwriters in CW2's office complained that there wasn't a loan that BSRM didn't like.

224.    Management at Bear Stearns grew concerned that the company was failing to maintain due diligence controls adequate to monitor the underwriting quality of the loans it was securitizing.  John Mongelluzo, head of Bear Stearns' due diligence department, issued numerous warnings to Bear Stearns beginning in 2005.  Mongelluzo repeatedly implored the heads of Bear Stearns' mortgage finance department, Mary Haggerty and Baron Silverstein, to revise due diligence protocols by, for example, ranking loans and subjecting higher risk loans to more scrutiny, such as being re-underwritten by more seasoned underwriters.  Mongelluzo also advised that Bear Stearns should enact a policy to "track loans that are overridden by our due diligence managers and track the performance of 'exception' loans to those that passed due diligence inspection."  Mongelluzo again warned the company in March 2007 that Bear Stearns needed "to completely revamp how we do due diligence."  His proposals were rejected by the company.[12]

225.    Stephanie Paduano, a member of Bear Stearns' internal audit department, also warned executive management about the dangers of reduced due diligence.  In March 2006, she sent internal audit reports specifying the need to establish and enhance quality control, failures which had resulted in the purchase of numerous patently defective loans.  Like Mongelluzo, Ms. Paduano's warnings also fell on deaf ears.

---

[12]    *See Ambac Assur. Corp. v. EMC Mortg. Corp.*, (S.D.N.Y. 2011), Docket # 117 (filed Jan. 20, 2011) (proposed amended complaint citing e-mail from John Mongelluzzo (BSC, Vice President of Due Diligence) to Mary Haggerty (BSC, Senior Managing Director, Co-Head Mortgage Finance) and Baron Silverstein (BSC, Senior Managing Director, Co-Head Mortgage Finance), among others, dated March 6, 2007).

226.     Bear Stearns instead sought to avoid any meaningful due diligence as a way of securitizing as many loans as possible.  In 2005, BSC quietly changed its internal protocols to allow EMC to securitize loans before the expiration of the 30- to 90-day early payment default period following the acquisition of a loan by EMC.  This change allowed EMC to enhance earnings by increasing the volume of its securitizations.

227.     BSC's prior policy had been to keep loans in inventory until the early payment default period was over.  Seasoning loans during this period prevented EMC from securitizing loans that, according to its internal guidelines, were likely to "contain some form of misrepresentations and should not have been made."  Securitizing these loans as quickly as possible allowed EMC to avoid the possibility of a default or delinquency rendering them unsecuritizable.

228.     BSC executives, such as Defendant Jeffrey Verschleiser, forcefully advocated packaging loans purchased by EMC into securities as quickly as possible.  In a recently published June 13, 2006 email, Mr. Verschleiser asserted that his office needed "to be certain we can securitize the loans with 1 month [early payment default] before the [early payment default] period expires."  Similarly, recently published documents show that, in or about December 2005, Mr. Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the subprime loans closed in December for the conduit" by January.

229.     Internal communications confirm that EMC was securitizing large numbers of defective loans amid a break-down in its due diligence processes. In a recently published March 2006 email, BSC Vice President Robert Durden admitted that many loans purchased by EMC were securitized without any due diligence clearance: "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared. I think the

ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."

### 3.     The WaMu Entities

230.     WaMu Bank also let the demands of the market dictate its adherence to sound underwriting guidelines and securitization procedures.  By 2007, WaMu Bank was one of the top overall mortgage originators by volume in the United States, with a 4.1 percent market share. WaMu Capital, in turn, was one of the largest issuers of mortgage-backed securities in 2007 with a 5.7 market share.  From 2005-2007, WaMu Capital's total volume of subprime RMBS issuances was $11.3 billion.

231.     In 2005, with the market for conventional, fixed-rate loans drying up, WaMu Bank formalized a strategy to move away from low risk to high risk home loan origination.  On April 13, 2010, James G. Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate Permanent Subcommittee on Investigations ("PSI") that WaMu Bank's focus had shifted "to becoming more of a higher risk, sub-prime lender . . . This effort was characterized by statements advocating that the company become either via acquisition or internal growth a dominant sub-prime lender."

232.     Documents released in April 2010 by the PSI show that, in April 2006, the President of WaMu Bank's Home Loans Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin Products."  The presentation showed that the least profitable loans were government-backed and fixed loans; the most profitable were Option ARM, Home Equity, and Subprime Loans.  Subprime loans, at 150 basis points, were eight times more profitable than a fixed loan at 19 basis points.

233.     In its push to generate more risky loan products, WaMu Bank pressed its sales agents to pump out a greater volume of loans with loose adherence to its own underwriting

guidelines.  WaMu Bank gave mortgage brokers handsome commissions for selling the riskiest

loans, which carried higher fees, bolstering profits and, ultimately, the compensation of the

bank's executives.  In a *New York Times* article published December 27, 2008, Steven M.

Knobel, the founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business

with WaMu Bank until 2007, stated that "[i]t was the Wild West . . . If you were alive, they

would give you a loan.  Actually, I think if you were dead, they would still give you a loan."

234.     WaMu Bank pushed its Option ARM loans on borrowers regardless of their

sophistication, income level, or financial stability.  An Option ARM loan is typically a 30-year

Adjustable Rate Mortgage ("ARM") that initially offers the borrower four monthly payment

options:  (i) a specified minimum payment (which was typically lower than the interest payment

and therefore caused the loan to grow, referred to as negative amortization), (ii) an interest-only

payment, (iii) a 15-year fully amortizing payment, and (iv) a 30-year fully amortizing payment.

The rate of an ARM loan also adjusts monthly and if the loan rate was higher than the required

interest in the payment, the balance of the loan would increase (called negative amortization).

Fay Chapman, WaMu Bank's former Chief Legal Officer, candidly admitted to the *Seattle Times*

in an article published on October 26, 2009, that "[m]ortgage brokers put people into the product

who shouldn't have been."  In 2003, WaMu originated $32.3 billion of Option ARM loans.  By

2005, that number almost had doubled to $64.1 billion.

235.     WaMu Bank's employee compensation structure favored these types of high-risk

home loans.  In a document entitled "2007 Product Strategy," WaMu Bank noted that it must

"maintain a compensation structure that supports the high margin product strategy."  A

compensation grid from 2007 shows the company paid the highest commissions on Option

ARMs, subprime loans and home-equity loans:  A $300,000 Option ARM, for example, would

earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount.  The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes. Likewise, a WaMu Bank "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Option ARM, Non-prime referrals and Home Equity Loans . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

236.    WaMu Bank could originate so many high-risk loans because its underwriting guidelines had become so loose that they were rendered meaningless.  In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.

237.    On September 28, 2007, WaMu Bank's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending.  The report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR."  It additionally concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

238.    In early 2008, Radian Guaranty Inc., one of WaMu Bank's mortgage insurers, issued a similar report to WaMu Bank with the results of its review conducted from August 13, 2007 to September 28, 2007.  The objectives of the review were, *inter alia*, to determine WaMu Bank's "compliance with Radian's underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's underwriting decisions."  Radian gave WaMu Bank an overall rating of "Unacceptable."  Of 133 loans reviewed, it found 11 loans or 8 percent had

"insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines."  Half of the delinquent loans reviewed had "questionable property values, occupancy and possible strawbuyers [sic]."

239.    Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger, WaMu Bank's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases causes our origination data to be suspect particularly with respect to DTI [Debt To Income ratio]."

240.    In a *Seattle Times* article published October 25, 2009, Tom Golon, a former senior home loan consultant for WaMu in Seattle, stated that Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down." The WaMu staff was subjected to "total blanketing – e-mails, memos, meetings set up so people understood that this was what the company wanted them to do."

241.    Various witnesses with direct experience in WaMu Bank's underwriting operations also testified before the FCIC that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule.  For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."  Similarly, Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents."  When she asked how they could possibly close it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it."

242.    WaMu Bank's appetite for volume kept it from diligently investigating the rampant disregard of underwriting guidelines that infected its origination business.  Perhaps the

most compelling evidence involves two top loan producers at two different WaMu Bank origination offices, called Montebello and Downey, in Southern California.  Each of those loan officers made hundreds of millions of dollars in home loans each year and consistently won recognition for their efforts.  Recently disclosed documents revealed that a 2005 internal WaMu Bank review found that loans from those two offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])."  The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review."  The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named."  But virtually none of the proposed recommendations were implemented.

243.    The statements of confidential witnesses further confirm that WaMu Bank's pursuit of volume resulted in the abandonment of underwriting guidelines and sound due diligence practices during the relevant time period.  The lack of sound diligence began at origination.  Confidential Witness 3 ("CW3"), a former loan officer at a WaMu Bank branch office during the relevant time period, stated that the initial underwriting of a loan was performed on an automated desktop underwriting system.  The system was fairly stringent.  If the system declined a loan, however, that loan would be sent to the subprime system for a manual underwriting.  There, the loans rejected by WaMu Bank's automated system would be approved by manual underwriters "in hours," even though the majority of the loans were likely to default.

244.    WaMu Bank's emphasis on increasing the quantity of loans originated greatly reduced the efficacy of WaMu Bank's own underwriting process.  Confidential Witness 4

("CW4"), a former contract underwriter for WaMu Bank during the relevant time period, stated

that, while working for WaMu Bank, he came across many "bad loans." If CW4 did not approve

a loan, the loan would be elevated to his underwriting manager for review. If approval for the

loan was not forthcoming, the loan officer who originated the loan would "raise hell" and the

loan would be elevated up the line until someone agreed to approve the loan. CW4 stated that

WaMu Bank emphasized production over quality. CW4 further estimated that 95 percent of the

loans he disapproved would eventually be pushed through the approval process by managing

members of WaMu Bank.

245.    This pressure from WaMu Bank would continue from origination to underwriting

to due diligence to securitization. Confidential Witness 5 ("CW5"), a former due diligence

underwriting manager for WaMu Bank during the relevant time period, confirms that WaMu

Bank placed pressure on loan underwriters to originate and underwrite as many loans as possible

for inclusion in the loan pools that collateralized mortgage-backed certificates. CW5 stated that

there was always pressure to push loans through, even if those loans failed to meet the

underwriting guidelines. When CW5's office received a "bad loan," it would be "red-flagged"

by the due diligence team. Red-flagged loans were not to be placed in the loan pools for sale to

investors. However, the WaMu Bank New York offices, which were in charge of packaging and

selling the loans, would pressure CW5's due diligence office to push such "red-flagged" loans

through so they could be packaged for traders in New York. WaMu Bank accomplished this,

according to CW5, by removing the red-flagged loans from the pool and allowing them to

mature for four months. After four months, these loans were considered "aged/old." Due

diligence was only performed on new loans, so these aged/old loans would not be subjected to

additional due diligence. Once these red-flagged loans had gone 90 days from the date of

origination without defaulting, they were considered "performing" and would be included in new loan pools for sale to investors. CW5 stated that most loans do not default in the first 90 days because borrowers would only have made one or two payments by then. This failure of diligence virtually guaranteed that "bad loans" would eventually be included in the securitizations. CW5 estimated that close to 100 percent of the loans CW5's office red-flagged were later included in loan pools for sale.

246. Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans. WaMu thus made a deliberate decision at the highest levels to "off-load" these loans through securitization and sale to investors.

247. Not only did WaMu decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans. A September 2008 internal review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan. . . confirmed to contain suspicious activity from being sold to an investor." In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."

### 4. The Long Beach Entities

248. Long Beach Mortgage was acquired by WMI in 1999. Long Beach Mortgage served as WaMu Bank's subprime loan origination division until January 1, 2006, and thereafter was known as WaMu Bank's "specialty mortgage lending" channel. Some of the programs at Long Beach Mortgage included stated income document programs for W-2 wage earners, a

program that started in 2005.  Long Beach Mortgage would also approve 100 percent financing

for stated-income borrowers with FICO scores as low as 500.

249.    There was also a "three letters of reference" program for self-employed

borrowers, where a borrower only had to submit three letters of reference from anyone for whom

they supposedly worked.  No attempt was made to verify the information in the letters of

reference.  Some of the letters of reference that were considered acceptable included statements

such as:  "So-and-so cuts my lawn and does a good job."  At Long Beach Mortgage, FICO scores

ranged from 500-620, but Long Beach Mortgage salespeople considered a borrower with a 620

FICO score to have good credit.

250.    Borrowers could get a loan with no established FICO score merely by providing

"three alternative trade lines."  An "alternative trade line" was anything that did not appear on

the borrower's credit report, including documentation of car insurance payments, verification of

rent payment, or a note from a person claiming the borrower had repaid a personal debt.  Long

Beach Mortgage originated a significant amount of these types of problematic loans.  These

loans made up the majority of first payment defaults – *i.e.*, loans on which the borrower failed to

make even the first payment – during the end of 2006.

251.    As a result of these and other practices, in January 2004, the FDIC and the State

of Washington sent a report to WaMu's Board concerning, *inter alia*, "unsatisfactory

underwriting practices at affiliate Long Beach Mortgage Company."  The recently released

report noted an internal report dated July 31, 2003, which found that "40% (109 of 271) of loans

reviewed were considered unacceptable due to one or more critical errors.  This raised concerns

over [Long Beach Mortgage Company's] ability to meet the representations and warranty's [sic]

made to facilitate sales of loan securitizations."  *FDIC/Washington State Joint Visitation Report*

*of Washington Mutual Bank*, January 13, 2004.  It further noted that a second report in August 2003 had "reached similar conclusions and disclosed that [Long Beach Mortgage Company's] credit management and portfolio oversight practices were unsatisfactory."  *Id.*  The FDIC-Washington examiners found that, out of 4,000 loans reviewed, "approximately, 950 were deemed saleable, 800 were deemed unsalable, and the remainder contained deficiencies requiring remediation prior to sale."  *Id.*  The examiners concluded that "[t]he culture, practices, and systems at Long Beach Mortgage Company are inconsistent with the lending activity of the bank."  *Id.*

252.    In a recently published November 1, 2005 internal report entitled "LBMC Post Mortem," the authors concluded that Long Beach Mortgage Company's "[u]nderwriting guidelines are not consistently followed and conditions are not consistently or effectively met." What is more, "[u]nderwriters are not consistently recognizing non-arm's length transactions and/or underwriting associated risk effectively."

253.    Another recently surfaced April 17, 2006 report from WaMu's General Auditor, Randy Melby, to the Audit Committee of WaMu's Board of Directors, discussed Long Beach Mortgage Company's "relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel."  Mr. Melby concluded that "[t]hese factors, coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality."

254.    Ten days later, on April 27, 2006, Steve Rotella, WaMu's COO, informed WaMu's Chairman and CEO, Kerry Killinger, that Long Beach Mortgage "delinquencies are up 140% and foreclosures close to 70% . . . First payment defaults are way up and the 2005 vintage is way up relative to previous years.  It is ugly."  In another recently uncovered e-mail, Mr.

Rotella commented two weeks later that "LBMC is terrible" due, among other things to, "repurchases, EPDs [Early Payment Defaults], manual underwriting, very weak servicing/collections practices and a weak staff."

255.    In a recently disclosed December 11, 2006 e-mail from Cynthia Abercrombie, Senior Vice President/Senior Risk Officer to Ron Cathcart, WaMu's Chief Enterprise Risk Officer, Ms. Abercrombie noted that post-funding reviews of Long Beach Mortgage loans identified the following issues:

- Appraisal deficiencies that could impact value and were not addressed;

- Material misrepresentations relating to credit evaluation;

- Legal documents were missing or contained errors or discrepancies;

- Credit evaluation or loan decision errors; and

- Required credit documentation was insufficient or missing from the file.

256.    The conclusion of the reviews was "a lack of proper execution of the credit guidelines" and "weakness in controls around clearing conditions."  In response, Mr. Cathcart admitted that "Long Beach represents a real problem for WaMu."

257.    Long Beach employees were incentivized to disregard underwriting guidelines in favor of volume.  The Long Beach 2006 Incentive Plan, for example, outlined four compensation tiers that were based on loan volume.  The largest producers of loans made the most money because compensation was linked to volume and also earned a higher rate of commission.

258.    On August 20, 2007, WaMu Audit Services issued a report (recently made public) entitled "Long Beach Mortgage Loan Origination & Underwriting."  The report was sent to WaMu's most senior executives, including Mr. Killinger, Mr. Rotella, Mr. Melby, Mr. Schneider and Mr. Cathcart.  Among its conclusions were:

- Underwriting guidelines established to mitigate the risk of unsound underwriting are not always followed and decision-making methodology is not always fully documented.

- [F]ocused areas of improvement for LMB are appraisal deficiencies, credit evaluation or loan decision errors, unaddressed fraud alerts, missing legal documents, material misrepresentations relating to credit evaluations, debt capacity or debt ratio error, missing title report, insufficient credit documentation, invalid or insufficient signing authority, misrepresentation in appraisal information, missing Final HUD 1 statements that when obtained had unaddressed issues.

- Policies and procedures defined [sic] to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed.

259.    The statements of confidential witnesses confirm that Long Beach emphasized loan origination volume to the detriment and expense of its underwriting guidelines and due diligence practices.  Confidential Witness 6 ("CW6"), a former underwriter for Long Beach Mortgage during the relevant time period, stated that Long Beach Mortgage was a "last stop shop" that approved all loans.  CW6 had doubts regarding the loans Long Beach Mortgage processed and often questioned its underwriting policies.  Supervisors told CW6 to "sit down, shut up, be quiet and approve the loan."  Loans declined by CW6 would be either returned with instructions that CW6 approve the loan or sent to another underwriter for approval.  If the loan was sent to another underwriter, CW6's reason for declining the loan would be removed from the file.

260.    In a December 21, 2009 interview with the *Huffington Post Investigative Fund*, Diane Kosch, a former member of Long Beach Mortgage's quality control team, stated that "[m]ost of the time everything that we wanted to stop the loan for went above our heads to upper management."  Quality team members became so suspicious, she said, that they started making copies of problem files to protect themselves.  Karen Weaver, a former underwriter in Long Beach Mortgage's Atlanta office, attested that a lot of brokers "were making up pay stubs and

96

presenting that."  A former Long Beach Mortgage account executive for Colorado sales, Pam

Tellinger, admitted she "knew brokers who were doing fraudulent documents all day long."

Antoinette Hendry, a former underwriter and team manager at Long Beach in California,

described how account executives would "offer kickbacks of money" to underwriters to get

questionable loans approved.  Long Beach did not have the appropriate due diligence systems in

place to monitor and prevent these events from occurring.

> ## G.  Liability of JPMorgan Chase and JPMorgan Bank as Successors in Interest
>
> ### 1.  Liability of the JPMorgan Defendants as Successors in Interest to the Bear Stearns Entities

261.  On March 16, 2008, BSI entered into the Agreement and Plan of Merger with

JPMorgan Chase for the purpose of consummating a "strategic business combination

transaction" between the two entities.

262.  Pursuant to the Merger, BSI merged with Bear Stearns Merger Corporation, a

wholly-owned subsidiary of JPMorgan Chase, making BSI a wholly-owned subsidiary of

JPMorgan Chase.  As such, upon the May 30, 2008 effective date of the Merger, JPMorgan

Chase became the ultimate corporate parent of BSI's subsidiaries BSC, EMC, SAMI and

BSABS.

263.  JPMorgan took immediate control of Bear Stearns' business and personnel

decisions, according to *The New York Times* in an article published April 6, 2008.  The article

cited an internal JPMorgan memo revealing that "JPMorgan Chase, which is taking over the rival

investment bank Bear Stearns, will dominate the management ranks of the combined investment

banking and trading businesses."  Of the 26 executive positions in the new merged investment

banking and trading division, only five would come from Bear Stearns.

264.    In a June 30, 2008 press release describing internal restructuring to be undertaken pursuant to the Merger, JPMorgan stated its intent to assume Bear Stearns and its debts, liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to JPMorgan Chase, resulting in a transfer of substantially all of Bear Stearns' assets to JPMorgan Chase. In connection with such transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-outstanding registered U.S. debt securities; (2) Bear Stearns' obligations relating to trust preferred securities; (3) Bear Stearns' then-outstanding foreign debt securities; and (4) Bear Stearns' guarantees of then-outstanding foreign debt securities issued by subsidiaries of Bear Stearns, in each case, in accordance with the agreements and indentures governing these securities.

265.    BSC subsequently merged with J.P. Morgan Securities and is now doing business as J.P. Morgan Securities.  JPMorgan's 2008 Annual Report described the transaction as a merger, stating that "[o]n October 1, 2008, J.P. Morgan Securities Inc. merged with and into Bear, Stearns & Co. Inc., and the surviving entity changed its name to J.P. Morgan Securities Inc."

266.    Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear visitors to J.P. Morgan Securities' website, and the EMC website, www.emcmortgagecorp.com, now identifies EMC as a brand of JPMorgan Bank.

267.    J.P. Morgan Securities was fully aware of the pending claims and potential claims against Bear Stearns when it consummated the merger.  J.P. Morgan Securities has further evinced its intent to assume Bear Stearns' liabilities by paying to defend and settle lawsuits brought against Bear Stearns.

268.    As a result of BSI's acquisition, JPMorgan Chase's "transfer of substantially all of Bear Stearns' assets to JPMorgan Chase," and explicit assumption of Bear Stearns' debt,

JPMorgan Chase is the successor-in-interest to BSI and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSI.

269.    As a result of its merger with BSC, J.P. Morgan Securities is the successor-in-interest to BSC and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSC.

270.    Therefore, this action is brought against JPMorgan Chase as the successor to BSI and J.P. Morgan Securities as successor to BSC.  BSI is not a defendant in this action.

### 2.    Liability of the JPMorgan Defendants as Successors in Interest to the WaMu and Long Beach Entities

271.    On September 25, 2008, the Office of Thrift Supervision closed WaMu Bank and named the FDIC as receiver.  Shortly thereafter, the FDIC, in its corporate and receivership capacities, and JPMorgan Bank entered into a Purchase and Assumption Agreement for JPMorgan Bank to "purchase substantially all of the assets and assume all deposit and substantially all other liabilities of" WaMu Bank.  *See* PAA.

272.    The PAA described the assets purchased by JPMorgan Bank as:

**3.1    Assets Purchased by Assuming Bank.**  Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing.  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.  The subsidiaries,  joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a.  Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1 (emphasis added).

273. Pursuant to the PAA, JPMorgan Bank purchased "all subsidiaries" of WaMu Bank, including WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities. As such, WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities became wholly-owned subsidiaries of JPMorgan Bank.

274. JPMorgan Bank also assumed nearly all the liabilities of WaMu Bank:

**2.1** **Liabilities Assumed by Assuming Bank.** Subject to Sections 2.5 [Borrower Claims] and 4.8 [Agreement with Respect to Certain Existing Agreements], the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) <u>and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records</u> of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

PAA § 2.1 (emphasis added).

275. The only liabilities expressly disclaimed by JPMorgan Bank were "any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower . . . related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities." PAA § 2.5.

276. JPMorgan Bank thus assumed all liabilities relating to the WaMu Securitizations, as the WaMu Securitizations were "reflected on the Books and Records" of WaMu Bank as of the date of its closing, and were not expressly disclaimed by JPMorgan Bank in the PAA.

277. The FDIC itself asserts that JPMorgan Bank assumed the liabilities associated with the securitization activities of WaMu Bank. In a Reply Memorandum filed on February 11, 2011, in *Deutsche Bank Nat'l Trust Co. v. FDIC (as receiver for WaMu Bank) and JPMorgan*

*Chase Bank, N.A.*, D.C. District Court, No. 09-1656 RMC, concerning whether WaMu Bank or the FDIC retained the trust-related liabilities for WaMu Bank's securitization activities, the FDIC asserted that "the liabilities and obligations at issue were assumed in their entirety by [JPMorgan Bank] under the P&A Agreement, thereby extinguishing any potential liability by FDIC Receiver." *Deutsche* Docket #58 at 1.

278.   The FDIC also stated, in a November 22, 2010 filing, that "FDIC Receiver's exercise of the transfer provision[13] in this case is consistent with the general principle that when an entity purchases the assets of an ongoing business and expressly or impliedly assumes the related liabilities, the acquiring entity succeeds to the pre-sale debts and obligations of the business, thereby extinguishing the liability of the seller." *Deutsche* Docket #54 at 38. Moreover, "[i]n connection with that purchase, FDIC Receiver transferred to [JPMorgan Bank], and [JPMorgan Bank] expressly agreed to 'assume' and to 'pay, perform and discharge,' substantially all of [WaMu Bank's] liabilities." *Id. citing* PAA § 2.1.

279.   The Final Report of the Examiner ("Examiner's Report"), submitted by the court-appointed Examiner on November 1, 2010 during Washington Mutual, Inc.'s bankruptcy, further supports FHFA's and the FDIC's assertion that all liabilities associated with the WaMu Securitizations were transferred to JPMorgan Bank as a result of the PAA. *In re Washington Mutual, Inc.*, No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (filed publicly with exhibits on Nov. 22, 2010).

---

[13]   "A liability is held by either FDIC Receiver or the assuming institution, not both, and FDIC Receiver's liability ends when the transferee's liability begins.  Here, [JPMorgan Bank] purchased substantially all of [WaMu Bank's] assets in a 'whole bank' transaction, including its ongoing banking operations and 'nationwide mortgage banking activities.'  Ex. 9, JPMorgan Bank 2009 Form 10-K (2/24/10) at 58, see [PAA] at 1."  *Deutsche* Docket #54 at 39.

280.     Per the exhibits to the Examiner's Report, the FDIC offered five different transaction structures to prospective bidders for the assets of WaMu Bank.  JPMorgan Bank elected to bid on what was described as "Transaction #3":

> **C.  <u>Transaction #3 Whole Bank, All Deposits</u>.**  Under this transaction, the Purchase and Assumption (Whole Bank), the Potential Acquirer whose Bid is accepted by the Corporation assumes the Assumed Deposits of the Bank and all other liabilities but specifically excluding the preferred stock, non-asset related defensive litigation, subordinated debt and senior debt, and purchases all of the assets of the Bank, excluding those assets identified as excluded assets in the Legal Documents and subject to the provisions thereof.

Exam. Report Ex. JPMCD 000001550.00009 (description); JPMCD_000002773.0001 (JPMorgan Bank Bid Form).  This is in contrast with Transactions #4 and #5, which offered JPMorgan Bank the option of assuming "only certain other liabilities."  *Id.*

281.     Additionally, during the drafting process, the FDIC posted a "FAQ" for potential acquirers with respect to the WaMu Bank transaction.  The FDIC's unequivocal position was that the mortgage securitization obligations passed to the acquirer:

> 9.  Are the off-balance sheet credit card portfolio and mortgage securitizations included in the transaction?  Do you expect the acquirer to assume the servicing obligations?  If there are pricing issues associated with the contracts (e.g., the pricing is disadvantageous to the assuming institution), can we take advantage of the FDIC's repudiation powers to effect a repricing?
>
> Answer:  The bank's interests and obligations associated with the off-balance sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only contracts and obligations remaining in the receivership are subject to repudiation powers.

Examiner's Report Ex. JPMCD 000001550.00212 – JPMCD 000001550.00213.

282.     In fact, JPMorgan Bank knew and expressed concern that the PAA and Section 2.1, as drafted, included the transfer of liabilities relating to the WaMu securitizations from WaMu Bank to JPMorgan Bank.  On September 23, JPMorgan Bank wrote in an e-mail to the FDIC that

Let's say there is a contract between the thrift and the Parent and that is included in the Books and Records (not something like "accrued for on the books of the Failed Bank," which probably would fix the problem) of the thrift at the time of closing. Any liability under that contract is then arguably a liability reflected in the Books and Records. Therefore one would most likely conclude that liabilities under that contract are assumed under 2.1 . . . So the way that [indemnification provision] 12.1 reads is we are indemnified for a claim by Wamu (shareholder of Failed Bank) with respect to that contract only to the extent the liability was not assumed -- indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing. In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here.

Examiner's Report Ex. JPM_EX00034958, e-mail from Dan Cooney of JPMorgan Bank to David Gearin of the FDIC. The language at issue was not altered, despite JPMorgan Bank's protests.

283.     The above-quoted passage—"indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing"—also demonstrates that, under the language of the PAA, JPMorgan Bank knew that it would be the appropriate successor for all liabilities and obligations not disclaimed in the PAA. *Id.*

284.     Further, JPMorgan Chase's SEC filings following its purchase and assumption of WaMu Bank accounted for the additional liability associated with the WaMu Securitizations. For instance, in a 424(b)(5) prospectus supplement, filed on December 12, 2009, JPMorgan Chase cautions that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans . . . by us and certain of our subsidiaries, as well as entities acquired by us as part of the Bear Stearns, Washington Mutual and other transactions, could materially increase our costs and lower our profitability, and could materially and adversely impact our results of operations and financial condition."

285.     JPMorgan Bank was fully aware of the pending claims and potential claims against WaMu Bank when it purchased and assumed WaMu Bank's assets and liabilities on

September 25, 2008.  Indeed, WaMu itself had warned investors in its 10-Q for the quarter

ending June 30, 2008 (filed with the SEC on August 11, 2008) that "errors may have been made

in the process of originating the loans" in its securitizations, and further cautioned that

"representations and warranties made by the Company in connection with" the sales of its RMBS

products could be "breached."  As WaMu explained to its investors, if  "it is determined that

such errors constitute a breach of a representation or warranty made to the investor in connection

with the Company's sale of the loan, then if the breach had a material adverse effect on the value

of the loan, the Company will be required to either repurchase the loan or indemnify the investor

for losses sustained.  Reserves established to repurchase loans or indemnify investors are

recorded as a reduction to revenue from sales and servicing of home loans on the Consolidated

Statements of Income."  Prior to the sale of its assets and liabilities to JPMorgan Bank, WaMu

had already "recorded reserves of $375 million and $268 million as of June 30, 2008 and

December 31, 2007, to cover its estimated exposure" related to these "aforementioned loss

contingencies." (Washington Mutual, Inc. Form 10-Q for the Period Ending June 30, 2008, at

10-11.)

      286.    JPMorgan Bank has further evinced its intent to assume WaMu Banks' liabilities

by paying to defend and settle lawsuits brought against WaMu Bank and its subsidiaries.

      287.    Moreover, the former WaMu Bank website, www.wamu.com, redirects visitors to

a JPMorgan Chase website proposing that visitors "update [their] favorites" to include

www.chase.com.

      288.    Similarly, the former WaMu Securities website, www.wamusecurities.com,

redirects visitors to a JPMorgan Chase-branded website with the text "Washington Mutual

Mortgage Securities Corp. (WMMSC), a wholly owned subsidiary of JPMorgan Chase Bank, National Association."

289.    As a result of the purchase and assumption of "substantially all of the assets and . . . all deposit and substantially all other liabilities of" WaMu Bank, JPMorgan Bank is the successor-in-interest to WaMu Bank and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of WaMu Bank.

290.    Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank (and Long Beach Mortgage, a subsidiary that was later merged into and made a division of WaMu Bank).  WaMu Bank and Long Beach Mortgage are not defendants in this action.

### III.    The Statements in the Registration Statements

#### A.    Compliance With Underwriting Guidelines

291.    The Prospectus and Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were supposed to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systematic violations of those guidelines with respect to the securitized loans.

292.    The statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates and the GSEs' decision to purchase and invest in the GSE

Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

293.    The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.

### 1.    JPMorgan's Statements Regarding Compliance With Underwriting Guidelines

294.    For example, the Prospectus Supplement for the JPMAC 2006-WMC1 Securitization, for which WMC Mortgage Corp. was the originator, J.P. Morgan Acquisition was the sponsor, J.P. Morgan Acceptance was the depositor, and J.P. Morgan Securities was the underwriter, stated that:  "The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the "Underwriting Guidelines") or (ii) purchased by WMC Mortgage Corp. after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."  The Prospectus Supplement further stated that "The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

295.    The JPMAC 2006-WMC1 Prospectus Supplement stated that "WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception."  However, it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio

('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

296.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines."

297.     The Prospectus Supplement further stated that:  "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

298.     Additionally, the Prospectus Supplement claimed that:  "The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit

may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

299.    Moreover, the Prospectus Supplement stated that that WMC verified employment for every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplement stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC obtained "telephonic verification of employment."

300.    The Prospectus and Prospectus Supplement for each of the JPMorgan Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each JPMorgan Securitization are reflected in Appendix A to this Amended Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the JPMorgan Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

## 2.    Bear Stearns's Statements Regarding Compliance With Underwriting Guidelines

301.    The Prospectus Supplements for the Bear Stearns Securitizations also contained several key statements with respect to the underwriting standards of the banks that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the BSABS 2007-HE7 Securitization, for which the Encore Credit division of Bear Stearns Residential Mortgage Corporation ("BSRM") was the originator, EMC was the sponsor, BSABS was the depositor, and BSC was the underwriter, stated that:  "The mortgage loans originated by BSRM were originated generally in accordance with guidelines (the 'BSRM Underwriting Guidelines') established by BSRM" and that "[t]he BSRM Underwriting Guidelines are intended to make sure

that (i) the loan terms relate to the borrower's ability to repay and (ii) the value and marketability of the property are acceptable."

302.    The BSABS 2007-HE7 Prospectus Supplement stated that "[e]xceptions to the BSRM Underwriting Guidelines are considered" on a "case-by-case basis" but only upon "reasonable compensating factors" such as "validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrower's potential for increased earnings based on education, job training, etc."  Additionally, "[w]hen exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan, including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan."

303.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information. The mortgage loan file also contains a credit report on each applicant from an approved credit reporting company."

304.    The Prospectus Supplement further stated that:  "Under the BSRM Underwriting Guidelines, there are various risk categories used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher credit risk mortgage loans are graded in risk categories that permit higher debt ratios and more (or more

109

recent) major derogatory credit items such as outstanding judgments, liens that do not impair the lien position, or prior bankruptcies."

305.    Additionally, the Prospectus Supplement claimed that:  "The BSRM Underwriting Guidelines are applied in accordance with a procedure that complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property that conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of BSRM. The maximum allowable loan-to-value ratio varies based upon the income documentation, property type, creditworthiness, debt service-to-income ratio of the applicant and the overall risks associated with the loan decision."

306.    The Prospectus and Prospectus Supplement for each of the Bear Stearns Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Bear Stearns Securitization are reflected in Appendix A to this Amended Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Bear Stearns Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

### 3.    WaMu's Statements Regarding Compliance With Underwriting Guidelines

307.    The Prospectus Supplement for the WaMu Securitizations also contained several key statements with respect to the underwriting standards of the banks that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the WAMU 2007-OA3 Securitization, for which WaMu Bank was both the originator and sponsor, WaMu Acceptance

was the depositor, and WaMu Capital was the underwriter, stated that: "All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting guidelines of the sponsor as described in this section" and that "[t]he sponsor's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

308.    The WAMU 2007-OA3 Prospectus Supplement stated that "[e]xceptions to the sponsor's loan program parameters may be made," however, it also stated that such exceptions would be made "on a case-by-case basis" and only upon "compensating factors" such as "low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address," and furthermore, it stated that "the basis for the exception is documented, and in some cases the approval of a senior underwriter is required."

309.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that: "Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history" and that "[t]o evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower."

310.    The Prospectus Supplement further stated that: "In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and

111

the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")."

311.     With respect to appraisals, the Prospectus Supplement stated that: "The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac… the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property."

312.     The Prospectus and Prospectus Supplements for each of the WaMu Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each WaMu Securitization are reflected in Appendix A to this Amended Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the WaMu Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

### 4.     Long Beach's Statements Regarding Compliance With Underwriting Guidelines

313.     The Prospectus Supplements for the Long Beach Securitizations also contained several key statements with respect to the underwriting standards of the banks that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the LBMLT 2006-11 Securitization, for which Long Beach Mortgage was the originator and sponsor, Long Beach

Securities was the depositor, and WaMu Capital was the underwriter, stated that: "All of the mortgage loans owned by the trust have been, or will be, originated by [Long Beach Mortgage] through wholesale brokers or re-underwritten upon acquisition from correspondents by the sponsor generally in accordance with the Long Beach underwriting guidelines described in this section" and that "The Long Beach underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."

314.    The LBMLT 2006-11 Prospectus Supplement stated that Long Beach "may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the Long Beach underwriting risk category guidelines warrants an underwriting exception." and that "[i]t is expected that some of the mortgage loans owned by the trust will be underwriting exceptions," however, it also stated that such exceptions would be made "[o]n a case-by-case basis and only with the approval of an employee with appropriate risk level authority," and only upon "compensating factors" such as " low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the prospective borrower's current address."

315.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "During the underwriting or re-underwriting process, [Long Beach] reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability

113

to repay the loan, and determines whether the mortgaged property complies with the Long Beach underwriting guidelines."

316.    The Prospectus Supplement further stated that:  "Under the Long Beach underwriting programs, various risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the prospective borrower's credit history and debt ratio…In general, higher credit risk mortgage loans are graded in categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Long Beach underwriting programs establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories."

317.    Additionally, the Prospectus Supplement claimed that:  "The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process. In most cases, properties in below average condition, including properties requiring major deferred maintenance, are not acceptable under the Long Beach underwriting programs. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  Every independent appraisal is reviewed by an underwriter of the sponsor or its affiliate and is reviewed by one or more third party vendors which may refer the appraisal to the sponsor or one

of its affiliates for additional further review before the loan is funded or re-underwritten. Depending upon the original principal balance and loan-to-value ratio of the mortgaged property, the appraisal review may include an administrative review, technical review, desk review or field review of the original appraisal."

318.     Moreover, the Prospectus Supplement stated that for Long Beach "verification of employment is required for salaried prospective borrowers." Indeed the Prospectus Supplement states that Long Beach "re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs."

319.     The Prospectus and Prospectus Supplements for each of the Long Beach Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Long Beach Securitization are reflected in Appendix A to this Amended Complaint.  As discussed in Section IV.B, below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Long Beach Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

### 5.     Statements Regarding Representations Made by the Originator and Seller

320.     Further, for the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements described or referenced additional representations and warranties in the PSA or Mortgage Loan Purchase Agreement by the originator and sponsor concerning the mortgage loans underlying the Securitizations.  Such representations and warranties, which are described more fully for each Securitization in Appendix A, included: (i) the origination

complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws and (ii) none of the mortgage loans exhibited a history of delinquency or were in default.

321.    Additionally, the JPMorgan-sponsored Securitizations, all but two of the WaMu-sponsored Securitizations[14], the Long Beach-sponsored Securitizations, and the AABST 2005-5, ARSI 2006-M2, and CBASS 2006-CB7 Securitizations, contained "bringdown" language, which is described more fully for each of the above securitizations in Appendix A.  In each of these securitizations, the depositor "brought down" the representations and warranties of the originator and seller at the date of issuance, incorporating those representations into the depositor's representations to prospective investors.

322.    The JPMorgan and Long Beach-sponsored Securitizations, plus the AABST 2005-5, ARSI 2006-M2, and CBASS 2006-CB7 Securitizations, contained the following or substantially similar language that "brought down" the originator or seller representations:

> The depositor will not include any loan in the trust fund for any series of securities if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the loan as of the date of initial issuance of the related series of securities.

323.    The WaMu-sponsored Securitizations contained the following language that "brought down" the originator or seller representations:

> The depositor will not transfer any mortgage loan to a trust if anything has come to the depositor's attention that would cause it to believe that the representations and warranties made in respect of a mortgage loan will not be accurate and complete in all material respects as of the Closing Date.

---

[14]   The two exceptions are the WMALT 2005-9 and WMALT 2005-10 Securitizations.

324.     The inclusion of these representations and the "bringdown" language in the Prospectuses and Prospectus Supplements had provided additional representations and assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's decision to purchase the Certificates.

### B.     Statements Regarding Occupancy Status of Borrower

325.     The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[15]

**Table 5**

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 94.34 | 0.68 | 4.97 |

---

[15]   Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| AHM 2005-1 | VIA | Group VI | 70.17 | 3.63 | 26.20 |
| AHM 2005-4 | IVA | Group IV | 67.42 | 4.37 | 28.21 |
| ARSI 2006-M2 | A1 | Group I | 85.97 | 0.78 | 13.25 |
| BALTA 2005-10 | II2A1 | Group II-2 | 44.53 | 13.96 | 41.51 |
| BALTA 2005-10 | II3A1 | Group II-3 | 65.56 | 3.50 | 30.94 |
| BALTA 2006-1 | II1A1 | Group II-1 | 52.92 | 8.95 | 38.13 |
| BALTA 2006-2 | II2A1 | Group II-2 | 68.82 | 8.91 | 22.27 |
| BALTA 2006-3 | II1A1 | Group II-1 | 27.93 | 16.20 | 55.87 |
| BALTA 2006-4 | I2A1 | Group I-2 | 34.09 | 7.02 | 58.89 |
| BALTA 2006-4 | III1A1 | Group III-1 | 88.56 | 6.58 | 4.86 |
| BSABS 2005-HE12 | IIA | Group II | 88.00 | 0.82 | 11.18 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 82.78 | 1.35 | 15.87 |
| BSABS 2006-HE2 | IIA | Group II | 76.11 | 1.08 | 22.81 |
| BSABS 2006-HE4 | IIA | Group II | 89.10 | 0.96 | 9.93 |
| BSABS 2006-HE5 | IIA | Group II | 86.90 | 0.91 | 12.19 |
| BSABS 2006-HE7 | II2A | Group II-2 | 92.02 | 0.43 | 7.55 |
| BSABS 2006-HE8 | II2A | Group II-2 | 94.75 | 0.22 | 5.03 |
| BSABS 2006-HE9 | IIA | Group II | 96.00 | 0.32 | 3.68 |
| BSABS 2006-HE9 | IIIA | Group III | 91.13 | 0.81 | 8.06 |
| BSABS 2006-HE10 | II2A | Group II-2 | 94.25 | 0.40 | 5.35 |
| BSABS 2006-HE10 | II3A | Group II-3 | 91.15 | 1.23 | 7.62 |
| BSABS 2007-FS1 | IIA | Group II | 98.80 | 0.00 | 1.20 |
| BSABS 2007-HE1 | II2A | Group II-2 | 94.75 | 0.80 | 4.45 |
| BSABS 2007-HE1 | II3A | Group II-3 | 89.24 | 1.18 | 9.58 |
| BSABS 2007-HE2 | II2A | Group II-2 | 93.73 | 0.74 | 5.54 |
| BSABS 2007-HE2 | II3A | Group II-3 | 88.94 | 1.33 | 9.73 |
| BSABS 2007-HE3 | IIA | Group II | 92.93 | 0.62 | 6.44 |
| BSABS 2007-HE3 | IIIA | Group III | 94.59 | 1.05 | 4.36 |
| BSABS 2007-HE4 | IIA | Group II | 89.99 | 1.08 | 8.92 |
| BSABS 2007-HE5 | IIA | Group II | 91.35 | 2.02 | 6.63 |
| BSABS 2007-HE5 | IIIA | Group III | 100.00 | 0.00 | 0.00 |
| BSABS 2007-HE6 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSABS 2007-HE7 | IIA1 | Group II | 91.96 | 1.26 | 6.77 |
| BSABS 2007-HE7 | IIIA1 | Group III | 94.63 | 1.02 | 4.35 |
| BSMF 2006-SL5 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2006-SL6 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 83.01 | 4.75 | 12.23 |
| BSMF 2007-SL1 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| BSMF 2007-SL2 | IIA | Group II | 100.00 | 0.00 | 0.00 |

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| CBASS 2006-CB2 | AV | Group 1 | 87.34 | 2.94 | 9.72 |
| CBASS 2006-CB7 | A1 | Group I | 85.79 | 2.29 | 11.93 |
| GPMF 2005-AR5 | IIA1 | Group II | 43.72 | 5.04 | 51.24 |
| GPMF 2006-AR3 | IIA1 | Group II | 46.09 | 5.85 | 48.06 |
| GPMF 2006-AR3 | IIA2 | Group II | 46.09 | 5.85 | 48.06 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 84.02 | 6.34 | 9.64 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 59.03 | 7.48 | 33.49 |
| JPMAC 2005-FRE1 | AI | Group I | 85.92 | 1.71 | 12.37 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 92.70 | 1.43 | 5.87 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 90.27 | 5.39 | 4.35 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 87.87 | 1.35 | 10.78 |
| JPMAC 2006-CH1 | A1 | Group 1 | 88.44 | 0.89 | 10.67 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 94.58 | 0.59 | 4.83 |
| JPMAC 2006-CW1 | A1A | Group 1 | 97.69 | 0.28 | 2.04 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 95.10 | 0.63 | 4.27 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 85.44 | 0.86 | 13.70 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 83.13 | 1.19 | 15.68 |
| JPMAC 2006-HE1 | A1 | Group 1 | 86.74 | 1.66 | 11.60 |
| JPMAC 2006-HE2 | A1 | Group 1 | 92.69 | 0.39 | 6.92 |
| JPMAC 2006-HE3 | A1 | Group 1 | 91.96 | 1.38 | 6.67 |
| JPMAC 2006-NC1 | A1 | Group 1 | 80.21 | 4.49 | 15.30 |
| JPMAC 2006-NC2 | A1A | Group 1 | 94.36 | 0.83 | 4.81 |
| JPMAC 2006-RM1 | A1A | Group 1 | 96.08 | 0.23 | 3.69 |
| JPMAC 2006-RM1 | A1B | Group 1 | 96.08 | 0.23 | 3.69 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 98.34 | 0.32 | 1.34 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 97.43 | 1.26 | 1.30 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 97.79 | 0.95 | 1.25 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 97.79 | 0.95 | 1.25 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 98.04 | 0.62 | 1.34 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 98.04 | 0.62 | 1.34 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 95.50 | 3.97 | 0.52 |
| JPMAC 2007-CH3 | A1A | Group 1 | 90.97 | 1.46 | 7.57 |
| JPMAC 2007-CH3 | A1B | Group 1 | 90.97 | 1.46 | 7.57 |
| JPMAC 2007-CH4 | A1 | Group 1 | 92.19 | 6.27 | 1.54 |
| JPMAC 2007-CH5 | A1 | Group 1 | 88.25 | 1.19 | 10.56 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 94.25 | 5.24 | 0.51 |
| LBMLT 2005-3 | IA | Group I | 96.90 | 0.26 | 2.84 |
| LBMLT 2006-1 | IA | Group I | 76.58 | 1.57 | 21.85 |
| LBMLT 2006-2 | IA | Group I | 77.52 | 1.60 | 20.88 |

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| LBMLT 2006-3 | IA | Group I | 92.79 | 0.75 | 6.46 |
| LBMLT 2006-4 | IA | Group I | 95.06 | 0.27 | 4.68 |
| LBMLT 2006-5 | IA | Group I | 93.94 | 0.58 | 5.48 |
| LBMLT 2006-6 | IA | Group I | 96.73 | 0.39 | 2.87 |
| LBMLT 2006-7 | IA | Group I | 95.77 | 0.63 | 3.60 |
| LBMLT 2006-8 | IA | Group I | 94.14 | 0.63 | 5.24 |
| LBMLT 2006-9 | IA | Group I | 91.79 | 1.02 | 7.19 |
| LBMLT 2006-10 | IA | Group I | 92.45 | 0.56 | 6.99 |
| LBMLT 2006-11 | IA | Group I | 93.94 | 0.80 | 5.26 |
| LBMLT 2006-WL1 | IA2 | Group I | 81.38 | 1.25 | 17.37 |
| LBMLT 2006-WL1 | IA1 | Group I | 81.38 | 1.25 | 17.37 |
| LBMLT 2006-WL2 | IA | Group I | 82.02 | 1.01 | 16.97 |
| LBMLT 2006-WL3 | IA | Group I | 83.71 | 1.00 | 15.29 |
| LUM 2006-3 | II2A1 | Group II-2 | 73.56 | 3.32 | 23.12 |
| NCMT 2007-1 | 1A1 | Group 1 | 100.00 | 0.00 | 0.00 |
| PCHLT 2005-4 | 2A1 | Group 2 | 83.15 | 2.29 | 14.56 |
| SACO 2007-1 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| SACO 2007-2 | IIA | Group II | 100.00 | 0.00 | 0.00 |
| SAMI 2006-AR4 | IA1 | Group I | 72.69 | 10.24 | 17.07 |
| WAMU 2007-OA3 | 1A | Group 1 | 51.00 | 12.02 | 36.98 |
| WMABS 2006-HE1 | IA | Group 1 | 89.73 | 0.49 | 9.78 |
| WMABS 2006-HE3 | IA | Group 1 | 90.13 | 0.52 | 9.34 |
| WMABS 2006-HE4 | IA | Group 1 | 91.03 | 0.67 | 8.30 |
| WMABS 2006-HE5 | IA | Group 1 | 91.57 | 0.96 | 7.47 |
| WMABS 2007-HE1 | IA | Group 1 | 90.50 | 0.17 | 9.32 |
| WMABS 2007-HE2 | IA | Group 1 | 91.68 | 1.15 | 7.18 |
| WMALT 2005-9 | 1CB | Group 1 | 0.00 | 0.00 | 100.00 |
| WMALT 2005-10 | 1CB | Group 1 | 0.00 | 11.39 | 88.61 |
| WMALT 2006-AR4 | 1A | Group 1 | 76.33 | 6.26 | 17.40 |
| WMALT 2006-AR4 | 2A | Group 2 | 75.30 | 6.63 | 18.07 |
| WMALT 2006-AR4 | 3A | Group 3 | 78.93 | 2.60 | 18.47 |
| WMALT 2006-AR5 | 1A | Group 1 | 81.36 | 7.87 | 10.76 |
| WMALT 2006-AR5 | 2A | Group 2 | 68.33 | 9.25 | 22.42 |
| WMALT 2006-AR8 | 1A | Group 1 | 80.55 | 4.40 | 15.05 |
| WMALT 2006-AR9 | 1A | Group 1 | 78.49 | 10.50 | 11.01 |
| WMALT 2007-OA1 | 1A | Group 1 | 79.22 | 9.06 | 11.72 |
| WMALT 2007-OA2 | 1A | Group 1 | 79.33 | 5.59 | 15.08 |
| WMALT 2007-OA3 | 1A | Group 1 | 82.89 | 3.90 | 13.21 |
| WMALT 2007-OA3 | 3A | Group 3 | 60.04 | 8.23 | 31.73 |

| Transaction | Tranche | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|---|
| WMHE 2007-HE1 | IA | Group I | 93.53 | 1.03 | 5.44 |
| WMHE 2007-HE2 | IA | Group I | 91.79 | 1.23 | 6.98 |
| WMHE 2007-HE3 | IA | Group I | 94.16 | 1.24 | 4.59 |
| WMHE 2007-HE4 | IA | Group I | 92.96 | 1.84 | 5.20 |

326.    As Table 5 makes clear, the Prospectus Supplement for over 93 percent of the Securitizations reported that more than 50 percent of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (*i.e.* a second home or investment property).

327.    The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about the occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default and are more likely to care for their primary residence than borrowers who purchase homes as second homes or investments and live elsewhere, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

328.    Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in Section IV.A.1, the Registration Statement for each Securitization materially *overstated* the percentage

121

of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C.    Statements Regarding Loan to Value Ratios

329.    The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

330.    The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

331.    The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups for each Securitization are reflected in Table 6 below.[16]

**Table 6**

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 63.41 | 0.00 |

---

[16]    As used in this Amended Complaint, "LTV" refers to the loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined loan-to-value ratio, or "CLTV").

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| AHM 2005-1 | VIA | Group VI | 92.90 | 0.00 |
| AHM 2005-4 | IVA | Group IV | 94.45 | 0.00 |
| ARSI 2006-M2 | A1 | Group I | 45.87 | 0.00 |
| BALTA 2005-10 | II2A1 | Group II-2 | 98.22 | 0.00 |
| BALTA 2005-10 | II3A1 | Group II-3 | 98.52 | 0.00 |
| BALTA 2006-1 | II1A1 | Group II-1 | 97.74 | 0.00 |
| BALTA 2006-2 | II2A1 | Group II-2 | 99.19 | 0.00 |
| BALTA 2006-3 | II1A1 | Group II-1 | 97.70 | 0.00 |
| BALTA 2006-4 | I2A1 | Group I-2 | 98.52 | 0.00 |
| BALTA 2006-4 | III1A1 | Group III-1 | 83.43 | 0.00 |
| BSABS 2005-HE12 | IIA | Group II | 58.04 | 0.00 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 50.91 | 0.00 |
| BSABS 2006-HE2 | IIA | Group II | 50.24 | 0.00 |
| BSABS 2006-HE4 | IIA | Group II | 66.09 | 0.00 |
| BSABS 2006-HE5 | IIA | Group II | 52.23 | 0.00 |
| BSABS 2006-HE7 | II2A | Group II-2 | 58.48 | 0.00 |
| BSABS 2006-HE8 | II2A | Group II-2 | 59.19 | 0.00 |
| BSABS 2006-HE9 | IIA | Group II | 48.60 | 0.00 |
| BSABS 2006-HE9 | IIIA | Group III | 50.00 | 0.00 |
| BSABS 2006-HE10 | II2A | Group II-2 | 55.06 | 0.00 |
| BSABS 2006-HE10 | II3A | Group II-3 | 51.39 | 0.00 |
| BSABS 2007-FS1 | IIA | Group II | 36.55 | 0.00 |
| BSABS 2007-HE1 | II2A | Group II-2 | 54.46 | 0.00 |
| BSABS 2007-HE1 | II3A | Group II-3 | 52.89 | 0.00 |
| BSABS 2007-HE2 | II2A | Group II-2 | 39.16 | 0.00 |
| BSABS 2007-HE2 | II3A | Group II-3 | 35.32 | 0.00 |
| BSABS 2007-HE3 | IIA | Group II | 44.19 | 0.00 |
| BSABS 2007-HE3 | IIIA | Group III | 49.54 | 0.00 |
| BSABS 2007-HE4 | IIA | Group II | 53.46 | 0.00 |
| BSABS 2007-HE5 | IIA | Group II | 61.17 | 0.00 |
| BSABS 2007-HE5 | IIIA | Group III | 48.36 | 0.00 |
| BSABS 2007-HE6 | IIA | Group II | 54.31 | 0.00 |
| BSABS 2007-HE7 | IIA1 | Group II | 66.83 | 0.00 |
| BSABS 2007-HE7 | IIIA1 | Group III | 74.70 | 0.00 |
| BSMF 2006-SL5 | IIA | Group II | 1.93 | 0.00 |
| BSMF 2006-SL6 | IIA | Group II | 3.62 | 0.00 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 100.00 | 0.00 |
| BSMF 2007-SL1 | IIA | Group II | 0.47 | 0.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| BSMF 2007-SL2 | IIA | Group II | 1.77 | 0.00 |
| CBASS 2006-CB2 | AV | Group 1 | 64.44 | 0.04 |
| CBASS 2006-CB7 | A1 | Group I | 45.11 | 0.00 |
| GPMF 2005-AR5 | IIA1 | Group II | 96.48 | 0.00 |
| GPMF 2006-AR3 | IIA1 | Group II | 97.93 | 0.00 |
| GPMF 2006-AR3 | IIA2 | Group II | 97.93 | 0.00 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 94.54 | 0.00 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 92.37 | 0.00 |
| JPMAC 2005-FRE1 | AI | Group I | 52.82 | 0.00 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 70.09 | 0.00 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 63.36 | 0.00 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 52.46 | 0.00 |
| JPMAC 2006-CH1 | A1 | Group 1 | 53.08 | 0.00 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 67.63 | 0.00 |
| JPMAC 2006-CW1 | A1A | Group 1 | 71.17 | 0.00 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 66.24 | 0.00 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 59.44 | 0.00 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 52.73 | 0.00 |
| JPMAC 2006-HE1 | A1 | Group 1 | 64.92 | 0.00 |
| JPMAC 2006-HE2 | A1 | Group 1 | 76.16 | 0.00 |
| JPMAC 2006-HE3 | A1 | Group 1 | 43.50 | 0.00 |
| JPMAC 2006-NC1 | A1 | Group 1 | 56.25 | 0.00 |
| JPMAC 2006-NC2 | A1A | Group 1 | 57.98 | 0.00 |
| JPMAC 2006-RM1 | A1A | Group 1 | 56.97 | 0.00 |
| JPMAC 2006-RM1 | A1B | Group 1 | 56.97 | 0.00 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 62.34 | 0.00 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 68.40 | 0.00 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 66.96 | 0.00 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 66.96 | 0.00 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 64.62 | 0.00 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 64.62 | 0.00 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 57.39 | 0.00 |
| JPMAC 2007-CH3 | A1A | Group 1 | 63.36 | 0.00 |
| JPMAC 2007-CH3 | A1B | Group 1 | 63.36 | 0.00 |
| JPMAC 2007-CH4 | A1 | Group 1 | 56.35 | 0.00 |
| JPMAC 2007-CH5 | A1 | Group 1 | 50.85 | 0.00 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 96.71 | 0.00 |
| LBMLT 2005-3 | IA | Group I | 100.00 | 0.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| LBMLT 2006-1 | IA | Group I | 72.87 | 0.00 |
| LBMLT 2006-2 | IA | Group I | 67.64 | 0.00 |
| LBMLT 2006-3 | IA | Group I | 75.85 | 0.00 |
| LBMLT 2006-4 | IA | Group I | 81.33 | 0.00 |
| LBMLT 2006-5 | IA | Group I | 74.73 | 0.00 |
| LBMLT 2006-6 | IA | Group I | 28.45 | 0.00 |
| LBMLT 2006-7 | IA | Group I | 22.74 | 0.00 |
| LBMLT 2006-8 | IA | Group I | 70.66 | 0.00 |
| LBMLT 2006-9 | IA | Group I | 63.13 | 0.00 |
| LBMLT 2006-10 | IA | Group I | 59.81 | 0.00 |
| LBMLT 2006-11 | IA | Group I | 61.67 | 0.00 |
| LBMLT 2006-WL1 | IA1 | Group I | 70.76 | 0.00 |
| LBMLT 2006-WL1 | IA2 | Group I | 70.76 | 0.00 |
| LBMLT 2006-WL2 | IA | Group I | 19.23 | 0.00 |
| LBMLT 2006-WL3 | IA | Group I | 21.86 | 0.00 |
| LUM 2006-3 | II2A1 | Group II-2 | 96.85 | 0.00 |
| NCMT 2007-1 | 1A1 | Group 1 | 48.06 | 0.00 |
| PCHLT 2005-4 | 2A1 | Group 2 | 59.05 | 0.00 |
| SACO 2007-1 | IIA | Group II | 2.54 | 0.00 |
| SACO 2007-2 | IIA | Group II | 1.17 | 0.00 |
| SAMI 2006-AR4 | IA1 | Group I | 91.65 | 0.00 |
| WAMU 2007-OA3 | 1A | Group 1 | 93.43 | 0.00 |
| WMABS 2006-HE1 | IA | Group 1 | 59.84 | 0.00 |
| WMABS 2006-HE3 | IA | Group 1 | 40.79 | 0.00 |
| WMABS 2006-HE4 | IA | Group 1 | 22.83 | 0.00 |
| WMABS 2006-HE5 | IA | Group 1 | 49.18 | 0.00 |
| WMABS 2007-HE1 | IA | Group 1 | 62.14 | 0.00 |
| WMABS 2007-HE2 | IA | Group 1 | 60.98 | 0.00 |
| WMALT 2005-9 | 1CB | Group 1 | 89.08 | 0.00 |
| WMALT 2005-10 | 1CB | Group 1 | 94.88 | 0.00 |
| WMALT 2006-AR4 | 1A | Group 1 | 77.29 | 0.00 |
| WMALT 2006-AR4 | 2A | Group 2 | 90.48 | 0.00 |
| WMALT 2006-AR4 | 3A | Group 3 | 76.36 | 0.00 |
| WMALT 2006-AR5 | 1A | Group 1 | 70.75 | 0.00 |
| WMALT 2006-AR5 | 2A | Group 2 | 76.48 | 0.00 |
| WMALT 2006-AR8 | 1A | Group 1 | 77.21 | 0.00 |
| WMALT 2006-AR9 | 1A | Group 1 | 76.47 | 0.00 |
| WMALT 2007-OA1 | 1A | Group 1 | 45.17 | 0.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|---|
| WMALT 2007-OA2 | 1A | Group 1 | 46.97 | 0.00 |
| WMALT 2007-OA3 | 1A | Group 1 | 49.34 | 0.00 |
| WMALT 2007-OA3 | 3A | Group 3 | 90.37 | 0.00 |
| WMHE 2007-HE1 | IA | Group I | 60.41 | 0.00 |
| WMHE 2007-HE2 | IA | Group I | 58.78 | 0.00 |
| WMHE 2007-HE3 | IA | Group I | 59.11 | 0.00 |
| WMHE 2007-HE4 | IA | Group I | 57.07 | 0.00 |

332.     As Table 6 makes clear, the Prospectus Supplements for over 77 percent of the Securitizations reported that 50 percent or more of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less, and the Prospectus Supplement for nearly all of the Securitizations reported that *zero* mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent, with the lone exception (CBASS 2006-CB2) reporting that 0.04 percent of the mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

333.     The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

334.     Thus, the LTV ratio is a material consideration to a reasonable investor, including the GSEs, in deciding whether to purchase a certificate in a securitization of mortgage loans. The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property in the

126

absence of a mortgage insurance policy, and thus only lend 80 percent of the value of the property.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in Section IV.A.2, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.[17]

### D.    Statements Regarding Credit Ratings

335.    Credit ratings are assigned to the tranches of securities issued in mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe the various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.

---

[17]    The eleven exceptions are BSMF 2006-SL5, BSMF 2007-SL1, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-WL2, LBMLT 2006-WL3, SACO 2007-1, SACO 2007-2, WMABS 2006-HE4, WMALT 2007-OA1, and WMALT 2007-OA2 for which the Registration Statement understated the percentage of loans with an LTV ratio above 100 percent by 51.87 percent, 60.70 percent, 14.00 percent, 14.38 percent, 9.40 percent, 10.39 percent, 57.82 percent, 54.37 percent, 13.52 percent, 13.31 percent, and 11.93 percent, respectively, but did not overstate the percentage of loans with an LTV ratio at or less than 80 percent.

Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

336.    Rating agencies determine the credit rating for each tranche of securities issued in a mortgage backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor provided loan level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[18]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificateholders.  If the collateral within the securitization is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

337.    Credit ratings have been an important tool to gauge risk when making investment decisions.  In testimony before the Senate PSI, Susan Barnes, the North American Practice Leader for residential mortgage-backed securities at S&P from 2005 to 2008, confirmed that the

---

[18]   "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

rating agencies relied upon investment banks to provide accurate information about the loan

pools:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations. **S&P relies on the data produced by others and reported to both S&P and investors about those loans. . . .S&P does not receive the original loan files for the loans in the pool.** Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

Senate Homeland Security and Governmental Affairs Subcommittee on Investigations, Hearing

on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, Apr. 23, 2010

(emphasis added).

338.    For almost a hundred years, investors like pension funds, municipalities,

insurance companies, and university endowments have relied heavily on credit ratings to assist

them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's

respective internal policies limited their purchases of private label residential mortgage-backed

securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds

(or their equivalent).

339.    Each tranche of Securities in the Securitizations received a credit rating upon

issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the

credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for

each of the GSE Certificates was "investment grade," almost always AAA or its equivalent.  The

accuracy of these ratings was material to a reasonable investor's decision to purchase the

Certificates, and the GSEs' decision to purchase the GSE Certificates.  As set forth in Table 9,

below at paragraph 437, the ratings for the Securitizations were inflated as a result of

Defendants' provision of incorrect data concerning the attributes of the underlying mortgage

collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE

Certificates as AAA (or its equivalent) when, in fact, they were not.

IV.     **Falsity Of Statements in the Prospectus Supplements**

A.     **The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False Or Misleading**

340.    An analysis of loan-level data for a sample of mortgage loans in each

Securitization was conducted in order to assess whether the statistical information provided in

the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted

of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if

there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on

a statistically-significant basis, material misrepresentations of underwriting standards and of

certain key characteristics of the mortgage loans across the Securitizations at the time of

origination.  Plaintiff's data analysis further demonstrates that the data concerning owner

occupancy and LTV ratios was materially false and misleading at the time of origination.

1.     **Owner Occupancy Data Was Materially False**

341.    Plaintiff's data analysis reveals that the owner-occupancy statistics reported in the

Prospectus Supplements were materially false and inflated at the time of origination.  In fact, far

fewer underlying properties were occupied by their owners than disclosed in the Prospectus

Supplements, and more correspondingly were held as second homes or investment properties.

342.    To determine whether a given borrower actually occupied the property as

claimed, a number of tests were conducted during the data review, including, *inter alia*, (i)

whether the borrower's tax bill was being mailed to the mortgaged property or to a different

address six months after the loan closed; (ii) whether the borrower had claimed an owner-

occupied tax exemption on the mortgaged property; and (iii) whether the mailing address of the

property was reflected in the borrower's credit reports, tax records, or lien records. Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

343.    A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading. For example, for the JPMAC 2006-WMC2 Securitization, for which J.P. Morgan Acquisition was the sponsor and J.P. Morgan Securities was the underwriter, the Prospectus Supplement stated that 2.57 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data analysis revealed that for 12.43 percent of the properties represented as owner-occupied, the owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 14.68 percent, more than *five times* the percentage reported in the Prospectus Supplement.[19]

344.    The data analysis revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties. The true percentage of non-owner occupied properties, as determined by the data analysis, versus the percentage stated in the Prospectus Supplement for each Securitization, is reflected in Table 7 below.

---

[19]    This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 2.57 percent) and (b) the product of (i) the stated owner-occupied percentage (here, 97.43 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 12.43 percent).

Table 7

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 5.66 | 12.31 | 17.27 | 11.61 |
| AHM 2005-1 | VIA | Group VI | 29.83 | 12.91 | 38.89 | 9.06 |
| AHM 2005-4 | IVA | Group IV | 32.58 | 12.37 | 40.92 | 8.34 |
| ARSI 2006-M2 | A1 | Group I | 14.03 | 7.98 | 20.89 | 6.86 |
| BALTA 2005-10 | II2A1 | Group II-2 | 55.47 | 14.34 | 61.86 | 6.39 |
| BALTA 2005-10 | II3A1 | Group II-3 | 34.44 | 12.18 | 42.42 | 7.98 |
| BALTA 2006-1 | II1A1 | Group II-1 | 47.08 | 13.61 | 54.28 | 7.20 |
| BALTA 2006-2 | II2A1 | Group II-2 | 31.18 | 15.43 | 41.80 | 10.62 |
| BALTA 2006-3 | II1A1 | Group II-1 | 72.07 | 9.92 | 74.84 | 2.77 |
| BALTA 2006-4 | I2A1 | Group I-2 | 65.91 | 19.19 | 72.45 | 6.54 |
| BALTA 2006-4 | III1A1 | Group III-1 | 11.44 | 12.72 | 22.71 | 11.27 |
| BSABS 2005-HE12 | IIA | Group II | 12.00 | 12.48 | 22.98 | 10.98 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 17.22 | 10.00 | 25.50 | 8.28 |
| BSABS 2006-HE2 | IIA | Group II | 23.89 | 11.84 | 32.90 | 9.01 |
| BSABS 2006-HE4 | IIA | Group II | 10.90 | 13.82 | 23.21 | 12.31 |
| BSABS 2006-HE5 | IIA | Group II | 13.10 | 11.89 | 23.43 | 10.33 |
| BSABS 2006-HE7 | II2A | Group II-2 | 7.98 | 13.66 | 20.55 | 12.57 |
| BSABS 2006-HE8 | II2A | Group II-2 | 5.25 | 10.93 | 15.61 | 10.36 |
| BSABS 2006-HE9 | IIA | Group II | 4.00 | 10.86 | 14.43 | 10.43 |
| BSABS 2006-HE9 | IIIA | Group III | 8.87 | 11.42 | 19.28 | 10.41 |
| BSABS 2006-HE10 | II2A | Group II-2 | 5.75 | 11.56 | 16.65 | 10.89 |
| BSABS 2006-HE10 | II3A | Group II-3 | 8.85 | 12.47 | 20.22 | 11.37 |
| BSABS 2007-FS1 | IIA | Group II | 1.20 | 7.17 | 8.28 | 7.08 |
| BSABS 2007-HE1 | II2A | Group II-2 | 5.25 | 11.28 | 15.94 | 10.68 |
| BSABS 2007-HE1 | II3A | Group II-3 | 10.76 | 9.89 | 19.59 | 8.83 |
| BSABS 2007-HE2 | II2A | Group II-2 | 6.27 | 7.02 | 12.85 | 6.58 |
| BSABS 2007-HE2 | II3A | Group II-3 | 11.06 | 7.14 | 17.41 | 6.35 |
| BSABS 2007-HE3 | IIA | Group II | 7.07 | 10.81 | 17.12 | 10.05 |
| BSABS 2007-HE3 | IIIA | Group III | 5.41 | 9.07 | 13.99 | 8.58 |
| BSABS 2007-HE4 | IIA | Group II | 10.01 | 9.86 | 18.88 | 8.87 |

---

[20] "Strong indication" is defined for purposes of this Complaint as failing two or more owner occupancy tests, as explained in paragraph 342.

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| BSABS 2007-HE5 | IIA | Group II | 8.65 | 9.60 | 17.41 | 8.76 |
| BSABS 2007-HE5 | IIIA | Group III | 0.00 | 9.29 | 9.29 | 9.29 |
| BSABS 2007-HE6 | IIA | Group II | 0.00 | 10.91 | 10.91 | 10.91 |
| BSABS 2007-HE7 | IIA1 | Group II | 8.04 | 10.82 | 17.99 | 9.95 |
| BSABS 2007-HE7 | IIIA1 | Group III | 5.37 | 10.39 | 15.20 | 9.83 |
| BSMF 2006-SL5 | IIA | Group II | 0.00 | 14.15 | 14.15 | 14.15 |
| BSMF 2006-SL6 | IIA | Group II | 0.00 | 13.86 | 13.86 | 13.86 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 16.99 | 13.41 | 28.12 | 11.13 |
| BSMF 2007-SL1 | IIA | Group II | 0.00 | 12.08 | 12.08 | 12.08 |
| BSMF 2007-SL2 | IIA | Group II | 0.00 | 10.74 | 10.74 | 10.74 |
| CBASS 2006-CB2 | AV | Group 1 | 12.66 | 12.01 | 23.15 | 10.49 |
| CBASS 2006-CB7 | A1 | Group I | 14.21 | 8.59 | 21.58 | 7.37 |
| GPMF 2005-AR5 | IIA1 | Group II | 56.28 | 15.55 | 63.08 | 6.80 |
| GPMF 2006-AR3 | IIA1 | Group II | 53.91 | 19.05 | 62.69 | 8.78 |
| GPMF 2006-AR3 | IIA2 | Group II | 53.91 | 19.05 | 62.69 | 8.78 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 15.98 | 12.96 | 26.86 | 10.88 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 40.97 | 12.85 | 48.56 | 7.59 |
| JPMAC 2005-FRE1 | AI | Group I | 14.08 | 13.63 | 25.79 | 11.71 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 7.30 | 9.61 | 16.21 | 8.91 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 9.73 | 14.14 | 22.49 | 12.76 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 12.13 | 13.33 | 23.84 | 11.71 |
| JPMAC 2006-CH1 | A1 | Group 1 | 11.56 | 11.37 | 21.62 | 10.06 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 5.42 | 11.87 | 16.65 | 11.23 |
| JPMAC 2006-CW1 | A1A | Group 1 | 2.31 | 10.11 | 12.19 | 9.88 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 4.90 | 12.94 | 17.21 | 12.31 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 14.56 | 15.13 | 27.49 | 12.93 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 16.87 | 13.18 | 27.83 | 10.96 |
| JPMAC 2006-HE1 | A1 | Group 1 | 13.26 | 12.47 | 24.08 | 10.82 |
| JPMAC 2006-HE2 | A1 | Group 1 | 7.31 | 10.22 | 16.78 | 9.47 |
| JPMAC 2006-HE3 | A1 | Group 1 | 8.04 | 14.78 | 21.63 | 13.59 |
| JPMAC 2006-NC1 | A1 | Group 1 | 19.79 | 12.19 | 29.57 | 9.78 |
| JPMAC 2006-NC2 | A1A | Group 1 | 5.64 | 10.18 | 15.25 | 9.61 |
| JPMAC 2006-RM1 | A1A | Group 1 | 3.92 | 12.03 | 15.47 | 11.55 |
| JPMAC 2006-RM1 | A1B | Group 1 | 3.92 | 12.03 | 15.47 | 11.55 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 1.66 | 11.41 | 12.88 | 11.22 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| JPMAC 2006-WMC2 | A1 | Group 1 | 2.57 | 12.43 | 14.68 | 12.11 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 2.21 | 13.66 | 15.57 | 13.36 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 2.21 | 13.66 | 15.57 | 13.36 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 1.96 | 10.78 | 12.53 | 10.57 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 1.96 | 10.78 | 12.53 | 10.57 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 4.50 | 11.17 | 15.17 | 10.67 |
| JPMAC 2007-CH3 | A1A | Group 1 | 9.03 | 10.62 | 18.70 | 9.67 |
| JPMAC 2007-CH3 | A1B | Group 1 | 9.03 | 10.62 | 18.70 | 9.67 |
| JPMAC 2007-CH4 | A1 | Group 1 | 7.81 | 12.66 | 19.48 | 11.67 |
| JPMAC 2007-CH5 | A1 | Group 1 | 11.75 | 9.68 | 20.30 | 8.55 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 5.75 | 17.56 | 22.30 | 16.55 |
| LBMLT 2005-3 | IA | Group I | 3.10 | 11.41 | 14.16 | 11.06 |
| LBMLT 2006-1 | IA | Group I | 23.42 | 10.34 | 31.34 | 7.92 |
| LBMLT 2006-2 | IA | Group I | 22.48 | 11.98 | 31.77 | 9.29 |
| LBMLT 2006-3 | IA | Group I | 7.21 | 11.79 | 18.15 | 10.94 |
| LBMLT 2006-4 | IA | Group I | 4.94 | 12.29 | 16.63 | 11.68 |
| LBMLT 2006-5 | IA | Group I | 6.06 | 11.57 | 16.93 | 10.87 |
| LBMLT 2006-6 | IA | Group I | 3.27 | 12.94 | 15.78 | 12.51 |
| LBMLT 2006-7 | IA | Group I | 4.23 | 13.82 | 17.47 | 13.24 |
| LBMLT 2006-8 | IA | Group I | 5.86 | 14.42 | 19.43 | 13.57 |
| LBMLT 2006-9 | IA | Group I | 8.21 | 12.90 | 20.05 | 11.84 |
| LBMLT 2006-10 | IA | Group I | 7.55 | 14.52 | 20.97 | 13.42 |
| LBMLT 2006-11 | IA | Group I | 6.06 | 14.37 | 19.56 | 13.50 |
| LBMLT 2006-WL1 | IA1 | Group I | 18.62 | 10.80 | 27.41 | 8.79 |
| LBMLT 2006-WL1 | IA2 | Group I | 18.62 | 10.80 | 27.41 | 8.79 |
| LBMLT 2006-WL2 | IA | Group I | 17.98 | 13.41 | 28.98 | 11.00 |
| LBMLT 2006-WL3 | IA | Group I | 16.29 | 11.48 | 25.90 | 9.61 |
| LUM 2006-3 | II2A1 | Group II-2 | 26.44 | 13.97 | 36.72 | 10.28 |
| NCMT 2007-1 | 1A1 | Group 1 | 0.00 | 11.15 | 11.15 | 11.15 |
| PCHLT 2005-4 | 2A1 | Group 2 | 16.85 | 15.81 | 30.00 | 13.15 |
| SACO 2007-1 | IIA | Group II | 0.00 | 11.19 | 11.19 | 11.19 |
| SACO 2007-2 | IIA | Group II | 0.00 | 12.86 | 12.86 | 12.86 |
| SAMI 2006-AR4 | IA1 | Group I | 27.31 | 19.81 | 41.71 | 14.40 |
| WAMU 2007-OA3 | 1A | Group 1 | 49.00 | 13.04 | 55.65 | 6.65 |
| WMABS 2006-HE1 | IA | Group 1 | 10.27 | 9.79 | 19.05 | 8.78 |

134

| Transaction | Tranche | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner Occupied With Strong Indication of Non-Owner Occupancy[20] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|---|
| WMABS 2006-HE3 | IA | Group I | 9.87 | 10.75 | 19.56 | 9.69 |
| WMABS 2006-HE4 | IA | Group I | 8.97 | 10.62 | 18.64 | 9.67 |
| WMABS 2006-HE5 | IA | Group I | 8.43 | 10.59 | 18.13 | 9.70 |
| WMABS 2007-HE1 | IA | Group I | 9.50 | 11.92 | 20.29 | 10.79 |
| WMABS 2007-HE2 | IA | Group I | 8.32 | 11.85 | 19.18 | 10.86 |
| WMALT 2005-9 | 1CB | Group 1 | 100.00 | n/a | n/a | n/a |
| WMALT 2005-10 | 1CB | Group 1 | 100.00 | n/a | n/a | n/a |
| WMALT 2006-AR4 | 1A | Group 1 | 23.67 | 18.91 | 38.10 | 14.43 |
| WMALT 2006-AR4 | 2A | Group 2 | 24.70 | 18.78 | 38.84 | 14.14 |
| WMALT 2006-AR4 | 3A | Group 3 | 21.07 | 13.44 | 31.68 | 10.61 |
| WMALT 2006-AR5 | 1A | Group 1 | 18.64 | 22.95 | 37.31 | 18.67 |
| WMALT 2006-AR5 | 2A | Group 2 | 31.67 | 17.20 | 43.42 | 11.75 |
| WMALT 2006-AR8 | 1A | Group 1 | 19.45 | 13.27 | 30.14 | 10.69 |
| WMALT 2006-AR9 | 1A | Group 1 | 21.51 | 15.64 | 33.79 | 12.28 |
| WMALT 2007-OA1 | 1A | Group 1 | 20.78 | 14.67 | 32.40 | 11.62 |
| WMALT 2007-OA2 | 1A | Group 1 | 20.67 | 13.98 | 31.76 | 11.09 |
| WMALT 2007-OA3 | 1A | Group 1 | 17.11 | 14.14 | 28.83 | 11.72 |
| WMALT 2007-OA3 | 3A | Group 3 | 39.96 | 17.57 | 50.51 | 10.55 |
| WMHE 2007-HE1 | IA | Group I | 6.47 | 15.68 | 21.14 | 14.67 |
| WMHE 2007-HE2 | IA | Group I | 8.21 | 14.71 | 21.71 | 13.50 |
| WMHE 2007-HE3 | IA | Group I | 5.84 | 13.14 | 18.21 | 12.37 |
| WMHE 2007-HE4 | IA | Group I | 7.04 | 13.19 | 19.30 | 12.26 |

345.    The GSEs understood that Defendants had determined that the statistics provided in the Prospectus Supplements were true and correct in all material respects.  In reality, as Table 7 reflects, the Prospectus Supplement for each Securitization was materially inaccurate, understating the percentage of non-owner occupied properties by at least 2.77 percent,[21] and for many Securitizations by 10 percent or more, thus materially understating the risk of the GSE Certificates.  The Prospectus Supplements containing the owner-occupancy statistics bore the

---

[21]    The two exceptions are the WMALT 2005-9 and WMALT 2005-10 Securitizations.

names of the JPMorgan Entities, the Bear Stearns Entities, the WaMu Entities, the Long Beach Entities, and the Other Underwriter Defendants, and as such, suggested that the JPMorgan Entities, the Bear Stearns Entities, the WaMu Entities, the Long Beach Entities, and the Other Underwriter Defendants were endorsing the statistics in these documents.

346.    Specifically, the data analysis revealed that the Prospectus Supplements for the JPMorgan Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 11.14 percent.

347.    Likewise, the data analysis revealed that the Prospectus Supplements for the Bear Stearns Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 9.77 percent.

348.    The data analysis also revealed that the Prospectus Supplements for the WaMu Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 11.66 percent.[22]

349.    The data analysis also revealed that the Prospectus Supplements for the Long Beach Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 11.28 percent.

350.    Examples of the findings showing that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of origination are discussed in detail below at paragraphs 381-382.  The forensic loan file review conducted by Plaintiff reaffirms what the above statistics demonstrate: the owner-occupancy data in the Prospectus Supplements was materially false at the time of origination.

_____

[22]    This calculation excludes the WMALT 2005-9 and WMALT 2005-10 Securitizations, for which none of the properties were reported by the prospectus supplements as being owner occupied.

## 2.      Loan-to-Value Data Was Materially False

351.    The data analysis further reveals that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated at the time of origination, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  Such retroactive AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  Such AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  Retroactive AVMs produce independent, statistically-derived valuation estimates at the time of the loan's origination by applying modeling techniques to this data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation, repeat sales indexes, and regression analysis, relying only on sales made within the last 24 months prior to the origination of the mortgage loan at issue.

352.    Applying the VP4 AVM to the available data for the properties securing the sampled loans shows that the retroactive appraised value given to such properties was significantly higher than the actual value of such properties at the time they were originated.  The result of this overstatement of property values is a material understatement of LTV.  That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default

353.    For example, for the JPMAC 2006-WMC2 Securitization, which was sponsored by J.P. Morgan Acquisition and underwritten by J.P. Morgan Securities, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent.

In fact, 16.36 percent of the sample of loans included in the data analysis had LTV ratios above

100 percent.  In addition, the Prospectus Supplement stated that 68.40 percent of the loans had

LTV ratios at or below 80 percent.  The data analysis indicated that only 39.78 percent of the

loans had LTV ratios at or below 80 percent.

354.    The data analysis revealed that for each Securitization, the Prospectus Supplement

misrepresented both the percentage of loans with an LTV ratio that were above 100 percent and

the percentage of loans that had an LTV ratio at or below 80 percent, at the time of origination.

Table 8 reflects (i) the true percentage of mortgages in the Supporting Loan Group at the time of

origination with LTV ratios above 100 percent, versus the percentage reported in the Prospectus

Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group at the time

of origination with LTV ratios at or below 80 percent, versus the percentage reported in the

Prospectus Supplement.  The percentages listed in Table 8 were calculated by aggregated

principal balance.

**Table 8**

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 63.41 | 43.07 | 0.00 | 14.00 |
| AHM 2005-1 | VIA | Group VI | 92.90 | 66.10 | 0.00 | 7.24 |
| AHM 2005-4 | IVA | Group IV | 94.45 | 59.16 | 0.00 | 6.79 |
| ARSI 2006-M2 | A1 | Group I | 45.87 | 34.51 | 0.00 | 20.46 |
| BALTA 2005-10 | II2A1 | Group II-2 | 98.22 | 56.28 | 0.00 | 8.44 |
| BALTA 2005-10 | II3A1 | Group II-3 | 98.52 | 52.84 | 0.00 | 9.15 |
| BALTA 2006-1 | II1A1 | Group II-1 | 97.74 | 50.60 | 0.00 | 8.70 |
| BALTA 2006-2 | II2A1 | Group II-2 | 99.19 | 50.12 | 0.00 | 6.34 |
| BALTA 2006-3 | II1A1 | Group II-1 | 97.70 | 57.00 | 0.00 | 5.89 |

138

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| BALTA 2006-4 | I2A1 | Group I-2 | 98.52 | 48.73 | 0.00 | 11.46 |
| BALTA 2006-4 | III1A1 | Group III-1 | 83.43 | 46.04 | 0.00 | 9.54 |
| BSABS 2005-HE12 | IIA | Group II | 58.04 | 43.54 | 0.00 | 14.63 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 50.91 | 35.48 | 0.00 | 22.58 |
| BSABS 2006-HE2 | IIA | Group II | 50.24 | 41.35 | 0.00 | 11.53 |
| BSABS 2006-HE4 | IIA | Group II | 66.09 | 45.72 | 0.00 | 16.29 |
| BSABS 2006-HE5 | IIA | Group II | 52.23 | 40.68 | 0.00 | 16.95 |
| BSABS 2006-HE7 | II2A | Group II-2 | 58.48 | 37.56 | 0.00 | 18.92 |
| BSABS 2006-HE8 | II2A | Group II-2 | 59.19 | 38.94 | 0.00 | 14.60 |
| BSABS 2006-HE9 | IIA | Group II | 48.60 | 33.89 | 0.00 | 17.58 |
| BSABS 2006-HE9 | IIIA | Group III | 50.00 | 33.13 | 0.00 | 20.19 |
| BSABS 2006-HE10 | II2A | Group II-2 | 55.06 | 33.65 | 0.00 | 24.09 |
| BSABS 2006-HE10 | II3A | Group II-3 | 51.39 | 31.48 | 0.00 | 21.97 |
| BSABS 2007-FS1 | IIA | Group II | 36.55 | 27.16 | 0.00 | 21.34 |
| BSABS 2007-HE1 | II2A | Group II-2 | 54.46 | 33.98 | 0.00 | 23.71 |
| BSABS 2007-HE1 | II3A | Group II-3 | 52.89 | 31.21 | 0.00 | 21.71 |
| BSABS 2007-HE2 | II2A | Group II-2 | 39.16 | 18.82 | 0.00 | 27.06 |
| BSABS 2007-HE2 | II3A | Group II-3 | 35.32 | 19.49 | 0.00 | 32.78 |
| BSABS 2007-HE3 | IIA | Group II | 44.19 | 27.66 | 0.00 | 30.00 |
| BSABS 2007-HE3 | IIIA | Group III | 49.54 | 31.46 | 0.00 | 23.38 |
| BSABS 2007-HE4 | IIA | Group II | 53.46 | 32.64 | 0.00 | 25.94 |
| BSABS 2007-HE5 | IIA | Group II | 61.17 | 39.46 | 0.00 | 19.43 |
| BSABS 2007-HE5 | IIIA | Group III | 48.36 | 33.12 | 0.00 | 26.96 |
| BSABS 2007-HE6 | IIA | Group II | 54.31 | 31.62 | 0.00 | 26.95 |
| BSABS 2007-HE7 | IIA1 | Group II | 66.83 | 37.42 | 0.00 | 23.78 |
| BSABS 2007-HE7 | IIIA1 | Group III | 74.70 | 46.92 | 0.00 | 17.14 |
| BSMF 2006-SL5 | IIA | Group II | 1.93 | 3.10 | 0.00 | 51.87 |
| BSMF 2006-SL6 | IIA | Group II | 3.62 | 3.52 | 0.00 | 57.15 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 100.00 | 44.98 | 0.00 | 13.10 |
| BSMF 2007-SL1 | IIA | Group II | 0.47 | 1.12 | 0.00 | 60.70 |
| BSMF 2007-SL2 | IIA | Group II | 1.77 | 1.72 | 0.00 | 57.28 |
| CBASS 2006-CB2 | AV | Group 1 | 64.44 | 45.98 | 0.04 | 12.59 |
| CBASS 2006-CB7 | A1 | Group I | 45.11 | 32.70 | 0.00 | 26.28 |
| GPMF 2005-AR5 | IIA1 | Group II | 96.48 | 57.02 | 0.00 | 7.00 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| GPMF 2006-AR3 | IIA1 | Group II | 97.93 | 52.84 | 0.00 | 6.57 |
| GPMF 2006-AR3 | IIA2 | Group II | 97.93 | 52.84 | 0.00 | 6.57 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 94.54 | 55.96 | 0.00 | 6.76 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 92.37 | 47.58 | 0.00 | 12.11 |
| JPMAC 2005-FRE1 | AI | Group I | 52.82 | 32.47 | 0.00 | 15.74 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 70.09 | 40.37 | 0.00 | 12.83 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 63.36 | 45.43 | 0.00 | 12.48 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 52.46 | 35.01 | 0.00 | 16.89 |
| JPMAC 2006-CH1 | A1 | Group 1 | 53.08 | 37.64 | 0.00 | 17.82 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 67.63 | 41.03 | 0.00 | 15.05 |
| JPMAC 2006-CW1 | A1A | Group 1 | 71.17 | 52.52 | 0.00 | 6.70 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 66.24 | 46.93 | 0.00 | 10.50 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 59.44 | 39.00 | 0.00 | 15.43 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 52.73 | 34.03 | 0.00 | 16.16 |
| JPMAC 2006-HE1 | A1 | Group 1 | 64.92 | 41.62 | 0.00 | 13.48 |
| JPMAC 2006-HE2 | A1 | Group 1 | 76.16 | 45.54 | 0.00 | 13.57 |
| JPMAC 2006-HE3 | A1 | Group 1 | 43.50 | 25.93 | 0.00 | 21.82 |
| JPMAC 2006-NC1 | A1 | Group 1 | 56.25 | 41.84 | 0.00 | 13.96 |
| JPMAC 2006-NC2 | A1A | Group 1 | 57.98 | 43.74 | 0.00 | 16.63 |
| JPMAC 2006-RM1 | A1A | Group 1 | 56.97 | 35.04 | 0.00 | 19.26 |
| JPMAC 2006-RM1 | A1B | Group 1 | 56.97 | 35.04 | 0.00 | 19.26 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 62.34 | 43.20 | 0.00 | 16.73 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 68.40 | 39.78 | 0.00 | 16.36 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 66.96 | 39.31 | 0.00 | 18.24 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 66.96 | 39.31 | 0.00 | 18.24 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 64.62 | 31.19 | 0.00 | 23.87 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 64.62 | 31.19 | 0.00 | 23.87 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 57.39 | 41.12 | 0.00 | 15.37 |
| JPMAC 2007-CH3 | A1A | Group 1 | 63.36 | 38.00 | 0.00 | 16.62 |
| JPMAC 2007-CH3 | A1B | Group 1 | 63.36 | 38.00 | 0.00 | 16.62 |
| JPMAC 2007-CH4 | A1 | Group 1 | 56.35 | 40.32 | 0.00 | 17.85 |
| JPMAC 2007-CH5 | A1 | Group 1 | 50.85 | 32.39 | 0.00 | 22.13 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 96.71 | 54.52 | 0.00 | 5.81 |
| LBMLT 2005-3 | IA | Group I | 100.00 | 56.13 | 0.00 | 6.45 |

140

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| LBMLT 2006-1 | IA | Group I | 72.87 | 50.10 | 0.00 | 11.25 |
| LBMLT 2006-2 | IA | Group I | 67.64 | 42.70 | 0.00 | 11.94 |
| LBMLT 2006-3 | IA | Group I | 75.85 | 46.02 | 0.00 | 12.74 |
| LBMLT 2006-4 | IA | Group I | 81.33 | 40.50 | 0.00 | 12.40 |
| LBMLT 2006-5 | IA | Group I | 74.73 | 46.95 | 0.00 | 12.34 |
| LBMLT 2006-6 | IA | Group I | 28.45 | 29.62 | 0.00 | 14.00 |
| LBMLT 2006-7 | IA | Group I | 22.74 | 24.05 | 0.00 | 14.38 |
| LBMLT 2006-8 | IA | Group I | 70.66 | 44.13 | 0.00 | 16.70 |
| LBMLT 2006-9 | IA | Group I | 63.13 | 34.87 | 0.00 | 19.60 |
| LBMLT 2006-10 | IA | Group I | 59.81 | 36.05 | 0.00 | 20.72 |
| LBMLT 2006-11 | IA | Group I | 61.67 | 36.74 | 0.00 | 21.35 |
| LBMLT 2006-WL1 | IA1 | Group I | 70.76 | 46.32 | 0.00 | 11.69 |
| LBMLT 2006-WL1 | IA2 | Group I | 70.76 | 46.32 | 0.00 | 11.69 |
| LBMLT 2006-WL2 | IA | Group I | 19.23 | 25.15 | 0.00 | 9.40 |
| LBMLT 2006-WL3 | IA | Group I | 21.86 | 23.17 | 0.00 | 14.57 |
| LUM 2006-3 | II2A1 | Group II-2 | 96.85 | 55.23 | 0.00 | 7.03 |
| NCMT 2007-1 | 1A1 | Group 1 | 48.06 | 31.51 | 0.00 | 27.78 |
| PCHLT 2005-4 | 2A1 | Group 2 | 59.05 | 43.48 | 0.00 | 14.71 |
| SACO 2007-1 | IIA | Group II | 2.54 | 3.17 | 0.00 | 57.82 |
| SACO 2007-2 | IIA | Group II | 1.17 | 2.71 | 0.00 | 54.37 |
| SAMI 2006-AR4 | IA1 | Group I | 91.65 | 46.49 | 0.00 | 9.55 |
| WAMU 2007-OA3 | 1A | Group 1 | 93.43 | 64.08 | 0.00 | 10.53 |
| WMABS 2006-HE1 | IA | Group 1 | 59.84 | 42.14 | 0.00 | 15.51 |
| WMABS 2006-HE3 | IA | Group 1 | 40.79 | 32.96 | 0.00 | 19.52 |
| WMABS 2006-HE4 | IA | Group 1 | 22.83 | 29.10 | 0.00 | 13.52 |
| WMABS 2006-HE5 | IA | Group 1 | 49.18 | 21.97 | 0.00 | 24.78 |
| WMABS 2007-HE1 | IA | Group 1 | 62.14 | 34.22 | 0.00 | 21.30 |
| WMABS 2007-HE2 | IA | Group 1 | 60.98 | 33.29 | 0.00 | 21.95 |
| WMALT 2005-9 | 1CB | Group 1 | 89.08 | 77.70 | 0.00 | 3.72 |
| WMALT 2005-10 | 1CB | Group 1 | 94.88 | 72.62 | 0.00 | 6.39 |
| WMALT 2006-AR4 | 1A | Group 1 | 77.29 | 54.58 | 0.00 | 10.21 |
| WMALT 2006-AR4 | 2A | Group 2 | 90.48 | 66.33 | 0.00 | 6.67 |
| WMALT 2006-AR4 | 3A | Group 3 | 76.36 | 55.17 | 0.00 | 9.10 |
| WMALT 2006-AR5 | 1A | Group 1 | 70.75 | 51.69 | 0.00 | 11.03 |

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True Percentage of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios Greater Than 100% | True Percentage of Loans in Sample With LTV Ratios Greater Than 100% Based on Data Analysis |
|---|---|---|---|---|---|---|
| WMALT 2006-AR5 | 2A | Group 2 | 76.48 | 57.57 | 0.00 | 6.65 |
| WMALT 2006-AR8 | 1A | Group 1 | 77.21 | 53.16 | 0.00 | 9.87 |
| WMALT 2006-AR9 | 1A | Group 1 | 76.47 | 45.61 | 0.00 | 14.58 |
| WMALT 2007-OA1 | 1A | Group 1 | 45.17 | 47.68 | 0.00 | 13.31 |
| WMALT 2007-OA2 | 1A | Group 1 | 46.97 | 48.02 | 0.00 | 11.93 |
| WMALT 2007-OA3 | 1A | Group 1 | 49.34 | 42.86 | 0.00 | 14.37 |
| WMALT 2007-OA3 | 3A | Group 3 | 90.37 | 47.97 | 0.00 | 18.12 |
| WMHE 2007-HE1 | IA | Group I | 60.41 | 38.83 | 0.00 | 23.08 |
| WMHE 2007-HE2 | IA | Group I | 58.78 | 40.12 | 0.00 | 22.89 |
| WMHE 2007-HE3 | IA | Group I | 59.11 | 37.65 | 0.00 | 21.59 |
| WMHE 2007-HE4 | IA | Group I | 57.07 | 34.97 | 0.00 | 26.24 |

355.    As Table 8 demonstrates, the Prospectus Supplements for all but one of the Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.  In contrast, the data analysis revealed that at least 3.72 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.

356.    These systematic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  As described in greater detail below, government investigations and news reports have confirmed that appraisers for nearly all of the originators from which the JPMorgan Entities, the Bear Stearns Entities, the WaMu Entities, and the Long Beach Entities purchased mortgage loans, including WMC Mortgage, Fremont, Countrywide,

142

GreenPoint, Argent, New Century, American Home, and Option One, did not produce independent appraisals and that the appraisers did not honestly believe their appraisals when they were made.  For example, as described below at paragraph 401, the Massachusetts Attorney General brought an enforcement action against Fremont based, in part, on the fact that Fremont "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to…property appraisals."  This and other examples discussed below confirm that the appraisals underlying the LTV ratios described above were objectively false because the appraisals vastly overstated the actual value of the property, and also subjectively false because the appraisers themselves did not believe the appraisals to be true at the time they were made.

357.    Indeed, independent appraisers following proper practices and, providing genuine estimates as to valuation, would not systematically generate appraisals that, as demonstrated by Table 8, deviate so significantly (and so consistently upward) from the true values of the appraised properties.  These consistent one-directional errors demonstrate that, contrary to the representations in the Prospectus and Prospectus Supplements described above, the appraisers did not comply with the Uniform Standards of Professional Appraisal Practice but instead generated inflated appraisal values merely to justify the issuance of a mortgage loan.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011); *see also* paragraph 432-433.

**B.     The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

358.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by systematically misreported owner-occupancy and LTV statistics, discussed above, and by (1) a forensic review of over 1,061 loan files for loans in the Supporting Loan Groups for the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Securitizations; (2) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (3) the collapse of the Certificates' credit ratings; and (4) the surge in delinquency and default in the mortgages in the Securitizations.

**1.     A Forensic Review of Loan Files Has Revealed Pervasive Failures to Adhere to Underwriting Guidelines**

359.    A forensic review of 535 loan files for loans in the Supporting Loan Group for the BSMF 2007-AR3 Securitization, for which EMC served as the sponsor, SAMI served as the depositor, and BSC served as the sole underwriter, has revealed that approximately 98 percent of the reviewed loans were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

360.    Further, a forensic review of 426 loan files for loans in the Supporting Loan Group for the BSABS 2006-AQ1 Securitization, for which EMC also served as the sponsor, SAMI also served as the depositor, and BSC also served as the sole underwriter, has revealed that over 90 percent of the reviewed loans were not underwritten in accordance with the

underwriting guidelines or otherwise breached the representations contained in the transaction documents.

361.    Additionally, an initial forensic review of 100 loan files for loans in the Supporting Loan Group for the CBASS 2006-CB7 Securitization, for which Credit-Based Asset Servicing and Securitization LLC served as the sponsor, Bond Securitization, LLC served as the depositor, and J.P. Morgan Securities served as the lead underwriter, has revealed that approximately 79 percent of the reviewed loans were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

362.    The forensic review consisted of an analysis of the loan origination file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration documentation with pertinent information indicating a borrower's assets or residence, and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information.

**(a)       The BSMF 2007-AR3 Securitization**

363.    The majority of the mortgage loans in the BSMF 2007-AR3 Securitization were originated or acquired by Bear Stearns affiliates EMC and BSRM.[23]   The Prospectus Supplement

---

[23] According to the BSMF 2007-AR3 Prospectus Supplement, EMC originated or acquired 64.01 percent, 41.63 percent, and 41.49 percent of the group I, sub-group II-1, and sub-group II-2 mortgage loans, respectively; BSRM originated 23.04 percent, 14.52 percent, and 16.49 percent of the group I, sub-group II-1, and sub-group II-2 mortgage loans, respectively; SouthStar Funding, LLC originated 9.71 percent, 8.85 percent, and 15.59 percent of the group I, sub-group II-1, and sub-group II-2 mortgage loans, respectively; Impac Funding Corporation originated 14.77 percent and 13.56 percent of the sub-group II-1 and sub-group II-2 mortgage loans, respectively; Aegis Mortgage Corporation originated 10.52 percent and 6.72 percent of the

for the BSMF 2007-AR3 Securitization stated that the mortgage loans underlying the Securitization which were "originated or acquired" by EMC were "originated generally in accordance with the underwriting guidelines established by the Sponsor [EMC] as set forth" in the "EMC Underwriting Guidelines."  The EMC Underwriting Guidelines were generally consistent with prudent and customary underwriting practices in the mortgage industry.  The prospectus supplement for the BSMF 2007-AR3 Securitization stated that the EMC Underwriting Guidelines were "applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral" and that the guidelines required the consideration of "the ratio of [the proposed borrower's monthly obligation] to the proposed borrower's acceptable stable monthly gross income" as well as the "prospective borrower's credit report."  Thus, the EMC Underwriting Guidelines were designed to assess the likelihood a borrower would be able to repay the loan.

364.    Similarly, the BSMF 2007-AR3 Prospectus Supplement stated that the mortgage loans underlying the Securitization which were originated by BSRM were "originated by BSRM generally in accordance with the underwriting guidelines established by BSRM as set forth" in the "BSRM Underwriting Guidelines."  The BSRM Underwriting Guidelines were generally consistent with prudent and customary underwriting practices in the mortgage industry.  The prospectus supplement for the BSMF 2007-AR3 Securitization stated that the BSRM Underwriting Guidelines were "intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable" and that the guidelines required the consideration of "the loan applicant's sources of

---

sub-group II-1 and sub-group II-2 mortgage loans, respectively; the remainder of the mortgage loans were originated by various originators, none of which originated more than 10 percent of the mortgage loans in any loan group or sub-group.  The applicable Supporting Loan Group collateralizing the GSE Certificates in the BSMF 2007-AR3 Securitization is sub-group II-2.

income," "the credit history of the applicant," and "the debt-to-income ratio to determine the applicant's ability to repay the loan." Thus, the BSRM Underwriting Guidelines were also designed to assess the likelihood a borrower would be able to repay the loan.

365. According to both the applicable EMC Alt-A First Lien Program Underwriting Guidelines and the EMC Alt-A Second Lien Underwriting Guidelines, "All loans must undergo the prudent underwriting of the Seller as delegated by EMC. The Underwriting Guidelines set forth should be met for all loans submitted to EMC for purchase. EMC will review documented exceptions to these guidelines on a case-by-case basis, provided sound and prudent underwriting practices were followed." The Prospectus Supplement stated that exceptions to the EMC Underwriting Guidelines would be "managed through a formal exception process" where "compensating factors are present." This approach is consistent with the underwriting practices of other originators.

366. Similarly, the applicable BSRM Alt-A Program Underwriting Guidelines, required that "[a]ll loans must undergo the prudent underwriting of Bear Stearns Residential Mortgage. The Underwriting Guidelines set forth should be met for all loans submitted to Bear Stearns Residential Mortgage." Exceptions to the BSRM Underwriting Guidelines, according to the Prospectus Supplement, were to be made on a "case-by-case basis" where "reasonable compensating factors" were present. This approach is likewise consistent with the underwriting practices of other originators.

367. In total, 523 of the 535 loans that were reviewed from the BSMF 2007-AR3 Securitization did not comply with the applicable underwriting guidelines. Although the Prospectus Supplement represented that exceptions would be justified by sufficient compensating factors, none of these 523 loan files reflecting a breach of underwriting guidelines

evidenced sufficient compensating factors that would justify or support such an exception.  An over 97 percent breach rate, in any event, could not possibly be explained by the proper application of compensating factors to justify any such exceptions.

### (b)    The BSABS 2006-AQ1 Securitization

368.    The mortgage loans in the BSABS 2006-AQ1 Securitization were originated by Argent Mortgage Company, LLC ("Argent") and Ameriquest Mortgage Company ("Ameriquest").[24]  The Prospectus Supplement for the BSABS 2006-AQ1 Securitization stated that the mortgage loans underlying the Securitization which were originated by Argent and Ameriquest (collectively, the "Ameriquest Loan Sellers") were "originated generally in accordance with guidelines…established by the Ameriquest Loan Sellers" (the "Ameriquest Loan Seller Underwriting Guidelines").  The Ameriquest Loan Seller Underwriting Guidelines were generally consistent with prudent and customary underwriting practices in the mortgage industry.  The prospectus supplement for the BSABS 2006-AQ1 Securitization stated that the Ameriquest Loan Seller Underwriting Guidelines were "primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral" and that the guidelines required the consideration of the borrower's "debt-to-income ratio to determine the applicant's ability to repay the loan" as well as the "credit history of the applicant."  Thus, the Ameriquest Loan Seller Underwriting Guidelines were designed to assess the likelihood a borrower would be able to repay the loan.

---

[24] According to the BSABS 2006-AQ1 Prospectus Supplement, Argent originated 98.94 percent, 89.63 percent, and 95.06 percent of the sub-group I-1, sub-group I-2, and group II mortgage loans, respectively; Ameriquest originated 1.06 percent, 10.37 percent, and 4.94 percent of the sub-group I-1, sub-group I-2, and group II mortgage loans, respectively.  The applicable Supporting Loan Group collateralizing the GSE Certificates in the BSABS 2006-AQ1 Securitization is sub-group I-2.

148

369.    According to both the relevant Argent Underwriting Guidelines and the Argent Alt-A Underwriting Guidelines, "Argent evaluates and approves all applicants based on credit, capacity to repay, and collateral."  Similarly, the relevant Ameriquest Underwriting Guidelines required the evaluation of the borrower's credit quality, debt ratio, and the value of the property. Exceptions to the Ameriquest Loan Seller Underwriting Guidelines, according to the Prospectus Supplement, were to be made on a "case-by-case basis" where "compensating factors" that "warrant[] an exception" were present.

370.    In total, 387 of the 426 loans that were reviewed from the BSABS 2006-AQ1 Securitization did not comply with the applicable underwriting guidelines.  Although the Prospectus Supplement represented that exceptions would be justified by sufficient compensating factors, none of these 387 loan files reflecting a breach of underwriting guidelines evidenced sufficient compensating factors that would justify or support such an exception.  An over 90 percent breach rate, in any event, could not possibly be explained by the proper application of compensating factors to justify any such exceptions.

### (c)    The CBASS 2006-CB7 Securitization

371.    The mortgage loans in the CBASS 2006-CB7 Securitization were originated by Argent, Ameriquest, New Century Mortgage Corporation ("New Century") and various other mortgage loan originators.[25]  The Prospectus Supplement for the CBASS 2006-CB7 Securitization stated that the mortgage loans underlying the Securitization which were originated by Argent and Ameriquest (collectively, the "Ameriquest Loan Sellers") were "originated

---

[25] According to the CBASS 2006-CB7 Prospectus Supplement, Argent and Ameriquest combined originated 28.84 percent of the mortgage loans.  New Century originated 25.61 percent of the mortgage loans.  The remainder of the mortgage loans were originated by various originators, none of which originated more than 20 percent of the mortgage loans in the mortgage pool.

generally in accordance with guidelines…established by the Ameriquest Loan Sellers" (the "Ameriquest Loan Seller Underwriting Guidelines"). The Ameriquest Loan Seller Underwriting Guidelines were generally consistent with prudent and customary underwriting practices in the mortgage industry. The prospectus supplement for the CBASS 2006-CB7 Securitization stated that the Ameriquest Loan Seller Underwriting Guidelines were "primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral" and that the guidelines required the consideration of the borrower's "debt-to-income ratio to determine the applicant's ability to repay the loan" as well as the "credit history of the applicant." Thus, the Ameriquest Loan Seller Underwriting Guidelines were designed to assess the likelihood a borrower would be able to repay the loan. This approach is consistent with the underwriting practices of other originators.

372.    The CBASS 2006-CB7 Prospectus Supplement similarly stated that the mortgage loans underlying the Securitization which were originated by New Century were "originated or acquired by New Century in accordance with the New Century Underwriting Guidelines." The New Century Underwriting Guidelines were generally consistent with prudent and customary underwriting practices in the mortgage industry. The prospectus supplement for the CBASS 2006-CB7 Securitization stated that the New Century Underwriting Guidelines were "primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan" and that the guidelines required the consideration of the borrower's "credit history, repayment ability and debt service-to-income ratio." Thus, the New Century Underwriting Guidelines were also designed to assess the likelihood a borrower would be able to

repay the loan.  This approach is also consistent with the underwriting practices of other originators.

373.    The CBASS 2006-CB7 Prospectus Supplement more generally provided that the mortgage loans underlying the Securitization were "reviewed" for "credit and compliance considerations" by the sponsor.  This review "evaluates the mortgagor's credit standing, repayment ability and willingness to repay debt" and considers "the quality, quantity and durability of income history, history of debt management, history of debt repayment and net worth accumulation of the mortgagor" as well as "a current credit report."

374.    Exceptions to the Ameriquest Loan Seller Underwriting Guidelines, according to the Prospectus Supplement, were to be made on a "case-by-case basis" where "compensating factors" that "warrant[] an exception" were present.  Likewise, exceptions to the New Century Underwriting Guidelines were to be made on a "case-by-case basis," but only "where compensating factors exist."  This approach is consistent with the underwriting practices of other originators.

375.    In total, 79 of the 100 loans that were reviewed from the CBASS 2006-CB7 Securitization did not comply with the applicable underwriting guidelines.  Although the Prospectus Supplement represented that exceptions would be justified by sufficient compensating factors, none of these 79 loan files reflecting a breach of underwriting guidelines evidenced sufficient compensating factors that would justify or support such an exception.  A 79 percent breach rate, in any event, could not possibly be explained by the proper application of compensating factors to justify any such exceptions.

       **(d)**      **The Forensic Review Demonstrates The Material Falsity of the Registration Statements**

376.    The results of the forensic review demonstrate that the statements in the Registration Statements applicable to the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Securitizations, that the mortgage loans were underwritten in accordance with the guidelines described in the Prospectus Supplements, were materially false.  The forensic review revealed abandonment of underwriting guidelines, including as follows:

- Failure to test the reasonableness of the borrower's stated income, which in turn contributed to material misrepresentations of income;

- Failure to properly investigate the borrower's intent to occupy the subject property as a primary residence or second home when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended to be utilized for investment purposes;

- Failure to properly investigate information contained in the borrower's credit report for potential misrepresentations of outstanding debt; and

- Failure to properly calculate the borrower's outstanding debt, which in turn resulted in the borrower's debt-to-income ratio ("DTI") exceeding the maximum allowed under the underwriting guidelines.

377.    The following examples from the forensic review of the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Securitizations illustrate the types of violations discussed above that pervade the loan pools for these securitizations.  These are examples of violations of the applicable underwriting guidelines and are not a complete list of all the findings.

       **a.**      **Stated Income Was Not Reasonable**

378.    It is standard in the industry for underwriting guidelines to require a verification of employment or reasonableness of stated income in the loan application.  Although, according to the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Prospectus Supplements, no verification of income is required for low documentation loans, the applicable underwriting guidelines generally provide that, for stated income and low documentation loans, the

underwriter verify the employment listed by the borrower on the application and assess whether the stated income is reasonable given the applicant's employment. The EMC Underwriting Guidelines, for instance, state that, for low documentation loans, "[i]ncome must be reasonable for employment stated." The BSRM Underwriting Guidelines state that, for low documentation loans, "[i]ncome must be reasonable for employment." The Argent Underwriting Guidelines and Argent Alt-A Underwriting Guidelines similarly state that "[t]he stated income for the applicant's occupation and/or other sources must be reasonable." The BSABS 2006-AQ1 Prospectus Supplement requires that the "applicant's income as stated must be reasonable for the related occupation in the loan underwriter's discretion," as does the CBASS 2006-CB7 Prospectus Supplement.

379.     The following examples from the forensic review reveal instances where there was no evidence that the loan underwriter analyzed the reasonableness of the borrower's stated income for the employment listed on the loan application as required by the applicable underwriting guidelines. In fact, the forensic review verified that the borrower misrepresented his or her income on the application. This misrepresentation resulted in a miscalculation of the borrower's DTI. Had the loan underwriter performed an evaluation of the income stated on the application by the borrower, as required by the applicable underwriting guidelines, including evaluating the borrower's stated occupation, geographic region of employment, years of experience, and education level, the unreasonableness of the borrower's stated income would have been evident.

- A loan that closed in January 2007 with a principal amount of $368,000 was originated pursuant to EMC's Low Documentation Program and included in the BSMF 2007-AR3 Securitization. The loan application stated that the borrower was employed as an inspector/foreman of a fire systems company earning $13,500 per month. The Bureau of Labor Statistics reported that the average salary at the 90th percentile for an inspector in the same geographic region in

2006 was $7,675 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 1.5 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  Moreover, the loan file contained the borrower's 2006 and 2007 tax returns provided for modification purposes, which revealed an income for 2006 of only $6,835 per month and indicated the same line of work for both 2006 and 2007.  Furthermore, in a Statement of Financial Affairs filed by the borrower as part of a May 2008 Chapter 13 bankruptcy proceeding, the borrower also reported an income in 2006 of only $6,835 per month.  A recalculation of DTI based on the borrower's verified same year income yields a DTI of 88.37 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $248,583.81, or 67.55 percent of the original loan balance.

- A loan that closed in February 2007 with a principal amount of $142,400 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  This loan was a rate-term refinance.  The loan application stated that the borrower was employed as a school cook earning $6,500 per month.  The Bureau of Labor Statistics reported that the average salary at the 90th percentile for a cook in the same geographic region in 2006 was $2,669 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 2 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a May 2010 Chapter 7 bankruptcy proceeding, the borrower reported an income in 2008, the year following the subject loan's closing in 2007, of only $1,680 per month.  It is unlikely the borrower's income would have decreased considering, per Schedule I of the bankruptcy petition, the borrower was still employed by the same employer.  A recalculation of DTI based on the borrower's verified next year income and additional undisclosed debt yields a DTI of 252.53 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $151,206.91, or 106.18 percent of the original loan balance.

- A loan that closed in February 2007 with a principal amount of $67,900 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The loan application stated that the borrower was employed as a training specialist earning $18,583 per month.  The Bureau of Labor Statistics reported that the average salary at the 90th percentile for a training specialist in the same geographic region in 2007 was $7,568 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 2 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  Moreover, the initial loan

154

application indicated the borrower earned $10,250 per month and the co-borrower earned $8,333 per month; however, the final 1003 application reflects the borrower's stated income as $18,583 and the co-borrower's stated income as $0, which also should have put a reasonably prudent underwriter on notice for potential misrepresentation. Despite these red flags, the loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income. The borrower provided a pay stub for the pay period ending August 2009 in connection with a post-closing review. The pay stub revealed the borrower's actual income was $7,056 per month. It is unlikely the borrower's income would have decreased considering the borrower was still employed by the same employer and in the same position. A recalculation of DTI based on the borrower's verified income yields a DTI of 120.63 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $76,184.38, or 112.20 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $72,000 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization. The loan application stated that the borrower was employed as a supervisor of a truck parts company earning $13,500 per month. The U.S. Bureau of Labor Statistics reported the average salary at the 90th percentile for a supervisor of a truck parts company in the same geographic region was $6,124 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 2 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a January 2009 Chapter 13 bankruptcy proceeding, the borrower reported an income in 2007 of only $7,625 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 78.09 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $39,180.74, or 54.42 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $300,000 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization. The loan application stated that the borrower was employed as a supervisor of a janitorial services company earning $11,300 per month. The U.S. Bureau of Labor Statistics reported the average salary at the 90th percentile for a supervisor of a janitorial services company in the same geographic region was $4,860 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 2 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income. A review of the borrower's credit report also revealed an undisclosed debt in the

155

amount of a $19,838 auto loan obtained in July 2006 prior to the subject closing. A recalculation of DTI based on the borrower's more reasonable income and undisclosed debt yields a DTI of 131.19 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $241,544.69, or 80.51 percent of the original loan balance.

- A loan that closed in August 2006 with a principal amount of $404,700 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization.  The loan application stated that the borrower was employed as a yard foreman earning $17,500 per month.  The U.S. Bureau of Labor Statistics reported the average salary at the 90th percentile for a yard foreman in the same geographic region was $9,491 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by more than 1.5 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  Also, other red flags were present: per the origination credit report, the borrower refinanced the subject property multiple times which resulted in equity stripping; the borrower received $9,480 at closing and the borrower's credit report reflected the borrower's total utilization of available credit as 96 percent.  A recalculation of DTI based on the borrower's more reasonable income yields a DTI of 61.17 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $331,483.89, or 81.91 percent of the original loan balance.

- A loan that closed in March 2006 with a principal amount of $125,910 was originated pursuant to Americorp Credit's Stated Income Program and included in the CBASS 2006-CB7 Securitization.  The loan application stated that the borrower was employed as a health care nurse aide earning $3,990 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a health care nurse aide in the same geographic region.  Moreover, in the Statement of Financial Affairs filed by the borrower as part of a September 2006 bankruptcy proceeding, the borrower reported monthly income of $1,945.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 101.11 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $50,994, or 40.50 percent of the original loan balance.

- A loan that closed in July 2006 with a principal amount of $247,500 was originated pursuant to Wilmington's Stated Income Program and included in the CBASS 2006-CB7 Securitization.  The loan application stated that the borrower was employed as a bartender for a chain restaurant and bar earning $5,300 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a bartender for a chain restaurant and bar in the same

156

geographic region.  Moreover, the loan file contained post-closing loan modification documents, including the borrower's 2005 W2 and 2005 tax returns, which reflected a monthly income of $2,354.  It is unlikely the borrower's income would have more than doubled considering the borrower was employed with the same employer in the same line of work at the time of origination of the subject loan.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  A recalculation of DTI based on the borrower's near-year verified income yields a DTI of 152.82 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $72,481.55, or 29.29 percent of the original loan balance.

- A loan that closed in June 2006 with a principal amount of $144,000 was originated pursuant to Wilmington's Stated Income Program and included in the CBASS 2006-CB7 Securitization.  The loan application stated that the borrower was employed as a manager of a catering business earning $8,500 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a manager in the same geographic region.  Moreover, in the Statement of Financial Affairs filed by the borrower as part of a March 2007 bankruptcy proceeding, the borrower reported a 2006 monthly income of $1,250.  The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 248.30 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $145,719.46, or 101.19 percent of the original loan balance.

380.  Accordingly, the results of the forensic review demonstrate that the representations in the Registration Statement concerning the reasonableness of the borrowers' stated incomes were materially false and misleading.  In particular, a significant number of mortgage loans were made on the basis of "stated incomes" that were patently unreasonable, and were not properly underwritten through efforts to assess the reasonableness of the borrowers' stated incomes.

### b.   The Underwriter Disregarded Evidence of Occupancy Fraud

381.  The EMC Underwriting Guidelines state that "[a]ll loans must undergo the prudent underwriting of the Seller as delegated by EMC…. EMC will review documented exceptions to these guidelines on a case-by-case basis, provided sound and prudent underwriting

practices were followed."  Comparably, the BSRM Underwriting Guidelines require that "[a]ll loans must undergo the prudent underwriting of Bear Stearns Residential Mortgage."  The BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS 2006-CB7 Prospectus Supplements all describe loan programs contingent on the occupancy status of the subject property.  A falsified occupancy status may increase the credit risk of the loan.  The following examples from the forensic review illustrate instances where the loan underwriter did not adequately question the borrower's intended occupancy of the subject property despite several facts or circumstances that would have put a reasonable and prudent underwriter on notice for potential occupancy misrepresentations.  Additionally, these examples show a failure of the underwriting process and a disregard for originator's underwriting requirements.

- A loan that closed in December 2006 with a principal amount of $266,000 was originated pursuant to EMC's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The loan closed as an owner-occupied limited cash out refinance.  The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner-occupied.  The loss mitigation portion of the loan file includes a copy of the borrower's 2006 tax return that reflects the subject property was a rental residence since December 2005.  The loan file also contains copies of the borrower's bank statements and HUD-1, which reflect the borrower's current address as the previous address listed on the loan application.  No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner-occupied.  The borrower defaulted and the loan was subsequently liquidated for a loss of $184,115.84, or 69.22 percent of the original loan balance.

- A loan that closed in January 2007 with a principal amount of $170,000 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The loan closed as an owner-occupied cash-out refinance.  The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner-occupied.  The final loan application indicated that the borrower was occupying the subject property as a primary residence.  However, a review of the loan file revealed that the borrower was in the process of purchasing a primary residence, not the subject property and out of state, at the time of loan application.  Furthermore, the loan file contained a hardship letter obtained in connection with a post-closing request for a loan modification, which revealed that the borrower

158

moved from the subject property in January 2007, the same month as the subject loan closing, to occupy the out of state residence purchased in February 2007. Moreover, the hardship letter also revealed that the borrower retained the subject property as an investment property.  No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied.  The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $184,968.78, or 108.81 percent of the original loan balance.

- A loan that closed in January 2007 with a principal amount of $232,000 was originated pursuant to EMC's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The loan closed as an owner-occupied rate-term refinance.  The applicable guidelines for this loan required that the borrower on the mortgage note occupy the subject property and the loan was represented as owner-occupied.  Public records revealed an address for a utility bill from 2004 to 2010 at the subject property address for a person other than the borrower.  Public records also revealed a utility bill for the Borrower at an address other than the subject from August 1997 to July 2011.  No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner-occupied.  The borrower defaulted and the loan was subsequently liquidated for a loss of $194,761.55, or 83.95 percent of the original loan balance.

- A loan that closed in January 2007 with a principal amount of $216,800 was originated pursuant to SouthStar's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The loan closed as an owner-occupied cash-out refinance.  The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner-occupied.  The borrower indicated on the loan application they resided at the subject property for the 2 years preceding the loan application; however, the lender obtained a Rapid Reporting Identity Report dated December 4, 2006, prior to loan closing, which reflected the borrower's last reported address as one identified on the loan application as a rental property.  The origination credit report, under the alert and valuations section, indicated a current address mismatch when using the subject property as the borrower's primary residence.  No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied.  Post-closing documents, including the borrower's 2006 tax return and the borrower's July 2008 hardship letter, confirmed the supposed rental property as the borrower's true primary residence and the subject property as a rental for the previous 3 years, dating back to 2005.  The borrower defaulted and the loan was subsequently liquidated for a loss of $168,436.71, or 77.69 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $391,500 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization.  The applicable guidelines for

159

this loan required that at least one of the borrowers on the mortgage note occupy the subject property and the loan was represented as owner-occupied. The subject property was located in Maryland. The origination loan file contained Florida driver's licenses issued in March 2005 for both the borrower and co-borrower. Additionally, the business the borrowers claimed ownership of was registered in Florida. Also, the loan was closed in Florida. Moreover, in a Statement of Financial Affairs filed by the borrowers as part of a April 2008 Chapter 7 bankruptcy proceeding, the borrowers stated they were residing at a property located in Florida. Further, the borrowers attested that they had not lived at any other address in the preceding three years. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The borrower defaulted and the loan was subsequently liquidated for a loss of $252,101.84, or 64.39 percent of the original loan balance.

- A loan that closed in August 2006 with a principal amount of $446,500 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization. The applicable guidelines for this loan required that at least one of the borrowers on the mortgage note occupy the subject property and the loan was represented as owner-occupied. The borrower purchased the subject property in October 2005; however, the origination loan file contained a copy of the borrower's driver's license, issued November 2005, that reflected an address other than the subject property. The borrower's driver's license should have reflected the subject property as the borrower's primary residence. The origination credit report also reflected the borrower's current address as being the same residence listed on the driver's license. Post-closing documents confirmed the occupancy misrepresentation: the borrower's 2006 W-2 form 1099 and 2007 pay stub both indicated the other address. Further, a post-closing hardship letter revealed the reason the borrower was in default was due to tenants at the subject property not paying rent. In addition, the loan approval required the borrower to provide multiple documentation sources verifying occupancy of the subject property; however, no documentation confirming residency was ever provided by the borrower. The borrower defaulted and the loan was subsequently liquidated for a loss of $393,555.13, or 88.14 percent of the original loan balance.

- A loan that closed in June 2006 with a principal amount of $144,000 was originated pursuant to Wilmington's Stated Income Program and included in the CBASS 2006-CB7 Securitization. The loan closed as a re-finance. The applicable guidelines for this loan required that the borrower on the mortgage note occupy the subject property and the loan was represented as owner-occupied. However, the loan application lists a different property as the borrower's primary residence. An investigation revealed that the borrower has never owned the property identified as the primary residence. Further, the borrower used a third address for a bankruptcy petition filed in March 2007. The local utility company verified active service at the subject property yet the service has never been in the borrower's name. No evidence in the file indicates that the underwriting process

160

addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The borrower defaulted and the loan was subsequently liquidated for a loss of $145,719.46, or 101.19 percent of the original loan balance.

382. Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the underwriting performed with respect to the borrowers' occupancy status were materially false or misleading and that the loans were not properly underwritten. In particular, the prospectus supplements materially understated the proportion of loans secured by non-owner occupied properties. Had loans been properly underwritten, the borrower's intended occupancy status would have been discovered. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loans and the pool of loans in the securitization as investment and second home properties generally have a higher rate of default and higher loss severities than owner-occupied primary residences.

### c. Failure To Follow-Up On Unexplained Credit Inquiries

383. The EMC and BSRM Underwriting Guidelines define the borrower's liabilities to include all installment debts with more than ten payments remaining, all car lease payments, and revolving debt, among other debts. The Argent and Argent Alt-A Underwriting Guidelines define the borrower's liabilities to include all debts for real estate owned and all installment and revolving credit debt, with certain limited exceptions. Further, prudent and reasonable underwriting practices require that, where several recent credit inquiries are listed on such a report, the loan underwriter confirm that the inquiries were not the result of additional debt undisclosed on the loan application. The following are examples of some instances where the borrower's credit reports indicated numerous credit inquiries that should have put the loan underwriter on notice for potential misrepresentations of debt obligations that would affect the

161

borrower's DTI ratio.  In each of these instances there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of any undisclosed or additional liabilities of the borrower. Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered.  Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to repay the loan.

- A loan that closed in February 2007 with a principal amount of $67,900 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The applicable guidelines required a qualified credit report to be present in the loan file.  A qualified credit report includes credit inquiries for the previous 90 days.  The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application.  Despite this requirement, the underwriter failed to investigate the borrower's credit history.  There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 9 inquiries, dated from November 5, 2006 through January 30, 2007, listed on the origination credit report dated January 30, 2007.  A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 120.63 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $76,184.38, or 112.20 percent of the original loan balance.

- A loan that closed in February 2007 with a principal amount of $142,400 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The applicable guidelines required a qualified credit report to be present in the loan file.  A qualified credit report includes credit inquiries for the previous 90 days and, further, lender's guidelines required the lender to investigate the borrower's credit.  The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application.  Despite this requirement, the underwriter failed to investigate the borrower's credit history.  There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 6 inquiries, dated from September 12, 2006 through November 29, 2006, listed on the origination credit report dated November 29, 2006.  A recalculation of DTI based on the borrower's verified income and undisclosed debt yields a DTI of 252.53 percent which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was

162

subsequently foreclosed on with a remaining balance of $151,206.91, or 106.18 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $87,300 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The applicable guidelines required a qualified credit report to be present in the loan file. A qualified credit report includes credit inquiries for the previous 90 days and, further, lender's guidelines required the lender to investigate the borrower's credit. The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application. Despite this requirement, the underwriter failed to investigate the borrower's credit history. There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 11 inquiries, dated from May 22, 2006 through August 9, 2006, listed on the origination credit report dated August 9, 2006. A recalculation of DTI based on the borrower's undisclosed debt and recalculated income yields a DTI of 143.05 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $98,930.31, or 113.32 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $53,200 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization. The applicable guidelines required a qualified credit report to be present in the loan file. A qualified credit report includes credit inquiries for the previous 90 days and, further, lender's guidelines required the lender to investigate the borrower's credit. The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application. Despite this requirement, the underwriter failed to investigate the borrower's credit history. While there was a letter of explanation from the borrower explaining that the 5 inquiries, dated from May 30, 2006 through July 24, 2006, listed on the origination credit report dated July 25, 2006, were a result of seeking financing for the subject property, the letter did not address or clarify whether any new debt had been obtained as a result of the inquiries. Had the underwriter investigated, public records would have revealed recent prior undisclosed mortgages. A recalculation of DTI based on the borrower's undisclosed debt and recalculated income yields a DTI of 105.53 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $52,823.09, or 99.29 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $54,000 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The applicable guidelines required a qualified credit report to be present in the loan file. A qualified credit report includes credit inquiries for the previous 90 days and, further, lender's

163

guidelines required the lender to investigate the borrower's credit. The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application. Despite this requirement, the underwriter failed to investigate the borrower's credit history. There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 5 inquiries, dated from June 13, 2006 through July 5, 2006, listed on the origination credit report dated July 27, 2006. Further, the final loan approval required the lender to obtain a written explanation from the borrower regarding all derogatory credit dated within the most recent 24 months. The origination credit report reflected 2 collection accounts within the most recent 24 months. There was no evidence in the loan file that the underwriter requested or obtained an explanation from the borrower for these credit issues. Public records revealed 5 undisclosed mortgages closed within 30 days of the subject loan closing, 3 prior to the origination of the subject loan. The DTI based on the borrower's undisclosed debt could not be recalculated due to the verification that the borrower's overall net income was negative, resulting in an invalid DTI that breached the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $53,295.16, or 98.69 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $112,500 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The applicable guidelines required a qualified credit report to be present in the loan file. A qualified credit report includes credit inquiries for the previous 90 days and, further, lender's guidelines required the lender to investigate the borrower's credit. The origination underwriter should have determined whether any recent credit inquiries listed on the report resulted in additional debt undisclosed on the loan application. Furthermore, the lender's guidelines require a letter of explanation for any inquiries which occur between the loan application date and the final credit report date. Despite these requirements, the underwriter failed to investigate the borrower's credit history. There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 15 inquiries, dated from May 12, 2006 through May 18, 2006, listed on the final origination credit report dated May 23, 2006. One of the inquiries, dated May 12, 2006, resulted in the establishment of a new auto loan. Public records revealed one undisclosed property. The DTI based on the borrower's undisclosed debt could not be recalculated due to the verification that the borrower's overall net income was negative, resulting in an invalid DTI that breached the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $109,820.60, or 97.62 percent of the original loan balance.

384.    In each of these instances there was no evidence in the origination loan file that

the loan underwriter took steps to follow-up on these credit inquiries or that any action was taken

to verify that these credit inquiries would not result in additional debts of the borrower, as required by the applicable underwriting guidelines or prudent underwriting practices.  Had these inquiries been addressed during the underwriting process, the additional debts would have been discovered and the loan would not have been approved.  Failure to investigate these issues prevented the underwriting process from uncovering additional debts and thus assessing the borrower's true ability to make timely payments on his mortgage loan.

**d.**    **Debts Incorrectly Calculated; Debt-to-Income Exceeded Guidelines**

385.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan.  The EMC Underwriting Guidelines define the borrower's liabilities to include all installment debts with more than ten payments remaining, all car lease payments, revolving debt, and any applicable Home Equity Line of Credit ("HELOC") debt.  The BSRM Underwriting Guidelines include the same categories of debts in defining the borrower's liabilities, plus the explicit inclusion of student loan debt and time share liabilities.  The Argent and Argent Alt-A Underwriting Guidelines likewise require the calculation of borrower debt based on real estate owned, installment debt, and revolving credit debt.  The following are some examples where the forensic review revealed that the underwriting process either failed to incorporate all of the borrower's debt or the borrower's monthly debt obligations were incorrectly calculated.  When properly calculated, the borrower's actual DTI ratio exceeded the limits established by the applicable underwriting guidelines.  The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed in January 2007 with a principal amount of $240,000 was originated pursuant to EMC's Low Documentation Program and included in the BSMF 2007-AR3 Securitization.  The lender failed to properly calculate the borrower's debts.  The audit credit report revealed an undisclosed installment loan

165

for $23,424 opened in October 2006, 3 months prior to the loan application, with a payment of $406 per month. The loan was not yet reporting on the origination credit report and the borrower failed to disclose the debt on the loan application. There was no evidence in the loan file that the underwriter requested or obtained an explanation from the borrower for the 4 inquiries, dated from October 28, 2006 through November 20, 2006, listed on the origination credit report. A recalculation of DTI based on the borrower's undisclosed debt and verified income yields a DTI of 137.37 percent, which exceeds the guideline maximum allowable DTI of 55 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $184,875.88, or 77.03 percent of the original loan balance.

- A loan that closed in January 2007 with a principal amount of $228,000 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization. The lender failed to properly calculate the borrower's debts. A review of the audit credit report revealed that the borrower opened an installment loan in December 2006 in the amount of $9,036 with a monthly payment of $201 and failed to disclose this debt on the loan application. The origination credit report dated January 18, 2007 revealed 6 inquiries, one of which lead to the undisclosed installment loan. A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 118.27 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $138,989.71, or 60.96 percent of the original loan balance.

- A loan that closed in February 2007 with a principal amount of $67,900 was originated pursuant to BSRM's Low Documentation Program and included in the BSMF 2007-AR3 Securitization. The lender failed to properly calculate the borrower's debts. A review of the audit credit report and Mortgage Electronic Registration Systems revealed 6 undisclosed mortgages opened within 30 days of the subject loan's closing. The following mortgages were undisclosed on the loan application: A mortgage in the amount of $80,100 and a monthly payment of $546 opened January 2007, a mortgage in the amount of $88,200 and a monthly payment of $602 opened January 2007, a mortgage in the amount of $94,500 and a monthly payment of $645 opened January 2007, a mortgage in the amount of $27,000 and a monthly payment of $170 opened February 2007, a mortgage in the amount of $88,900 and a monthly payment of $606 opened February 2007, and a mortgage in the amount of $114,300 and a monthly payment of $780 opened February 2007. Moreover, the origination credit report dated January 30, 2007 revealed 9 inquiries dated from November 5, 2006 through January 30, 2007, and the loan file contained a lease agreement for a rental property not disclosed on the loan application, both of which should have put a reasonably prudent underwriter on notice for potential misrepresentation. A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 120.63 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $76,184.38, or 112.20 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $53,200 was originated pursuant to the Ameriquest Loan Sellers' Stated Income Program and included in the BSABS 2006-AQ1 Securitization. The lender failed to properly calculate the borrower's debts. Public records and the audit credit report revealed 4 undisclosed mortgages that closed in August 2006. The borrower purchased 3 properties for a total of $124,400 and combined monthly payments of $929. The loan file contained a letter of explanation from the borrower stating that the 5 credit inquiries, dated from May 2006 through July 2006, listed on the credit origination report dated July 2006, were the result of seeking financing for the subject property. However, the letter did not address or clarify whether any new debt had been obtained as a result of the inquiries. Had the underwriter investigated, public records would have revealed the undisclosed properties. A recalculation of DTI based on the borrower's undisclosed debt and recalculated income yields a DTI of 105.53 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $52,823.09, or 99.29 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $102,680 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The lender failed to properly calculate the borrower's debts. The lender used a monthly debt of $1,138 to determine DTI; however, the underwriter failed to account for a leased automobile in the borrower's DTI. The origination credit report reflected a leased automobile with a payment of $412 per month and a balance of $18,610. The applicable guidelines require all leases to be included in the DTI. The correct recalculation results in a monthly debt of $1,550. A recalculation of DTI based on the borrower's proper debt calculation yields a DTI of 71.98 percent which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $101,715.84, or 99.06 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $87,300 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The lender failed to properly calculate the borrower's debts. In addition to several unexplained credit inquiries, the underwriter failed to account for the borrower's property purchased in April 2006, with a first and second mortgage in the amount of $305,300 and $76,300, with monthly payments of $2,505 and $889. A recalculation of DTI based on the borrower's undisclosed debt and proper calculation of rental income yields a DTI of 231.03 percent which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $54,282.15, or 52.87 percent of the original loan balance.

- A loan that closed in September 2006 with a principal amount of $131,250 was originated pursuant to the Ameriquest Loan Sellers' Full Documentation Program and included in the BSABS 2006-AQ1 Securitization. The lender failed to

167

properly calculate the borrower's debts.  The lender used a monthly debt of $1,798 to determine DTI; however, the applicable underwriting guidelines require all collection accounts and charge-offs within the previous 24 months to be included in the debt ratio calculation.  Despite this requirement, the underwriter failed to include a recent collection debt of $7,849 with a monthly payment of $462.  The borrower also misrepresented the amount of rental income received, based on documents in the loan origination file.  A recalculation of DTI based on the borrower's undisclosed debt and correct rental income yields a DTI of 100.70 percent which exceeds the guideline maximum allowable DTI of 55 percent.  The borrower defaulted and the loan was subsequently foreclosed on with a remaining balance of $127,269.98, or 96.97 percent of the original loan balance.

- A loan that closed in April 2006 with a principal amount of $311,400 was originated pursuant to Argent's Full Documentation Program and included in the CBASS 2006-CB7 Securitization.  A forensic review of the loan file reveals that the borrower disclosed an additional mortgage loan with a $1,621 monthly payment, but the underwriter failed to account for this loan in during origination of the subject loan.  A recalculation of the DTI that includes this additional mortgage loan results in an increase in the DTI from 46 percent to 89.23 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $237,961, or 76.42 percent of the original loan balance.

- A loan that closed in July 2006 with a principal amount of $346,750 was originated pursuant to New Century's Full Documentation Program and included in the CBASS 2006-CB7 Securitization.  The loan underwriter approved the borrower with a 42.13 percent DTI by including debts totaling $2,224.  A forensic review of the loan file reveals that the payment for the second lien mortgage associated with the subject property was incorrectly calculated.  The underwriter qualified the borrower based on a second mortgage payment of $226 per month; however, the actual second mortgage payment was $655 per month.  There is no evidence in the file to support the underwriter's calculation of the second mortgage payment.  A recalculation of the DTI based on the borrower's properly calculated debts results in an increase in the DTI from 42.125 percent to 53.48 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The borrower defaulted and the loan was subsequently liquidated for a loss of $216,208, or 62.35 percent of the original loan balance.

- A loan that closed in March 2006 with a principal amount of $127,710 was originated pursuant to Argent's Limited Documentation Program and included in the CBASS 2006-CB7 Securitization.  The loan underwriter approved the borrower with a 20.04 percent DTI by including debts totaling $1,578.  A forensic review of the loan file reveals that the borrower was qualified for the subject loan without accounting for the borrower's primary residence housing debt of $1,729.  There was no evidence in the loan file to support the exclusion of the borrower's primary residence housing debt from the borrower's monthly debt obligations.  A recalculation of the DTI based on all evidence uncovered in the forensic review

results in increase in the DTI from 20.04 percent to 117.48 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was subsequently liquidated for a loss of $172,417, or 135.01 percent of the original loan balance.

386.     Of the 535 loans reviewed from the BSMF 2007-AR3 Securitization, 89 loans (or 25.2 percent) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type. Of the 426 loans reviewed from the BSABS 2006-AQ1 Securitization, 62 loans (or 14.6 percent) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type.

### 2.     Both Government and Private Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines

387.     The abandonment of underwriting guidelines is further confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by the Defendants in the Securitizations.

388.     For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. WMC Mortgage, Fremont, Countrywide, GreenPoint, Argent, New Century, American Home, and Option One, which originated many of the loans for the Securitizations at issue here, were all on that list. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of

169

the Currency Press Release (Nov. 13, 2008), *available at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.

(a)      <strong>WMC Mortgage Corp.</strong>

389.    WMC Mortgage originated all or the majority of the mortgage loans in the JPMAC 2005-WMC1, JPMAC 2006-WMC1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-WMC4, and WMABS 2007-HE2 Securitizations.

390.    WMC Mortgage employed reckless underwriting standards and practices, as described more fully below, that resulted in a huge amount of foreclosures, ranking WMC Mortgage fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.  General Electric, which had purchased WMC Mortgage in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year.  *See, e.g.*, Diane Brady, Adventures of a Subprime Survivor, Bloomberg Businessweek, Oct. 29, 2007, *available at* http://www.businessweek.com/magazine/content/07_44/b4056074.htm.

391.    WMC Mortgage's reckless loan originating practices attracted attention by regulatory authorities.  In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees (the "Statement of Charges") against WMC Mortgage and its principal owners individually.  *See* Statement of Charges, No. C-07-557-08-SC01, June 4, 2008.  The Statement of Charges included 86 loan files, which revealed that at least 76 loans were defective or otherwise in violation of Washington state law.  *Id.*  Among other things, the investigation uncovered that WMC Mortgage had originated loans with unlicensed or unregistered mortgage brokers,

170

understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington State deceptive and unfair practices laws.  *Id*.

392.     On January 20, 2012, the L.A. Times reported that the FBI and Justice Department have been investigating possible fraud at WMC.  According to the L.A. Times, the government is investigating "whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans."  The L.A. Times further reported that the FBI's San Francisco office "has been looking into WMC's business practices for nearly two years" and "has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sales of mortgages to investors."  Michael Hudson and E. Scott Reckard, *GE Lending Unit Said to be Target of U.S. Probe*, L.A. Times, January 20, 2012, *available at* http://articles.latimes.com/2012/jan/20/business/la-fi-mortgage-probe-20120120.

393.     Former WMC employees have also come forward—in interviews with *iWatch News*, which acts as an online publication dedicated to investigative and accountability reporting for the Center for Public Integrity, one of the oldest and largest non-partisan, non-profit investigative news organization—and provided overwhelming, first-hand evidence that WMC not only abandoned its underwriting standards and practices, but that WMC and its employees engaged in out-and-out fraud to increase profits and commissions.  Dave Riedel, a former compliance manager at WMC who supervised a quality-control team of a dozen or more people in Southern California, told *iWatch News* that WMC "sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors."  Michael Hudson, *Fraud and folly: The untold story of General Electric's subprime debacle*, iWatch News, January 6, 2012, last updated January 23,

2012), *available at* http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

394.    Reidel and his team uncovered numerous examples of fraud committed by WMC employees.  "These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.  Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms…."  In 2005, Riedel and his team became particularly concerned about a sales manager who oversaw the funding of hundreds of loans each month.  Riedel told *iWatch News* that "[a]n audit of those loans… found that many of the deals showed evidence of fraud or other defects such as missing documents."  Riedel brought these concerns to WMC's management, which took no disciplinary action against the sales manager.  Later, Riedel informed a visiting GE compliance official of the audit and of WMC's failure to respond.  As apparent payback for alerting management to the fraud he uncovered, Riedel lost his office and staff and was demoted.

395.    In May of 2006, Riedel presented GE officials with results of an internal audit of loans that investors had asked WMC to repurchase, which indicated that "78 percent of them had been fraudulent" and "nearly four out of the five loan applications backing these mortgages had contained misrepresentations about borrower's incomes or employment."  Upon information and belief, WMC made no changes to its origination practices, procedures, or internal control in response to Riedel's presentation.

396.    Gail Roman, a former loan auditor at WMC's regional offices in Orangeburg, N.Y. informed *iWatch News* that she "dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications," but "[m]anagement ignored [her] reports and

172

approved the loans anyway."  Roman reported that WMC "didn't want to hear what you found . . . .[e]ven if you had enough documentation to show that there was fraud or questionable activity."

397.    Victor Argueta, a former risk analyst at WMC, told *iWatch News* that "one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved."  These documents included bank statements, W-2s and "'[a]nything to make the loan look better than what was the real story.'"  In another instance, Argueta reported to management that certain salespeople "were putting down fake jobs on borrowers' loan applications" and "listing their own cell phone numbers so they could pose as the borrowers' supervisors and 'confirm' that the borrowers were working at the made-up employers."  Despite's Argueta's report, WMC's management took no action against the offending salespeople.

398.    Confidential witnesses independent of the WMC employees interviewed by *iWatch* further corroborate the *iWatch News* reports that WMC abandoned its underwriting guidelines completely.  One confidential witness, an underwriter for WMC during the time of the Securitizations, described WMC as being "pretty crooked."  The witness stated that originators knew that brokers were altering documents needed for the loan application, such as bank statements.  The witness recounted that a broker from Florida routinely presented fraudulent documents, which would prompt her team to reject his brokered applications; however, the Florida broker would circumvent the denials by escalating the applications to upper management, which would approve the loans.

399.    A second confidential witness, an underwriter at WMC during the time of the Securitizations, expressed doubts about the quality of the loans, to the point that, in many instances, the witness did not feel comfortable putting the witness' name on an approval.  In such

instances, the loan application would be directed to a manager at a higher level, because "there was always someone who could paint a pretty picture out of any scenario."  This witness said he caught material misrepresentations or fraud on a daily basis and was surprised they were never brought to the attention of law enforcement.  The witness elaborated on a particularly egregious occurrence where the witness discovered that the buyer was related to the loan officer or the appraiser and that the subject properties were being appraised for three times their value.  The witness asserted that management at WMC "swept it under a rug."

### (b)     Fremont Investment & Loan

400.    Fremont originated the mortgage loans in the JPMAC 2005-FRE1, JPMAC 2006-FRE1, JPMAC 2006-FRE2, and NCMT 2007-1 Securitizations.  Fremont was one of the country's largest subprime lenders and originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.

401.    On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont for an array of "unfair and deceptive business conduct," "on a broad scale."  *See* Complaint, *Commonwealth v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Mass. Super. Ct.) (the "Fremont Complaint"). According to the Massachusetts Attorney General's complaint, Fremont "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; "consistently failed to monitor or supervise

174

brokers' practices or to independently verify the information provided to Fremont by brokers";

and "ma[de] loans based on information that Fremont knew or should have known was

inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and

credit scores."  *See* Fremont Complaint.

402.    On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a

preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued

to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court

found that the record supported the lower court's conclusions that "Fremont made no effort to

determine whether borrowers could 'make the scheduled payments under the terms of the loan,'"

and that "Fremont knew or should have known that [its lending practices and loan terms] would

operate in concert essentially to guarantee that the borrower would be unable to pay and default

would follow."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).

The terms of the preliminary injunction were made permanent by a settlement reached on June 9,

2009.

403.    A confidential witness who previously worked at Fremont in its system operations

and underwriting sections stated that Fremont consistently cut corners and sacrificed

underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and

profit," and that when he attempted to decline a loan, he was regularly told "you have signed

worse loans than this."  The same witness also said that employees at Fremont would create

documents that were not provided by the borrowers, including check stubs and tax documents, in

order to get loans approved.  The confidential witness stated that Fremont regularly hired

underwriters with no experience, who regularly missed substantial numbers of answers on

internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

(c)      <b>Countrywide Home Loans, Inc.</b>

404.    Countrywide originated mortgage loans in the BALTA 2006-4, JPMAC 2006-CW1, JPMAC 2006-CW2, BALTA 2006-2, SAMI 2006-AR4, WMALT 2006-AR4, WMALT 2006-AR9, WMALT 2007-OA1, and WMALT 2007-OA2 Securitizations.

405.    In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission of the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").  The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

406.    Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things,

176

whether the defendants had misrepresented the quality of Countrywide's underwriting processes. The court noted that the SEC presented evidence that Countrywide "routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines …." The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines …." *S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010). Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

407.    The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards. For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

### (d)    GreenPoint Mortgage Funding, Inc.

408.    GreenPoint originated mortgage loans in the GPMF 2005-AR5, GPMF 2006-AR3, and JPALT 2007-A2 Securitizations.

409.    GreenPoint systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no-documentation or limited-documentation loans to individuals without sound credit histories. In

177

November 2008, Business Week Magazine reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay back the loans. GreenPoint's parent corporation, Capital One Financial Corp., eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

410.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California, 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.

411.    GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated. For example, in *U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.,* No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009), a consultant's investigation concluded that 93 percent of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting. The investigation found that GreenPoint loans suffered from serious defects including:

- Pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower.

- Violations of GreenPoint's own underwriting guidelines and prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income

and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

- Misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property.

- Inflated appraisal values.

412.    On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery would be required to determine whether GreenPoint would be required under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual loans identified by U.S. Bank.

**(e)    Argent**

413.    Argent originated the majority of the mortgage loans in the ARSI 2006-M2 and BSABS 2006-AQ1 Securitizations, as well as certain mortgage loans in the CBASS 2006-CB7 Securitization.

414.    In July 2008, Orson Benn, a former vice president of Argent who was in charge of overseeing the state of Florida for the mortgage company, was convicted of mortgage fraud stemming from his approval of fraudulent loan applications.  Benn, who "taught" mortgage brokers "how to doctor credit reports, coached them to inflate income on loan applications, and helped them invent phantom jobs for borrowers," was sentenced to 18 years in prison for his role in more than $550 million in fraudulent loans that were "bundl[ed]" and sold "to investors."[26] Benn testified that because Argent was securitizing the mortgages and was not dependent on the borrowers' ability to repay the loans, the accuracy of individual loan applications was not a priority.  *Id.*

---

[26]    Jack Dolan, Matthew Haggman, and Rob Barry, "Home Loan Racket Flourished in Florida," *The Miami Herald*, Jan. 29, 2009.

415.    On June 22, 2011 nine former Argent account managers, supervisors, and underwriters were indicted in Ohio for falsifying documents in order to approve loans that did not meet Argent's underwriting standards.[27]  The indicted Argent employees are alleged to have "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's incomes and assets" and then "approved the loans knowing that the company's own lending rules had not been satisfied."[28]  According to Cuyahoga County Prosecutor, in applications for at least 100 loans "the buyers, with the assistance of mortgage brokers and account managers from Argent or other representatives from Argent, misstated one of more of the following: the amount of their assets, their income, the source of or existence of any down payment, the existence of a legitimate seller carryback mortgage, and/or basic and fundamental financial information regarding their financial condition, in order to gain approval for the loan amounts requested in these applications."  Press Release, Cuyahoga County Prosecutor, *supra*.  Also indicted were two appraisers who worked with Argent to falsify the appraised values for the subject properties.  *Id*.  In November 2011, Angela Pasternak, one of the indicted Argent account managers was subsequently indicted a second time for "approv[ing] exceptions knowing that loan applications contained false income information and bogus credit scores."[29]

416.    Other former Argent employees have repeatedly discussed the failure of Argent to follow its underwriting guidelines.  For example, Jacquelyn Fishwick, a former Argent

---

[27]  "Nine Former Argent Mortgage Company Account Managers, Supervisors and Underwriters Indicted," Press Release, Cuyahoga County Prosecutor, June 22, 2011.

[28]  Mark Gillispie, "Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury," *The Plain Dealer*, June 23, 2011.

[29]  Mark Gillispie, "Argent Mortgage Worker Gets Indicted Again In Suspected Mortgage Fraud Case, *The Plain Dealer*, November 15, 2011.  Ms. Pasternak's attorney has stated that she was following the directives of supervisors.  *Id*.

underwriter and account manager, has stated that "Argent employees played fast and loose with the rules" and that she "personally saw some stuff [that she] didn't agree with," including Argent "account managers remov[ing] documents from files and creat[ing] documents by cutting and pasting them."[30]  According to the same article, "[a]ll kinds of people [who] were in on the scam, from buyers and sellers of real estate to the mortgage brokers, appraisers and title officials who facilitated this massive fraud."  *Id.*

417.    Similarly, Steve Jerigan, a fraud investigator for Argent has called into question the company's appraisal practices.  Jerigan has described a particularly telling instance when he went to investigate a new subdivision for which Argent had made a number of loans.  According to Jerigan, the addresses on the loans led to the middle of a cornfield and an identical fake picture had been included in each file.  In short, he quickly discovered that the loans were based on fabrications.[31]

418.    When Citigroup acquired Argent in 2007, Richard Bowen, the Chief Underwriter in Citigroup's Consumer Lending Group, performed a review of Argent.  Bowen found that "large numbers" of Argent's loans were "not underwritten according to the representations that were there."  FCIC Hearing Transcript, Apr. 7, 2010, p. 239.

### (f)    New Century

419.    New Century originated mortgage loans in the JPMAC 2006-NC1, JPMAC 2006-NC2, CBASS 2006-CB2, and CBASS 2006-CB7 Securitizations.

420.    In 2010, the OCC identified New Century as *the worst* subprime lender in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan

---

[30]    "Subprime House of Cards," *Cleveland Plain Dealer*, May 11, 2008.

[31]    Michael W. Hudson, "Silencing the Whistle-Blowers," *The Investigative Fund*, May 10, 2010.

areas between 2005 and 2007 with the highest rates of delinquency.  *See* "Worst Ten in the

Worst Ten," Office of the Comptroller of the Currency Press Release (Nov. 13, 2008), *available*

*at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.  Further,

in January 2011, the FCIC issued its final report, which detailed, among other things, the

collapse of mortgage underwriting standards and subsequent collapse of the mortgage market

and wider economy.  *See* FCIC Report.  The FCIC Report singled out New Century for its role:

> New Century—once the nation's second-largest subprime lender—ignored
> early warnings that its own loan quality was deteriorating and stripped
> power from two risk-control departments that had noted the evidence. In a
> June 2004 presentation, the Quality Assurance staff reported they had
> found severe underwriting errors, including evidence of predatory lending,
> federal and state violations, and credit issues, in 25% of the loans they
> audited in November and December 2003. In 2004, Chief Operating
> Officer and later CEO Brad Morrice recommended these results be
> removed from the statistical tools used to track loan performance, and in
> 2005, the department was dissolved and its personnel terminated. The
> same year, the Internal Audit department identified numerous deficiencies
> in loan files; out of nine reviews it conducted in 2005, it gave the
> company's loan production department "unsatisfactory" ratings seven
> times. Patrick Flanagan, president of New Century's mortgage-originating
> subsidiary, cut the department's budget, saying in a memo that the "group
> was out of control and tries to dictate business practices instead of audit."

421.    On February 29, 2008, after an extensive document review and conducting over

100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a

detailed report on the various deficiencies at New Century, including lax mortgage standards and

a failure to follow its own underwriting guidelines.  Among his findings, the Examiner reported:

- "New Century had a brazen obsession with increasing loan originations, without
  due regard to the risks associated with that business strategy ….  Although a
  primary goal of any mortgage banking company is to make more loans, New
  Century did so in an aggressive manner that elevated the risks to dangerous and
  ultimately fatal levels."

- New Century also made frequent exceptions to its underwriting guidelines for
  borrowers who might not otherwise qualify for a particular loan.  A senior officer
  of New Century warned in 2004 that the "number one issue is exceptions to the
  guidelines."  Moreover, many of the appraisals used to value the homes that

secured the mortgages had deficiencies.

- "New Century … layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at* http://graphics8.nytimes.com/ packages/pdf/business/Final_Report_New_Century.pdf.

422.     On December 9, 2009, the SEC charged three of New Century's top officers with violations of federal securities laws.  The SEC's complaint details how New Century's representations regarding its underwriting guidelines, e.g., that New Century was committed to "adher[ing] to high origination standards in order to sell [its] loan products in the secondary market" and "only approv[ing] subprime loan applications that evidence a borrower's ability to repay the loan," were blatantly false.

423.     Confidential witnesses confirmed that New Century abandoned its underwriting guidelines.  One confidential witness, who was an internal bureau quality assurance underwriter for New Century, stated that he had doubts about the quality of the loans he reviewed.  A second confidential witness managed an appraisal review staff at New Century.  His team would review the application to ensure that the collateral was sufficient to support the loan.  He estimated that over 50 percent of the loans his group reviewed did not have the proper collateral, and as such his group would rate the loans either "Low" or "Unacceptable"; however, his superiors often overrode his decisions.

424.     Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century.  Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit

scores and no supporting proof of income.  *See* Written Testimony of Patricia Lindsay for the

FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-

0407-Lindsay.pdf, at 3.

**(g)**   **American Home**

425.   American Home originated mortgage loans in the AHM 2005-1, AHM 2005-4,

and JPALT 2007-A2 Securitizations.

426.   An internal American Home "Credit Update" presentation from October 2005,

which was made public in June 2008, made clear that American Home's underwriting guidelines

were to be either relaxed substantially or essentially rendered meaningless, in order to allow

American Home to make loans to high-risk borrowers.  Specifically, the Credit Update set forth

a new "interpretation" of guidelines that included:

- Not requiring verification of income sources on stated income loans.

- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling.

- Reducing the required documentation for self-employed borrowers.

- Broadening the acceptable use of second and third loans to cover the full property value.

427.   An internal American Home e-mail sent on November 2, 2006, made public in

June 2008, from Steve Somerman, an American Home Senior Vice President of Product and

Sales Support in California and co-creator of the American Home's "Choice Point Loans"

program, to loan officers nationwide, stated that American Home would make a loan to virtually

any borrower, regardless of the borrower's ability to verify income, assets or even employment.

The e-mail specifically encouraged loan officers to make a variety of loans that were inherently

risky and extremely susceptible to delinquencies and default, including (i) stated income loans,

where both the income and assets of the borrower were taken as stated on the credit application

184

without verification; (ii) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (iii) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history. *See* Complaint, *In re American Home Mortgage Securities Litigation*, No. 07-MD-1898 (TCP) (E.D.N.Y. June 3, 2008).

428.    American Home is involved in several criminal probes and investigations, and federal prosecutors have convicted one American Home sales executive, Kourash Partow, of mortgage fraud. *See* Judgment in a Criminal Case, *U.S. v. Partow*, Case No. 3:06-CR-00070-08-HRH, Aug. 31, 2007; *see also U.S. v. Partow*, 283 Fed. Appx. 476 (9th Cir. 2008). After conviction, Partow, who worked for Countrywide before joining American Home, sought a lighter sentence on the grounds that his former employers (Countrywide and American Home) both had knowledge of the loan document inaccuracies and in fact encouraged manipulation by intentionally misrepresenting the performance of loans and the adequacy of how the loans were underwritten. Partow admitted that he would falsify clients' income or assets in order to get loans approved, and that American Home did not require documentary verification of such figures. "Loan Data Focus of Probe, Countrywide Files May Have Included Dubious Information," *The Wall Street Journal*, March 22, 2008; MSNBC.com, "Inside the fiasco that led to the mortgage mess and Countrywide's collapse," updated March 22, 2009.

429.    In May of 2009, Edmund Andrews, a New York Times economics reporter, wrote about his experience applying for a mortgage through American Home:

> I thought I knew a lot about go-go mortgages. I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages. I had interviewed people with very modest incomes who had taken out big loans. Yet for all that, I was stunned at how much money people were willing to throw at me.

[The American Home Loan officer] called back the next morning. "Your credit scores are almost perfect, he said happily. "Based on your income, you can qualify for a mortgage of about $500,000."

What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house [the American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen.

"I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage—not mine."

Edmund L. Andrews. "My Personal Credit Crisis," *New York Times*, May 17, 2009.

### (h)   Option One

430.    Option One originated the mortgage loans in the JPMAC 2005-OPT2 Securitization.

431.    Option One has been identified through multiple reports and investigations for its faulty underwriting. On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. *See* Complaint, *Commonwealth v. H&R Block, Inc.*, CV NO. 08-2474-BLS (Mass. Super. Ct. June 3, 2008). According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards … and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id*. at ¶ 4. The Massachusetts Attorney General alleged that Option One's agents and brokers

"frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id*. at ¶ 8.  Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id*. at 10.

### 3. Government Investigations Have Also Revealed That Appraisers Were Pressured To Issue Inflated Appraisals

432.    As described above, the originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals.  Appraisal pressure was especially strong when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were.

433.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a

'Hobson's Choice.'"[32]  Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

>    **4.    The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines**

434.    The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

435.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that Defendants made to investors in the Prospectus Supplements.

436.    JPMorgan, Bear Stearns, WaMu, and Long Beach provided, or caused to be provided, loan level information, including the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan level information described in aggregation reports in the Prospectus Supplements, to the rating agencies.  The rating agencies in turn relied on this information to calculate the Certificates' assigned credit ratings.  Because the information that JPMorgan, Bear Stearns, WaMu and Long Beach provided or caused to be provided to the rating agencies was materially false, the models used by the ratings agencies under-predicted the

---

[32]    *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.

likelihood of default and loss, as well as the loss severity.  As a result of the false information provided by JPMorgan, Bear Stearns, WaMu, and Long Beach, the securitizations lacked the level of subordination required for the certificates to be rated AAA (or its equivalent), and investors, including Fannie Mae and Freddie Mac, were deprived of the level of protection commensurate with a AAA (or its equivalent) rating.  As a result, the GSEs paid Defendants inflated prices for purportedly AAA (or its equivalent) Certificates, unaware that those Certificates in reality carried a greater risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

437.    The GSEs could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, December 20, 2007 and April 4, 2008, for Freddie Mac and Fannie Mae, respectively.  These are the first dates on which any of the GSE Certificates were downgraded below investment grade by a credit ratings agency.  In subsequent months and years, most of the GSE Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade.  Prior to the initial downgrades in December 2007 and April 2008, respectively, Freddie Mac and Fannie Mae had no basis to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements.  After these downgrades, it required significant investigation and fact-finding for the GSEs to formulate the claims stated herein.  The downgrades beginning in December 2007 raised questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality.  Table 9 details the extent of the downgrades.[33]

---

[33]   Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

**Table 9**

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| AABST 2005-5 | IIA | Aaa/AAA/AAA | B2/AAA/CCC |
| AHM 2005-1 | VIA | Aaa/AAA /-- | B3/AAA/-- |
| AHM 2005-4 | IVA | Aaa/AAA/-- | Caa3/D/-- |
| ARSI 2006-M2 | A1 | Aaa/AAA/AAA | Caa2/CCC/C |
| BALTA 2005-10 | II2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2005-10 | II3A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-1 | II1A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-2 | II2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-3 | II1A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-4 | I2A1 | Aaa/AAA/-- | Ca/D/-- |
| BALTA 2006-4 | III1A1 | Aaa/AAA/-- | Caa3/D/-- |
| BSABS 2005-HE12 | IIA | Aaa/AAA/-- | Aa3/AA/-- |
| BSABS 2006-AQ1 | I2A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE2 | IIA | Aaa/AAA/-- | Ba3/A-/-- |
| BSABS 2006-HE4 | IIA | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2006-HE5 | IIA | Aaa /AAA/-- | Caa2/B-/-- |
| BSABS 2006-HE7 | II2A | Aaa/AAA/-- | Ca/CC/-- |
| BSABS 2006-HE8 | II2A | Aaa/AAA/-- | B1/B-/-- |
| BSABS 2006-HE9 | IIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE9 | IIIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE10 | II2A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2006-HE10 | II3A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-FS1 | IIA | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2007-HE1 | II2A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE1 | II3A | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE2 | II2A | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2007-HE2 | II3A | Aaa/AAA/-- | Ca/CCC/-- |
| BSABS 2007-HE3 | IIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE3 | IIIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE4 | IIA | Aaa/AAA/-- | Caa2/CCC/-- |
| BSABS 2007-HE5 | IIA | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE5 | IIIA | Aaa/AAA/-- | Caa2/CCC/-- |
| BSABS 2007-HE6 | IIA | Aaa/--/AAA | Ca/--/C |
| BSABS 2007-HE7 | IIA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| BSABS 2007-HE7 | IIIA1 | Aaa/AAA/-- | Ca/CCC/-- |
| BSMF 2006-SL5 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2006-SL6 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2007-AR3 | II2A1 | Aaa/AAA/-- | Ca/D/-- |

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| BSMF 2007-SL1 | IIA | Aaa/AAA/-- | C/D/-- |
| BSMF 2007-SL2 | IIA | Aaa/AAA/-- | C/D/-- |
| CBASS 2006-CB2 | AV | Aaa/AAA/AAA | Caa2/B-/CCC |
| CBASS 2006-CB7 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| GPMF 2005-AR1 | IIA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| GPMF 2006-AR3 | IIA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| GPMF 2006-AR3 | IIA2 | Aaa/AAA/-- | C/D/-- |
| JPALT 2005-A2 | 2A1 | Aaa/AAA/-- | Caa3/CC/-- |
| JPALT 2007-A2 | 11A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2005-FRE1 | AI | Aaa/AAA/AAA | Ba3/AA+/CCC |
| JPMAC 2005-OPT2 | A1A | Aaa/AAA/AAA | Aa2/AAA/A |
| JPMAC 2005-WMC1 | A1 | Aaa/AAA/AAA | WR/NR/PIF |
| JPMAC 2006-ACC1 | A1 | Aaa/AAA/AAA | Ba3/BB/CCC |
| JPMAC 2006-CH1 | A1 | Aaa/AAA/AAA | B2/A-/CCC |
| JPMAC 2006-CH2 | AV1 | Aaa/AAA/AAA | Caa3/CCC/C |
| JPMAC 2006-CW1 | A1A | Aaa/AAA/AAA | Aa3/BBB/B |
| JPMAC 2006-CW2 | AV1 | Aaa/AAA/AAA | B1/B/CC |
| JPMAC 2006-FRE1 | A1 | Aaa/AAA/AAA | Ba3/B/CCC |
| JPMAC 2006-FRE2 | A1 | Aaa/AAA/AAA | Ba3/B/CCC |
| JPMAC 2006-HE1 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2006-HE2 | A1 | Aaa/AAA/AAA | Caa2/CCC/CC |
| JPMAC 2006-HE3 | A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2006-NC1 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2006-NC2 | A1A | Aaa/AAA/AAA | Aa3/B+/B |
| JPMAC 2006-RM1 | A1A | Aaa/AAA/AAA | Caa2/CCC/CC |
| JPMAC 2006-RM1 | A1B | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2006-WMC1 | A1 | Aaa/AAA/AAA | B3/B+/CCC |
| JPMAC 2006-WMC2 | A1 | Aaa/AAA/AAA | Ca/CCC/C |
| JPMAC 2006-WMC3 | A1SS | Aaa/AAA/AAA | B2/CCC/CC |
| JPMAC 2006-WMC3 | A1MZ | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2006-WMC4 | A1A | Aaa/AAA/AAA | Caa3/CCC/C |
| JPMAC 2006-WMC4 | A1B | Aaa/AAA/AAA | C/CCC/C |
| JPMAC 2007-CH2 | AV1 | Aaa/AAA/AAA | B3/B/CCC |
| JPMAC 2007-CH3 | A1A | Aaa/AAA/AAA | B3/CCC/CC |
| JPMAC 2007-CH3 | A1B | Aaa/AAA/AAA | Ca/CCC/CC |
| JPMAC 2007-CH4 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMAC 2007-CH5 | A1 | Aaa/AAA/AAA | Caa1/CCC/CC |
| JPMMT 2006-A3 | 1A1 | Aaa/--/AAA | Caa3/--/D |
| LBMLT 2005-3 | IA | Aaa/AAA/AAA | Ca/CCC/CC |
| LBMLT 2006-1 | IA | Aaa/AAA/-- | Caa3/CCC/-- |

191

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| LBMLT 2006-2 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-3 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-4 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-5 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-6 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-7 | IA | Aaa/AAA/AAA | Ca/CCC/C |
| LBMLT 2006-8 | IA | Aaa/AAA/-- | Caa3/CCC/-- |
| LBMLT 2006-9 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-10 | IA | Aaa/AAA/-- | Caa2/CCC/-- |
| LBMLT 2006-11 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| LBMLT 2006-WL1 | IA1 | Aaa/AAA/-- | Caa1/BB/-- |
| LBMLT 2006-WL1 | IA2 | Aaa/AAA/-- | B1/BB/-- |
| LBMLT 2006-WL2 | IA | Aaa/AAA/AAA | Caa3/CCC/C |
| LBMLT 2006-WL3 | IA | Aaa/AAA/AAA | Caa3/CCC/C |
| LUM 2006-3 | II2A1 | Aaa/--/AAA | Caa3/--/D |
| NCMT 2007-1 | 1A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| PCHLT 2005-4 | 2A1 | Aaa/AAA/AAA | Ba1/BBB+/B |
| SACO 2007-1 | IIA | Aaa/AAA/-- | C/D/-- |
| SACO 2007-2 | IIA | Aaa/AAA/-- | C/D/-- |
| SAMI 2006-AR4 | IA1 | Aaa/AAA/-- | Ca/D/-- |
| WAMU 2007-OA3 | 1A | Aaa/AAA/-- | Caa3/CCC/-- |
| WMABS 2006-HE1 | IA | Aaa/AAA/AAA | Caa3/B-/CC |
| WMABS 2006-HE3 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2006-HE4 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2006-HE5 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2007-HE1 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMABS 2007-HE2 | IA | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2005-9 | 1CB | Aaa/AAA/-- | Caa2/CCC/-- |
| WMALT 2005-10 | 1CB | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR4 | 1A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR4 | 2A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR4 | 3A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR5 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2006-AR5 | 2A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR8 | 1A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2006-AR9 | 1A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2007-OA1 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA2 | 1A | Aaa/AAA/-- | Ca/D/-- |
| WMALT 2007-OA3 | 1A | Aaa/AAA/-- | Ca/CCC/-- |
| WMALT 2007-OA3 | 3A | Aaa/AAA/-- | Ca/CC/-- |

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| WMHE 2007-HE1 | IA | Aaa/AAA/-- | Caa2/CCC/-- |
| WMHE 2007-HE2 | IA | Aaa/AAA/AAA | Caa3/CCC/C |
| WMHE 2007-HE3 | IA | Aaa/AAA/AAA | Caa2/CCC/CC |
| WMHE 2007-HE4 | IA | Aaa/AAA/-- | Caa2/CCC/-- |

### 5. The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

438.    Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

439.    Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 10 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of March 2012.

**Table 10**

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| AABST 2005-5 | IIA | Pool 2 | 30.26 |
| AHM 2005-1 | VIA | Group VI | 18.89 |
| AHM 2005-4 | IVA | Group IV | 23.20 |
| ARSI 2006-M2 | A1 | Group I | 35.92 |
| BALTA 2005-10 | II2A1 | Group II-2 | 28.54 |
| BALTA 2005-10 | II3A1 | Group II-3 | 31.44 |
| BALTA 2006-1 | II1A1 | Group II-1 | 35.64 |
| BALTA 2006-2 | II2A1 | Group II-2 | 32.96 |
| BALTA 2006-3 | II1A1 | Group II-1 | 35.65 |

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| BALTA 2006-4 | I2A1 | Group I-2 | 53.90 |
| BALTA 2006-4 | III1A1 | Group III-1 | 39.63 |
| BSABS 2005-HE12 | IIA | Group II | 51.62 |
| BSABS 2006-AQ1 | I2A | Group I-2 | 57.94 |
| BSABS 2006-HE2 | IIA | Group II | 51.99 |
| BSABS 2006-HE4 | IIA | Group II | 55.33 |
| BSABS 2006-HE5 | IIA | Group II | 54.53 |
| BSABS 2006-HE7 | II2A | Group II-2 | 55.78 |
| BSABS 2006-HE8 | II2A | Group II-2 | 48.45 |
| BSABS 2006-HE9 | IIA | Group II | 54.12 |
| BSABS 2006-HE9 | IIIA | Group III | 56.30 |
| BSABS 2006-HE10 | II2A | Group II-2 | 58.12 |
| BSABS 2006-HE10 | II3A | Group II-3 | 56.31 |
| BSABS 2007-FS1 | IIA | Group II | 51.01 |
| BSABS 2007-HE1 | II2A | Group II-2 | 53.45 |
| BSABS 2007-HE1 | II3A | Group II-3 | 52.45 |
| BSABS 2007-HE2 | II2A | Group II-2 | 56.79 |
| BSABS 2007-HE2 | II3A | Group II-3 | 61.85 |
| BSABS 2007-HE3 | IIA | Group II | 58.78 |
| BSABS 2007-HE3 | IIIA | Group III | 60.51 |
| BSABS 2007-HE4 | IIA | Group II | 35.43 |
| BSABS 2007-HE5 | IIA | Group II | 48.41 |
| BSABS 2007-HE5 | IIIA | Group III | 44.01 |
| BSABS 2007-HE6 | IIA | Group II | 53.89 |
| BSABS 2007-HE7 | IIA1 | Group II | 52.86 |
| BSABS 2007-HE7 | IIIA1 | Group III | 47.90 |
| BSMF 2006-SL5 | IIA | Group II | 21.48 |
| BSMF 2006-SL6 | IIA | Group II | 30.98 |
| BSMF 2007-AR3 | II2A1 | Group II-2 | 60.51 |
| BSMF 2007-SL1 | IIA | Group II | 22.03 |
| BSMF 2007-SL2 | IIA | Group II | 20.99 |
| CBASS 2006-CB2 | AV | Group 1 | 43.14 |
| CBASS 2006-CB7 | A1 | Group I | 50.15 |
| GPMF 2005-AR5 | IIA1 | Group II-A | 44.00 |
| GPMF 2005-AR5 | IIA1 | Group II-B | 42.02 |
| GPMF 2005-AR5 | IIA1 | Group II-C | 52.04 |
| GPMF 2006-AR3 | IIA1 | Group II | 49.55 |
| GPMF 2006-AR3 | IIA2 | Group II | 49.55 |
| JPALT 2005-A2 | 2A1 | Pool 2 | 23.53 |
| JPALT 2007-A2 | 11A1 | Pool 1A | 44.11 |

194

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| JPMAC 2005-FRE1 | AI | Group I | 48.34 |
| JPMAC 2005-OPT2 | A1A | Group 1 | 35.95 |
| JPMAC 2005-WMC1 | A1 | Group 1 | 42.96 |
| JPMAC 2006-ACC1 | A1 | Group 1 | 49.01 |
| JPMAC 2006-CH1 | A1 | Group 1 | 46.38 |
| JPMAC 2006-CH2 | AV1 | Group 2-A | 46.15 |
| JPMAC 2006-CW1 | A1A | Group 1 | 74.49 |
| JPMAC 2006-CW2 | AV1 | Group 2 | 64.36 |
| JPMAC 2006-FRE1 | A1 | Group 1 | 51.39 |
| JPMAC 2006-FRE2 | A1 | Group 1 | 53.26 |
| JPMAC 2006-HE1 | A1 | Group 1 | 46.72 |
| JPMAC 2006-HE2 | A1 | Group 1 | 48.50 |
| JPMAC 2006-HE3 | A1 | Group 1 | 52.07 |
| JPMAC 2006-NC1 | A1 | Group 1 | 42.99 |
| JPMAC 2006-NC2 | A1A | Group 1 | 40.81 |
| JPMAC 2006-RM1 | A1A | Group 1 | 43.03 |
| JPMAC 2006-RM1 | A1B | Group 1 | 43.03 |
| JPMAC 2006-WMC1 | A1 | Group 1 | 47.24 |
| JPMAC 2006-WMC2 | A1 | Group 1 | 47.27 |
| JPMAC 2006-WMC3 | A1SS | Group 1 | 46.41 |
| JPMAC 2006-WMC3 | A1MZ | Group 1 | 46.41 |
| JPMAC 2006-WMC4 | A1A | Group 1 | 48.72 |
| JPMAC 2006-WMC4 | A1B | Group 1 | 48.72 |
| JPMAC 2007-CH2 | AV1 | Group 2-A | 40.45 |
| JPMAC 2007-CH3 | A1A | Group 1 | 43.70 |
| JPMAC 2007-CH3 | A1B | Group 1 | 43.70 |
| JPMAC 2007-CH4 | A1 | Group 1 | 44.82 |
| JPMAC 2007-CH5 | A1 | Group 1 | 47.67 |
| JPMMT 2006-A3 | 1A1 | Pool 1 | 24.58 |
| LBMLT 2005-3 | IA | Group I | 50.39 |
| LBMLT 2006-1 | IA | Group I | 50.66 |
| LBMLT 2006-2 | IA | Group I | 54.94 |
| LBMLT 2006-3 | IA | Group I | 50.94 |
| LBMLT 2006-4 | IA | Group I | 51.93 |
| LBMLT 2006-5 | IA | Group I | 52.07 |
| LBMLT 2006-6 | IA | Group I | 48.25 |
| LBMLT 2006-7 | IA | Group I | 51.20 |
| LBMLT 2006-8 | IA | Group I | 46.30 |
| LBMLT 2006-9 | IA | Group I | 54.39 |
| LBMLT 2006-10 | IA | Group I | 51.58 |

| Transaction | Tranche | Supporting Loan Group | Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|---|
| LBMLT 2006-11 | IA | Group I | 49.13 |
| LBMLT 2006-WL1 | IA1 | Group I | 43.99 |
| LBMLT 2006-WL1 | IA2 | Group I | 43.99 |
| LBMLT 2006-WL2 | IA | Group I | 48.78 |
| LBMLT 2006-WL3 | IA | Group I | 49.35 |
| LUM 2006-3 | II2A1 | Group II-2 | 24.85 |
| NCMT 2007-1 | 1A1 | Group 1 | 32.44 |
| PCHLT 2005-4 | 2A1 | Group 2 | 48.45 |
| SACO 2007-1 | IIA | Group II | 12.93 |
| SACO 2007-2 | IIA | Group II | 16.51 |
| SAMI 2006-AR4 | IA1 | Group I | 41.68 |
| WAMU 2007-OA3 | 1A | Group 1 | 30.65 |
| WMABS 2006-HE1 | IA | Group 1 | 30.93 |
| WMABS 2006-HE3 | IA | Group I | 48.23 |
| WMABS 2006-HE4 | IA | Group I | 47.40 |
| WMABS 2006-HE5 | IA | Group I | 50.40 |
| WMABS 2007-HE1 | IA | Group I | 51.85 |
| WMABS 2007-HE2 | IA | Group I | 55.38 |
| WMALT 2005-9 | 1CB | Group 1 | 13.14 |
| WMALT 2005-10 | 1CB | Group 1 | 26.07 |
| WMALT 2006-AR4 | 1A | Group 1 | 48.07 |
| WMALT 2006-AR4 | 2A | Group 2 | 52.51 |
| WMALT 2006-AR4 | 3A | Group 3 | 38.66 |
| WMALT 2006-AR5 | 1A | Group 1 | 56.42 |
| WMALT 2006-AR5 | 2A | Group 2 | 38.56 |
| WMALT 2006-AR8 | 1A | Group 1 | 39.20 |
| WMALT 2006-AR9 | 1A | Group 1 | 46.16 |
| WMALT 2007-OA1 | 1A | Group 1 | 46.82 |
| WMALT 2007-OA2 | 1A | Group 1 | 41.79 |
| WMALT 2007-OA3 | 1A | Group 1 | 44.22 |
| WMALT 2007-OA3 | 3A | Group 3 | 41.48 |
| WMHE 2007-HE1 | IA | Group I | 45.86 |
| WMHE 2007-HE2 | IA | Group I | 50.51 |
| WMHE 2007-HE3 | IA | Group I | 46.12 |
| WMHE 2007-HE4 | IA | Group I | 47.66 |

440.    The confirmed misstatements concerning owner occupancy and LTV ratios, the

forensic review of 1,061 loan files for the BSMF 2007-AR3, BSABS 2006-AQ1, and CBASS

2006-CB7 Securitizations, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit ratings and the rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

### V.   Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach Knew Their Representations Were False

441.   The allegations in this Section V are made in support of Plaintiff's common law fraud and aiding and abetting fraud claims, and *not* in support of Plaintiff's claims under (i) Sections 11, 12(a)(2) and 15 of the Securities Act, (ii) Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, or (iii) Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, which are based solely on strict liability and negligence.

#### A.   JPMorgan, Bear Stearns, WaMu, and Long Beach Had Actual Knowledge From Their Due Diligence That They Were Securitizing Defective Loans

442.   JPMorgan, Bear Stearns, WaMu, and Long Beach originated and acquired from the loan originators the underlying mortgage loans in the 94 Securitizations they sponsored. JPMorgan, Bear Stearns, WaMu, and Long Beach performed due diligence to determine the quality of the loans they were purchasing.  JPMorgan, Bear Stearns, WaMu, and Long Beach also conducted due diligence on the originators from whom they were purchasing loans, and on the loans included in each offering to determine whether such loans complied with the applicable underwriting guidelines.

443.   The Registration Statements of JPMorgan, Bear Stearns, WaMu, and Long Beach represented that the loans were underwritten in accordance with their respective underwriting guidelines and contained further assurances of quality control and due diligence.  For example,

197

WaMu represented that it conducted due diligence on third-party lenders who originated loans

for the securitization and that they carefully inspected the loan seller's underwriting standards:

> In initially approving a mortgage loan seller, the sponsor takes into account the following: annual origination volume, tenure of business and key staff in originating loans, policies and procedures for originating loans including quality control and appraisal review, review audits performed on mortgage loan seller by rating agencies, regulatory agencies and government sponsored entities, the mortgage loan seller's financial statements, errors and omissions insurance coverage and fidelity bond and liability insurance coverage. Approved mortgage loan sellers' financial statements, insurance coverage and new review audits are reviewed on an annual basis. **Additionally, the sponsor performs a monthly ongoing performance review of previously purchased mortgage loans for trends in delinquencies, losses and repurchases. The mortgage loan sellers' underwriting guidelines are reviewed for consistency with the sponsor's credit parameters and conformity with the underwriting standards** described under 'Underwriting of the Mortgage Loans' below and are either approved or approved with exceptions.

> WMALT 2007-OA1 Prospectus Supplement, at S-37 (filed Jan. 25, 2007) (emphasis added).

444. In another example, Bear Stearns represented that "[p]erforming loans acquired

by the sponsor are subject to varying levels of due diligence prior to purchase" with the loans

being "reviewed for credit, data integrity, appraisal valuation, documentation, as well as

compliance with certain laws." BSABS 2006-HE8 Prospectus Supplement. Further, Bear

Stearns represented that "[p]erforming loans purchased will have been originated pursuant to the

sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable

to the sponsor." *Id.*

445. WaMu made similar representations. For example, the WMALT 2007-OA1

Prospectus Supplement also provided that "[t]he sponsor's credit risk oversight department

conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases,

statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan

sellers. Sample size is determined by due diligence results for prior purchased pools from that

seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase.  Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers."  *Id.* at S-41.

446.    Similar assurances and representations are made in the Prospectus Supplements for the other GSE Certificates.  Thus, by virtue of their roles as sponsors and their own independent due diligence, JPMorgan, Bear Stearns, WaMu, and Long Beach had access to information regarding the true credit quality of the loans collateralizing the Securitizations that they sponsored.

447.    JPMorgan, Bear Stearns, WaMu, and Long Beach knew or recklessly disregarded the fact that certain loan originators were not originating loans in accordance with their underwriting guidelines.  WaMu, for example, had long been put on notice of their poor underwriting standards by regulators.  As stated in the PSI: "From 2004 to 2008, WaMu's regulators also repeatedly criticized WaMu's failure to exercise sufficient oversight of its loan personnel to reduce excessive loan error and exception rates that allowed the issuance of loans in violation of WaMu's credit standards."  According to Lawrence Carter, the Office of Thrift Supervision Examiner-in-Chief at WaMu, WaMu President of Home Loans Craig Chapman, had "been going around the country visiting home lending and fulfillment offices.  His view is that band-aids have been used to address past issues and that there is a fundamental absence of process."

448.    Documents recently released by a third-party due diligence firm, Clayton, confirm that JPMorgan, Bear Stearns, and Long Beach were aware—on a daily basis—of the weakness in the loan pools and in the underwriting standards of the originators they used in their residential mortgage backed securitizations.  As discussed above, according to an internal Clayton

"Trending Report" made public by the Government in conjunction with testimony given in September 2010, JPMorgan, Bear Stearns, and WaMu were informed that a significant percent of the loans Clayton reviewed for their respective sponsor entities "failed to meet guidelines." These loans were not properly approved as "exception loans" because they did not have any "compensating factors."

449.    JPMorgan, Bear Stearns, and WaMu were informed that 27 percent, 16 percent, 27 percent, and 9 percent of the loans reviewed by Clayton for J.P. Morgan Acquisition, EMC, WaMu Bank, and WaMu Securities, respectively, were not underwritten according to represented underwriting standards.

450.    Confronted with such a high failure rate, JPMorgan, Bear Stearns, and WaMu should have either rejected the pool outright, increased oversight of their own internal underwriting, or investigated whether the third-party originators involved could be considered a trusted source of loans in the future.  Even assuming JPMorgan, Bear Stearns, and WaMu incredibly believed a 27 percent, 16 percent, 27 percent, or 9 percent failure rate could be chalked up to "sampling error" (due to the fact that Clayton Holdings did not review every loan in a pool), the proper response would have been to increase the sample size to test that hypothesis.

451.    Instead, JPMorgan, Bear Stearns, and WaMu continued to carry on with their own poor internal underwriting and work with problematic originators.  Moreover, not only did they fail to expand the sample size to truly investigate the problems, they failed to disclose the red flags revealed by Clayton's review to the GSEs.  According to Clayton's "Trending Report," JPMorgan, Bear Stearns, and WaMu "waived in" to their pools 51 percent, 42 percent, 29

percent, and 50 percent, for J.P. Morgan Acquisition, EMC, WaMu Bank, and WaMu Securities, respectively, of the defective loans that Clayton had identified as being outside the guidelines.

452.    Clayton's "Trending Report" provides compelling evidence that JPMorgan, Bear Stearns, and WaMu knew, or were reckless in not knowing, they were securitizing defective loans and selling the resulting securities to investors like Fannie Mae and Freddie Mac. According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, through their numerous roles as underwriter and sponsor, JPMorgan, Bear Stearns, and WaMu were made fully aware on a regular basis that a significant percentage of their loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying securities sold to investors, such as those collateralizing the GSE Certificates.

453.    Not only did JPMorgan, Bear Stearns, and WaMu let poor loans pass into their securitizations in exchange for underwriting and securitization fees, they also took the fraud further, affirmatively seeking to profit from this knowledge.  Rather than rejecting these loans from the loan pool, as they should have, JPMorgan, Bear Stearns, and WaMu used the evidence of underwriting defects to negotiate lower prices for the loans and thus boost their own profits. According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, the banks would use the exception reports to force a lower price for itself, and not to benefit investors at all:

> I don't think that we added any value to the investor, the end investor, to get down to your point.  I think only our value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies.

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.  In other words, rather than exclude defective loans from collateral pools, or cease doing business with consistently failing originators,

investment banks like JPMorgan, Bear Stearns, and WaMu would instead use the Clayton data simply to insist on a lower price from the loan originators, thereby increasing their own profits while the defective loans were included in the pools for securitization.

454.    Further, JPMorgan, Bear Stearns, WaMu, and Long Beach failed to disclose the defect rates and other misinformation found in the Registration Statements to the credit ratings agencies that depended on the information provided by the GSEs in determining the credit rating of a Securitization.  JPMorgan, Bear Stearns, WaMu, and Long Beach fed the ratings agencies the same false loan level data regarding loan-to-value ratios, owner-occupancy status, home values, and debt-to-income ratios that they provided to investors in aggregate form in the Prospectuses and Prospectus Supplements.  The rating agencies then input this false data into their quantitative models to assess the credit risk associated with the RMBS, project likely future defaults, and ultimately, determine the ratings on the RMBS products of JPMorgan, Bear Stearns, WaMu, and Long Beach.  As a result, Defendants essentially pre-determined the ratings by feeding bad data into the ratings system.

>    **B.**    **JPMorgan Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors**

455.    The evidence discussed above not only shows that the representations were untrue, but also that JPMorgan knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates.  As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed JPMorgan that significant percentages of loans in the pools did not adhere to

underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans JPMorgan submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 27 percent of mortgage loans that Clayton found defective, 51 percent were subsequently waived in by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  JPMorgan's waiver of over *half* of the defective loans shows that JPMorgan knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

456.   As discussed above, the strikingly high number of JPMorgan's loans that were rejected by third party due diligence firms, yet subsequently "waived" into securitizations by JPMorgan, demonstrates JPMorgan's knowledge that defective loans were being included in their offerings.

457.   Through its various affiliates and subsidiaries, JPMorgan participated in every step of the securitization process, from the origination and servicing of the mortgage loans, to the sponsoring and structuring of the securitization, to the underwriting and marketing of the Certificates.  JPMorgan acknowledged that it "participates in virtually all aspects of the securitization process, including but not limited to: a) origination and servicing of loans; b) sponsoring, structuring and underwriting mortgage and asset-backed securities; c) market marking; and d) investing."  (Letter from JPMorgan to FDIC dated February 22, 2010.)  In its February 22, 2010 and July 1, 2010 letters to the FDIC, JPMorgan claimed that being "involved in as many aspects of the securitization business" gave JPMorgan "a balanced perspective."

458.   This vertical integration allowed JPMorgan to control and manipulate the loan level documentation and the value at which properties were appraised, and to ensure that loans would be approved by its loan underwriters.  By virtue of their control over each step in the

securitization process, JPMorgan had knowledge of the true characteristics and credit quality of the mortgage loans.

459.   JPMorgan also purchased mortgages to securitize from third-party originators. While JPMorgan could have examined the loan files themselves as part of its due diligence process, JPMorgan instead used third-party due diligence firms like Clayton to examine only a small percentage of the loan files.  In instances where the third party due diligence firms rated the loans as failing to meet the underwriting standards, JPMorgan often chose to include such defective loans in the securitizations, thereby passing the risk of delinquency and default to investors.

460.   JPMorgan continued this behavior during the worst period of the financial crisis. As investors were demanding that JPMorgan's newly acquired subsidiary, Bear Stearns, repurchase mortgage loans that were not underwritten to represented standards of quality, JPMorgan was denying those repurchase requests while simultaneously making repurchase demands for the very same loans from the originator, Capital One Financial Corp.  In a June 26, 2008 letter to Capital One, Allison Malkin, an executive director with J.P. Morgan Securities (the entity with which BSC was eventually merged), stated "that it is [Bear Stearns'] position that these breaches materially and adversely affect the value" of the mortgage loans.  "JPMorgan Refused Mortgage Repurchases It Also Sought, Ambac Says," *Bloomberg* (Jan. 24, 2011)

461.   JPMorgan's own subprime lender, Chase Home Finance LLC ("CHF"), originated all or the majority of the mortgage loans underlying the JPMAC 2006-CH1, JPMAC 2006-CH2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, and JPMAC 2007-CH5 Securitizations.  CHF also originated a significant number of the mortgage loans underlying the JPALT 2005-A2 Securitization.  CHF is a wholly-owned subsidiary of JPMorgan Bank.

JPMorgan Bank directed and controlled the business operations of CHF as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.

462.    JPMorgan abandoned its underwriting standards and condoned fraud by encouraging its employees to ignore and manipulate JPMorgan's automated underwriting system, called "ZiPPY."  "Chase mortgage memo pushes 'Cheats & Tricks,'" *The Oregonian* (March 27, 2008).  CHF went so far as to explicitly instruct loan originators to falsify loan information in order to elicit approval from the ZiPPY automated underwriting system for stated income loans of poor quality.  At internal memorandum circulated by CHF in its Portland, Oregon office titled "Cheats & Tricks" gave originators tips on how to circumvent the underwriting system, including exhortations that a mortgage should "Never Fear!!" because ZiPPY "can be adjusted" to "get the findings you need."  The memorandum encouraged brokers to game the ZiPPY system because "[i]t's super easy!  Give it a try!"  It provided the following "handy steps" in order to gain approval for an otherwise rejected Stated Income / Stated Asset loan application:

> (1)  In the income section of your 1003, make sure you input all income in base income.  **DO NOT break it down by overtime, commissions or bonus.**

> (2)  NO GIFT FUNDS!  If your borrower is getting a gift, add it to a bank account along with the rest of the assets.  Be sure to remove any mention of gift funds on the rest of your 1003.

> (3)  If you do not get Stated/Stated, **try resubmitting with slightly higher income.  Inch it up $500 to see if you can get the findings you want.**  Do the same for assets.

(Emphasis added).

463.    Management-level employees at JPMorgan Bank and CHF knew that mortgage origination fraud was occurring, and indeed encouraged such fraudulent practices in an effort to increase the volume of loans originated, and thus, their compensation.  CHF's former Regional

Vice President, James Theckston, explained to The New York Times that 60 percent of his 2006 performance review depended on him increasing the origination of high-risk loans.  Mr. Theckston stated that CHF executives could earn a commission for the origination of subprime loans that was seven times higher than for prime mortgages, and that they therefore looked for less savvy borrowers—those with less education, without previous mortgage experience, or without fluent English skills—and directed them toward subprime loans.  According to Mr. Theckston, these borrowers ended up paying higher mortgage rates, and were more likely to default and lose their homes.  "A Banker Speaks, With Regret," *The New York Times* (Nov. 30, 2011).

464.    Mr. Theckston further revealed: "On the application, you don't put down a job; you don't show income; you don't show assets; but you still got a nod."  "If you had some old bag lady walking down the street and she had a decent credit score, she got a loan …You've got somebody making $20,000 buying a $500,000 home, thinking that she'd flip it.  It was crazy, but the banks put programs together to make those kinds of loans."

465.    Mr. Theckston explained that knowledge of this fraud existed at the top levels of management:  "The bigwigs of the corporations knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares? . . . The government is going to bail us out.  And the problem loans will be out of here, maybe even overseas."

466.    Through the abandonment of underwriting guidelines and other techniques, JPMorgan was able to substantially increase the volume of mortgage loans that it originated and securitized by abandoning its underwriting standards.

467.    By 2006, however, JPMorgan had grown alarmed at the increasing rate of late payments in its subprime portfolio.  As the poor quality of these mortgage loans became

apparent, JPMorgan decided to exit its subprime positions.  This decision came from JPMorgan's

CEO, Jamie Dimon, evidencing knowledge of the perilous state of the JPMorgan's subprime

assets by JPMorgan senior management.  An article in *Bloomberg* on February 17, 2010 revealed

that JPMorgan CEO Jamie Dimon was fully aware that its residential mortgage backed securities

were of poor and deteriorating credit quality and that he attempted to shed the associated risk

from  JPMorgan's own balance sheet.  The article reported that "[i]n October 2006, Mr. Dimon,

JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan]

needed to start selling its subprime-mortgage positions."  In late 2008, *Fortune Magazine* quoted

the same October 2006 phone conversation, where Mr. Dimon instructed Mr. King to sell

JPMorgan's positions: "I really want you to watch out for subprime! . . . We need to sell a lot of

our positions.  I've seen it before.  This stuff could go up in smoke!"  "Jamie Dimon's swat

team:  How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch,"

*Fortune Magazine* (September 2, 2008).  By the end of 2006, JPMorgan had unloaded $12

billion in subprime assets that JPMorgan itself had originated.  *Id.*

468.    Despite Mr. Dimon's view that JPMorgan's subprime holdings "could go up in

smoke!" and JPMorgan's decision to sell its own holdings in subprime assets, JPMorgan

continued to originate and securitize poorly underwritten mortgage loans and vouch for their

quality.  This was the time period in which the GSEs acquired a significant amount of the

JPMorgan Certificates, relying on JPMorgan's representations that the mortgage loans were

underwritten in accordance with JPMorgan's purported underwriting standards.

469.    JPMorgan waived a significant (over 51 percent)  number of the loans rejected by

its third-party due diligence firm into loan pools for securitization.  JPMorgan also abandoned its

underwriting standards in directing its employees to enter untrue and misleading information into

its automated underwriting system in order to generate approvals for loans that would otherwise be rejected.  Finally, JPMorgan CEO Jamie Dimon himself knew that subprime positions were risky and dangerous; all the while JPMorgan continued to originate, acquire and securitize defective and credit-impaired loans for inclusion in its securitizations.  These loans collateralized the certificates issued in connection with such securitizations, which were sold to investors like the GSEs.  These facts demonstrate that JPMorgan knew its representations were false but nonetheless was willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

### C.  Bear Stearns Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors

470.    The evidence discussed above not only shows that the representations were untrue, but also that Bear Stearns knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates.  As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed Bear Stearns that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 16 percent of the mortgage loans Bear Stearns submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 16 percent of mortgage loans that Clayton found defective, 42 percent were subsequently waived in by Bear Stearns without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  Bear Stearns' waiver of 42 percent of the defective loans shows that Bear Stearns knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

471.    Bear Stearns' collapse and subsequent acquisition by JPMorgan has been the subject of intense public scrutiny and investigation, most notably by the FCIC.  In February 2011, the FCIC released interviews with Bear Stearns executives regarding its role in the origination, acquisition, and securitization of mortgage loans.  The documentary evidence revealed widespread fraudulent conduct on the part of Bear Stearns.  Such fraudulent conduct has been the basis for both investigation and litigation by public officials, including the Attorney General of Oregon, who filed an action on behalf of the Oregon Public Employees Retirement Fund against Bear Stearns for misrepresentations in its role as issuer and underwriter in the sale of certificates.  *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 08 Civ. 8093 (SDNY).

472.    Through its various affiliates and subsidiaries, Bear Stearns participated in every step of the securitization process, from the origination and servicing of the mortgage loans to the sponsoring and structuring of the securitization, to the underwriting and marketing of the Certificates.  According to the FCIC, it was Bear Stearns that actually "pioneered" the "'vertical integration' mortgage model" so that it could have "a stake in every step of the mortgage business—originating mortgages, bundling these loans into securities, bundling these securities into other securities, and selling all of them on Wall Street." (FCIC Report at 204.)  Between 2003 and 2006, Bear Stearns' revenue and profit increased by 123.8 percent and 77.6 percent, respectively.  This growth was largely driven by mortgage finance and Bear Stearns' securitization machine.  By 2006, Bear Stearns' securitizations accounted for 11 percent of the overall U.S. mortgage-securities market.  Bear Stearns announced in its 2006 Annual Report: "Our vertically integrated franchise allows us to access every step of the mortgage process, including origination, securitization, distribution and servicing."

473.    This vertical integration allowed Bear Stearns to control and manipulate the loan level documentation, to knowingly choose poor quality mortgage loans for securitization as a method of off-loading the loans to investors as soon as possible, and to selectively make repurchase claims of originators while simultaneously denying those of investors.  By virtue of their control over each step in the securitization process, Bear Stearns had knowledge of the true characteristics and credit quality of the mortgage loans.

474.    Bear Stearns' own subprime lender, EMC, originated or acquired all or the majority of the mortgage loans underlying the BALTA 2005-10, BALTA 2006-1, BALTA 2006-2, BALTA 2006-4, BSMF 2006-SL5, BSMF 2006-SL6, BSMF 2007-SL1, and BSMF 2007-SL2 Securitizations.  EMC also originated or acquired a significant number of the mortgage loans underlying the BSABS 2007-HE1 and BSMF 2007-AR3 Securitizations.  EMC was a wholly-owned subsidiary of BSI and is now a subsidiary of JPMorgan Bank.

475.    Encore Credit, a division of Bear Stearns Residential Mortgage Corporation ("BSRM"), originated the mortgage loans underlying the WMABS 2006-HE3, BSABS 2006-HE9, BSABS 2007-HE4, BSABS 2007-HE5, BSABS 2007-HE6, and BSABS 2007-HE7 Securitizations.  Encore Credit and BSRM also originated a significant number of the mortgage loans underlying the BSABS 2007-HE1, BSABS 2007-HE5, BSMF 2007-SL1, and BSMF 2007-SL2 Securitizations.  BSRM was a wholly-owned subsidiary of BSI and is now believed to be a subsidiary of JPMorgan Chase.

476.    Bear Stearns directed and controlled the business operations of EMC and Encore Credit as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.  EMC began acquiring subprime loans in 2003.  From 2004 to 2007, EMC more than doubled the volume of subprime loans it acquired for securitization, from over $27 billion in

2004 to over $80 billion in 2007.  BSRM began originating mortgage loans in 2005.  In 2006,

BSRM originated over $4 billion in mortgages.  Bear Stearns securitized these loans through

BSC, its underwriting affiliate.  According to *Inside Mortgage Finance*, BSC underwrote

approximately $130.8 billion and $103.4 billion of mortgage-backed securities in 2005 and 2006,

respectively.  It was the first and third largest underwriter of non-agency mortgage-backed

securities in those years.[34]  Bear Stearns' mortgage securitization business helped to increase

Bear Stearns' revenue by over 123 percent from 2003 to 2006.

477.    Like JPMorgan, Bear Stearns used third-party due diligence firms such as Clayton

to review whether the loans Bear Stearns intended to acquire for securitization were underwritten

in accordance with applicable underwriting standards.  If a loan did not comply with

underwriting guidelines, Bear Stearns could (i) demand that the originator cure the defect, (ii)

reject the loan for inclusion in the securitization, or (iii) accept the defective loan as part of the

loan pool for purchase.  As its appetite for mortgage loans to securitize grew, Bear Stearns

rejected fewer and fewer defective loans.  Bear Stearns made use of the exception process to

waive defective loans into the loan pool, effectively abandoning its underwriting standards.  The

vast majority of these loans did not have sufficient compensating factors to justify these

exceptions.  In testimony to the FCIC in September 2010, former Clayton President Keith

Johnson said that investment banks like Bear Stearns were aware that valid compensating factors

did not exist, and used these defects as leverage to negotiate a lower purchase price for the loans.

Internal communications from Bear Stearns, discussed below, confirm that Bear Stearns would

simultaneously deny repurchase demands from investors while making such repurchase demands

---

[34] "Agency" mortgage-backed securities are guaranteed by a government agency or
government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency"
mortgage-backed securities are issued by banks and financial companies not associated with a
government agency or government-sponsored enterprise.

on originators for the same loans.  As such, Bear Stearns knowingly securitized, marketed, and sold loans that did not meet its underwriting standards.

478.    Bear Stearns' management was so eager to securitize as many mortgage loans as possible that it abandoned any adherence to underwriting or due diligence standards.  On February 11, 2005, Bear Stearns Senior Managing Director Mary Haggerty e-mailed Vice President of Due Diligence John Mongelluzo with instructions to reduce the amount of due diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."

479.    Third-party due diligence firms were also told to reduce due diligence.  In an e-mail dated April 5, 2007, an EMC Assistant Manager for Quality Control Underwriting and Vendor Management ordered Adfitech, Inc. ("Adfitech") not to take efforts to verify information in a loan file, directing:

- "Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS,"

- Do not "make phone calls on employment," and

- "Occupancy misrep is not a securitization breach."

480.    Bear Stearns Internal Audit Reports also described the various reductions in due diligence.  According to February 28, 2006, and June 22, 2006 reports, Bear Stearns would reduce the number of loans in the loan samples that were reviewed as part of the due diligence process, conduct due diligence only after the loans were purchased ("post-closing" due diligence), eliminate internal reports on defective loans, and conduct no due diligence if such due diligence would interfere with mortgage loan pools being securitized.

481.    *The Atlantic* confirmed this abandonment of reasonable due diligence procedures in a May 2010 article describing:

- how Bear Stearns pressured EMC analysts to perform their due diligence of the underlying mortgages in only one to three days;

- how Bear Stearns encouraged EMC analysts to falsify loan data (including FICO scores) if the loan file was missing the requisite information; and

- how Bear Stearns pushed EMC analysts to avoid investigating a potentially bad loan and instead focus on making it "fit."

"E-mails Suggest Bear Stearns Cheated Clients Out of Billions," *The Atlantic* (Jan. 25, 2011)

482.    Former EMC mortgage analyst Matthew Van Leeuwen, an employee from 2004 to 2006, confirmed in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," so that if there were "outstanding data issues" analysts should just "fill in the holes."  The pressure was directed from the top of Bear Stearns' corporate structure.  For example, EMC's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, told her staff to do "whatever is necessary" to meet Bear Stearns' objectives for desired loan production.  Her April 14, 2006 e-mail further stated:

> I refuse to receive any more emails . . . questioning why we're not funding more loans each day.  I'm holding each of you responsible for making sure we fund at least 500 each and every day. . . . [I]f we have 500+ loans in this office we MUST find a way to . . . buy them. . . . I expect to see 500+ each day. . . . I'll do whatever is necessary to make sure you're successful in meeting this objective.

483.    Bear Stearns knew that its shoddy due diligence procedures were resulting in the securitization of large numbers of defective loans.  Recently disclosed documents, such as a January 26, 2005 Contractor Services Agreement between EMC and Adfitech, reveal that EMC hired Adfitech in 2005 to "review loans to evaluate if they meet investor quality guidelines, if sound underwriting judgment was used, and if the loan is devoid of all misrepresentation or fraud characteristics." Based on its analysis of a sample of EMC's loans, Adfitech discovered that over 38 percent of the loans were defective under EMC's existing quality control procedures, according to Bear Stearns' Managing Director and EMC's President Stephen Golden's April 26,

2010 deposition taken in *Ambac Assurance Corp. v. EMC Mortgage LLC et al*. No.

650421/2011(N.Y. Sup. Ct.).

484.    Not surprisingly, given the abandonment of due diligence and underwriting

standards by Bear Stearns, loans acquired by Bear Stearns began to default at an increasing rate.

These triggered concern in Bear Stearns as early as 2005.  Rather than improving the quality of

loans acquired for securitization, Bear Stearns reacted by changing the time period in which Bear

Stearns was required to hold loans it acquired.  Previously, Bear Stearns was required to hold

third-party loans in inventory for between 30 and 90 days before the loans could be securitized.

This allowed Bear Stearns to determine whether any of the loans would suffer from an early

payment default.  In 2006, Bear Stearns stopped screening out these defective loans and instead

required that all mortgage loans be securitized before the early payment default period expired.

Bear Stearns Senior Managing Director Jeffrey Verschleiser confirmed the revised protocol in a

June 13, 2006 e-mail to Haggerty stating that they need  "to be certain we can securitize the

loans with 1 month epd before the epd period expires."  This desire to unload bad mortgage loans

by selling them to other investors through the securitization process was further evidenced by a

May 5, 2007 e-mail from Bear Stearns Managing Director Keith Lind, who demanded "to know

why we are taking losses on 2nd lien loans from 2005 when they could have been

securitized?????"

485.    In addition to purposely acquiring and securitizing defective loans that did not

meet their represented underwriting guidelines and selling them to investors, Bear Stearns'

subprime subsidiary, EMC, further profited from these bad loans by making repurchase claims

against the originator of the loans.  Repurchase claims are derived from rights found in mortgage

loan purchase agreements, whereby the originator makes representations to the sponsor (EMC)

that the loans were underwritten in accordance with certain underwriting standards.  If the sponsor (EMC) discovers this not to be the case, it can request that the originator repurchase any affected loans.  Similarly, the PSA between EMC and the trust requires that EMC repurchase any loans it knows are defective.  Instead of seeking the actual repurchase of these bad loans, however—which would remove the loans from the trust and compensate the certificateholders— EMC settled its repurchase claims and kept the settlement proceeds for itself.  EMC did not pass the proceeds of these repurchase claims on to the trust.

486.    EMC came to several such settlement agreements and other arrangements as part of its repurchase scheme.  On January 30, 2007, an originator agreed to pay over $2.5 million to EMC "in lieu of repurchasing the Defective Loans."  On December 18, 2007, an originator agreed to pay almost $12 million "for full payment and satisfaction of the Monetary Claims, and the balance of the Settlement Amount (if any) for settlement of the Defective Loans."  On October 1, 2007, an originator agreed to pay $1 million "in lieu of repurchasing the Defective Loans."  According to an internal presentation requested by Bear Stearns' Managing Director and Head of Mortgage-Backed Securities, Thomas Marano, EMC received $1.9 billion from April 2006 to April 2007 in claim resolutions, with most resolutions being settlements.  Bear Stearns would also accept discounts on future loan purchasers instead of immediate cash settlements, valuing these arrangements at $367 million for the period beginning in 2007 through the first quarter of 2008.  *See also* "E-mails Suggest Bear Stearns Cheated Clients Out of Billions," *The Atlantic* (Jan. 25, 2011).

487.    These funds should have been passed to the trusts but Bear Stearns did not disclose its repurchase settlements with certificateholders in the trust.  In a December 11, 2009 deposition, Bear Stearns' Deal Manager Robert Durden could not identify a single "instance in

which EMC or Bear Stearns disclosed to Ambac or other investors that it was recovering on

EPDs from originators with respect to securitized mortgage loans, pocketing the money and not

putting it into the trust." Bear Stearns knew this practice breached its representations and

warranties made to purchasers of certificates: PriceWaterhouseCoopers advised Bear Stearns that

the program was contrary to "common industry practices, the expectation of investors and . . . the

provisions in the [deal documents]" in an August 31, 2006 audit, and, according to EMC

President Stephen Golden, EMC concluded that it could not retain funds in connection with the

repurchase claims in mid-2007. Despite this advice, EMC reached two such agreements in the

latter half of 2007 and continued to fail to remit the proceeds to the trust.

PricewaterhouseCoopers LLP, Bear Stearns/EMC UPB Break Repurchase Project Audit Report,

August 31, 2006 (Haas Decl., Ex. 18, EMC-AMB 006803209).

488.    Bear Stearns also abused its reduced documentation programs, including its stated

income, low documentation, and no documentation loan programs in its pursuit to originate as

many loans as possible. Low documentation loan programs were originally designed for self-

employed business owners and professionals with high credit scores and loans with low loan-to-

value ratios. Despite representations in the Registration Statements that low documentation

loans adhered to traditional underwriting standards, low documentation loan programs were

instead used as a tactic to circumvent Bear Stearns' underwriting standards altogether.

489.    A Bear Stearns Internal Audit Report dated February 28, 2006 revealed that Bear

Stearns systematically issued reduced documentation loans to borrowers who misrepresented

their income, assets, employment, and intentions to occupy purchased properties. Bear Stearns

loan officers were encouraged to ignore red flags and close the loans regardless. Former EMC

Mortgage Analyst Matthew Van Leeuwen explained in a March 30, 2009 e-mail that a "missing

credit score would magically become a 680 in Bear's system, things like that." Stated Income loans were typically approved even if the stated income could not be verified as reasonable by sources like Salary.com or support in the loan application.

490. The evidence discussed above reveals that Bear Stearns had knowledge that it had, in fact, completely abandoned its underwriting standards. Bear Stearns waived a significant number of loans rejected by its third-party due diligence firm into loan pools for securitization. Bear Stearns packaged loans for securitization at an earlier and earlier date, effectively gutting any sort of due diligence and thereby passing the risk of default onto the certificateholders. Senior management of Bear Stearns also directed its employees to abandon purported underwriting standards by not verifying employment or checking credit reports—all in the pursuit of increased volume and market share. Further, Bear Stearns demanded that originators repurchase loans and then retained the payments received, as opposed to remitting such funds to the trusts. These facts demonstrate that Bear Stearns knew its representations were false, but nonetheless was willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

### D. WaMu and Long Beach Knew Their Representations Were False And Were Willing to Capitalize On Their Unique Knowledge At The Expense of Investors

491. The evidence discussed above not only shows that the representations were untrue, but also that WaMu and Long Beach knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates. As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

217

- Third-party due diligence providers such as Clayton and Bohan informed WaMu that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans WaMu Bank submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 27 percent of mortgage loans that Clayton found defective, 29 percent were subsequently waived in by WaMu without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  WaMu's waiver of nearly a third of the defective loans shows that WaMu knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

492.    Like JPMorgan and Bear Stearns, WaMu and its Long Beach subsidiaries also systematically abandoned their underwriting standards in pursuit of greater volumes of mortgage loans to securitize and sell to investors.  As part of its strategy to grow and become a vertically integrated origination and securitization operation, WaMu acquired Long Beach Mortgage in 1999, thereby securing an in-house subprime originator, and also acquired WaMu Capital, thereby giving WaMu an in-house underwriter that could control the underwriting process and retain securitization underwriting fees.  By virtue of their control over each step in the securitization process, WaMu and Long Beach and their senior management had actual knowledge of the true characteristics and credit quality of the mortgage loans.

493.    Long Beach Mortgage, which was exclusively a subprime lender, originated all or the majority of the mortgage loans underlying the LBMLT 2005-3, LBMLT 2006-2, LBMLT 2006-3, LBMLT 2006-4, LBMLT 2006-5, LBMLT 2006-6, LBMLT 2006-7, LBMLT 2006-8, LBMLT 2006-9, LBMLT 2006-10, LBMLT 2006-11, LBMLT 2006-WL1, LBMLT 2006-WL2, LBMLT 2006-WL3, WMABS 2006-HE1, WMHE 2007-HE1, WMHE 2007-HE2, WMHE 2007-HE3, and WMHE 2007-HE4 Securitizations.  Long Beach Mortgage, formerly a WaMu Bank subsidiary, became a division of WaMu Bank in July 2006 and was shut down in 2007.  In

218

addition, WaMu Bank itself originated all or the majority of the mortgage loans underlying the WAMU 2007-OA3 Securitization.

494.     WaMu directed and controlled the business operations of Long Beach Mortgage as part of its plan to originate and securitize an increasingly larger volume of mortgage loans.  In 2000, Long Beach originated and securitized approximately $2.5 billion in subprime mortgage loans; in 2006, it securitized nearly $30 billion in subprime home loans.  *PSI Report*, p. 54. WaMu accomplished this rapid pace of growth by allowing and encouraging employees to ignore its purported underwriting standards.

495.     WaMu's management purposely originated and securitized increasingly risky mortgage loans in order to grow market share.  WaMu's strategy is made clear by internal documents that called for riskier and riskier lending activities:

- A June 2004 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger, in presented a five-year strategic plan to take on "more credit risk (with more home equity, Alt A and non-prime residential loans) over the next five years," in the belief that "[a]bove average creation of shareholder value requires significant risk taking."

- A January 2005 presentation to the board of directors entitled "Higher Risk Lending Strategy 'Asset Allocation Initiative'" that advocated WaMu's strategic shift from originating low risk fixed rate and government-backed loans to high risk subprime, Option ARM and home equity loans.

- A June 2005 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger called for WaMu to increase its market share of Option ARM, home equity, subprime and Alt A loans to over 10 percent.

- An April 18, 2006 presentation titled "Home Loans Discussion, Board of Directors Meeting" that described WaMu's plan to increase the percentage of its loans that were considered high risk from 49 percent in 2005 to 82 percent by 2008; the presentation also described how subprime loans were eight times as profitable as government-backed loans.

- A June 12, 2006 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger noted that "Wall Street appears to assign higher P/Es to companies embracing credit risk and penalizes companies with higher interest-rate and operating risks," further encouraging riskier lending practices.

219

- A June 18, 2007 Strategic Direction Memorandum wherein WaMu CEO Kerry Killinger stressed WaMu's emphasis on "higher-risk adjusted return products such as home equity, sub-prime first mortgages, Alt A mortgages and proprietary products such as Mortgage Plus."

496.    WaMu expanded into higher risk loan products while simultaneously abandoning its stated underwriting standards through the use of exceptions.  James G. Vanasek, WaMu's Chief Risk Officer until 2005, acknowledged to the Senate PSI that exceptions were "a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."  *PSI Hearing*, April 13, 2010.  The Office of Thrift Supervision issued a Report of Examination to WaMu in August 2005, stating that it "remain[ed] concerned with the number of underwriting exceptions and with issues that evidence lack of compliance with bank policy."  The OTS followed up with a May 2006 Findings Memorandum, stating that the loans it reviewed did not have exceptions and "probably should not have been made."  *PSI Report*, p. 180.

497.    In a 2005 internal memorandum, Mr. Vanasek described WaMu's own loan sales team as "infectious and dangerous," "aggressive, and often times abusive" in response to his attempts to enforce a "more disciplined underwriting approach."  *PSI Report*, p. 143.  Mr. Vanasek further testified to the Senate PSI that if an underwriter rejected a loan application, "the loans were always escalated up, so if they declined a loan, it was escalated to a higher level, a marketing officer who would ultimately approve."  *PSI Hearing*, April 13, 2010.  Keysha Cooper, a WaMu Senior Mortgage Underwriter from 2003-2007 stated in a November 1, 2008 *New York Times* article, "I swear 60 percent of the loans I approved I was made to."  "At WaMu, a loan factory," *The New York Times* (Nov. 2, 2008).

498.    In addition, contrary to its guidelines and prudent standards of underwriting, WaMu used the starter interest rate as the qualifying rate as opposed to the eventual, higher

interest rate, thereby resulting in a "payment shock" if the interest rate increased.  WaMu also focused on borrower credit scores in originating loans, as opposed to verifying borrower income and assets.

499.     WaMu encouraged its employees to avoid investigating red flags.  According to a December 27, 2008 *New York Times* article, John D. Parsons, a WaMu mortgage processing supervisor, stated that he "was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers," but that WaMu "was all about saying yes."  "Saying Yes, WaMu Built Empire on Shaky Loans," *The New York Times* (December 27, 2008).  Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file.'"  "Part One: Reckless Strategies Doomed WaMu," *The Seattle Times* (October 25, 2009).  She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here?  We're just going to take this stuff and throw it out."  *Id.*

500.     A PSI hearing exhibit details admissions by several WaMu employees to falsifying loan documentation in order to approve more loans.  *PSI Hearing*, Ex. 30.  A Westlake Village loan office sales associate stated that sales team members would "cut and paste the current borrower's name and address" onto the old bank statements.  *PSI Hearing*, Ex. 31.

501.     Karen Weaver, a former Long Beach underwriter, acknowledged that brokers "were making up pay stubs and presenting that."  "At Top Subprime Mortgage Lender, Policies Were An Invitation To Fraud," *Huffington Post* (Dec. 21, 2009).  Anoinette Hendryx, a former Long Beach manager and underwriter, said that account executives would "offer kickbacks of money" to underwriters to get bad loans approved.  *Id.*

502.    WaMu's strategy of approving virtually every loan was successful in increasing its volume of loans originated at the sacrifice of quality.  This has been confirmed by WaMu employees and insiders.  In the same *New York Times* article, WaMu senior underwriter Keysha Cooper acknowledged that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?"  A former WaMu senior home consultant told the *Seattle Times* in the October 25, 2009 article discussed above that WaMu employees were subject to "total blanketing – emails, memos, meetings set up so people understood that this was what the company wanted them to do."

503.    WaMu senior management was aware that its personnel ignored WaMu's stated underwriting standards, and even sought to benefit from this asymmetrical knowledge.  The minutes of a December 2006 WaMu Risk Committee Meeting reflect that "delinquency behavior was flagged in October [2006] for further review and analysis . . . . The primary factors contributing to increased delinquency appear to be caused by process issues including the sale and securitization of delinquent loans, loans not underwritten to standards, lower credit quality loans and seller servicers reporting false delinquent payment status."  Despite this concern for rising delinquencies, Cheryl Feltgen, WaMu's Chief Risk Officer, wrote in a February 2007 e-mail that  WaMu was "contemplating selling a larger portion of our Option ARMs than we have in the recent past.  Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the market seems not to be yet discounting a lot for those factors."  In other words, WaMu sought "arbitrage" of its loan portfolio by selling risky and increasingly delinquent loans

to investors who were not aware that WaMu had systematically abandoned its underwriting standards.

504.    WaMu avoided taking losses on these poor quality loans by packaging them into mortgage-backed securities and selling them to investors who were not aware of WaMu's systematic abandonment of its purported underwriting standards.  A January 2005 presentation to the WaMu board of directors titled "Higher Risk Lending Strategy" highlighted the success of this strategy because "[c]redit-related losses from newly originated [High Risk Loan] portfolio . . . will occur several years after origination."  Mr. Vanasek, in his testimony before the PSI, was asked by Senator Levin: "Is it fair to say that WaMu was not particularly worried about the risk associated with Long Beach subprime mortgages because it sold those loans and passed the risk on to investors?"  Mr. Vanasek responded:  "Yes, I would say that was a fair characterization."

505.    WaMu accelerated its strategy to sell as many high risk loans as possible as the housing market worsened.  WaMu Executive Vice President and securitization chief, David Beck, wrote in a February 2007 e-mail that "[t]he performance of newly minted option arm loans is causing us problems.  Cheryl can validate but my view is our alt a (high margin) option arms [are] not performing well.  We should address selling 1Q as soon as we can before we loose [sic] the [opportunity]."  Cheryl Feltgen, the Chief Risk Officer for WaMu Home Loans, confirmed her acceptance of this strategy, stating "[t]here is a meltdown in the subprime market which is creating a 'flight to quality.' . . . This seems to me to be a great time to sell as many Option ARMs as we possibly can.  [CEO] Kerry Killinger was certainly encouraging us to think seriously about it at the MBR last week."  WaMu was particularly concerned about the Long Beach loans as they had the highest rates of default.  To help offset that risk, WaMu COO

Stephen Rotella told WaMu CEO Kerry Killinger that he "asked the guys to work with Beck's group to see if we could package and sell any of the bad portfolio product flat."

506.   WaMu knew that the loans it was securitizing and selling to investors had fraudulent information.  One internal report "WaMu Risk Mitigation and Mortgage Fraud 2008 Targeted Review," completed in September 2008, confirmed that WaMu had sold loans to investors after WaMu's internal controls had identified loans as fraudulent.  "The controls that are intended to prevent the sale of loans that have been confirmed by Risk Mitigation to contain misrepresentations or fraud are not currently effective.  There is not a systematic process to prevent a loan in the Risk Mitigation Inventory and/or confirmed to contain suspicious activity from being sold to an investor. ... Of the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud.  There is evidence that this control weakness has existed for some time."  A 2008 study by WaMu's Corporate Credit Review team confirmed that WaMu's had allocated far too few resources to monitoring and combating fraud. "Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors."

507.   Long Beach in particular was known to be a source of fraudulently originated loans.  One internal audit from 2005 found that Long Beach suffered from "[r]elaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel. . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool."  Ronald Cathcart, the Chief Enterprise Risk Officer for WaMu, noted in a 2007 e-mail that, for Long Beach, "deterioration was accelerating in recent vintages with each vintage since 2002 having performed worse than the prior vintage."  Mr. Cathcart cited "[a]ppraisal deficiencies . . . . Material misrepresentations . . . Legal documents were missing or contained

errors or discrepancies . . . loan decision errors" as the cause.  WaMu shut down Long Beach in June 2007, incorporating the former subsidiary as WaMu's "Wholesale Specialty Lending" channel.

508.    WaMu, itself wary of holding risky or poorly underwritten loans, conducted internal studies to determine the risk of its loan holdings.  WaMu did not inform investors of the results of these studies.  During his testimony before the PSI, Senator Levin asked David Beck, WaMu's Executive Vice President and head of securitization, about whether WaMu disclosed its findings to investors: "Did they know, were they informed that loans with those or some of those characteristics had a greater propensity towards delinquency in WaMu's analysis?"  Mr. Beck confirmed: "They were not told of the WaMu analysis."

509.    WaMu was very aware of the risk of purchasing poorly underwritten and risky loans and retaining them on its balance sheet.  As such, WaMu made an effort to purchase and retain only higher quality loans on its books.  Mr. Vanasek told the PSI that "some subprime mortgage loans purchased from others, namely Ameriquest, were retained on the balance sheet. They tended to be higher quality subprime loans and they were monitored very closely."  Senator Coburn asked for confirmation: "So basically, you were buying higher quality subprime loans from competitors than you were selling to the market."  Mr. Vanasek responded, "Correct."

510.    WaMu falsely overstated appraisals in order to secure low LTV ratios for mortgages, thereby making the loans more attractive to prospective purchasers of certificates. WaMu utilized two appraisal management companies, eAppraiseIT and Lender's Service, Inc. ("LSI"), to oversee the appraisals of its loans.  Documents produced in the New York Attorney General's suit against eAppraiseIT and its parent First American, *New York v. First American Corp. (eAppraiseIT)*, reveals that WaMu selected individual appraisers who were willing to

produce false, inflated appraisals and refused to hire appraisers who maintained their

independence.  *New York v. First American Corp and First American eAppraiseIT*, No.

1:2007cv10397 (NY. Sup. Ct. 2007).  WaMu rebuked any sign of independence in its appraisers,

returning appraisals it deemed too low to eAppraiseIT for "reconsideration" and shifting its

business to a competitor of eAppraiseIT when one regional office refused to compromise its

independence.

511.    eAppraiseIT's management was initially resistant to this pressure from WaMu but

eventually was pressured into sacrificing its independence to meet WaMu's demands.

eAppraiseIT's President complained in an August 9, 2006 e-mail to WaMu that "[t]he Wamu

internal staff . . . admonish us to be certain we solve the [requests for reconsideration of

appraisal] issue quickly or we will all be in for some pretty rough seas."  An August 15, 2006 e-

mail to eAppraiseIT's president reflects an eAppraiseIT Executive Vice President complaining

because WaMu's loan officers demanded that eAppraiseIT's appraisers "tell them specifically

what they needed."  However, on September 14, 2006, that same executive VP wrote that

eAppraiseIT was "studying allowing [the manager's] group a little flexibility to raise the value

5% with a cap of $50k if it is fully justified."  Eventually, all independence would be lost, as

confirmed by the eAppraiseIT's Chief Appraiser, Peter Gailitis, who stated in an August 10,

2010 sworn affidavit that "the pressure from WaMu sales staff to 'hit value' continued

throughout the time I was with [eAppraiseIT] . . . Requests from WaMu loan officers to increase

values would come in various forms . . . to the effect of 'we need X value' or 'we need to hit' a

certain value in order to make the deal go through."

512.    WaMu used the influence and leverage of its continued business to turn

eAppraiseIT into virtually a captive appraiser.  eAppraiseIT hired over 60 former WaMu

appraisal office employees as staff appraisers and Appraisal Business Managers ("ABM"), reflecting eAppraiseIT's recognition that hiring former WaMu employees was "instrumental in [eAppraiseIT's] relational and operational success with [WaMu's] sales force."  WaMu directed that its former employees, now comprising a third of eAppraiseIT's staff, would deal with any requests by WaMu for reconsideration of appraisals.  When eAppraiseIT's office in Northern California refused to comply with WaMu's requests, WaMu moved all its Northern California business to a competitor, LSI.

513.   WaMu further compromised the independence of appraisers and the quality of appraisal values by requiring eAppraiseIT and LSI to use WaMu's own selected list of appraisers.  WaMu knew that these appraisers would deliver the inflated values they required to make the mortgage loans look attractive to potential investors.  eAppraiseIT's President recapped WaMu's strategy in a February 22, 2007 e-mail to senior executives at eAppraiseIT's parent company, First American.  He wrote: "We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's 'Proven Appraisers.'  . . . We will pay their appraisers whatever they demand.  Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value."

514.   Despite the Office of Thrift Supervision's 2005 guidance that "Staff responsible for the development and maintenance of the [approved loan appraiser] list should be independent of the loan production process," WaMu, eAppraiseIT, and LSI decided in a March 1, 2007 meeting that, according to the minutes, a "Proven Appraiser List is being created. This will replace the WaMu preferred list.  The initial list of names will be provided by lending. . . Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority

Basis." eAppraiseIT informed its staff in an April 17, 2007 e-mail that WaMu "decided to construct their own appraisal panel, now known as the wamu proven panel, and instructed the [appraisal managers] to utilize appraisers from this panel whenever possible. The end result is that if you are not on this proven panel it is very unlikely you will receive wamu work."

515.    LSI received the same treatment from WaMu.  If LSI wanted to use a appraiser that wasn't on WaMu's Proven Appraiser List, LSI had to provide a justification.  A 2007 Memorandum by eAppraiseIT Executive Vice President attached to an April 17, 2007 email drafted by eAppraiseIT President sent to First American Corp executives stated that "we need a short sentence in the message log so that we can monitor, – AND most important - lending can see why you didn't assign to a PAL service provider. Not using a PAL appraiser will be an issue so we need to ensure we've covered our bases as to why they're not utilized."

516.    According to the New York Attorney General's complaint, when one appraiser refused to reconsider the values of five appraisals he was removed from the proven appraiser list by WaMu.  He was told by a WaMu employee that "many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high value to permit the loans to close." *See Complaint, New York v. First American & eAppraiseIT,* No. 1:2007cv10397, *2007 WL 6420430 (N.Y.Sup. Nov. 1, 2007).*

517.    Indeed, the situation was best summed up by one of WaMu's former employees. On April 27, 2007, a former WaMu Oversight officer, Sabina Senorans, who had moved to sales wrote in an e-mail: "The sales people finally got their way at WAMU. The appraisal list that Eappraiseit and LSI is using has been totally scrubbed, but instead of keeping good appraisers, they went for the Badd [sic] ones . . . So many appraisers have been knocked off the list. . . . I did

manage to salvage a few in Nassau County, but other area, forget about it.  Now sales can easily threaten to take an appraiser off their list if they cannnot [sic] get what they want.  Scary, huh?"  In her February 20, 2009 deposition, the Sabina Senorans testified that the "people who are good appraisers were removed at the request of the loan officers and the sales staff."

518.    Such improper influence by WaMu and lack of independence on the part of appraisers was confirmed by the Office of Thrift Supervision in July 2008.  The OTS investigated WaMu's appraisal practices and found that "[n]umerous instances were identified where, because of undue influence on the appraiser, values were increased without supporting documentation" and constituted "unsafe or unsound banking practices."  *PSI Report*, p. 190.

519.    eAppraiseIT recognized WaMu's practices for what they were:  In an e-mail dated September 13, 2006, eAppraiseIT's President, Anthony Merlo, wrote to WaMu's executives that "[t]he issue is getting outrageously unethical and now border line [sic] dangerous.  Please respond what you will do to have this stopped within the Wamu organization."  eAppraiseIT's President then forwarded the e-mail to First American executives, noting: "I need to clamp down, especially since we warrant appraisals.  It's pure pressure to commit fraud."  In spite of these concerns, eAppraiseIT continued its work for WaMu, conducting over 260,000 appraisals for WaMu, until the fall of 2007 when the New York Attorney General brought its action.

520.    WaMu also developed a series of internal practices that directly led to the origination and securitization of fraudulent loans.  First, as discussed above, WaMu tied bonuses to the number of loans closed by a loan officer, thereby encouraging employees to be more concerned with volume than quality.  Second, WaMu adopted a plan to pay for "overages," which were payments to loan officers who sold mortgages to clients at a higher rate of interest than the rate for which the client was qualified.  A 2008 WaMu internal study titled "AIG/UG

and OTS Allegation of Loan Frauds Originated by [redacted employee]" found that these compensation practices lead to unsound underwriting. The memorandum concluded that because volume was emphasized above all else, "the temptation to advise the borrower on means and methods to game the system may occur. Our compensation and reward structure is heavily tilted for these employees toward production of closed loans."

521.     WaMu's Chief Risk Officer, Mr. Vanasek, confirmed these findings in his testimony to the Senate PSI. "Because of the compensation systems rewarding volume versus quality and the independent structure of the originators, I am confident at times borrowers were coached to fill out applications with overstated incomes or net worth to meet the minimum underwriting requirements. Catching this kind of fraud was difficult at best and required the support of line management. Not surprisingly, loan originators constantly threatened to quit and go to Countrywide or elsewhere if the loan applications were not approved." *PSI Report*, p. 103.

522.     The internal corporate culture at WaMu emphasized market growth over sound risk management. Mr. Vanasek and his risk department repeatedly issues warnings to WaMu's senior management concerning WaMu's origination and acquisition of mortgage loans of increasingly poor credit quality. In a February 28, 2005 memorandum to WaMu CEO Kerry Killinger and others members of the Executive Committee, Mr. Vanasek warned that "[m]y credit team and I fear that we are considering expanding our risk appetite beyond the '05 Plan at exactly the wrong point in the cycle … the market is over heated in many key areas of the country." In another 2005 memorandum, Mr. Vanasek warned WaMu that the increasing use of Option ARM loans would result in a high number of defaulted mortgages, stating: "The organization is at significant risk in its Option ARM and Hybrid portfolio of payment shock created by abnormally low Start – or teaser – rates, and aggressively low underwriting rates.... It

is our contention that in the upwardly sloping rate environment and expected flattening of housing appreciation, we are putting borrowers into homes that they simply cannot afford."

523.   WaMu's senior management ignored these repeated warnings and created a corporate culture that empowered sales at the expense of risk management. WaMu's management told risk managers, via an October 31, 2005 memorandum, that they had to "shift [their] ways of thinking" from being a "regulatory burden" that restricted lending operations to being a "customer service" that supported WaMu's aggressive growth strategy. WaMu's Chief Compliance and Risk Oversight Officer, Melissa Martinez, told risk managers they had to rely less on loan documentation and more on automated underwriting systems.

524.   In 2004, WaMu promoted a new advertising slogan called "The Power of Yes." Mr. Vanasek told the Senate PSI that "[t]he implication of that statement was that Washington Mutual would find some way to make a loan. The tag line symbolized the management attitude about mortgage lending more clearly than anything I can tell you." *PSI Report*, p. 146.

525.   Those executives who dissented from WaMu's aggressive growth strategy were generally dismissed or asked to leave. Indeed, Mr. Vanasek retired in December 2005 due to a lack of management support for his attempts at reigning in WaMu's aggressive lending. When he left, WaMu subordinated the risk department to the business division. WaMu continued its risky lending. Ronald Cathcart, the Chief Enterprise Risk Officer for WaMu, told the Senate PSI: "By February 2008, I had been so fully isolated that I initiated a meeting with the Director, where I advised that I was being marginalized by senior management to the point that I was no longer able to discharge my responsibilities as Chief Enterprise Risk Officer of WaMu. Within several weeks, I was terminated by the Chairman." *PSI Report*, p. 115.

526.     This evidence, which has been exhaustively documented in the Senate PSI Report and other government sources, reveals that WaMu and Long Beach knew that their underwriting standards had been utterly abandoned.  WaMu and Long Beach pressured their employees to rubber stamp loans; effectively gutting any sort of due diligence and making employment contingent on an employees' willingness to close as many loans as possible.  WaMu's own internal controls indicated the poor credit quality of WaMu and Long Beach mortgage loans, which WaMu and Long Beach proceeded to sell into securitizations regardless, capitalizing on their asymmetrical information.  WaMu also knew that its internal controls were inadequate.  Further, WaMu actively sought to elicit false and misleading valuations from supposedly "independent" appraisers.  Finally, WaMu fired, forced out, or ignored any employees who attempted to put an end to WaMu's fraudulent and reckless behavior.  These facts demonstrate that WaMu and Long Beach knew their representations were false and, in spite of this, were willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

**VI.      The GSEs Justifiably Relied on the Representations of JPMorgan, Bear Stearns, WaMu, and Long Beach**

527.     Generally, when purchasing RMBS, the GSEs require compliance with their investment requirements, as well as various representations and warranties concerning, among other things, the credit quality of the underlying loans, evaluation of the borrower's ability to pay, the accuracy of loan data provided, and adherence to applicable local, state and federal law.  Such representations and warranties were material to the GSEs' decisions to purchase RMBS, including the GSE Certificates.

528.     JPMorgan, Bear Stearns, WaMu, and Long Beach knew that the GSEs had specific requirements for investing in non-agency mortgage-backed securities, such as the GSE Certificates, and JPMorgan, Bear Stearns, WaMu, and Long Beach intended for the GSEs to rely

232

on its fraudulent misstatements as shown by their provision of representations, warranties and anticipated credit ratings in connection with the GSE Certificates, and their repetition of false loan statistics in the term sheets, free writing prospectuses, and Prospectus Supplements, among other offering materials.

529.    When JPMorgan, Bear Stearns, WaMu, and Long Beach made misrepresentations and omissions in the offering materials, it was aware of the GSEs' investment requirements for purchasing RMBS.

530.    For example, Fannie Mae's guidelines to sellers provided, among other things:

- "With respect to each Mortgage Loan, all loan data (including information about borrower income, census tract, occupancy) set forth in the PSA, Mortgage Loan Purchase Agreement, prospectus, prospectus supplement and any electronic files delivered in connection herewith, is true, correct, and complete."

- "Each Mortgage Loan at the time it was made complied in all material respects with all applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws."

- "The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective quantitative principles which relate to the borrower's credit characteristics, income, assets and liabilities (as applicable to a particular underwriting methodology program) to the proposed payment, and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the Mortgage Loan."

531.    Similarly, Freddie Mac's guidelines to sellers provided, among other things:

"The methodology used in underwriting the extension of credit for each mortgage loan in the trust employs objective mathematical principles which relate to the borrower's income, assets, and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the ability to make timely payments on the mortgage loan."

532.     Accordingly, Fannie Mae and Freddie Mac required JPMorgan, Bear Stearns, WaMu, and Long Beach to provide representations and warranties regarding the origination and quality of the mortgage loans, including that the mortgage loans had been underwritten in accordance with the loan originators' underwriting guidelines.

533.     Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by JPMorgan, Bear Stearns, WaMu, and Long Beach in their capacities as the sponsor, depositor, and lead and selling underwriter for the 94 JPMorgan, Bear Stearns, WaMu, and Long Beach-sponsored Securitizations.  JPMorgan, Bear Stearns, WaMu, and Long Beach provided term sheets to the GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

534.     The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P. Morgan Securities, BSC, and WaMu Capital relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

535.     JPMorgan, Bear Stearns, WaMu, and Long Beach in their capacities as the sponsors, depositors, and lead and selling underwriters for the 94 JPMorgan, Bear Stearns, WaMu, and Long Beach-sponsored Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies.  The credit rating agencies based their ratings on the information provided to them by JPMorgan, Bear Stearns, WaMu, and Long Beach, and the agencies' anticipated ratings of the Certificates were dependant on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of representations of JPMorgan, Bear Stearns, WaMu, and Long Beach in the term sheets and Prospectus Supplements.

536.     In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSEs' purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

537.     In purchasing the GSE Certificates, the GSEs justifiably relied on the false representations and omissions of material fact, detailed above, that were made by JPMorgan, Bear Stearns, WaMu, and Long Beach, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

538.     The GSEs' reliance was reasonable because industry practice was for an investor to rely upon the representations and warranties of the sponsors, depositors and underwriters regarding the quality of the mortgage loans and the standards under which they were originated.

Information regarding the originators' compliance with underwriting guidelines, owner-occupancy rates, LTV ratios, and data provided to credit ratings agencies was peculiarly within the knowledge of JPMorgan, Bear Stearns, WaMu, and Long Beach, and investors were therefore required to rely upon the representations made by the sponsors, depositors and underwriters to address the asymmetry of information concerning the mortgage loans underlying the securitizations.  The JPMorgan, Bear Stearns, WaMu, and Long Beach offering materials, including those filed with the SEC, did not provide sufficient information about the individual mortgage loans underlying the GSE Certificates to render the JPMorgan, Bear Stearns, WaMu, and Long Beach false statements or omissions not misleading.

539.    JPMorgan, Bear Stearns, WaMu, and Long Beach intended for investors, including Fannie Mae and Freddie Mac, to rely on its representations of material facts about the assets backing the GSE Certificates.  JPMorgan, Bear Stearns, WaMu, and Long Beach instructed investors to rely on the information provided by them in the Registration Statements and no other information.  Thus, for example, the Prospectus Supplement for the JPMAC 2006-WMC2 Securitization states:  "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein.  We have not authorized anyone else to provide you with different information."  *See* JPMAC 2006-WMC2 Prospectus Supplement (filed June 22, 2006).  The offering materials for the remaining Securitizations contain similar language.

540.    Furthermore, JPMorgan, Bear Stearns, WaMu, and Long Beach regularly provided information concerning the volume of their annual securitization business and their market shares to prospective RMBS investors, such as Fannie Mae and Freddie Mac, to assure them that JPMorgan, Bear Stearns, WaMu, and Long Beach possessed expertise in the RMBS

market and as a result, investors should rely upon the representations in the offering materials endorsed by JPMorgan, Bear Stearns, WaMu, and Long Beach. *See, e.g.*, JPMAC 2006-WMC2 Prospectus Supplement at "*The Sponsor: Securitization Activities of the Sponsor*." (filed June 22, 2006).

541.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above. From the day the GSEs purchased the GSE Certificates, the GSEs suffered injury.

## VII.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages

542.    In total, between September 7, 2005 and September 19, 2007, Fannie Mae and Freddie Mac purchased over $33 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Tables 11 and 12 reflect Fannie Mae's and Freddie Mac's purchases of the Certificates, respectively.[35]

### Table 11

| Transaction | Tranche | CUSIP | Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| BALTA 2005-10 | II3A1 | 07386HZG9 | 12/30/2005 | $569,686,000.00 | 101.1406 | BSC |
| BALTA 2006-4 | I2A1 | 073871AC9 | 6/30/2006 | $403,000,000.00 | 100 | BSC |
| BALTA 2006-4 | III1A1 | 073871BL8 | 6/30/2006 | $132,532,000.00 | 99.3125 | BSC |
| BSABS 2006-HE9 | IIA | 07389MAD9 | 11/30/2006 | $218,304,000.00 | 100 | BSC |
| BSABS 2006-HE10 | II2A | 07389RAR7 | 12/29/2006 | $201,892,000.00 | 100 | BSC |
| BSABS 2007-FS1 | IIA | 073855AG3 | 2/28/2007 | $70,635,000.00 | 99.9935 | BSC |
| BSABS 2007-HE1 | II2A | 07389UAR0 | 1/30/2007 | $118,512,000.00 | 100 | BSC |
| BSABS 2007-HE2 | II2A | 07389YAE1 | 2/28/2007 | $75,162,000.00 | 100 | BSC |

---

[35]    Purchased securities in Tables 11 and 12 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | Tranche | CUSIP | Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| BSABS 2007-HE3 | IIA | 073852AE5 | 3/30/2007 | $131,715,000.00 | 100 | BSC |
| BSABS 2007-HE3 | IIIA | 073852AF2 | 3/30/2007 | $90,354,000.00 | 100 | BSC |
| BSABS 2007-HE4 | IIA | 07386RAE9 | 4/30/2007 | $210,625,000.00 | 100 | BSC |
| BSABS 2007-HE5 | IIA | 073859AE0 | 5/30/2007 | $99,922,000.00 | 100 | BSC |
| BSABS 2007-HE7 | IIA1 | 07387VAC3 | 9/19/2007 | $137,892,000.00 | 100 | BSC |
| BSABS 2007-HE7 | IIIA1 | 07387VAE9 | 9/19/2007 | $69,504,000.00 | 100 | BSC |
| GPMF 2005-AR5 | IIA1 | 39538WEE4 | 10/31/2005 | $470,923,000.00 | 100 | BSC |
| GPMF 2006-AR3 | IIA1 | 39538WHA9 | 4/28/2006 | $492,223,000.00 | 100 | BSC |
| GPMF 2006-AR3 | IIA2 | 39538WHB7 | 4/28/2006 | $259,690,000.00 | 100 | BSC |
| JPALT 2005-A2 | 2A1 | 46627MBS5 | 12/29/2005 | $68,406,000.00 | 100.1484 | J.P. Morgan Securities |
| JPMAC 2005-OPT2 | A1A | 46626LEF3 | 12/21/2005 | $311,578,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CW1 | A1A | 46628MAA4 | 5/31/2006 | $213,081,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE3 | A1 | 46629VAA3 | 11/10/2006 | $189,800,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-NC2 | A1A | 46629HAA4 | 8/23/2006 | $223,083,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-RM1 | A1A | 46629NAA1 | 9/27/2006 | $230,853,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-RM1 | A1B | 46629NAB9 | 9/27/2006 | $57,713,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC1 | A1 | 46626LJK7 | 3/30/2006 | $161,500,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC2 | A1 | 46628TAA9 | 6/28/2006 | $324,255,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC3 | A1SS | 46629KAA7 | 9/14/2006 | $175,270,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC3 | A1MZ | 46629KAB5 | 9/14/2006 | $43,817,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC4 | A1A | 46630BAA4 | 12/20/2006 | $376,675,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-WMC4 | A1B | 46630BAB2 | 12/20/2006 | $41,853,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH3 | A1A | 46630XAA6 | 5/15/2007 | $374,118,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH3 | A1B | 46630XAB4 | 5/15/2007 | $41,569,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH5 | A1 | 46631KAA3 | 7/12/2007 | $304,336,000.00 | 100 | J.P. Morgan Securities |
| JPMMT 2006-A3 | 1A1 | 46628KAA8 | 4/28/2006 5/2/2006 | $174,498,090.91 | 99.6914 99.5430 | J.P. Morgan Securities |
| LBMLT 2006-3 | IA | 542514UG7 | 4/6/2006 | $256,950,500.00 | 100 | WaMu Capital |
| LBMLT 2006-4 | IA | 54251MAA2 | 5/9/2006 | $393,834,000.00 | 100 | WaMu Capital |
| LBMLT 2006-WL1 | IA2 | 542514QQ0 | 2/8/2006 | $256,209,000.00 | 100 | Goldman Sachs |

| Transaction | Tranche | CUSIP | Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| LBMLT 2006-WL2 | IA | 542514RZ9 | 1/30/2006 | $462,263,000.00 | 100 | Lehman Brothers Inc. |
| LUM 2006-3 | II2A1 | 55027AAD2 | 7/3/2006 | $143,433,854.79 | 99.1289 | Citigroup |
| WMALT 2005-9 | 1CB | 93934FEL2 | 10/31/2005 | $69,400,400.00 | 101.5156 | WaMu Capital |
| WMALT 2005-10 | 1CB | 93934FFY3 | 11/30/2005 | $62,532,200.00 | 102.5938 | WaMu Capital |

**Table 12**

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| AABST 2005-5 | IIA | 00764MHD2 | 10/28/2005 | $500,000,000.00 | 100 | BSC |
| AHM 2005-1 | VIA | 02660TDH3 | 4/28/2006 | $251,446,839.54 | 99.234375 | BSC |
| AHM 2005-4 | IVA | 02660TGV9 | 2/1/2006 | $556,435,000.00 | 99.203125 | BSC |
| ARSI 2006-M2 | A1 | 04013BAR3 | 8/29/2006 | $717,382,000.00 | 100 | J.P. Morgan Securities |
| BALTA 2005-10 | II2A1 | 07386HZE4 | 12/30/2005 | $407,783,000.00 | 100.9199219 | BSC |
| BALTA 2006-1 | III1A1 | 07386HB75 | 2/28/2006 | $208,000,000.00 | 99.7890625 | BSC |
| BALTA 2006-2 | II2A1 | 07386HF30 | 3/31/2006 | $381,136,000.00 | 100.671875 | BSC |
| BALTA 2006-3 | III1A1 | 07386HK83 | 4/28/2006 | $276,267,000.00 | 100 | BSC |
| BALTA 2006-4 | I2A1 | 073871AC9 | 6/30/2006 | $404,809,000.00 | 100 | BSC |
| BSABS 2005-HE12 | IIA | 0738795P9 | 12/30/2005 | $302,737,000.00 | 100 | BSC |
| BSABS 2006-AQ1 | I2A | 07389PAD2 | 11/30/2006 | $192,142,000.00 | 100 | BSC |
| BSABS 2006-HE2 | IIA | 07387UEL1 | 2/28/2006 | $241,697,000.00 | 100 | BSC |
| BSABS 2006-HE4 | IIA | 07388AAD6 | 4/28/2006 | $264,889,000.00 | 100 | BSC |
| BSABS 2006-HE5 | IIA | 07388CAD2 | 5/30/2006 | $162,020,000.00 | 100 | BSC |
| BSABS 2006-HE7 | II2A | 07388HAR0 | 8/30/2006 | $100,275,000.00 | 100 | BSC |
| BSABS 2006-HE8 | II2A | 07388JAR6 | 10/30/2006 | $51,306,000.00 | 100 | BSC |
| BSABS 2006-HE9 | IIIA | 07389MAE7 | 11/30/2006 | $236,045,000.00 | 100 | BSC |
| BSABS 2006-HE10 | II3A | 07389RAS5 | 12/29/2006 | $132,221,000.00 | 100 | BSC |
| BSABS 2007-HE1 | II3A | 07389UAS8 | 1/30/2007 | $92,100,000.00 | 100 | BSC |
| BSABS 2007-HE2 | II3A | 07389YAF8 | 2/28/2007 | $77,349,000.00 | 100 | BSC |
| BSABS 2007-HE5 | IIIA | 073859AF7 | 5/30/2007 | $122,752,000.00 | 100 | BSC |
| BSABS 2007-HE6 | IIA | 07387YAE3 | 8/30/2007 | $291,210,000.00 | 100 | BSC |
| BSMF 2006-SL5 | IIA | 07401HAB8 | 11/30/2006 | $23,706,000.00 | 100 | BSC |
| BSMF 2006-SL6 | IIA | 07400LAT1 | 12/29/2006 | $20,279,000.00 | 100 | BSC |

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| BSMF 2007-AR3 | II2A1 | 07401VAS0 | 3/30/2007 | $241,679,000.00 | 100 | BSC |
| BSMF 2007-SL1 | IIA | 07401PAB0 | 1/30/2007 | $24,050,000.00 | 100 | BSC |
| BSMF 2007-SL2 | IIA | 07401RAB6 | 2/28/2007 | $21,671,000.00 | 100 | BSC |
| CBASS 2006-CB2 | AV | 12498NAW3 | 2/28/2006 | $347,712,000.00 | 100 | J.P. Morgan Securities |
| CBASS 2006-CB7 | A1 | 12479DAA6 | 10/5/2006 | $385,237,000.00 | 100 | J.P. Morgan Securities |
| JPALT 2007-A2 | 11A1 | 466278AA6 | 5/31/2007 | $369,061,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2005-FRE1 | AI | 46626LBU3 | 11/29/2005 | $274,516,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2005-WMC1 | A1 | 46626LBD1 | 10/27/2005 | $404,000,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-ACC1 | A1 | 46628RAA3 | 6/2/2006 | $266,700,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CH1 | A1 | 46629TAA8 | 11/14/2006 | $149,925,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CH2 | AV1 | 46629QAS5 | 12/14/2006 | $900,296,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-CW2 | AV1 | 46629BAN9 | 8/8/2006 | $410,588,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-FRE1 | A1 | 46626LFX3 | 1/27/2006 | $279,696,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-FRE2 | A1 | 46626LGX2 | 3/29/2006 | $267,476,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE1 | A1 | 46626LGT1 | 2/28/2006 | $166,827,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-HE2 | A1 | 46625SAA4 | 6/30/2006 | $171,430,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2006-NC1 | A1 | 46626LJL5 | 4/27/2006 | $345,251,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH2 | AV1 | 46630MAS1 | 3/15/2007 | $234,600,000.00 | 100 | J.P. Morgan Securities |
| JPMAC 2007-CH4 | A1 | 46630CAA2 | 6/15/2007 | $435,000,000.00 | 100 | J.P. Morgan Securities |
| LBMLT 2005-3 | IA | 542514NT7 | 9/7/2005 | $604,830,000.00 | 100 | Lehman Brothers Inc. |
| LBMLT 2006-1 | IA | 542514RH9 | 2/7/2006 | $870,736,000.00 | 100 | Credit Suisse |
| LBMLT 2006-2 | IA | 542514TQ7 | 3/7/2006 | $1,101,891,000.00 | 100 | RBS Greenwich |
| LBMLT 2006-3 | IA | 542514UG7 | 4/6/2006 | $256,950,500.00 | 100 | WaMu Capital |
| LBMLT 2006-4 | IA | 54251MAA2 | 5/9/2006 | $393,834,000.00 | 100 | WaMu Capital |
| LBMLT 2006-5 | IA | 54251PAA5 | 6/15/2006 | $631,423,000.00 | 100 | WaMu Capital |
| LBMLT 2006-6 | IA | 54251RAA1 | 7/26/2006 | $415,891,000.00 | 100 | WaMu Capital |
| LBMLT 2006-7 | IA | 54251TAA7 | 8/30/2006 | $360,139,000.00 | 100 | WaMu Capital |
| LBMLT 2006-8 | IA | 54251UAA4 | 9/21/2006 | $366,091,000.00 | 100 | WaMu Capital |
| LBMLT 2006-9 | IA | 54251WAA0 | 10/12/2006 | $420,396,000.00 | 100 | WaMu Capital |

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| LBMLT 2006-10 | IA | 54251YAA6 | 11/9/2006 | $288,380,000.00 | 100 | WaMu Capital |
| LBMLT 2006-11 | IA | 542512AA6 | 12/14/2006 | $408,047,000.00 | 100 | WaMu Capital |
| LBMLT 2006-WL1 | IA1 | 542514QP2 | 2/8/2006 | $284,678,000.00 | 100 | Goldman Sachs |
| LBMLT 2006-WL3 | IA | 542514SS4 | 1/30/2006 | $440,218,000.00 | 100 | Lehman Brothers Inc. |
| NCMT 2007-1 | 1A1 | 65106FAA0 | 7/12/2007 | $370,224,000.00 | 100 | BSC |
| PCHLT 2005-4 | 2A1 | 71085PDF7 | 10/26/2005 | $433,582,000.00 | 100 | BSC |
| SACO 2007-1 | IIA | 785814AB0 | 1/16/2007 | $50,429,000.00 | 100 | BSC |
| SACO 2007-2 | IIA | 78581NAB8 | 2/28/2007 | $20,226,000.00 | 100 | BSC |
| SAMI 2006-AR4 | IA1 | 86360QAA3 | 6/30/2006 | $316,180,000.00 | 100 | BSC |
| WAMU 2007-OA3 | 1A | 93364AAA0 | 3/27/2007 | $140,139,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE1 | IA | 92925CEP3 | 4/20/2006 | $53,578,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE3 | IA | 93934MAA5 | 9/27/2006 | $175,828,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE4 | IA | 93934QAA6 | 10/27/2006 | $117,798,000.00 | 100 | WaMu Capital |
| WMABS 2006-HE5 | IA | 93934XAA1 | 12/7/2006 | $269,063,000.00 | 100 | WaMu Capital |
| WMABS 2007-HE1 | IA | 93935KAA8 | 1/17/2007 | $115,217,000.00 | 99.9908 | WaMu Capital |
| WMABS 2007-HE2 | IA | 93934TAA0 | 3/13/2007 | $286,276,000.00 | 100 | WaMu Capital |
| WMALT 2006-AR4 | 1A | 939345AA2 | 5/30/2006 | $76,071,000.00 | 99.75 | WaMu Capital |
| WMALT 2006-AR4 | 2A | 939345AB0 | 5/30/2006 | $69,518,000.00 | 99.796875 | WaMu Capital |
| WMALT 2006-AR4 | 3A | 939345AC8 | 5/30/2006 | $251,313,000.00 | 99.859375 | WaMu Capital |
| WMALT 2006-AR5 | 1A | 93935AAA0 | 6/28/2006 | $74,766,000.00 | 99.65625 | WaMu Capital |
| WMALT 2006-AR5 | 2A | 93935AAB8 | 6/28/2006 | $57,966,000.00 | 99.65625 | WaMu Capital |
| WMALT 2006-AR8 | 1A | 93935LAA6 | 9/28/2006 | $211,150,000.00 | 100 | WaMu Capital |
| WMALT 2006-AR9 | 1A | 939346AA0 | 10/26/2006 | $270,142,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA1 | 1A | 93935NAA2 | 1/26/2007 | $255,047,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA2 | 1A | 93935QAA5 | 2/26/2007 | $222,967,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA3 | 1A | 939355AA1 | 3/28/2007 | $230,966,000.00 | 100 | WaMu Capital |
| WMALT 2007-OA3 | 3A | 939355AC7 | 3/28/2007 | $195,998,000.00 | 100 | WaMu Capital |
| WMHE 2007-HE1 | IA | 933631AA1 | 1/16/2007 | $368,226,000.00 | 100 | WaMu Capital |
| WMHE 2007-HE2 | IA | 92926SAA4 | 4/10/2007 | $491,550,000.00 | 99.9781 | WaMu Capital |
| WMHE 2007-HE3 | IA | 93364EAA2 | 5/10/2007 | $372,475,000.00 | 100 | WaMu Capital |

| Transaction | Tranche | CUSIP | Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| WMHE 2007-HE4 | IA | 93363XAA1 | 6/13/2007 | $249,921,000.00 | 100 | WaMu Capital |

543.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the Certificates and the GSEs' decision to purchase the GSE Certificates.  A reasonable investor would have understood that Defendants were responsible for the contents of those Registration Statements, and that would have influenced its purchasing decision.

544.    The false statements and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

545.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

546.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Fannie Mae and Freddie Mac did not know of Defendants' misstatements and omissions at the time they

242

purchased the Certificates.  Defendants' misstatements and omissions both understated the risk

and overstated the value of the GSE Certificates, and had the GSEs known of these

misstatements and omissions, they would not have purchased the GSE Certificates.  Defendants'

misrepresentations and omissions, which proximately caused the GSEs' losses, also contributed

to the Nation's housing crisis.

547.    Based upon sales of the Certificates or similar certificates in the secondary

market, Defendants proximately caused billions of dollars in damages to Fannie Mae and Freddie

Mac in an amount to be determined at trial.

### VIII.    Tolling of the Securities Act of 1933 Claims

548.    The statutory claims raised by Plaintiff on behalf of the GSEs are currently the

subject of class action lawsuits.  Until it opted-out with the filing of this case, Plaintiff was a

putative class member of three class action lawsuits for its timely-filed purchases of certificates

from the following trusts: JPMAC 2006-ACC1, JPMAC 2006-CH2, JPMAC 2006-HE2, JPMAC

2006-HE3, JPMAC 2006-RM1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-

WMC4, JPALT 2007-A2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, JPMAC

2007-CH5, JPMMT 2006-A3, BSABS 2007-HE3, BSABS 2007-HE4, BSABS 2007-HE5,

BSABS 2007-HE6, and BSMF 2007-AR3.

### A.    The JPMorgan *Plumbers* Class Action

549.    These statutory claims were tolled by the pendency of a class action filed on

March 26, 2008, against various JPMorgan entities, former officers, and ratings agencies on

behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities

that were issued, underwritten or sold by these entities and/or officers.  *See Plumbers' &*

*Pipefitters' Local #562 Supplemental Plan & Trust, et al. v. J.P. Morgan Acceptance*

*Corporation 1, et al.*, Case No. 5675/08 (N.Y. Supr. Ct. 2008) (the "JPMorgan *Plumbers* Class

Action"). Originally filed in New York state court, the JPMorgan *Plumbers* Class Action was later consolidated and transferred to the United States District Court for the Eastern District of New York, Case No. 2:08-cv-01713 (ERK)(WDW). The JPMorgan *Plumbers* Class Action complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

550. Plaintiff was originally included in the defined class in the JPMorgan *Plumbers* Class Action complaint with respect to the GSEs' investments in JPMAC 2006-ACC1, JPMAC 2006-CH2, JPMAC 2006-HE2, JPMAC 2006-HE3, JPMAC 2006-RM1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-WMC4, JPMAC 2007-CH2, and JPMMT 2006-A3.

551. Defendants J.P. Morgan Securities, J.P. Morgan Acceptance, David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, and Edwin F. McMichael are also defendants in the JPMorgan *Plumbers* Class Action for the same statutory causes of action asserted herein.

552. Plaintiff was a member of the JPMorgan *Plumbers* Class Action from March 28, 2008 until September 2, 2011 when it opted out of the Class Action with the filing of this Complaint. On December 13, 2011, after Plaintiff filed this action, the United States District Court for the Eastern District of New York dismissed claims related to these Trusts from the JPMorgan *Plumbers* Class Action.

### B.   The JPMorgan *Fort Worth* Class Action

553. These statutory claims were tolled by the pendency of a class action filed on March 12, 2009, against various JPMorgan entities, former officers, and ratings agencies on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten or sold by these entities and/or officers. *See Fort Worth Employees' Retirement Fund, et al. v. J.P. Morgan Chase & Co., et al.*, Case No. 600767/09 (N.Y. Supr. Ct. 2009) (the "JPMorgan *Fort Worth* Class Action"). Originally filed in New York state court, the JPMorgan *Fort Worth* Class Action was later transferred to the United States

District Court for the Southern District of New York and consolidated into *Employees'*
*Retirement System of the Government of the Virgin Islands, et al. v. J.P. Morgan Chase & Co., et*
*al.*, Case No. 09-cv-3701 (JGK).  The JPMorgan *Fort Worth* Class Action complaint alleges
claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

554.     Plaintiff was originally included in the defined class in the JPMorgan *Fort Worth*
Class Action complaint with respect to the GSEs' investments in JPALT 2007-A2, JPMAC
2007-CH3, JPMAC 2007-CH4, and JPMAC 2007-CH5.

555.     Defendants JPMorgan Chase, J.P. Morgan Acquisition, J.P. Morgan Acceptance,
J.P. Morgan Securities, Brian Bernard, Louis Schioppo, Jr., Christine E. Cole, David M. Duzyk,
William A. King, and Edwin F. McMichael are also defendants in the JPMorgan *Fort Worth*
Class Action for the same statutory causes of action asserted herein.

556.     Plaintiff was a member of the JPMorgan *Fort Worth* Class Action from March 12,
2009 until September 2, 2011 when it opted out of the Class Action with the filing of this
Complaint.  On March 30, 2011, after Plaintiff filed this action, the United States District Court
for the Southern District of New York dismissed claims related to these Trusts from the
JPMorgan *Fort Worth* Class Action.

### C.     The Bear Stearns Class Action

557.     These statutory claims were tolled by the pendency of a class action filed on May
15, 2009, against various Bear Stearns entities, former officers, and ratings agencies on behalf of
all investors who purchased or otherwise acquired certain mortgage-backed securities that were
issued, underwritten or sold by these entities and/or officers.  *See New Jersey Carpenters Health*
*Fund and Boilermakers Blacksmith National Pension Trust, et al. v. Structured Asset Mortgage*
*Inv., et al.*, S.D.N.Y. Case No. 08 Civ. 8093 (the "Bear Stearns Class Action").  That action was
later consolidated into *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*,

S.D.N.Y. Master File No. 08 Civ. 8093 (LTS)(KNF).  The Bear Stearns Class Action First

Consolidated Amended Securities Class Action Complaint alleges claims under Sections 11,

12(a)(2), and 15 of the Securities Act of 1933.

558.    Plaintiff was originally included in the defined class in the Bear Stearns Class

Action First Consolidated Amended Securities Class Action Complaint with respect to the GSEs'

investments in BSABS 2007-HE3, BSABS 2007-HE4, BSABS 2007-HE5, BSABS 2007-HE6,

and BSMF 2007-AR3.

559.    Defendants Structured Asset Mortgage Investments II, Inc., Bear Stearns Asset

Backed Securities I, LLC, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer,

Thomas F. Marano, Mathew E. Perkins, Samuel L. Molinaro, Jr., Kim Lutthans, Katherine

Garniewski, and Joseph T. Jurkowski, Jr. are also defendants in the Bear Stearns Class Action

for the same statutory causes of action asserted herein.

560.    Plaintiff was a member of the Bear Stearns Class Action, for the BSABS 2007-

HE5, BSABS 2007-HE6, and BSMF 2007-AR3 Securitizations, from May 15, 2009 until

October 29, 2010, when claims relating to those Securitizations were not renewed in the

Consolidated Class Action Complaint filed on February 19, 2010.  Plaintiff was a member of the

Bear Stearns Class Action, for the BSABS 2007-HE3 and BSABS 2007-HE4 Securitizations,

from May 15, 2009 until September 2, 2011 when it opted out of the Class Action with the filing

of this Complaint.

561.    Plaintiff reasonably and justifiably relied on the named plaintiffs in the above

Class Actions to protect its rights, and it reasonably and justifiably relied on the class action

tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974),

and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), to toll the statute of

limitations on its 1933 Act claims.

562.    Although the classes in the above Class Actions have not been certified yet, and

Plaintiff's claims related to these trusts may be covered in the above Class Actions to the extent

not dismissed, Plaintiff has chosen to file this separate action and to assert its 1933 Act claims,

which have been tolled by the pendency of the above Class Actions, in order to preserve their

rights.

## FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,**
**Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit**
**Suisse, Goldman Sachs, RBS Greenwich, David Beck, Brian Bernard, Larry Breitbarth,**
**Richard Careaga, Thomas W. Casey, Christine E. Cole, David M. Duzyk, Stephen**
**Fortunato, Katherine Garniewski, Keith Johnson, Rolland Jurgens, Joseph T. Jurkowski,**
**Jr., William A. King, Suzanne Krahling, Thomas G. Lehmann, Kim Lutthans, Thomas F.**
**Marano, Jeffrey Mayer, Edwin F. McMichael, Samuel L. Molinaro, Jr., Michael B.**
**Nierenberg, Diane Novak, Matthew E. Perkins, John F. Robinson, Louis Schioppo, Jr.,**
**Jeffrey L. Verschleiser, Donald Wilhelm, and David H. Zielke)**

563.    Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set

forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be

construed as alleging fraud.

564.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of

1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements.  This claim is brought against

Defendants J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC,

WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich with respect to

each of the Registration Statements.  This claim is also brought against (i) Defendants J.P.

Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach

Securities, and (ii) David Beck, Brian Bernard, Larry Breitbarth, Richard Careaga, Thomas W. Casey, Christine E. Cole, David M. Duzyk, Stephen Fortunato, Katherine Garniewski, Keith Johnson, Rolland Jurgens, Joseph T. Jurkowski, Jr., William A. King, Suzanne Krahling, Thomas G. Lehmann, Kim Lutthans, Thomas F. Marano, Jeffrey Mayer, Edwin F. McMichael, Samuel L. Molinaro, Jr., Michael B. Nierenberg, Diane Novak, Matthew E. Perkins, John F. Robinson, Louis Schioppo, Jr., Jeffrey L. Verschleiser, Donald Wilhelm, and David H. Zielke (the foregoing Individual Defendants collectively referred to as the "Section 11 Individual Defendants"), each with respect to the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that registered securities that were bona fide offered to the public on or after September 6, 2005.

565.    Defendants J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich are strictly liable for making false and materially misleading misstatements in each of the Registration Statements, and for omitting facts necessary to make the facts stated therein not misleading.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, and the Section 11 Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 74 of the 103 Securitizations (as specified in Tables 2 and 3 above), including the related Prospectus Supplements, and for omitting facts necessary to make the facts stated therein not misleading.

566.    Defendant J.P. Morgan Securities served as the lead underwriter of 30 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 30 Securitizations.

567.    Defendant BSC served as the lead underwriter of 38 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 38 Securitizations.

568.    Defendant WaMu Capital served as the lead underwriter of 31 of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statements for those 31 Securitizations.

569.    Defendant Citigroup served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

570.    Defendant Credit Suisse served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

571.    Defendant Goldman Sachs served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

572.    Defendant RBS Greenwich served as the lead underwriter of one of the Securitizations and, as such, is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement for that Securitization.

573.    Defendant J.P. Morgan Acceptance filed three Registration Statements under which 27 of the 103 Securitizations were carried out.  As depositor, Defendant J.P. Morgan

Acceptance is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, J.P. Morgan Acceptance is liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141607 and 333-130192 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

574. Defendants SAMI and BSABS filed five Registration Statements under which 35 of the 103 Securitizations were carried out. As depositors, Defendants SAMI and BSABS are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, SAMI and BSABS are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-140247, 333-131374, and 333-132232 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

575. Defendants WaMu Securities and WaMu Acceptance filed three Registration Statements under which 20 of the 103 Securitizations were carried out. As depositors, Defendants WaMu Securities and WaMu Acceptance are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, WaMu Securities and WaMu Acceptance are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141255 and 333-130795 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

576. Defendant Long Beach Securities filed two Registration Statements under which 15 of the 103 Securitizations were carried out. As depositor, Defendant Long Beach Securities is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, Long Beach Securities is liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-131252 Registration Statement that registered securities that were bona fide offered to the public on or after September 6, 2005.

577. At the time Defendant J.P. Morgan Acceptance filed three Registration Statements applicable to 27 of the Securitizations, the JPMorgan Section 11 Individual Defendants were officers and/or directors of J.P. Morgan Acceptance. In addition, the JPMorgan Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements. As such, the JPMorgan Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141607 and 333-130192 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

578. At the time Defendants SAMI and BSABS filed five Registration Statements applicable to 35 of the Securitizations, the Bear Stearns Section 11 Individual Defendants were officers and/or directors of SAMI and BSABS. In addition, the Bear Stearns Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements. As such, the Bear Stearns Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-140247, 333-131374, and 333-132232

Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

579.    At the time Defendants WaMu Securities and WaMu Acceptance filed three Registration Statements applicable to 20 of the Securitizations, the WaMu Section 11 Individual Defendants were officers and/or directors of WaMu Securities and WaMu Acceptance.  In addition, the WaMu Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the WaMu Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-141255 and 333-130795 Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

580.    At the time Defendant Long Beach Securities filed two Registration Statements applicable to 15 of the Securitizations, the Long Beach Section 11 Individual Defendants were officers and/or directors of Long Beach Securities.  In addition, the Long Beach Section 11 Individual Defendants signed those Registration Statements and/or either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Long Beach Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the 333-131252 Registration that registered securities that were bona fide offered to the public on or after September 6, 2005.

581.    At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

582.    The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to, among other things, compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

583.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements.  Fannie Mae and Freddie Mac made these purchases in the primary market or, for the LUM 2006-3 Securitization, shortly after issuance.  At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

584.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich owed Fannie Mae, Freddie Mac and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Individual Defendants owed the same duty with respect to the Registration Statements filed by J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities that they signed that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 74 of the Securitizations.

585.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, RBS Greenwich and the Section 11 Individual Defendants did not exercise such due

diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.  In addition, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, though subject to strict liability without regard to whether they performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

586.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

587.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).  Furthermore, this action is brought within one year of the discovery of the materially untrue statements and omissions in the Registration Statements, and brought within three years of the effective date of the Registration Statements, by virtue of the

timely filing of the Class Actions to which Plaintiff was a putative class member, thus tolling

Plaintiff's claims.  Plaintiff has justifiably and reasonably relied on the class action tolling

doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *In*

*re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of

limitations on its Section 11 cause of action for the entire period of time during which the

JPMAC 2006-ACC1, JPMAC 2006-CH2, JPMAC 2006-HE2, JPMAC 2006-HE3, JPMAC

2006-RM1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-WMC4, JPALT 2007-

A2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, JPMAC 2007-CH5, JPMMT

2006-A3, BSABS 2007-HE3, BSABS 2007-HE4, BSABS 2007-HE5, BSABS 2007-HE6, and

BSMF 2007-AR3 Registration Statements were the subject of the Class Actions.

588.    By reason of the conduct herein alleged, Defendants J.P. Morgan Securities, J.P.

Morgan Acceptance, BSC, SAMI, BSABS, WaMu Capital, WaMu Securities, WaMu

Acceptance, Long Beach Securities, Citigroup, Credit Suisse, Goldman Sachs, RBS Greenwich,

and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

**Violation of Section 12(a)(2) of the Securities Act of 1933**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,**
**Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse,**
**Goldman Sachs, and RBS Greenwich)**

589.     Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

590.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements in the Securitizations listed in Table 1, against J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich as underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities as depositors (collectively, the "Section 12(a)(2) Defendants").

591.     This claim is predicated upon J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich's negligence in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in Table 1 that were purchased in the primary market, other than the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations, for which none of the Defendants were the selling underwriter and as to which the allegations in this section to do not apply.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities acted negligently in making materially false and misleading statements in the Prospectuses for the

Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

592.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

593.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich participated in drafting the Prospectuses.

594.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

595.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

596.    J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 97 Securitizations under those Registration Statements, and each Prospectus provided contact information for J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities in the event that investors had questions about their potential investment. J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as statutory sellers, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac, for the benefit of JPMorgan, Bear Stearns, WaMu, and Long Beach.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities were motivated to do so in order to further the interests of JPMorgan, Bear Stearns, WaMu, and Long Beach.  In addition, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.

597.    With respect to the 97 Securitizations for which they filed Registration Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS,

WaMu Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting the Prospectuses.

598.     J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

599.     Each of the Section 12(a)(2) Defendants actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

600.     Each of the Prospectuses contained material misstatements of fact and omitted information to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

601.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

602.     The Section 12(a)(2) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

603.     J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich owed to Fannie Mae and Freddie Mac, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact

required to be stated in order to make the statements contained therein not misleading.  J.P.

Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach

Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out

under the 97 Registration Statements filed by them.

604.    The Section 12(a)(2) Defendants failed to exercise such reasonable care.  These

defendants, in the exercise of reasonable care, should have known that the Prospectuses

contained untrue statements of material facts and omissions of material facts at the time of the

Securitizations as set forth above.

605.    In contrast, Fannie Mae and Freddie Mac did not know, and in the exercise of

reasonable diligence could not have known, of the untruths and omissions contained in the

Prospectuses at the time they purchased the GSE Certificates.  Had GSEs known of those

untruths and omissions, they would not have purchased the GSE Certificates.

606.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market

pursuant to the Prospectuses, except for LUM 2006-3, which it acquired shortly after issuance.

607.    Fannie Mae and Freddie Mac sustained substantial damages in connection with

their investments in the GSE Certificates and have the right to rescind and recover the

consideration paid for the GSE Certificates, with interest thereon.

608.    The time period from June 16, 2009 through July 31, 2011 has been tolled for

statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae

and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS,

SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach

Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July

14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue

of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae,

Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance,

EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities,

Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the

date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus

timely under 12 U.S.C. § 4617(b)(12).  Furthermore, this action is brought within one year of the

time when Plaintiff discovered or reasonably could have discovered facts upon which this action

is based, and within three years of the time that the Certificates upon which this cause of action

is brought were sold to the public, by virtue of the timely filing of the Class Actions to which

Plaintiff was a putative class member, thus tolling Plaintiff's claims.  Plaintiff has reasonably and

justifiably relied on the class action tolling doctrines articulated in *American Pipe &*

*Construction Co. v. Utah*, 414 U.S. 538 (1974) and *In re WorldCom Securities Litigation*, 496

F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its Section 12(a)(2) cause of

action for the entire period of time during which the JPMAC 2006-ACC1, JPMAC 2006-CH2,

JPMAC 2006-HE2, JPMAC 2006-HE3, JPMAC 2006-RM1, JPMAC 2006-WMC2, JPMAC

2006-WMC3, JPMAC 2006-WMC4, JPALT 2007-A2, JPMAC 2007-CH2, JPMAC 2007-CH3,

JPMAC 2007-CH4, JPMAC 2007-CH5, JPMMT 2006-A3, BSABS 2007-HE3, BSABS 2007-

HE4, BSABS 2007-HE5, BSABS 2007-HE6, and BSMF 2007-AR3 Registration Statements

were the subject of the Class Actions.

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants)

609.    Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

610.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against JPMorgan Chase (both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants (collectively the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

611.    The JPMorgan Individual Defendants at all relevant times participated in the operation and management of J.P. Morgan Acceptance and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance. Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance. Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian Bernard served as President of J.P. Morgan Acceptance.

612.    The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs.

262

Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph

T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served

as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of

BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of

BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS.

Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant

Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served

as Treasurer of SAMI.

613.    The WaMu Individual Defendants at all relevant times participated in the

operation and management of WaMu Securities and/or WaMu Acceptance and their related

subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu

Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as

First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and

President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu

Acceptance.  Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant

Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice

President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato

served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as

Controller of WaMu Acceptance.  Defendant Marc K. Malone served as First Vice President and

Controller of WaMu Securities.  Defendant Michael L. Parker served as Director and President

of WaMu Securities.

614.    The Long Beach Individual Defendants at all relevant times participated in the

operation and management of Long Beach Securities and its related subsidiaries, and conducted

and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs. Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities. Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities. Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as Controller of Long Beach Securities.

615.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.  These materials contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

616.    Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the three Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would

264

be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

617.    Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the three Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

618.    Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance.  In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of the three Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 27 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

619.    Defendant EMC was the sponsor for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting SAMI and BSABS as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process,

and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

620.    Defendant EMC also acted as the seller of the mortgage loans for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.

621.    Defendant EMC also controlled all aspects of the businesses of SAMI and BSABS, as SAMI and BSABS were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of EMC overlapped with the officers and directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able to, and did in fact, control the contents of the five Registration Statements filed by SAMI and BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

622.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose

vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

623.     Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

624.     Non-party WaMu Bank also controlled all aspects of the businesses of WaMu Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

625.     Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these

Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

626.    Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

627.    Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

628.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under the two Registration Statements filed by Defendant Long Beach Securities, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage

loans to be securitized, determining the structure of the Securitizations, selecting Long Beach Securities as the special purpose vehicle, and selecting the underwriters. In its role as sponsor, Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

629.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, also acted as the seller of the mortgage loans for the nine Securitizations carried out under the two Registration Statements filed by Defendant Long Beach Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a Mortgage Loan Purchase Agreement.

630.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as Long Beach Securities was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates. Upon information and belief, the officers and directors of Long Beach Mortgage overlapped with the officers and directors of Long Beach Securities. In addition, because of its position as sponsor, Long Beach Mortgage was able to, and did in fact, control the contents of the two Registration Statements filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

631.    Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition. Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition. As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct

269

and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

632.  JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

633.  JPMorgan Bank culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

634.  Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance.  Defendant JPMorgan Chase wholly owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities.  As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

635.     JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

636.     JPMorgan Chase culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

637.     This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in connection with the issuance and sale of the Certificates.

638.     Non-party WaMu Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large

volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

639.     Non-party WaMu Bank culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach Securities and the issuing trusts to serve as conduits for the mortgage loans.

640.     This claim is against Defendant JPMorgan Chase in its capacity as successor-in-interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection with the issuance and sale of the Certificates.

641.     Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

642.     Non-party BSI culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

272

643.    The Section 15 Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, JPMorgan, Bear Stearns, WaMu, and Long Beach generated profits at multiple levels of the securitization process.

644.    Fannie Mae and Freddie Mac purchased in the primary market, or, for the LUM 2006-3 Securitization, shortly after issuance, Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

645.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

646.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

647.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS,

SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).  Furthermore, the timely filing of the Class Actions to which Plaintiff was a putative class member has tolled Plaintiff's claims.  Plaintiff has justifiably and reasonably relied on the class action tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its Section 15 cause of action for the entire period of time during which the JPMAC 2006-ACC1, JPMAC 2006-CH2, JPMAC 2006-HE2, JPMAC 2006-HE3, JPMAC 2006-RM1, JPMAC 2006-WMC2, JPMAC 2006-WMC3, JPMAC 2006-WMC4, JPALT 2007-A2, JPMAC 2007-CH2, JPMAC 2007-CH3, JPMAC 2007-CH4, JPMAC 2007-CH5, JPMMT 2006-A3, BSABS 2007-HE3, BSABS 2007-HE4, BSABS 2007-HE5, BSABS 2007-HE6, and BSMF 2007-AR3 Registration Statements were the subject of the Class Actions.

## FOURTH CAUSE OF ACTION

### Violation of Section 13.1-522(A)(ii) of the Virginia Code
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich)**

648.     Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

649.     This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 12 above that were purchased by Freddie Mac on or after September 6, 2006, other than the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations, for which none of the Defendants were the selling underwriter and as to which the allegations in this section do not apply.  This claim is brought against J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich as underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities as depositors (collectively, the "Section 13.1-522(A)(ii) Defendants").

650.     This claim is predicated upon the negligence of J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the above Securitizations. Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities acted negligently in making materially false and misleading statements in

the Prospectuses for the Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

651.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

652.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich participated in drafting the Prospectuses.

653.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

654.    J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

655.     J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 97 Securitizations under those Registration Statements, and each Prospectus provided contact information for J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities in the event that investors had questions about their potential investment.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as statutory sellers, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Freddie Mac for the benefit of JPMorgan, Bear Stearns, WaMu, and Long Beach.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities were motivated to do so in order to further the interests of JPMorgan, Bear Stearns, WaMu, and Long Beach.  In addition, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.

656.     With respect to the 97 Securitizations for which they filed Registration Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS, WaMu

277

Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting the Prospectuses.

657.   Each of the Section 13.1-522(A)(ii) Defendants actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

658.   Each of the Prospectuses contained material misstatements of fact and omitted information to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

659.   The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

660.   The Section 13.1-522(A)(ii) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

661.   J.P. Morgan Securities, BSC, WaMu Capital, Credit Suisse, Goldman Sachs, and RBS Greenwich owed to Freddie Mac, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities

owed the same duty with respect to the Prospectuses for the Securitizations carried out under the 97 Registration Statements filed by them.

662.     The Section 13.1-522(A)(ii) Defendants failed to exercise such reasonable care. These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

663.     In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  Had Freddie Mac known of those untruths and omissions, it would not have purchased the GSE Certificates.

664.     Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

665.     The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank. This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FIFTH CAUSE OF ACTION

### Violation of Section 13.1-522(C) of the Virginia Code
### (Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants)

666.     Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

667.     This claim is brought by Plaintiff pursuant to Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 12 above that were purchased by Freddie Mac on or after September 6, 2006, other than the LBMLT 2005-3 and LBMLT 2006-WL3 Securitizations for which none of the Defendants were the selling underwriter and as to which the allegations in this section to do not apply.  This claim is brought against JPMorgan Chase (both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants (collectively the "Section 13.1-522(C) Defendants") for controlling-person liability with regard to the Fifth Cause of Action set forth above.

668.     The JPMorgan Individual Defendants at all relevant times participated in the operation and management of J.P. Morgan Acceptance and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance.  Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance.  Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant

William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian Bernard served as President of J.P. Morgan Acceptance.

669.    The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs. Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS. Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served as Treasurer of SAMI.

670.    The WaMu Individual Defendants at all relevant times participated in the operation and management of WaMu Securities and/or WaMu Acceptance and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu Acceptance.  Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as

Controller of WaMu Acceptance.  Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities.  Defendant Michael L. Parker served as Director and President of WaMu Securities.

671.    The Long Beach Individual Defendants at all relevant times participated in the operation and management of Long Beach Securities and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs. Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities. Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities. Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as Controller of Long Beach Securities.

672.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.

673.    Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect

to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

674.    Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

675.    Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance.  In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of the five Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 27 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

676.    Defendant EMC was the sponsor for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized,

determining the structure of the Securitizations, selecting SAMI and BSABS as the special

purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and intended

that the mortgage loans it purchased would be sold in connection with the securitization process,

and that certificates representing the ownership interests of investors in the mortgages would be

issued by the relevant trusts.

677.    Defendant EMC also acted as the seller of the mortgage loans for the 32

Securitizations carried out under the five Registration Statements filed by Defendants SAMI and

BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage

Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment

Agreement.

678.    Defendant EMC also controlled all aspects of the businesses of SAMI and

BSABS, as SAMI and BSABS were merely special purpose entities that were created for the

purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon

information and belief, the officers and directors of EMC overlapped with the officers and

directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able

to, and did in fact, control the contents of the five Registration Statements filed by SAMI and

BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35

Securitizations and which contained material misstatements of fact and omitted facts necessary

to make the facts stated therein not misleading.

679.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-

interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20

Securitizations carried out under three of the Registration Statements filed by Defendants WaMu

Securities and WaMu Acceptance, and culpably participated in the violations of Section 13.1-

522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

680.    Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

681.    Non-party WaMu Bank also controlled all aspects of the businesses of WaMu Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

682.     Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

683.     Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

684.     Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

685.     This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and,

later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under

the two Registration Statements filed by Defendant Long Beach Securities, and culpably

participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the

offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage

loans to be securitized, determining the structure of the Securitizations, selecting Long Beach

Securities as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor,

Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in

connection with the securitization process, and that certificates representing the ownership

interests of investors in the mortgages would be issued by the relevant trusts.

686.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also acted as the seller of the mortgage loans for the nine

Securitizations carried out under the two Registration Statements filed by Defendant Long Beach

Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a

Mortgage Loan Purchase Agreement.

687.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as

Long Beach Securities was merely a special purpose entity that was created for the purpose of

acting as a pass-through for the issuance of certain of the Certificates.  Upon information and

belief, the officers and directors of Long Beach Mortgage overlapped with the officers and

directors of Long Beach Securities.  In addition, because of its position as sponsor, Long Beach

Mortgage was able to, and did in fact, control the contents of the two Registration Statements

filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which

pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

688.     Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition.  Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition.  As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

689.     JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

690.     JPMorgan Bank culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

691.     Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance.  Defendant JPMorgan Chase wholly owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities.  As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions

of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

692.    JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

693.    JPMorgan Chase culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

694.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach

Mortgage, and Long Beach Securities in connection with the issuance and sale of the Certificates.

695.    Non-party WaMu Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

696.    Non-party WaMu Bank culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach Securities and the issuing trusts to serve as conduits for the mortgage loans.

697.    This claim is against Defendant JPMorgan Chase in its capacity as successor-in-interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection with the issuance and sale of the Certificates.

698.    Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

699.    Non-party BSI culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

700.    The Section 13.1-522(C) Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, JPMorgan, Bear Stearns, WaMu, and Long Beach generated profits at multiple levels of the securitization process.

701.    Freddie Mac purchased in the primary market the GSE Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

702.    Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

703.    Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

704.    The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank. This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
### (Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs)

705.    Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

706.    This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae, other than the LBMLT 2006-WL2 Securitization, for which none of the Defendants were the selling underwriter and as to which the allegations in this section to do not apply.  This claim is brought against J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC, WaMu Capital, Citigroup, and Goldman Sachs as underwriters; and J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities as depositors (collectively, the "Section 31-5606.05(a)(1)(B) Defendants").

707.    This claim is predicated upon the negligence of J.P. Morgan Securities, BSC, WaMu Capital, Citigroup and Goldman Sachs in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the above Securitizations.  Defendants J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities acted negligently in making materially false and misleading statements in the Prospectuses for the Securitizations carried out under the 13 Registration Statements they filed, which are applicable to 97 of the Securitizations.

293

708.   J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered the Certificates publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

709.   J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs participated in drafting the Prospectuses.

710.   J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs successfully solicited Fannie Mae's purchases of the GSE Certificates.  As underwriters, J.P. Mortgage Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

711.   J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

712.   J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 97 Securitizations under those Registration Statements, and each Prospectus provided contact information for J.P. Morgan

Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities in the event that investors had questions about their potential investment.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as statutory sellers, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae, for the benefit of JPMorgan, Bear Stearns, WaMu, and Long Beach.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities were motivated to do so in order to further the interests of JPMorgan, Bear Stearns, WaMu, and Long Beach.  In addition, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.

713.    With respect to the 97 Securitizations for which they filed Registration Statements, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities reviewed and participated in drafting the Prospectuses.

714.    Each of the Section 31-5606.05(a)(1)(B) Defendants actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

715.    Each of the Prospectuses contained material misstatements of fact and omitted information to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

716.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

717.    The Section 31-5606.05(a)(1)(B) Defendants offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

718.    J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, and Goldman Sachs owed to Fannie Mae, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the 97 Registration Statements filed by them.

719.    The Section 31-5606.05(a)(1)(B) Defendants failed to exercise such reasonable care.  These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

720.     In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  Had Fannie Mae known of those untruths and omissions, it would not have purchased the GSE Certificates.

721.     Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

722.     The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SEVENTH CAUSE OF ACTION

**Violation of Section 31-5606.05(c) of the District of Columbia Code
(Against JPMorgan Chase, JPMorgan Bank, J.P. Morgan Securities, J.P. Morgan
Acquisition, EMC, WaMu Securities, and the Individual Defendants)**

723.     Plaintiff realleges each allegation in paragraphs 1 through 440 above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

724.     This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, that were purchased by Fannie Mae, other than the LBMLT 2006-WL2 Securitization, for which none of the Defendants were the selling underwriter and as to which the allegations in this section do not apply.  This claim is brought against JPMorgan Chase (both in its own capacity and as successor to BSI), JPMorgan Bank (both in its own capacity and as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acquisition, EMC, WaMu Securities, and the Individual Defendants (collectively the "Section 31-5606.05(c) Defendants") for controlling-person liability with regard to the Seventh Cause of Action set forth above.

725.     The JPMorgan Individual Defendants at all relevant times participated in the operation and management of J.P. Morgan Acceptance and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of J.P. Morgan Acceptance's business affairs.  Defendant David M. Duzyk served as President of J.P. Morgan Acceptance. Defendant Louis Schioppo, Jr. served as Controller and Chief Financial Officer of J.P. Morgan Acceptance.  Defendant Christine E. Cole served as Director of J.P. Morgan Acceptance. Defendant Edwin F. McMichael served as Director of J.P. Morgan Acceptance.  Defendant

William A. King served as President and Director of J.P. Morgan Acceptance.  Defendant Brian Bernard served as President of J.P. Morgan Acceptance.

726.    The Bear Stearns Individual Defendants at all relevant times participated in the operation and management of SAMI and/or BSABS and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of SAMI and/or BSABS' business affairs. Defendant Matthew E. Perkins served as President and Director of BSABS.  Defendant Joseph T. Jurkowski, Jr. served as Vice President of BSABS.  Defendant Samuel L. Molinaro, Jr. served as Treasurer and Director of BSABS.  Defendant Thomas F. Marano served as Director of BSABS and as Director of SAMI.  Defendant Kim Lutthans served as Independent Director of BSABS.  Defendant Katherine Garniewski served as Independent Director of BSABS. Defendant Jeffrey Mayer served as Director of BSABS and as Director of SAMI.  Defendant Jeffrey L. Verschleiser served as President of SAMI.  Defendant Michael B. Nierenberg served as Treasurer of SAMI.

727.    The WaMu Individual Defendants at all relevant times participated in the operation and management of WaMu Securities and/or WaMu Acceptance and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WaMu Securities and/or WaMu Acceptance's business affairs.  Defendant Richard Careaga served as First Vice President of WaMu Acceptance.  Defendant David Beck served as Director and President of WaMu Acceptance.  Defendant Diane Novak served as Director of WaMu Acceptance.  Defendant Rolland Jurgens served as Controller of WaMu Acceptance.  Defendant Thomas G. Lehmann served as Director and President of WaMu Acceptance and as First Vice President, Director and Senior Counsel of WaMu Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of WaMu Acceptance.  Defendant Donald Wilhelm served as

Controller of WaMu Acceptance.  Defendant Marc K. Malone served as First Vice President and Controller of WaMu Securities.  Defendant Michael L. Parker served as Director and President of WaMu Securities.

728.    The Long Beach Individual Defendants at all relevant times participated in the operation and management of Long Beach Securities and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of Long Beach Securities business affairs. Defendant David H. Zielke served as First Vice President and Assistant General Counsel of WaMu Bank.  Defendant Thomas W. Casey served as Director of Long Beach Securities. Defendant John F. Robinson served as Director of Long Beach Securities.  Defendant Keith Johnson served as Director and President of Long Beach Securities.  Defendant Suzanne Krahling served as Chief Financial Officer and Senior Vice President of Long Beach Securities. Defendant Larry Breitbarth served as Controller and Senior Vice President of Long Beach Securities.  Defendant Art Den Heyer served as Controller and Assistant Vice President of Long Beach Securities.  Defendant Stephen Lobo served as Treasurer and Senior Vice President of Long Beach Securities.  Defendant Stephen Fortunato served as Chief Financial Officer of Long Beach Securities.  Defendant Rolland Jurgens served as Controller of Long Beach Securities.

729.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.

730.    Defendant J.P. Morgan Acquisition was the sponsor for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with

respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting J.P. Morgan Acceptance as the special purpose vehicle, and selecting the underwriters. In its role as sponsor, J.P. Morgan Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

731. Defendant J.P. Morgan Acquisition also acted as the seller of the mortgage loans for the 27 Securitizations carried out under the five Registration Statements filed by Defendant J.P. Morgan Acceptance, in that it conveyed such mortgage loans to J.P. Morgan Acceptance pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement.

732. Defendant J.P. Morgan Acquisition also controlled all aspects of the business of J.P. Morgan Acceptance, as J.P. Morgan Acceptance was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of certain of the Certificates. Upon information and belief, the officers and directors of J.P. Morgan Acquisition overlapped with the officers and directors of J.P. Morgan Acceptance. In addition, because of its position as sponsor, J.P. Morgan Acquisition was able to, and did in fact, control the contents of the five Registration Statements filed by J.P. Morgan Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 27 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

733. Defendant EMC was the sponsor for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be

securitized, determining the structure of the Securitizations, selecting SAMI and BSABS as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

734.    Defendant EMC also acted as the seller of the mortgage loans for the 32 Securitizations carried out under the five Registration Statements filed by Defendants SAMI and BSABS, in that it conveyed such mortgage loans to SAMI and BSABS pursuant to a Mortgage Loan Purchase Agreement, Stock and Mortgage Loan Purchase Agreement, or Assignment Agreement.

735.    Defendant EMC also controlled all aspects of the businesses of SAMI and BSABS, as SAMI and BSABS were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of EMC overlapped with the officers and directors of SAMI and BSABS.  In addition, because of its position as sponsor, EMC was able to, and did in fact, control the contents of the five Registration Statements filed by SAMI and BSABS, including the Prospectuses and Prospectus Supplements, which pertained to 35 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

736.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank was the sponsor or co-sponsor for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, and culpably participated in the violations of Section 31-

5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting WaMu Securities and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

737.    Non-party WaMu Bank also acted as the seller of the mortgage loans for 12 of the 20 Securitizations carried out under three of the Registration Statements filed by Defendants WaMu Securities and WaMu Acceptance, in that it conveyed such mortgage loans to WaMu Securities and WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

738.    Non-party WaMu Bank also controlled all aspects of the businesses of WaMu Securities and WaMu Acceptance, as WaMu Securities and WaMu Acceptance were merely special purpose entities that were created for the purpose of acting as pass-throughs for the issuance of certain of the Certificates.  Upon information and belief, the officers and directors of WaMu Bank overlapped with the officers and directors of WaMu Securities and WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Bank was able to, and did in fact, control the contents of three of the Registration Statements filed by WaMu Securities and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

739.    Defendant WaMu Securities was the sponsor or co-sponsor for 15 of the  20 Securitizations carried out under  three of the Registration Statements filed by itself or Defendant WaMu Acceptance, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting itself and WaMu Acceptance as the special purpose vehicles, and selecting the underwriters.  In its role as sponsor, WaMu Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

740.    Defendant WaMu Securities also acted as the seller of the mortgage loans for 15 of the 20 Securitizations carried out under three of the Registration Statements filed by itself and Defendant WaMu Acceptance, in that it retained or conveyed such mortgage loans to WaMu Acceptance pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement.

741.    Upon information and belief, the officers and directors of WaMu Securities overlapped with the officers and directors of WaMu Acceptance.  In addition, because of its position as sponsor, WaMu Securities was able to, and did in fact, control the contents of three of the Registration Statements filed by itself and WaMu Acceptance, including the Prospectuses and Prospectus Supplements, which pertained to 20 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

742.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party Long Beach Mortgage, a wholly-owned subsidiary and,

later, a division of WaMu Bank, was the sponsor for the nine Securitizations carried out under

the two Registration Statements filed by Defendant Long Beach Securities, and culpably

participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the

offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage

loans to be securitized, determining the structure of the Securitizations, selecting Long Beach

Securities as the special purpose vehicle, and selecting the underwriters.  In its role as sponsor,

Long Beach Mortgage knew and intended that the mortgage loans it purchased would be sold in

connection with the securitization process, and that certificates representing the ownership

interests of investors in the mortgages would be issued by the relevant trusts.

744.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also acted as the seller of the mortgage loans for the nine

Securitizations carried out under the two Registration Statements filed by Defendant Long Beach

Securities, in that it conveyed such mortgage loans to Long Beach Securities pursuant to a

Mortgage Loan Purchase Agreement.

744.    Non-party Long Beach Mortgage, a wholly-owned subsidiary and, later, a

division of WaMu Bank, also controlled all aspects of the business of Long Beach Securities, as

Long Beach Securities was merely a special purpose entity that was created for the purpose of

acting as a pass-through for the issuance of certain of the Certificates.  Upon information and

belief, the officers and directors of Long Beach Mortgage overlapped with the officers and

directors of Long Beach Securities.  In addition, because of its position as sponsor, Long Beach

Mortgage was able to, and did in fact, control the contents of the two Registration Statements

filed by Long Beach Securities, including the Prospectuses and Prospectus Supplements, which

pertained to 15 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

745.    Defendant JPMorgan Bank controlled the business operations of J.P. Morgan Acquisition.  Defendant JPMorgan Bank wholly owns J.P. Morgan Acquisition.  As the sole corporate parent of J.P. Morgan Acquisition, JPMorgan Bank had the practical ability to direct and control the actions of J.P. Morgan Acquisition in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of J.P. Morgan Acquisition in connection with the issuance and sale of the Certificates.

746.    JPMorgan Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

747.    JPMorgan Bank culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

748.    Defendant JPMorgan Chase controlled the business operations of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance.  Defendant JPMorgan Chase wholly owns JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance and is the ultimate corporate parent of JPMorgan Bank, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and J.P. Morgan Securities.  As the corporate parent of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance, JPMorgan Chase had the practical ability to direct and control the actions

of JPMorgan Bank, J.P. Morgan Securities, and J.P. Morgan Acceptance in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of JPMorgan Bank, J.P. Morgan Securities and J.P. Morgan Acceptance in connection with the issuance and sale of the Certificates.

749.    JPMorgan Chase expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

750.    JPMorgan Chase culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as J.P. Morgan Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

751.    This claim is against Defendant JPMorgan Bank in its capacity as successor-in-interest to WaMu Bank.  Non-party WaMu Bank controlled the business operations of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  WaMu Bank wholly owned WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities.  As the sole corporate parent of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities, WaMu Bank had the practical ability to direct and control the actions of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of WaMu Capital, WaMu Securities, WaMu Acceptance, Long Beach

Mortgage, and Long Beach Securities in connection with the issuance and sale of the Certificates.

752.    Non-party WaMu Bank expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

753.    Non-party WaMu Bank culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as WaMu Securities, WaMu Acceptance, and Long Beach Securities and the issuing trusts to serve as conduits for the mortgage loans.

754.    This claim is against Defendant JPMorgan Chase in its capacity as successor-in-interest to BSI.  Non-party BSI controlled the business operations of BSC, EMC, SAMI, and BSABS.  BSI wholly owned BSC, EMC, SAMI, and BSABS.  As the sole corporate parent of BSC, EMC, SAMI, and BSABS, BSI had the practical ability to direct and control the actions of BSC, EMC, SAMI, and BSABS in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of BSC, EMC, SAMI, and BSABS in connection with the issuance and sale of the Certificates.

755.    Non-party BSI expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

756.     Non-party BSI culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as SAMI and BSABS and the issuing trusts to serve as conduits for the mortgage loans.

757.     The Section 31-5606.05(c) Defendants, in their own capacity or as successors-in-interest, are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of J.P. Morgan Securities, BSC, WaMu Capital, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, Long Beach Mortgage, and Long Beach Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, JPMorgan, Bear Stearns, WaMu, and Long Beach generated profits at multiple levels of the securitization process.

758.     Fannie Mae purchased in the primary market, or, for the LUM 2006-3 Securitization, shortly after issuance, Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

759.     Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

760.     Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

761.     The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## EIGHTH CAUSE OF ACTION

### Common Law Fraud
**(Against J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital)**

762.     Plaintiff realleges each allegation in paragraphs 1 through 546 above as if fully set forth herein.

763.     This is a claim for common law fraud against Defendants J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank (in its capacity as successor to WaMu Bank and Long Beach Mortgage), J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital with respect to the Securitizations J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, or Long Beach Mortgage sponsored.  JPMorgan Bank is the successor to WaMu Bank and Long Beach Mortgage.  J.P. Morgan Securities is the successor to BSC.

764.     The material representations set forth above were fraudulent, and the representations of J.P. Morgan Securities, BSC, and WaMu Capital falsely and misleadingly misrepresented and omitted material statements of fact.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.  The representations on which the GSEs relied were directly communicated to them by J.P. Morgan Securities, BSC, and WaMu Capital.  J.P. Morgan Securities, BSC, and WaMu Capital knew, or were reckless in not knowing, that their representations and omissions were false and/or misleading at the time they

were made.  J.P. Morgan Securities, BSC, and WaMu Capital made the misleading statements

for the purpose of inducing the GSEs to purchase the GSE Certificates.

765.    The basis for the false representations in the term sheets and Prospectus

Supplements that J.P. Morgan Securities, BSC, and WaMu Capital made to the GSEs was

information that J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach

Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach

Securities provided to J.P. Morgan Securities, BSC, and WaMu Capital as to the strength of the

collateral underlying the GSE Certificates and the structure of the Securitizations.  J.P. Morgan

Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P. Morgan

Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities communicated this

information to J.P. Morgan Securities, BSC, and WaMu Capital with the knowledge and intent

that J.P. Morgan Securities, BSC, and WaMu Capital would communicate this information to

purchasers of the GSE Certificates.  J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu

Securities, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance,

and Long Beach Securities each had reason to expect that the GSEs were among the class of

persons who would receive and rely on such representations.

766.    Each of J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long

Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach

Securities, J.P. Morgan Securities, BSC, and WaMu Capital intended that the above misleading

statements were to be made for the purpose of inducing the GSEs to purchase the GSE

Certificates.

767.    The GSEs justifiably relied on the false representations and misleading omissions

of J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities, Long Beach Mortgage, J.P.

Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, Long Beach Securities, J.P. Morgan Securities, BSC, and WaMu Capital.

768.    Had the GSEs known the true facts regarding the underwriting practices of JPMorgan, Bear Stearns, WaMu, and Long Beach, and the quality of the mortgage loans collateralizing the GSE Certificates, they would not have purchased the GSE Certificates.

769.    As a result of the foregoing, the GSEs have suffered damages according to proof. In the alternative, Plaintiff hereby demands rescission and makes any necessary tender of the GSE Certificates.

770.    The misconduct of JPMorgan, Bear Stearns, WaMu, and Long Beach was intentional and wanton.  The immediate victims of their fraud were Fannie Mae and Freddie Mac, two Government-sponsored entities whose primary mission is assuring affordable housing to millions of Americans.  Further, the public nature of the harm caused by JPMorgan, Bear Stearns, WaMu, and Long Beach is apparent—and conclusively demonstrated by—in the congressional hearings and federal enforcement actions that have been pursued against JPMorgan, Bear Stearns, WaMu, and Long Beach as a direct result of their fraudulent conduct at issue in this Complaint.  *See, e.g.*, the Senate PSI Report, *passim*; the FCIC Report, *passim*; "Criminal Probe Targets 6 Wall Street Firms: Source," *Reuters* (May 13, 2010); "JPMorgan Said to Face SEC Subpoena Along With Credit Suisse," *Bloomberg* (May 6, 2011); "Feds Investigate Washington Mutual Failure," *Associated Press* (Oct. 16, 2008); "Washington Mutual Created 'Mortgage Time Bomb,' Senate Panel Says," *Los Angeles Times* (Apr. 13, 2010).  Punitive damages are therefore warranted for the actions of JPMorgan, Bear Stearns, WaMu, and Long Beach in order to punish, deter them from future misconduct, and protect the public.

771.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## NINTH CAUSE OF ACTION

**Aiding and Abetting Fraud**
**(Against J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank, J.P. Morgan**
**Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities)**

772.    Plaintiff realleges each allegation in paragraphs 1 through 546 above as if fully set forth herein.

773.    This is a claim for aiding and abetting fraud against Defendants J.P. Morgan Acquisition, EMC, WaMu Securities, JPMorgan Bank (in its capacity as successor to WaMu Bank), J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities with respect to the Securitizations sponsored by J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage.  JPMorgan Bank is the successor to WaMu Bank and Long Beach Mortgage.

774.    J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage, as sponsors for 94 of the Securitizations, substantially assisted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud by choosing which mortgage loans would be included in those Securitizations, even though they *knew* the loans had been underwritten to shoddy standards.  The actions of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, and Long Beach Mortgage in assisting in the origination of, and then purchasing, poorly underwritten loans were an integral part of the Securitizations.

775.    Likewise, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as depositors for 97 of the Securitizations, substantially assisted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud by issuing the Registration Statements that were used to offer publicly the Certificates.  As the issuer of the Certificates, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach

Securities were an integral part of the sale of the Certificates to the GSEs by J.P. Morgan

Securities, BSC, and WaMu Capital.

776.    As described above, J.P. Morgan Securities, BSC, and WaMu Capital made

fraudulent and untrue statements of material fact and omitted to state material facts regarding the

true credit quality of the GSE Certificates, the true rate of owner occupancy, the true LTV and

CLTV ratio of the underlying mortgage loans, and compliance by the originators with applicable

underwriting guidelines.

777.    Each of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long

Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach

Securities had unique access to the loan files, and therefore was aware of the extreme weakness

of the loans.  In fact, JPMorgan, Bear Stearns, WaMu, and Long Beach during the same period

they were selling the GSE Certificates to the GSEs were also engaging in putback requests with

originators and other parties based upon the weakness of the underlying loans.  Accordingly, J.P.

Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan

Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities were aware that the

representations and omissions of J.P. Morgan Securities, BSC, and WaMu Capital were

fraudulent.

778.    The central role of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu

Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and

Long Beach Securities in J.P. Morgan Securities', BSC's, and WaMu Capital's vertically

integrated sales strategy for the Certificates substantially assisted in J.P. Morgan Securities',

BSC's, and WaMu Capital's fraud.  J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu

Bank, and Long Beach Mortgage, as the purchasers of the underlying mortgage loans, worked

closely with J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach Securities, as the vehicles for securitizing the mortgage loans, which in turn worked closely with J.P. Morgan Securities, BSC, and WaMu Capital, as the distribution arms for the Certificates that were collateralized by those mortgage loans and then sold to the GSEs. J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities worked hand-in-glove to provide J.P. Morgan Securities, BSC, and WaMu Capital with Certificates that it could fraudulently sell to the GSEs.

779.    J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities provided substantial assistance in J.P. Morgan Securities', BSC's, and WaMu Capital's fraud that played a significant and material role in inducing the GSEs to purchase the GSE Certificates.  As a direct, proximate and foreseeable result of J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities aiding and abetting J.P. Morgan Securities, BSC, and WaMu Capital in their fraud against the GSEs, the GSEs have been damaged in an amount to be determined at trial.

780.    Because J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities aided and abetted J.P. Morgan Securities', BSC's, and WaMu Capital's fraud willfully and wantonly, and because, by their acts, J.P. Morgan Acquisition, EMC, WaMu Securities, WaMu Bank, Long Beach Mortgage, J.P. Morgan Acceptance, SAMI, BSABS, WaMu Acceptance, and Long Beach Securities knowingly affected the general public, including but not

limited to all persons with interests in the Certificates, Plaintiff is entitled to recover punitive damages.

781.    The time period from June 16, 2009 through July 31, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July 14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## TENTH CAUSE OF ACTION

### Successor and Vicarious Liability
### (Against JPMorgan Chase, J.P. Morgan Securities, and JPMorgan Bank)

782.     Plaintiff realleges each allegation in paragraphs 1 through 546 above as if fully set forth herein.

783.     Defendant JPMorgan Chase is the successor to BSI, pursuant to the Merger.  J.P. Morgan Chase is liable for BSI's wrongdoing, in its entirety, under common law, because BSI merged and consolidated with JPMorgan Chase, because JPMorgan Chase has expressly or impliedly assumed BSI's tort liabilities, and because JPMorgan Chase is a mere continuation of BSI.  This action is thus brought against JPMorgan Chase both in its own capacity and as successor to BSI.

784.     Defendant J.P. Morgan Securities is the successor to BSC, pursuant to the Merger. J.P. Morgan Securities is liable for BSC's wrongdoing, in its entirety, under common law, because BSC merged and consolidated with J. P. Morgan Securities, because J.P. Morgan Securities has expressly or impliedly assumed BSC's tort liabilities, and because J.P. Morgan Securities is a mere continuation of BSC.  This action is thus brought against J.P. Morgan Securities both in its own capacity and as successor to BSC.

785.     Defendant JPMorgan Bank succeeded to WaMu Bank's, including Long Beach Mortgage's, liabilities pursuant to the PAA.  JPMorgan Bank is liable for WaMu Bank's wrongdoing, in its entirety, under common law, because WaMu Bank merged and consolidated with JPMorgan Bank, because JPMorgan Bank has expressly or impliedly assumed WaMu Bank's tort liabilities, and because JPMorgan Bank is a mere continuation of WaMu Bank.  This action is thus brought against JPMorgan Bank both in its own capacity and as successor to WaMu Bank.

319

786.     The time period from June 16, 2009 through July 31, 2011 has been tolled for
statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae
and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, EMC, BSABS,
SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities, Long Beach
Securities, Long Beach Mortgage, and Chase Home Finance LLC.  The time period from July
14, 2011 through September 1, 2011 has been tolled for statute of limitations purposes by virtue
of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae,
Freddie Mac, and J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance,
EMC, BSABS, SAMI, BSC, Chase Mortgage Finance Corp., WaMu Capital, WaMu Securities,
Long Beach Securities, and JPMorgan Bank.  This action is brought within three years of the
date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus
timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

787.     An award in favor of Plaintiff against all Defendants, jointly and severally, for all
damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but
including:

a.     Rescission and recovery of the consideration paid for the GSE
Certificates, with interest thereon;

b.     Each GSEs' monetary losses, including any diminution in value of the
GSE Certificates, lost principal and lost interest payments thereon, and
consequential damages, including the cost of investigating the
misrepresentations and performance of the underlying collateral to the
Certificates, as well as any increased coupon payment on the GSEs' senior
preferred stock held by the U.S. Treasury Department, arising from losses
on the GSE Certificates;

c.     Punitive damages;

320

d.      Attorneys' fees and costs;

e.      Prejudgment interest at the maximum legal rate; and

f.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

788.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:    New York, New York
          June 13, 2012

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By:_____
     Philippe Z. Selendy
     Manisha M. Sheth

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
   Finance Agency*