UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FEDERAL HOUSING FINANCE AGENCY, etc.,   :
                                        :
                         Plaintiff,     :     11 Civ. 6188 (DLC)
           -v-                          :
                                        :     OPINION & ORDER
JPMORGAN CHASE & CO., et al.,           :
                                        :
                         Defendants.    :
                                        :
----------------------------------------X


APPEARANCES:

For Plaintiff Federal Housing Finance Agency:
Philippe Z. Selendy
Kathleen M. Sullivan
Manisha M. Sheth
William B. Adams
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601

For Defendants JPMorgan Chase & Co., JPMorgan
Chase Bank, N.A., J.P. Morgan Mortgage
Acquisition Corporation, J.P. Morgan Securities
LLC, J.P. Morgan Acceptance Corporation I, EMC
Mortgage LLC, Bear Stearns & Co., Inc.,
Structured Asset Mortgage Investments II Inc.,
Bear Stearns Asset Backed Securities I LLC, WaMu
Asset Acceptance Corporation, WaMu Capital
Corporation, Washington Mutual Mortgage
Securities Corporation, Long Beach Securities
Corporation, David M. Duzyk, Louis Schioppo,
Jr., Christine E. Cole, Edwin F. McMichael,
William A. King, Brian Bernard, Joseph T.
Jurkowski, Jr., Kim Lutthans, Katherine
Garniewski, Richard Careaga, David Beck, Diane
Novak, Rolland Jurgens, Thomas G. Lehmann,
Stephen Fortunato, Donald Wilhelm, Marc K.
Malone, Michael L. Parker, David H. Zielke,
Thomas W. Casey, John F. Robinson, D. Keith

Johnson, Suzanne Krahling, Larry Breitbarth, Art
Den Heyer and Stephen Lobo:
Penny Shane
Sharon L. Nelles
Jonathan M. Sedlak
Yavar Bathaee
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004-2498

For Defendant Credit Suisse Securities (USA)
LLC:
Richard W. Clary
Michael T. Reynolds
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

For Defendant RBS Securities Inc.:
Thomas C. Rice
David J. Woll
Alan Turner
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

For Defendant Goldman, Sachs & Co.:
Richard H. Klapper
Theodore Edelman
Michael T. Tomaino, Jr.
Jordan T. Razza
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

For Defendant Citigroup Global Markets Inc.:
Brad S. Karp
Susanna M. Buergel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

For Defendant Jeffrey L. Verschleiser:
Dani R. James
Jade A. Burns

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036

For Defendant Matthew Perkins:
Sandra Hauser
Patrick E. Fitzmaurice
SNR Denton
1221 Avenue of the Americas
New York, New York 10020-1089

For Defendant Jeffrey Mayer:
Richard A. Edlin
Ronald D. Lefton
Candace Camarata
Greenberg Traurig, LLP
200 Park Avenue,
New York, NY 10166

For Defendants Tom Marano and Michael
Nierenberg:
Joel C. Haims
LaShann M. DeArcy
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

For Defendant Samuel L. Molinaro, Jr.:
Pamela Rogers Chepiga
Josephine A. Cheatham
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020


DENISE COTE, District Judge:

     This is one of sixteen actions currently before this Court

in which the Federal Housing Finance Agency ("FHFA" or "the

Agency"), as conservator for Fannie Mae and Freddie Mac

(together, the "Government Sponsored Enterprises" or "GSEs"),

3

alleges misconduct on the part of the nation's largest financial institutions in connection with the offer and sale of mortgage-backed securities purchased by the GSEs in the period between 2005 and 2007.[1]  As amended, the complaints in each of the actions assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, *l*(a)(2), o; the Virginia Securities Act, VA Code Ann. § 13.1-522(A)(ii), (C); and the District of Columbia Securities Act, D.C. Code § 31-

---

[1] The sixteen cases are: FHFA v. UBS Americas, Inc., et al., 11 Civ. 5201 (DLC); FHFA v. JPMorgan Chase & Co., et al., 11 Civ. 6188 (DLC); FHFA v. HSBC North America Holdings, Inc., et al., 11 Civ. 6189 (DLC); FHFA v. Barclays Bank PLC, et al., 11 Civ 6190 (DLC); FHFA v. Deutsche Bank AG, et al., 11 Civ. 6192 (DLC); FHFA v. First Horizon National Corp., et al., 11 Civ 6193 (DLC); FHFA v. Bank of America Corp., et al., 11 Civ. 6195 (DLC); FHFA v. Citigroup Inc., et al., 11 Civ. 6196 (DLC); FHFA v. Goldman, Sachs & Co., et al., 11 Civ. 6198 (DLC); FHFA v. Credit Suisse Holdings (USA), Inc., et al., 11 Civ. 6200 (DLC); FHFA v. Nomura Holding America, Inc., et al., 11 Civ. 6201 (DLC); FHFA v. Merrill Lynch & Co., Inc., et al., 11 Civ. 6202 (DLC); FHFA v. SG Americas, Inc., et al., 11 Civ. 6203 (DLC); FHFA v. Morgan Stanley, et al., 11 Civ. 6739 (DLC); FHFA v. Ally Financial Inc., et al., 11 Civ. 7010 (DLC); FHFA v. General Electric Co., et al, 11 Civ. 7048 (DLC).  The FHFA has also brought two similar actions, which are pending in federal courts in California and Connecticut.  See FHFA v. Countrywide Financial Corp., et al., No. 12 Civ. 1059 (MRP) (C.D. Cal.); FHFA v. Royal Bank of Scotland, No. 11 Civ. 1383 (AWT) (D. Conn).

5606.05(a)(1)(B), (c).[2]  In six of the cases, including this one, the Agency has also asserted claims of fraud and aiding and abetting fraud under the common law of New York State (the "Fraud Claim Cases").[3]

The sixteen actions are congregated before this Court for coordinated pretrial proceedings.  An initial conference was held with counsel for all parties in the coordinated actions on December 2, 2011.  At that time, it was agreed that a motion to dismiss filed in FHFA v. UBS, 11 Civ. 5201 (DLC) (the "UBS Matter"), would serve as the vehicle for litigating certain legal issues common to all sixteen cases, including certain timeliness issues and whether the FHFA has standing to bring these cases.  On May 4, 2012, the Court denied a motion by the defendants in the UBS Matter to dismiss the plaintiff's securities law claims.  See Federal Housing Finance Agency v. UBS Americas, Inc., et al., 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ("UBS I").  An Opinion of June 26 decided certain additional

---

[2] This Opinion refers to the plaintiff's claims under the securities laws of the District of Columbia and Virginia as the plaintiff's "Blue Sky" claims.

[3] See FHFA v. JPMorgan Chase & Co., et al., 11 Civ. 6188 (DLC); FHFA v. Deutsche Bank AG, et al., 11 Civ. 6192 (DLC); FHFA v. Goldman, Sachs & Co., et al., 11 Civ. 6198 (DLC); FHFA v. Merrill Lynch & Co., Inc., et al., 11 Civ. 6202 (DLC); FHFA v. Morgan Stanley, et al., 11 Civ. 6739 (DLC); FHFA v. Ally Financial Inc., et al., 11 Civ. 7010 (DLC).

legal issues left open by the May 4 Opinion.  See Federal
Housing Finance Agency v. UBS Americas, Inc., et al., 2012 WL
2400263 (S.D.N.Y. June 26, 2012) ("UBS II").[4]

Pursuant to a June 14 Pretrial Scheduling Order,
depositions are to begin in all cases in January 2013, and all
fact and expert discovery in this matter, 11 Civ. 6188 (DLC),
must be concluded by December 6, 2013.  Trial in this matter is
scheduled to begin on June 4, 2014.  The June 14 Order also set
a schedule for the briefing of defendants' motions to dismiss in
the remaining fifteen cases.  Briefing has occurred two phases,
with the motions in this case and the remaining Fraud Claim
Cases becoming fully submitted on October 11, 2012.  The motions
in the remaining nine cases are scheduled to be fully submitted
November 9, 2012.

The primary defendant in this case is JPMorgan Chase & Co.
("JPMorgan"), in its own right and as successor to Bear Stearns
& Co. Inc. ("Bear Stearns"), Washington Mutual Bank ("WaMu"),
and Long Beach Securities (a subsidiary of WaMu).  Various
corporate and individual affiliates of JPMorgan, Bear Stearns,
WaMu, and Long Beach that were involved in the securitization

---

[4] On July 19, 2012, the Court certified the timeliness issue for
interlocutory appeal pursuant to 28 U.S.C. § 1292(b); the Court
of Appeals granted leave to appeal on August 14.  The appeal
will be heard no earlier than November 26, 2012.

process are also defendants, as are four banks that acted as underwriters for certain of the securitizations but are not otherwise affiliated with JPMorgan: Citigroup Global Markets, Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman Sachs & Co. ("Goldman Sachs"), and RBS Securities ("RBS Greenwich") (collectively, the "Other Underwriter Defendants").

Except for the inclusion of substantive and aiding-and-abetting fraud claims, the structure of the Amended Complaint in this case parallels that of the Second Amended Complaint in the UBS Matter. The following discussion, therefore, borrows liberally from UBS I. Briefly stated, FHFA contends that Fannie Mae and Freddie Mac purchased over $33 billion in residential mortgage-backed securities ("RMBS") sponsored or underwritten by JPMorgan, Bear Stearns, or WaMu entities during the period between September 2005 and September 2007. RMBS are securities entitling the holder to income payments from pools of residential mortgage loans that are held by a trust. For each of the securities at issue here, the offering process began with a "sponsor," which acquired or originated the mortgage loans that were to be included in the offering.[5] The sponsor

---

[5] Defendants themselves -- or their affiliated entities -- originated many of the underlying mortgage loans. In addition, sponsors purchased loans from the following non-party mortgage

transferred a portfolio of loans to a trust that was created specifically for that securitization; this task was accomplished through the involvement of an intermediary known as a "depositor."  The trust then issued certificates to an underwriter, which, in turn, sold them to the GSEs.  The certificates were backed by the underlying mortgages.  Thus, their value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.  In several instances, the GSEs purchased multiple Certificates representing different tranches of a single securitization.  Consequently, although this case concerns 103 securitizations, the GSEs purchased 127 distinct certificates (the "GSE Certificates"), each backed by a different supporting loan group.

Each of the GSE Certificates was offered pursuant to one of nineteen shelf registration statements filed with the Securities and Exchange Commission ("SEC").  For each of the GSE Certificates, the pertinent shelf registration statement, along with the prospectus and a prospectus supplement filed at the time of securitization together constitute the "Offering

---

originators: Countrywide Home Loans, Inc.; American Home Mortgage Corp.; Fremont Investment & Loan; WMC Mortgage Corp.; GreenPoint Mortgage Funding, Inc.; Argent Mortgage funding Company, LLC; Option One Mortgage Corp.; and New Century Mortgage Corp.

Documents" (or "Offering Materials").  The Securities Act makes the sponsor, depositor, underwriters and any individual signatories jointly and severally liable for any material misstatements in these documents.  See 15 U.S.C. § 77k(a).  The District of Columbia and Virginia Blue Sky provisions impose liability on similar terms.

JPMorgan served as the lead underwriter for 30 out of the 103 securitizations at issue in this case, and for 27 of those also served as sponsor and depositor.  Bear Stearns served as lead underwriter for 38 of the securitizations, depositor for 35 of those, and sponsor for 32 of that subset.  WaMu or Long Beach served as sponsor and depositor for 35 of the securitizations, for 31 of which it was also one of the lead underwriters. Citigroup and RBS Greenwich each served as co-lead underwriter (with JPMorgan and WaMu, respectively) for a single securitization.  Lehman Brothers served as co-lead underwriter with WaMu for two securitizations and was the sole lead underwriter for two additional securitizations that WaMu entities sponsored.  Goldman Sachs was the lead underwriter for two securitizations sponsored by WaMu entities.  Each individual defendant signed one or more of the Offering Documents at issue here.

FHFA's Amended Complaint asserts, <u>inter alia</u>, that the
Offering Documents for the 127 GSE Certificates "contained
materially false or misleading statements and omissions."  More
particularly, the Amended Complaint alleges that "[d]efendants
falsely represented that the underlying mortgage loans complied
with certain underwriting guidelines and standards, including
representations that significantly overstated the ability of
borrowers to repay their mortgage loans."  The Offering
Documents are also alleged to have contained representations
regarding "the percentage of loans secured by owner-occupied
properties and the percentage of the loan group's aggregate
principal balance with loan-to-value ratios within specified
ranges" that were both false and materially incomplete.  FHFA
asserts that "the false statements of material facts and
omissions of material facts in the Registration Statements,
including the Prospectuses and Prospectus Supplements, directly
caused Fannie Mae and Freddie Mac to suffer billions of dollars
in damages," because "[t]he mortgage loans underlying the GSE
Certificates experienced defaults and delinquencies at a much
higher rate than they would have had the loan originators
adhered to the underwriting guidelines set forth in the
Registration Statement."  FHFA's claims of substantive fraud and
aiding and abetting fraud are predicated on each of these three

categories of misstatement.[6]  With regard to these claims only,
FHFA further alleges: (1) that JPMorgan, Bear Stearns, WaMu,
Long Beach and their affiliates knew that the Offering
Documents' representations were false; and (2) that the GSEs
justifiably relied on those representations.

In moving to dismiss the plaintiff's complaint in this case
the defendants raise four principal arguments, most of which
focus on the adequacy of the fraud claims.[7]  First, the
defendants argue that the Amended Complaint does not contain
sufficient factual support for the allegation that the loans
underlying the securitizations were not underwritten in
accordance with the guidelines set out in the Offering
Documents.  They do not argue that the remaining two categories
of misrepresentation -- regarding owner-occupancy rates and
loan-to-value ratios -- are inadequately pleaded.  Second,

---

[6] FHFA alleges fraud by J.P. Morgan Acquisition, EMC Mortgage
("EMC"), WaMu Securities, JPMorgan Bank, J.P. Morgan Acceptance,
Structured Asset Mortgage Investments ("SAMI"), Bear Stearns
Asset Backed Securities ("BSABS"), WaMu Acceptance, Long Beach
Securities, J.P. Morgan Securities, Bear Stearns & Co. ("BSC"),
and WaMu Capital.  FHFA alleges that, except for J.P. Morgan
Securities, BSC, and WaMu Capital, these same defendants aided
and abetted fraud.

[7] The defendants also adopt and incorporate all dismissal grounds
and arguments advanced by the defendants in the UBS Matter, and
the Court, likewise, adopts the reasoning set forth in UBS I and
UBS II that led to the rejection of those arguments.

JPMorgan argues that the Amended Complaint fails to plead the remaining elements necessary to sustain the plaintiff's fraud claims, including scienter, justifiable reliance, and loss causation.  Third, JPMorgan maintains that downgrades in the credit ratings of certain certificates related to those at issue here (though, importantly, none of the GSE Certificates themselves) should have put the GSEs on notice of their claims at least as early as September 2007, making this action untimely when filed.  Fourth, JPMorgan asserts that FHFA's claims against it as successor-in-interest to WaMu are barred by the Financial Institutions Reform, Recover, and Enforcement Act of 1989 ("FIRREA").  For their part, the Other Underwriter Defendants assert that the Amended Complaint's allegations as to them are inadequate to state a claim, as the Agency does not purport to have reviewed the files of any of the loans included in the securitizations for which they acted as underwriters.[8]  For the reasons that follow, defendants' motion is granted in part.

---

[8] Credit Suisse, RBS, and Goldman Sachs also argue that FHFA's claims as to them under the Virginia Securities Act are time barred.  FHFA acknowledges as much in its reply brief, representing that the references to the underwriter defendants in that count "is merely a scrivener's error."  Those claims are therefore dismissed.

I.   Falsity With Regard to Underwriting Standards

JPMorgan and the Other Underwriter Defendants contend that the Amended Complaint "sets out no basis to assert" that Offering Documents' representations regarding adherence to loan underwriting guidelines were false "with respect to the specific securitizations, certificates or loans at issue here."  This failure, they argue, renders the pleading inadequate pursuant to Rule 12(b)(6), Fed. R. Civ. P.  As defendants note, the Agency's fraud, Securities Act, and Blue Sky claims all require that the plaintiff plead, <u>inter alia</u>, that the defendants made a materially false or misleading statement.  <u>See</u> 15 U.S.C. §§ 77k(a), 77<i>l</i>(a)(2); D.C. Code § 31-5606.05(a)(1)(B); Va. Code § 13.1-522; <u>City of New York v. Smokes-Spirits.Com, Inc.</u>, 541 F.3d 425, 454 (2d Cir. 2008)(reciting the elements of fraud under New York common law), <u>rev'd on other grounds sub nom.</u> <u>Hemi Group, LLC v. City of New York</u>, 130 S. Ct. 983 (2010).[9]

The FHFA's Securities Act and Blue Sky Claims are governed by the pleading standard set forth in Rule 8(a), Fed. R. Civ. P, which "place[s] a relatively minimal burden on the plaintiff." <u>NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.</u>, 693 F.3d

---

[9] The parties' reliance on New York authorities indicates their agreement that the common law fraud claims should be decided under the law of New York, where the alleged misrepresentations occurred.  <u>See</u> <u>UBS I</u>, 858 F.Supp.2d at 335 (applying New York law to plaintiff's negligent misrepresentation claims).

145, 157 (2d Cir. 2012) (citation omitted).[10]  Under the rule, a pleading need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.  The plaintiff's fraud allegations must satisfy not only Rule 8(a), but also Rule 9(b), Fed. R. Civ. P.,[11] which imposes the additional requirement that a plaintiff "state with particularity the circumstances constituting fraud."  But in reviewing the sufficiency of a fraud plaintiff's allegations with regard to falsity, the Court of Appeals has taken care to note that, "[e]ven with the heightened pleading standard under Rule 9(b), . . . we do not require the pleading of detailed evidentiary matter in

---

[10] Although claims brought under Sections 11 and 12(a)(2) of the Securities Act that "sound in fraud" are governed by the heightened pleading requirements of Rule 9(b), Rombach v. Chang, 355 F. 3d 164, 171 (2d Cir. 2004), the Amended Complaint explicitly disclaims any suggestion of fraud in connection with alleged violations of state and federal securities laws.

[11] The pleading standards under the Private Securities Litigation Reform Act ("PSLRA") are higher in certain respects than those under Rule 9(b).  See Novak v. Kasas, 216 F.3d 300, 312 (2d Cir. 2000).  But the PSLRA's pleading requirements do not apply to claims arising under state law.  See 15 U.S.C. §§ 78u-4(b)(1) ("In any private action arising under this chapter . . .") (emphasis added), 78u-4(b)(2)(A) (same).

securities litigation."  In re Scholastic Corp. Securities

Litig., 252 F.3d 63, 72 (2d Cir. 2001).  When assessing the

adequacy of a complaint in the face of a Rule 12(b)(6) motion,

the court is obliged -- under either pleading standard -- to

accept as true the facts alleged by the plaintiff.  Stevelman v.

Alias Research Inc., 174 F.3d 79, 83 (2d Cir. 1999).

As in UBS I, the prospectus and prospectus supplement for

each of the securitizations at issue in this case described the

underwriting guidelines that were said to govern the origination

of mortgages with whose income the securitization was backed.

For example, the prospectus supplement for the JPMAC 2006-CH1

Securitization, for which JPMorgan affiliates acted as sponsor,

depositor, and lead underwriter -- as well as originator of all

the underlying loans -- contained the following representations:

- The Mortgage Loans were originated and underwritten in
  accordance with either the Chase Home Mortgage Call Center
  Underwriting Guidelines described below (the "CHM Call
  Center Underwriting Guidelines") or the Chase Home Mortgage
  Wholesale/Retail Underwriting Guidelines described below
  (the "CHM Wholesale/Retail Underwriting Guidelines").

[Regarding CHM Wholesale/Retail Underwriting Guidelines:]

- The Chase Home Mortgage Wholesale/Retail Underwriting
  Guidelines consider the value and adequacy of the mortgaged
  property as collateral for the proposed mortgage loan, but
  also take into consideration the borrower's credit standing
  and repayment ability.

- In general, for mortgage loans underwritten under the Full
  Documentation program, Chase Home Mortgage verifies income

15

and assets through alternate documentation or written third
party verifications, except that no asset verification is
required for borrowers in all credit grades and all
documentation types that have an LTV less than, or equal to
80%, or a credit score equal to or greater than 640.  For
loan amounts in excess of $500,000 asset verification is
required regardless of LTV or credit score.  The 12-Month
Bank Statement program is similar to the Full Documentation
program, except that the last 12 months of bank statements
are utilized to support income. . . .  Under the Reduced
Documentation program the maximum loan-to-value ratio for
non-self-employed borrowers is reduced by 10%, and asset
verification for the source of the borrower's down payment
is not required for all credit grades and all documentation
types that meet the following criteria: LTV less than or
equal to 80%, or a credit score equal to or greater than
640.  For loan amounts in excess of $500,000 asset
verification is required regardless of LTV or credit score.

- On a case by case basis, Chase Home Mortgage may determine
  that, based upon compensating factors, a prospective
  borrower not strictly qualifying under the underwriting
  risk category guidelines described below warrants an
  underwriting exception.  Compensating factors may include,
  without limitation, relatively low loan-to-value ratio,
  relatively low debt-to-income ratio, stable employment and
  time in the same residence.  It is expected that a
  significant number of the mortgage loans underwritten in
  accordance with the Chase Home Mortgage Wholesale/Retail
  Underwriting Guidelines will have been originated with such
  underwriting exceptions based on compensating factors.

- [T]he depositor will not include any loan in the trust fund
  for any series of securities if anything has come to the
  depositor's attention that would cause it to believe that
  the representations and warranties of a seller or
  originator will not be accurate and complete in all
  material respects in respect of the loan as of the date of
  initial issuance of the related series of securities.

The prospectus supplements for the other securitizations

contained similar representations.

As noted, FHFA's claims are premised in part on the allegation that the mortgages underlying the 127 GSE Certificates (the "Supporting Loans" or "Supporting Loan Groups") deviate so significantly from the underwriting guidelines set out in the Offering Documents as to render those representations false.  In an effort to provide the requisite factual support for this allegation, the Amended Complaint cites four categories of evidence.

First, the Amended Complaint reports the results of private and government investigations, which have concluded that, during the relevant period, several of the mortgage originators whose loans support the GSE Certificates disregarded their own underwriting guidelines on a widespread and systematic basis. Among the originators specifically mentioned are: WMC Mortgage Corp.; Fremont Investment & Loan; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; Argent; New Century; American Home; and Option One.  These eight originators are alleged to have underwritten some or all of the loans in at least 31 of the securitizations at issue here, representing 36 Certificates. Bear Stearns served as a lead underwriter -- and in some cases depositor and sponsor -- for 10 of the 31 securitizations, JPMorgan for 16, and WaMu for 5.

Many of the securitizations were also made up of loans originated by the defendants' own subprime lending divisions, which are likewise alleged to have departed from stated underwriting standards.  For example, the Amended Complaint cites statements by Jamie Dimon, CEO of JPMorgan Chase, criticizing the quality of loans originated during the relevant period by Chase Home Finance LLC ("CHF"), a division of defendant JPMorgan Bank, and discusses a $5.3 billion settlement that the bank reached in 2012 with state and local authorities in an investigation into abuse in origination, servicing, and foreclosure of residential mortgage loans.  With respect to Bear Stearns, the Amended Complaint reports the statements of two confidential witnesses who were personally involved in the origination and underwriting of mortgages for Bear's in-house originator, EMC.  The witnesses describe being pressured by supervisors to approve loans in disregard of their expressed concerns about potentially fraudulent documentation, excessive LTV ratios, and the questionable creditworthiness of borrowers. WaMu too is alleged to have departed significantly from underwriting standards in its own origination of loans.  As one appraiser who did business with WaMu during the relevant period described the bank's origination practices: "It was the Wild West . . . If you were alive, they would give you a loan.

Actually, I think if you were dead, they would still give you a loan."

The Amended Complaint cites the "total collapse in credit ratings of the GSE certificates" as further evidence that the Offering Documents' statements regarding adherence to underwriting guidelines were false.  FHFA alleges that JPMorgan, Bear Stearns, and WaMu provided the major rating agencies with loan-level information, including borrower debt-to-income ratios, for the loans included in the 103 securitizations and that the agencies in turn relied on this information to calculate the credit ratings to be assigned to each GSE Certificate.  FHFA suggests that the subsequent downgrade of the GSE Certificates to non-investment status is evidence of the market's discovery that the underlying loans were not underwritten in the manner advertised to the ratings agencies at the time of securitization.

Third, the Agency supports its claims with regard to underwriting standards by asserting that, to date, as many as 60% of the loans in the Supporting Loan Groups -- intended to be among the safest of the loans in a given securitization -- are in default, have been foreclosed upon, or are delinquent.  FHFA maintains that if in fact the loans in the Supporting Loan Groups had been underwritten in accordance with the

representations in the Offering Documents, one would expect those percentages to be "substantially lower."

Fourth, the Amended Complaint reports the results of the plaintiff's "forensic review" of over 1,000 loan files drawn from three securitizations. As part of the review, the plaintiff analyzed the loan files for 535 mortgages in the Supporting Loan Group for the BSMF 2007-AR3, for which Bear Stearns or its affiliates served as sponsor, depositor and underwriter. The agency concluded that approximately 98% of the loans it reviewed "were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents." The Agency found a similarly high breach rate -- 90% -- in a sample of 426 loans drawn from the Supporting Loan Group for the BSABS 2006-AQ1 Securitization, for which Bear Sterns affiliates likewise acted as sponsor, depositor, and lead underwriter. FHFA also reviewed 100 loan files drawn from the Supporting Loan Group for the CBASS 2006-CB7 Securitization, for which JPMorgan served as lead underwriter; the review yielded a breach rate of 79%. As recounted in the Amended Complaint, the underwriting failures noted as part of the forensic review included: (1) failure to question borrowers' unreasonable statements of their income; (2) disregard of evidence of occupancy fraud; (3)

failure to follow-up on unexplained credit inquiries; and (4) failure to calculate properly the borrower's pre-existing debt. For each of these four categories of underwriting failure, the Amended Complaint also describes a sample of specific loans and the reasons for which those loans were found to be in breach. To take one example, the Amended Complaint cites the following instance of a loan for which the originator failed to question the borrower's unreasonable statement of income:

> A loan that closed in January 2007 with a principal amount of $368,000 was originated pursuant to EMC's Low Documentation Program and included in the BSMF 2007-AR3 Securitization. The loan application stated that the borrower was employed as an inspector/foreman of a fire systems company earning $13,500 per month. The Bureau of Labor Statistics reported that the average salary at the 90th percentile for an inspector in the same geographic region in 2006 was $7,675 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile by over 1.5 times, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. The loan file contains no evidence that the loan underwriter assessed the reasonableness of the borrower's stated income. Moreover, the loan file contained the borrower's 2006 and 2007 tax returns provided for modification purposes, which revealed an income for 2006 of only $6,835 per month and indicated the same line of work for both 2006 and 2007. Furthermore, in a Statement of Financial Affairs filed by the borrower as part of a May 2008 Chapter 13 bankruptcy proceeding, the borrower also reported an income in 2006 of only $6,835 per month. A recalculation of [debt-to-income ratio or "DTI"] based on the borrower's verified same year income yields a DTI of 88.37 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The borrower defaulted and the loan was

subsequently liquidated for a loss of $248,583.81, or
67.55 percent of the original loan balance.

The Amended Complaint devotes over 60 of its 321 pages to
these four categories of factual support.  Taken together, these
allegations amply support FHFA's assertion that the Offering
Documents for the Securitizations contained false statements
regarding originators' compliance with underwriting standards.
UBS I, 858 F. Supp. 2d at 332.

JPMorgan asserts, however, that, for three reasons, this
evidence is insufficiently particularized to support the
allegation that the Offering Documents for all of the 103
securitizations at issue in this case misrepresented the
standards that governed the underwriting of the Supporting
Loans.  It argues first that the results of government and
private investigations into the underwriting practices of
mortgage originators are insufficiently tethered to the specific
securitizations at issue here.  It also dismisses the Amended
Complaint's allegations regarding poor loan performance and
credit-rating downgrades as nothing more than "fraud by
hindsight."  But JPMorgan trains its sights most directly on the
plaintiff's forensic review of loan files, noting that the
review sampled Supporting Loans for just three of the 127 GSE
Certificates.  It complains particularly that the review did not
include a single WaMu securitization and included only one

JPMorgan securitization, for which the bank served as an underwriter but not a sponsor.  According to JPMorgan, the review "says nothing" about the GSE Certificates that were not sampled.  The Other Underwriter Defendants make similar claims. RBS argues that the Amended Complaint fails to allege underwriting violations with regard to the loans underlying the only securitization for which it acted as underwriter -- the LBMLT-2006-2 Securitization.  Goldman Sachs and Credit Suisse make the same argument with respect to the securitizations for which they served as underwriters: the LBMLT 2006-WL1 Securitization and the LBMLT 2006-1 Securitization, respectively.

The defendants' argument is a variation on one pressed by the defendants in UBS I.  In seeking dismissal of the Second Amended Complaint, UBS complained that FHFA "did not even review loan files for 19 of the 22 Securitizations at issue, all of which were backed by loans from different Originators."  The Court rejected this argument, concluding that FHFA's forensic review of loan files, "[t]aken together" with "investigations by government and private agencies that revealed underwriting failures by originators . . . , confidential witness accounts, and, ultimately, the surge in defaults on the underlying mortgages and collapse of the certificates' credit ratings"

23

provided sufficient factual matter to state a claim under Rule
8(a).  UBS I, 858 F. Supp. 2d at 332; see Iqbal, 129 S. Ct. at
1949.  That conclusion is equally appropriate here.

First, the defendants are correct that the descriptions in
the Amended Complaint of government and private investigations
are insufficient, alone, to permit a claim to be brought on any
individual certificate.  Those descriptions, however, serve a
different function; they provide a basis to assert that there
was a systematic failure by the defendants in their packaging
and sale of RMBS.  The linkage to individual certificates is
provided by other sections of the pleading, principally the loan
performance and credit-rating histories of the certificates.
The findings in the government and private investigations
support this inference.

FHFA has alleged that each of the GSE Certificates has
either: (1) been downgraded by one of the major ratings houses
below investment grade, or (2) experienced delinquencies and
defaults in more than 25% of the Supporting Loan Group.  The
defendants attack this evidence as well.  They complain that by
relying on these events the FHFA is simply alleging fraud by
hindsight.  The defendants are correct that the downgrade of an
investment once thought to be riskless to near-junk status could
reflect a variety of factors, including mistakes on the part of

the ratings agencies and larger economic forces.  But such a downgrade could also reflect a realization on the part of the market that the assets underlying the securities at issue "were not as advertised."  UBS I, 858 F. Supp. 2d at 321.

FHFA's allegation that the credit-rating downgrades are, at least in part, evidence of defects in the securitization process finds further support in the remarkably high percentages of loans in all of the Supporting Loan Groups that are delinquent, defaulted or foreclosed upon.  The Agency's reliance on this information is not, as the defendants allege, an effort to argue "fraud by hindsight;" rather the Amended Complaint suggests that these market events are telltale signs of defects that were present in the securitizations all along, albeit unbeknownst to the purchasing public.

FHFA may be wrong, of course; a jury will decide.  But the claim is not an implausible one, particularly given the Amended Complaint's allegations that lax underwriting practices and, in some instances, purposeful manipulation of borrowers' credit profiles were widespread among some of the defendants' own origination arms and among third-party mortgage originators who are known to have contributed significant numbers of loans to these securitizations.

In UBS I, as here, FHFA buttressed its underwriting guidelines claim with a forensic review of loan files, which further strengthened the inference of a link between generalized originator misconduct and the downgrade of the GSE Certificates. But although UBS I acknowledged that the complaint in that case "reli[ed] primarily" on the results of FHFA's forensic review to make a forceful case that the UBS defendants falsely described the underwriting standards applied to Supporting Loans, id. at 332, the Opinion never suggested that such a review was essential to state a claim. To the contrary, the holding that the statute of limitations for the plaintiff's Securities Act claims did not begin to run until the date on which a Certificate's credit rating was downgraded necessarily implies that such a review is not essential to render the pleading sufficient.[12]  UBS I, 858 F. Supp. 2d at 320-21.

If defendants were correct that in order to allege the falsehood of group-level representations in connection with the offering of asset-backed securities, a plaintiff must conduct a detailed pre-complaint, asset-level analysis, it would be the rare complaint that would survive a motion to dismiss. Indeed,

---

[12] It is noteworthy that JPMorgan's relies on this Court's statute-of-limitations holding in UBS I to support its argument that the downgrade of certificates subordinate to those owned by the GSEs triggered the running of the statute of limitations for certain of FHFA's claims.

such a rule might constitute an insurmountable barrier for any private plaintiff.  After all, FHFA was apparently able to obtain the loan files it reviewed at least in part through recourse to administrative subpoenas.[13]  Such a requirement would also impose prohibitive costs on the would-be plaintiff, essentially requiring her to "prove her case at the pleading stage," Woodford v. Comm. Action Agency, 239 F.3d 517, 526 (2d Cir. 2001), and inverting the general rule that it is the producing party who must bear the cost of discovery.  That result cannot be squared with the Second Circuit's admonition that Rule 9(b) does not require a securities fraud plaintiff to plead "detailed evidentiary matter," In re Scholastic Corp. Securities Litig., 252 F.3d at 72, or with that court's more recent decision countenancing the bringing of a single class action on behalf of purchasers of certificates from different tranches of an offering or even multiple offerings backed by the

---

[13] FHFA's desire to vet its allegations against the defendants before coming to court by conducting a forensic review of loan files may be responsible for some of the delay in filing these lawsuits.  A more extensive forensic review would no doubt have lengthened the delay.  The defendants have complained vociferously about both this delay and the Agency's failure to review even more loan files.

27

same shelf registration statement.  See NECA-IBEW Health & Welfare Fund, 693 F. 3d at 164.[14]

As the foregoing discussion should illustrate, the defendants' argument with respect to the adequacy of the plaintiff's pleading fails, whether analyzed under Rule 8(a) or 9(b).  Although, Rule 9(b) requires that the factual basis for claims of fraud be pleaded "with particularity," as has already been noted, the Court of Appeals has refused to equate "particularity" with a requirement that the plaintiff prove falsehood at the pleading stage.  See In re Scholastic Corp. Securities Litig., 252 F.3d at 72.  Rule 9(b)'s heightened pleading requirement has three purposes: (1) to put the defendant on notice of the details of the claims against him, (2) to protect a defendant's reputation and goodwill from

---

[14] The defendants are also incorrect that FHFA's review of loan files from three securitizations does nothing to support its claims with respect to the other securitizations at issue here. The alleged failure of Bear Stearns and JPMorgan to act diligently to ensure that non-conforming loans were excluded from the sampled securitizations, taken together with similar default rates and credit downgrades across securitizations in which those defendants participated, suggest that these failures were not isolated.  Indeed, as noted, the forensic review undertaken in the UBS Matter likewise sampled from only a few of the securitizations at issue in that case, but the Court nonetheless rejected UBS's nearly identical argument that the pleading was deficient for failing to allege that FHFA had reviewed loan files for all 22 of the securitizations at issue.

unfounded allegations, and (3) to prevent strike suits.  ATSI
Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d
Cir. 2007).

FHFA has alleged falsity with sufficient particularity to
accomplish the goals of Rule 9(b).  As described above, the
Amended Complaint devotes over 60 pages to detailed allegations
of falsehood, which touch on each of the 103 Securitizations at
issue in this case.  The Amended Complaint also provides the
defendants with ample notice of the basis on which the FHFA
alleges falsehood and more than enough information to assist
them in preparing their defenses.  For these reasons, the
plaintiff has pled falsity with sufficient detail under Rules
8(a) and 9(b) to sustain its claims for fraud and securities law
violations with respect to each of the 103 Securitizations.

II.  Adequacy of the Remaining Fraud Allegations

In addition to attacking the adequacy of the plaintiff's
allegations with respect to falsity, JPMorgan argues that the
Amended Complaint fails to plead the remaining elements of
common law fraud.  Under New York law, "[t]he elements of a
cause of action for fraud require a material misrepresentation
of a fact, knowledge of its falsity, an intent to induce
reliance, justifiable reliance by the plaintiff and damages."
Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E. 2d 976,

979 (N.Y. 2009).  Moreover, Federal Rule of Civil Procedure 9(b)

requires that a fraud plaintiff "(1) specify the statements that

[she] contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain

why the statements were fraudulent."  Anschutz Corp. v. Merrill

Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012) (citation

omitted).  In JPMorgan's view, FHFA has alleged no basis from

which to infer fraudulent intent, is precluded by the

sophistication of the GSEs from asserting justifiable reliance,

and has failed to plead loss causation.

A.  Allegations Evidencing Fraudulent Intent

        Applying Rule 9(b) to claims of common law fraud, the Court

of Appeals has repeatedly required fraud plaintiffs to "allege

facts that give rise to a strong inference of fraudulent

intent."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir.

2006) (citation omitted).  That requirement may be satisfied

"either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts

that constitute strong circumstantial evidence of conscious

misbehavior or recklessness."  Id. at 290-91 (citation omitted).

Although as noted, the pleading standards in the PSLRA do not

apply to this action, even under that standard,

        [a]t least four circumstances may give rise to a
        strong inference of the requisite scienter: where the

30

complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009) (citation omitted).

1. Allegations with regard to JPMorgan

With respect to the securitizations in which JPMorgan itself participated, the plaintiff's primary theory of scienter is that JPMorgan "knew facts or had access to information suggesting that" its public statements regarding the LTV ratios, owner occupancy rates and underwriting standards that characterized the Supporting Loan Groups "were not accurate." Id. The Amended Complaint puts forth a variety of allegations in an effort to plead this theory with sufficient particularity to avoid dismissal.

First, the Amended Complaint cites the evidence upon which it relied to assert the falsity of the three categories of statements at issue -- i.e. representations regarding loan-to-value ratios, owner occupancy rates, and underwriting standards that characterized the Supporting Loans.  The plaintiff argues that the degree to which this information is erroneous is itself suggestive that the defendants knew or should have known that

31

the representations in the Offering Documents were false.  FHFA
notes, for example, that its own analysis has revealed that the
Offering Documents for all but two of the securitizations
overstated the owner-occupancy rates of properties in the
Supporting Loan Groups by between 5 and 15%.  The Agency's
analysis of loan-to-value ratios similarly suggests that the
defendants significantly overstated the percentage of Supporting
Loans with a loan-to-value ratio of 80% or less and failed to
disclose that any of the loans were underwater, when, in fact,
as many as 60% of them were.  FHFA also points to the dramatic
downgrades of the credit ratings assigned to the GSE
Certificates and the results of its forensic review of
Supporting Loans from the CBASS 2006-CB7 Securitization, which
revealed that 79% of the reviewed loans were originated in
breach of the applicable underwriting guidelines.  FHFA alleges
that if, as was indicated in the Offering Documents, JPMorgan or
its agents in fact conducted an independent quality-assurance
and due-diligence review prior to accepting the Supporting Loans
for inclusion in these securitizations, then the bank should
have recognized these inaccuracies.

　　　FHFA finds further support for its scienter allegations in
a report prepared by the third-party due diligence firm Clayton
Holdings and recently made public by the Government in

connection with an investigation by the Financial Crisis Inquiry Commission.  The report indicates that between the first quarter of 2006 and the second quarter of 2007, JPMorgan was informed that up to 27% of the loans that it proposed for securitization were not originated in accordance with represented underwriting standards.[15]  Although the Offering Documents allowed for the inclusion of non-conforming loans, where sufficient compensating factors existed, FHFA asserts that the 27% of loans identified by Clayton as non-conforming "did not have any compensating factors" and therefore fell outside of this exception.  Faced with such a defect rate in Clayton's sample, JPMorgan might have investigated its own underwriting practices and those of the third-party originators from which it purchased loans to determine whether its public statements regarding underwriting practices were accurate.  Instead, FHFA alleges, JPMorgan waived into its securitization pools 51% of the loans identified by Clayton as defective.  The Agency suggests that this response is

---

[15] Citing Landesbank Baden-Wurttember v. Goldman Sachs & Co., No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) (summary order), JPMorgan argues that the Clayton report, which was prepared in 2007, "'cannot bear on the defendants' knowledge at the time of issuance.'"  But FHFA does not allege that the defendants had access to the report itself when they marketed these securities; rather, it cites the report as evidence of information that Clayton communicated to the defendants on a rolling basis between the first quarter of 2006 and the second quarter of 2007.

a strong indicator that JPMorgan consciously disregarded facts
that would reveal that the underwriting guidelines information
it included in its Offering Documents was false.

FHFA also relies on JPMorgan's role as an originator of
many of the very loans that made their way into the Supporting
Groups as evidence that JPMorgan "had knowledge of the true
characteristics and credit quality of the mortgage loans."  As
alleged in the Amended Complaint, CHF, JPMorgan's subprime
lending arm, originated all or the majority of loans underlying
six of the securitizations at issue here, and contributed a
significant number of loans to a seventh.  FHFA cites evidence
of CHF's questionable origination practices in an effort to show
that JPMorgan disregarded evidence that loans originated by CHF
and selected for inclusion in JPMorgan-sponsored securitizations
did not conform to the stated guidelines.  For instance,
according to the Amended Complaint, CHF supervisors in Oregon
distributed a memorandum to their employees containing "cheats &
tricks" that would allow borrowers who did not otherwise qualify
to obtain low-documentation loans.  Among other things, loan
officers were instructed that if the bank's automated
underwriting software rejected a Stated Income/Stated Asset loan
application, they should "try resubmitting with slightly higher
income.  Inch it up $500 to see if you can get the findings you

34

want."  FHFA also cites an interview that James Theckston, a
former vice president at CHF, gave to the New York Times, in
which Theckston disclosed that 60% of his 2006 performance
review depended on his success in increasing high-risk loans.
Speaking specifically about the potential to securitize and sell
off questionable loans, Theckston said, "The bigwigs of the
corporation knew [about declining lending standards], but they
figured we're going to make billions out of it, so who cares?
The government is going to bail us out.  And the problem loans
will be out of here, maybe even overseas."

      The Amended Complaint alleges fraud with respect to each of
the three categories of false statements upon which FHFA's
Securities Act and Blue Sky claims are premised -- statements
regarding the owner-occupancy rates, LTV ratios and underwriting
standards that characterized the Supporting Loans.  It can
hardly be disputed that, taken together, the allegations above
adequately plead that JPMorgan acted with fraudulent intent in
misrepresenting the underwriting standards that governed the
Supporting Loans.  With regard to the first two categories of
statements, however, FHFA's only basis for alleging scienter is
the apparent disparity between the owner-occupancy and LTV
figures reported in the Offering Documents and the results of
the Agency's own analysis.  It is true, as FHFA notes, that the

magnitude of inaccuracy can sometimes provide circumstantial evidence that a fraud defendant made her false statements knowingly or recklessly.  See In re Scholastic Corp., 252 F.3d at 73; Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000). Generally, however, such evidence must be supported by additional circumstantial evidence in order for the plaintiff to carry her pleading burden, particularly where the originator of the false information is a third-party.  See In re Worldcom, Inc. Sec. Litig., 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003) ("Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.") (emphasis supplied).

FHFA has not put forth any such supporting evidence with respect to its owner-occupancy and LTV allegations against JPMorgan.  The Agency alleges that the LTV figures in the offering documents were false because appraisers knowingly and systematically over-reported the value of the underlying properties.  But the Amended Complaint does not indicate any

basis for believing that JPMorgan was aware of such over-reporting, if it occurred, other than the fact that the bank represented to investors that it reviewed a sample of the securitized loans to verify, inter alia, "appraisal valuation." Unlike the accounting firm in Worldcom, JPMorgan was under no affirmative obligation to verify appraisal values, and the Amended Complaint provides no basis to determine how frequently it made efforts to do so or what percentage of loans reviewed pursuant to JPMorgan's general due-diligence efforts were flagged on the basis of a questionable appraisal.

Likewise, the fact that, according to FHFA, the Offering Documents for most of the securitizations overstated owner-occupancy rates by between 5 and 15% cannot alone give rise to an inference of fraudulent intent.  It is true that, in its review of individual loan files, FHFA claims to have discovered patent evidence of borrowers falsely reporting owner-occupancy information.  But again, the Amended Complaint provides no basis to conclude that JPMorgan's due diligence review would be likely to turn up such evidence in the regular course.

2.  Allegations with Regard to Bear Stearns

FHFA's allegations of scienter with respect to those offerings in which Bear Stearns participated are compelling. FHFA again cites Clayton's analysis, which found that between

37

the first quarter of 2006 and the second quarter of 2006, 16% of
the loans that Bear Stearns submitted to Clayton for review were
found to violate the applicable underwriting guidelines.  The
Amended Complaint asserts that, rather than exclude all of the
loans, Bear Stearns waived 42% of them into securitizations that
it marketed to the public.  FHFA also alleges that another due-
diligence firm, Adfitech, reviewed a sample of loans proposed
for securitization by Bear Stearns affiliate EMC and discovered
that over 38% were defective under EMC's existing quality
control procedures.  Like JPMorgan, Bear Stearns was involved
not only in the securitization of mortgage loans but also in
their origination, through two affiliates -- Encore Credit and
EMC.  FHFA alleges that this perspective gave Bear Stearns
"knowledge of the true characteristics and credit quality of the
mortgage loans" that it included in the Supporting Groups.

    Moreover, with respect to Bear Stearns, FHFA's scienter
allegations in support of its owner-occupancy and LTV-ratio
claims do not simply rely on the discrepancy between the data
reported in the Offering Documents and the Agency's own
analysis.  Rather, the Amended Complaint cites an April 2007 e-
mail from an EMC Assistant Manager for Quality Control
Underwriting to Adfitech, a due diligence firm, instructing as
follows: "Effective immediately, in addition to not ordering

38

occupancy inspections and review appraisals, do not perform reverifications or retrieve credit reports on the securitization breach audits;" refrain from "mak[ing] phone calls on employment;" and "[o]ccupancy misrep is not a securitization breach."  This e-mail indicates that for some period of time before April 2007, EMC had turned a blind eye to appraisal and owner-occupancy fraud.[16]

The Amended Complaint also marshals a number of additional allegations in support of FHFA's claim that Bear Sterns and its affiliates consciously disregarded evidence of underwriting breaches in the loans that it securitized.  These include:

- In February and June 2006, Bear Stearns prepared Internal Audit Reports indicating that the bank planned to reduce the number of loans to be included in due diligence reviews, conduct such reviews only after the loans were purchased, and conduct no due diligence if that process would interfere with the securitization process.

- EMC mortgage analysts were subjected to intense pressure by management to securitize as many loans as quickly as possible.  According to one former analyst, "the pressure was pretty great for everybody to just churn the mortgages

---

[16] JPMorgan points out that this e-mail was sent after issuance of prospectus supplements for more than 80% of the securitizations purchased by the GSEs.  The e-mail does not indicate when EMC stopped ordering occupancy inspections or reviewing appraisals, but it provides sufficient corroborating evidence of scienter for the period covered by the fraud claims given the allegation that securitizations brought to market throughout the period misrepresented owner-occupancy and LTV figures by a significant margin.

on through the system," so that if there were "outstanding data issues" analysts should just "fill the holes."

- As early as 2006, Bear Stearns modified its internal policy, which previously required the bank to hold loans acquired from third parties in inventory for 30-90 days before securitizing them.  The purpose of the policy was to determine whether the loans would default during the "early default period" ("EDP").  Yet the modification, which was specifically endorsed by Bear Stearns Senior Managing Director Jeffrey Verschleiser, <u>required</u> that analysts securitize loans before the EDP had expired.

- According to FHFA, the change in the bank's treatment of loans in the EDP confirms that Bear Stearns knew about the questionable quality of the loans it was securitizing.  In further support of this allegation, the Agency cites an e-mail that Managing Director Keith Lind sent in May 2007 demanding to know "why we are taking losses on 2nd lien loans from 2005 when they could have been securitized."

As was the case with FHFA's allegations against JPMorgan, taken together, these allegations adequately plead scienter with respect to the Agency's claims regarding underwriting compliance.  Moreover, because FHFA has plead additional facts to support its allegation that the Bear Stearns acted fraudulently in under-reporting the LTV ratios and over-reporting the owner occupancy rates of the Supporting Loans, the defendants' motion to dismiss these claims for failure to plead scienter is likewise denied.

3.  Allegations With Regard to WaMu and Long Beach

The Amended Complaint's scienter allegations with regard to WaMu begin with the Clayton report.  According to the report, between the first quarter of 2006 and the second quarter of

40

2007, 27% of the mortgage loans that WaMu submitted to Clayton
for review were rejected as falling outside the applicable
underwriting guidelines.  Nonetheless, of the 27% of loans found
to be in breach, WaMu waived 29% into its loan pools.  Like
JPMorgan and Bear Stearns, WaMu had a vertically integrated
mortgage origination and securitization business, with Long
Beach Mortgage operating as its in-house subprime originator.

The Amended Complaint further alleges that as early as
August 2005, WaMu had been advised by the United States Office
of Thrift Supervision that the agency was "concerned with the
number of underwriting exceptions and with issues that evidence
a lack of compliance with bank policy" regarding underwriting
standards.  FHFA cites sources indicating that WaMu's loan sales
team subjected quality assurance personnel to "aggressive, and
often time abusive" pressure to approve loans, even where there
were reasons to suspect the borrower's credit worthiness.
According to the Amended Complaint, WaMu employees were
discouraged from investigating borrowers' questionable salary
representations and were told to limit the loan documentation
they collected.  In some cases, WaMu personnel even manufactured
loan documentation.  One WAMU loan sales associate reported
that, in order to get new loans approved, his colleagues would
cut-and-paste the name and address of the applicant into bank

statements taken from the file of an entirely different borrower.

FHFA alleges that despite the warning from the Office of Thrift Supervision, WaMu continued its lax origination practices with the full knowledge of upper management.  It points to the minutes of a December 2006 WaMu Risk Committee Meeting in which WaMu personnel acknowledged that an increase in delinquencies was due in part to the fact that loans had not been "underwritten to standards."  Despite this recognition, however, WaMu's Chief Risk Officer disclosed in an e-mail a few months later that WaMu was "contemplating selling a larger portion of [its] Option ARMs" -- that is adjustable rate mortgages -- "than [it had] in the past."  Indeed, in September 2008, WaMu acknowledged in an internal report that "The controls that are intended to prevent the sale of loans that have been confirmed by Risk Management to contain misrepresentations or fraud are not currently effective. . . .  There is evidence that this control weakness has existed for some time."

The Amended Complaint also contains detailed allegations that "WaMu falsely overstated appraisals in order to secure low LTV ratios for mortgages, thereby making the loans more attractive to prospective purchasers of certificates."  Citing documents produced in a lawsuit by the New York Attorney General

against two appraisers that worked for WaMu, FHFA alleges that
"WaMu selected individual appraisers who were willing to produce
false, inflated appraisals and refused to hire appraisers who
maintained their independence."  Indeed, the Amended Complaint
recounts in detail how WaMu pressured appraisal services --
eAppraiseIT and LSI -- to provide inflated property estimates so
that the bank's sales staff could "hit value."

    Taken together, this evidence supports an inference that
WaMu and its affiliates knowingly included false information
regarding LTV ratios and underwriting guidelines in the
securities they marketed to the GSEs.  Because none of the
allegations in the Amended Complaint specifically address what
awareness WaMu had, if any, of owner-occupancy fraud during the
relevant period, however, FHFA's fraud allegations are dismissed
to the extent they rely on that data.

B.  Allegations Regarding Justifiable Reliance

    As noted, in order adequately to allege a claim for fraud
under New York common law, a plaintiff must plead facts tending
to show that her reliance on the defendant's misrepresentation
was reasonable.  Ashland Inc. v. Morgan Stanley & Co., Inc., 652
F.3d 333, 337-38 (2d Cir. 2011).  Whether a fraud plaintiff's
reliance was "reasonable" depends on "the entire context of the
transaction, including factors such as its complexity and

43

magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003). Nonetheless, even sophisticated plaintiffs are not required as a matter of law to "conduct their own audit" or "subject [their counterparties] to detailed questioning" where they have bargained for representations of truthfulness. DDJ Mgmt., LLC v. Rhone Group LLC, 931 N.E.2d 87, 92-93 (N.Y. 2010). Moreover, because justifiable reliance "involve[s] many factors to consider and balance, no single one of which is dispositive," it is "often a question of fact for the jury rather than a question of law for the court." STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011) (citation omitted).

As this Court has previously noted, during the relevant period, "the GSEs were highly sophisticated players in the mortgage-backed securities market, which they participated in not only as purchasers but also as packagers and marketers of securities." UBS I, 858 F. Supp. 2d at 335. The defendants argue that this sophistication precludes FHFA from establishing that the GSEs justifiably relied on the allegedly fraudulent statements that defendants included in the Offering Documents. They note that the GSEs were very familiar with origination

44

practices at many of the third-party mortgage originators whose loans made their way into the securitizations at issue, that the GSEs specifically sought securitizations backed by subprime loans, and that the Offering Documents contained extensive cautionary language regarding the riskiness of the investments.

The defendants' arguments about the GSEs' knowledge of the mortgage industry rely, for the most part, on facts that are not appropriate for consideration in the context of a motion to dismiss.[17]  More importantly, none of their arguments establish as a matter of law that through reasonable diligence the GSEs should have discovered the inaccuracy of the defendants' statements with regard to underwriting practices, LTV ratios, and owner occupancy for the certificates they purchased.  As the Court recognized in UBS I, even in the face of knowledge that many of the originators supplying loans to these securitizations engaged in dubious underwriting practices, "the GSEs were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials."  858 F. Supp. 2d

---

[17] In deciding whether to dismiss a complaint pursuant to Rule 12(b)(6), the district court "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference."  Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002).

at 321 (rejecting claim that knowledge of dubious underwriting
practices in the home mortgage market triggered statute of
limitations).  Indeed, as the FHFA notes, given that the GSEs
did not have access to data such as loan tapes and loan files
that would permit them to determine that the representations in
the Offering Documents were incorrect, it is difficult to see
how they could help but rely on the representations of
defendants, who did have access to those materials.  And while
the GSEs were certainly aware that they were purchasing
securitizations backed by subprime loans, neither the Amended
Complaint nor documents integral to it establish that they knew
that the loans supporting these particular securitizations were
so haphazardly originated as to put in jeopardy even the AAA-
rated Certificates they purchased.

Likewise, disclosures regarding the riskiness of the
securitizations cannot absolve the defendants of their duty to
avoid making fraudulent representations regarding the character
of the underlying assets.  True, the Second Circuit has
recognized that "[c]ertain alleged misrepresentations in a stock
offering are immaterial as a matter of law because it cannot be
said that any reasonable investor could consider them important
in light of adequate cautionary language set out in the same
offering."  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357

46

(2d Cir. 2002).  But the cautionary language must "directly relate to the risk that brought about the plaintiffs' loss." Id. at 359.  Moreover, it is well established that this principle, known as the "bespeaks caution" doctrine, "applies only to statements that are forward-looking," and does not limit a defendant's liability for statements whose falsity "was ascertainable when [they] were made."  Iowa Public Employees' Retirement System v. MF Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010).  Of course, the line between forward-looking statements and those of present fact may be "hard to draw," id. at 143, but there can be little doubt that representations about the underwriting standards applied to an existing group of loans fall firmly on the side of ascertainable fact.

In any case, the three examples of cautionary language cited in JPMorgan's brief do nothing to qualify the Offering Materials' representations regarding underwriting standards. They include:

- A statement that "changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner."

- A disclosure that "originators . . . do not determine whether mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac."

- A statement that, "as a result [of stated] underwriting guidelines, the mortgage loans in the

47

> mortgage pool are likely to experience rates of
> delinquency, foreclosure and bankruptcy that . . . may
> be substantially higher[] than those experienced by
> mortgage loans underwritten in a more traditional
> manner."

The second statement is irrelevant to the plaintiff's claims,

which concern whether the Supporting Loans complied with

underwriting guidelines set out in the Offering Documents, not

whether those loans would be suitable for purchase directly by

the GSEs.  The other two statements address potential

assumptions regarding the future performance of the loans but

say nothing about whether, as an historical matter, they were

underwritten in accordance with guidelines.

A jury may ultimately conclude that the GSEs should have

known better than to rely on the defendants' representations

regarding the characteristics of the Supporting Loans.  But this

motion to dismiss does not permit such a finding as a matter of

law.

C.  Allegations Regarding Loss Causation

JPMorgan also argues that the fraud allegations fail for

the independent reason that FHFA has failed adequately to plead

loss causation.  As defendants note, in order to recover on its

fraud claims at trial, FHFA must prove that misrepresentations

by the defendants "directly caused the loss about which [it]

complains."  Laub v. Faessel, 745 N.Y.S.2d 534, 536 (App. Div.

1st Dep't 2002).  "A fraudulent misrepresentation is a legal
cause of a pecuniary loss resulting from action or inaction in
reliance upon it if, but only if, the loss might reasonably be
expected to result from the reliance."  <u>Stutman v. Chemical
Bank</u>, 731 N.E.2d 608, 612 (N.Y. 2000).

The Amended Complaint alleges, <u>inter alia</u>, that

> [t]he false statements and omissions of material facts
> in the Registration Statements, including the
> Prospectuses and Prospectus Supplements, directly
> caused Fannie Mae and Freddie Mac to suffer billions
> of dollars in damages, including without limitation
> depreciation in the value of the [GSE] Certificates.
> The mortgage loans underlying the GSE Certificates
> experienced defaults and delinquencies at a much
> higher rate than they would have had the loan
> originators adhered to the underwriting guidelines set
> forth in the Registration Statements, and the payments
> to the trusts were therefore much lower than they
> would have been had the loans been underwritten as
> described in the Registration Statements.

For the purposes of this motion, the defendants do not
dispute that, under normal economic conditions, the discovery of
misrepresentations of the type alleged by FHFA could result in a
significant decline in the value of the GSE Certificates.
Rather, they maintain that "FHFA has pled no facts that if
proven would show" that the losses the GSEs actually sustained
"were attributable to fraud, rather than the systemic and
market-wide decline in the housing market."

Like their attempt to challenge the plaintiff's reasonable-
reliance allegations, this argument by the defendants turns

impermissibly on factual matter that is not encompassed within the pleadings.  <u>Taylor</u>, 313 F.3d at 776.  Moreover, although the Second Circuit has recognized in the analogous context of securities fraud claims under the Exchange Act that an intervening economic event can break the chain of causation between a defendant's misrepresentations and the damages that the plaintiff claims she suffered, that court has also emphasized that "such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  <u>Emergent Capital</u>, 343 F.3d at 197.[18]

---

[18] As the plaintiff notes, defendants' argument, made in a footnote, that the plaintiff must plead the existence of a liquid secondary market in order to allege a decline in value of the securities relies on district court precedent that has now been overturned by the Second Circuit.  <u>See</u> <u>NECA-IBEW Health & Welfare Fund</u>, 693 F.3d at 167 ("The value of a security is not unascertainable simply because it trades in an illiquid market and therefore has no 'actual market price.'").  The logic of the Second Circuit's decision, which concerned the Securities Act, is equally applicable to FHFA's fraud and Blue Sky claims.

In another footnote, JPMorgan argues that FHFA's demands for rescission and punitive damages are improper.  These arguments are fully briefed by the parties in <u>FHFA v. Merrill Lynch & Co., Inc., et al.</u>, 11 Civ. 6202 (DLC).  As it is well established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," <u>Tolbert v. Queens Coll.</u>, 242 F.3d 58, 75 (2d Cir. 2001) (citation omitted), the Court will not address them here.

JPMorgan also uses the margin of its brief to challenge the adequacy of the plaintiff's pleading with respect to credit

III.  Statute of Limitations

Next, the defendants revive a claim that this Court rejected in UBS I: that certain of FHFA's claims are barred by the one-year statute of limitations set out in Section 13 of the Securities Act.  Section 13 provides, in relevant part:

> No action shall be maintained to enforce any liability created under section 77k or 77 l (a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . .

15 U.S.C. § 77m.  UBS I held that an untrue statement or omission is "discovered" for the purposes of Section 13 at such time as a "reasonably diligent plaintiff" would have "sufficient information about a given misstatement or omission to adequately plead it in a complaint."  858 F. Supp. 2d at 320.  Reviewing the allegations in UBS I in light of this holding, the Court concluded that

> [w]hatever questions the GSEs might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have "discovered" that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies . . . .

---

ratings as a distinct category of misstatement and control-person liability.  Again, these arguments are not sufficiently elaborated, though JPMorgan remains free to raise them at summary judgment.

Id. at 322.  Because the first downgrades of Certificates
purchased by the GSEs from UBS occurred on December 20, 2007,
for Freddie Mac, and April 4, 2008, for Fannie Mae, the Court
reasoned that the GSEs' claims were "open in September 2008 when
FHFA's conservatorship began," making them timely under Section
13 and the Housing and Economic Recovery Act's extender
provision.  Id.

Although UBS I undisputedly adopted the downgrade of the
GSE Certificates as the triggering event for Section 13's one-
year limitations period, JPMorgan argues in this case that the
GSEs were "on notice" of the defects in the Offering Documents
as early as August 2007, when Moody's downgraded the credit
ratings of certain certificates that were subordinate to those
purchased by Fannie and Freddie.  JPMorgan's argument that these
downgrades preclude FHFA from pleading timely Securities Act
claims fails for at least three reasons.  First, the argument,
like several others already discussed, relies on information
that is not alleged in the Amended Complaint.  Second, as UBS I
recognized, under controlling Supreme Court precedent,

> the relevant question in assessing the timeliness of
> these claims is not when the GSEs were put "on notice"
> of the potential that the prospectuses included
> material misstatements or omissions, but rather when
> they, or a reasonably diligent plaintiff in their
> position, could have "discovered" that this was so
> with sufficient particularity to plead a Securities
> Act claim that would survive a motion to dismiss.

Id. at 320.

Third, as JPMorgan's own statements elsewhere in its brief reveal, the argument is logically flawed.  The securitizations at issue here were largely supported by relatively high-risk, subprime loans -- a fact that JPMorgan emphasizes repeatedly in challenging the adequacy of the plaintiff's allegations with respect to reliance.  Given the volatility of the supporting assets, it is unsurprising that, as Moody's remarked in downgrading the subordinate certificates, certain of the loans included in these securitizations defaulted "at a rate materially higher than original expectations."  In order to guard against the possibility that such market fluctuations could wipe out their investments, the GSEs paid a premium for certificates that were backed by subordinated certificates -- including the very certificates cited by JPMorgan -- that would suffer losses first in the event the underlying mortgages became delinquent or defaulted.[19]  As a result of this subordinated structure, the GSE Certificates were rated AAA by the ratings agencies, meaning they were the safest category of investment.  As it was the purpose of the junior tranches to absorb losses

---

[19] In many cases, these subordinated certificates absorbed losses not only from the Supporting Loan Groups, but also from other groups of loans in the securitization.

due to downturns in the housing market or in the economy more
generally, there is little, if any reason to believe that the
downgrade of those tranches should have led the GSEs to discover
that the underlying mortgages were not simply risky, but so
poorly underwritten as to put at risk even the most senior
certificates.

IV.  JPMorgan as Successor-in-Interest to WaMu Bank

Next, JPMorgan argues that FHFA's claims against it as
successor-in-interest to WaMu Bank are barred by the
administrative exhaustion requirements of FIRREA.  On September
25, 2008, the United States Office of Thrift Supervision, acting
pursuant to FIRREA, closed Washington Mutual Bank and placed it
into the receivership of the Federal Deposit Insurance
Corporation ("FDIC").  That same day, the FDIC signed a Purchase
and Assumption Agreement ("PAA") with JPMorgan in which JPMorgan
agreed to "purchase substantially all of the assets and assume
all deposits and substantially all other liabilities of" WaMu
Bank.  The purchase included "all subsidiaries, joint ventures,
partnerships, and any and all other business combinations or
arrangements, whether active, inactive, dissolved or terminated"
of WaMu Bank.  The only liabilities expressly disclaimed by
JPMorgan were,

    any liability associated with borrower claims for
    payment of or liability to any borrower for monetary

> relief, or that provide for any other form of relief
> to any borrower . . . related in any way to any loan
> or commitment to lend made by the Failed Bank prior to
> failure, or to any loan made by a third party in
> connection with a loan which is or was held by the
> Failed Bank, or otherwise arising in connection with
> the Failed Bank's lending or loan purchase activities.

Among other things, FIRREA establishes administrative procedures for bringing claims against institutions for which the FDIC is acting as receiver.  See 12 U.S.C. § 1821(d)(3)-(13).  "[I]n any case involving the liquidation or winding up of the affairs of a closed depository institution," the FDIC must give notice to the failed bank's creditors to file a claim with the Commission.  Id. § 1821(d)(3)(b).  The Commission is authorized to process filed claims, disallowing them or allowing and paying them, as appropriate.  Id. § 1821(d)(5),(10).  If the FDIC disallows a claim, the claimant can pursue an administrative appeal followed by a petition for review in the Court of Appeal or commence an original action in the District Court.  Id. § 1821(d)(6)-(7).  Subject to this exception, FIRREA deprives courts -- both federal and state -- of jurisdiction to hear

> (i) any claim or action for payment from, or any
> action seeking a determination of rights with respect
> to, the assets of any depository institution for
> which the Corporation has been appointed receiver,
> including assets which the Corporation may acquire
> from itself as such receiver; or

>(ii) any claim relating to any act or omission of
>such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).

The second prong of FIRREA's jurisdiction-stripping provision is drafted in strikingly broad terms and could, on first blush, be construed to bar any lawsuit that is in any way related to an "act or omission" of a failed bank or the FDIC. The Second Circuit has recognized, however, that "[t]his provision is not an isolated edict, but is part of FIRREA's statutory scheme, which was intended to force plaintiffs with claims against failed depository institutions to exhaust administrative remedies before coming to federal court." Bank of New York v. First Millennium, Inc., 607 F.3d 905, 921 (2d Cir. 2010). Thus, following two other Courts of Appeals, the court has held that, as used in FIRREA's jurisdiction-stripping provision, the word "claim" is a term-of-art and must be construed to mean "only claims that could be brought under the administrative procedures of § 1821(d), not any claim at all involving the FDIC" or, by implication, the failed bank. Id.

JPMorgan does not directly contest the Amended Complaint's detailed allegations that it has assumed WaMu Bank's liabilities with respect to the securitizations at issue here. Indeed, as the plaintiff points out, JPMorgan itself has publicly referenced its liability for "repurchase and/or indemnity

obligations arising in connection with sale and securitization of loans" by, among others, WaMu.  The FDIC has likewise opined that "the liabilities and obligations" arising from WaMu's sale of mortgage-backed securities "were assumed in their entirety by JPMC [(JPMorgan Chase)] under the P&A Agreement, thereby extinguishing any potential liability by FDIC Receiver."

Thus, for the purposes of this motion, there is no dispute that JPMorgan is a proper defendant with respect to FHFA's WaMu-related claims.  In insisting that FHFA was required to exhaust FIRREA's administrative procedures before filing suit, however, the JPMorgan defendants have failed to explain how the Agency's claims against them "could be brought" through that procedure. Indeed, as FIRREA's judicial review provision suggests, the administrative procedures were designed to permit a claimant to "seek[] a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver."[20]  But the assets -- and liabilities -- at issue here have passed, by operation of the PAA, to JPMorgan,

---

[20] See also Freeman v. FDIC, 56 F.3d 1394, 1400 (D.C. Cir. 1995) ("The effect of these provisions, read together, is to require anyone bringing a claim against or 'seeking a determination of rights with respect to' the assets of a failed bank held by the FDIC as receiver to first exhaust administrative remedies by filing an administrative claim under the FDIC's administrative claims process.") (emphasis supplied).

and FIRREA's claims procedure includes no provision for impleading the purchaser of a failed bank's assets and liabilities.  Thus, the claims that FHFA asserts here could not be brought under the administrative procedures of § 1821(d), making FIRREA's exhaustion requirement inapplicable.  Bank of New York, 607 F.3d at 921.

Village of Oakwood v. State Bank and Trust Co., 539 F.3d 373 (6th Cir. 2008), cited by JPMorgan in support of its exhaustion argument, is not to the contrary.  In that case, the Sixth Circuit concluded that FIRREA's exhaustion requirement applied to a suit by depositors of a failed bank to recover the value of their uninsured deposits from a successor institution (the "assuming bank").  As the court's factual recitation makes clear, however, the assuming bank had not agreed to purchase the liabilities at issue, and the plaintiffs had already made claims related to those same liabilities through FIRREA's administrative-claims procedure.  Indeed, although the plaintiffs named only the assuming bank in their complaint, their primary theory was that the defendant had aided and abetted a breach of fiduciary duty by the FDIC.  Id. at 376; cf. Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1144 (D.C. Cir. 2011)(interpreting Village of Oakwood to hold that "[w]here a claim is functionally, albeit not formally, against a depository

58

institution for which the FDIC is receiver, it is a 'claim'
within the meaning of FIRREA's administrative claims process.").
Defendants also rely on <u>Benson v. JPMorgan Chase Bank, N.A.</u>, 673
F.3d 1207, 1208-09 (9th Cir. 2012), which holds that FIRREA's
exhaustion requirement applies to claims asserted against an
assuming bank any time the claim is based on the conduct of the
failed institution.  But <u>Benson</u> hinges on the broad
interpretation of 12 U.S.C. § 1821(d)(13)(D) that was
specifically rejected by the Second Circuit in <u>Bank of New York</u>.
<u>See</u> 607 F.3d at 921.  Because, in this Circuit, "only claims
that could be brought under the administrative procedures of §
1821(d)" are subject to FIRREA's exhaustion requirement, <u>id.</u>,
FHFA's WaMu-related claims are properly here.

CONCLUSION

The defendants' September 7 motions to dismiss are granted with respect to:

- Plaintiff's Virginia Securities Act claims against the Other Underwriter Defendants;

- Plaintiff's claims of owner-occupancy and LTV-ratio fraud relating to the securities for which JPMorgan served as lead underwriter;

- And plaintiff's claims of owner-occupancy fraud relating to the securities for which WaMu or Long Beach served as sponsor, depositor, or lead underwriter.

The motions to dismiss are denied in all other respects.


SO ORDERED:

Dated:     New York, New York
           November 5, 2012


                                   _____
                                            DENISE COTE
                                   United States District Judge


60